# EXHIBIT 2

JUDGE WOOD **13 CIV 6929**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW PEARLMAN, on behalf of himself
and all Others Similarly Situated,
                                   Plaintiff,

                v.

LIGHTINTHEBOX HOLDING CO., LTD., QUI
(ALAN) GUO and XHENG (RICHARD) HUE,,

                Defendants,

Civil Action No.:

COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

JURY TRIAL DEMANDED

Plaintiff Matthew Pearlman, by his attorneys and on behalf of himself and the

class he seeks to represent, makes the following allegations against defendants

LightInTheBox Holding Co., LTD., ("LHC" or the "Company"), Qui Guo, and Xheng

Hue (collectively, "Defendants"):

        1.      This is a federal securities class action pursuing remedies under the

Securities Exchange Act of 1934 (the "Exchange Act") on behalf of persons or entities

that purchased LHC securities between its initial public offering on June 6, 2013, and

August 19, 2013, inclusive (the "Class Period").

        2.      LHC is a global online retail company that sells directly to consumers via

the internet. The Company's American Depositary Shares ("ADS"), which represent two

shares of the Company's ordinary stock, trade on the New York Stock Exchange under

the ticker symbol "LITB." LHC began trading following its initial public offering

("IPO") on June 6, 2013.

729497

3.      LHC imploded on August 19, 2013, following the Company's announcement of its second quarter financial results for the quarter ended June 30, 2013, lass than one month after the Company's IPO.  The Company failed to meet market expectations of $75.8 million in revenue and earnings of $0.06 per share, as LHC could only manage $72.2 million in revenue and $0.05 earnings per share.  The Company's profitability suffered because its revenue growth of 52.6% could not offset the Company's 57% increase in operational costs.  Additionally, the Company forecasted revenues of just $68 million to $70 million for the third quarter 2013, whereas analysts were expecting revenue guidance of approximately $75.8 million.  The primary cause for the Company's poor results was that the sales of wedding and prom dresses were much weaker during the second quarter 2013 than Defendants had represented in the Registration Statement and during the road show.

4.      On this news the Company's ADS, which traded as high as $23.38 per share intraday trading during the Class Period, collapsed approximately 40% from its close on August 19, 2013 to close at $11.58 per share on August 20, 2013.

5.      As set forth below, Defendants materially overstated LHC's prospects and growth potential and materially mislead the investing public by issuing false and misleading statements and omitting material facts necessary to make Defendants' statements not false and misleading.

6.      Plaintiff and other similarly situated Class members purchased LHC's ADS at artificially inflated prices during the Class Period and suffered damages as a result.

2

## JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the 1934 Act.

9. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) as the Company's agent of service of process is headquartered in this District, the Company's ADS trades on the New York Stock Exchange, the underwriters that conducted the IPO of the Company's securities did so within this Distrcit and the alleged misconduct was transacted and emanated from this District.

10. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including the mail, the internet, telephone communications and the facilities of national securities exchanges.

## PARTIES

11. Plaintiff Matthew Pearlman purchased LHC ADS during the Class Period, as set forth in the certification attached as Exhibit A, and has been damaged thereby.

12. Defendant LHC is organized under the laws of the Cayman Islands and headquartered in Beijing, China. LHC is a global online retail company that sells directly to consumers via the internet. LHC offers products in three main categories: (1) apparel; (2) small accessories and gadgets; and (3) home and garden. The Company completed an IPO for its ADS on June 6, 2013 and its ADS trade on the NYSE, an efficient market, under the ticker symbol "LITB".

729497

13.     Defendant Quji (Alan) Guo ("Guo") is, and was throughout all relevant times, LHC's Chief Executive Officer ("CEO").

14.     Defendant Xheng (Richard) Hue ("Hue") is, and was throughout all relevant times, LHC's Chief Financial Officer ("CFO").

15.     Defendants referenced in ¶¶ 13-14 are referred to herein as the Individual Defendants.  According to the prospectus used for the IPO of the Company's ADS, LHC and the Individual Defendants' agent for the service of process in the United States is Law Debenture Corporate Services Inc., 400 Madison Avenue, 4th Floor, New York, NY 10017.

16.     The Individual Defendants were at all relevant times during the Class Period controlling persons of LHC within the meaning of Section 20(a) of the Exchange Act.  Because of the Individual Defendants' positions with the Company, they had access to undisclosed information about its assets, and present and future business prospects through, among other means, access to internal corporate documents.

