**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  | x |  |
|---|---|---|
|  | : | Consolidated Civil Action No. |
|  | : | 1:21-cv-06360-AKH |
|  | : |  |
| IN RE OATLY GROUP AB SECURITIES | : | <u>CLASS ACTION</u> |
| LITIGATION | : |  |
|  | : | **CONSOLIDATED AMENDED** |
|  | : | **COMPLAINT FOR VIOLATION OF** |
|  | : | **THE FEDERAL SECURITIES LAWS** |
|  | : |  |
|  | : | <u>DEMAND FOR JURY TRIAL</u> |
|  | : |  |
|  | : |  |

---

|  | x |

## TABLE OF CONTENTS

SUMMARY OF THE ACTION ................................................................................ 1

**PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934** .............. 5

    I.      JURISDICTION AND VENUE ............................................................. 5

    II.     THE EXCHANGE ACT PARTIES ...................................................... 6

    III.    FRAUDULENT SCHEME AND COURSE OF BUSINESS ............................. 7

    IV.    SUBSTANTIVE ALLEGATIONS ....................................................... 7

    V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
           AND OMISSIONS DURING THE CLASS PERIOD ...................................... 12

         A.    Misstatements Regarding Demand for Oatly's Products ......................... 12

         B.    Misstatements Regarding Oatly's Environmental Practices .................... 21

         C.    Failure to Adequately Disclose Rising Costs of Key Ingredients and Their
             Almost Certain Materially Adverse Impact on Oatly's Post IPO Profitability
             and Margins .......................................................................... 22

    VI.    THE TRUTH BEGINS TO EMERGE .................................................. 28

    VII.   ADDITIONAL SCIENTER ALLEGATIONS ......................................... 36

    VIII.  LOSS CAUSATION AND ECONOMIC LOSS ...................................... 37

    IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE .............................. 39

    X.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .............................. 40

**PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933** ........................... 41

    XI.    JURISDICTION AND VENUE ......................................................... 42

    XII.   THE SECURITIES ACT PARTIES .................................................... 42

    XIII.  THE DEFECTIVE MAY 2021 OFFERING DOCUMENTS ........................... 45

         A.    The Offering Documents Materially Untrue, Misleading, and Incomplete
             Statements Regarding Oatly's Historical Revenues .............................. 46

         B.    The Offering Documents Materially Untrue, Misleading, and Incomplete
             Statements Regarding Product Demand ........................................... 48

i

C.    The Offering Documents Materially Untrue, Misleading, and Incomplete Statements Regarding Oatly's Environmental Practices ......................... 54

D.    The Offering Documents' Failure to Adequately Disclose Rising Costs of Key Ingredients and Their Almost Certain Materially Adverse Impact on Oatly's Post IPO Profitability and Margins .............................................. 55

XIV.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................... 60

XV.    CLASS ACTION ALLEGATIONS .................................................... 66

**PRAYER FOR RELIEF** ........................................................................ 69

**JURY DEMAND** .............................................................................. 70

Lead Plaintiff Mario Bello and additional plaintiffs Kai Jochims and Mark Hayden (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts; and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Oatly Group AB ("Oatly" or the "Company"), press releases and other announcements by the Company, and media reports about the Company. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This is a securities class action on behalf of a class (the "ADS Class") consisting of all purchasers of American Depositary Shares ("ADSs") of Oatly between May 20, 2021, and November 15, 2021 (the "Class Period"), including all those who purchased such shares directly in the Company's May 20, 2021 initial public offering of ADSs (the "May 2021 IPO"), seeking remedies under the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act") for materially false, misleading, and/or incomplete statements made (and related material omissions committed) during the Class Period. Plaintiffs also bring claims on behalf of all those who bought or sold options on Oatly ADSs during the Class Period, seeking remedies under the Securities Act only (the "Options Sub-Class" and, together with the ADS Class, the "Classes"). The Exchange Act claims are asserted against Oatly and Toni Petersson (its Chief Executive Officer ("CEO")) and Christian Hanke (its Chief Financial Officer ("CFO")) (collectively, the "Exchange Act Defendants"). The Securities Act claims, which are based on

materially untrue, misleading, and/or incomplete statements made (and related material omissions) contained in the Offering Documents (as defined below), are asserted against the "Securities Act Defendants," which consist of Oatly, CEO Petersson and CFO Hanke, as well as the additional Company directors who signed the Offering Documents.

2.      Oatly describes itself as the world's original and largest oatmilk company.  It is organized under the laws of Sweden.  Since the May 2021 IPO, its ADSs are listed and trade on the NASDAQ Global Market ("NASDAQ") under the ticker "OTLY."

3.      Oatly's initial public offering ("IPO") in the United States was held on or around May 20, 2021, in which Oatly offered and sold 64,688,000 ADS — and certain selling shareholders sold an additional 19,688,000 ADSs — to members of the ADS Class at a price of $17.00 per ADS.  Each ADS represents one Oatly ordinary share.  The IPO raised $1.4 billion for the Company, and over $335 million for the selling shareholders.  In connection with the May 2021 IPO, and repeatedly thereafter, Oatly claimed that "***[d]emand for Oatly products has grown at an incredible rate***" and that the "***global demand for Oatly products has significantly outpaced our supply.***"[1]  Such statements, however, were materially false and misleading.

4.      Two months after the IPO, on July 14, 2021, Spruce Point Capital Management ("Spruce Point") issued a report entitled, "Sour on an Oat-lier Investment" (the "Spruce Point Report" or the "Report").  The Report brought to light a number of improprieties at Oatly, including inflated claims of growing customer demand in China and other markets, accounting irregularities, and undisclosed production problems arising out of spiking prices for key manufacturing inputs, among other issues.

---

[1]      All emphases in quoted materials are added.

5.      As these revelations hit the market, the price of Oatly ADSs fell 8.8% over two trading days, falling from its closing price of $21.13 on July 13, 2021, to close at $19.48 on July 14, on unusually high trading volume.

6.      Subsequently, on November 15, 2021, Oatly reported its third quarter ("3Q") financial results for the quarter that had ended September 30, 2021 (just 4½ months after the May 2021 IPO). Oatly's 3Q 2021 results included a reported *loss* of over $41 million and a dramatic 15% year-over-year decline in gross profit margins (which had fallen from 31.1% in the 3Q 2020 to just 26.2% in the 3Q 2021). Oatly's 3Q 2021 earnings announcements also effectively confirmed several key allegations from the Spruce Point Report, including disclosing for the first time that the Company's retail shelf space — *i.e.*, the amount of physical space on store shelves that retailers devote to a company's products — had *declined* in Europe in the months prior to the May 2021 IPO. As Oatly's CFO (Defendant Hanke) told investors before the market opened on November 15, the Company "*started 2021 with less shelf space than prior years*," and that "for 2021 we had to *scale back a distribution of our products for 12 countries in EMEA*."[2] Shelf space is a key indicator of retail demand for a company's products because stores purchase inventories of, and allocate physical retail space to, products that customers are most likely to buy. Thus, a decline in shelf space for a particular product or brand indicates declining consumer demand for that product or brand.

7.      In response, the price of Oatly ADSs suffered a staggering one-day decline of 20.81%, falling from a closing price of $11.82 on Friday, November 12, 2021, to close down at $9.36 on November 15, 2021, on unusually high trading volume.

---

[2]      "EMEA" refers collectively to "Europe, Middle East, and Africa," although the vast bulk of Oatly's "EMEA" results have always been attributable to Europe, which is the Company's core market.

8.      In addition, unbeknownst to investors, Oatly's shelf space in the United States had also declined prior to the IPO (and continued to decline until at least September 2021). Further confirming the diminishing demand for Oatly products, Plaintiffs have also learned that the Company's inventory of finished-but-as-yet-unsold goods increased over 215% after March 31, 2021 (the date of the last quarterly financial statements included in the May 2021 IPO), and that Oatly idled certain of its manufacturing facilities in Asia beginning in or around December 2021. In sum, throughout the Class Period, Oatly was materially overstating customer demand for its products and misleading investors about the Company's financial prospects.

9.      In addition to overstating customer demand, Oatly also overstated its sustainability practices in an effort to "greenwash" the Company so that it would appear more environmentally friendly than it actually was, and also failed to adequately disclose the extent to which the rising prices for key ingredients threatened to (and actually did) hurt the Company's bottom line.

10.      All told, during the Class Period, Oatly ADS's declined a staggering 45% from its IPO price of $17.00 per share (and 67% from its Class Period high of $28.73 on June 11, 2021) to close at only $9.36 on November 15, causing investors to lose hundreds of millions of dollars in less than six months.

11.      By contrast, Oatly reaped over $1.4 billion from the May 2021 IPO. Moreover, Defendant Petersson (Oatly's CEO) made $21.5 million and Defendant Hanke (Oatly's CFO) made another $2 million by selling Oatly shares in a private placement done in connection with the May 2021 IPO.

12.      Plaintiffs assert two separate sets of claims. Counts I and II, as set forth in Part One of this Complaint assert securities fraud claims under Section 10(b) and 20(a) of the Exchange Act. The Exchange Act claims are asserted on behalf of both the ADS Class and the Options Sub-

4

Class, and incorporate all allegations and inferences from the facts alleged that the Exchange Act Defendants made the materially false, misleading, and incomplete statements and omissions alleged herein with *scienter* (*i.e.*, intentionally or recklessly), in violation of Section 10(b) and Rule 10b-5 promulgated thereunder.  The Exchange Act claims also allege that the Exchange Act Defendants are also liable under Count II as control persons under Section 20(a).

13.    Counts III, IV, and V, set forth in Part Two of this Complaint, assert strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act based on the materially false, misleading, or incomplete Offering Documents (defined below) for the May 2021 IPO.  These Securities Act claims are asserted on behalf of only the ADS Class.  Plaintiffs specifically disclaim any allegations of fraud or fraudulent intent in the separately pleaded, non-fraud Securities Act claims asserted in Counts III, IV, and V, with the proviso that any challenged statements of opinion or belief made in the Offering Documents are alleged to have been actionable and materially inaccurate, misleading, or incomplete statements of opinion or belief as of the date of the IPO.

## PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934

### I.    JURISDICTION AND VENUE

14.    Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.

15.    Venue is proper here pursuant to §27 of the Exchange Act.  Oatly's ADSs are listed on the NASDAQ, which is located in this District, and many of the acts and transactions giving rise to the violations of law complained of occurred here.  Oatly maintains offices in the United States in this District.  The depositary of Oatly ADSs, JPMorgan Chase Bank, N.A., is also located in this District.

16.     In connection with the acts alleged in this Complaint, the Exchange Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## II.     THE EXCHANGE ACT PARTIES

17.     Lead Plaintiff Mario Bello purchased Oatly ADSs traceable to the May 2021 IPO as set forth in his lead plaintiff papers, and was damaged thereby.  (ECF. Nos. 13-3, 13-4).

18.     Additional plaintiff Kai Jochim purchased Oatly ADSs traceable to the May 2021 IPO as set forth in his July 23, 2021 Certification Pursuant to Federal Securities Laws and was damaged thereby.  (ECF. No. 31-1.)

19.     Additional plaintiff Mark D. Hayden purchased call options on Oatly ADSs during the Class Period, and was damaged thereby.  (ECF. No. 20-3.)  Plaintiff Hayden seeks to represent the Options Sub-Class for the purpose of this action.

20.     Defendant Oatly describes itself as the world's original and largest oatmilk company.  It is organized under the laws of Sweden and its headquarters are in Sweden.  Oatly is the registrant of its ADSs, which are listed and trade on the NASDAQ under the ticker OTLY.  Oatly maintains its U.S. offices at 220 E. 42nd Street, Suite 409A, New York, New York 10017.

21.     Defendant Toni Petersson ("Petersson") is, and at all relevant times was, the CEO of Oatly.  Petersson signed the Registration Statement and made numerous other statements at issue as alleged herein.

22.     Defendant Christian Hanke ("Hanke") is, and at all relevant times was, the CFO of Oatly.  Hanke signed the Registration Statement and made numerous other statements at issue as alleged herein.

23.    Defendants Petersson and Hanke (the "Individual Exchange Act Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Oatly's filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Exchange Act Defendants were provided with copies of the Company's reports and press releases alleged herein to be materially false, misleading, and incomplete prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Exchange Act Defendants knew that the adverse facts specified herein had not been disclosed to, but were being concealed from, the public, and that the statements at issue were materially false, misleading, and incomplete when made.  The Individual Exchange Act Defendants are liable for the materially false, misleading, and incomplete statements pleaded herein at ¶¶42-75.

## III.    FRAUDULENT SCHEME AND COURSE OF BUSINESS

24.    Defendants are liable for making materially false, misleading, and incomplete statements and failing to disclose materially adverse facts that they were obligated to disclose and that were known to them about Oatly.  Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of Oatly ADSs as it: (i) deceived the investing public regarding Oatly's prospects and business; (ii) artificially inflated the prices of Oatly ADSs; and (iii) caused Plaintiffs and other members of the Classes to purchase Oatly ADSs and trade options on Oatly ADSs at inflated prices.

