**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE OATLY GROUP AB SECURITIES LITIGATION | Consolidated Civil Action No. 1:21-cv-06360 (AKH)(SLC) <br><br> ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

LATHAM & WATKINS LLP
Christopher J. Clark
William O. Reckler
Benjamin Naftalis
Kalana Kariyawasam
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200

Elizabeth R. Marks
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000

*Attorneys for Defendants*

Dated:   April 8, 2022

**TABLE OF CONTENTS**

Preliminary Statement.................................................................................................1

Background...................................................................................................................4

      A.      Oatly.........................................................................................................4

      B.      The Initial Public Offering.....................................................................4

      C.      Spruce Point Report ...............................................................................5

      D.      Oatly's Q2 and Q3 2021 Results ...........................................................6

      E.      The Consolidated Amended Complaint...................................................7

Argument ....................................................................................................................8

I.      Plaintiffs' Exchange Act Claims Fail to State a Claim........................................8

      A.      Plaintiffs Fail to State a Claim Under Section 10(b) of the Exchange Act..............8

            1.      Plaintiffs Do Not Adequately Plead Any Material Affirmative Misstatements or Omissions .........................................................9

            2.      Plaintiffs Fail to Allege Scienter.............................................25

            3.      Plaintiffs Fail to Allege Loss Causation ..................................29

      B.      Plaintiffs Fail to State a Claim Under Section 20(a) of the Exchange Act Against Petersson and Hanke..................................................................32

II.      Plaintiffs' Securities Act Claims Fail To State A Claim ...................................33

      A.      Plaintiffs' Securities Act Claims Should Be Analyzed Using the Heightened Pleading Standard for Claims That Sound in Fraud.........................33

      B.      Plaintiffs Fail to State a Claim Under Section 11 of the Securities Act ................34

             1.      Plaintiffs Fail to Allege Material Misstatements or Omissions in the Offering Documents.........................................................35

            2.      Even If False, the 2018 Revenue Statement Was Not Material.................37

      C.      Plaintiffs Fail to State a Claim Under Section 12(a) of the Securities Act............39

            1.      Plaintiffs Fail to Allege That All of the Director Defendants Are Statutory Sellers.........................................................40

2.      Plaintiffs Fail to Allege Standing to Bring a Section 12(a)(2) Claim........41

D.    Plaintiffs Fail to State a Claim Under Section 15 of the Securities Act
      Against Petersson, Hanke and the Director Defendants .......................................42

Conclusion ....................................................................................................................................42

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*60223 Trust v. Goldman Sachs & Co.*,
540 F. Supp. 2d 449 (S.D.N.Y. 2007)......................................................................................32

*In re Adient PLC Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..........................................................................23

*Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*,
2020 WL 3318029 (S.D.N.Y. June 18, 2020) ........................................................................40

*Arkansas Pub. Emp. Ret. Sys. v. Bristol-Myers Squibb Co.*,
---F.4th---, 2022 WL 727149 (2d Cir. Mar. 11, 2022).....................................................18, 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................................8

*Ashland Inc. v. Morgan Stanley & Co.*,
700 F. Supp. 2d 453 (S.D.N.Y. 2010)......................................................................................28

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)......................................................................................42

*Bond Opportunity Fund v. Unilab Corp.*,
2003 WL 21058251 (S.D.N.Y. May 9, 2003) .........................................................................24

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021).......................................................................................22

*Chiarella v. United States*,
445 U.S. 222 (1980).................................................................................................................17

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)..................................................................................9, 27

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
--- F. Supp. 3d ---, 2021 WL 4481119 (S.D.N.Y. Sept. 30, 2021) ...................................20, 21

*In re Cosi, Inc. Sec. Litig.*,
379 F. Supp. 2d 580 (S.D.N.Y. 2005).......................................................................................41

*Craftmatic Sec. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989)......................................................................................................40

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..................................................................................23, 38

*Elliott Assocs., L.P. v. Covance, Inc.*,
   2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000).........................................................11

*Fishbaum v. Liz Claiborne, Inc.*,
   189 F.3d 460, 1999 WL 568023 (2d Cir. 1999) .....................................................26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)................................................................10, 11

*Gagnon v. Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019)......................................................................10

*Gavish v. Revlon, Inc.*,
   2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004).........................................................38

*In re Gen. Elec. Sec. Litig.*,
   2020 WL 2306434 (S.D.N.Y. May 7, 2020) ............................................................23

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009)......................................................................26

*Gustafson v. Alloyd Co., Inc.*,
   513 U.S. 561 (1995)..................................................................................................41

*Johnson v. Sequans Comms. S.A.*,
   2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ............................................................23

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)............................................................................ *passim*

*Kinsey v. Cendant Corp.*,
   2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005)....................................................27, 28

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013).....................................................................................21

*Lasker v. N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) .........................................................................................35

*Lau v. Opera Ltd.*,
   527 F. Supp. 3d 537 (S.D.N.Y. 2021).......................................................................30

*Lentell v. Merrill Lynch*,
   396 F.3d 161 (2d Cir. 2005)......................................................................................30

iv

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015).............15, 23, 37

*Marsh & McLennan Cos. Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006).....................................................................................17

*Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)..........................................................................13, 14, 36

*Monroe Cnty. Emps. Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)...............................................................................17, 19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)....................................................................34, 38, 39, 40

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
    2016 U.S. Dist. LEXIS 136929 (S.D.N.Y. Sep. 30, 2016).......................................................15

*In re Noah Educational Holdings, Ltd. Sec. Litig.*,
    2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ..........................................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...............................................................................................24, 25

*In re Omnicom Grp. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)..................................................................................................30

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008)....................................................................................36

*In re Pareteum Sec. Litig.*,
    19 Civ. 9767 (AKH), 2020 WL 3448526 (S.D.N.Y. 2020).....................................................22

*Pinter v. Dahl*,
    486 U.S. 622 (1988).............................................................................................................40

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ..........................................................................................20, 39

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Comm.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................................9

*Police and Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings*,
    2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017)..........................................................................35

*In re Prestige Brands Holding, Inc.*,
    2006 WL 2147719 (S.D.N.Y. July 10, 2006) ...................................................................26, 27

*Pub. Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)......................................................................................41

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)......................................................................................4, 8

*Ret. Sys. v. Nokia Corp.*,
    2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011).........................................................................25

*Rombach v. Chang*,
    355 F.3d 164 (2nd Cir. 2004)...................................................................................13, 33, 34, 35

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ...................................................................................................40

*SEC v. Patel*,
    2008 WL 781914 (D.N.H. Mar. 24, 2008) ............................................................................38

*In re Security Capital Assur. Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010)........................................................................30, 31, 32

*In re Segue Software, Inc. Sec. Litig.*,
    106 F. Supp. 2d 161 (D. Mass. 2000) ....................................................................................38

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996).....................................................................................................40

*Shemian v. Research In Motion Ltd.*,
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013), aff'd, 570 F. App'x 32 (2d Cir. 2014) ...........27

*South Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)..................................................................................................25, 26

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................................................26, 28, 29

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000).........................................................................................33

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings*,
    127 F. Supp. 3d 156 .....................................................................................................................6

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
    2009 WL 464934 (S.D.N.Y. Feb. 25, 2009)...........................................................................23

*Yung v. Lee,*
    432 F.3d 142 (2d Cir. 2005).................................................................................41

## STATUTES

15 U.S.C.
    § 77g.............................................................................................................39
    § 77l(a)(2) ....................................................................................................39
    § 78t(a) .........................................................................................................32
    § 78u-4(b)......................................................................................................1
    § 78u-5(c)-(i).................................................................................................25

## RULES

Fed. R. Civ. P. 8.............................................................................................1, 34

Fed. R. Civ. P. 9(b) .................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)........................................................................................1

Fed. R. Evid. 201 ................................................................................................6

Defendants Oatly Group AB ("Oatly") and Toni Petersson, Christian Hanke, Björn Öste, Fredrik Berg, Ann Chung, Bernard Hours, Hannah Jones, Mattias Klintemar, Po Sing Tomakin Lai, Eric Melloul, Yawn Wu, and Tim Zhang (the "Individual Defendants" and together with Oatly, the "Defendants") submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Complaint (the "Complaint")[1] pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiffs invested in a rapidly growing company, the stock declined amidst a global pandemic, and Plaintiffs then manufactured a lawsuit to try to recover their alleged losses. But the Complaint does not include well-pleaded facts necessary to state claims under the Securities Exchange Act of 1934 (the "Exchange Act") or the Securities Act of 1933 (the "Securities Act"), and must be dismissed on all counts.

Oatly, a global manufacturer of oat milk and other oat-based dairy-alternative products, went public last spring to raise capital so that it could grow its manufacturing and distribution capabilities to meet high consumer demand. However, Oatly's ability to increase production has been hampered by global supply chain constraints during the COVID-19 pandemic. Before, during, and in the months after its initial public offering ("IPO") in May 2021, Oatly repeatedly disclosed its production capacity constraints and warned investors that supply chain issues and rising ingredient costs could lead to lower gross profits, decreased shelf space, and distribution issues. The rise of the Delta variant in the fall of 2021 only compounded those problems.

---

[1] Exhibit A to the Declaration of Kalana Kariyawasam filed herewith. Citations to the Complaint are in the form "¶ _." Citations in the form "Ex. _" are exhibits to the Declaration of Kalana Kariyawasam.

Oatly's identification of its business risks was sound and prescient, and Oatly's stock price fell. But the fact that Oatly's stock price fell does not mean that Defendants engaged in a fraudulent scheme to defraud investors or that any representations in Oatly's offering documents were materially false or misleading.

