**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE OATLY GROUP AB SECURITIES LITIGATION | Consolidated Civil Action No. 1:21-cv-06360 (AKH)(SLC)<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND CONSOLIDATED COMPLAINT**

LATHAM & WATKINS LLP
Christopher J. Clark
William O. Reckler
Benjamin Naftalis
Kalana Kariyawasam
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200

Elizabeth R. Marks
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000

*Attorneys for Defendants*

Dated:   October 3, 2022

**TABLE OF CONTENTS**

Preliminary Statement.............................................................................................................1

Background .............................................................................................................................4

Argument ................................................................................................................................8

I.      Plaintiffs' Exchange Act Claims Fail to State a Claim.........................................................9

      A.      Plaintiffs Fail to State a Claim Under Section 10(b) of the Exchange Act.............9

          1.      Plaintiffs Fail to Plead Any Material Misstatements or Omissions.............9

              a.      Plaintiffs Fail to Plead Defendants Made Actionable
Omissions.....................................................................................10

                  (1)     Plaintiffs Fail to Plead an Actionable Omission
Regarding Decreases in Shelf Space or Retail
Market Share. .........................................................11

                      (a)     Plaintiffs Fail to Allege Particularized Facts
Regarding Declines in Shelf Space and
Market Share. ........................................................12

                      (b)     Plaintiffs Fail to Allege a Duty to Disclose
Allegedly Omitted Facts About Shelf Space
and Market Share Based on Item 303. ...................15

                      (c)     Plaintiffs Fail to Allege a Duty to Disclose
Facts About Shelf Space and Market Share
Based on the Need to Supplement
Defendants' Statements to Make Them Not
Misleading...............................................................17

                      (d)     Plaintiffs Fail to Plead Any Actionable
Omissions in Oatly's Risk Disclosures
Regarding Shelf Space or Market Share...............19

                      (e)     Plaintiffs Fail to Plead that the Allegedly
Omitted Facts Related to Shelf Space and
Market Share Were Material...................................21

                  (2)     Plaintiffs Fail to Plead an Actionable Omission
Regarding the Rising Costs of Key Ingredients.................22

               b.      Plaintiffs Fail to Adequately Plead Defendants Made
Affirmative False Statements.........................................................24

                  (1)     Plaintiffs Fail to Allege the Falsity of Defendants'
Statements Regarding Shelf Space and Market
Share. .....................................................................25

                  (2)     Plaintiffs Fail to Allege the Falsity of Defendants'
Statements Regarding Demand in China. .........................27

|   |   | (a) | CW2's Allegations Do Not Establish the Falsity of the Statements Regarding Demand in China. | 27 |
|   |   | (b) | The Spruce Point Report Does Not Establish the Falsity of Statements Regarding Demand in China. | 28 |
|   | c. | | Most of the Statements Challenged by Plaintiffs Are Inactionable as a Matter of Law. | 29 |
|   |   | (1) | Puzzle Pleading | 30 |
|   |   | (2) | Puffery / Corporate Optimism | 30 |
|   |   | (3) | Statements of Opinions | 31 |
| 2. | | | Plaintiffs Fail to Allege Scienter. | 32 |
|   | a. | | Plaintiffs Do Not Plead Motive or Opportunity to Engage in Fraud. | 32 |
|   | b. | | Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness. | 33 |
|   | c. | | Plaintiffs' Allegations Establish a "Nonculpable Inference" Which Is More Compelling Than Fraud. | 34 |
| 3. | | | Plaintiffs Fail to Allege Loss Causation. | 35 |
|   | a. | | The Spruce Point Report | 37 |
|   | b. | | November 2021 Q3 2021 Results | 38 |
| B. | | | Plaintiffs Fail to State a Claim Under Section 20(a) of the Exchange Act. | 40 |

II.  Plaintiffs' Securities Act Claims Fail To State A Claim. ..................................................40

A.  Plaintiffs' Securities Act Claims Should Be Analyzed Using the Heightened Pleading Standard for Claims That Sound in Fraud. ..........................40

B.  Plaintiffs Fail to State a Claim Under Section 11 of the Securities Act. ...............41

C.  Plaintiffs Fail to State a Claim Under Section 12(a) of the Securities Act. ...........42

1.  Plaintiffs Fail to Allege the Director Defendants Are Statutory Sellers. ..................43

2.  Plaintiffs Fail to Allege Standing to Bring a Section 12(a)(2) Claim. ..................44

D.  Plaintiffs Fail to State a Claim Under Section 15 of the Securities Act Against Petersson, Hanke and the Director Defendants. .......................................44

Conclusion .........................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*60223 Trust v. Goldman Sachs & Co.*,
  540 F. Supp. 2d 449 (S.D.N.Y. 2007)......................................................................37

*In re Adelphia Comms. Corp. Sec. and Deriv. Litig.*,
  2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007)..........................................................41

*In re Agria Corp. Sec. Litig.*,
  672 F. Supp. 2d 520 (S.D.N.Y. 2009).......................................................................11

*Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*,
  2020 WL 3318029 (S.D.N.Y. June 18, 2020) ...........................................................43

*Arkansas Pub. Emp. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ......................................................................................23

*Asay v. Pinduoduo Inc.*,
  2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020) .....................................................22, 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................8

*In re AT&T/DirecTV Now Sec. Litig.*,
  480 F. Supp. 3d 507 (S.D.N.Y. 2020).......................................................................29

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006).......................................................................44

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .............................................................16

*Bond Opportunity Fund v. Unilab Corp.*,
  2003 WL 21058251 (S.D.N.Y. May 9, 2003) ..........................................................31

*Born v. Quad/Graphics, Inc.*,
  521 F. Supp. 3d 469 (S.D.N.Y. 2021).......................................................................30

*Chapman v. Mueller Water Prods., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)..................................................................20, 21

*Chiarella v. United States*,
  445 U.S. 222 (1980)...................................................................................................10

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................................9, 33

*In re Cosi, Inc. Sec. Litig.*,
   379 F. Supp. 2d 580 (S.D.N.Y. 2005).....................................................................44

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009).....................................................................................30

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
   2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) .........34

*Fishbaum v. Liz Claiborne, Inc.*,
   189 F.3d 460, 1999 WL 568023 (2d Cir. 1999) ......................................................32

*In re Flag Telecom Holdings*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005).................................................................26, 27

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
   2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010).........................................................12

*Gagnon v. Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019)......................................................................24

*In re Gen. Elec. Sec. Litig.*,
   2020 WL 2306434 (S.D.N.Y. May 7, 2020) ............................................................30

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009)......................................................................33

*Gustafson v. Alloyd Co., Inc.*,
   513 U.S. 561 (1995)..................................................................................................44

*In re Hardinge, Inc. Sec. Litig.*,
   696 F. Supp. 2d 309 (W.D.N.Y. 2010).....................................................................11

*IBEW Local Union No. 458 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland*,
   783 F.3d 383 (2d Cir. 2015).....................................................................................22

*In re Investment Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.DN.Y. 2017).......................................................................18

*Jiajia Luo v. Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020).......................................................................11

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)........................................................................9, 32, 33, 35

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) ...........................................................................................16

*Kinsey v. Cendant Corp.*,
   2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ..................................................................34

*Klamberg v. Roth*,
   473 F. Supp. 544 (S.D.N.Y. 1979) ...................................................................................19

*Lasker v. N.Y. State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996)..................................................................................................42

*Lau v. Opera Ltd.*,
   527 F. Supp. 3d 537 (S.D.N.Y. 2021)...............................................................................37

*Lighthouse Fin. Group v. Royal Bank of Scot. Group*,
   2013 WL 4405538 (S.D.N.Y. August 2, 2013) ................................................................36

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)...............................................................................28

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)....................28, 30

*Marsh & McLennan Cos. Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................................................................10, 15, 17

*Menaldi v. Och-Ziff Capital Management Group LLC*,
   277 F. Supp. 3d 500 (S.D.N.Y. 2017)...............................................................................11

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances, Inc.*,
   2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ..................................................................17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .....................................................................................36, 39

*Monroe Cnty. Emps. Ret. Sys. v. YPF Sociedad Anonima*,
   15 F. Supp. 3d 336 (S.D.N.Y. 2014).........................................................................10, 11, 23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)........................................................................................42, 43

*In re Noah Educational Holdings, Ltd. Sec. Litig.*,
   2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ..............................................................20, 24

*In re Omega Healthcare Investors, Inc. Sec. Litig.*,
   563 F. Supp. 3d 259 (S.D.N.Y. 2021)........................................................................17, 18, 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
 575 U.S. 175 (2015)..................................................................................................31, 32

*In re Omnicom Grp. Sec. Litig.,*
 597 F.3d 501 (2d Cir. 2010)......................................................................................36, 37

*In re Pareteum Sec. Litig.,*
 19 Civ. 9767 (AKH), 2020 WL 3448526 (S.D.N.Y. 2020).....................................................30

*Pearlstein v. BlackBerry Ltd.,*
 93 F. Supp. 3d 233 (S.D.N.Y. 2015), *aff'd sub nom. Cox v. Blackberry Ltd.*, 660 F. App'x 23
 (2d Cir. 2016).......................................................................................................16

*Pinter v. Dahl,*
 486 U.S. 622 (1988).................................................................................................43

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Comm.,*
 694 F. Supp. 2d 287 (S.D.N.Y. 2010)...................................................................................9

*Police and Fire Ret. Sys. of the City of Detroit v. La Quinta Hldgs. Inc.,*
 2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017)..............................................................42

*In re ProShares Tr. Sec. Litig.,*
 728 F.3d 96 (2d Cir. 2013).....................................................................................11, 24

*Rapoport v. Asia Elecs. Holding Co.,*
 88 F. Supp. 2d 179 (S.D.N.Y. 2000).......................................................................4, 8

*Rombach v. Chang,*
 355 F.3d 164 (2d Cir. 2004)..............................................................................40, 41, 42

*In re Security Cap. Assur. Ltd. Sec. Litig.,*
 729 F. Supp. 2d 569 (S.D.N.Y. 2010)................................................................36, 37, 38

*Shemian v. Research In Motion Ltd.,*
 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ...............................................................33

*South Cherry St., LLC v. Hennessee Grp. LLC,*
 573 F.3d 98 (2d Cir. 2009)......................................................................................32

*Stadnick v. Vivint Solar, Inc.,*
 861 F.3d 31 (2d Cir. 2017)...............................................................................21, 22, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
 551 U.S. 308 (2007)...............................................................................................10, 12, 35

*In re Ultrafem Inc. Sec. Litig.,*
 91 F. Supp. 2d 678 (S.D.N.Y. 2000)..............................................................................41

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)..................................................................................35

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015)......................................................................6

*Willard v. UP Fintech Hldg. Ltd.*,
  527 F. Supp. 3d 609 (S.D.N.Y. 2021)..............................................................15, 17

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
  2009 WL 464934 (S.D.N.Y. Feb. 25, 2009).............................................................30

*Yung v. Lee*,
  432 F.3d 142 (2d Cir. 2005)..................................................................................44

*In re Yunji Inc., Sec. Litig.*,
  2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021)...........................................................15

*Zagami v. Cellceutix Corp.*,
  2016 WL 3199531 (S.D.N.Y. June 8, 2016) ...........................................................15

## STATUTES

15 U.S.C.
  § 77l(a)(2) .........................................................................................................42
  § 78t(a).............................................................................................................40
  § 78u-4(b).............................................................................................................1

## RULES

Fed. R. Civ. P.
  8(a) .....................................................................................................................1
  9(b).............................................................................................................*passim*
  12(b)(6) ................................................................................................................1

## REGULATIONS

17 C.F.R. § 229.303(b)(2)(i)-(ii)...............................................................................15

Defendants Oatly Group AB ("Oatly") and Toni Petersson, Christian Hanke, Björn Öste, Fredrik Berg, Ann Chung, Bernard Hours, Hannah Jones, Mattias Klintemar, Po Sing Tomakin Lai, Eric Melloul, Yawen Wu, and Tim Zhang (the "Individual Defendants" and together with Oatly, the "Defendants") submit this memorandum of law in support of their motion to dismiss the Second Consolidated Complaint (the "Complaint")[1] pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiffs invested in a rapidly growing company, the stock declined amidst a global pandemic, and Plaintiffs then manufactured a lawsuit to try to recover their alleged losses. But the Complaint, which Plaintiffs have had multiple opportunities to amend, does not include well-pleaded facts necessary to state claims under the Securities Exchange Act of 1934 (the "Exchange Act") or the Securities Act of 1933 (the "Securities Act") and must therefore be dismissed.