17.     The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company and were directly involved in day-to-day operations as alleged herein.  The Individual Defendants made affirmative misrepresentations, as described herein, and were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein (including SEC filings, press releases and other publications), were aware of and/or recklessly disregarded that materially false or misleading statements were being issued regarding the Company, and nonetheless approved or ratified these statements in violation of the federal securities laws.

4

18.    As officers and controlling persons of a publicly held company whose ADS was, and is, registered with the SEC, traded on the New York Stock Exchange, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and future prospects, and to correct any previously-issued statements that had become materially misleading or untrue so that the market price of the Company's publicly-traded securities would be based upon truthful, complete and accurate information.    The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons or entities who purchased LHC ADS during the Class Period and who were damaged thereby (the "Class").    Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

20.    The members of the Class are so numerous that joinder of all members is impracticable.    Throughout the Class Period, the Company's ADS were actively traded on the New York Stock Exchange.    While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by LHC, its transfer agent, or Bank of New York Mellon, which was

5

729497

appointed as the depositary bank for LHC's ADS program, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

22.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of LHC; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

24.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

729497

the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

25.    On June 6, 2013, LHC and its senior executives assisted by investment banks Credit Suisse (USA) LLC and Stifel, Nicolaus & Company, Incorporated, completed the IPO.  The Company sold more than 9.5 million ADS at $9.50 per share and raised $90.7 million in gross proceeds.  Prior to the IPO, the Individual Defendants partook in an intense, multi-week roadshow in an attempt to market the offering.  LHC issued and sold the first 8.3 million shares, along with another 192,368 shares sold for the underwriters' overallotment.  Defendant Guo and other LHC directors and executives sold another 1,052,632 shares for the underwriters' overallotment.

26.    The registration statement and the associated prospectus used to conduct the IPO (collectively, the "Registration Statement"), contained several material misstatements and omitted material information, including, in pertinent part, the following:

1.    "We believe that by offering more variety and personalization we will be able to create and capture new consumer demand."  This information was false and misleading because at the time of the IPO, which was more than two-thirds through the Company's second quarter 2013, that soft demand in the Company's apparel division was causing LHC's overall second quarter 2013 sales growth to decline.  Specifically, the Company's apparel division was hurt by weak demand in the area of wedding and prom dresses

7

729497

and such was known to the Defendants at the time the statements were made.

2.  "We have developed a large global customer base since we launched our first website," "[t]he number of our customers increased approximately 0.5 million in 2010 to approximately 2.5 million in 2012,"and "[t]he number of our customers was approximately 1.1 million in the three months ended March 31, 2013."  This information was false and misleading because Defendants knew that most of LHC's customers were to persons or entities that were one-time customers and had little chance for repeat business.

3.  "We expect to continue to focus on the growth in sales of apparel and expect that sales of apparel will continue to contribute significantly to our total net revenues in the near future."  This information was false and misleading because Defendants knew that weak demand for wedding and prom dresses was adversely affecting the Company's sales revenues in its apparel division and decreasing its overall sales growth.

4.  "We expect our net revenues to grow in the future as we continue to introduce new products and deepen our penetration of various geographic markets around the world" and "expand our customer base and increase sales to each customer to drive our growth." This information was false and misleading because Defendants

8

729497

already knew that demand for its products was weak and that sales revenue was being driven down as a result.

5. "[W]e expect our selling and marketing expenses as a percentage of our net revenues to continue to decrease in the long term as we achieve economies of scale and utilize our selling and marketing channels more efficiently," and "[w]e expect our general and administrative expenses as a percentage of our net revenues to decrease in the future as we achieve economies of scale." This information was false and misleading because Defendants already knew that the Company's costs had grown disproportionately compared to revenue and sales and this would result in reduction in profit.

6. "Our product categories, such as apparel, small accessories and gadgets, and home and garden, target large global markets with strong consumer demand." This information was false and misleading because Defendants already knew that demand for the products in its apparel division had weakened and would result in weaker revenue growth in the second quarter 2013.

27. During the Company's IPO roadshow, Defendants expounded about the Company's prospects and issued a 64% revenue growth target in 2013 to analysts. Statements concerning such a revenue growth target were false and misleading when made as the Defendants already knew that the Company's revenue growth was slowing due to weak demand in its apparel division during the second quarter 2013. These

9

statements were made solely for the purpose to ignite a market for the Company's IPO, which was slow to form due to reservations the investing public held for Chinese companies.