## IV.    SUBSTANTIVE ALLEGATIONS

25.    Oatly was founded in 1994, and its current holding company was incorporated in accordance with Swedish law on October 5, 2016, under the name Goldcup 13678 AB.  On

December 21, 2016, Oatly changed its name to Havre Global AB and on March 1, 2021, it changed its name to Oatly Group AB.

26.    According to the prospectus for the May 2021 IPO (the "Prospectus"), Oatly was founded by Defendant Björn Öste and his brother, Rickard Öste, who were "on a mission to make the best possible form of milk for human beings and the planet." Allegedly, this "commitment to oats has resulted in core technical advancements that enabled [Oatly] to unlock the breadth of the dairy portfolio, including milks, ice cream, yogurt, cooking creams, spreads and on-the-go drinks." Six years after Oatly opened its doors, the Company "launched [its] first oatmilk product under the Oatly brand in 2001" and in "2006, [the Company] set up the first Oatly factory in Ladskrona, Sweden."

27.    Oatly claims that it first entered the U.S. market in 2017 by "targeting coffee's tastemakers, professional baristas and independent coffee shops," and that it then expanded into selling products through traditional retail channels such as grocery stores, convenience stores, and big-box retailers, like Target. The Company claims that in 2018 it "entered China, focusing again on penetrating specialty coffee and tea shops."

28.    Oatly's "home market" is Sweden. According to the Prospectus, Oatly's other key markets are the United Kingdom, Germany, the United States, and China.

29.    The core of the Company's manufacturing process is "oat base." According to the Prospectus, Oatly "developed proprietary oat base production technology that leverages patented enzymatic processes to turn oats into nutritional, great tasting liquid product." In this process, oats are cleaned, dehulled, and heated to groats, which then undergo an enzymatic processing to form the basis of oat base. During this process, rapeseed oil is added to the enzymatically processed oats. Subsequently, oat base is combined with other ingredients to create the different products

Oatly sells to its customers in a process referred to as "filling and mixing." In other words, oatmilk, oat ice cream, and so-called "oatgurt" all start with the same "oat base," much in the same way that traditional milk, ice cream, and yogurt all start with animal milk. Oats and rapeseed oil are crucial ingredients in all of Oatly's products.

30.     Oatly claims that it owns and manages the majority of its oat base manufacturing facilities. Oatly does not, however, own the majority of the facilities used for filling and mixing, *i.e.*, the plants necessary to turn oat base into finished consumer products, like oatmilk. The company utilizes three main supply models for filling and mixing: (i) co-packing (or "complete outsourcing"), (ii) hybrid manufacturing, and (iii) end-to-end self-manufacturing. In co-packing, Oatly transports the oat base through tanker trucks to third parties for filling and mixing. With respect to so-called "hybrid" manufacturing, Oatly transports oat base through pipelines from an Oatly-owned facility to a physically adjacent plant operated by a third-party, which conducts the filling and mixing. And, in end-to-end self-manufacturing, the production of oat base and the filling and mixing process both occur at a single, Oatly-owned facility. As a reasonable investor would expect, co-packing manufacturing should cost Oatly more than hybrid manufacturing, and hybrid manufacturing should cost more than end-to-end self-manufacturing.

31.     According to the Prospectus, "finished products" from the filling and mixing process are taken from either the third-party or the Oatly manufacturing facility (as applicable), to the Company's "fulfillment warehouses, where they will be distributed to [Oatly's] customers."

32.     According to the Prospectus, "[f]or the year ended December 31, 2020, approximately 52% of [Oatly's] products were produced through the co-packing and complete outsourcing model, 24% through hybrid model and 24% through . . . end-to-end manufacturing." By November 2021, the Company reported that in the financial quarter ending on September 30,

2021, 40% of its products were produced through co-packing, 38% were produced through hybrid manufacturing, and 22% were produced through end-to-end manufacturing.  Based on these numbers, Oatly's manufacturing costs should have decreased as the Company shifted to more profitable manufacturing methods.

33.     According to the Prospectus, the Company claims to have built its "factories and manufacturing facilities to be in close proximity to [Oatly's] customers as well as [the Company's] co-packers."  As of the May 2021 IPO, Oatly was operating hybrid manufacturing facilities in Millville, New Jersey, and Vlissingen, Netherlands.   The Company's only end-to-end manufacturing facility prior to the IPO was located in Ladskronna, Sweden.  During the Class Period, Oatly started at least some manufacturing at an end-to-end facility in Ogden, Utah, and a hybrid facility in Singapore.  The map below shows Oatly's existing and anticipated manufacturing facilities as of the May 2021 IPO:

**CURRENT OATLY FACILITIES & CAPEX PROJECTS**



34.     In the Prospectus and on multiple other occasions, the Company justified expanding its manufacturing capabilities by claiming, among other things, that "the greatest constraint on [Oatly's] growth has been production capacity" because "[h]istorically, global demand for Oatly products has significantly outpaced our supply."  Indeed, the Prospectus represented that Oatly would use the proceeds from its IPO primarily to increase production capacity, and to "leverage the significant demand for Oatly products in new and existing markets" to "Grow Distribution." As the Prospectus further represented, key to this strategy was "continu[ing] to build on industry-leading food retail performance *by growing velocity and expanding on-shelf presence with Oatly's full portfolio*," while adding that "[t]he food retail channel . . . has welcomed Oatly on shelves."  In other words, the Prospectus (and the Offering Documents) sold the May 2021 IPO to investors in large part based upon its representations of strong demand and "expanding" shelf space with retailers.

35.     The IPO was held on or around May 20, 2021.  In the IPO, Oatly sold 68,688,000 ADS — certain selling shareholders (including Defendant Öste) sold an additional 19,688,000 ADS — to members of the ADS Class at a price of $17.00 per share.  The IPO raised $1.4 billion for the Company.

36.     Each Oatly ADS represents one Oatly ordinary share.  An ADS holder is not a shareholder of the Company; rather, the rights of an ADS holder are provided in a deposit agreement between the Company, the depositary of the ADSs (JPMorgan Chase Bank, N.A.), and all holders and beneficial owners of the ADSs thereunder.  The depositary holds the ordinary shares that underlie the ADSs.  An ADS holder may surrender its ADSs to the depositary and withdraw the underlying ordinary shares pursuant to limitations set forth in the deposit agreement.

37.    In connection with the IPO, Oatly (i) filed a draft Form F-1 Registration Statement with the SEC on April 19, 2021; (ii) amended that Registration Statement on May 11 and May 17, 2021; and (iii) filed its final Prospectus Supplement, on May 17, 2021.  The final Registration Statement and Prospectus documents (including all materials incorporated by reference therein, and all "free-writing" prospectus materials, including the roadshow presentation materials referenced at ¶52, below) are collectively referred to herein as the "Offering Documents."  On May 19, 2021, the SEC issued a Notice of Effectiveness of the Registration Statement.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

38.    The Class Period starts on May 20, 2021, the first day Oatly began trading on the NASDAQ, after the Offering Documents became effective.

39.    The Offering Documents contained materially false, misleading, and incomplete statements about customer demand for Oatly's products, the Company's purported environmentally friendly business practices, and undisclosed production problems caused by the rapidly increasing costs of oat base's two key ingredients, oats and rapeseed oil.  As set out below, the Exchange Act Defendants repeated many of these misleading statements throughout the Class Period in press releases, investor presentations, and SEC filings, until the truth was fully revealed on November 15, 2021.

### A.    Misstatements Regarding Demand for Oatly's Products

40.    Even before the start of the Class Period and the IPO, Defendants repeatedly touted the supposed high demand for Oatly's products.  For example, as Oatly's Chief Marketing Officer, John Schoolcraft, stated on December 11, 2019:

> We launched in the U.S. and within nine months there was a national oat milk shortage.  It's cool but not cool because you want to supply that.  ***We've come to realize we'll never be able to make enough oat milk***.  ***The demand is more great***

*than the supply*.  It doesn't matter how fast we build our factories, because we're building them as fast as we can.

41.     In reality, however, by the time of the May 2021 IPO, demand for Oatly's products was declining, as evidenced by the Company's declining shelf space with retailers in Europe and the U.S.  But this did not stop Defendants from continuing to mislead investors as to the deteriorating demand for Oatly products, as further set forth below.

42.     For example, the Offering Documents touted high demand for Oatly's products and reiterated that the main constraint on the Company's growth was its inability to produce sufficient quantities of oat-based products to meet this demand.  *Inter alia*, the Offering documents stated:

> *Demand for Oatly products has grown at an incredible rate*.  *To date, production capacity has been a major constraint on our growth, and we have made substantial investments to scale our production capacity and address supply shortages*.
>
> * * *
>
> *Our brand has excelled on a global scale*, as evidenced by the following market statistics:
>
> - In 2020, Oatly contributed the highest amount of sales growth to the dairy alternatives drinks category across each of our key markets – the United Kingdom, Germany and Sweden.
>
> - In our home market of Sweden, we had a 53% market share of the total sales in the alternative dairy products non-milk based category as of 2020, according to Nielsen.
>
> - In the United States, the United Kingdom, Germany and Sweden, we are the highest selling brand in the oat category by retail sales value, which is the largest category within dairy alternatives in the United Kingdom and Germany and is the fastest-growing category within the United States.
>
> - Our 2020 year-over-year retail sales growth rates were 99% in the United Kingdom, according to IRI Infoscan, 199% in Germany and 182% in the United States, according to Nielsen.  Our growth led the increase in demand for oat-based products.  Since 2018, when we launched our new retail strategy in Germany, oatmilk's market share of sales in the retail plant-based dairy category has grown from approximately 23% for the rolling four week period ended January

13

2018 to approximately 60% for the rolling four week period ended December 2020, according to Nielsen.

***We also believe that global demand for Oatly products has far outpaced our supply***.  As we continue to scale, we have a significant opportunity to satisfy unmet demand and leverage our brand success to expand our product portfolio.

\* \* \*

**<u>Retail sales data shows that Oatly is the driving force behind the increasing consumer demand for oat-based dairy products</u>**.

43.    The Company also touted its "demonstrated global commercial success through [its] expansion" claiming that in Oatly's "core markets of Sweden, the United Kingdom, Germany and the United States [Oatly's] brand contributed the most sales growth to the plant-based milk category in 2020" and to Oatly's increasing sales velocity in the Company's "Core Markets" in the United States and Europe.  As the Offering Documents stated:

> We are the highest selling oatmilk brand by retail sales value in Sweden, Germany and the United Kingdom in grocery in the dairy alternative non-milk based category for 2020, according to Nielsen and IRI Infoscan.  ***In 2020, we drove 49%, 43% and 13% of plant-based milk growth in the United Kingdom, Germany and the United States according to Nielsen and IRI Infoscan***.  ***Within our core markets of Sweden, the United Kingdom and Germany, our brand contributed the most sales growth to the plant-based milk category in 2020***.



***We have demonstrated global commercial success through our expansion into more than 20 markets across three continents***.

14

* * *

We will leverage the significant demand for Oatly products to grow in new and existing markets. ***Our accelerating performance in Germany, the United Kingdom and the United States, where we have consistently increased velocity, is indicative of the potential we see across each of our international markets, including China***. Furthermore, there is significant whitespace to expand our foodservice and food retail locations within our existing markets. ***The food retail channel, in particular, has welcomed Oatly on shelves*** as we have driven incremental profit, traffic and premiumization in a milk category that was shifting towards private label. ***Our TDP share, which represents our brand's total distribution points ("TDP") as a percentage of the total oatmilk category distribution points, of 40%, 32% and 13% in the United Kingdom, Germany and the United States, respectively, indicates the significant upside in our existing markets***.

44.    The statements set out in ¶¶42-43 were materially false, misleading, and incomplete because (i) customer demand for Oatly's products was not increasing; (ii) retail customers were purchasing fewer Oatly products and customer demand for those products was, in fact, decreasing, as evidenced by, among other things, Oatly's declining shelf space with retailers in Europe and the U.S. prior to the May 2021 IPO; (iii) the statements overstated the amount of real customer demand for Oatly's products; and (iv) as a result of the foregoing, Oatly's statements about its operations, business, and prospects were materially false and misleading.

45.    Further, a major selling point of the ADSs in the May 2021 IPO was the purported growing demand in China for the Company's products. The Offering Documents stated, in pertinent part:

*Our growth in China demonstrates the effectiveness of this expansion strategy. . . . Within approximately two years of entering the Chinese market, we had over 9,500 foodservice and retail points of sale in total with a growth rate of over 450% as of December 31, 2020.*

* * *

In 2018, we entered China, focusing again on penetrating specialty coffee and tea shops and quickly generating a powerful brand resonance with consumers. *We have since used premier foodservice partnerships to rapidly expand across the broader Asian region and facilitate market education for consuming plant-based*

15

*milks as alternatives to dairy products, particularly with coffee and tea*.  In Asia, as of December 31, 2020, we had a presence in approximately 11,000 coffee and tea shops and approximately more than 6,000 retail and specialty shops, including an exclusive, branded partnership with Starbucks China in over 4,700 stores.