Plaintiffs attempt to state a claim under Section 10(b) and 20(a) of the Exchange Act by twisting Oatly's accurate statements about the challenges of meeting high demand due to supply issues into alleged misstatements, asserting in conclusory fashion that consumer demand was actually *declining* and that Defendants engaged in a fraudulent scheme to hide that from investors. Plaintiffs engage in similar tactics for the other categories of alleged misstatements in the Complaint, which quotes large blocks of text from Oatly's offering documents and other filings, but without specifying which parts of those passages it alleges are false. To the extent that Defendants can make heads or tails of this impermissible "puzzle pleading," it appears that Plaintiffs challenge statements on a total of four topics:

    (1) The demand for Oatly's products;

    (2) Oatly's commitment to environmental sustainability, which Plaintiffs claim was false because a single manufacturing facility in New Jersey had an issue with its wastewater in 2019;

    (3) Oatly's disclosure of the risk of rising ingredient prices, which Plaintiffs claim was misleading because prices were already rising; and

    (4) Oatly's 2018 revenue for the United States and other accounting disclosures.

Plaintiffs fail to adequately allege an actionable misstatement with respect to any of these topics. Most notably, they do not allege particularized facts to support their allegations that any of Oatly's statements on these subjects were false or misleading. And even if Plaintiffs could

sufficiently plead falsity, most of the challenged statements are inactionable as puffery, opinions, or forward-looking statements. Because of the difficulty in identifying the specific statements that Plaintiffs challenge, and because the shortcomings in the allegations overlap among the different categories of statements, Defendants have set out on **Appendix A** each alleged misstatement (or omission), organized by subject matter, and the reasons each is not actionable as a matter of law.

Not only have Plaintiffs failed to plead an actionable statement on which to base their claims, but they have also failed to plead that Defendants acted with scienter. The 70-page Complaint allocates no more than four short paragraphs to pleading that Defendants had the motive and opportunity to commit fraud, based on their sales of shares in connection with the IPO. But, such stock sales are insufficient to establish scienter as a matter of law. And Plaintiffs fall far short of the higher burden of pleading a strong inference that the Defendants had a mental state embracing intent to deceive, manipulate, or defraud investors. In fact, the Complaint does not allege *any* particularized facts regarding Defendants' state of mind. Plaintiffs' Section 10(b) claim further fails because they have not adequately pleaded loss causation—they do not allege any corrective disclosures that reveal a fraud. And because Plaintiffs cannot plead a Section 10(b) claim, their Section 20(a) claim fails as well.

The Securities Act claims, which are based on essentially the same alleged misstatements as the Exchange Act claims, fail for the same reasons: Plaintiffs do not adequately plead that any of Defendants' statements were false or misleading. Plaintiffs further fail to plead facts establishing the "statutory seller" and standing requirements of Section 12(a)(2). And because Plaintiffs cannot state a claim under Section 11 or 12(a)(2), their Section 15 claim also fails.

3

## BACKGROUND

### A.   Oatly

Oatly is a Swedish company founded in 1994 that produces oat-based products, including oat milk, ice cream, and yogurt.  (¶¶ 25–26).  Oatly's key markets are Sweden, the United Kingdom, Germany, the United States, and China.  (¶ 28.)  Its manufacturing process is based on a proprietary "oat base" that includes oats and rapeseed oil as key ingredients.  (¶ 29.)

### B.   The Initial Public Offering

Oatly raised $1.0 billion[2] in an IPO on May 20, 2021, selling American Depository Shares ("ADSs") at a price of $17.00 per share, after filing its final amended Form-1 Registration Statement and Prospectus Supplement with the Securities & Exchange Commission ("SEC") on May 17, 2021 (the "Offering Documents").  (¶¶ 10, 35, 37; Aug. 16, 2021 Press Release, Ex. G at 1.)[3]  Defendants Toni Petersson (Oatly's CEO) and Christian Hanke (Oatly's CFO) sold shares in private placements in connection with the IPO—but not directly in the IPO.  (¶ 11.)  Defendant Björn Öste (a co-founder and director) sold shares directly in the IPO.  (¶¶ 125.)  Plaintiffs do not allege that any other Individual Defendant sold shares in connection with the IPO or during the class period.

At the time of the IPO, Oatly had manufacturing facilities in Sweden, New Jersey, and the Netherlands, with plans for opening additional facilities in Utah, Singapore, China, and the

---

[2] The Complaint alleges this figure was $1.4 billion (¶¶ 3, 11, 35) but, as explained in Oatly's August 2021 press release, the IPO provided "net proceeds to the Company of approximately $1,037.3 million." (Ex. G at 1.)

[3] The Court may consider documents on which the Complaint relies.  *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("Plaintiffs' decision not to attach either of [the Prospectus or the article on which they rely] to the amended complaint puzzles and concerns this Court.  This Court must carefully consider both of these documents, as they form the basis of the claim.  If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint.").

United Kingdom.[4] (¶ 33.)  In the Offering Documents and on multiple other occasions, Oatly disclosed that consumer demand for its products was greater than supply, and the greatest constraint on growth was production capacity.  (¶¶ 34, 40.)  Oatly explained that it would use the proceeds from the IPO to increase its production capacity.  (¶ 34.)  However, the Offering Documents warned that this expansion could "take longer or prove more expensive than [Oatly] anticipate[d], particularly in light of the COVID-19 pandemic," and that Oatly "may not succeed in increasing [its] revenue and margins sufficiently to offset the anticipated higher expenses." (Final Am. F-1, Ex. C at 24.)  In fact, the Offering Documents stated that construction at multiple facilities had already been delayed because of COVID-19.  (*Id.* at 27.)  Oatly also disclosed other risks it would face if it was unable to address its supply challenges.  (*See, e.g.*, *Id.* at 25 ("If we are unable to manage our supply chain effectively and ensure that our products are available to meet consumer demand, our operating costs could increase and our profit margins could decrease.").  Oatly also disclosed risks related to the costs of key ingredients like oats and rapeseed oil.  (*See, e.g.*, ¶ 169 ("Our financial performance depends in large part on our ability to arrange for the purchase of raw materials in sufficient quantities at competitive prices.").)

C.    **Spruce Point Report**

Before the market opened on July 14, 2021, an investment group, Spruce Point Capital Management ("Spruce Point") issued a report about Oatly (¶ 76), which Plaintiffs rely on in support of many of their allegations.  Spruce Point had a short position in Oatly's stock "and therefore st[ood] to realize significant gains in the event that the price decline[d]."  (Spruce Point Report, Ex. E at 2.)  Spruce Point stated that the report was based solely on public information

---

[4] For the sake of accuracy, Defendants note that, as disclosed in Oatly's final amended Form F-1, the Utah facility was operational by the time of the IPO, not starting "[d]uring the class period" as Plaintiffs allege.  (¶ 33; Ex. C at 76.)

5

(*id.*) and criticized Oatly's revenue metrics and financial disclosures. (¶ 77.) At the time the market closed on July 14, 2021, Oatly's stock had dropped to $20.54, down 2.8% from the prior day's close.[5] As reflected in **Appendix B** hereto, that stock drop was in line with a downward trend in the price of Oatly's stock since early June.

On July 26, 2021, Plaintiff Kai Jochims filed a class action complaint against Defendants, bringing claims under the Exchange Act, based entirely on the Spruce Point report. ECF No. 1. On September 24, 2021, Plaintiffs Mario Bello and Mark Hayden asserted membership in the putative class alleged by Jochims. *See* ECF No. 19.

### D.    Oatly's Q2 and Q3 2021 Results

On August 16, 2021, Oatly issued a press release announcing its financial results for the second quarter of 2021 ("Q2 Release") and held an earnings call ("Q2 Earnings Call") (collectively, Oatly's "Q2 Results"). (¶¶ 54, 56–57.) In the Q2 Release, Petersson noted "lower fill rates due to the robust consumer demand and continued capacity restraints." (¶¶ 54–55.) The Q2 Release stated that Oatly's "revenue growth ha[d] been constrained by limitations in [its] capacity," and on the earnings call, Petersson explained "recent pressures on our market share velocity [are] expected and directly correlated with the capacity constraints and less of inventory to fulfill demand across sales channels." (¶¶ 56–57.) The Q2 Release further noted "growth was partially offset by COVID-19 and start-up related manufacturing delays." (Q2 Release, Ex. G at 3.)

---

[5] The Court may take judicial notice of Oatly's stock price over time. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings*, 127 F. Supp. 3d 156, 166 ("Under Federal Rule of Evidence 201, a court may take judicial notice, 'at any stage of the proceeding,' of any fact 'that is not subject to reasonable dispute because' it 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"). Plaintiffs inaccurately allege Oatly's stock price closed at $19.48 on July 14, 2021. (¶ 5.)

On Monday, November 15, 2021, Oatly announced its third quarter financial results in a press release ("Q3 Release") and earnings call ("Q3 Earnings Call") (collectively, Oatly's "Q3 Results"). (¶¶ 86, 88.) Oatly disclosed that the supply chain risks it had previously identified, including in its Offering Documents and Q2 reporting, had materialized. (¶ 86.) It also announced that it had lost $44 million in the third quarter and its gross profit margins were down. (*Id.*) During the earnings call, Hanke stated that due to supply constraints, Oatly had to scale back distribution for certain regions. (¶ 88; Q3 Earnings Call Tr., Ex. H at 10.) He also explained, "we started 2021 with less shelf space than prior years, based on our lack of inventory and the fact that we have historically sold all that we have produced." (¶ 88.) In the press release, Petersson explained that the COVID-19 pandemic was at least partially to blame for production challenges. (*See* ¶ 87 ("the pace at which we expected to increase revenue . . . and to open new markets is slower than we anticipated as we navigate a dynamic COVID operating environment").)[6]

Oatly's stock price decreased to $9.36 at close on November 15, 2021. (¶ 96.) Media outlets, such as the Wall Street Journal, reported, "Swedish oat-milk maker Oatly Group AB warned that production challenges might keep it from growing as fast as previously projected, sending its shares lower"; "the company's reduced sales outlook added to investors' concerns about Oatly's losses and its capacity to meet growing demand." (¶ 103.)