Oatly, a global manufacturer of oat milk and other oat-based dairy-alternative products, went public in May 2021 to raise capital so that it could grow its manufacturing and distribution capabilities to meet high consumer demand. However, Oatly's ability to increase production has been hampered by global supply chain constraints during the COVID-19 pandemic. Before, during, and in the months after its initial public offering ("IPO") in May 2021, Oatly repeatedly disclosed its production capacity constraints and warned investors that supply chain issues and

---

[1] Exhibit A to the Declaration of Kalana Kariyawasam filed herewith. Citations to the Complaint are in the form "¶ _." Citations to exhibits to the Declaration of Kalana Kariyawasam are in the form "Ex. _."

rising ingredient costs could lead to lower gross profits, decreased shelf space, and market share losses. The Delta variant in late 2021 and rising inflation only compounded those problems.

Oatly's identification of its business risks was sound and prescient, and Oatly's stock price fell after the IPO. But the fact that Oatly's stock price fell does not mean that Defendants engaged in a fraudulent scheme to defraud investors or that any representations in Oatly's offering documents were materially false or misleading.

Plaintiffs attempt to state claims under the Exchange Act and the Securities Act by taking three categories of truthful and accurate statements out of context and mischaracterizing them, alleging:

1. That general statements about strong consumer demand and Oatly's intent to expand contained misleading omissions because Oatly did not disclose losses in shelf space at certain stores and retail market share in certain regions in late 2020 and early 2021, and that certain statements regarding shelf space and market share were affirmatively false;

2. That risk disclosures about rising ingredient costs were misleading because Oatly did not disclose the fact that ingredient prices were *already* increasing on publicly available commodity future exchanges; and

3. That statements about Oatly's growth in China between 2018 and 2020 were affirmatively false in light of Oatly's earlier troubles entering the Chinese market and a December 2021 manufacturing slowdown at a single Singapore plant.

Plaintiffs fail to adequately allege an actionable omission or affirmative misstatement with respect to any of these categories of statements. Most notably, they do not satisfy the PLSRA requirement of pleading particularized facts demonstrating that Oatly's statements were misleading. For example, the only facts that Plaintiffs allege regarding problems in China occurred well outside of the class period, which has no relevance to or bearing on the losses Plaintiffs allege here. Plaintiffs also fail to plead that Defendants had a duty to disclose the allegedly omitted information because they do not allege that it contradicted Defendants' affirmative statements or made them misleading. Indeed, some declines in retail shelf space or

market share would be a natural consequence of Oatly's fully disclosed supply issues, and reasonable investors would have inferred that such losses might occur.

With respect to rising ingredient prices, Oatly *did* disclose the risk, and real-time prices were publicly available and accessible to investors. Plaintiffs also fail to allege that the purportedly omitted facts were material to investors; nor could they. With respect to shelf space and market share, any undisclosed declines would have affected only a small portion of Oatly's business. What Plaintiffs describe as "significant market share losses," were in reality a 2% decrease in retail-specific market share in a single region in 2021; and Oatly's business in that region is primarily non-retail and the losses were in line with historical trends.

Even if Plaintiffs had sufficiently pleaded material omissions or falsity (and they have not), most of the challenged statements are inactionable as puzzle pleading, puffery, or opinions. The Exchange Act and Securities Act claims, which are based on the same challenged statements, both fail for these reasons.

With respect to the Exchange Act, Plaintiffs also fail to plead that Defendants acted with scienter, a necessary element of their Section 10(b) and 20(a) claims. In fact, Plaintiffs do not allege any particularized facts regarding Defendants' state of mind, falling far short of their high burden of pleading a strong inference that Defendants had a mental state embracing intent to deceive, manipulate, or defraud investors. The Exchange Act claims further fail because Plaintiffs have not adequately pleaded loss causation: They do not allege corrective disclosures that caused a stock price drop.

With respect to the Securities Act claims, Plaintiffs also fail to plead facts establishing the "statutory seller" and standing requirements of Section 12(a)(2). And because Plaintiffs cannot state a claim under Section 11 or 12(a)(2), their Section 15 claim also fails.

3

Accordingly, all of Plaintiffs' claims fail and, because this is their third complaint,[2] the Complaint should be dismissed with prejudice.

## BACKGROUND

### A.      Oatly Detailed Key Risks in Its Initial Public Offering.

Oatly is a Swedish company that produces oat-based products, including oat milk, frozen dessert, and yogurt.  (¶ 38.)  Its proprietary "oat base" includes oats and rapeseed oil as key ingredients.  (¶ 41.)

Oatly raised $1.0 billion in an IPO on May 20, 2021, selling American Depository Shares ("ADS") at a price of $17.00 per share, after filing its final amended Form-1 Registration Statement and Prospectus Supplement with the Securities & Exchange Commission ("SEC") on May 17, 2021 (the "Offering Documents").  (¶ 47; Aug. 16, 2021 Press Release, Ex. D at 1.)[3] Defendants Toni Petersson (Oatly's CEO) and Christian Hanke (Oatly's CFO) sold shares in private placements in connection with, but not directly in, the IPO.  (¶ 12.)  Defendant Björn Öste (a co-founder and director) sold shares directly in the IPO.  (¶ 47.)

The Offering Documents contained over forty pages describing "key factors affecting [Oatly's] performance," the "impact of the COVID-19 pandemic," and "risk factors" for the business.  (*E.g.*, Final. Am. F-1, Ex. B at 24–61, 73–77.)  The risk disclosures explained that Oatly had a history of net losses and might be unable to achieve profitability.  (*Id.* at 24.)  The

---

[2] In fact, one of the named Plaintiffs, Jochims, has now filed four complaints, his first having been dismissed by the Court *sua sponte*.  *See* ECF Nos. 1, 31, 64, 76.

[3] The Court may consider documents on which the Complaint relies.  *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("Plaintiffs' decision not to attach either of [the Prospectus or the article on which they rely] to the amended complaint puzzles and concerns this Court.  This Court must carefully consider both of these documents, as they form the basis of the claim.  If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint." (internal citation omitted)).

4

disclosures further explained that consumer demand for Oatly products was greater than supply, and that production capacity was the greatest constraint on growth. (¶¶ 46, 50.) Oatly explained that it would use the proceeds from the IPO to increase its production capacity. (¶ 46.) However, the Offering Documents warned that this expansion could "take longer or prove more expensive than we anticipate, particularly in light of the COVID-19 pandemic, and we may not succeed in increasing our revenue and margins sufficiently to offset the anticipated higher expenses." (Final Am. F-1, Ex. B at 24.) Oatly also disclosed, "If we are unable to manage our supply chain effectively and ensure that our products are available to meet consumer demand, our operating costs could increase and our profit margins could decrease." (*Id.* at 25.)

Oatly explained—at length—the risks it faced related to the availability and costs of key ingredients like oats and rapeseed oil. (*See, e.g.*, *id.* at 24–26 ("Our financial performance depends in large part on our ability to arrange for the purchase of raw materials in sufficient quantities at competitive prices.").) Oatly further detailed the risk that it "may not be able to compete successfully in [its] highly competitive market," describing, *inter alia*, how "[n]umerous brands and products compete for limited retail . . . consumers," and how "[c]ompetitive pressures or other factors could cause [Oatly] to lose market share." (*See, e.g.*, *id.* at 29–30.) It explained, "We may lose loyal customers and consumers to our competitors if we are unable to meet customers' orders in a timely manner." (*Id.* at 38.)

B.    **The Spruce Point Report Failed to Impact Oatly's Stock Price.**

Before the market opened on July 14, 2021, an investment group, Spruce Point Capital Management ("Spruce Point") issued a report about Oatly (¶ 68). Spruce Point had a short position in Oatly's stock "and therefore st[ood] to realize significant gains in the event that the price decline[d]." (Spruce Point Report, Ex. C at 2.) Spruce Point stated that the report was

5

based solely on public information (*id.*) and criticized Oatly's revenue metrics and financial disclosures.  (¶ 68.)  By the time the market closed that day, Oatly's stock had dropped 2.8% from the prior day's close.[4]  As reflected in **Appendix B** hereto, that stock price decline was consistent with a downward trend since early June and was significantly smaller than the stock's decline the prior trading day.

### C.      Plaintiffs Filed Complaints Piggybacking on the Spruce Point Report.

On July 26, 2021, Plaintiff Kai Jochims filed a class action complaint against Defendants, bringing claims under the Exchange Act, based entirely on the Spruce Point Report.  ECF No. 1. On July 30 and September 22, 2021, Francesca Bentley and Anthony Kostendt filed substantially similar complaints.  (Nos. 21-cv-06485; 21-cv-07904.)  On September 24, 2021, Lead Plaintiff Mario Bello and Plaintiff Mark Hayden separately sought consolidation of the three actions and appointment as lead plaintiff.  *See* ECF Nos. 11, 18.[5]

### D.      Oatly's Q2 and Q3 2021 Results Disclosed Impacts of Supply Problems.

On August 16, 2021, Oatly issued a press release announcing its financial results for the second quarter of 2021 ("Q2 2021 Release") and held an earnings call ("Q2 2021 Earnings Call") (collectively, Oatly's "Q2 2021 Results").  (¶¶ 136, 138–39.)  On the Q2 2021 Earnings Call, Petersson explained "recent pressures on our market share [and] velocity . . . [were] expected and directly correlated with the capacity constraints."  (¶ 139.)  The Q2 2021 Release further noted that "growth was partially offset by COVID-19 and start-up related manufacturing delays."  (Q2 2021 Release, Ex. D at 3.)

---

[4] The Court may take judicial notice of Oatly's stock price over time.  *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

[5] The Court dismissed Jochims's complaint (ECF No. 29) and Jochims filed an amended complaint (ECF No. 31) prior to the Court's selection of Bello as lead plaintiff and consolidation of the pending actions (ECF No. 37).