28.     Indeed, such statements had the desired effect, as the price of the LHC's ADS spiked on the strong statements contained in the Registration Statement and made during the roadshow.  The Company's ADS traded 30% above the IPO price in the first day of open market trading and closed at $11.61 per share on the close of its first trading day.

29.     On June 6, 2013, *The Wall Street Journal's Money Beat* issued a report entitled "First Chinese IPO of 2013 Delivers Decent Pop."  The article highlighted the efforts of Defendant Guo to solicit potential investors during a two-week roadshow.  The article includes the following statements from Defendant Guo, in pertinent part:

> "A lot of one-on-one, face-to-face meetings gave us the chance to clarify questions they may have with the company," he said. Part of what was discussed was the company's governance practices and accounting procedures — which has been a problem for some Chinese firms in the past.

> "We do get questions around corporate governance. As a publicly traded company, we need to prove to investors with our performance, and we also need to be very strict and keep on improving on all aspects of corporate governance," he said. "We need to keep open and transparent communications channels with investors."

> "In the long run, China, with a lot of innovative, entrepreneurial internet companies... will be a good match to the U.S. public stock markets that understand the internet as an industry," he said

> As for other online retail companies looking to list, Mr. Guo said: "I tend to echo [Amazon CEO] Jeff Bezos, that this is only day one for e-commerce. There's still going to be a journey as a lot more consumers come to buy more products online, and buy more frequently online."

10

729497

30.     Despite these statements concerning the Company's corporate governance practices and open and transparent communications with investors, Defendant Guo knew that the information he was providing investors in the Registration Statement and on the roadshows prior to the IPO was materially false and misleading.  Defendants were not being open and transparent with the investing public about the Company's prospects and actual profitability.  Additionally, by promoting the Company's transparency and corporate governance efforts, Defendant Guo was also misrepresenting the level of transparency to that point and the effectiveness of its internal controls, which would later be exposed with the announcement of the Company's second quarter 2013 financial results.

31.     On July 22, 2013, one of the IPO underwriters, Credit Suisse published a research report that initiated its coverage of LHC and set an initial $16.50 per ADS price target on the Company.  Credit Suisse stated that the Company's ADS, trading near the price target, were "fairly valued."  Based on Defendants' representations, Credit Suisse stated that it expected that the Company's "non-GAAP net earnings to turn positive to US$14.7 mn in 2013E and grow 132% to US$34.1 mn in 2014E."  Additionally, Credit Suisse pontificated about LHC's high margins, profitability and its senior management's business acumen while specifically referencing conversations with the Company's management.  Those statements are included below:

> Management sees LITB as a company which connects the small-size (or even mini-size) manufacturers in China with global customers overseas. Therefore, it has strong bargaining power when negotiating with its suppliers. At the same time, it has a price advantage compared with the offline market overseas because it sources from China and sells mainly to overseas customers. It retails a wide variety of products including customized apparel, home and garden

11

products, accessories and gadgets, electronics, etc.

We interviewed LITB's key management one by one and have reached a conclusion that they have a clear understanding of where they are and where they want to be in a few years' time. We believe they are committed to the business and that was a main driver that the company could deliver solid business execution. Their past experience in related industries and positions has helped.

We expect LITB to achieve 63% YoY revenue growth in 2013E and 57% in 2014E. Our revenue forecast is mainly driven by the increase in the number of orders.

32. Moreover, the Credit Suisse report also stated it "expect[ed] admin expenses to come down gradually alongside improving operating leverage and economy of scale in the next few years, as shown in Figure 48," thus increasing its profit estimates for LHC. Credit Suisse expected the Company's Non-GAAP to improve significantly in 2013 to 5.3% and its non-GAAP earnings to turn positive to US $14.7 million in 2013. Further, Credit Suisse expects diluted earnings per share US $0.40 in 2013.

33. As an underwriter of the IPO, Credit Suisse had greater access to LHC, the Individual Defendants and other members of senior management. The statements and projections made in the Credit Suisse report relied upon not only the publically available information, but the representations of management throughout the Company's IPO process and roadshow. Credit Suisse's report reflects the statements made by management, which investors ultimately relied on in purchasing the Company's ADS.

34. Unfortunately, the statements reiterated in Credit Suisse's report would prove to be wrong. The Company's growth was ultimately hindered by soft demand and increasing costs, which were known by Defendants, but undisclosed to the investing public. The senior management's failure or unwillingness to disclose the Company's weaknesses is evidence of a weak understanding of their corporate duties and

12

729497

responsibilities. The Individual Defendants' and senior management's business acumen is further brought into question by the blatant, contrary statements issued prior to the Company's actual, disappointing results. It is one thing to not disclose corrective disclosures, it is another to make statement blatantly contradictory to the actual, known results.