46.     The statements set out in ¶45 were materially false, misleading, and incomplete because (i) customer demand for Oatly's products was not increasing in China; (ii) retail customers were purchasing fewer Oatly products and customer demand for those products was, in fact, decreasing, as evidenced by, among other things, the fact that Oatly would be forced to idle its Singapore production facility due to a lack of customer orders; (iii) the statements overstated the amount of real customer demand for Oatly's products in China and thus the growth prospects for the Company in China; and (iv) as a result of the foregoing, Oatly's statements about its operations, business, and prospects were materially false and misleading.

47.     Significantly, the Offering Documents also lacked key disclosures about the Company's revenues that could have revealed the declining demand for Oatly's products and, in any event, were required under the International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board.

48.     For example, IFRS standard 15 establishes the principles that an entity applies when reporting information about the nature, amount, timing, and uncertainty of revenue and cash flows from a contract with a customer.  IFRS 15 mandates that a company report discounts, rebates, and returns for goods sold when the company reports the revenues generated from selling those goods. Such information is necessary to evaluate whether such revenues are the result of sales arising from genuine customer demand or are merely a byproduct of discounted prices or sales that will ultimately have to be reversed.  Tellingly, the Offering Documents stated that Oatly "routinely offer[s] sales discounts and promotions through various programs to customers" — but its incorporated financial statements conspicuously omitted any IFRS 15 disclosure.

16

49.     Similarly, the Offering Documents and incorporated financial statements did not contain specific revenue amounts for the Company's different product lines (*e.g.*, oatmilk vs. oatgurt vs. oat ice cream).  IFRS standard 8 requires that "[a]n entity shall report the revenues from external customers for each product and service, or each group of similar products and services, unless that necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed."  In other words, IFRS 8 mandates that a company report its revenues broken down by product or product line.  The Offering Documents, however, were silent on how much of the Company's revenues were attributable to its various single products or product lines, thus facilitating Oatly's ability to conceal important information concerning customer demand for its full product line.

50.     The Offering Documents included a risk disclosure related to "shelf space." However, this "risk disclosure" simply stated that if Oatly lost "shelf space" the Company's "business, financial condition and results of operations ***could*** be adversely affect."  As the Offering Documents stated:

> If we fail to meet demand for our products and, as a result, ***consumers who have previously purchased our products buy other brands or our retailers allocate shelf space to other brands***, our business, financial condition and results of operations ***<u>could</u>*** ***be adversely affected***.

51.     Indeed, the risk disclosure language set out at ¶50 was itself materially false, misleading, and incomplete because as of the May 2021 IPO (i) the "risk" of declining shelf space had already materialized; (ii)  customer demand for Oatly's products was not increasing; and (iii) retail customers were purchasing fewer Oatly products and customer demand for those products was, in fact, decreasing, as evidenced by, among other things, Oatly's declining shelf space with retailers in Europe and the U.S. prior to the May 2021 IPO.

52.    Defendants also made statements touting the high global demand for Oatly's products and the Company's exponential growth in Asia in written roadshow materials for the May 2021 IPO (as well as in Oatly's subsequent June 2021 Investor Presentation).  For example, written materials from those presentations stated that "YoY Growth" (*i.e.*, year-over-year growth) in Asia was 414.16% and that "consumer demand globally increase[d]":

## CONTINUED STRONG MOMENTUM IN Q1 2021

| KEY DEVELOPMENTS | ($MM) | Q1 2021 | Q1 2020 | YoY GROWTH |
|---|---|---|---|---|
| • Capacity expansion delays due to COVID-19 and continued to experience significant supply constraints as consumer demand globally increases | Americas | $33.5 | $20.3 | 65.2% |
| | EMEA | $81.6 | $59.1 | 38.1% |
| • Launched branded partnership with Starbucks in the U.S. | Asia | $24.9 | $4.8 | 414.6% |
| • Started oatbase production at the Ogden, UT facility in mid-March | **Total Revenue** | **$140.1** | **$84.2** | **66.2%** |
| | Gross Profit | $41.9 | $27.3 | 53.7% |
| • Began production on the third oatbase line in Vlissingen, Netherlands | Gross Margin | 29.9% | 32.4% | (2.4%) |

**OATLY!**                                                                                  22

53.    However, the statements set out in ¶52 touting Oatly's growth in Asia were materially false, misleading, and incomplete because as of the IPO (i) customer demand for Oatly's products was not increasing in China or Asia generally; (ii) retail customers were purchasing fewer Oatly products and customer demand for those products was, in fact, decreasing, as evidenced by, among other things, the fact that Oatly would be forced to idle its Singapore production facility due to a lack of customer orders; (iii) the statements overstated the amount of real customer demand for Oatly's products in China and thus the growth prospects for the Company in China;

and (iv) as a result of the foregoing, Oatly's statements about its operations, business, and prospects were materially false and misleading.

54.    Oatly also misleadingly touted the supposed high demand for its products in its August 16, 2021 press release announcing the Company's second quarter 2021 financial results, which was also filed on Form 6-K with the SEC that same day (the "August 2021 Release").  In the August 2021 Release, Oatly continued to claim there was "robust consumer demand" for the Company's products.  Specifically, CEO Petersson is quoted as saying:

> 2021 represents the most transformational year in our Company's history with the completion of our successful IPO in May, which has provided us with the capital to fuel new production ***capacity globally as we scale our business across three continents to meet <u>the robust consumer demand</u> for our leading oat-based brand. We are incredibly proud of our global team's execution with strong growth in new and existing customers***, the opening of two new facilities in Ogden, Utah and Singapore, as well as doubling production capacity at our facility in Vlissingen, Netherlands.

55.    As the August 2021 Release further stated:

> EMEA revenue increased $18.8 million, or 31.6%, to $78.5 million for the second quarter of 2021 compared to $59.7 million in the prior year period.  ***This increase was primarily due to higher production compared to the same period prior year, with <u>growth in foodservice and retail channels</u> across oatdrink, oatgurt and other food product offerings, partially offset by lower fill rates due to the <u>robust consumer demand</u> and continued capacity constraints***.

> Americas revenue increased $16.3 million, or 65.0%, to $41.3 million for the second quarter of 2021 compared to $25.1 million in the prior year period.  ***This increase was primarily due to higher production compared to the same period prior year with growth in both new and existing foodservice and retail channels across oatdrink, oatgurt and frozen product offerings, partially offset by lower fill rates due to the <u>robust consumer demand</u> and continued capacity constraints***.

> * * *

> Asia revenue increased $15.7 million, or 148.6%, to $26.3 million for the second quarter of 2021 compared to $10.6 million in the prior year period.  ***This increase was primarily due to higher production compared to the same period prior year with growth in both new and existing foodservice and e-commerce channels as well as in the retail channels across oatdrink offerings, partially offset [sic] continued capacity constraints***.

56.    Also on August 16, 2021, the Company released its financial statements for the three and six months ended June 30, 2021, which were also filed on Form 6-K with the SEC (the "2Q 2021 Financials").  The 2Q 2021 Financials again represented that "*[t]o date, our growth has been constrained by our production capacity, as consumer demand for our products continues to outpace our global capacity*."  The 2Q 2021 Financials further stated:

> *To date we have experienced accelerated demand and our revenue growth has been constrained by limitations in our production capacity*.  As noted above we plan to significantly increase our capacity to support our continued expansion and revenue growth across our three geographic regions.
>
> The following factors and trends in our business have driven net revenue growth over prior periods and are expected to be key drivers of our net revenue growth going forward:
>
> * * *
>
> *Grow within retail channels globally by increasing our distribution points with existing and new customers, <u>capturing greater shelf space</u> and continue to drive velocity increases*.
>
> * * *
>
> *Expand global production capacity to meet unmet demand*.

57.    On Oatly's analyst conference call later that same day, Defendant Petersson also touted "*<u>robust customer demand</u> for [Oatly's] leading brand*" and stated that "*global demand for Oatly products continued to outpace our supply*", with capacity constraining our growth in the second quarter."  Defendant Petersson also said the following on the August Investor Call:

> And as we continue to scale, *we have significant opportunity to satisfy unmet demand and leverage our brand success to expand across geographies, sales channels and product categories*.  June was the highest production month in company's history, and we have started out the third quarter strong in July with a consecutive record-setting production month.  As Peter will elaborate on, this is a trend we expect to continue and gives us confidence in our 2021 outlook for revenue to exceed $690 million, an increase of greater than 64% year-over-year, representing an acceleration in our rate of growth in the second half of 2021 from the first half of 2021.

* * *

*Any recent pressures on our market share velocity measured channel is expected and directly correlated with the capacity constraints and less of inventory to fulfill demand across sales channels*.  As we've seen in the past, once supply improves, we can increase velocities and growth as well as backlog of orders to fulfill.

58.     The statements set out in ¶¶54-57 were materially false, misleading, and incomplete because (i) customer demand for Oatly's products was not "robust," "unmet," "outpacing supply," or otherwise increasing; (ii) retail customers were purchasing fewer Oatly products and that customer demand for those products was, in fact, decreasing, as evidenced by, among other things, Oatly's declining shelf space with retailers in Europe and the U.S. prior to the May 2021 IPO; (iii) the statements overstated the amount of real customer demand for Oatly's products; and (iv) as a result of the foregoing, Oatly's statements about its operations, business, and prospects were materially false and misleading.

## B.    Misstatements Regarding Oatly's Environmental Practices

59.     The Offering Documents touted that "*Sustainability is at the core of our business and actionable in our products*" and that "on average, a liter of Oatly product consumed in place of cow's milk results in around 80% less greenhouse gas emissions, 79% less land usage and 60% less energy consumption.  Similarly, the Offering Documents stressed that, "*Sustainability at Oatly is far more than achieving certain key performance indicators and corporate policies—it is a mindset that helps us navigate business decisions and build a culture that is singularly focused on pushing the boundaries of the plant-based movement*."

60.     Indeed, the Offering Documents also affirmatively represented that Oatly's environmental practices were one of the Company's "Competitive Strengths."  Specifically, the Offering Documents described this purported "Competitive Strength[]," in part, as follows:

Rooted and validated through our research, we believe the growth of our products is an actionable solution to some of society's greatest environmental and nutritional

21

challenges.  We are focused on driving the global appetite and market for plant-based dairy, and we are just scratching the surface.  ***With every liter of Oatly we produce, our positive environmental and societal impact increases***.  We strive to drive meaningful change within the food industry by making it easier for people to turn what they eat and drink into personal moments of healthy joy, while reducing the impact on the planet's resources in the process.  ***Our unwavering commitment to sustainability fuels our growth***.

61.     The statements set out in ¶¶59-60 were materially false, misleading, and incomplete because they overstated Oatly's sustainability practices and impact because, as was later revealed in the Spruce Point Report, documents obtained through a FOIA request showed "very high concentrations" of certain wastewater byproducts from Oatly's manufacturing facility in New Jersey, which were of significant concern to local regulators and required the installation of a new wastewater treatment facility.  *See also* ¶82.

### C.     Failure to Adequately Disclose Rising Costs of Key Ingredients and Their Almost Certain Materially Adverse Impact on Oatly's Post IPO Profitability and Margins

62.     As the Company's name implies, oats are the most important ingredient in Oatly's products.  The next most important ingredient is rapeseed oil.  Both of these commodities are necessary for the manufacturing of oat base, which is the foundation of all Oatly products.  Thus, a ready supply of oats and rapeseed oil at reasonable prices is essential to the Company's business and operations.  As detailed below, however, during the Class Period Oatly knew or recklessly disregarded that prices for oats and rapeseed oil were skyrocketing as of the May 2021 IPO, and that the resulting increased cost for these commodities would have an adverse impact on Oatly's profitability and margins as compared to recent years past.  Instead, the Exchange Act Defendants downplayed the impact that rising prices for oats and rapeseed oil for future delivery would almost certainly have on increasing Oatly's manufacturing costs (and in decreasing the Company's profitability).

22

63.     Indeed, 2021 was a predictably very bad year for companies, like Oatly, that needed to purchase large quantities of oats and rapeseed oil, as futures prices for both commodities for delivery in the latter part of 2021 increased sharply in relation to historical averages.  As shown below (*see* ¶¶66-68), these price increases started well before the May 2021 IPO; indeed, — futures prices for oats started to increase in the summer of 2020 and futures prices for rapeseed oil began to climb in January 2021.  In spite of this, the Offering Documents misleadingly assured investors that the Company had secured its supplies of oats and rapeseed oil, while disclosing that the only purported risk to the Company in connection with its obtaining such ingredients was a lack of "oats and other raw materials" that did not meet the Company's "quality standards."