### E.    The Consolidated Amended Complaint

On March 4, 2022, Plaintiffs filed the Complaint, adding claims under the Securities Act. Plaintiffs allege a "Class Period" of May 20, 2021 (Oatly's IPO) through November 15, 2021

---

[6] *See also* Q3 Release, Ex. I at 1 ("[Oatly's] positive momentum was partially offset by temporary headwinds as we scale our global production capacity, particularly in Ogden, Utah, and as we manage through COVID-19 Delta-variant related restrictions and temporary foodservice closures in Asia.").

(Oatly's Q3 Results) (¶ 1), and that Defendants made misleading statements or omissions in the Offering Documents and throughout the Class Period about the following four topics: (1) consumer demand, (2) environmental practices, (3) ingredient prices, and (4) revenue and accounting practices. (¶¶ 39, 47, 139.) Plaintiffs allege that the "truth" regarding these topics emerged in two purported corrective disclosures—the Spruce Point report and the announcement of the Q3 Results—and that Oatly's stock dropped in response and caused their losses. (¶¶ 76–96, 142.)

As demonstrated below, Plaintiffs' claims fail because they are based on conclusory allegations, unwarranted inferential leaps, and unreliable sources.

## ARGUMENT

Although in deciding this motion the Court must assume that well-pleaded factual allegations in the Complaint are true, it need not accept legal conclusions, naked assertions, mere conclusory statements, or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). Nor is the Court required to accept as true allegations that are contradicted by documents deemed to be part of the Complaint, such as the Offering Documents. *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000). The claims must raise more than the "mere possibility of misconduct"; rather, plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678–79. Plaintiffs fail to meet this pleading standard, much less satisfy the heightened pleading standards of Rule 9(b) and the PSLRA.

## I.     PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL TO STATE A CLAIM

### A.     Plaintiffs Fail to State a Claim Under Section 10(b) of the Exchange Act

Plaintiffs allege that the Exchange Act Defendants (Oatly, Petersson and Hanke) violated Section 10(b), which requires plaintiffs to establish that (1) each defendant made a misstatement

or omission of a material fact; (2) with scienter; and (3) which caused plaintiff's loss. *See Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

Plaintiffs must establish those elements under the Rule 9(b) heightened pleading standards, which requires that a plaintiff "state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Further, the PSLRA "requires that a securities fraud complaint state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind and that, with regard to a misstatement or omission of material fact, the complaint must specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 374 (S.D.N.Y. 2004) (emphasis added) (internal quotation marks omitted). Accordingly, claims based on "speculation and conclusory allegations" will not survive a motion to dismiss. *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010).

Plaintiffs allege that three categories of statements violate Section 10(b): affirmative misstatements regarding (1) consumer demand and (2) environmental practices; and (3) omissions regarding rising ingredient costs. Plaintiffs also allege omission of certain accounting information as a subset of their allegations regarding Oatly's statements about consumer demand. (*See* ¶¶ 47–49.) Plaintiffs fail to meet the high burdens imposed by Rule 9(b) and the PSLRA as to any of these statements or omissions.

### 1.      Plaintiffs Do Not Adequately Plead Any Material Affirmative Misstatements or Omissions

Putting aside the fact that many of the statements Plaintiffs challenge are inactionable puffery, opinions, or forward-looking statements (*see* Section I.A.c, *infra*), Plaintiffs do not, as a threshold matter, plead with particularity that these statements or omissions were materially false

9

or misleading.  For the Court's convenience, the table at Appendix A lists all of the alleged

misstatements in the Complaint and summarizes the reasons why they are not actionable, as

discussed further below.

> a.    Plaintiffs Do Not Adequately Plead Oatly Made Affirmative False
>        Statements

Most of the statements that Plaintiffs challenge in the Complaint as affirmatively false are

about the high demand for Oatly's products and Oatly's ability to meet that demand being

hampered by production constraints.  (*See* ¶¶ 40–58 (*e.g.*, "Demand for Oatly products has

grown at an incredible rate," and "To date, production capacity has been a major constraint on

growth.").)  Plaintiffs allege that such statements were false because consumer demand was

actually declining.  (*E.g.*, ¶¶ 41, 44, 47, 51, 58.)  Plaintiffs also challenge Defendants' statements

regarding Oatly's environmental practices, *e.g.*, "Sustainability is at the core of our business."

(¶¶ 59–61.)  They allege those statements were false because an Oatly facility in New Jersey had

"high concentrations of certain wastewater byproducts." (*E.g.*, ¶ 61.)

Plaintiffs' allegations that these statements are false are conclusory and based on

unwarranted inferential leaps and unreliable sources of information.

> (1)    *Plaintiffs' Unwarranted Inferences Do Not Establish
>         Falsity*

For a plaintiff to establish falsity, "they must demonstrate with specificity why [a

statement is false]," and must plead more than "a marginal inference of falsity."  *Gagnon v.

Alkermes PLC*, 368 F. Supp. 3d 750, 770 (S.D.N.Y. 2019).  Thus, a plaintiff fails to establish the

falsity of a defendant's statements where "the factual allegations are entirely consistent with

conditions other than" the conditions that would make the defendant's statements false.  *In re

Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 448–49 (S.D.N.Y. 2005); *see also*

10

*Elliott Assocs., L.P. v. Covance, Inc.*, 2000 WL 1752848, at *7 (S.D.N.Y. Nov. 28, 2000) (plaintiff could not establish falsity of statements based on "an unreasonable leap of logic").

Here, rather than plead a single fact to establish that consumer demand was declining instead of increasing, Plaintiffs rely on unwarranted inferential leaps.  For example, Plaintiffs plead that Defendants' disclosure in the Q3 Release that Oatly "started 2021 with less shelf space than prior years" and "had to scale back a distribution of our products for 12 countries," "confirmed that customer demand for Oatly's product had been decreasing since even before the May 2021 IPO." (¶¶ 87–88.)  This argument relies on an inferential leap:  that shelf space and distribution decreases were *caused* by a lack of demand for Oatly's products.  But Plaintiffs have not provided any factual assertions to support such an inference.  That inference—unsupported by any facts—is unwarranted because decreased shelf space and distribution are "entirely consistent with conditions other than lack of demand."  *Flag Telecom Holdings*, 352 F. Supp. 2d at 448.  As Hanke explained in the third quarter earnings call, the decrease in shelf space here was caused by "our lack of inventory, and the fact that we have historically sold all that we have produced." (¶ 88.)  He similarly explained, "*Further evidence of our supply constraints last fall is the fact that*, for 2021, we had to scale back the distribution of our products for 12 countries in EMEA." (¶ 88.[7]) Plaintiffs do not adequately allege why Defendants' explanation for the decrease in shelf space and distribution—production constraints and supply chain delays— should not be believed.  Indeed, decreases in shelf space and distribution were an expected consequence of the production constraints, a risk that Oatly consistently disclosed.  (*E.g.*, ¶¶ 34,

---

[7] Plaintiffs' quotation of this statement in the Complaint tellingly omits the italicized portion of the sentence.  (*See* Q3 Earnings Call Tr., Ex. H at 10.)

42, 55.)  If anything, the decreases in shelf space and distribution show that Defendants' statements regarding production constraints were true.

Plaintiffs also rely on other unwarranted leaps to support their claim that Defendants' statements regarding high demand were false.  For example, they conclude that the year-over-year decrease in margin (¶ 86), operating loss (*id.*), and increased inventory (¶ 92) disclosed in Oatly's Q3 Release were caused by decreased demand.  But these challenges are consistent with production constraints and COVID-induced barriers to distribution in the face of generally strong demand.  In particular, inventory increases are a natural result of the distribution issues Oatly disclosed, including "foodservice location closures in Asia due to the COVID-19 Delta variant," "a truck driver shortage in the United Kingdom," and a "challenging supply chain environment." (Q3 Release, Ex. I at 1, 3–4, 7.)  Inventory cannot be sold if a company is struggling to get the product to the consumer, regardless of demand.  For example, Oatly explained in its third quarter earnings call, "We are starting to build supply to meet consumer demand, but the pace at which we expected to increase revenue in new and existing retailers to open up new markets is slower than we anticipated as we navigate a dynamic COVID operating environment.  We believe this is primarily a timing issue."  (Q3 Earnings Call Tr., Ex. H at 10.)  Also, Oatly was in a growth phase (*id.*), which naturally would be accompanied by an increase in inventory.  For the same reasons, Oatly's increase in inventory does not suggest that it was free of production constraints and distribution difficulties across its international operations, contrary to Plaintiffs' assertions. (¶ 92.)  Instead, it shows Oatly's statements regarding those challenges were true.

Plaintiffs rely on similarly unwarranted inferential leaps when alleging that Defendants' statements regarding environmental practices were false.  Plaintiffs challenge general statements about Oatly's commitment to environmental sustainability—*e.g.*, "Our unwavering commitment

to sustainability fuels our growth," (¶ 60)—and one statement that, "on average, a liter of Oatly product consumed in place of cow's milk results in around 80% less greenhouse gas emissions, 79% less land usage and 60% less energy consumption." (¶¶ 59, 61.) But again, Plaintiffs plead no particularized facts to show that Oatly was *not* committed to sustainability or that the statistics regarding why oat milk is more environmentally friendly than cow's milk were false. Rather, they rely on the inferential leap that because Oatly had an isolated incident at one manufacturing plant regarding wastewater byproducts, *all* of Defendants' statements regarding the environment were therefore affirmatively false. (¶¶ 60–61, 82.)

Such an inference is unwarranted—an isolated incident at one of many locations Oatly operates across more than 20 countries says nothing about Oatly's global commitment to the environment, or whether manufacturing oat milk produces lower emissions than cow's milk. *See Rombach v. Chang*, 355 F.3d 164, 173 (2nd Cir. 2004) (recognizing that problems at some of the defendant's 119 facilities did not indicate a systemic problem, and holding that plaintiffs may not cherry-pick a handful of "unremarkable circumstances" in lieu of pleading particularized facts).