On Monday, November 15, 2021, Oatly announced its third quarter financial results in a press release ("Q3 2021 Release") and earnings call ("Q3 2021 Earnings Call") (collectively, Oatly's "Q3 2021 Results"). (¶¶ 76–77.) Oatly disclosed that the supply chain risks it had previously identified, including in its Offering Documents and Q2 reporting, had materialized. (¶ 77.) It also announced that it had lost $44 million in the third quarter and its gross profit margins were down. (¶ 76.) During the earnings call, Hanke explained that in "EMEA" (Europe, Middle East and Asia), "we started 2021 with less shelf space than prior years based on our lack of inventory and the fact that we have historically sold all that we have produced." (Q3 2021 Earnings Call, Ex. G at 10.) Petersson further explained on the call that in EMEA, "during Q1, Q2, we were under great pressure due to supply constraints leading to lower growth rate, lower fill rates, strained relationship with retailers, lost market shares, consequences of losing 12 markets in 2020."[6] (*Id.* at 14.)

That same day, Oatly's stock price decreased 20.8% from the prior day's close. (¶ 8.) Media outlets such as the Wall Street Journal reported that "[Oatly] warned that production challenges might keep it from growing as fast as previously projected, sending its shares lower." (¶ 163; Nov. 15, 2021 WSJ Article, Ex. H at 1.)

###### E. **Plaintiffs Revised Their Theories Twice Through Amended Complaints.**

After Bello was appointed lead plaintiff, Bello, Jochims and Hayden filed a Consolidated Amended Complaint (the "CAC") on March 4, 2022. They added claims under the Securities Act and asserted that Oatly made misstatements regarding (1) consumer demand, (2) environmental practices, (3) ingredient prices, and (4) accounting practices. ECF No. 64 (¶¶ 39, 47, 139). Defendants moved to dismiss on April 8, 2022. Plaintiffs did not file a response but

---

[6] Plaintiffs inaccurately attribute this quote to Hanke. (¶¶ 54, 135.)

rather determined that it was "more efficient and appropriate for Plaintiff to file a superseding amended complaint." (ECF No. 72.)

In the current Complaint—the third for Bello and Hayden and the fourth for Jochims—Plaintiffs assert the same causes of action for violations of the Exchange Act and Securities Act, and the same "Class Period" of May 20, 2021 (Oatly's IPO) through November 15, 2021 (Oatly's Q3 2021 Results). (¶ 1.) However, they abandon most of the CAC's theories of falsity and fraud, which alleged *ad nauseum* that Oatly's consumer demand was actually decreasing. (*See, e.g.*, CAC at ¶¶ 44, 51, 58, 149, 153.) Plaintiffs also abandon all allegations regarding environmental practices and accounting violations under IFRS. Instead, the Complaint now focuses primarily on alleged omissions regarding purportedly declining shelf space and market share, and maintains certain arguments about rising ingredient prices and growth in China. (¶¶ 50–67, 130–154.) All of the allegations remain equally flawed.

## ARGUMENT

Although the Court must assume that well-pleaded factual allegations in the Complaint are true for purposes of this motion, it need not accept legal conclusions, mere conclusory statements, or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). Nor is the Court required to accept as true allegations that are contradicted by documents deemed to be part of the Complaint. *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000). Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678–79. Plaintiffs fail to meet this pleading standard, much less satisfy the heightened pleading standards of Rule 9(b) and the PSLRA.

## I.    PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL TO STATE A CLAIM.

### A.    Plaintiffs Fail to State a Claim Under Section 10(b) of the Exchange Act.

Plaintiffs allege that Defendants Oatly, Petersson and Hanke (the "Exchange Act Defendants") violated Section 10(b), which requires plaintiffs to establish that (1) each defendant made a misstatement or omission of a material fact; (2) with scienter; (3) which caused plaintiff's loss.  *See Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  Plaintiffs fail to plead any of those elements.

Plaintiffs must establish those elements under the Rule 9(b) heightened pleading standards, which requires that a plaintiff "state *with particularity* the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b) (emphasis added).  Further, the PSLRA "requires that a securities fraud complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind and that, with regard to a misstatement or omission of material fact, the complaint must specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 374 (S.D.N.Y. 2004).  Claims based on "speculation and conclusory allegations" will not survive.  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010).

### 1.    Plaintiffs Fail to Plead Any Material Misstatements or Omissions.

Putting aside the fact that many of the statements Plaintiffs challenge are inactionable puffery or opinions (*see* Section I.A.1.c, *infra*), Plaintiffs do not plead with particularity that any of the alleged misstatements or omissions were materially false or misleading.[7]

---

[7] For the Court's convenience, the table at **Appendix A** lists all of the challenged statements in the Complaint and summarizes the reasons why they are not actionable.

a.      Plaintiffs Fail to Plead Defendants Made Actionable Omissions.

The Complaint alleges two categories of materially misleading omissions:  It alleges that Defendants failed to disclose that (1) Oatly suffered losses in shelf space and retail market share (in isolated regions) by or during the first half of 2021, and (2) the prices for key ingredients were already rising as of the May 2021 IPO.[8]  Plaintiffs fail to plead actionable omissions for both categories.

In order to plead an omission claim, Plaintiffs must allege *with particularity* the information that Defendants purportedly failed to disclose.  Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

Plaintiffs must also allege that Defendants had a duty to disclose the information that was allegedly omitted.  "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."  *Marsh & McLennan Cos. Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (quoting *Chiarella v. United States*, 445 U.S. 222, 235 (1980)).  Such a duty arises (1) where "specific statutes and regulations create affirmative duties to disclose information" or, more generally, (2) where disclosure is "necessary to ensure the completeness and accuracy of [a defendant's] public statements."  *Id.*

With respect to a duty to make disclosures that ensure the completeness of a statement, "[a]n omission is only actionable when the failure to disclose renders a statement misleading."  *Monroe Cnty. Emps. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y.

---

[8] Though the Complaint's introductory paragraphs also state that Oatly failed to disclose that "supply problems were so severe that they were causing Oatly to lose retail shelf space and hemorrhage market share" (¶ 4), Plaintiffs never plead any allegations supporting their statement that Oatly failed to disclose "supply problems."  (*See* ¶¶ 134–35, 140.)

2014) (internal quotation marks omitted).  "A corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.'" *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 320 (W.D.N.Y. 2010).  Where a statement is "generalized" and would not have caused a reasonable investor to believe something contrary to the omitted fact, it is not actionable.  *Menaldi v. Och-Ziff Capital Management Group LLC*, 277 F. Supp. 3d 500, 513 (S.D.N.Y. 2017) (generic statements about a compliance program were not rendered misleading by failure to disclose FCPA violations); *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 410 (S.D.N.Y. 2020) (disclosures regarding company's content controls were not misleading where "no reasonable investor could infer" from the disclosure that the controls were effective).  Moreover, there is no duty to disclose when the omitted fact does not actually contradict a challenged statement.  *See In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 529 (S.D.N.Y. 2009).  In addition, "[t]here is no duty to disclose information that is equally available to both parties," including "matters of public knowledge." *Monroe Cnty. Emps. Ret. Sys.*, 15 F. Supp. 3d at 349, 355 (internal quotation marks omitted).

In addition to pleading a duty to disclose, a plaintiff must also show that the allegedly omitted information was material.  An omission is considered material when there is "a *substantial* likelihood that the disclosure of the omitted material would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information already available." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quotation marks omitted) (emphasis in original).

          (1)     *Plaintiffs Fail to Plead an Actionable Omission Regarding Decreases in Shelf Space or Retail Market Share.*

Plaintiffs allege that Oatly's statements in the Offering Documents and Q2 2021 Release related to "robust consumer demand" and "accelerating performance," *inter alia* (*see, e.g.,* ¶¶

11

131–33, 136–39), were incomplete because they failed to disclose:  (1) "Oatly's retail shelf space in both Europe and the U.S. had been *declining* in the quarters immediately preceding Oatly's May 2021 IPO," "since at least late 2020 (and was continuing to decline)"; and (2) "as a result, [Oatly] had already begun to *lose* significant market share to its competitors."  (¶¶ 134–35, 140.) Plaintiffs fail to state a claim because they fail to allege: (a) particularized facts supporting the allegedly omitted facts; (b) a duty to disclose based on Item 3030; (c) a duty to disclose based on the purported need to make the challenged statements complete; (d) that Oatly's risk disclosures were misleading; and (e) that the allegedly omitted facts were material.

(a)      *Plaintiffs Fail to Allege Particularized Facts Regarding Declines in Shelf Space and Market Share.*

Plaintiffs make sweeping, conclusory allegations regarding Oatly's alleged omissions but do not allege particularized facts to support the claim that there was actually information omitted, as required by Rule 9(b) and the PSLRA.  *See Tellabs, Inc.*, 551 U.S. at 313 ("The PSLRA requires plaintiffs to state with particularity . . . the facts constituting the alleged violation.").

*First*, with respect to its claim that Oatly made omissions by not disclosing decreases in shelf space, Plaintiffs have not pleaded facts to support the assertion that "Oatly's retail shelf space in both Europe and the U.S. had been declining in the quarters immediately preceding Oatly's May 2021 IPO."  (¶¶ 134–35, 140.)  Plaintiffs point to the Q3 2021 Earnings Call, March 14, 2022 WSJ Article (the "WSJ Article"), and CW1 as evidence of such declines.  (¶ 135(a)-(e).)  But upon closer inspection, those sources do not support the claim.  *See Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *13 (S.D.N.Y. Sept. 28, 2010) (holding allegations of omitted facts were insufficient where the plaintiffs failed to identify a source or particularized facts supporting those allegations).

12

Q3 2021 Earnings Call.  On the Q3 2021 Earnings Call, Oatly stated:  "in EMEA . . . [Oatly] started 2021 with less shelf space than prior years."  (Q3 2021 Earnings Call, Ex. G at 10.)  This statement says nothing about the U.S., and it only speaks to shelf space in EMEA as of the *start* of 2021—not to any "continuing declines" during the first two quarters of 2021.  In fact, Oatly clarified that it "did *not* lose shelf space" in EMEA in Q1 or Q2 (or any other time in 2021); instead, supply constraints in the first two quarters resulted in Oatly "not getting the spacing distribution *as expected* post summer [of 2021]."  (*Id.* at 14 (emphasis added).)

WSJ Article.  Plaintiffs allege the WSJ Article "confirms that in the period leading up to the IPO (and continuing well after) Oatly was suffering from . . .  diminishing shelf space in the U.S. market for oatmilk."  (¶ 135(c)–(d).)  But the WSJ Article does not describe any general trends in Oatly's U.S. retail shelf space.  It merely reports there were reductions in Oatly's presence at certain "smaller supermarkets" (sourced from "people familiar with the matter") and at "a Wisconsin-based grocer" in an unspecified time period.  (WSJ Article, Ex. I at 1, 8.)