35.    On August 6, 2013, LHC issued a press release announcing that the Company would release its second quarter 2013 financial results at the close of the market on August 19, 2013. Defendants did not warn the market at this time of any change in expectations or weakness of LHC, which would contribute to disappointing financial results.

36.    The Company's ADS price continued to climb on the strength of Defendants' strong Class Period statements. These statements were analyzed, reiterated and emphasized by the financial analysts creating further positive buzz around the Company's ADS.

37.    For example, on August 6, 2013, *Investors Business Daily* pointed out that the Company's stock price was up 10% during intraday trading and explained that the Company is expected to turn a profit of $0.36 per share.

38.    On that same day, Bloomberg noted that although the Bloomberg China-U.S. Equity Index, which tracks most Chinese shares traded in the U.S., was down, LHC jumped on the news of its earnings announcement. Bloomberg stated that it surveyed three analysts regarding their expectations for LHC and stated that the consensus was an expected $0.06 earnings per share compared with $0.02 per share in the first quarter.

13

729497

39. On August 12, 2013, financial blogger Rick Munarriz published an article entitled "Is This Online Retailer The New Amazon.com?," which reiterated Defendants' exceedingly positive statements. The article specifically highlighted the Company's revenue growth year-over-year and that the expectation was that $325 million in net sales was within reach in 2013 and that analysts expected earnings of $0.36 per share for 2013 and $0.68 per share in 2014.

40. Instead, the true facts were known only by Defendants and concealed from the investing public and the Class during the Class Period. The true facts were:

1. The LHC's sales growth rate in the second quarter of 2013 was only about half of the Company's growth rate in the first quarter of 2013.

2. The Company was suffering weak demand in one of its key divisions – apparel that significantly affected its revenue growth.

3. LHC's costs were increasing at a higher rate than its revenues during the second quarter of 2013.

4. The Company's corporate governance and internal controls for financial reporting were either inadequate or knowingly disregarded.

5. As a result of these factors, the Company was not on pace to achieve the results that Defendants had led the market to expect.

41. On August 19. 2013, following the market's close, the Company issued a press release announcing its second quarter 2013 financial results for the quarter ended June 30, 2013, which was less than one month after the Company's IPO. The Company

14

reported disappointing financial results with revenues of just $72.2 million and earnings per share of $0.05 compared with estimated revenue of $75.8 million and earnings per share of $0.06. Profitability was harmed by increasing costs as operating costs rose 57% and was no offset by revenue growth of only 52.6%. The Company's rising operational costs were the result of overhead costs, fulfillment expenses and the growth of sales and marketing costs, which were all readily identifiable.

42.    Further, the Company forecasted revenues of just $68 million to $70 million for the third quarter compared with analyst estimates of $75.8 million. The Company's estimates were well below $79 million guidance projected by analysts surveyed by *Thomson Reuters*. As explained by Erick Brock, a portfolio manager at Clough Capital Partners, "They missed the top line and there was a quarter-to-quarter decline which people weren't expecting." The market was not expecting the decline because of the statement issued by Defendants in the Registration Statement and during the roadshow.

43.    During the earnings conference call, Defendant Guo conceded that the demand for the Company's wedding and prom dresses was much weaker than represented in the Registration Statement and in comments made during the roadshow. Specifically, Defendant Guo admitted during the conference call that LHC had "concluded that [it] placed too much emphasis on higher-end (apparel) and not enough focus on lower-end products that traditionally sell very well."

44.    On August 20, 2013, *Barron's* published a report concerning LHC's disappointing earnings and guidance. The *Barron's* article explains that the Company's prospectus represented that in the first quarter of 2013, LHC's revenue grew 100%,

15

however, that rate substantially slowed in the second quarter 2013 falling to 52.7% and that according to the guidance, the revenue growth rate would slow even further in the third quarter 2013 to 33-37%. According to the article, in order to reach the Company's stated 64% revenue growth goal for 2013, as represented during the roadshow, the Company would have to achieve 90% year-on-year growth in the fourth quarter.

45.    On the news of LHC's poor results and dwindling expectations, the Company's ADS, which had traded as high as $23.98 during the Class Period, collapsed approximately 40% from its August 19, 2013, close of $19.27 to a close of $11.58 on August 20, 2013. The Company lost over $100 million in market capitalization from the Company's Class Period high in a single day.