64.     Specifically, the Offering Documents were silent on how much Oatly paid for its key ingredients (oats and rapeseed oil), and as to what, if anything, Oatly did to hedge against increases in oat and rapeseed oil prices.  Instead, the Offering Documents simply described the sources of these products, stating:

> Sourcing oats.  We *source* oats from regional millers, and we secure regional supply and capacity while minimizing transportation distance and expenses.  Within our regions, we work with farmers to implement sustainable agricultural strategies for oat cultivation, as well as actively seek to aid meat and dairy farmers to increase the amount of crops they grow for human consumption.

> * * *

> Rapeseed oil and other strategic ingredients.  We source non-GMO rapeseed oil. For our products produced in EMEA, we source from Sweden, and for products produced in the United States, we source from Canada . . .

> * * *

> We currently work closely with five oat suppliers to source our oats – we have one supplier in Belgium, one in Malaysia, two in Sweden and one in the United States. We have agreements in place with each of these suppliers and believe that the terms contained in these agreements are customary for such suppliers in our industry. Under each of these agreements, we are required to provide forecasts of our anticipated needs for certain periods of time to assess the supply we will require for

the upcoming term, and the oats supplied under each of these agreements are subject to certain quality control and sustainability requirements.

65.    The statements set out in ¶64 were materially false, misleading, and incomplete because disclosing only the "source" for these products, but not how much they Company was having to pay for its key ingredients, failed to disclose that the prices for future delivery of oats and rapeseed oil had been increasing dramatically in the months prior to the May 2021 IPO (as alleged in the following paragraphs) and, thus, were almost certain to adversely impact the Company's financial performance going forward (notwithstanding that the Company may have had "sources" to supply oats and rapeseed oil).

66.    A commodity futures contract is an agreement to buy a specified amount of a commodity at a set point in the future for an agreed-upon price.  Oat futures are actively bought and sold on the Chicago Mercantile Exchange ("CME").  Each CME future represents a contract for 5,000 bushels of oats, which is deliverable on the second business day following the last trading day of the delivery month.  CME oat futures contracts are monthly contracts, with deliveries in March, May, July, September, and December of each year, with two deliveries in July and September.  Each CME oat future is listed on the exchange 10 months prior to its delivery date. Consequently, the published prices for CME oat futures contracts are a reliable measure for the expected cost of procuring oats for delivery as of 10 months in the future.  The graph below shows the daily closing prices (over time, beginning in May 2020 and ending on November 15, 2021) for the various CME oat futures for delivery in May, July, and December of 2021, with the white line showing the price for May 2021 delivery — and the blue, orange, and purple lines showing the prices for oat futures for delivery in July, September, and December 2021, respectively:

**CLOSING CME OAT FUTURES PRICES FOR MAY, JULY,
SEPTEMBER, AND DECEMBER 2021 DELIVERY**



67.     Similarly, rapeseed futures contracts are actively bought and sold on the Euronext

exchange.  Each Euronext rapeseed future represents contract for delivery of 50 tons of rapeseed

oil for delivery in February, May, August, or November of a given year at one of several ports

throughout Europe.  Each Euronext rapeseed future is listed on the exchange 10 months prior to

its delivery date.  Consequently, the published prices for Euronext rapeseed futures are a reliable

measure for the expected cost of acquiring rapeseed as of 10 months in the future.  The graph

below shows the daily closing price for one Euronext rapeseed future for the next available, or

"active," delivery date (*i.e.*, the price for delivery 10 months in the future) over the period May

2020 through November 15, 2021:

**CLOSING EURONEXT RAPESEED OIL FUTURE PRICES FOR 10 MONTH DELIVERY**



68.    As can be seen clearly from the graphs above, the cost of oats and rapeseed oil for

delivery 10 months in the future (*i.e.*, for delivery in the latter part of 2021) increased sharply in

the period leading up to the May 2021 IPO, and thereafter continued to increase during the second

half of 2021.  As the self-proclaimed "original and largest oatmilk company," which had been in

business for over two decades, the Exchange Act Defendants knew (or at best recklessly

disregarded) that the sharp rise in prices for future delivery of oats and rapeseed oil, which had

already occurred as of the IPO, would have a significant adverse impact on the Company in the

post-IPO period.

69.    Moreover, although the Offering Documents contained purported risk disclosures

related to "oats or other raw materials," those disclosures addressed only the potential risk of a

reduction in supplies of oats that met the Company's "quality standards" (which the Offering

Documents described as the risk that Oatly might face "reduced or limited availability of oats or

other raw materials that meet our quality standards").  However, the Offering Documents did ***not***

address any risk relating to the ***already-increased*** price of oat and rapeseed futures.

70.     The Offering Documents also included the certain other generic "risk disclosures" related to oats, which simply stated that the Company's "financial performance depends in large part on . . . the purchase of raw materials . . . at competitive prices."  For example, the Offering Documents stated:

> Our future business, results of operations and financial condition **may** be adversely affected by reduced or limited availability of oats and other raw materials that our limited number of suppliers are able to sell to us that meet our quality standards.
>
> Our ability to ensure a continuing supply of high-quality oats and other raw materials for our products at competitive prices depends on many factors beyond our control.  In particular, we rely on a limited number of regional suppliers that supply us with high-quality oats and maintain controls and procedures in order to meet our standards for quality and sustainability.  Our financial performance depends in large part on our ability to arrange for the purchase of raw materials in sufficient quantities **at competitive prices**.  We are not assured of continued supply or adequate pricing of raw materials. Any of our suppliers could discontinue or seek to alter their relationship with us. . .
>
> In addition, we also compete with other food companies in the procurement of oats and other raw materials, and this competition may increase in the future if consumer demand increases for these items or products containing them or if competitors increasingly offer products in these market sectors.  If supplies of oats and other raw materials that meet our quality standards are reduced or are in greater demand, we may not be able to obtain sufficient supply to meet our needs on favorable terms, or at all.

71.     However, none of these "risk disclosures" disclosed that the prices for future delivery of oats and rapeseed oil had **already** increased dramatically in the months prior to the May 2021 IPO — nor did they disclose the almost certain adverse impact that such increasing prices would have on the Company's financial performance going forward.

72.     The Company also included a boilerplate risk disclosure concerning "[v]olatility in the prices of raw materials," which stated:

> **_Volatility in the prices of raw materials and other supplies we purchase could increase our cost of sales and reduce our profitability_**.  Moreover, we may not be able to implement price increases for our products to cover any increased costs, and any price increases we do implement may result in lower sales volumes.  **_If we are not successful in managing our ingredient and packaging costs or the higher costs_**

*of sustainable materials, if we are unable to increase our prices to cover increased costs or if such price increases reduce our sales volumes, then such increases in costs will adversely affect our business, financial condition and results of operations*.

73.     However, as with the other "risk factors," such "warnings" did not disclose that, as alleged above, the prices for future delivery of oats and rapeseed oil had ***already*** increased dramatically in the months prior to the May 2021 IPO — nor did they disclose the almost certain adverse impact that such increasing prices would have on the Company's financial performance going forward.

74.     Similarly, the "risk factors" in the August 2021 Release only alerted investors to the purported risk of "reduced or limited availability of oats or other raw materials that meet [Oatly's] quality standards" and are silent about the already materialized risk of rapidly increasing oat prices.

75.     Indeed, the purported "risk disclosure" statements set out in ¶¶69-74 were themselves materially false and misleading because (i) they failed to disclose that the prices for future delivery of oats and rapeseed oil had been increasing dramatically in the months prior to the May 2021 IPO (as alleged in the following paragraphs) and, thus, were almost certain to adversely impact the Company's financial performance going forward notwithstanding a "source" to supply oats and rapeseed oil; and (ii) the "risk" of increasing prices for oats and rapeseed oil for future delivery had already materialized prior to the May 2021 IPO.

## VI.    THE TRUTH BEGINS TO EMERGE

76.     The truth about Oatly's business and financial condition began to emerge on July 14, 2021, before the market opened, when Spruce Point issued its Report entitled, "Sour on an Oat-lier Investment."   The 124-page Report (which became available online that same day) detailed a wide array of misconduct and misstatements by Oatly, including, *inter alia*, that it had

made materials misrepresentations and omissions concerning (i) customer demand for its products in China and elsewhere, (ii) various accounting information that was either misstated or omitted in violation of applicable accounting standards, and (iii) the adverse impact that rising oat and rapeseed oil prices would have on Oatly's performance going forward. The Report was based on Spruce Point's close review of Oatly's financial statements and other public statements, as well as on its interviews of former Oatly employees, site visits, and other investigative work.

77.    As the Report stated, Oatly's reported revenue metrics are "insufficient and not what we expect from a company with a 20-year operational history." For example, the Report pointed out that the Offering Documents did not disclose new sales by product for the previous 36 months and further noted that, although "[d]iscounts, rebates and coupons are deducted from gross to reported net revenues," "Oatly doesn't provide a bridge so investors can gauge promotional activity[.]" In other words, as the Report found, Oatly's financial disclosures (including specifically the financial statements contained in the Offering Documents) violated the Company's reporting obligations under IFRS 8 and 15, as discussed above.

78.    As to sales, the Report also pointed out that "Oatly's 2018 U.S. sales can't be reconciled and vary by 100% [compared to other reported sales figures]. Both Nielsen and a Swedish magazine reported $6m of sales in 2018, whereas Oatly [] disclosed $12m of sales in [the] [I]nvestor [P]resentation."

79.    As for Oatly's supposedly expanding business in China, the Report found that Oatly had already tried and failed to enter the Chinese market:

> Oatly is claiming 2020 sales growth of 450% in China, and substantial ecommerce success with 21% of sales through the channel. However, it doesn't say that it failed earlier in its China ambitions, and that it has made conflicting statements about how it succeeded this time around.

80.     The Report further alleged that Oatly had failed to disclose the risks posed by price

increases in oats and rapeseed.  The Report stated, in pertinent part:

> Oatly highlights and discloses risks to foreign exchange, interest rates, credit, and
> liquidity, but doesn't say a word about commodity risk.  Yet, in its 2019
> Sustainability Report oats and rapeseed oil were 87% and 7% of purchase volumes.
> Furthermore, Canada has historically supplied 10% of Oatly's total oat needs and is
> critical to fueling its U.S. growth. . . .  This appears to be problamtic as Canadian oat
> production was recently forecasted to decline by the USDA.

81.     In addition, the Report stated, in pertinent part:

> Oat prices and rapeseed oil, as measured by futures contracts, are up sharply in 2021.
> Curiously, Oatly fails to say anything about the effect of these commodity prices on
> its business prospects.

82.     As the Spruce Point Report disclosed, Oatly had also misled investors about the

sustainability of the Company's U.S. manufacturing process.  For example, the Report pointed to,

among other things, documents that Spruce Point had obtained through a FOIA request which

showed that in 2019 "early testing results of water generated from Oatly's [New Jersey] facility"

indicated "very high concentrations of TSS (Total Suspended Solids), COD (Chemical Oxygen

Demand) and CBOD (Carbonaceous Biochemical Oxygen Demand)" — all of which are

wastewater byproducts that result from the manufacturing of oat base.  As the Report stated, these

documents showed that local regulators in New Jersey were concerned that Oatly's harmful

wastewater byproduct numbers "were very high" in most instances — and would require the

installation of a new wastewater treatment facility.  The information in the Report thus belied the

statements in the Offering Documents that "[s]ustainability is at the core of our business," and that

the Company had an "unwavering commitment to sustainability."  Indeed, consistent with what

the Spruce Point Report found, the U.K. Advertising Standards Agency recently banned a number

of Oatly's advertisements in January 2022 for making misleading claims about purported the

environmental benefits of substituting traditional dairy milk and dairy milk-based products with Oatly's oat-based counterparts for such products.[3]

83.    On July 14, 2021, CNBC published a story entitled, "Oatly accused of overstating revenue and greenwashing by activist short Spruce Point."  Regarding the accounting allegations, the CNBC story noted that, "the report points to the company's recent investor presentation, which showed estimated 2018 U.S. revenue of $12 million[, but that] Nielsen and Umgas Magazine, a Swedish publication, reported that Oatly's net U.S. sales were just $6 million in 2018."  In addition, CNBC cited the Report's statement that, "We [Spruce Point] observe periods of large divergence in revenue and accounts receivable growth rates at Oatly. . . .  This is a classic sign of potential accounting shenanigans and is often cited as a top red flag to predict accounting scandals."

84.    On July 15, 2021, the Spruce Point Report received additional coverage from additional news outlets.  For example, at 10:15 a.m., *Fortune* published an article entitled, "Wild Oats? Inside Spruce Point's 124-Page Attack Alleging Mismanagement And False Claims At Oatly."  *Fortune* described the Report as "the results of an extensive investigation into Oatly[.]"