(2) *The Confidential Witness Allegations Do Not Establish Falsity*

Plaintiffs also rely on information from two Confidential Witnesses ("CWs") as support for their allegations that Defendants' statements regarding consumer demand were false. To the extent facts suggesting falsity are sourced from confidential witnesses, those witnesses must be "described sufficiently to indicate a *high likelihood* that they actually knew facts underlying their allegations." *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798–800 (S.D.N.Y. 2020) (a plaintiff must specify "each CW's position, length of employment, and job responsibilities."). The

13

Complaint fails to meet that requirement with respect to one of the two CWs. And neither of the CWs actually said anything about consumer demand.[8]

*CW1*: Plaintiffs rely on CW1 as support for the assertion that "shelf space in the U.S. was decreasing both before and after the May 2021 IPO" based on CW1's recollection that "the Company's shelf space was scaled back at several large retailers, including Target and Sprouts." (¶ 91 (emphasis not included).) As an initial matter, the fact that two retailers scaled back shelf space does not mean U.S. shelf space decreased as a whole. But more importantly, as discussed above, even if U.S. shelf space had decreased, that would not establish that consumer demand was decreasing. Notably, CW1 says nothing with regard to consumer demand. (¶ 91.) That is particularly significant because CW1— "a former Oatly Sales Director in the U.S., who was employed at the Company during 2020 until the latter part of 2021" and "whose job included overseeing U.S. retail sales and distribution"—would likely have known if consumer demand was decreasing during the class period. (¶ 91.) Their silence on the issue speaks volumes.

*CW2:* Plaintiffs' support for their allegation that Defendants did not disclose "decreasing customer demand in Asia" is that, according to CW2, a Singapore manufacturing facility reduced production hours "starting in December 2021 . . . because of declining order volume in Asia." (¶ 94.) As an initial matter, CW2 is identified only as "a former manager in Oatly's Singapore facility during 2021." (¶ 94.) Plaintiffs do not allege what type of manager CW2 was, how senior, in what department they worked, or why they left Oatly. Thus, Plaintiffs have failed to plead sufficiently that CW2 was in a position to know whether order volume was declining in Asia. *See Miao*, 442 F. Supp. 3d at 798. Moreover, CW only speaks to events "starting in

---

[8] Plaintiffs do not purport to rely on the CWs with respect to statements about Oatly's environmental practices or ingredient costs.

14

December 2021," which is outside the class period and at least four months after the last alleged misstatements regarding consumer demand (made in the Q2 Results in August 2021).  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580–81 (S.D.N.Y. 2014) (confidential witness allegations regarding product testing in the spring of 2012 rejected because the witness said nothing about what testing the company was conducting in March 2013 during the class period), aff'd, 604 F. App'x 62 (2d Cir. 2015); *see also N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 U.S. Dist. LEXIS 136929, at *32–33 (S.D.N.Y. Sep. 30, 2016).  Further still, the allegations are consistent with Oatly's statements in its Q3 Results that "positive momentum was partially offset by temporary headwinds . . . as we manage through COVID-19 Delta-variant related restrictions and temporary foodservice closures in Asia."  (Q3 Release, Ex. I at 1.)

Neither CW adequately supports Plaintiffs' allegations that consumer demand was declining or that Defendants' statements on that subject were false.

(3)   *The Spruce Point Report Does Not Establish Falsity*

Plaintiffs rely on the Spruce Point report as further support for their allegations regarding declining customer demand and Oatly's purported lack of commitment to the environment. (¶ 82.)  But the Spruce Point report—even if considered a reliable source of information, despite being published by a self-interested short seller looking to reap a profit, and which admits it is based on publicly available information—does not allege what Plaintiffs claim it alleges.

With respect to consumer demand, Plaintiffs specifically rely on two statements in the Spruce Point report.  *First*, Plaintiffs rely on the report's statement that Oatly "failed earlier in its China ambitions."  (¶ 79.)  Plaintiffs do not quote the next sentence from the Spruce Point report, however, clarifying that "Oatly gained limited traction in China in 2011-2013 under the effort of founder Öste."  (Spruce Point Rpt., Ex. E at 9.)  Events eight to ten years prior to the IPO plainly

15

have nothing to do with whether Defendants' statements during the Class Period regarding consumer demand in China were false.  *Second*, Plaintiffs rely on the report's allegation that Oatly "has made conflicting statements about how it succeeded [in China] this time around." (¶ 79.)  This allegation compares a statement from Oatly's Offering Documents that, "[i]n 2018, we entered China, focusing again on penetrating specialty coffee and tea shops," with a statement by the China Food Press that, "Zhang Chun, who was in charge of introducing Oatly into China, recalled with emotion that when it entered the Chinese market in 2018, Oatly first entered Ole, a high-end boutique supermarket . . . but 'basically no one was interested in it.'" (Spruce Point Rpt., Ex. E at 9, 108.)   There is no conflict in those statements:  Oatly could have attempted to enter the market in China through both coffee and tea shops *and* through high-end supermarkets, and had varying degrees of success with respect to each.  And even if Oatly had difficulty entering the market *in China* through high-end supermarkets, that certainly would not support Plaintiffs' allegation that *global demand* for Oatly's products was not high and increasing.  Notably, the report never claims that consumer demand in general was declining.

With respect to Defendants' statements regarding sustainability, Plaintiffs point to allegations from the Spruce Point report regarding "high concentrations" of "certain wastewater byproducts from Oatly's manufacturing facility in New Jersey."  (¶¶ 61, 82.)  Even if this allegation were true, it involved an isolated incident at one facility.  As explained above, this one incident does not mean that Oatly was not committed to environmentally friendly practices.  Nor do Plaintiffs, or the Spruce Point report, identify how Defendants' reported statistics regarding lower greenhouse gas emissions, land usage, and energy consumption from the manufacture of oat milk compared to cow's milk were false.

16

b.    Plaintiffs Do Not Adequately Plead That Defendants Made Misleading Omissions

Plaintiffs allege that Oatly failed to disclose that the costs of its key ingredients, oats and rapeseed oil, were already rising as of the May 2021 IPO.  (¶¶ 62–75.)  Plaintiffs also claim that Oatly's Offering Documents omitted financial disclosures "required under the International Financial Reporting Standards" ("IFRS").  (¶¶ 47–49, 77.)  Neither allegation is availing.[9]

In order to plead an omission claim, Plaintiffs must allege that Oatly had a duty to disclose the information that was omitted.  "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."  *Marsh & McLennan Cos. Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (quoting *Chiarella v. United States*, 445 U.S. 222, 235 (1980)).  Such a duty arises (1) where "specific statutes and regulations create affirmative duties to disclose information" or, more generally, (2) where disclosure is "necessary to ensure the completeness and accuracy of [a defendant's] public statements."  *Id.*  With regard to the second source of duty, "[a]n omission is only actionable when the failure to disclose renders a statement misleading."  *Monroe Cnty. Emps. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) (internal quotation marks omitted).  And omitted information must have been material to be actionable.  *Id.* ("There is no duty to disclose all information even tangentially related to the subject matter of a statement.").  To the extent a defendant did not disclose information that was already public, that omission would not be material.  "There is no duty to disclose information that is equally available to both parties or . . . that has been widely reported in readily available media."  *Id.* (internal quotation marks omitted).  Further, public

---

[9] In the Exchange Act section of the Complaint, although Plaintiffs allege in boilerplate fashion that Defendants' statements regarding consumer demand and environmental practices were "incomplete" (¶¶ 44, 46, 51, 61), they do not explain how so or allege facts to support such a claim.

17

companies do not have a duty to disclose potentially commercially sensitive financial terms of their contractual relationships.  *See Arkansas Pub. Emp. Ret. Sys. v. Bristol-Myers Squibb Co.*, ---F.4th---, 2022 WL 727149, at *6 (2d Cir. Mar. 11, 2022) (no duty to disclose competitively valuable information).

(1)   *Defendants Had No Duty to Disclose Rising Costs of Key Ingredients, Which Were Publicly Available*

Plaintiffs allege that statements regarding the source of Oatly's key ingredients—oats and rapeseed oil—and risk disclosures related to these materials, were misleading because Defendants failed to disclose how much Oatly paid for these ingredients and that prices "were skyrocketing as of the May 2021 IPO."  (¶¶ 62–75.)  Plaintiffs' arguments are unavailing because (1) oat and rapeseed oil are commodities traded on public exchanges, and Defendants had no duty to disclose futures prices that were publicly available; (2) to the extent Oatly negotiated different pricing with its suppliers, Defendants had no duty to disclose commercially sensitive terms of Oatly's contracts for these ingredients; and (3) Defendants' statements regarding the sources of the ingredients and risk disclosures regarding the risk of rising costs were sufficient as a matter of law.

Plaintiffs do not allege that Oatly had any non-public knowledge regarding rising oat and rapeseed oil prices.  Instead, Plaintiffs concede that oat futures are "actively bought and sold on the Chicago Mercantile Exchange," and "rapeseed futures contracts are actively bought and sold on the Euronext exchange."  (¶¶ 66–67.)  Indeed, Plaintiffs present detailed public information about the prices of oat and rapeseed oil over time, the same information to which the investing public had access.  (*Id.*)  Clearly, Defendants had no duty to disclose public information relating

18

to the prices of oats and rapeseed oil.[10]  *See Monroe Cnty. Emps. Ret. Sys.*, 15 F. Supp. 3d at 349 (no duty to disclose public information).

Even if Oatly had contracted with suppliers to purchase oats and rapeseed oil at different prices than those traded on the exchanges, Defendants would have no duty to disclose the terms of those contracts, which might be commercially sensitive and confidential.  *See Bristol-Myers*, 2022 WL 727149, at *6 (no duty to disclose commercially sensitive information).