CW1.  The only specific allegation Plaintiffs source from CW1 is that Target and Sprouts Farmers Market "reduced their shelf space for Oatly products during this period."  (¶ 135(b).)  But the fact that two retailers—and not the largest supermarkets in the U.S.—scaled back shelf space does not mean U.S. shelf space decreased as a whole or was "declining."  Further, CW1 does not speak to a definite time period in which the alleged shelf space losses occurred.

None of the alleged facts above—even assuming they are true and considered particularized under the PSLRA—support an allegation that Oatly's shelf space was declining across all of Europe and the U.S. in the first and second quarters of 2021.  At most, these facts indicate that at a single point in time (the beginning of 2021), shelf space had declined somewhere in EMEA, and in certain stores in the U.S.—far short of a market-wide trend.

*Second*, with respect to market share, Plaintiffs overreach by asserting that Oatly failed to disclose that it had "begun to ***lose*** significant market share to its competitors, including in the all-important U.S. market."  The only facts Plaintiffs plead are taken from the WSJ Article and they do not substantiate such a loss of market share.  (*See* ¶¶ 134–35, 140.)

As an initial matter, the WSJ Article only addresses the U.S. market.  Plaintiffs' allegation seems to implicate loss of market share in other regions, including, but not limited to the U.S.  Plaintiffs do not plead a single fact regarding loss of market share anywhere outside of the U.S.  Further, the article itself clarifies that it is reporting only on the "U.S. *retail oat milk* category," based on data from NielsenIQ.  (WSJ Article, Ex. I at 1 (emphasis added).)  Nielsen's data also reflects oat milk only, and does not include other products Oatly sells, such as oatgurt and frozen desserts.  (*Id.* at 2.)  Oatly's U.S. retail market share for oat milk is a much more narrow metric than its global market share, its wholesale (*i.e.*, non-retail, such as foodservice) market share, or its market share across all products.  For example, according to the WSJ Article, "more than half" of Oatly's U.S. sales are to non-retail customers, like restaurants or coffee shops.  (*Id.*)   In fact, the WSJ Article states that Oatly's retail market share in the U.S. fell by only 2% from 2020 to 2021.  (¶ 135(c).)  Given that the U.S. accounts for less than 25% of Oatly's sales,[9] and retail sales account for less than 50% of Oatly's U.S. sales, the WSJ Article hardly supports Plaintiffs' overbroad claim that Oatly had begun to lose "significant market share to its competitors," across many regions and all products.

---

[9] *See* Final Am. F-1, Ex. B at 4.

  (b)  *Plaintiffs Fail to Allege a Duty to Disclose Allegedly Omitted Facts About Shelf Space and Market Share Based on Item 303.*

As noted above, a duty to disclose may arise where "specific statutes and regulations create affirmative duties to disclose information." *Marsh & McLennan*, 501 F. Supp. 2d at 469. Here, Plaintiffs allege Defendants had a duty to disclose the allegedly omitted facts based on an SEC regulation, "Item 303." (*See* ¶ 154; *see also* ¶¶ 94–96). However, Plaintiffs' allegations do not establish that Oatly failed to disclose any material adverse trends in shelf space or market share, as required to establish an actionable Item 303 violation.

Item 303 requires that issuers describe (1) "any known trends or uncertainties that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" and (2) "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(b)(2)(i)-(ii). "[A]n inquiry into the existence of a trend must account for both the type of trend alleged to exist and the amount of time it might take for said trend to manifest under the circumstances." *In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *7 (E.D.N.Y. Mar. 31, 2021). Item 303 imposes a duty to disclose trends that are "both (1) presently known to management *and* (2) reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Willard v. UP Fintech Hldg. Ltd.*, 527 F. Supp. 3d 609, 619 (S.D.N.Y. 2021) (emphasis in original). Issuers are not required to list all possible consequences of a trend when such consequences would be speculative or could be inferred by investors. *Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at *15 (S.D.N.Y. June 8, 2016).

  Shelf Space. With respect to shelf space, Plaintiffs fail to allege an Item 303 violation because they do not actually allege any trend or that any decreases in shelf space were material.

As discussed in Section I.A.1.a(1)(a), *supra*, Plaintiffs allege only two decreases in shelf space, occurring during brief snapshots in time:  (1) in Q1 2021, Oatly started with less space shelf than in previous years in EMEA, and (2) in Q2 2021, some U.S. grocery stores were stocking fewer Oatly products.  But even if there had been continuous declines that started in late 2020 across all of the U.S. and Europe, a decline in shelf space over the "two financial quarters prior" to the IPO (¶ 77) would not create a trend, particularly in the volatile COVID-era market.  *See Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) (citing *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004) (holding that a five-month decline in natural gas prices did not yet constitute a trend requiring disclosure)); *see also Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) (finding that two- and five-month periods could not create reportable tends in device performance in a volatile market), *aff'd sub nom. Cox v. Blackberry Ltd.*, 660 F. App'x 23 (2d Cir. 2016).  Moreover, even if two quarters were long enough to create a "trend," decreases in shelf space at only certain U.S. grocers, or at one point in time in one region (EMEA), would not be considered a *material* trend, as discussed in Section I.A.1.a(1)(e), *infra*.

Market Share.  With respect to market share, as with shelf space, Plaintiffs fail to allege Oatly failed to disclose any material trend.  As discussed above in Section I.A.1.a(1)(a), *supra*, Plaintiffs allege declines only in Oatly's *U.S. retail* market share for *oat milk* (rather than across all regions, markets, or products).  And the declines alleged are relatively small:  4% from 2019 to 2020, and 2% from 2020 to 2021.  (¶¶ 9, 54(c)).  If anything, this "trend" shows that declines in market share in the U.S. retail market were actually slowing.  And a small decline in market share in one region, one product, and one type of market (retail) would not be material to investors for the reasons above discussed in Section I.A.1.a(1)(e), *infra*.

Even assuming purported declines in shelf space and market share could be considered material trends, Plaintiffs have not alleged either of the two essential elements of an Item 303 claim: that management was aware of these trends at the time the Offering Materials were published, or that these trends were reasonably likely to have a material effect on Oatly's financial conditions or results of operations. *See Willard*, 527 F. Supp. 3d at 619. As discussed in Section I.A.2.b below, the lack of any allegations regarding the state of mind of Oatly's management is a glaring hole in the Complaint with respect to scienter. It also means Plaintiffs cannot establish this element of an Item 303 claim. And although the Complaint contains allegations that declines in shelf space and market share had an "adverse impact on Oatly's business" (*e.g.*, ¶ 135(e)), Plaintiffs never allege particularized facts regarding how Oatly's financial results were negatively impacted by the shelf space and market share declines they allege occurred in only two regions and in the retail market. The failure to plead either element is fatal to Plaintiffs' attempts to impose a duty to disclose on Defendants via Item 303.

> (c)  *Plaintiffs Fail to Allege a Duty to Disclose Facts About Shelf Space and Market Share Based on the Need to Supplement Defendants' Statements to Make Them Not Misleading.*

A duty to disclose may also arise where disclosure is "necessary to ensure the completeness and accuracy of [a defendant's] public statements." *Marsh & McLennan*, 501 F. Supp. 2d at 469. However, where omitted facts are not sufficiently related to challenged statements so as to put them "in play" for disclosure, there is no duty to disclose. *In re Omega Healthcare Investors, Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272–73 (S.D.N.Y. 2021) (broad statements regarding strong financial performance did not put alleged omission regarding defendant subsidiary's financial troubles "in play"); *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances, Inc.*, 2021 WL 1199035, at *18 (S.D.N.Y. Mar. 30, 2021) (statements about

financial controls were not rendered misleading by failure to disclose improper payments). Here, Plaintiffs argue that Defendants' statements about robust consumer demand and how production constraints have hampered Oatly's ability to grow were incomplete and misleading in light of the allegedly omitted facts regarding declines in shelf space and market share. (*See* ¶¶ 134–35, 140.) However, Plaintiffs fail to plead breach of a duty to disclose because Oatly's statements were not sufficiently related to shelf space and market share, and Oatly's adjoining discussions of production constraints both ensured its statements were not misleading and fulfilled any possible duty to disclose.

Plaintiffs' attempt to plead that Defendants had a duty to disclose the declines in shelf space and market share fails because these alleged omissions are not sufficiently related to the challenged statements to make them misleading. *See In re Investment Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 616 (S.DN.Y. 2017). The statements Plaintiffs challenge about robust consumer demand and production constraints hampering growth are generalized statements that say nothing about shelf space or market share. (*See, e.g.*, ¶¶ 131–32, 136–37.) Defendants' statements did not put declines in shelf space and market share "in play." *See In re Omega Healthcare Investors, Inc. Sec. Litig.*, 563 F. Supp. 3d at 272–73.

Even if the declines in shelf space and market share were sufficiently related to statements about consumer demand, the Complaint does not explain how Defendants' statements about growing demand *subject to production constraints* could have misled an investor into believing Oatly had not experienced shelf space or market share decreases in certain regions or sectors in 2021.[10] A reasonable investor would not make the unwarranted inference that growing

---

[10] Some of the generalized statements Plaintiffs challenge do include specific references to Oatly's historical sales performance. (¶¶ 132, 137 (*E.g.*, "Americas revenue increased $16.3 million . . . for the second quarter of 2021.").) It is unclear whether Plaintiffs are challenging these figures, but if so, Oatly's

demand is always accompanied by ever-increasing (or even stable) shelf space and market share across all regions and segments, especially in light of the disclosed supply constraints.

Indeed, Oatly's statements regarding production constraints obviated any possible duty to disclose losses in shelf space and market share because a reasonable investor would have inferred that difficulties with supplying product would lead to difficulties in stocking shelves, growing shelf space, or maintaining market share. *See Klamberg v. Roth*, 473 F. Supp. 544, 551 (S.D.N.Y. 1979) ("[S]o long as material facts are disclosed or already known, it is not deceptive . . . to fail to verbalize all adverse inferences expressly."). For example, in the Offering Documents, Oatly repeatedly disclosed that it had been "constrain[ed]" by production capacity and how COVID-19 had produced negative impacts on the business. (*See, e.g.*, ¶ 131; Final Am. F-1, Ex. B at 5 ("To date, production capacity has been a major constraint on our growth."); *id.* at 72 ("To date, our revenue growth has been constrained by limitations in our production capacity."); *id.* at 76–77 ("The COVID-19 pandemic has impacted our business . . . . [W]e experienced a deterioration in sales to coffee shops and restaurant customers.").) Similarly, in the Q2 2021 Release, Oatly disclosed that pressures on market share and velocity were "expected and directly correlated with the capacity constraints and less of inventory to fulfill demand across sales channels." (¶ 139.)

> ### (d) *Plaintiffs Fail to Plead Any Actionable Omissions in Oatly's Risk Disclosures Regarding Shelf Space or Market Share.*

One of the statements Plaintiffs challenge as containing misleading omissions is Oatly's risk disclosure warning that its business could be adversely affected if it failed to meet demand and retailers allocated shelf space to other brands. (¶ 133.) Plaintiffs claim this statement was

---

accurate characterization of past results cannot create a duty to disclose as a matter of law. *In re Omega Healthcare Investors, Inc. Sec. Litig.*, 563 F. Supp. 3d at 272–73.

misleading because "although [it] only purported to warn of a 'risk' that supply problems might cause consumers to purchase other oatmilk brands and food retailers to 'allocate shelf space to other brands,' in fact Oatly was already suffering from lost shelf space to competitors in both the U.S. and Europe as of and in the period leading up to the IPO." (¶ 135). When assessing whether a risk disclosure (as opposed to other types of statements) was misleading, "[t]he main inquiry is whether a 'reasonable investor could have been misled about the nature of the risk when he invested.'" *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 406 (S.D.N.Y. 2020).