## UNDISCLOSED MATERIAL, ADVERSE FACTS

46.    The market for LHC common stock was open, well-developed, and efficient at all relevant times.

47.    As a result of these materially false and misleading statements and failures to disclose, the Company's ADS traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired LHC ADS relying upon the integrity of the market price of the Company's ADS and market information relating to LHC, and have been damaged thereby.

48.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's ADS, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading because they failed to disclose material

16

729497

adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

49.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the stock purchases by Plaintiff and other members of the Class.

50.    Each Defendant is liable for making false statements, or failing to disclose adverse facts about LHC.   Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of the Company's ADS because they (a) deceived the investing public regarding the Company's prospects and business; (b) artificially inflated the prices of LHC ADS; and (c) caused Plaintiff and other members of the Class to purchase LHC ADS at inflated prices.

## SCIENTER ALLEGATIONS

51.    As alleged herein, Defendants acted with scienter, in that they knew the Company's public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

52.    As alleged herein, by virtue of their receipt of information reflecting the true facts regarding LHC and its business practices, their control over or receipt of the Company's materially false and misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning

17

729497

LHC, Defendants were active and culpable participants in the fraudulent scheme alleged herein.

53.    Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.

54.    The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## UNDER THE FRAUD-ON-THE-MARKET DOCTRINE

55.    At all relevant times, the market for LHC securities was efficient for the following reasons, among others:

a.    The Company's stock was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

b.    As a regulated issuer, LHC filed its Registration Statement with the SEC; and

c.    LHC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

56.    As a result of the foregoing, the market readily digested information regarding LHC from all publicly available sources and reflected such information in the Company's ADS price.  Under these circumstances, all purchasers of LHC securities

18

729497

during the Class Period suffered similar injuries through their purchases of LHC securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of LHC who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All
### Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, LHC and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding LHC's prospects, revenues and

19

729497

profitbaility.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

60.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon purchasers of the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.    Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of LHC, including information relating to the demand for its products, slowing revenue growth, increasing operational costs and the weaknesses in its internal controls for financial reporting.

63.    Defendants employed devices, schemes and artifices to defraud, while in possession of material, non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive investors about LHC's true value, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LHC, its future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly

20

729497

herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of LHC securities during the Class Period.

64.    Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives of the Company during the Class Period and members of the Company's management team; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company were privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading; and (iv) as alleged above, directly made material misstatements.

65.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. These material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing LHC's softening demand, slowing revenue growth, increasing operational costs, accounting practices, internal controls over financial reporting, financial condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' omissions and misstatements regarding the Company's business, accounting practices, internal controls, and future prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to

21

729497

obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

66.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of LHC's securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of LHC's publicly-traded securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was know to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired LHC securities during the Class Period at artificially high prices and were damaged thereby.

67.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth about the Company's business, accounting practices, internal controls and future prospects, which was not disclosed by Defendant, Plaintiff and other members of the Class would not have purchased or otherwise acquired their LHC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.    By virtue of the foregoing, LHC and the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

729497

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective transactions in the Company's common stock during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of LHC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

23

729497

73.     By virtue of their positions as controlling persons of LHC, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as lead plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as lead counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.     Such other and further relief as the Court may deem just and proper.

Dated: September 30, 2013

GAINEY McKENNA & EGLESTON

By: _Thomas J. McKenna_

24

729497

Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383


**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

By:

Gregory Mark Nespole
Patrick Donovan
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax:  (212) 545-4653

25

729497

## CERTIFICATION OF NAMED PLAINTIFF

I, __Matthew Pearlman__ ("Plaintiff") hereby retain Gainey McKenna & Egleston and such co-counsel as appropriate, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that: ·

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff reviewed a copy of the complaint and is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *LightInTheBox Holding Co., Ltd.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 250 | LITB | Buy | 9/19/13 | 14.50 |
| 500 | LITB | Buy | 8/16/13 | 20.00 |
| 250 | LITB | Buy | 8/15/13 | 19.29 |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

None.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __6__ day of September, 2013

_/s/ Matthew Pearlman_
Signature

__Matthew Pearlman__
Print Name (& Title if applicable)

__Mhpearlman@gmail.com__
E-mail

__1135 Rexford Dr. #205__
Address

__LA, CA 90035__
City, State, Zip

__310-800-0498__
Phone