85.    In response to the revelations contained in the Spruce Point Report, the price of Oatly ADSs — which had closed at $21.13 per ADS on July 13 — fell to $19.48 at the close on July 15, 2021, for a two-day decline of 8.8% on unusually high trading volume on both days.

86.    However, worse news was yet to come.  On November 15, 2021, Oatly announced its third quarter financial results, which disclosed that the Company had suffered a third quarter operating *loss* of over $44 million, and that the Company's gross profit margins had fallen year-

---

[3]    Jack Wright and James Gant, *Oatly ads BANNED over misleading environmental boast that ditching dairy is good for the planet: Oat drink brand gave no evidence it 'generated 73% less CO2' than regular cow's milk*, DAILY MAIL (Jan. 25, 2022), https://www.dailymail.co.uk/news/article-10441759/Oatly-ads-banned-misleading-environmental-claims.html.

on-year to only 26.2% from 32% compared to the third quarter 2020 — a staggering 15% decline.[4] While the November 2021 Release tried to put a positive spin on Oatly's deteriorating business and operations, it also disclosed that the Company was revising its fiscal year 2021 revenue projection **downwards** by over 7%, from $690 million to $635 million.

87.     Defendants' November 15 disclosures also confirmed that customer demand for Oatly's products had been decreasing since even before the May 2021 IPO.  For example, the Company disclosed the need to expand its "shelf space" with retailers.  In this context, "shelf space" refers to the amount of space a given retailer (*e.g.*, Target) devotes to selling a particular product, like Oatly-brand oatmilk.  Because retailers want to maximize their sales, products in high demand will tend to receive a larger allocation of shelf space whereas products that are less popular (or are declining in popularity) will be allocated less shelf space within a given store.  If demand for Oatly's products was increasing as the Company claimed, then the Company's allocation of shelf space in retail stores should also be increasing because retailers want to stock more of the goods customers want to buy.  The November 2021 Release indicates that Oatly's shelf space in its key European markets was not increasing and had, in fact, been declining as of the May 2021 IPO, which indicates that demand for Oatly's products in Europe is declining.  Specifically, the November 2021 Release quoted Defendant Petersson as saying, in pertinent part:

> **[F]or 2021 we are updating our outlook to reflect the near-term factors in the operating environment.  In EMEA, we are starting to build supply to meet consumer demand, but the pace at which we expected to increase revenue in new and existing retailers and to open new markets is slower than we anticipated as we navigate a dynamic COVID operating environment**.  We believe this is primarily a timing issue and in the first half of 2022, **we expect to have an increased share of shelf space at retail given our strong velocities and current supply levels**.

---

[4]     The results were announced in a November 15 press release (the "November 2021 Release"), which included Oatly's interim condensed consolidated financial statements for the three and nine months ended September 30, 2021 (the "3Q 2021 Financials"), which were both filed with the SEC on separate Form 6-K's.

88.     Before the market opened on November 15, 2021, Oatly convened a conference call with investors and analysts to discuss the Company's third quarter earnings, which was attended by Defendant Petersson and Defendant Hanke, among others (the "November Investor Call").  On that call, Hanke disclosed that the Company "**started 2021 with less shelf space than prior years**[,]" which he claimed was "based on our lack of inventory, and the fact that we have historically sold all that we have produced."  He then conceded that "for 2021 we had to scale back a distribution of our products for 12 countries in EMEA" (*i.e.*, Europe) and that the Company "expect[s] to have a better share of shelf" in the future.  In other words, Hanke disclosed for the first time that the Company had **lost shelf space** with retailers in its key European market **before the May 2021 IPO, which was not disclosed in the Offering Documents**.

89.     On the November 15 Investor Call, in response to a request to "clarify" whether Oatly's shelf space in Europe (*i.e.*, "EMEA") "has declined as opposed to not growing at the rate at which you had expected," Defendant Petersson prevaricated by stating:

> Yes.  So we did not lose shelf space.  We did expect to have the greatest space and more distribution in Q4.  And that is due to many, many different reasons.  And if I just — let me just walk you through what's happened here from Q1 to Q4 to better — to give you better colors on what's going on here.  So during Q1, Q2, we were on great pressure due to supply constraints leading to lower growth rates, lower fill rates, strained relationship with retails, **lost market shares, consequences for losing 12 markets in 2020**.

90.     Regardless of Petersson's prevarication, the substantive message was the same: far from increasing demand in Europe prior to the May 2021 IPO, demand was declining and the Company had "**lost market share**" and "**12 markets**" in the key region of Europe.

91.     Plaintiffs have also learned from confidential witnesses that shelf space was declining in the U.S.  CW1 (a former Oatly Sales Director in the U.S., who was employed at the Company during 2020 until the latter part of 2021) confirmed that U.S. customers, such as supermarkets, also scaled back shelf space for Oatly products.  This former Oatly employee (whose

job included overseeing U.S. retail sales and distribution) stated that Oatly's shelf space in the U.S. was decreasing both ***before and after the May 2021 IPO***.  For example, as CW1 recalled, the Company's shelf space was scaled back at several large retailers, including Target and the Sprouts Farmers Market grocery store chain.

92.    Additional information disclosed for the first time in the 3Q 2021 Financials paints a picture dramatically at odds with Oatly's oft-repeated claims that customer demand was so "robust" and "strong" that the Company's manufacturing could not keep up.  Indeed, the 3Q 2021 Financials make clear that far from being unable to manufacture enough products to meet customer demand, the Company's inventory of ***unsold goods*** had actually increased nearly 215% in dollar terms since March 31, 2020.  The chart below shows the dollar value of Oatly's inventory of "finished goods"[5] as reported for the first quarter of 2021 in the Offering Documents, the second quarter of 2021 in the 2Q 2021 Financials, and the third quarter of 2021 in the 3Q 2021 Financials.



---

[5]    Finished goods consists of products that are fully manufactured and ready to sell to customers but have not been sold.

93.     Simply put, the massive increase in Oatly's unsold inventory between the May 2021 IPO and the third quarter of 2021 should never have happened if it was true that Oatly could "***never be able to make enough oat milk***" to satisfy its customers.  The fact that Oatly's unsold supply increased is further confirmation of deteriorating customer demand in contradiction to what the Company repeatedly told investors.

94.     Plaintiffs have also independently uncovered evidence of undisclosed decreasing customer demand in Asia.  As discussed above, Oatly opened a hybrid manufacturing facility in Singapore during the Class Period.  The purpose of that new facility was to supply oat milk to China and other parts of Asia.  Plaintiffs have learned from CW2 (a former manager in Oatly's Singapore facility during 2021) that, starting in December 2021, the Singapore manufacturing facility reduced production hours and/or idled production entirely for multiple months.  According to CW2, Oatly reduced its production in Singapore because of declining order volume in Asia.  The fact that Oatly had to slash production at one of its newest facilities is further evidence that demand for the Company's products was declining, particularly in Asia.

95.     Defendants' November 15 disclosures also belatedly confirmed that the rising prices for oats and rapeseed oil were negatively impacting the Company.  Specifically, the November 2021 Release and the 3Q 2021 Financials included a new "Risk Factor" for the Company: "***the impact of rising commodity prices . . . on our cost of goods sold***."

96.     In response to Defendants' corrective November 15 disclosures, the price of Oatly ADSs plummeted 20.81% in one day, falling from a closing price of $11.82 on Friday, November 12, to close at only $9.36 on November 15, on unusually heavy trading volume.  The November 15 closing price of $9.36 represented a nearly 45% decline in value from the $17.00 per ADS price of the May 2021 IPO.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

97.    As alleged herein, Oatly and the Individual Securities Act Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false, misleading, and incomplete when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, the Individual Securities Act Defendants, by virtue of their receipt of information reflecting the true facts regarding Oatly, their control over, and/or receipt and/or modification of Oatly's allegedly materially false, misleading, and incomplete statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Oatly, participated in the fraudulent scheme alleged herein.

98.    Moreover, defendant CEO Petersson and defendant CFO Hanke seized on Oatly's artificially high ADS price to sell shares in connection with the May 2021 IPO.  These highly suspicious transactions earned the Individual Securities Act Defendants millions of dollars.

99.    According to the Offering Documents, Petersson and Hanke exercised certain Oatly stock warrants in connection with the May 2021 IPO, which gave them 9,948,987 and 1,343,960 ordinary shares in Oatly, respectively.  A portion of these shares thereafter then sold to a combination of Luxor Capital Group, Santo Domingo Group Advised by Quadrant Capital Advisors, Inc., and K2 Global V LLC as part of a "Concurrent Private Placement" held in connection with the May 2021 IPO.  Petersson sold 1,343,960 ordinary shares in Oatly as part of the Concurrent Private Placement, reaping at least $21,503,360.  Hanke sold 131,029 ordinary shares in Oatly as part of the Concurrent Private Placement, reaping at least $2,096,464.

## VIII.    LOSS CAUSATION AND ECONOMIC LOSS

100.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Oatly ADSs and operated as a fraud or deceit on purchasers of Oatly ADSs.  As detailed above, when the truth about Oatly's misconduct was revealed, the value of Oatly's ADSs declined precipitously as the prior artificial inflation no longer propped up the ADR price.  The decline in the price of Oatly ADSs was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price decline negate any inference that the losses suffered by Plaintiffs and other members of the Classes were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic losses, *i.e.*, damages, suffered by Plaintiffs and other members of the Classes were a direct result of defendants' fraudulent scheme to artificially inflate the prices of Oatly ADSs and the subsequent significant decline in the value of Oatly ADSs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

101.    At all relevant times, the Exchange Act Defendants' materially false, misleading, and incomplete statements alleged herein directly or proximately caused the damages suffered by Plaintiffs and other members of the Classes.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Oatly's business, operations, and financial results as alleged herein.  Throughout the Class Period, the Exchange Act Defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Oatly ADSs to be artificially inflated.  Plaintiffs and other members of the Classes purchased Oatly ADSs, and

bought and sold options on Oatly ADSs, at those artificially inflated prices, causing them to suffer damages as complained of herein.

102.    The causal connection between the Exchange Act Defendants' fraud and the losses suffered by Plaintiffs and the members of the Classes is further supported by the reactions of the press and stock analysts to the Company's November 15, 2021 disclosures and the precipitous decline in the value of Oatly's ADSs that day.

103.    For example, on November 15, 2021, *The Wall Street Journal* published an article entitled, "Oatly Shares Fall as Oat-Milk Maker Details Production Issues."  As reported in that article, on November 15, 2021, "Swedish oat-milk maker Oatly Group AB warned that production challenges might keep it from growing as fast as previously projected, sending its shares lower on Monday."  *The Wall Street Journal* further reported that "[t]he company's reduced sales outlook added to investors' concerns about Oatly's losses and its capacity to meet growing demand" and, as a result, the Company's' "[ADSs] closed Monday at $9.36, down nearly 21%."  *The Wall Street Journal* also cited the fact that Oatly's "costs rose for ingredients, packaging materials and shipping" as further reasons for why ADS prices declined.

104.    Similarly, on November 15, 2021, Exane BNP Paribas Equity Research issued an analyst report entitled "Q321 results and 15 questions for management" (the "BNP Report").  The BNP Report noted that Oatly's "sales expectations for EMEA [(Europe, Middle East, and Africa)] are c.USD31m below its previous plan due to slower than expected expansion in its retails distribution footprint and into new markets, as retailers delayed material updates to their planograms in light of a highly dynamic Covid operating environment."  The BNP Report also noted that "[i]n 2022, Oatly expects inflationary pressures to impact its COGS [(cost of goods sold)] with oat prices and other commodity prices as well as packaging materials increasing as a

result of a number of different factors. . . ."  As a result of these factors, among others, Exane BNP

Paribas Equity Research "reduce[d] [its] sales estimates by" 9% for 2021, 10% for 2022 and 7%

for 2023.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE

105.    Plaintiffs and the Classes are entitled to a presumption of reliance pursuant to *Basic*

*Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market

for Oatly ADS was an efficient market at all relevant times by virtue of the following factors,

among others:

(a)    Oatly ADS met the requirements for listing, and were listed and actively

traded on NASDAQ, a highly efficient market;

(b)    Oatly regularly communicated with public investors via established market

communication mechanisms, including the regular dissemination of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and

(c)    Oatly was followed by a number of securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms.  These reports were publicly available and

entered the public marketplace.

106.    As a result of the foregoing, the market for Oatly ADS promptly incorporated

current information regarding the Company from publicly available sources and reflected such

information in the prices of the ADSs and in the prices of options on those ADSs.  Under these

circumstances, all those who transacted in Oatly ADS and options on those ADSs during the Class

Period suffered similar injury through their transactions in Oatly ADS and options on those ADSs

at artificially inflated prices and a presumption of reliance applies.