Moreover, Oatly did disclose the risk of rising prices in its Offering Documents.  (*See* ¶ 70 ("Our financial performance depends in large part on our ability to arrange for the purchase of raw materials in sufficient quantities at competitive prices.  We are not assured of continued supply or adequate pricing of raw materials."); ¶ 72 ("Volatility in the prices of raw materials and other supplies we purchase could increase our cost of sales and reduce our profitability.").)  Plaintiffs argue Defendants omitted to disclose that "the prices for future delivery of oats and rapeseed oil had *already* increased" and that "the 'risk' of increasing prices for oats and rapeseed oil for future delivery had already materialized."  (¶¶ 71, 75.)  But this Court has made clear that risk disclosure statements like Oatly's are not misleading, even if the risks described had "already materialized."  *See In re Noah Educational Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010) ("[S]uch cautionary language, in this context, cannot reasonably be read to imply that [the defendant's] cost of raw materials had not increased, to some extent, in the current quarter.").

---

[10] Similarly, Plaintiffs note the Spruce Point report states, "Canada has historically supplied 10% of Oatly's total oat needs . . . .  This appears to be problamtic [sic] as Canadian oat production was recently forecasted to decline by the USDA."  (¶ 80.)  Again, that was public information, as the Spruce Point report admits.  (Spruce Point Rpt., Ex. E at 2, 7.)

19

Thus, Plaintiffs fail to plead an omission claim regarding ingredient prices, and Defendants' statements related thereto are not actionable.

(2)    *Defendants Had No Duty to Make Accounting Disclosures Under the IFRS, Which Are Not Required For SEC Filings*

Plaintiffs also make an omission claim regarding Oatly's financial disclosures. Plaintiffs allege that the Offering Documents "lacked key disclosures about the Company's revenues that could have revealed the declining demand for Oatly's productions and, in any event, were required under the International Financial Reporting Standards." (¶ 47.) This claim fails because Plaintiffs do not adequately plead that Defendants had a duty to make IFRS disclosures in Oatly's filings with the SEC.

"When a securities fraud claim is premised on the defendant's predicate violations of law or accounting standards . . . the plaintiff must specify *what* law or standard the defendant violated and *how* the alleged violation occurred." *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S,* 11 F.4th 90, 99 (2d Cir. 2021) (emphasis in original) (internal citations omitted). Further, violation of accounting standards alone cannot supply a cause of action under the securities laws; a plaintiff must allege how the defendant's accounting choices would have "misled a reasonable investor." *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, --- F. Supp. 3d ---, 2021 WL 4481119, at \*10 (S.D.N.Y. Sept. 30, 2021).

Even if Oatly were required to comply with IFRS standards for its SEC filings—and Plaintiffs have not alleged that it was—Plaintiffs have not pleaded with particularity how Defendants' accounting practices would have misled a reasonable investor. With regard to IFRS 15, Plaintiffs merely assert in conclusory fashion that Oatly's financial statements "conspicuously omitted any IFRS 15 disclosure," which requires "that a company report discounts, rebates, and returns for goods sold when the company reports revenues generated

20

from those goods." (¶¶ 48, 77.)  But Oatly's Offering Documents did disclose that Oatly routinely offers sales discounts and promotions to its customers (*id.*), and Plaintiffs do not plead what else they believe Defendants should have disclosed, or anything to suggest Oatly's accounting practices would have misled a reasonable investor.  *See Farfetch Ltd.*, 2021 WL 4481119, at *10.

Similarly, Plaintiffs allege that the Offering Documents "did not contain specific revenue amounts for the company's different product lines" in violation of IFRS 8 and make the conclusory assertion that the absence of such a revenue breakdown facilitated Oatly's ability to "conceal important information concerning customer demand for its full product line." (¶¶ 49, 77).  But Plaintiffs do not explain how Oatly's existing revenue reporting was misleading, or how a breakdown by product would have revealed the "truth."[11]

Such conclusory allegations of violations of IFRS standards are not sufficiently particularized to state a claim, even if Plaintiffs had pleaded that Oatly was required to comply with IFRS standards for its financial reporting to the SEC.[12]

   c.   Most of the Statements Challenged by Plaintiffs Are Inactionable
        as a Matter of Law

As explained above, Plaintiffs have not pleaded with particularity that Defendants made any false statements or misleading omissions.  But even if they had, most of the challenged

---

[11] Moreover, Plaintiffs fail to acknowledge that Oatly did disclose in its final amended F-1 that "oatmilk accounted for approximately 90% and 86% of [its] revenue in the years ended December 31, 2020 and 2019, respectively." (Ex. C at 30.)

[12] Later in the Complaint, Plaintiffs highlight the Spruce Point report's claim that Oatly's revenue metrics are "insufficient and not what we expect from a company with a 20-year operational history. " (¶ 77.)  But a general desire for more financial metrics does not establish that Defendants made a misleading statement or omission.  *Kleinman v. Elan Corp.*, 706 F.3d 145, 152–53 (2d Cir. 2013) ("Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor.").

statements underlying Plaintiffs' Section 10(b) claim are not actionable as a matter of law because they are (1) "puffery" and too general to cause a reasonable investor to rely on them, (2) inactionable opinions, or (3) forward-looking statements that fall under the safe harbor provisions of the PSLRA.

Moreover, Plaintiffs have cut-and-pasted very long block quotes from Defendants into the Complaint without specifying which parts of the quotes they are alleging to be false, and which parts they are just quoting for completeness. This is impermissible puzzle pleading, because it makes it impossible for Defendants (and the Court) to discern which statements Plaintiffs are actually alleging are false. Many of the statements challenged in the Complaint are inactionable for this independent reason as well.

(1)    <u>Puzzle Pleading</u>

The Complaint is filled with pages of long block quotations of alleged misstatements by the Defendants. Many of the statements in those quotations are either ancillary to other statements in the block quotes that Plaintiffs are specifically challenging as false, or contain specific data that Plaintiffs do not even attempt to plead is false. Following these quotations, Plaintiffs simply conclude in boilerplate fashion that the entire block quote was actionable, making allegations such as, "The statements set out in ¶¶ 42–43 were materially false, misleading, and incomplete because (i) customer demand for Oatly's products was not increasing . . . ." (¶ 44.) This is impermissible "puzzle pleading," exactly what the PSLRA was enacted to prevent. *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478–79 (S.D.N.Y. 2021); *In re Pareteum Sec. Litig.*, 19 Civ. 9767 (AKH), 2020 WL 3448526, at \*1–2 (S.D.N.Y. 2020) (complaints "larded with block quotations . . . leave the reader to wonder which aspects of the quotations are worthy of judicial attention" and constitute "puzzle pleadings"). The statements that constitute puzzle pleading are identified in Appendix A and are not actionable.

22

(2)       Puffery / Corporate Optimism

Courts have determined that certain types of statements are inherently inactionable because they are "too general to cause a reasonable investor to rely on them"—these statements are referred to as "puffery" or "corporate optimism." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *In re Adient PLC Sec. Litig.*, 2020 WL 1644018, at *21–22 (S.D.N.Y. Apr. 2, 2020) ("These types of general statements of corporate optimism are inactionable under the securities laws because they are not sufficiently specific that a reasonable investor could rely on them as a guarantee of some concrete fact or outcome." (internal quotation marks omitted)).  "[R]osy predictions, or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable." *Lululemon*, 14 F. Supp. 3d at 572 (internal quotation marks omitted). "They are the statements that lack the sort of definitive positive projections that might require later correction." *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *7 (S.D.N.Y. May 7, 2020). "[S]oft adjectives are nothing more than puffery." *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009).

Here, many of the statements Plaintiffs challenge constitute inactionable puffery.  For example, "Demand for Oatly products has grown at an incredible rate." (¶ 42.)  That is exactly the kind of statement containing "soft adjectives" that courts have found too general to be actionable.  Of the 37 statements challenged as false or misleading in the Complaint, 15 of them are puffery; those statements are identified in Appendix A.  These statements, even if false or misleading, are not actionable because they are vague, optimistic statements about Oatly that investors would not rely on when deciding whether to purchase shares.  *See Johnson v. Sequans Comms. S.A.*, 2013 WL 214297, at *14  (S.D.N.Y. Jan. 17, 2013) ("The statements that

23

[Defendant] 'believes we have a strong position in [a growing] market,' and 'believes we are better positioned to drive our roadmap to meet those needs' are non-actionable.").

(3)    <u>Opinion Misstatements</u>

"[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Nor is an opinion misleading "when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189. As such, to state a claim based on an allegedly false opinion, plaintiffs must do more than plead its objective falsity; they must also allege "with particularity" its subjective falsity (*i.e.*, that the speaker did not truly believe the opinion given). *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003). "The investor must identify particular (and material) facts going to the basis for the [speaker's] opinion . . . . That is no small task for an investor." *Omnicare*, 575 U.S. at 194.

Of the 37 challenged statements in the Complaint, six of them are inactionable opinions, such as: "*[W]e believe* the growth of our products is an actionable solution to some of society's greatest environmental and nutritional challenges." (¶ 60 (emphasis added).) All such statements are catalogued in Appendix A. As discussed above, Plaintiffs do not adequately plead why any of these statements are objectively false. But, even if they had, they do not allege any facts to demonstrate *subjective* falsity—that the Defendants did not believe the statements when they made them. Instead, Plaintiffs state in conclusory fashion that "any challenged statements of opinion or belief made in the Offering Documents are alleged to have been actionable and materially inaccurate, misleading, or incomplete statements of opinion or belief." (¶ 13.) They make a similar blanket allegation that Defendants Petersson and Hanke "knew that the adverse facts specified [in the Complaint] had not been disclosed to, but were being concealed from, the

24

public, and that the statements at issue were materially false, misleading, and incomplete when made." (¶ 23.)  But these boilerplate allegations do not "identify particular (and material) facts going to the basis for the issuer's opinion," *Omnicare*, 575 U.S. at 194, and are insufficient to plead that the opinion statements challenged in the Complaint were not sincerely held.

(4)      Forward-Looking Statements

The PSLRA provides a "safe harbor" for forward-looking statements, such as those about "future economic performance," when they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)-(i).