First, Courts in this district have held that risk disclosures are not misleading just because the risk of which they warned have already materialized. For example, in *In re Noah Educational Holdings, Ltd. Securities Litigation*, 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010), the court found that in the context of all its risk disclosures, the defendant's warning about the risk of rising raw material costs could not be read to imply that there had not been some effect on raw material prices in the current quarter. *Id.* at *2; *see also Chapman*, 466 F. Supp. 3d at 406.

Further, Oatly's general risk disclosure about the adverse effects of failing to meet demand was not misleading with respect to the specific losses in shelf space and market share that Plaintiffs allege. General risk disclosures do not mislead a reasonable investor with regard to specific materializations of a risk. *See In re Noah Ed. Holdings*, 2010 WL 1372709, at *7. Oatly's risk disclosure did not specify the amount, timing, regions, or retailers where the shelf space losses or loss of customers to competitors could take place. Despite Plaintiffs' sweeping overstatement about "lost shelf space to competitors in both the U.S. and Europe," the only losses of shelf space and market share Plaintiffs plead with particularity occurred in limited

20

geographic regions in limited periods of time, as discussed in Section I.A.1.a(1)(a), *supra*. *See Chapman*, 466 F. Supp. 3d at 406.

> **(e)      Plaintiffs Fail to Plead that the Allegedly Omitted Facts Related to Shelf Space and Market Share Were Material.**

Even if Plaintiffs had adequately alleged with particularity that Oatly omitted facts it was under a duty to disclose, they have not alleged that any of the facts were material. The Second Circuit has noted that materiality is context-specific. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 38 (2d Cir. 2017) ("The materiality of an omission must be assessed in light of the total mix of information in the public domain."). As explained above, Plaintiffs plead facts regarding only a narrow set of alleged omissions, each relating only to one or two regions, one product, and brief timeframes. (*See* Section I.A.1.a(1)(a), *supra*.) None of these allegations would alter the total mix of information available across Oatly's multiproduct global businesses. *See Stadnick*, 861 F.3d at 38-39 (omission of certain financial information from 3rd quarter statement would not have altered total mix available when considered in combination with all metrics reported).

With respect to shelf space, even if shelf space had declined across all retailers across all of U.S. and Europe—rather than simply in two stores in the U.S. as CW1 said—that still would not be material to a reasonable investor. That is because shelf space is distinct from both sales and market share; a company can have less shelf space than a competitor, but high product velocity (*i.e.*, turnover of product) within that shelf space, such that its sales retail market share is actually higher than the competitor's. (*See, e.g.*, Q3 2021 Earnings Call, Ex. G at 14 ("[I]n one of the premium retailers in the U.K., we drive 27% sales from 7% shelf space.").) Thus, shelf space alone is a metric of marginal use to average investors, especially compared to more useful metrics like actual financial performance and future projections.

21

With respect to market share, it is not material that Oatly experienced a 2% market share decline in the U.S. (a single region accounting for less than 25% of Oatly's global sales[11]), and even then only in retail (which represents less than 50% Oatly's business even within the U.S.). *See IBEW Local Union No. 458 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland*, 783 F.3d 383, 391 (2d Cir. 2015) (failure to disclose subprime exposures worth less than 4% of asset-backed securities exposure was not material).

The limited utility of information about shelf space and market share means that it is unlikely to be viewed by a reasonable investor as significantly altering the extensive mix of information already available in the Offering Documents regarding Oatly's difficulties in obtaining enough product to supply to retailers. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) ("[C]ritically, Vivint's registration statement contained ample warnings and disclosures that explained shareholder revenue and earnings fluctuations."); *Asay v. Pinduoduo Inc.*, 2020 WL 1530745, at *10 (S.D.N.Y. Mar. 30, 2020) ("Pinduoduo provided purchasers with 'ample warnings and disclosures' about the growth of marketing expenses.").

(2)    *Plaintiffs Fail to Plead an Actionable Omission Regarding the Rising Costs of Key Ingredients.*

The second category with respect to which Plaintiffs allege omissions is the rising costs of ingredients.  Plaintiffs allege that statements regarding the source of Oatly's key ingredients— oats and rapeseed oil—and risk disclosures related to these materials were misleading because Defendants failed to disclose that "prices for delivery of oats and rapeseed oil in the post-IPO period had *already* increased dramatically as of the IPO." (¶¶ 143–54.)  Plaintiffs also allege

---

[11] *See* Final Am. F-1, Ex. B at 4.

that Oatly had a duty to disclose rising ingredient prices pursuant to Item 303.  (*See* ¶¶ 154, 94–96.)  Plaintiffs arguments fail for the following reasons:

*First*, the law is clear that Defendants had no duty to disclose readily available public information.  *See Monroe Cnty. Emps. Ret. Sys.*, 15 F. Supp. 3d at 349, 355 (no duty to disclose information that is "equally available to both parties," including "matters of public knowledge").  Plaintiffs do not allege that Oatly had any non-public information regarding rising oat and rapeseed oil prices.  Instead, Plaintiffs concede that oat futures are "actively bought and sold on the [Chicago Mercantile Exchange]," and "[r]apeseed futures contracts are actively bought and sold on the Euronext exchange."  (¶¶ 145-146.)  Indeed, Plaintiffs present detailed public information about the prices of oat and rapeseed oil over time, information to which the investing public had access and that Defendants had no duty to include in their disclosures.[12]  (*Id.*)

*Second*, even if Plaintiffs had alleged Oatly had contracted with suppliers to purchase oats and rapeseed oil at higher prices—which they do not—Defendants would have no duty to disclose the terms of those contracts, which would be commercially sensitive and confidential.  *See Arkansas Pub. Emp. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353 (2d Cir. 2022) (no duty to disclose competitively valuable information).

*Third*, Oatly did disclose the risk of rising prices in its Offering Documents.  (*See* ¶ 151 ("Our financial performance depends in large part on our ability to arrange for the purchase of raw materials in sufficient quantities at competitive prices.  We are not assured of continued supply or adequate pricing of raw materials."); ¶ 152 ("Volatility in the prices of raw materials

---

[12] Similarly, Plaintiffs note the Spruce Point Report states, "Canada has historically supplied 10% of Oatly's total oat needs . . . .  This appears to be problamtic [sic] as Canadian oat production was recently forecasted to decline by the USDA."  (¶ 71.)  Again, that was public information, as the Spruce Point Report admits.  (Spruce Point Rpt., Ex. C at 2, 7.)

and other supplies we purchase could increase our cost of sales and reduce our profitability.").)[13]

An additional disclosure about rising ingredient prices was unnecessary and immaterial in light of those extensive disclosures. *See Stadnick*, 861 F.3d at 39; *Asay*, 2020 WL 1530745, at *10.

*Fourth*, as discussed above, courts in this district have found that risk disclosures like Oatly's are not misleading, even if the risks described had already materialized. *See In re Noah Educ. Holdings*, 2010 WL 1372709, at *7.

*Fifth*, Plaintiffs' Item 303-based claim with respect to the rising costs fails for similar reasons: Even if rising prices for key ingredients constituted a "trend," Defendants had no duty to disclose this information because, given that oat and rapeseed oil prices are easily accessible public information, an additional disclosure by Oatly regarding rising ingredient prices would not have altered the mix of information available to investors. *See In re ProShares Tr. Sec. Litig.*, 728 F.3d at 102. Further, that information did not need to be disclosed in light of Oatly's extensive disclosures regarding the risks associated with rising ingredient costs in the Offering Documents. *See Stadnick*, 861 F.3d at 39; *Asay*, 2020 WL 1530745, at *10.

> b.    <u>Plaintiffs Fail to Adequately Plead Defendants Made Affirmative False Statements.</u>

Plaintiffs challenge as affirmatively false statements regarding (1) shelf space and market share, and (2) growth in China. For a plaintiff to establish falsity, "they must demonstrate with specificity why [a statement is false]," and must plead more than "a marginal inference of falsity." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 770 (S.D.N.Y. 2019). Plaintiffs fail to establish falsity because they do not plead facts contrary to any of Oatly's statements.

---

[13] Further, in its Q2 2021 Earnings Call, Oatly noted that it saw a rise in the cost of rapeseed oil in 2021, and that it expected the cost to continue to rise through the second half of 2021. (Ex. E at 11.)

(1)    *Plaintiffs Fail to Allege the Falsity of Defendants'*
*Statements Regarding Shelf Space and Market Share.*

There are two specific statements regarding shelf space and market share that Plaintiffs challenge as affirmatively false. First, Plaintiffs challenge the following statement:

> The ***following factors*** and trends in our business ***have driven net revenue growth*** over priors periods and are expected to be key drivers of our net revenue growth going forward: . . . Grow within retail channels globally by increasing our distribution points with existing and new customers, *capturing greater shelf space*, and continue to drive velocity increases.

(¶ 138). Specifically, Plaintiffs allege that Oatly's reference to "capturing greater shelf space" was false in light of recent declines in shelf space. (¶¶ 138, 140.) But this mischaracterizes Oatly's statement, which discusses what drove net revenue growth over prior periods and what was expected to be a key driver of net revenue growth going forward. Plaintiffs do not allege that greater shelf space was not actually a key driver of revenue in the past, or that Oatly was not hopeful that it would be a key driver going forward.

Second, Plaintiffs challenge Defendant Petersson's statement in the Q2 2021 Earnings Call that "[a]ny recent pressures on our market share velocity measured channel is expected and directly correlated with the capacity constraints and less of inventory to fulfill demand across sales channels." (¶ 139.) They allege his statement was false because it "represented that, even though the ***rate*** at which Oatly was ***increasing*** its market share was slowing (i.e., its 'market share ***velocity***'), its market share was still growing." (¶ 140.) Notably, this statement is from a transcript of the Q2 2021 Earnings Call. Plaintiffs read the transcription of "market share velocity" to mean "rate of market share growth." But this was a clear transcription error; "market share" and "velocity" are separate concepts that should have each been separated by a comma. Indeed, the term "velocity" has a specific definition in Oatly's public documents: it refers to the average volume of sales per store per week. (F-1, Ex. B at 13; *see also* Q3 2021

25

Earnings Call, Ex. G at 6.)  It does not describe market share growth and is not synonymous with growth.  If it were, many of Oatly's statements would be redundant.  (*See, e.g.*, ¶¶ 46, 139 ("build on industry-leading food retail performance by *growing velocity*"; "once supply improves, we can increase *velocities and growth*" (emphasis added)).)

Even if Petersson had implied Oatly's market share was growing through his use of the word "velocity," his statement is not specifically about the United States, which is the region in which Plaintiffs allege market share was declining.  (¶ 135(c).)  And even if market share was declining in the United States, that would not make a statement about all regions false.