39

107.    Without knowledge of the misrepresented or omitted material facts, Plaintiffs and other class members purchased or acquired Oatly ADS between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiffs and other members of the Classes relied, and are entitled to have relied, upon the integrity of the market prices for Oatly ADSs, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

108.    Plaintiffs and the Classes are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## X.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Exchange Act Defendants**

109.    Plaintiffs incorporates ¶¶1-108 by reference.

110.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    The Exchange Act Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

40

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Oatly ADSs (and in connection with their purchases of call options on Oatly ADSs, and their sales of put options on Oatly ADSs) during the Class Period.

112.    Plaintiffs and the Classes have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Oatly ADSs and options on those ADSs. Plaintiffs and the Classes would not have purchased Oatly ADSs or options on those ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Exchange Act Defendants

113.    Plaintiffs incorporate ¶¶1-112 by reference.

114.    The Individual Exchange Act Defendants acted as controlling persons of Oatly within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Oatly to engage in the wrongful conduct complained of herein.  Oatly controlled the Individual Exchange Act Defendants and its employees.  By reason of such conduct, the Exchange Act Defendants are liable pursuant to §20(a) of the Exchange Act.

## PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933

115.    In this Part Two and Counts III, IV, and V below (the "Securities Act Claims"), Plaintiffs Bello and Jochim assert strict-liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act, on behalf of themselves and the members of the ADS Class only. These Plaintiffs incorporate the above factual allegations by reference to the extent applicable, but

expressly disclaim any allegations of scienter or fraud for these Securities Act claims.   No allegations of scienter or fraud are necessary to plead the Securities Act Claims.

## XI.    JURISDICTION AND VENUE

116.    The claims asserted in this Part Two of the Complaint arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l, 77o).

117.    This Court has jurisdiction over these claims under Section 22 of the Securities Act (15 U.S.C. §77v).

118.    Venue is proper in this Judicial District under Section 22 of the Securities Act (15 U.S.C. §77v(a)).   Many of the acts and transactions alleged in this Part Two of the Complaint, including the dissemination of materially untrue and misleading statements, occurred in substantial part in this District.   In addition, Oatly's U.S. office is located in this District, and by virtue of the May 2021 IPO, Oatly ADSs were registered to trade on the NASDAQ, which is headquartered in this District.

119.    This action was brought within one year of the discovery of the untrue statements and omissions in the Offering Documents (and within one year after discovery should have been made in the exercise of reasonable diligence) and within three years of the May 2021 IPO.

## XII.    THE SECURITIES ACT PARTIES

120.    Lead Plaintiff Mario Bello purchased Oatly ADSs traceable to the May 2021 IPO during the Class Period as set forth in his lead plaintiff papers and was damaged thereby.   (ECF. Nos. 13-3, 13-4).

121.    Additional plaintiff Kai Jochim purchased Oatly ADSs traceable to the May 2021 IPO during the Class Period as set forth in his July 23, 2021 Certification Pursuant to Federal Securities Laws and was damaged thereby.   (ECF. No. 31-1.)   Lead Plaintiff Bello and plaintiff Jochim are together referred to as the "Securities Act Plaintiffs."

122.    Defendant Oatly describes itself as the world's original and largest oatmilk company.  It is organized under the laws of Sweden and its headquarters are in Sweden.  Its ADSs are listed and trade on the NASDAQ under the ticker "OTLY."  Oatly maintains its U.S. offices at 220 E. 42nd Street, Suite 409A, New York, New York 10017.

123.    Defendant Petersson is, and at all relevant times was, the CEO of Oatly.  Petersson signed the Offering Documents.  Petersson also participated in roadshow events in the run up to the May 2021 IPO, where he solicited the purchase of ADSs in the May 2021 IPO.

124.    Defendant Hanke is, and at all relevant times was, the CFO of Oatly.  Hanke signed the Offering Documents.  Hanke also participated in roadshow events in the run up to the May 2021 IPO, where he solicited the purchase of ADSs in the May 2021 IPO.

125.    Defendant Björn Öste ("Öste") is, and at all relevant times was, a member of Oatly's Board of Directors and was a co-founder of Oatly.  Öste signed the Offering Documents.  Öste was also a "selling shareholder" in the IPO who personally sold shares he owned in connection with the May 2021 IPO.

126.    Defendant Fredrik Berg ("Berg") is, and at all relevant times was, a member of Oatly's Board of Directors.  Berg signed the Registration Statement.

127.    Defendant Ann Chung ("Chung") is, and at all relevant times was, a member of Oatly's Board of Directors.  Chung signed the Registration Statement.

128.    Defendant Bernard Hours ("Hours") is, and at all relevant times was, a member of Oatly's Board of Directors.  Hours signed the Registration Statement.

129.    Defendant Hannah Jones ("Jones") is, and at all relevant times was, a member of Oatly's Board of Directors.  Jones signed the Registration Statement.

130.    Defendant Mattias Klintemar ("Klintemar") is, and at all relevant times was, a member of Oatly's Board of Directors.  Klintemar signed the Registration Statement.

131.    Defendant Po Sing (Tomakin) Lai ("Lai") is, and at all relevant times was, a member of Oatly's Board of Directors.  Lai signed the Registration Statement.

132.    Defendant Eric Melloul ("Melloul") is, and at all relevant times was, a member of Oatly's Board of Directors.  Melloul signed the Registration Statement.

133.    Defendant Yawn Wu ("Wu") is, and at all relevant times was, a member of Oatly's Board of Directors.  Wu signed the Offering Documents.

134.    Defendant Tim Zhang ("Zhang") is, and at all relevant times was, a member of Oatly's Board of Directors.  Zhang signed the Offering Documents.

135.    Defendants Petersson, Hanke, Öste, Berg, Chung, Hours, Jones, Klintemar, Lai, Melloul, Wu, and Zhang (collectively, the "Individual Securities Act Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Oatly's filings with the SEC, including the Offering Documents.

136.    The Individual Securities Act Defendants, as signatories of the Offering Documents, were required to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation, to ensure that the Offering Documents were free of any materially inaccurate or misleading statements and free of any omissions of material fact or other matters that were required to be disclosed therein.  During the course of their "due diligence," the Individual Securities Act Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

137.    With assistance of the Individual Securities Act Defendants, the underwriting firms that Oatly retained to help plan and execute the May 2021 IPO met with potential investors and presented highly favorable, but materially incorrect and/or misleading, information about Oatly, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.  For example, in May 2021, before the IPO there was an "Oatly Road Presentation" at which the "presenters" included Defendant Petersson and Defendant Hanke, among others.  As described below, materially false, misleading, and incomplete statements were made to investors at this roadshow presentation.

138.    In addition to having access to internal corporate documents, the Individual Securities Act Defendants had access to all of Oatly's other top executives, directors, and advisors to determine: (i) the strategy to best accomplish the May 2021 IPO; (ii) the terms of the May 2021 IPO, including the price at which the Oatly's ADSs would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about Oatly would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications, at a minimum, the Individual Securities Act Defendants should have known of the undisclosed material misstatements, misleading statements, and omissions contained in the Offering Documents, as detailed herein.

## XIII.    THE DEFECTIVE MAY 2021 OFFERING DOCUMENTS

139.    Defendants' materially false and/or misleading statements for the purposes of Part Two of this Complaint can generally be grouped into four categories: (i) materially overstated revenues; (ii) materially false, misleading, or incomplete statements regarding customer demand for the Company's products; (iii) materially false, misleading, or incomplete statements regarding

the Company's purportedly environmentally-friendly business practices; and (iv) materially false, misleading, or incomplete statements regarding the materialized risk of rising commodity prices.

### A. The Offering Documents Materially Untrue, Misleading, and Incomplete Statements Regarding Oatly's Historical Revenues

140.    The Offering Documents misstated the Company's historical revenues. The Offering Documents state that Oatly had $12 million in revenue from sales in the United States in 2018. For example, *see* the bar chart below, which appeared in the Offering Documents. The footnote to this chart further states that the 2018 revenue figures "are management's estimates that were derived from [Oatly's] audited Swedish consolidated annual report," which "have not been audited or reviewed."



141.    Oatly made an identical claim (with an identical footnote) about the Company's 2018 United States revenue during at least one roadshow presentation for the May 2021 IPO. Specifically, the materials for that roadshow stated, in pertinent part:



142.    As revealed in the Spruce Point Report, however, in reality, Oatly's 2018 U.S. revenue was **at most** $8 million — one third less than what Oatly touted to investors.  As the Report states, Spruce Point confirmed this misstatement with a former senior manager:

> Spruce Point interviewed a senior manager working to grow Oatly's U.S. business who was with the Company during the pre-revenue, pre-product launch period, and through 2019.  According to this expert's words, the Company's revenues were in the range of $4 to $8 million in 2018.

143.    Oatly's misstated 2018 revenue is further confirmed by other sources.  For example, as a CNBC article from May 20, 2021, reported: "From 2018 to 2019, sales of [Oatly's] oat milk skyrocketed **from $6 million to nearly $40 million**," Nielsen data.  Similar figures were also cited in at least one article from the Swedish press as UMGAS Magazine reported prior to the IPO that Oatly's "U.S. sales of oat milk going **from $6 million in 2018 to about $40 million in 2019**."

144.    Making matters worse, according to the Spruce Point Report, **the Company had three different auditors between March 31, 2016, and March 24, 2021**.  This rapid turnover further calls into question the Company's financial disclosures.

145.    The statements set out in ¶¶140-141 were materially untrue, misleading, and incomplete because they materially overstated the Company's historical revenues for 2018.

### B.    The Offering Documents Materially Untrue, Misleading, and Incomplete Statements Regarding Product Demand

146.    The Offering Documents repeatedly touted robust and growing demand for Oatly's products, while also representing that the main constraint on the Company's growth was its inability to produce sufficient amounts of oat-based products to meet this demand.  In reality, however, by the time of the May 2021 IPO, demand for Oatly's products was declining, as evidenced by the Company's declining shelf space with retailers in Europe and the U.S.  But such statements were materially untrue, misleading and incomplete.

147.    For example, the Offering Documents touted high demand for Oatly's products and reiterated that the main constraint on the Company's growth was its inability to produce sufficient quantities of oat-based products to meet this demand.  *Inter alia*, the Offering documents stated:

> ***Demand for Oatly products has grown at an incredible rate***.  ***To date, production capacity has been a major constraint on our growth, and we have made substantial investments to scale our production capacity and address supply shortages***.

> ***Our brand has excelled on a global scale***, as evidenced by the following market statistics:

> - In 2020, Oatly contributed the highest amount of sales growth to the dairy alternatives drinks category across each of our key markets - the United Kingdom, Germany and Sweden.

> - In our home market of Sweden, we had a 53% market share of the total sales in the alternative dairy products non-milk based category as of 2020, according to Nielsen.

> - In the United States, the United Kingdom, Germany and Sweden, we are the highest selling brand in the oat category by retail sales value, which is the largest category within dairy alternatives in the United Kingdom and Germany and is the fastest-growing category within the United States.

- Our 2020 year-over-year retail sales growth rates were 99% in the United Kingdom, according to IRI Infoscan, 199% in Germany and 182% in the United States, according to Nielsen. Our growth led the increase in demand for oat-based products. Since 2018, when we launched our new retail strategy in Germany, oatmilk's market share of sales in the retail plant-based dairy category has grown from approximately 23% for the rolling four week period ended January 2018 to approximately 60% for the rolling four week period ended December 2020, according to Nielsen.

*We also believe that global demand for Oatly products has far outpaced our supply*. As we continue to scale, we have a significant opportunity to satisfy unmet demand and leverage our brand success to expand our product portfolio.

* * *

***Retail sales data shows that Oatly is the driving force behind the increasing consumer demand for oat-based dairy products***. We believe that oats are a crop uniquely positioned to achieve the goal of a better dairy portfolio, including[.]

148.    The Offering Documents also touted the Company's "demonstrated global commercial success through [its] expansion" claiming that in Oatly's "core markets of Sweden, the United Kingdom, Germany and the United States [Oatly's] brand contributed the most sales growth to the plant-based milk category in 2020" and Oatly's increasing sales velocity in the Company's "Core Markets" in the United States and Europe. As the Offering Documents stated:

We are the highest selling oatmilk brand by retail sales value in Sweden, Germany and the United Kingdom in grocery in the dairy alternative non-milk based category for 2020, according to Nielsen and IRI Infoscan. ***In 2020, we drove 49%, 43% and 13% of plant-based milk growth in the United Kingdom, Germany and the United States according to Nielsen and IRI Infoscan***. ***Within our core markets of Sweden, the United Kingdom and Germany, our brand contributed the most sales growth to the plant-based milk category in 2020***.