Plaintiffs object to a forward-looking statement by Petersson on an August 2021 investor call where he stated that Oatly expected "2021 outlook for revenue to exceed $690 million, an increase of greater than 64% year-over-year, representing an acceleration in our rate of growth." (¶ 57.)  At the beginning of that same call, Oatly noted that "management may make forward-looking statements . . . based on management's current expectations and beliefs" that "involve risks and uncertainties that could differ materially from actual events."  (Q2 Earnings Call Tr., Ex. F at 4.)  This was sufficient meaningful cautionary language under the PSLRA.  *See City of Roseville Empls.' Ret. Sys. v. Nokia Corp.*, 2011 WL 7158548, at *5 (S.D.N.Y. Sept. 6, 2011).  Thus, this statement is not actionable.

### 2.      Plaintiffs Fail to Allege Scienter

To succeed on their Exchange Act claims, Plaintiffs must not only plead with particularity that actionable statements were false or misleading, but they must also establish a "strong inference" that the Exchange Act Defendants had "a mental state embracing intent to deceive, manipulate, or defraud [investors]."  *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009).  "[I]t is not sufficient to set out 'facts from which, if true, a

reasonable person *could* infer that the defendant acted with the required intent,' for that gauge 'does not capture the stricter demand Congress sought to convey.'" *Id.* at 110–11 (emphasis in original). Instead, a "strong inference" must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs come nowhere close to pleading scienter sufficiently under the PSLRA. For this reason alone, all of Plaintiffs' Exchange Act claims fail.

a. <u>Plaintiffs Do Not Plead Motive or Opportunity to Engage in Fraud</u>

Scienter may be alleged by establishing motive and opportunity to engage in fraud. A plaintiff must plead, as to each defendant, a specific "concrete and personal benefit" to be realized from any purported fraud. *Kalnit*, 264 F.3d at 139. Plaintiffs allege that the Individual Exchange Act Defendants, Petersson and Hanke, "seized on Oatly's artificially high ADS price" by selling Oatly shares in a concurrent private placement in connection with the IPO. (¶ 98.) But to establish scienter based on stock sales, plaintiffs must plead that the sales were unusual or suspicious in amount or timing. *See Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (Table), 1999 WL 568023, at *4–5 (2d Cir. 1999). "Insider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). An insider's sale of shares in an IPO are not, without more, unusual or suspicious. *See In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006) ("Early investors . . . routinely sell stock in IPOs, and such sales raise no inference of fraud.").

Other than a boilerplate allegation that the Individual Exchange Act Defendants' stock sales were "highly suspicious," the Complaint contains no allegations to support Plaintiffs' claim that the amount or timing of the sales were unusual in any way. (¶¶ 98–99.) Plaintiffs allege that

26

Petersson and Hanke exercised stock warrants in connection with the IPO.  (¶ 99.)  Plaintiffs then allege that, in concurrent private placements, Petersson sold 13.5% of his shares while retaining 86.5% and Hanke sold only 9.7%, retaining 90.3%.  (*Id.*)  Sales of these sizes are not suspicious and certainly do not indicate that the Individual Exchange Act Defendants knowingly engaged in fraudulent activity.  *See e.g., In re Prestige Brands*, 2006 WL 2147719, at *5 (holding that plaintiffs failed to demonstrate that stock sales were suspicious and unusual where defendants retained over 80% of their stock).  Notably, Plaintiffs do not allege that the Individual Exchange Act Defendants sold any stock after the IPO, including at any other point during the Class Period.  Thus, Plaintiffs fail to allege that the Individual Exchange Act Defendants had motive and opportunity to engage in a fraud, either at the time of the IPO or during the rest of the Class Period.

       b.   <u>Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness</u>

    Where, as here, Plaintiffs have pleaded no motive, they bear a heavy pleading burden to establish a "strong inference" of scienter.  *See Kalnit*, 264 F.3d at 142 (without motive, allegations of scienter must be "correspondingly greater").  At a minimum, Plaintiffs must plead facts establishing that *each* defendant engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *In re Citigroup*, 330 F. Supp. 2d at 380 (quoting *Kalnit*, 264 F.3d at 142).  This is "not merely a heightened form of negligence" but "'conscious recklessness,' defined as 'a state of mind approximating actual intent.'"  *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *14 (S.D.N.Y. Mar. 29, 2013), aff'd, 570 F. App'x 32 (2d Cir. 2014).  Moreover, allegations of scienter based merely on an executive's position and access to information are insufficient.  *See, e.g., Kinsey v. Cendant Corp.*, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005)

("[C]onclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness.").

Plaintiffs state no facts, let alone particularized facts, giving rise to the strong inference that each Exchange Act Defendant had the requisite scienter.  In fact, only four paragraphs in the Complaint even attempt to address scienter.  (¶¶ 23, 97–99.)  Two of these paragraphs attempt to allege motive and opportunity based on the stock sales (¶¶ 98–99), but, as discussed above, those allegations are insufficient.  The only other allegation in the remaining two paragraphs is the conclusory assertion that "[b]ecause of their positions with the Company and their access to material non-public information" the Individual Exchange Act Defendants knew that the relevant disclosures were false.  (¶ 23; *see also* ¶ 97.)  But those allegations rely solely on the Defendants' positions and presumed access to information, and fail as a matter of law.  *See Kinsey*, 2005 WL 1907678, at \*5.  Plaintiffs' failure to plead scienter with particularly is a glaring omission that requires dismissal of  Plaintiffs' Section 10(b) claim.

c.      Plaintiffs' Allegations Establish a "Nonculpable Inference" Is More Compelling Than Fraud

Even where a plaintiff does allege particularized facts indicating a defendant had the requisite intent to deceive (which Plaintiffs have not done here), courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff."  *Tellabs, Inc.*, 551 U.S. at 323–24.  A "strong inference" must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 314.  Further, a self-defeating theory of fraud that "defies economic reason . . . does not yield a reasonable inference of fraudulent intent."  *Kalnit*, 264 F.3d at 140–41; *see Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 469 (S.D.N.Y. 2010) (no inference of scienter where fraud would be "economically irrational").

28

Here, Plaintiffs allege that the Exchange Act Defendants knowingly made false statements regarding high consumer demand and a commitment to sustainability, omitted material information regarding rising key ingredient prices, and failed to disclose certain financial information required by IFRS standards, in order to drive up Oatly's stock to artificially high prices so they could reap a benefit when they sold shares in connection with the IPO. (¶¶ 38–75.)  However, it is far more plausible that Defendants' statements were truthful—that demand for Oatly's products, for example, was strong, but that pandemic-related global supply chain issues contributed to production constraints, which were the causes of Oatly's declining stock and Plaintiffs' losses.  *See Tellabs, Inc.*, 551 U.S. at 314 ("A plaintiff . . . must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." (emphasis in original)).  Indeed, it would have been economically irrational for Oatly to try to grow and to invest heavily in expanding production (*see*, *e.g.*, ¶¶ 33–34) if demand for its products was actually low and on the decline.

Because Plaintiffs have failed to plead scienter on the part of any Individual Defendants, they have also failed to allege scienter on the part of Oatly.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.")

### 3.    Plaintiffs Fail to Allege Loss Causation

Loss causation is a necessary element of a Section 10(b) claim.  *See Kalnit*, 264 F.3d at 138.  Plaintiffs have failed to plead it here, and for this reason alone, all of their Section 10(b) claims fail.

A plaintiff may plead loss causation in one of two ways: (1) by alleging that a specific "corrective disclosure" negatively impacted the price of the stock, or (2) by alleging that the

materialization of a previously concealed risk caused their loss. *Lentell v. Merrill Lynch*, 396 F.3d 161, 173, 175 (2d Cir. 2005). Plaintiffs do not allege that a previously concealed risk materialized. Rather, they rely on two purported corrective disclosures: the Spruce Point report, published on July 14, 2021, and Oatly's November 15, 2021 Q3 Results. (¶¶ 76, 85, 86.)

To plead a "corrective disclosure," a plaintiff must allege a disclosure that revealed the falsity of prior misstatements and in doing so proximately caused a decline in the value of the plaintiff's securities. *Lentell*, 396 F.3d at 175. No "disclosure" occurs where the information "revealed" was already public. *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010). And proximate cause has not been alleged where a plaintiff fails to plead a "correlation between 'revealed' facts and a decline in [the defendant's] stock price." *In re Security Cap. Assur. Ltd. Sec. Litig.* (hereinafter *SCA*), 729 F. Supp. 2d 569, 599–600 (S.D.N.Y. 2010).

As a threshold matter here, neither alleged corrective disclosure could possibly be "corrective" because Plaintiffs have not adequately alleged that the Spruce Point report or Oatly's Q3 Results revealed any falsity. *See* Sections I.A.a and I.A.b, *supra*. Even if they did, the Spruce Point report is not a corrective disclosure because it states that it relied on public information, and Plaintiffs have not adequately alleged that it had a stock price impact. And Oatly's Q3 Results cannot have been a corrective disclosure because Plaintiffs allege that the purported "fraud" had already been made public by the Spruce Point report (or earlier).

a.    The Spruce Point Report

The Spruce Point report—published by a self-interested outsider—is not a corrective disclosure. It simply constitutes a "negative characterization of already-public information." *In re Omnicom*, 597 F.3d at 512 (A negative characterization of previously disclosed facts "does not constitute a corrective disclosure of anything but the [speaker's] opinions."); *see also Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 559–60 (S.D.N.Y. 2021) (where an alleged corrective

30

disclosure "contain[s] an analysis of publicly available information," it is not sufficient to allege loss causation). Spruce Point explicitly states that the report "expresses our research opinions . . . *all of which are based upon publicly available information.*" (Spruce Point Rpt., Ex. E at 2 (emphasis added).) Even if the report did contain non-public information, that information does not reveal the falsity of any of Defendants' prior statements, as discussed above. Any claim of loss causation based on the Spruce Point report thus fails.