Plaintiffs do not expressly allege the rest of the challenged statements regarding demand, shelf space, or market share (¶¶ 131–33, 136–39) were affirmatively false.  In fact, Plaintiffs never allege that consumer demand was *not* robust and was instead declining.  They instead imply that lack of consumer demand for Oatly's products contributed to the purported reductions in shelf space and market share.  (*See, e.g.*, ¶ 135(e).)  But this argument relies on unwarranted inferential leaps, unsupported by particularized allegations.  Challenges in supplying shelves are "entirely consistent with conditions other than lack of demand," *In re Flag Telecom Holdings*, 352 F. Supp. 2d 429, 448 (S.D.N.Y. 2005), namely the supply constraints Oatly disclosed.[14]

---

[14] Even Plaintiffs' own source, the WSJ Article, notes that Oatly "created" strong demand for oat milk, and that retailers wanted to stock Oatly products but had trouble receiving them.  (WSJ Article, Ex. I at 1.) Plaintiffs cite to Oatly's increasing inventory of finished goods to imply that demand for Oatly's products was not high.  (¶¶ 78–79, ¶ 135(e).)  But Oatly's increased inventory is consistent with COVID-induced barriers to distribution in the face of generally strong demand.  In particular, inventory increases are a natural result of the distribution and supply chain issues Oatly disclosed, including "foodservice location closures in Asia due to the COVID-19 Delta variant," "a truck driver shortage in the United Kingdom," and a "challenging supply chain environment."  (Q3 2021 Release, Ex. F at 1, 3–4.)

26

(2)    *Plaintiffs Fail to Allege the Falsity of Defendants'*
        *Statements Regarding Demand in China.*

Plaintiffs also challenge statements by Oatly in the Offering Documents regarding its entry and expansion in China in 2018. (¶ 141 (*E.g.*, "Within approximately two years of entering the Chinese market, we had over 9,500 foodservice and retails points of sale . . . as of December 31, 2020"; "In 2018, we entered China, focusing again on penetrating specialty coffee and tea shops".) They allege these statements were affirmatively false because "by the time of the IPO, demand for Oatly products in China was already stagnating if not decreasing." (¶ 142.)

As a threshold matter, the statements about China do not actually say anything about demand. Defendants discuss Oatly's 2018 entry into the Chinese market and Oatly's expansion success as of the end of 2020. (¶ 141.) The statements do not address past, present, or future demand for Oatly's products. (*Id.*) But even if Defendants had said that demand in China was strong, the Complaint fails to allege facts supporting the falsity of such a statement.

(a)    *CW2's Allegations Do Not Establish the Falsity of*
        *the Statements Regarding Demand in China.*

Plaintiffs' support for their allegation that "demand for Oatly products in China was already stagnating if not decreasing" is that, according to CW2, a Singapore manufacturing facility reduced production hours "by December 2021 . . . because of declining order volume in Asia." (¶ 142.) Plaintiffs do not plead CW2 is a reliable witness or that CW2's allegations establish the falsity of any of Oatly's statements.

As an initial matter, CW2 is identified only as "a former manager in Oatly's Singapore facility during 2021." (*Id.*) Plaintiffs do not allege what type of manager CW2 was, what their role and responsibilities included, or whether they would have been in a position to know what the production hours even were or why they might have been reduced, or what customer orders

27

were.  Thus, Plaintiffs have failed to plead that CW2 is a reliable witness.  *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798–800 (S.D.N.Y. 2020).

But even if CW2 was in a position to know that Oatly was "forced to idle its Singapore production facility due to a lack of customer orders" (¶ 142), that would not suggest the falsity of any of Defendants' statements about China.  Singapore is a separate sovereign state, and nowhere do Plaintiffs allege that the Singapore facility supplied product to China.  Even if they did, the statement Plaintiffs challenge was made in May 2021 about events in 2018 through 2020, but CW2's allegation describes an event in December 2021.  Courts routinely discount confidential witness statements that are significantly removed in time from the alleged misstatements.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580–81 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  In fact, December 2021 was after the Class Period ended.  Further still, CW2's allegations are consistent with Oatly's statements that "positive momentum was partially offset by temporary headwinds . . . as we manage through COVID-19 Delta-variant related restrictions and temporary foodservice closures in Asia."  (Q3 2021 Release, Ex. F at 1.)

> (b)   *The Spruce Point Report Does Not Establish the Falsity of Statements Regarding Demand in China.*

Plaintiffs quote two sentences in the Spruce Point Report about how Oatly (1) "failed earlier in its China ambitions" and (2) "has made conflicting statements about how it succeeded this time around." (¶ 70.)  But the Report does not actually indicate the falsity of Defendants' challenged statement regarding China.

First, with regard to the claim that Oatly "failed earlier in its China ambitions,"  Plaintiffs misleadingly do not quote the next sentence from the Spruce Point Report, which provides context about the time period it was addressing by clarifying that "Oatly gained limited traction in China in 2011-2013 under the effort of founder [Ö]ste."  (Spruce Point Rpt., Ex. C at 9.)

Events occurring between 2011 and 2013 plainly have nothing to do with Oatly's entry into China in 2018 or the state of its business in China in 2020.

Second, Plaintiffs rely on the Report's allegation that Oatly "has made conflicting statements about how it succeeded [in China] this time around." (¶ 70.)  This allegation compares a statement from Oatly's Offering Documents that, "[i]n 2018, we entered China, focusing again on penetrating specialty coffee and tea shops," with a statement by the China Food Press that, "Zhang Chun, who was in charge of introducing Oatly into China, recalled with emotion that when it entered the Chinese market in 2018, Oatly first entered Ole, a high-end boutique supermarket . . . but 'basically no one was interested in it.'" (Spruce Point Rpt., Ex. C at 9, 108.)   There is no conflict in those statements:  Oatly attempted to enter the market in China through both coffee and tea shops and through high end supermarkets, and had varying degrees of success.  Even if Oatly had difficulty entering the market in China through high-end supermarkets in 2018, that certainly would not support Plaintiffs' allegation that "by the time of the IPO, demand for Oatly products in China was already stagnating if not decreasing." (¶ 132.) *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 529 (S.D.N.Y. 2020) (plaintiffs failed to allege that a statement was false or misleading where their allegations were consistent with the defendants' statements).

c. Most of the Statements Challenged by Plaintiffs Are Inactionable as a Matter of Law.

As explained above, Plaintiffs have not pleaded with particularity that Defendants made any false statements or misleading omissions.  But even if they had, most of the challenged statements underlying Plaintiffs' Section 10(b) claim are not actionable as a matter of law because they are (1) puzzle pleading; (2) "puffery," *i.e.*, too general to cause a reasonable investor to rely on them; or (3) inactionable opinions.

29

(1)    *Puzzle Pleading*

Plaintiffs have cut-and-pasted long block quotes from Defendants into the Complaint without specifying which parts of the quotes they are alleging to be false and which parts they are just quoting for completeness. Many of the statements in those quotations are either ancillary to other statements in the block quotes that Plaintiffs are specifically challenging as false, or contain specific data that Plaintiffs do not even attempt to plead is false.

This is impermissible "puzzle pleading," exactly what the PSLRA was enacted to prevent. *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478–79 (S.D.N.Y. 2021); *In re Pareteum Sec. Litig.*, 19 Civ. 9767 (AKH), 2020 WL 3448526, at *1–2 (S.D.N.Y. 2020) (complaints "larded with block quotations . . . leave the reader to wonder which aspects of the quotations are worthy of judicial attention" and constitute "puzzle pleadings"). The statements that constitute puzzle pleading are identified in Appendix A and are not actionable.

(2)    *Puffery / Corporate Optimism*

Courts have determined that certain types of statements are inherently inactionable because they are "too general to cause a reasonable investor to rely on them"—these statements are referred to as "puffery" or "corporate optimism." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). "[R]osy predictions, or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable." *Lululemon*, 14 F. Supp. 3d at 572 (internal quotation marks omitted). "They are statements that lack the sort of definitive positive projections that might require later correction." *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *7 (S.D.N.Y. May 7, 2020). "[S]oft adjectives are nothing more than puffery." *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009).

30

Here, many of the statements Plaintiffs challenge constitute inactionable puffery. For example, "Demand for Oatly products has grown at an incredible rate." (¶ 131.) That is exactly the kind of statement containing "soft adjectives" (*e.g.*, "incredible") that courts have found too general to be actionable. Statements like "the food retail channel, in particular, has *welcomed* Oatly on shelves" (¶ 132) are similarly general and therefore inactionable. Of the statements challenged, 12 constitute inactionable puffery; those statements are identified in Appendix A.

### (3)  *Statements of Opinions*

"[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Nor is an opinion misleading "when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189. As such, to state a claim based on an allegedly false opinion, plaintiffs must do more than plead its objective falsity; they must also allege "with particularity" its subjective falsity (*i.e.*, that the speaker did not truly believe the opinion given*). Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003). "The investor must identify particular (and material) facts going to the basis for the [speaker's] opinion . . . . That is no small task for an investor." *Omnicare*, 575 U.S. at 194."

Two of the challenged statements constitute inactionable opinions. Plaintiffs challenge Oatly's statement, "We also believe that global demand for Oatly products has far outpaced our supply" (¶ 131), as well as Oatly's statement that it "believe[d] that the terms contained in [its supplier] agreements are customary for such suppliers in our industry." (¶ 149.) Plaintiffs have not alleged that either of these statements were objectively false, as discussed above.

Plaintiffs have also failed to allege facts suggesting that Oatly did not believe these statements were true when made. Nowhere in the Complaint do they "identify particular (and

31

material) facts going to the basis for the issuer's opinion." *Omnicare*, 575 U.S. at 194.  Further, even if the facts Plaintiffs allege did contradict the challenged statements, an allegation that Oatly "kn[ew], but fail[ed] to disclose, some fact cutting the other way," would not render these opinion statements misleading.  *Id.* at 189.

### 2. Plaintiffs Fail to Allege Scienter.

To succeed on their Exchange Act claims, Plaintiffs must not only plead with particularity that actionable statements were false or misleading, but they must also establish a "strong inference" that the Exchange Act Defendants had "a mental state embracing intent to deceive, manipulate, or defraud [investors]."  *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009).  "[I]t is not sufficient to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent."  *Id.* at 110–11 (emphasis in original) (internal quotation marks omitted).  Plaintiffs come nowhere close to pleading scienter sufficiently under the PSLRA.  This failure independently defeats Plaintiffs' Exchange Act claims.

a. <u>Plaintiffs Do Not Plead Motive or Opportunity to Engage in Fraud.</u>

Scienter may be alleged by establishing motive and opportunity to engage in fraud.  A plaintiff must plead, as to each defendant, a specific "concrete and personal benefit" to be realized from any purported fraud.  *Kalnit*, 264 F.3d at 139.

Plaintiffs allege that the Exchange Act Defendants "took advantage of Oatly's artificially inflated ADS price" by selling Oatly shares in a concurrent private placement in connection with the IPO.  (¶ 157–58.)  But to establish scienter based on stock sales, Plaintiffs must plead that the sales were unusual or suspicious in amount or timing.  *See Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (Table), 1999 WL 568023, at *4–5 (2d Cir. 1999).  "Insider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices and at

32

times calculated to maximize personal benefit from undisclosed inside information." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009).