*We have demonstrated global commercial success through our expansion into more than 20 markets across three continents.*

\* \* \*

We will leverage the significant demand for Oatly products to grow in new and existing markets. We believe we can continue to build on industry-leading food retail performance by growing velocity and expanding on-shelf presence with Oatly's full portfolio. *Our accelerating performance in Germany, the United Kingdom and the United States, where we have consistently increased velocity, is indicative of the potential we see across each of our international markets, including China.* Furthermore, there is significant whitespace to expand our foodservice and food retail locations within our existing markets. *The food retail channel, in particular, has welcomed Oatly <u>on shelves</u>* as we have driven incremental profit, traffic and premiumization in a milk category that was shifting towards private label. *Our TDP share, which represents our brand's total distribution points ("TDP") as a percentage of the total oatmilk category distribution points, of 40%, 32% and 13% in the United Kingdom, Germany and the United States, respectively, indicates the significant upside in our existing markets.*

149.    The statements set out in ¶¶147-48 were materially untrue, misleading, and incomplete because (i) customer demand for Oatly's products was not increasing; (ii) retail customers were purchasing fewer Oatly products and customer demand for those products was, in fact, decreasing, as evidenced by, among other things, Oatly's declining shelf space with retailers in Europe and the U.S. prior to the May 2021 IPO; (iii) they overstated the amount of real customer demand for Oatly's products; and (iv) as a result of the foregoing, Oatly's statements about its

operations, business, and prospects were materially untrue, misleading and incomplete as of the May 2021 IPO.

150.    Further, a major selling point of the ADSs in the May 2021 IPO was the purported growing demand in China for the Company's products.  The Offering Documents stated, in pertinent part:

> *Our growth in China demonstrates the effectiveness of this expansion strategy. . . .  Within approximately two years of entering the Chinese market, we had over 9,500 foodservice and retail points of sale in total with a growth rate of over 450% as of December 31, 2020*.

> \* \* \*

> In 2018, we entered China, focusing again on penetrating specialty coffee and tea shops and quickly generating a powerful brand resonance with consumers.  *We have since used premier foodservice partnerships to rapidly expand across the broader Asian region and facilitate market education for consuming plant-based milks as alternatives to dairy products, particularly with coffee and tea*.  In Asia, as of December 31, 2020, we had a presence in approximately 11,000 coffee and tea shops and approximately more than 6,000 retail and specialty shops, including an exclusive, branded partnership with Starbucks China in over 4,700 stores.

151.    The statements set out in ¶150 were materially untrue, misleading, and incomplete because (i) customer demand for Oatly's products was not increasing in China; (ii) retail customers were purchasing fewer Oatly products and customer demand for those products was, in fact, decreasing, as evidenced by, among other things, the fact that Oatly would be forced to idle its Singapore production facility due to a lack of customer orders; (iii) the statements overstated the amount of real customer demand for Oatly's products in China and thus the growth prospects for the Company in China; and (iv) as a result of the foregoing, Oatly's statements about its operations, business, and prospects were materially untrue, misleading and incomplete as of the May 2021 IPO.

152.    The Offering Documents also included a risk disclosure related to "shelf space," which simply stated that if Oatly lost "shelf space" the Company's "business, financial condition and results of operations *could* be adversely affect."  As the Offering Documents stated:

> If we fail to meet demand for our products and, as a result, ***consumers who have previously purchased our products buy other brands or our retailers allocate shelf space to other brands***, our business, financial condition and results of operations ***<u>could</u> be adversely affected***.

153.    However, the purported "risk disclosure" statements set out in ¶152 were themselves materially untrue, misleading and incomplete as of the May 2021 IPO because (i) the "risk" of declining shelf space had already materialized as of the May 2021 IPO; (ii) customer demand for Oatly's products was not increasing; and (iii) retail customers were purchasing fewer Oatly products and customer demand for those products was, in fact, decreasing, as evidenced by, among other things, Oatly's declining shelf space with retailers in Europe and the U.S. prior to the May 2021 IPO.

154.    Defendants also made statements touting the high global demand for Oatly's products and the Company's exponential growth in China and Asia were made in written roadshow materials for the May 2021 IPO.  For example, written materials from that presentation stated that "YoY Growth" (*i.e.*, year-over-year growth) in Asia was 414.16% and that "consumer demand globally increase[d]":

## CONTINUED STRONG MOMENTUM IN Q1 2021

| KEY DEVELOPMENTS | ($MM) | Q1 2021 | Q1 2020 | YoY GROWTH |
|---|---|---|---|---|
| • Capacity expansion delays due to COVID-19 and continued to experience significant supply constraints as consumer demand globally increases | Americas | $33.5 | $20.3 | 65.2% |
| | EMEA | $81.6 | $59.1 | 38.1% |
| • Launched branded partnership with Starbucks in the U.S. | Asia | $24.9 | $4.8 | 414.6% |
| | **Total Revenue** | **$140.1** | **$84.2** | **66.2%** |
| • Started oatbase production at the Ogden, UT facility in mid-March | Gross Profit | $41.9 | $27.3 | 53.7% |
| • Began production on the third oatbase line in Vlissingen, Netherlands | Gross Margin | 29.9% | 32.4% | (2.4%) |

**OATLY!**

22

155.    The statements set out in ¶154 were materially untrue, misleading, and incomplete as of the May 2021 IPO because (i) customer demand for Oatly's products was not increasing in China or Asia generally; (ii) retail customers were purchasing fewer Oatly products and customer demand for those products was, in fact, decreasing, as evidenced by, among other things, the fact that Oatly would be forced to idle its Singapore production facility due to a lack of customer orders; (iii) the statements overstated the amount of real customer demand for Oatly's products in China and thus the growth prospects for the Company in China; and (iv) as a result of the foregoing, Oatly's statements about its operations, business, and prospects were materially untrue as of the May 2021 IPO.

156.    In addition, the Offering Documents were materially misleading and incomplete because they failed to disclose that prior to the May 2021 IPO, (i) the Company's shelf space in Europe and the U.S. was decreasing; (ii) customer demand for Oatly's products was not increasing; and (iii) retail customers were purchasing fewer Oatly products and customer demand for those

53

products was, in fact, decreasing, as evidenced by, among other things, Oatly's declining shelf

space with retailers in Europe and the U.S. prior to the May 2021 IPO.

> C.    **The Offering Documents Materially Untrue, Misleading, and Incomplete Statements Regarding Oatly's Environmental Practices**

157.    The Offering Documents touted that "***Sustainability is at the core of our business and actionable in our products***" and that "on average, a liter of Oatly product consumed in place of cow's milk results in around 80% less greenhouse gas emissions, 79% less land usage and 60% less energy consumption."  Similarly, the Offering Documents stressed that, "***Sustainability at Oatly is far more than achieving certain key performance indicators and corporate policies — it is a mindset that helps us navigate business decisions and build a culture that is singularly focused on pushing the boundaries of the plant-based movement***."

158.    Indeed, the Offering Documents also affirmatively represented that Oatly's environmental practices were one of the Company's "Competitive Strengths."  Specifically, the Offering Documents described this purported "Competitive Strength[]," in part, as follows:

> Rooted and validated through our research, we believe the growth of our products is an actionable solution to some of society's greatest environmental and nutritional challenges.  We are focused on driving the global appetite and market for plant-based dairy, and we are just scratching the surface.  ***With every liter of Oatly we produce, our positive environmental and societal impact increases***.  We strive to drive meaningful change within the food industry by making it easier for people to turn what they eat and drink into personal moments of healthy joy, while reducing the impact on the planet's resources in the process.  ***Our unwavering commitment to sustainability fuels our growth***.

159.    The statements set out in ¶¶157-58 were materially untrue, misleading, and incomplete because they overstated Oatly's sustainability practices and impact because, as was later revealed in the Spruce Point Report, documents obtained through a FOIA request showed "very high concentrations" of certain wastewater by-products from Oatly's manufacturing facility

in New Jersey, which were of significant concern to local regulators and required the installation of a new wastewater treatment facility. *See also* ¶82 above.

160. In addition, the Offering Documents were materially misleading and incomplete because they failed to disclose that certain of Oatly's U.S. manufacturing facilities were not environmentally sustainable prior to the May 2021 IPO, as revealed in the Spruce Point Report.

**D.    The Offering Documents' Failure to Adequately Disclose Rising Costs of Key Ingredients and Their Almost Certain Materially Adverse Impact on Oatly's Post IPO Profitability and Margins**

161. As the Company's name implies, oats are the most important ingredient in Oatly's products. The next most important ingredient is rapeseed oil. Both of these commodities are necessary for the manufacturing of oat base, which is the foundation of all Oatly products. Thus, a ready supply of oats and rapeseed oil at reasonable prices is essential to the Company's business and operations. As detailed below, prices for oats and rapeseed oil were skyrocketing prior to the May 2021 IPO, and the resulting increased cost for these commodities would almost certainly have an adverse impact on Oatly's post IPO profitability and margins as compared to recent years past.

162. Indeed, 2021 was a predictably very bad year for companies, like Oatly, that needed to purchase large quantities of oats and rapeseed oil, as futures prices for both commodities for delivery in the latter part of 2021 increased sharply in relation to historical averages. As shown below (*see* ¶¶165-67), these price increases started well before the May 2021 IPO; futures prices for oats started to increase in the summer of 2020 and futures prices for rapeseed oil began to climb in January 2021. In spite of this, the Offering Documents assured investors that the Company had secured its supplies of oats and rapeseed oil, while disclosing that the only purported risk to the Company in connection with its obtaining such ingredients was a lack of "oats and other raw materials" that did not meet the Company's "quality standards."

163.    Specifically, the Offering Documents were silent on how much Oatly paid for its key ingredients (oats and rapeseed oil), and as to what, if anything, Oatly did to hedge against increases in oat and rapeseed oil prices.  Instead, the Offering Documents simply described the sources of these products stating:

> **Sourcing oats.**  We source oats from regional millers, and we secure regional supply and capacity while minimizing transportation distance and expenses.  Within our regions, we work with farmers to implement sustainable agricultural strategies for oat cultivation, as well as actively seek to aid meat and dairy farmers to increase the amount of crops they grow for human consumption. . . .
>
> Rapeseed oil and other strategic ingredients.  We source non-GMO rapeseed oil.  For our products produced in EMEA, we source from Sweden, and for products produced in the United States, we source from Canada. . . .
>
> * * *
>
> We currently work closely with five oat suppliers to source our oats – we have one supplier in Belgium, one in Malaysia, two in Sweden and one in the United States.  We have agreements in place with each of these suppliers and believe that the terms contained in these agreements are customary for such suppliers in our industry.  Under each of these agreements, we are required to provide forecasts of our anticipated needs for certain periods of time to assess the supply we will require for the upcoming term, and the oats supplied under each of these agreements are subject to certain quality control and sustainability requirements.

164.    The statements set out in ¶163 were materially untrue, misleading, and incomplete because disclosing only the "source" for these products, but not how much the Company was having to pay for its key ingredients, failed to disclose that the prices for future delivery of oats and rapeseed oil had been increasing dramatically in the months prior to the May 2021 IPO (as alleged in the following paragraphs) and, thus, were almost certain to adversely impact the Company's financial performance going forward (notwithstanding that the Company may have had "sources" to supply oats and rapeseed oil).

165.    A commodity futures contract is an agreement to buy a specified amount of a commodity at a set point in the future for an agreed-upon price.  Oat futures are actively bought

and sold on the CME.  Each CME future represents a contract for 5,000 bushels of oats, which is deliverable on the second business day following the last trading day of the delivery month.  CME oat futures contracts are monthly contracts, with deliveries in March, May, July, September, and December of each year, with two deliveries in July and September.  Each CME oat future is listed on the exchange 10 months prior to its delivery date.  Consequently, the published prices for CME oat futures contracts are a reliable measure for the expected cost of procuring oats for delivery as of 10 months in the future.  The graph below shows the daily closing prices (over time, beginning in May 2020 and ending on November 15, 2021) for the various CME oat futures for delivery in May, July, and December of 2021, with the white line showing the price for May 2021 delivery — and the blue, orange, and purple lines showing the prices for oat futures for delivery in July, September, and December 2021, respectively:

**CLOSING CME OAT FUTURES PRICES FOR MAY, JULY, SEPTEMBER, AND DECEMBER 2021 DELIVERY**



166.     Similarly, rapeseed futures contracts are actively bought and sold on the Euronext exchange.  Each Euronext rapeseed future represents contract for delivery of 50 tons of rapeseed oil for delivery in February, May, August, or November of a given year at one of several ports throughout Europe.  Each Euronext rapeseed future is listed on the exchange 10 months prior to

its delivery date.  Consequently, the published prices for Euronext rapeseed futures are a reliable measure for the expected cost of acquiring rapeseed as of 10 months in the future.  The graph below shows the daily closing price for one Euronext rapeseed future for the next available, or "active," delivery date (*i.e.*, the price for delivery 10 months in the future) over the period May 2020 through November 15, 2021:

**CLOSING EURONEXT RAPESEED OIL FUTURE PRICES FOR 10 MONTH DELIVERY**



167.    As can be seen clearly from the graphs above, the cost of oats and rapeseed oil for delivery 10 months in the future (*i.e.*, for delivery in the latter part of 2021) increased sharply in the period leading up to the May 2021 IPO, and thereafter continued to increase during the second half of 2021.