Plaintiffs' allegations also do not establish the necessary "correlation between 'revealed' facts and a decline in [Oatly's] stock price." *SCA*, 729 F. Supp. 2d at 599–600. In *SCA*, the court found the plaintiffs failed to plead such a correlation because they had not adequately alleged significant stock drops on the days of purported corrective disclosures, given the context of general losses that "coincide[d] with a market phenomenon." *Id.* Here, Plaintiffs fail to allege the Spruce Point produced a meaningful drop in Oatly's stock price in light of the overall decline in price in the months after the IPO. Specifically, Plaintiffs allege that the Spruce Point report was published before markets opened on July 14, 2021, and that as a result, the price of Oatly shares fell on July 14 and 15. (¶¶ 76, 85.) But Oatly's stock drop on those days was part of a general downtrend that started well before the Spruce Point report was published. *See* Appendix B. Indeed, as illustrated in the charts in Appendix B, Oatly's stock price experienced less severe daily drops on July 14 and 15, 2021 (2.8% and 5.2%, respectively) than the previous day, July 13—before the report was published—when the stock dropped by 5.8%.[13] The court need not "accept [Plaintiffs'] causal inference" that these disclosures incrementally caused their

---

[13] Further, even if the stock drop on July 15 of 5.2% had been irregular (which it was not), it cannot support allegations of loss causation. Plaintiffs allege "the market for Oatly ADSs was an efficient market" (¶ 105), so the market's response to the Spruce Point report—if any—should have been complete as of the close on July 14, when the stock dropped only 2.8%, which was noticeably less than on other days. *See SCA*, 729 F. Supp. 2d at 600 n.5.

losses, given the long declines before and beyond the day Spruce Point report was published. *SCA*, 729 F. Supp. 2d at 599; *see also 60223 Trust v. Goldman Sachs & Co.,* 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) (plaintiff failed to plead loss causation where "[t]he loss in value of the stock occurred gradually over the course of the entire class period").

> b. November 2021 Q3 Results

Oatly's Q3 Results also cannot have been a corrective disclosure because, by Plaintiffs' own allegations, the alleged falsity of Defendants' statements had already been "brought to light" by Spruce Point.  (¶ 4.)   Indeed, Plaintiffs allege that the Spruce Point report made public Oatly's "inflated claims of growing customer demand," "'very high concentrations' of certain wastewater byproducts from Oatly's manufacturing facility in New Jersey," and "problems arising out of spiking prices for key manufacturing inputs."  (*E.g.*, ¶¶ 4, 61.)  The only arguably "new" revelations alleged by Plaintiffs in the Q3 Results, aside from disappointing financial results, were that Oatly had "started 2021 with less shelf space than prior years" and that "for 2021 we had to scale back a distribution of our products for 12 countries."  ¶¶ 87–90.  But as discussed above, Plaintiffs are relying on an unwarranted inference when they claim that declining shelf space and distribution were caused by declining consumer demand.  There is no revelation in the Q3 Results that customer demand was declining (because it was not), or any other fact that would make the other statements challenged by Plaintiffs false or misleading. (*See generally* Q3 Release, Ex. I, and Q3 Earnings Call Tr., Ex. H.)

> **B.** **Plaintiffs Fail to State a Claim Under Section 20(a) of the Exchange Act Against Petersson and Hanke**

Plaintiffs' "control" person claim under Section 20(a) requires a predicate violation of the Exchange Act.  *See* 15 U.S.C. § 78t(a).  Here, because plaintiffs state no Section 10(b) claim, there can be no Section 20(a) claim either.

## II.    PLAINTIFFS' SECURITIES ACT CLAIMS FAIL TO STATE A CLAIM

Plaintiffs' Securities Act claims fail for many of the same reasons that their Exchange

Act claims fail:  the Complaint does not adequately allege that any of the challenged statements

are false or misleading, and even if it did, the statements are inactionable puffery, opinions,

and/or forward looking.  Plaintiffs' Section 12(a) claim fails for the additional reasons that

Plaintiffs (1) fail to allege members of Oatly's board of directors were statutory sellers, and (2)

do not allege standing to sue any Defendant under that provision.  Because Plaintiffs' Section 11

and 12(a) claims fail, their Section 15 claim fails as well.

### A.    Plaintiffs' Securities Act Claims Should Be Analyzed Using the Heightened Pleading Standard for Claims That Sound in Fraud

The same heightened pleading standard under Rule 9(b) and the PSLRA that applies to

the Exchange Act claims (*see* Section I.A, *supra*) applies to Plaintiffs' Securities Act claims.

*Rombach*, 355 F.3d at 170 ("[T]he same heightened pleading standard applies to securities

claims brought under Section 11 and Section 12(a)(2) when premised on averments of fraud.").

A plaintiff cannot avoid the heightened pleading standard by purporting to disclaim allegations

of fraud for their Securities Act claims, when a complaint in fact sounds in fraud.  *See id.* at 172

("Plaintiffs assert that their Section 11 claims do not sound in fraud but the wording and

imputations of the complaint are classically associated with fraud." (internal quotation marks

omitted)); *see also In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 690–91 (S.D.N.Y. 2000)

(plaintiff cannot avoid heightened pleading standards through a "boilerplate disclaimer").

Here, Plaintiffs' attempt to "disclaim" allegations of fraud for their Securities Act claims

(¶ 13) is of no avail because that disclaimer is not reflective of what they actually allege.  While

Plaintiffs go so far as to repeat their allegations in the Securities Act section of the Complaint

without characterizing them as fraud, rather than simply incorporating them by reference from

the Exchange Act section, (*see* ¶¶ 115–202), that is too clever by half. Plaintiffs' Securities Act claims are based on the same facts, occurrences, and misstatements as the Exchange Act claims, and the Exchange Act section of the Complaint is rife with references to Defendants' conduct with respect to those claims as a "fraudulent scheme" and alleges that the misstatements amount to securities fraud. (*See, e.g.*, ¶ 24.) In fact, *all but one* of the statements challenged under the Securities Act claims are also challenged under the Exchange Act claims. Thus, the Complaint as a whole sounds in fraud, and the challenged statements should be analyzed once, together, under the heightened pleading standard of Rule 9(b) and the PSLRA. *See Rombach*, 355 F.3d at 172 ("Plaintiffs assert that their Section 11 claims 'do[] not sound in fraud'" but allege "that the Registration statement was 'inaccurate and misleading' . . . . [T]hese nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud." (internal quotation marks omitted)).[14]

**B.      Plaintiffs Fail to State a Claim Under Section 11 of the Securities Act**

To state a claim under Section 11, plaintiffs must allege that (1) they purchased a registered security; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010). Even if Plaintiffs could adequately plead the first two elements, they cannot establish the third: that the Registration Statement contained misleading statements.

---

[14] Even under the notice pleading standard of Rule 8, Plaintiffs fail to state a claim given that they plead no facts to support their allegations, and other facts they do plead would require unwarranted inferential leaps or are based on unreliable sources.

### 1.    Plaintiffs Fail to Allege Material Misstatements or Omissions in the Offering Documents

All of the alleged misstatements and omissions from the Offering Documents underlying Plaintiffs' Section 11 claim are the same statements underlying Plaintiffs' Section 10(b) claim, with one exception. *See* Appendix A (showing sole statement underlying only Plaintiffs' Section 11 claim is an alleged overstatement of 2018 U.S. revenue).  Because these statements are not false or misleading for purposes of Section 10(b), as discussed above, they are not false or misleading for purposes of Section 11 either. *See, e.g.*, *Police and Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings*, 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017) ("The standard for determining whether a defendant made a material misstatement or omission is essentially the same under Section 10(b), Section 11, and Section 12." (citing *Rombach*, 355 F.3d at 172 n.7)); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57–59 (2d Cir. 1996) (noting that "[e]ach of the securities laws invoked by plaintiffs requires that they identify a materially misleading statement made by the defendants" and finding that the alleged misstatements were inactionable under both Section 10(b) and Section 11 after analyzing the statements together).

The only misstatement on which Plaintiffs base their Section 11 claim that does not also underlie their Section 10(b) claim is Defendants' alleged overstatement of a revenue figure in the Registration Statement and in a roadshow presentation for the IPO.  (¶¶ 140–42.)  Specifically, Defendants state in bar charts in these documents that Oatly's 2018 total revenue for the United States was $12 million. (*Id.*)  Plaintiffs claim that revenue for the United States in 2018 was "at most $8 million." (¶ 142.)  In alleging that Oatly overstated revenue, Plaintiffs rely on the Spruce Point report and three sources cited therein:  two news articles and comments from a former employee.  (¶¶ 142–43; Spruce Point Rpt., Ex. E at 49.)  But neither the report nor the

35

three sources it cites actually support Plaintiffs' allegations of falsity, and they are unreliable sources of information that can and should be disregarded.

With respect to the two news articles, both state that sales of Oatly's oat milk increased from $6 million in 2018 to about $40 million in 2019.  (¶ 143.)  As an initial matter, these articles are not reliable and are exactly the types of material that courts disregard in assessing the sufficiency of a pleading.  *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability.")  These articles were published as very short puff pieces focusing on Oatly's rise to success—they do not cite insider information and are not meant to be a discussion of Oatly's financial performance. (*See generally* Umgås Magazine Art., Ex. B; CNBC Art., Ex. D.)  In fact, one article (from CNBC) obtained its $6 million revenue figure from a "VP of Communications at Nielsen," not Oatly directly, while the other article (Umgås Magazine) did not even attempt to identify a source for its information.  (*Id.*)  They therefore should not be credited as particularized pleading to support an allegation that Oatly's bar graph was false.  Moreover, the articles are not even consistent with Plaintiffs' allegations—they do not state that revenue was "at most $8 million" as Plaintiffs claim; the articles report the $6 million figure, and Plaintiffs do not address that inconsistency.