Other than a boilerplate allegation that the Exchange Act Defendants' stock sales were "highly suspicious," the Complaint contains no allegations to support the claim that the amount or timing of the sales were unusual in any way. (¶¶ 157–58.) Plaintiffs allege that Petersson and Hanke exercised stock warrants in connection with the IPO. (¶ 158.) Plaintiffs then allege that, in concurrent private placements, Petersson and Hanke each sold 13.5% of their respective shares, each retaining 86.5% of their shares. (*Id.*) Sales of these sizes are not suspicious and certainly do not indicate that the Individual Exchange Act Defendants knowingly engaged in fraudulent activity. *See e.g., In re Gildan Activewear*, 636 F. Supp. 2d at 271 (holding defendant's sale of 22.5% of his stock holdings did not raise an inference of scienter). Notably, Plaintiffs do not allege that the Exchange Act Defendants sold any stock after the IPO, including at any other point during the Class Period. Thus, Plaintiffs fail to allege that the Exchange Act Defendants had motive and opportunity to engage in a fraud, either at the time of the IPO or during the rest of the Class Period.

b.       <u>Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness.</u>

Where, as here, Plaintiffs have pleaded no motive, they bear a heavy pleading burden to establish a "strong inference" of scienter. *See Kalnit*, 264 F.3d at 141–42. At a minimum, Plaintiffs must plead facts establishing that each defendant engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *In re Citigroup*, 330 F. Supp. 2d at 380 (*quoting Kalnit*, 264 F.3d at 142). This is "not merely a heightened form of negligence" but "'conscious recklessness,' defined as 'a state of mind approximating actual intent.'" *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *14 (S.D.N.Y. Mar. 29, 2013). Moreover, allegations of scienter based merely on an executive's

33

position and access to information are insufficient.  *See Kinsey v. Cendant Corp.*, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005).

Plaintiffs state no facts, let alone particularized facts, giving rise to the strong inference that each Exchange Act Defendant had the requisite scienter.  In fact, only five paragraphs in the Complaint even attempt to address scienter.  (¶¶ 128, 155–58.)  Two of those paragraphs attempt to allege motive and opportunity based on the stock sales (¶¶ 157–58), but, as discussed above, those allegations are insufficient.  One of the five paragraphs alleges that, because retail shelf space is "central to Oatly's business," Defendants must have known about the alleged losses of retail shelf space and market share or recklessly disregarded them.  (¶ 156).  But "allegations regarding core operations . . . are not independently sufficient to raise a strong inference of scienter," especially given that the PSLRA "requires that facts supporting the scienter inference be stated with particularity."  *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.) (internal quotation marks omitted), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) (endorsing Judge Sullivan's scienter analysis).

The only other allegation in the remaining two paragraphs is the assertion that "[b]ecause of their positions with the Company and their access to material non-public information" the Individual Exchange Act Defendants knew that the relevant disclosures were false.  (¶ 128; *see also* ¶ 155.)  But those allegations rely solely on the Defendants' positions and presumed access to information, and therefore fail as a matter of law to establish the requisite scienter.  *See Kinsey*, 2005 WL 1907678, at *5.

    c. <u>Plaintiffs' Allegations Establish a "Nonculpable Inference" Which Is More Compelling Than Fraud.</u>

Even where a plaintiff does allege particularized facts indicating a defendant had the requisite intent to deceive (which Plaintiffs have not done here), courts must weigh the

"plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs, Inc.*, 551 U.S. at 323–24. A "strong inference" of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 314. Further, a self-defeating theory of fraud that "defies economic reason . . . does not yield a reasonable inference of fraudulent intent." *Kalnit*, 264 F.3d at 140–41.

Here, Plaintiffs allege that the Exchange Act Defendants knowingly made false statements regarding consumer demand, and omitted material information regarding shelf space losses, retail market share losses, and rising key ingredient prices, in order to drive up Oatly's stock to artificially high prices so they could reap a benefit when they sold shares in connection with the IPO. (¶¶ 131–54 .) However, it is far more plausible that Defendants' statements were truthful—that demand for Oatly's products, for example, was strong, but that pandemic-related global supply chain issues contributed to production constraints, which were the causes of Oatly's declining stock and Plaintiffs' alleged losses. *See Tellabs, Inc.*, 551 U.S. at 327–28 ("A plaintiff . . . must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." (emphasis in original)). Indeed, it would have been economically irrational for Oatly to invest heavily in expanding production, including at its facility in Singapore—which it did (*see, e.g.*, ¶ 44)—if demand for its products was actually low and declining.

### 3.    Plaintiffs Fail to Allege Loss Causation.

Plaintiffs have failed to plead loss causation, which independently defeats their Section 10(b) claims. *See Kalnit*, 264 F.3d at 138.

"To establish loss causation, a plaintiff must show that a misstatement or omission concealed *something* from the market that, *when disclosed*, negatively affected the value of the security." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (quotation marks omitted) (emphasis in original). No "disclosure" occurs where the information revealed was

35

already public.  *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).  And loss causation has not been alleged where a plaintiff fails to plead a "correlation between 'revealed' facts and a decline in [the defendant's] stock price."  *In re Security Cap. Assur. Ltd. Sec. Litig.* (hereinafter *SCA*), 729 F. Supp. 2d 569, 599–600 (S.D.N.Y. 2010).  The Court also need not accept Plaintiff's explanation for a decline in stock price; it may reject a loss causation theory if there is a more plausible explanation for the price drop.  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064–65 (9th Cir. 2008) (rejecting loss causation theory in favor of "far more plausible" explanation).

Plaintiffs rely on two purported corrective disclosures: the Spruce Point Report, and Oatly's November 15, 2021 Q3 2021 Results.  (¶¶ 81, 161–62.)  As a threshold matter, neither could possibly be "corrective" because Plaintiffs have not adequately alleged that the Spruce Point Report or Oatly's Q3 2021 Results reveal the falsity or incompleteness of any of Defendants' prior statements, as explained in Sections I.A.1.a and I.A.1.b, *supra*.  Even if they did, Plaintiffs have not adequately alleged the Spruce Point Report was a corrective disclosure because the Report relied on public information and Plaintiffs have not adequately alleged the Report had a stock price impact given that Oatly's stock price drop was part of a general downward trend.  Plaintiffs have not adequately alleged Oatly's Q3 2021 Results constituted a corrective disclosure because there is a more plausible explanation for the stock drop than the alleged corrective disclosures within the Q3 2021 Results and many of the alleged disclosures were previously disclosed.[15]

---

[15] Note, while Plaintiffs claim that some alleged fraud was revealed by the WSJ Article, Plaintiffs do not allege this was a corrective disclosure as the WSJ Article was published outside the Class Period.  *See e.g.*, *Lighthouse Fin. Group v. Royal Bank of Scot. Group*, 2013 WL 4405538, at \*10 (S.D.N.Y. August 2, 2013) (holding that a report released after the close of the class period "cannot be a corrective disclosure sufficient to establish loss causation").

a.      The Spruce Point Report

Plaintiffs allege that the Spruce Point Report—published by a self-interested outsider—was a "partial disclosure" that revealed Oatly's "exposure to increasing oat and rapeseed oil prices and stagnant decline in demand for Oatly products in China." (¶ 161.)  However, the Spruce Point Report explicitly states that is "based upon publicly available information." (Spruce Point Rpt., Ex. C at 2.).  Such mere "negative characterization[s] of already-public information" do not constitute corrective disclosures.  *In re Omnicom*, 597 F.3d at 512; *see also Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 559–60 (S.D.N.Y. 2021).

Plaintiffs' allegations also do not establish the necessary "correlation between 'revealed' facts and a decline in [Oatly's] stock price." *SCA*, 729 F. Supp. 2d at 599–600.  In *SCA*, the court found the plaintiffs failed to plead such a correlation because they had not adequately alleged significant stock drops on the days of purported corrective disclosures, given the context of general losses that "coincide[d] with a market phenomenon." *Id.*  Here, Plaintiffs fail to allege the Spruce Point produced a meaningful drop in Oatly's stock price in light of the stock's overall decline in the months after the IPO.  Specifically, Plaintiffs allege that the Spruce Point Report was published before markets opened on July 14, 2021, and that as a result, the price of Oatly shares fell on July 14 and 15.  (¶¶ 68, 75.)  But Oatly's stock drop on those days was part of a general downtrend that started well before the Spruce Point Report was published.  *See* Appendix B.  Indeed, as illustrated in the charts in Appendix B, Oatly's stock price experienced less severe daily drops on July 14 and 15, 2021 (2.8% and 5.2%, respectively) than the previous day, July 13—before the Report was published—when the stock dropped by 5.8%.  The court need not "accept [Plaintiffs'] causal inference" that these disclosures incrementally caused their losses.  *SCA*, 729 F. Supp. 2d at 599; *see also 60223 Trust v. Goldman Sachs & Co.,* 540 F.

37

Supp. 2d 449, 461 (S.D.N.Y. 2007) (holding plaintiff failed to plead loss causation where "[t]he loss in value of the stock occurred gradually over the course of the entire class period").

Further, even if the stock drop on July 15 of 5.2% had been irregular (which it was not), it cannot support allegations of loss causation because Plaintiffs allege "the market for Oatly ADSs was an efficient market." (¶ 105.). If it was, the market's response to the Spruce Point Report—if any—would have been complete as of the close on July 14. *See SCA*, 729 F. Supp. 2d at 600 n.5.

     b.  November 2021 Q3 2021 Results

Plaintiffs allege the Q3 2021 Results disclosed that (1) "Oatly's shelf space . . . had actually been declining for at least the two financial quarters prior to Oatly's IPO," (2) Oatly "started 2021 with less shelf space than prior years," (3) Oatly "had experienced 'great pressure' in Q1 and Q2 that lead to 'lower growth rates, . . . strained relationship with retailers, and lost market shares," and (4) Oatly performed poorly on various financial metrics (*e.g.*, "a quarterly operating loss of over $44 million"). (¶ 162.) As an initial matter, these statements are not alleged to have revealed that any of Oatly's prior statements were false or misleading (¶¶ 134–35, 140), for the reasons above, and therefore cannot have been "corrective disclosures."

For example, Plaintiffs allege that "Oatly's shelf space . . . had actually been declining for at least the two financial quarters prior to Oatly's IPO" (¶ 162), but the Q3 2021 Results did not make such a disclosure. Oatly stated only that it "started 2021 with less shelf space than prior years" (¶ 162) in EMEA. That does not mean Oatly continued to lose shelf space *during* the first half of 2021. In fact, on the Q3 2021 Earnings Call, Defendant Petersson explained that "[Oatly] did not lose shelf space" in EMEA in 2021. (Q3 2021 Earnings Call, Ex. G at 14.)