168.    Moreover, although the Offering Documents contained purported risk disclosures related to "oats or other raw materials," those disclosures addressed only the potential risk of a reduction in supplies of oats that met the Company's "quality standards" (which the Offering Documents described as the risk that Oatly might face "reduced or limited availability of oats or other raw materials that meet our quality standards").  However, the Offering Documents did ***not*** address any risk relating to the ***already-increased*** price of oat and rapeseed futures.

169.    The Offering Documents also included certain other generic "risk disclosures" related to oats, which simply stated that the Company's "financial performance depends in large part on . . . the purchase of raw materials . . . at competitive prices."  For example, the Offering Documents stated:

> Our future business, results of operations and financial condition **may** be adversely affected by reduced or limited availability of oats and other raw materials that our limited number of suppliers are able to sell to us that meet our quality standards.
>
> Our ability to ensure a continuing supply of high-quality oats and other raw materials for our products at competitive prices depends on many factors beyond our control.  In particular, we rely on a limited number of regional suppliers that supply us with high-quality oats and maintain controls and procedures in order to meet our standards for quality and sustainability.  Our financial performance depends in large part on our ability to arrange for the purchase of raw materials in sufficient quantities **at competitive prices**.  We are not assured of continued supply or adequate pricing of raw materials.  Any of our suppliers could discontinue or seek to alter their relationship with us. . .
>
> In addition, we also compete with other food companies in the procurement of oats and other raw materials, and this competition may increase in the future if consumer demand increases for these items or products containing them or if competitors increasingly offer products in these market sectors.  If supplies of oats and other raw materials that meet our quality standards are reduced or are in greater demand, we may not be able to obtain sufficient supply to meet our needs on favorable terms, or at all.

170.    However, none of these "risk disclosures" disclosed that the prices for future delivery of oats and rapeseed oil had **already** increased dramatically in the months prior to the May 2021 IPO — nor did they disclose the almost certain adverse impact that such increasing prices would have on the Company's financial performance going forward.

171.    The Company also included a boilerplate risk disclosure concerning "[v]olatility in the prices of raw materials," which stated:

> ***Volatility in the prices of raw materials and other supplies we purchase could increase our cost of sales and reduce our profitability***.  Moreover, we may not be able to implement price increases for our products to cover any increased costs, and any price increases we do implement may result in lower sales volumes.  ***If we are not successful in managing our ingredient and packaging costs or the higher costs***

*of sustainable materials, if we are unable to increase our prices to cover increased costs or if such price increases reduce our sales volumes, then such increases in costs will adversely affect our business, financial condition and results of operations*.

172.    However, as with the other "risk factors," such "warnings" did not disclose that, as alleged above, the prices for future delivery of oats and rapeseed oil had ***already*** increased dramatically in the months prior to the May 2021 IPO — nor did they disclose the almost certain adverse impact that such increasing prices would have on the Company's financial performance going forward.

173.    Indeed, the purported "risk disclosure" statements set out in ¶¶168-73 were themselves materially untrue and misleading because (i) they failed to disclose that the prices for future delivery of oats and rapeseed oil had been increasing dramatically in the months prior to the May 2021 IPO and, thus, were almost certain to adversely impact the Company's financial performance going forward notwithstanding a "source" to supply oats and rapeseed oil; and (ii) the "risk" of increasing prices for oats and rapeseed oil had already materialized prior to the May 2021 IPO.

## XIV.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

**For Violation of Section 11 of the Securities Act**
**Against All Securities Act Defendants**

174.    The Securities Act Plaintiffs incorporate ¶¶1-173 by reference.

175.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the ADS Class, against each of the Securities Act Defendants.

176.    This is a non-fraud Count.  For the purpose of this Count, the Securities Act Plaintiffs do ***not*** assert that any Securities Act Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

177.    The Offering Documents, including the Form F-1 Registration Statement (as amended) and all materials incorporated therein (including the final Prospectus and all freewriting prospectus materials), contained untrue statements of material facts, omitted facts necessary to make the statements made therein not materially misleading, and omitted to state material facts required to be stated therein.

178.    Defendant Oatly is the issuer of the securities purchased by the Securities Act Plaintiffs and the ADS Class.  As such, Oatly is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.   By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Oatly is liable under Section 11 of the Securities Act to the Securities Act Plaintiffs and the ADS Class.

179.    Each Individual Securities Act Defendant signed the Offering Documents and caused their issuance.  As such, each of them is also strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they can carry their burden of establishing an affirmative "due diligence" defense.  Each Individual Securities Act Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that they were true and accurate, that there were no omissions of material facts that would make the Offering Documents misleading, and that the Offering Documents contained all facts required to be stated therein.  In the exercise of reasonable care, each Individual Securities Act Defendant should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of

material fact necessary to make the statements made therein not misleading. Accordingly, each Individual Securities Act Defendant is liable to the Securities Act Plaintiffs and the ADS Class.

180.    The Securities Act Defendants acted negligently in preparing the Offering Documents. None of the Securities Act Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for a belief that the statements contained in the Offering Documents were true and without omission of any material facts and were not misleading. In alleging the foregoing, the Securities Act Plaintiffs specifically disclaim any allegations of fraud.

181.    By reason of the conduct alleged herein, each Securities Act Defendant named in this Count violated Section 11 of the Securities Act.

182.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

183.    The Securities Act Plaintiffs acquired the Oatly ADSs pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein. The Securities Act Plaintiffs sustained damages as the price of Oatly's ADSs declined substantially following the issuance of the defective Offering Documents.

184.    This Count is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the May 2021 IPO.

185.     By virtue of the foregoing, the Securities Act Plaintiffs and the other members of the ADS Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from the Securities Act Defendants and each of them, jointly and severally.

## COUNT IV

### For Violation of Section 12(a) of the Securities Act
### Against All Securities Act Defendants

186.     The Securities Act Plaintiffs incorporate ¶¶1-185.

187.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the ADS Class, against all Securities Act Defendants.  Section 12(a)(2) provides that "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading," may be held liable.  15 U.S.C.§77l(a)(2).  Liability for a violation of Section 12(a)(2) extends to those, at a minimum, who passed title to the security to the purchaser, as well as those who solicited the purchase.

188.     This is a non-fraud Count.  For the purpose of this Count, the Securities Act Plaintiffs do *not* assert that any Securities Act Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

189.     Securities Act Defendants named in this Count were sellers, offerors, and/or solicitors of purchasers of Oatly's securities offered pursuant to the defective Offering Documents. Securities Act Defendants issued, or caused to be issued, the May 19, 2021 Prospectus filed on Form 424B4 (the "Prospectus"), which was used to induce investors, such as the Securities Act Plaintiffs and the other members of the ADS Class, to purchase Oatly's ADSs.  Securities Act

Defendants solicited the purchase of securities motivated at least in part by a desire to serve their own financial interests.

190.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  The actions of solicitation by the Securities Act Defendants named in this Count included participating in the preparation of the false and misleading Prospectus and marketing of Oatly's ADSs to investors, such as the Securities Act Plaintiffs and the other members of the ADS Class, including through roadshow events.

191.    Securities Act Defendants named in this Count owed to the purchasers of Oatly's ADSs, including the Securities Act Plaintiffs and the other members of the ADS Class, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  By virtue of each of these Securities Act Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material facts and omissions of material facts necessary to make statements therein not misleading.

192.    Securities Act Plaintiffs and the other members of the ADS Class did not know, nor could they have known, of the untruths or omissions contained in the Prospectus.

193.    Oatly, as the registrant of the securities issued in the May 2021 IPO, is strictly liable for the materially inaccurate statements contained in the Prospectus and the failure of the Prospectus to be complete and accurate.

194.    In addition, the Individual Securities Act Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that

such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. The Individual Securities Act Defendants did not make a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects. Had they done so, these defendants could have known of the material misstatements and omissions alleged herein. In alleging the foregoing, the Securities Act Plaintiffs specifically disclaim any allegation of fraud.

195.    The Securities Act Plaintiffs acquired Oatly ADSs pursuant to the Prospectus and without knowledge of the untruths and/or omissions alleged herein. The Securities Act Plaintiffs sustained damages, and the price of Oatly's ADSs declined substantially due to material misstatements and omissions in the Prospectus.

196.    This Count is brought within one year after discovery of the untrue statements and omissions in the Prospectus and within three years after Oatly's ADSs were sold to the ADS Class in connection with the May 2021 IPO.

197.    By reason of the conduct alleged herein, the Securities Act Defendants named in this Count violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violation, the Securities Act Plaintiffs and the other members of the ADS Class, who purchased Oatly ADSs pursuant to the Prospectus, sustained substantial damages in connection with their share purchases. Accordingly, those members of the ADS Class that purchased Oatly ADSs pursuant to the Prospectus and continue to hold such shares have the right to recover damages based on a rescissory measure of damages, together with interest thereon, and such other alternative damages to the maximum extent permitted by law or equity. ADS Class members that

purchased Oatly ADSs pursuant to the Prospectus and who have since sold their Oatly ADSs have the right to seek damages to the maximum extent permitted by law or equity.

## COUNT V

**For Violations of Section 15 of the Securities Act
Against the Individual Securities Act Defendants**

198.     The Securities Act Plaintiffs incorporates ¶¶1-197 by reference.

199.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the ADS Class, against each of the Individual Securities Act Defendants.

200.     The Individual Securities Act Defendants were controlling persons of Oatly within the meaning of Section 15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at Oatly, these Defendants, individually and collectively, had the power to influence, and exercised that power over Oatly to cause it to engage in the conduct complained of herein.

201.     Similarly, each of the Individual Securities Act Defendants controlled Oatly, which is subject to liability as a primary violator of Sections 11 and 12(a)(2) of the Securities Act, as alleged in Counts III and IV above, and they directly participated in controlling Oatly by having signed or authorized the signing of the Offering Documents and authorizing the issuance of the Oatly ADSs that were sold to the Securities Act Plaintiffs and the members of the ADS Class.

202.     As control persons of Oatly, each of the Individual Securities Act Defendants are jointly and severally liable pursuant to Section 15 of the Securities Act with and to the same extent as Oatly for its violations of Sections 11 and 12(a)(2) of the Securities Act.

## XV.  CLASS ACTION ALLEGATIONS

203.     The class action allegations set forth below apply to all claims asserted under both Parts One and Two of this Complaint, unless otherwise specified.

204.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of two putative classes: (i) The ADS Class consisting of all purchasers of Oatly ADSs during the Class Period, and (ii) the Options Sub-Class consisting of all individuals that bought or sold options on Oatly ADSs during the Class Period and were damaged thereby. Excluded from the Classes are Defendants and their families, the directors and officers of Oatly and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

205.    The members of the Classes are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Oatly issued 87.376 billion ADSs in the May 2021 IPO and those ADSs were actively traded on the NASDAQ Global Select Market throughout the Class Period.  While the exact number of ADS Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed class.  Record owners and other members of the ADS Class may be identified from records maintained by Oatly, its transfer agent, and/or the May 2021 IPO underwriters and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Similarly, while the exact number of Options Sub-Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed class.  Record owners and other members of the Options Sub-Class may be identified from records maintained by third parties that transacted in options with Sub-Class members and exchanges where options on Oatly ADSs are regularly traded.

206.    Plaintiffs' claims are typical of those of the Classes, as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

207.    Plaintiffs will adequately protect the interests of the Classes and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Classes.

208.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Classes which predominate over questions which may affect individual members of the Classes.  Among the questions of law and fact common to the Classes are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether the Offering Documents for the May 2021 IPO were materially false, incomplete, or misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

(c) whether (with respect to Counts I, II and III, only) the other statements alleged herein in Part One of this Complaint were materially false, incomplete, or misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

(d) whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements (with respect to Counts I, II and III, only);

(e) whether the prices of Oatly ADSs were artificially inflated during the Class Period because of Defendants' conduct as complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

209.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23 and appointing Plaintiffs as representative parties of the Classes and approving their selection of lead counsel;

B.    Awarding Plaintiffs and the members of the Classes damages, including rescission and pre- and post-judgment interest;

C.    Awarding Plaintiffs' reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 4, 2022

 *s/ William C. Fredericks*
WILLIAM C. FREDERICKS (WF-1576)
THOMAS L. LAUGHLIN, IV (TL-8888)
RHIANA L. SWARTZ (RS-2332)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile:  212-233-6334
wfredericks@scott-scott.com
tlaughlin@scott-scott.com
rswartz@scott-scott.com

JACOB B. LIEBERMAN (JL-2728)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
Colchester, CT 06415
Telephone: 860-810-7770
jlieberman@scott-scott.com

*Lead Counsel for Lead Plaintiff Mario Bello and Additional Plaintiffs Kai Jochim and Mark D. Hayden*

70

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

*s/ William C. Fredericks*
William C. Fredericks