The Spruce Point report also relies on information from an unidentified "senior manager" at Oatly, who purportedly said that "the Company's revenues were in the range of $4 to $8 million in 2018."  (Spruce Point Rpt., Ex. E at 50.)  A confidential witness's "position[] and/or job responsibilities [must be] described sufficiently to indicate a *high likelihood* that they actually knew facts underlying their allegations."  *Miao*, 442 F. Supp. 3d at 798 (emphasis

added).  Here, the role "senior manager" is too vague to determine whether this witness would have been in a position to know Oatly's revenues in 2018 in the United States—he is not even alleged to have worked in Oatly's accounting or finance department.  Moreover, this witness left Oatly in 2019, several years before he spoke to Spruce Point, which begs the question of whether any recollection he may have had about Oatly's 2018 revenue was reliable.  (Spruce Point Rpt., Ex. E at 50.)

Just as crucially, the report overstates what the witness said.  Specifically, Spruce Point asked the witness for "a rough estimate" of "the trajectory of U.S. sales from 2017 onward." (*Id.*)  The witness responded: "could have been between $1 and $2 million of revenue for the first year, and quadrupled in the second year."  (*Id.*)  Spruce Point followed up: "if sales were $1 to $2 million in 2017 and in 2018 it quadruped [sic], so sales would have been $4 to $8 million?" (*Id.*)  The CW responded: "Yes, it probably would have been close to that."  (*Id.*)  This "rough estimate" from a witness who was asked a leading question and responded as to what revenue "could have been" or "probably would have been" does not provide sufficient support for an allegation that Oatly's 2018 revenue figure in the Registration Statement was false.  *See Lululemon*, 14 F. Supp. 3d at 580–81 ("[W]here plaintiffs rely on confidential personal sources, those individuals must provide an adequate basis for believing that the defendants' statements were false." (internal quotation marks omitted)).  And, notably, Plaintiffs fail to cite a key fact from a different witness buried in a footnote in the report:  "Spruce Point interviewed another former employee . . . who claimed 2018 sales were $11m."  (*Id.*)  This fact *supports* the accuracy of Oatly's reported $12 million revenue figure.

### 2.  Even If False, the 2018 Revenue Statement Was Not Material

Even assuming that Oatly's 2018 revenue in the U.S. was $8 million rather than $12 million, that would not be material as a matter of law, and this statement thus would not be

37

actionable.  *See In re Morgan Stanley*, 592 F.3d at 358 (misleading statements only actionable under Section 11 if they are material).

In assessing whether an alleged misstatement is material, courts consider "whether the defendants' representations, taken together and in context, would have misled a reasonable investor," *id.* at 360, or in other words, whether the misstatement "significantly altered the total mix of information available to investors."  *ECA & Local 134*, 553 F.3d at 197–98 (internal quotation marks omitted).  In order to determine materiality, a court must consider both quantitative and qualitative factors.  *Id.*

*Quantitatively*, "[m]inor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law."  *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004).  Plaintiffs' alleged $4 million overstatement "must be placed in context" by looking at Oatly's global revenue, especially given that the United States was a new and small market for Oatly at that time.  *ECA & Local 134*, 553 F.3d at 204 ($2 billion reclassification was immaterial when considered in light of the company's total assets).  When the alleged overstatement of $4 million is compared with Oatly's annual global revenue of $118 million in 2018, it is only an aberration of approximately 3.3%.  That is not material.  *See id.* (stating that a "five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement"); *SEC v. Patel*, 2008 WL 781914, at *9, *11 (D.N.H. Mar. 24, 2008) (overstatement of revenue by 3.5% was immaterial and "far below" the "rule of thumb" of 5–10%); *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 170–71 (D. Mass. 2000) (overstatement of revenue of 2.6% was insignificant).

*Qualitatively*, a 3.3% misstatement for 2018 U.S. revenue would be even more immaterial given that Oatly went public in 2021.  Materiality has "a half-life" because as more

38

updated information reaches the market, "the less likely it is that—in the view of a reasonable investor—the misstatement [regarding past information] will alter the total mix of relevant information available at the time of the purchase." *Plumber*, 11 F.4th at 101.  Oatly's 2018 revenue for one region would not have been relevant for investors in May 2021, as it would not have spoken to the present value of Oatly at the time of the IPO.  In fact, Congress itself has deemed financial statements from more than two years past immaterial to investors for "emerging growth companies" like Oatly.  *See* 15 U.S.C. § 77g ("An emerging growth company need not present more than 2 years of audited financial statements."); Final Am. Form F-1, Ex. C at Cover Page (Oatly registered as an emerging growth company).

Because the alleged overstatement of revenue by 3.3% is not a significant difference, and because it was a regional data point relating to three years prior to the IPO, it would not have altered the total mix of relevant information for investors in May 2021 and thus was immaterial, even if it had been false (which it was not).  *Cf. Plumbers*, 11 F.4th at 101 (alleged misstatement immaterial when 39 months had passed).[15]

### C.      Plaintiffs Fail to State a Claim Under Section 12(a) of the Securities Act

To state a claim under Section 12(a)(2), plaintiffs must allege that (1) each defendant is a "statutory seller"; (2) a sale to each plaintiff was effectuated "by means of a prospectus or oral communication"; and (3) the prospectus or oral communication includes a material misstatement or omission.  15 U.S.C. § 77l(a)(2); *In re Morgan Stanley*, 592 F.3d at 359.  Because Plaintiffs

---

[15] Aside from the statement regarding the 2018 revenue figure, the only other unique aspect of Plaintiffs' Securities Act claims compared to their Exchange Act claims is that Plaintiffs allege *omissions* regarding Oatly's consumer demand and environmental practices statements (¶¶ 156, 160) under the Securities Act, while they allege only affirmative misstatements regarding these two topics for their Exchange Act claims.  *See* fn.9, *supra*.  However, Plaintiffs fail to establish a duty to disclose any omitted facts regarding consumer demand or environmental practices for the same reasons set forth in Section I.A.a, *supra*—none of the allegedly omitted facts would establish the falsity of Defendants' statements.

fail to allege material misstatements or omissions, as discussed above, they fail to state a claim under Section 12(a)(2).  *Id.*  But even if the Registration Statement did contain actionable statements, Plaintiffs' Section 12(a)(2) claim would still fail.  First, Plaintiffs have failed to allege that all of the directors who signed the Registration Statement ("Director Defendants") are "statutory sellers" by virtue of doing so.  Second, Plaintiffs do not have standing to bring Section 12(a)(2) claims.

### 1.     Plaintiffs Fail to Allege That All of the Director Defendants Are Statutory Sellers

A defendant is a "statutory seller" where he: (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner."  *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)) (internal punctuation omitted).  To "pass title" under the first prong of the test means to sell shares.  *See Pinter*, 486 U.S. at 642.  Here, Plaintiffs do not allege that any of the Director Defendants other than Öste sold shares in the IPO.  (*See* ¶¶ 125–34.)

Nor do Plaintiffs allege that any of the Director Defendants successfully solicited investors to purchase Oatly's securities in the IPO.  To "successfully solicit the purchase of a security" under the second prong of the test means something *aside* from just signing the Registration Statement.  Every Court of Appeals to have considered the issue of whether signing a registration statement is sufficient to render a director a statutory seller under Section 12(a)(2) has held it does not.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989); *see also Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at \*5 (S.D.N.Y. June 18, 2020) (dismissing Section 12(a)(2) claims against a

director whose "participation in the solicitation of the offering was limited to signing the Registration Statement"). Plaintiffs do not plead that the Directors attended road show presentations or meetings with investors, or did anything other than sign the Registration Statement. (¶¶ 126–34.) That is not sufficient.

Thus, aside from Öste, Plaintiffs' allegations are insufficient to plead that the Director Defendants are statutory sellers. And even with respect to Öste (and the other Defendants), Plaintiffs state no Section 12(a)(2) claim because they fail to allege actionable misstatements or omissions, as discussed above.

### 2.      Plaintiffs Fail to Allege Standing to Bring a Section 12(a)(2) Claim

Plaintiffs must also allege standing to bring a claim under Section 12(a)(2). Unlike under Section 11, a plaintiff only has standing to bring a claim under Section 12(a)(2) if they purchased shares directly in the challenged public offering, not in a private or secondary transaction. *See Yung v. Lee*, 432 F.3d 142, 147–49 (2d Cir. 2005) (citing *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 571, 584 (1995)). Where a plaintiff merely alleges purchase of shares "pursuant to or traceable to" a public offering, they do not adequately allege direct purchase of shares in the offering. *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005); *Pub. Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (plaintiff's allegation that securities were acquired "pursuant and/or traceable to" a public offering was "insufficient to allege standing for purposes of a Section 12(a)(2) claim.").

Here, Plaintiffs merely allege they purchased ADSs "traceable to the May 2021 IPO." (¶¶ 120–21.) That allegation cannot establish Section 12(a)(2) standing, so the Section 12(a)(2) claims must be dismissed as to all Defendants on this basis as well.

41

**D.**     **Plaintiffs Fail to State a Claim Under Section 15 of the Securities Act Against Petersson, Hanke and the Director Defendants**

To sufficiently plead a control person claim under Section 15, Plaintiffs must establish: "(1) an underlying primary violation [of Sections 11 or 12(a)(2) of the Securities Act]; and (2) [that] the individual defendant had control over the primary violator." *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 599 (S.D.N.Y. 2006). Here, Plaintiffs have failed to plead facts sufficient to state a claim for an underlying violation under Section 11 or Section 12(a), which defeats the control person claims against Petersson, Hanke, and the Director Defendants.

## CONCLUSION

The Complaint states no claim under the Exchange Act or Securities Act because Plaintiffs have failed to support their baseless and conclusory allegations with any particularized pleading. Defendants request that Plaintiffs' claims be dismissed in their entirety, with prejudice.

42

Dated: April 8, 2022

LATHAM & WATKINS LLP

By: /s/ William O. Reckler____
Christopher J. Clark
William O. Reckler
Benjamin Naftalis
Kalana Kariyawasam
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: chris.clark@lw.com
Email: william.reckler@lw.com
Email: benjamin.naftalis@lw.com
Email: kalana.kariyawasam@lw.com


Elizabeth R. Marks
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
Email: betsy.marks@lw.com

*Attorneys for Defendants*