Moreover, the purported "corrective disclosures" had been disclosed previously, making them publicly available information and an even less plausible explanation for the stock price

decline.  In fact, the Spruce Point Report had warned in July 2021 that investors "should be focused on [Oatly's] loss of market share in Sweden and the U.S." based on Oatly's failure to meet its sales projections, which Defendant Petersson publicly announced in mid-2019.  (Spruce Point Rpt., Ex. C at 6, 9.)  Further, on Oatly's Q2 2021 Earnings Call in August 2021, Petersson acknowledged "recent pressures on our market share" and offsets to growth rates (Q2 2021 Earnings Call, Ex. E at 7, 10, 23.)  It is therefore implausible that Oatly's stock price declined based on Oatly's Q3 2021 statement regarding lower growth rates and market share losses.

Here, a more plausible inference—that revised growth projections due to supply challenges are what caused Oatly's stock price drop—defeats Plaintiffs' allegations of loss causation.  Plaintiffs themselves cite the Wall Street Journal's reporting on the Q3 2021 Results, which accurately reported the most plausible inference for the stock drop after the Q3 2021 Results:  "[Oatly] warned that production challenges might keep it from growing as fast as previously projected, sending its shares lower"; "[t]he company's reduced sales outlook added to investors' concerns about Oatly's losses and its capacity to meet growing demand"; "[t]he problem is, if you can't supply it, it doesn't matter how strong the brand is . . . The market is worried [Oatly] might be missing out on an opportunity to grow the business."  (*See* ¶ 163; Nov. 15, 2021 WSJ Article, Ex. H at 1, 2.)  *Cf. Metzler*, 540 F.3d at 1064–65 (rejecting loss causation theory in favor of "far more plausible" explanation).  Of course, as discussed, Oatly consistently disclosed its supply challenges.  (*See* Section I.A.1.a(1)(c), *supra*.)

For all the reasons above, Plaintiffs have failed to plead any actionable misstatements or omissions, they have failed to plead scienter, and they have failed to plead loss causation.  Each of those failures independently defeats Plaintiffs' Section 10(b) claim.

39

**B.**      **Plaintiffs Fail to State a Claim Under Section 20(a) of the Exchange Act.**

Plaintiffs' "control" person claim under Section 20(a) requires a predicate violation of the Exchange Act.  *See* 15 U.S.C. § 78t(a).  Here, because plaintiffs state no Section 10(b) claim, there can be no Section 20(a) claim.

**II.     PLAINTIFFS' SECURITIES ACT CLAIMS FAIL TO STATE A CLAIM.**

Plaintiffs' Securities Act claims challenge a subset of the exact same statements that the Exchange Act claims challenge, discussed above.  Plaintiffs do not allege that any unique statements are false or misleading in this section of the Complaint.  Thus, the Section 11 claims fail for many of the same reasons that the Exchange Act claims fail:  The Complaint does not adequately allege that any of the challenged statements are false or misleading, and even if it did, the statements are inactionable puzzle pleading, puffery, or opinions.  Plaintiffs' Section 12(a) claim fails for the additional reasons that Plaintiffs fail to allege that (1) Oatly board members were statutory sellers, and (2) they have standing to sue any Defendant under that provision.  Because Plaintiffs' Section 11 and 12(a) claims fail, their Section 15 claim also fails.

**A.      Plaintiffs' Securities Act Claims Should Be Analyzed Using the Heightened Pleading Standard for Claims That Sound in Fraud.**

Plaintiffs' Securities Act claim should be analyzed using the heightened pleading standard of Rule 9(b) and the PSLRA because Plaintiffs' allegations of affirmative misstatements and material omissions sound in fraud.  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("[T]he same heightened pleading standard applies to securities claims brought under Section 11 and Section 12(a)(2) when premised on averments of fraud.").

Plaintiffs attempt to "disclaim" allegations of fraud for their Securities Act claims, asserting that their claims sound in "strict liability and negligence" (*e.g.*, ¶¶ 1, 13, 93, 109), even though their Exchange Act claims "incorporate by reference . . . all inferences of scienter or

40

fraud arising from those [Securities Act] allegations." (¶ 118.) But a plaintiff may not avoid heightened pleading standards "by merely inserting boilerplate language into their complaint stating that claims are based in negligence not fraud." *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000); *see also Rombach*, 355 F.3d at 172.

First, Plaintiffs' claims sound in fraud because of the language Plaintiffs use in articulating them. In *Rombach*, the Second Circuit explained that where allegations use "the wording and imputations . . . associated with fraud," heightened pleading standards apply. *Id.* at 172 (Section 11 claim sounded in fraud where the complaint alleged the defendants' registration statement was "inaccurate and misleading" and contained "untrue statements of material facts"). Here, Plaintiffs' Securities Act allegations are rife with the same wordings and imputations associated with fraud that were present in *Rombach*: Plaintiffs allege statements in the Offering Documents were "materially untrue and misleading" and "materially untrue, misleading, and incomplete" throughout their Securities Act section. (*See, e.g.*, ¶¶ 17, 37, 50, 53–54, 56, 67.)

Second, where a "[c]omplaint as a whole is targeted at [] fraud," a plaintiff may not avoid the heightened pleading standards. *See In re Adelphia Comms. Corp. Sec. and Deriv. Litig.*, 2007 WL 2615928, at * 9 (S.D.N.Y. Sept. 10, 2007). Such is the case where a plaintiff's purportedly non-fraud allegations are based on the same assertions as their allegations sounding in fraud. *See id.* Plaintiffs' Securities Act claims sound in fraud because they are based on the same facts, occurrences, and misstatements as their Exchange Act claims, which explicitly allege a "fraudulent scheme"; thus, as a whole, the Complaint is targeted at fraud and the challenged statements should be analyzed together under the heightened pleading standard.

**B.        Plaintiffs Fail to State a Claim Under Section 11 of the Securities Act.**

To state a claim under Section 11, plaintiffs must allege that (1) they purchased a registered security, (2) the defendant participated in the offering in a manner sufficient to give

41

rise to liability under Section 11, and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010).

Even if Plaintiffs could adequately plead the first two elements, they cannot establish the third: that the Registration Statement contained misleading statements. Plaintiffs do not allege any unique misstatements or omissions for their Section 11 claim; all of the alleged misstatements and omissions underlying their Section 11 claim also underlie their Section 10(b) claim. (*Compare* ¶¶ 50–67 (statements challenged under the Securities Act) *with* ¶¶ 131–35, 141–154 (same statements challenged under the Exchange Act). Because these statements are not false or misleading for purposes of Section 10(b), as discussed above, they are not false or misleading for purposes of Section 11 either. *See, e.g., Police and Fire Ret. Sys. of the City of Detroit v. La Quinta Hldgs. Inc.*, 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017) ("The standard for determining whether a defendant made a material misstatement or omission is essentially the same under Section 10(b), Section 11, and Section 12." (citing *Rombach*, 355 F.3d at 172 n.7)); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 57–59 (2d Cir. 1996) (finding that the alleged misstatements were inactionable under both Section 10(b) and Section 11 after analyzing the statements together).

    **C.**    **Plaintiffs Fail to State a Claim Under Section 12(a) of the Securities Act.**

To state a claim under Section 12(a)(2), plaintiffs must allege that (1) each defendant is a "statutory seller"; (2) a sale to each plaintiff was effectuated "by means of a prospectus or oral communication"; and (3) the prospectus or oral communication includes a material misstatement or omission. 15 U.S.C. § 77l(a)(2); *In re Morgan Stanley*, 592 F.3d at 359. Because Plaintiffs fail to allege material misstatements or omissions, as discussed above, they fail to state a claim

42

under Section 12(a)(2).  *Id.*  Even if the Registration Statement did contain actionable statements, Plaintiffs' Section 12(a)(2) claim would still fail.  First, Plaintiffs have failed to allege the directors who signed the Registration Statement ("Director Defendants") are "statutory sellers" by virtue of doing so or by selling shares (with the exception of Öste, who sold shares in the IPO).  Second, Plaintiffs do not have standing to bring Section 12(a)(2) claims.

### 1.      Plaintiffs Fail to Allege the Director Defendants Are Statutory Sellers.

A defendant is a "statutory seller" where he: (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner."  *Id.*  (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)).  To "pass title" means to sell shares.  *See Pinter*, 486 U.S. at 642.  Here, Plaintiffs do not allege that any of the Director Defendants other than Öste sold shares in the IPO.  (*See* ¶¶ 24–33.)

Nor do Plaintiffs allege that any of the Director Defendants successfully solicited investors to purchase Oatly's securities in the IPO.  To "successfully solicit the purchase of a security" under the second prong of the test means something *aside* from just signing the Registration Statement.  *Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at *5 (S.D.N.Y. June 18, 2020) (dismissing Section 12(a)(2) claims against a director whose "participation in the solicitation of the offering was limited to signing the Registration Statement").  Plaintiffs do not plead that the Directors attended road show presentations or meetings with investors, or did anything other than sign the Registration Statement.  (¶¶ 25–33.)

Thus, other than with respect to Öste, Plaintiffs' allegations are insufficient to plead that the Director Defendants are statutory sellers.

43

### 2.    Plaintiffs Fail to Allege Standing to Bring a Section 12(a)(2) Claim.

Plaintiffs must also allege standing to pursue a claim under Section 12(a)(2). Unlike under Section 11, a plaintiff only has such standing if they purchased shares directly in the challenged public offering, not in a private or secondary transaction. *See Yung v. Lee*, 432 F.3d 142, 147–49 (2d Cir. 2005) (citing *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 571, 584 (1995)). Where a plaintiff merely alleges purchase of shares "pursuant to or traceable to" a public offering, they do not adequately allege direct purchase of shares in the offering. *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005).

Here, Plaintiffs merely allege they purchased ADS "traceable to the IPO." (¶¶ 19–20.) Indeed, their prior filings in this action show that the earliest purchase of shares by any Plaintiff was June 7, 2021. (ECF Nos. 13-3, 20-3, 31-1.) Plaintiffs' allegations thus cannot establish Section 12(a)(2) standing, so the Section 12(a)(2) claims must be dismissed as to all Defendants.

### D.    Plaintiffs Fail to State a Claim Under Section 15 of the Securities Act Against Petersson, Hanke and the Director Defendants.

To sufficiently plead a control person claim under Section 15, Plaintiffs must establish: "(1) an underlying primary violation [of Sections 11 or 12(a)(2) of the Securities Act]; and (2) [that] the individual defendant had control over the primary violator." *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 599 (S.D.N.Y. 2006). Here, Plaintiffs have failed to plead facts sufficient to state a claim for an underlying violation under Section 11 or Section 12(a), which defeats the control person claims against Petersson, Hanke, and the Director Defendants.

### CONCLUSION

The Complaint states no claim under the Exchange Act or Securities Act because Plaintiffs have failed to support their baseless and conclusory allegations with any particularized

44

pleading.  Defendants request that Plaintiffs' claims be dismissed in their entirety, with

prejudice.


Dated: October 3, 2022

**LATHAM & WATKINS LLP**

By: /s/ William O. Reckler_
Christopher J. Clark
William O. Reckler
Benjamin Naftalis
Kalana Kariyawasam
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: chris.clark@lw.com
Email: william.reckler@lw.com
Email: benjamin.naftalis@lw.com
Email: kalana.kariyawasam@lw.com


Elizabeth R. Marks
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
Email: betsy.marks@lw.com

*Attorneys for Defendants*