**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE OATLY GROUP AB SECURITIES LITIGATION | Consolidated Civil Action No. 1:21-cv-06360-AKH |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**<u>MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ....................................................................................................... 4

    A.    Oatly's Products and Business.................................................................... 4

    B.    Oatly's May 20, 2021 IPO ........................................................................ 5

    C.    The Undisclosed Material Adverse Trends and Conditions Impacting
        Oatly's Business as of the IPO.................................................................... 6

        1.    Oatly's Declining Retail Shelf Space and Market Share Before
            the IPO ............................................................................................ 7

        2.    The Dramatic Pre-IPO Increases in Oatly's Key Raw
            Ingredients..................................................................................... 10

    D.    Oatly's Misleading Statements and Omissions........................................ 12

    E.    The Truth Begins to Emerge..................................................................... 14

ARGUMENT............................................................................................................................ 15

    I.    PART I OF THE COMPLAINT PLAUSIBLY ALLEGES VIOLATIONS OF
        THE SECURITIES ACT OF 1933 ........................................................................ 15

    A.    Legal Standard ......................................................................................... 16

    B.    The Offering Documents Contained Numerous Materially Untrue,
        Misleading, and Incomplete Statements .................................................. 19

        1.    Defendants Omitted Information Necessary to Make the
            Offering Documents "Complete and Accurate" ........................... 19

            a.    Plaintiffs Adequately Allege Declining Shelf Space and
                Market Share .................................................................... 21

            b.    Defendants Had a Duty to Disclose Oatly's Declining
                Retail Shelf Space and Market Share, and the Likely
                Impact of Increasing Oat and Rapeseed Prices................. 23

            c.    The Offering Documents' "Risk Warnings" Were
                 Deficient......................................................................... 28

        2.    The Offering Documents Failed to Disclose Material Adverse
            Trends in Violation of Item 303 of Regulation S-K ..................... 29

        3.    Defendants Also Made Affirmatively Misleading Statements
            Concerning Key Aspects of Oatly's Business .............................. 33

    C.    The Undisclosed Adverse Truths About Oatly's Business Were
        Material ..................................................................................................... 35

    D.    Contrary to Defendants' Claims, Defendants' Misrepresentation
        and Omissions Are Actionable ................................................................. 38

        E.      Plaintiffs Have Standing to Pursue Claims Under Section 12 of the
                1933 Act............................................................................................... 42

II.     PART II OF THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS
        OF THE SECURITIES EXCHANGE ACT OF 1934........................................ 42

        A.      Legal Standard .................................................................................... 43

        B.      Plaintiffs Plausibly Allege Actionable Material Misrepresentations
                and Omissions in the Offering Documents.............................................. 43

        C.      Plaintiffs Also Plausibly Allege Actionable Misstatements After the
                IPO ...................................................................................................... 44

        D.      Plaintiffs' Allegations Give Rise to a Strong Inference of Scienter ......... 46

                1.      The Exchange Act Defendants' Motive and Opportunity ............ 47

                2.      Circumstantial Evidence of Conscious Misbehavior or
                        Recklessness .................................................................................. 48

                3.      Core Operations Doctrine Further Supports Inferring Scienter.... 49

                4.      Defendants' "Non-Culpable Inferences" Are Unavailing ............ 50

        E.      Plaintiffs Plausibly Alleges Loss Causation ........................................... 50

III.    THE COMPLAINT PLAUSIBLY ALLEGES "CONTROL PERSON"
        CLAIMS ........................................................................................................... 54

CONCLUSION.............................................................................................................. 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*60223 TR. v. Goldman Sachs & Co.*,
  540 F. Supp. 2d 449 (S.D.N.Y. 2007)......................................................................52

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)...........................................................................50, 53

*Behrendsen v. Yangtze River Port Auth. & Logistics Ltd.*,
  No. 19CV00024, 2021 WL 2646353 (E.D.N.Y. June 28, 2021).............................51

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
  No. 07 CIV. 10528, 2010 WL 148617 (S.D.N.Y. Jan 14, 2010).............................30

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)....................................................................................54

*Cheng v. Canada Goose Holdings Inc.*,
  No. 19-CV-8204 (VSB), 2021 WL 3077469 (S.D.N.Y. July 19, 2021)..................40

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012).....................................................................46

*Constr. Laborers Pension Tr. For S. California v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020)................................................................29, 38

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
  No. 20 CIV. 4650 (ER), 2022 WL 912965 (S.D.N.Y. Mar. 29, 2022)...................38

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................................50

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...............................................................................46, 48

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................17

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)................................................................................36, 37

*Hawaii Structural Ironworkers Pension Tr. Fund. v. AMC Ent. Holdings, Inc.*,
  422 F. Supp.3d 821 (S.D.N.Y. 2019).......................................................................35

*Hutchins v. NBTY, Inc.*,
 No. CV 10-2159, 2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ............................................47

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
 No. 11 CIV. 4209 KBF, 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013)..................................50

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
 No. 03 CIV. 7301, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007)..........................................18

*In re Alstom SA Sec. Litig.*,
 406 F. Supp. 2d 433 (S.D.N.Y. 2005).....................................................................................20

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
 No. 17-CV-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..................................16

*In re BHP Billiton Ltd. Sec. Litig.*,
 276 F. Supp. 3d 65 (S.D.N.Y. 2017)..................................................................................27, 30

*In re CitiGroup Inc. Bond Litig.*,
 723 F. Supp. 2d 568 (S.D.N.Y. 2010).....................................................................................18

*In re CPI Card Grp. Inc. Sec. Litig.*,
 No. 16-CV-4531 (LAK)............................................................................................................31

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
 986 F. Supp. 2d 487 (S.D.N.Y. 2013).........................................................................28, 30, 36

*In re Gildan Activewear, Inc. Sec. Litig.*,
 636 F. Supp. 2d 261 (S.D.N.Y. 2009).....................................................................................47

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
 251 F. Supp. 3d 596 (S.D.N.Y. 2017).....................................................................................49

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) .....................................................................................47

*In re Morgan Stanley Info. Fund Sec. Litig.*,
 592 F.3d 347 (2d Cir. 2010)...............................................................................................16, 20

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
 No. 08 CIV.9203 (RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ................................28

*In re Oxford Health Plans, Inc.*,
 187 F.R.D. 133 (S.D.N.Y. 1999) .............................................................................................47

*In re Pareteum Sec. Litig.*,
 No. 19 CIV. 9767 (AKH), 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)...................... *passim*

*In re Patriot Nat'l. Inc. Sec. Litig.*,
   No. 17 CIV.1866 (ER), 2021 WL 3418615 (S.D.N.Y. Aug. 5, 2021) ...................................42

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007).............................................................................18, 47

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)....................................................................................................47

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2010)...................................................................................51

*In re Signet Jewelers Ltd. Sec. Litig.*,
   389 F. Supp. 3d 221 (S.D.N.Y. 2019)...................................................................................39

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)..................................................................................................18

*In re Ultrafem Inc. Sec. Litig.*,
   91 F. Supp. 2d 678 (S.D.N.Y. 2000).....................................................................................17

*In re Van der Moolen Holding N.V. Secs. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005)...................................................................................28

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)..................................................................................................24

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................................39

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011)...................................................................................39

*In re WorldCom, Inc. Sec Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)...................................................................................17

*In re WRT Energy*,
   No. 96 CIV. 3610 (JFK), 2005 WL 323729 (S.D.N.Y. Feb. 9, 2005)....................................19

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)....................................................................................................39

*Int'l Controls Corp. v. Vesco*,
   556 F.2d 665 (2d Cir. 1977)....................................................................................................3

*Karimi v. Deutsche Bank Aktiengesellschaft*,
   No. 22-CV-2854 (JSR), 2022 WL 2114628 (S.D.N.Y. June 13, 2022) ................................25

*Klamberg v. Roth*,
  473 F. Supp. 544 (S.D.N.Y. 1979) ................................................................25

*Kronfeld v. Trans World Airlines, Inc.*,
  832 F.2d 726 (2d Cir.1987)............................................................................27

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)....................................................................50, 54

*Lin v. Interactive Brokers Grp., Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008).............................................................19

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)................................................................... *passim*

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)............................................................................52

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)......................................................................24, 26

*Mullins v. City of New York*,
  653 F.3d 104 (2d Cir. 2011)............................................................................33

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)............................................................................27

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)............................................................................39

*Nursing Home Pens. Fund, Loc. 144 v. Oracle Corp*,
  380 F.3d 1226 (9th Cir. 2004) ........................................................................47

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*
  367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................30, 31, 32

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund.*,
  575 U.S. 175 (2015).........................................................................................41

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
  603 F.3d 144 (2d Cir. 2010)............................................................................42

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)............................................................................30

*Pearlstein v. Blackberry Ltd.*,
  93 F. Supp. 3d 233 (S.D.N.Y. 2015)...............................................................31

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
No. 15-CV-7199 (JMF), 2016 WL 58118590 (S.D.N.Y. Oct. 5, 2016) ...................................53

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
No. 1:16-CV-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) .............................24

*Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*,
No. 16-CV-3068 (AJN), 2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017)................................43

*Set Capital LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021)...................................................................................................28

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010).................................................................................................33

*Speakes v. Taro Pharm. Indus., Ltd.*,
No. 16-CV-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018).............................53

*Stratte-McClure v. Morgan Stanley*,
776 F. 3d 94 (2d Cir. 2015)................................................................................27, 30, 32, 33

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007).............................................................................................................46

*Tongu v. Sanofi*,
816 F.3d 199 (2d Cir. 2016).................................................................................................41

*Tripathy v. McClowski*,
No. 21-3094, 2022 WL 2069228 (2d Cir. June 9, 2022) .........................................................3

*Wilson v. Merrill Lynch & Co., Inc.*,
671 F.3d 120 (2d Cir. 2011).................................................................................................28

**Statutes, Rules, and Regulations**

17 C.F.R.
§229.303(a)(1) .....................................................................................................................29

15 U.S.C.
§77k(a) ............................................................................................................................16, 18
§77l(a)(2) ........................................................................................................................16, 18

Federal Rules of Civil Procedure
Rule 8....................................................................................................................................36
Rule 8(a)...........................................................................................................................17, 50
Rule 9(b) ...............................................................................................................17, 18, 19, 43
Rule 12(b)(6) ........................................................................................................................52

**Other Authorities**

C. Wright & A. Miller, *§1476 Effect of an Amended Pleading*,
   FEDERAL PRACTICE AND PROCEDURE §1476 (3d ed.) .................................................................3

Lead Plaintiff Mario Bello and additional Plaintiffs Kai Jochims and Mark Hayden (collectively, "Plaintiffs") respectfully submit this opposition to the Motion to Dismiss the Second Consolidated Complaint filed by Oatly Group AB ("Oatly") and the individual defendants (Dkt. #77), and their accompanying Memorandum of Law (Dkt. #78 ("Def. Br.")).

## PRELIMINARY STATEMENT

In May 2021, Oatly held an initial public offering ("IPO") in the United States and sold 68,688,000 American depository shares to investors, which raised over $1 billion for the Company. This securities class action seeks to recover damages based upon materially untrue statements contained in, and material omissions from the Offering Documents (as further defined below) for the IPO, and for certain subsequent false or misleading statements made in connection with Oatly's August 2021 announcement of its first post-IPO financial results.

Oatly's sales pitch for the IPO was simple: it claimed that "[h]istorically, global demand for Oatly products has outpaced our supply," that the "greatest constraint on [Oatly's] growth has been production capacity," and that Oatly would use its share of the IPO proceeds to build out the manufacturing infrastructure it purportedly needed to support its touted growth, including by growing distribution "in new and existing markets" and "expanding [the Company's] on-shelf presence" with retailers. ¶46.[1] Unfortunately for investors, however, far from being a company whose "greatest constraint" was "production capacity," as of the IPO, Oatly's business and growth prospects were being materially impaired by three then-existing material adverse trends: (i) an ongoing decline in retail shelf space in its "core markets" in the U.S. and Europe; (ii) an ongoing decline in market share in these same "core markets"; and (iii) a steep and steady rise in the prices

---

[1]     Citations in the form of "¶_" are to the paragraphs in Plaintiffs' August 17, 2022, Second Consolidated Complaint (Dkt. #76 (the "Complaint")).  Unless otherwise stated, in quoted materials all emphasis is added, and internal quotation marks and citations are omitted.

1

for post-IPO delivery of Oatly's key raw ingredients (oats and rapeseed oil), which predictably forced Oatly to start experiencing a sharp increase in costs soon after the IPO. These then-existing adverse conditions and trends – which can perhaps be best characterized as serious headwinds and/or ticking time bombs – were not disclosed in the Offering Documents. To the contrary, by discussing only the "possibility" that such problems "might" materialize in the future, Defendants affirmatively (and materially) misled investors into believing that these problems were mere "risks," when in fact the relevant undisclosed material adverse conditions and trends had ***already materialized*** as of the IPO. Defendants would then further mislead investors in August 2021, when they announced Oatly's second quarter financial results, and again falsely touted "growth in [its] . . . retail channels" and gains in "capturing greater shelf space." ¶¶136-37, 139.

The truth was partially revealed on July 14, 2021, when Spruce Point Capital Management ("Spruce Point") issued a report that, *inter alia*, flagged Oatly's silence on "commodity risk" despite rising prices for post-IPO delivery of oats and rapeseed oil, and warned of a likely "loss of market share in Sweden and the U.S." In response, by the close of trading on July 15, 2021, Oatly shares fell roughly 8.8%. The other shoe dropped on November 15, 2021, when Oatly was forced to announce highly disappointing results for the third quarter 2021 – the first full quarter after the IPO – including a stunning operating loss of over $44 million and a 15% decline in its gross margins, while its written earnings release, for the first time, "warned" investors of "the impact of rising commodity prices . . . on our cost of goods sold." ¶¶76, 80. Moreover, on the investor call held later that day, Oatly's CFO, Defendant Hanke, also belatedly admitted that Oatly had "started 2021 with less shelf space than prior years" and had had to "scale back distribution of our products for 12 countries in EMEA" (*i.e.*, Europe). ¶77. Oatly's CEO, Defendant Petersson, likewise admitted that in "Q1 [and] Q2" of 2021 (*i.e.*, both well before as well as after the May 2021 IPO),

2

the Company had been "under great pressure," and had experienced "lower growth rates, lower fill rates, [and] strained relationship with retail[er]s [and] *lost* market shares," as a "consequence[] for losing 12 [EMEA] markets in 2020." *Id.* In response, Oatly shares plummeted 20.81%.

Plaintiffs' Complaint is divided into two separate parts.[2] Part I asserts strict-liability and negligence claims under §§11 and 12(a)(2) of the Securities Act of 1933 for the materially deficient Offering Documents Oatly issued in connection with its May 2021 IPO, and accompanying §15 "control person" claims. ¶¶15-117. Defendants seek dismissal of these claims on grounds that nothing in the offering documents was materially untrue or misleading, and that in any event they had no "duty to disclose" the adverse trends of declining retail shelf space, deteriorating market share, or increased costs for post-IPO delivery of oats and rapeseed oil. These arguments are unavailing, as it is well-settled that the IPO offering document must be complete and accurate – which was certainly not the case here as, for example, Oatly touted "expanding" the Company's "on-shelf presence" when shelf space was declining. *See infra* §I.B.1. Statements like this (and others) in the offering documents put "in play" and required disclosure of the whole truth about declining retail shelf space, market share, and the impact of skyrocketing prices for oats and rapeseed oil. *See infra* §I.B.1.b. Item 303 of Regulation S-K, also independently required Oatly to disclose and describe these adverse trends in the offering documents, which it did not do. *See infra* §I.B.2. And the undisclosed information was material to investors by any measure. *See infra* §I.C. Accordingly, the claims in Part I of the Complaint are sufficiently pled.

---

[2] Defendants make much of the fact that Plaintiffs' have had "multiple opportunities to amend" (*e.g.*, Def. Br. at 1) and that the allegations in the Complaint have been refined as new information has become available (*see* Def. Br. at 7-8). This is a sideshow. *See*, *e.g.*, *Tripathy v. McClowski*, No. 21-3094, 2022 WL 2069228, at *2 (2d Cir. June 9, 2022) ("[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect.") (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)); C. Wright & A. Miller, *§1476 Effect of an Amended Pleading*, FEDERAL PRACTICE AND PROCEDURE §1476 (3d ed.) ("Once an amended pleading is interposed, the original pleading no longer performs any function in the case . . . .").

Part II of the Complaint asserts securities fraud claims under §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, and "control person" claims under §20(a).  ¶¶118-73.  Defendants' arguments for dismissal of Plaintiffs' fraud claims largely mirror their unavailing arguments for dismissal of the claims in Part I of the Complaint.  *See infra* §§II.B.-C.  In addition, Defendants wrongly claim that the Complaint fails to plead scienter and loss causation.  As to the former, there is no dispute that Defendants Petersson and Hanke used the IPO to make over $23.5 *million*, in total, on insider sales.  This fact demonstrates both the motive and the opportunity to commit fraud.  And there is no dispute that retail shelf space was core to Oatly's business and so it can be inferred that Defendants were aware of the declines in shelf space.  These facts alone are sufficient to plead scienter, but the Complaint also alleges strong circumstantial evidence that the Exchange Act Defendants (defined below) knew of their misstatements when made.  *See infra* §II.D.  Likewise, the dramatic losses suffered by investors when the truth was revealed – an 8.8% drop on July 14 and July 15, 2021, and a staggering drop of over 20% on November 15, 2021 – are more than sufficient to plead loss causation.  *See infra* §II.E.  Accordingly, the allegations in Part II of the Complaint sufficiently plead securities fraud.

Defendants motion to dismiss should be denied.

## STATEMENT OF FACTS

### A.    Oatly's Products and Business

Oatly was founded in Sweden by Defendant Björn Öste and his brother to develop oat-based alternatives to dairy products.  ¶38.  Oatly's products all begin with "oat base," which is combination of oats, certain enzymes, rapeseed oil, and other ingredients.  ¶41.  The oat base is then further processed and additional ingredients are added to make Oatly's finished products, such as oatmilk.  *Id.*  While Oatly offers several different dairy alternatives – such as "oatgurt" and

oat-based ice cream – oatmilk is, by far, its most important product and accounted for roughly 86% and 90% of its revenue in 2019 and 2020, respectively. *Id.*

Oatly has "factories and manufacturing facilities" around the world in "close proximity to [its] customers as well as [its] co-packers," who are third-party manufacturers that Oatly uses to turn its oat base into products that can be sold to customers. ¶¶42-44. According to Oatly, its "Core Markets" are the U.S., China, and certain European countries (notably Sweden, Germany and the U.K). ¶40. Unsurprisingly, Oatly's manufacturing facilities are located in or near these core markets. ¶44. By May 2021, Oatly was planning to expand its manufacturing facilities around the world, both by opening new factories in the U.S., U.K., China, and "Asia," and by expending pre-existing facilities in the U.S. and Europe. *Id.*

**B.    Oatly's May 20, 2021 IPO**

On May 20, 2021, Oatly held an IPO of its American depository shares (the "ADSs") in the U.S. at $17 per ADS, with each ADS representing an interest in one Oatly ordinary share. ¶48. In the IPO, (i) *Oatly* sold 68,688,000 ADSs for gross proceeds of $1.167 billion, and (ii) certain preexisting Oatly shareholders, including Defendant Öste, sold an additional 19,688,000 ADS for gross proceeds of $334.7 million. *Id.* At the same time, certain Oatly executives, including Defendants Petersson and Hanke, reaped a total of tens of millions in additional proceeds through a simultaneous private placement transaction at the IPO price, which effectively allowed them to "piggy-back" on the IPO. ¶158.

In connection with the IPO, Oatly filed a Form F-1 Registration Statement and Form 424B4 Prospectus. ¶¶39, 45. These documents, as amended, plus materials incorporated by reference, free-writing prospectus materials, and roadshow presentation materials, constitute the "Offering Documents" at the heart of this action. ¶45, *see* ¶36.

As set forth in the Offering Documents, Oatly's pitch for the IPO was simple:  it wanted to raise money to expand its production facilities because (allegedly) "the greatest constraint on [Oatly's] growth has been production capacity" and, "[h]istorically, global demand for Oatly products has outpaced our supply."  ¶46.  According to the Offering Documents, Oatly would use the proceeds from the IPO to "leverage the significant demand for Oatly products in new and existing markets" in order to "Grow Distribution."  *Id*.  Key to this strategy was "continu[ing] to build on industry-leading food retail performance by growing velocity and *expanding on-shelf presence*" with retailers who "ha[ve] welcomed Oatly on shelves."  *Id*.

Investors believed what Oatly told them about the Company's prospects, and the IPO raised over $1.1 billion for Oatly.  ¶47.  In addition, at the same time as the IPO, company insiders sold shares in a "Concurrent Private Placement" transaction, pursuant to which Defendants Petersson and Hanke were able to exercise certain Oatly warrants and then promptly sell 1,343,960 (Petersson) and 131,029 (Hanke) ordinary Oatly shares for additional insider sale proceeds of roughly $21.5 million and $2.1 million, respectively.  ¶158.

## C.    The Undisclosed Material Adverse Trends and Conditions Impacting Oatly's Business as of the IPO

Unfortunately for investors, however, as of the IPO, Oatly's business was being confronted by several known, materially adverse trends – which were not disclosed in the Offering Documents – that would soon force Oatly to report sharply disappointing results and cause its ADS price to plummet.  First, Oatly's retail shelf space and retail market share were both declining in the crucial U.S. and European markets.  *See*, *e.g.*, ¶¶6-10.  Second, and simultaneously, futures prices for delivery of oats and rapeseed oil – the key ingredients for "oat base" – had increased significantly as compared to historical averages starting in the second half of 2020, which meant that the reported costs of making Oatly's products would almost certainly materially increase (and Oatly's

6

reported margins would almost certainly materially decrease) soon after the IPO and going forward thereafter.

### 1.    Oatly's Declining Retail Shelf Space and Market Share Before the IPO

Shelf space refers to the amount of physical space a retailer devotes to selling a specific product or product line at a store. ¶7. In retail sales, shelf space is critically important to a brand's ability to grow demand and fend off competitors because retailers purchase inventories of, and allocate shelf space to, products that retailers believe are most likely to generate strong and sustained sales. *Id.* A decline in shelf space for a particular product or brand generally reflects retailers' declining confidence in the product or brand's ability to generate strong or sustained sales, including in relation to competitor products. *Id.* For example, a grocery store cereal aisle will have many shelves stocked with different kinds of breakfast cereal (Cheerios, Special K, Corn Flakes, etc.) based upon the store's views of how such cereals will sell. If Cheerios are more popular than Corn Flakes (*i.e.*, has a larger share of the breakfast cereal market), then the grocery store will allocate more shelf space to Cheerios than Corn Flakes. Thus, shelf space trends are key metrics for assessing whether a product or brand is gaining or losing market share (and is likely to do so in the future) as compared to competitors. *Id.*

The loss of retail shelf space is particularly damaging to innovators, like Oatly, who make and sell new products in competitive markets. *Id.* Losing shelf space to competitors, which occurred here, will reduce an innovator's growth prospects as both retailers and consumers turn increasingly to competing brands, which erode the innovator's first-mover advantage. *Id.*

Plaintiffs allege numerous facts showing that Oatly's retail shelf space and market share were declining in Europe prior to the IPO. Indeed, on November 15, 2021, Oatly itself admitted it had "started 2021 with less shelf space than prior years", that "for 2021 we had to scale back distribution of our products for 12 countries in [Europe]," and that "during Q1 [and] Q2 [2021]" –

7

*i.e.*, during the period immediately preceding the May 2021 IPO – it had suffered "lower growth rates, lower fill rates, [and] strained relationship[s] with retail[er]s."  ¶¶6, 54, 77.  And, Oatly also admitted that it "lost market shares [*sic*]" in Europe as a "consequence[] for losing [distribution in] 12 markets in 2020."  ¶77.

Moreover, Plaintiffs' investigation has shown that a similar story was playing out in the U.S. during the period preceding (and following) the IPO.  For example, Plaintiffs' confidential witness number 1 ("CW1") was an Oatly Sales Director in the U.S. starting in 2020 through the latter part of 2021, whose responsibilities included overseeing U.S. retail sales and distribution. ¶54. CW1 stated that both before and after the IPO, Oatly's retail shelf space was declining in the U.S., including, for example, at large supermarket chains like Target. *Id.*  Consistent with CW1's account, the *Wall Street Journal* ("*WSJ*") would later publish a lengthy exposé on Oatly's failing business, which found that U.S. grocers had decreased the shelf space allocated to Oatly products and reallocated it to Oatly's competitors (citing "Festival Foods" as just one example).  ¶¶9, 86. That *WSJ* article also reported that Oatly's "share of [the] U.S. retail oat milk market" ***had been declining for*** years, as shown in the chart below.



Source: Annual NielsenIQ data via industry analyst

*Id.*, ¶¶9, 84-85.  Tellingly, this chart also shows Oatly's retail market share was floundering at the expense of several large competitors (such as Hood (Planet Oat) and Chobani), who had the resources to continue to exploit any weaknesses and continuing declines in Oatly's performance.

*Meanwhile, at the same time Oatly's retail shelf space and market share were declining in the U.S. and Europe, "finished goods" (i.e., products that are fully manufactured but remain unsold) were piling up at Oatly*.  ¶78.  Between March 31, 2021, and September 30, 2021, Oatly's inventory of unsold products increased by a staggering 215%.  *Id.*  Oatly's inability to sell finished goods is further evidence of its declining retail shelf space and market share.

9

Prior to the IPO, Oatly's much-touted Chinese expansion (¶¶55-56) was also foundering in the face of stagnating demand for its products, as evidenced by Oatly's decision to idle its manufacturing facility in Singapore shortly after it opened in 2021 – a facility that was intended to supply oatmilk to China and other parts of Asia. ¶56. Indeed, Plaintiffs' CW2 – a former manager at the Singapore facility during 2021 – confirmed that Oatly had not only been forced to reduce production hours at this facility by late 2021, but that Oatly subsequently shut down production there *entirely* for multiple months because of declining order volume. *Id.*

### 2. The Dramatic Pre-IPO Increases in Oatly's Key Raw Ingredients

At the same time that Oatly's business was being battered in the U.S., Europe, and China, Oatly was facing other significant headwinds: price increases in oats and rapeseed oil (the two key ingredients for "oat base"). As Plaintiffs allege, starting in May 2020 (a year before the IPO), the CME price to purchase 5,000 bushels of oats for delivery in the post-IPO period steadily increased through November 2021 – and indeed nearly doubled – as shown below:

**CLOSING CME OAT FUTURES PRICES FOR MAY, JULY, SEPTEMBER, AND DECEMBER 2021 DELIVERY**



¶¶58-59.  The same trend occurred for rapeseed oil between August 2020 and November 2021, as the Euronext price to purchase 50 tons of rapeseed oil for delivery in the post-IPO period also skyrocketed, as shown below.

**CLOSING EURONEXT RAPESEED OIL FUTURE PRICES
FOR 10 MONTH DELIVERY**



¶¶60-61.

The sharp increases in oat and rapeseed prices for post-IPO delivery was effectively a ticking time-bomb, as it meant that Oatly's cost of producing oat base (and thus its cost of making all of its products) would almost certainly rise – and that Oatly's operating margins would fall – soon after the IPO. ¶¶61-62. And this is in fact what occurred, with Defendants' announcing on November 15, 2021, that Oatly's gross profit margins had fallen year-on-year to 26.2% from 32% (an 18% decline since 3Q 2020), and belatedly warning investors of "the impact of rising commodity prices . . . on our cost of goods sold." ¶¶76, 80.

### D.    Oatly's Misleading Statements and Omissions

Notwithstanding that Oatly's retail shelf space and market share were declining in its core markets, the Offering Documents misrepresented that "accelerating performance in Germany, the [U.K.] and [U.S.]" would allow the Company to "leverage the significant demand for Oatly

12

products to grow in new and existing markets." ¶51.  Similarly, Oatly touted that "[t]he *food retail channel, in particular*, has *welcomed* Oatly on shelves" – even though U.S. and European retailers were actually decreasing the shelf space allocated to Oatly products. *Id*.  And, tellingly, the Offering Documents only warned investors of the "risk" to Oatly's business "*[i]f . . . our retailers allocate shelf space to other brands*" – but never disclosed that Oatly retailers had *already* begun allocating less shelf space to Oatly products (with concomitant loss of retail market share) well before the IPO.[3]  ¶52.

As for the material, *then-existing,* adverse trend of increasing prices for key "oat base" ingredients, the Offering Documents were also silent – even though they discussed at length how Oatly sourced its oats and rapeseed oil through various supply agreements (¶¶63-64); how a reduction in "supplies of oats and other raw materials . . . *may* [prevent us from] be[ing] able to obtain sufficient supply to meet our needs on favorable terms;" how "[i]ngredient . . . costs are volatile and *may* rise significantly;" and how such potentially increased costs "*could* increase our costs of sales." ¶¶65-66.  Together, these statements – which discussed the importance of Oatly's supply agreements but warned merely of the *potential* for higher prices for "oats and other raw materials" – gave the patently misleading impression that Oatly was positioned to continue to acquire its key raw materials on favorable terms as of the IPO, when in fact the risk of serious material adverse trends in the prices of those materials had already materialized.  ¶67.

After the IPO, in announcing its August 2021 second quarter ("2Q2021") financial results, Oatly continued to misleading tout "robust consumer demand" and "growth in . . . retail channels," and falsely represent that growth "within retail channels globally" and its success in "capturing

---

[3]     Similarly, the Offering Documents touted that "growth in China demonstrates the effectiveness of [Oatly's] expansion strategy," when, in reality demand in China was declining. ¶¶55-56.

greater shelf space" was driving Oatly's revenue. ¶¶136-37. Similarly, echoing the Offering Documents, during Oatly's August 16, 2021, 2Q2021 conference call, Defendant Petersson stated that "global demand for Oatly products continued to outpace our supply" – and blamed "recent pressures on our market share velocity" (*i.e.*, slowing growth) on "capacity constraints and less of inventory to fulfill demand across sales channels" (¶139). In fact, however, Oatly had been losing retail shelf space and market share in the U.S. and Europe since at least the beginning of the year, and inventories of finished Oatly product were piling up.

### E.     The Truth Begins to Emerge

On July 14, 2021, Spruce Point Capital Management issued a report entitled "Sour on an Oat-lier Investment" (the "Report"). ¶¶5, 68-72; *see also* Ex. C.[4] The Report called into question many aspects of Oatly's sales pitch for the IPO based on not only Oatly's financials and other public statements, but also on Spruce Point's interviews of former Oatly employees, site visits to Oatly facilities, and documents it obtained through FOIA requests.[5] ¶68. Among other things, the Report stated that Oatly "failed earlier in its China ambitions, and that it has made conflicting statements about how it succeeded this time around." ¶70. It also observed that the Offering Documents did not "say a word about commodity risk" even though "[o]at prices and rapeseed oil, as measured by futures contracts, are up sharply in 2021" (¶¶71-72), and identified a potential "loss of market share in Sweden and the U.S." Ex. C at 6, 9. These partial disclosures received significant media attention on July 14 and July 15, 2021, and caused Oatly ADSs to suffer a two-

---

[4]     Citations in the format "Ex.__" are to the October 3, 2022, Declaration of Kalana Kariyawasam in Support of Defendants' Motion to Dismiss (Dkt. #79).

[5]     Defendants try to downplay the Report by claiming that everything in it was "already-public" (Def. Br. at 37), but the Report's heavy reliance on information obtained from FOIA requests, CWs, and archival research belies Defendants' assertions. *See, e.g.*, Ex C at 13, 29-37.

14

day decline of 8.8%, on unusually high trading volume.  ¶¶73-75.  But worse news was yet to come.

On November 15, 2021, Oatly announced that it had suffered an operating loss of over $44 million, and a 15% decline in its gross profit margins, in the third quarter, and that it had revised its total FY 2021 projected revenue *down* by *$55 million*, from $690 million to only $635 million. ¶76.  Moreover, on an investor call later that day, Defendant Hanke admitted that Oatly had "*started 2021 with less shelf space than prior years*" and that "*for 2021 we had to scale back distribution of our products for 12 countries in EMEA*" (*i.e.*, Europe).  ¶77.  On this call, Defendant Petersson, after first contradicting Hanke's admission that Oatly had "less shelf space," then similarly conceded that in "Q1, Q2, we were under great pressure due to supply constraints leading to lower growth rates, lower fill rates, *strained relationship with retail[er]s, lost market shares, consequences for losing 12 markets in 2020*."  *Id.*  As to oats and rapeseed oil, Oatly's November 15 press release and accompanying financials now added a new "risk factor", namely "the impact of rising commodity prices . . . on our cost of goods sold."  ¶80.

In response, Oatly ADSs plummeted from $11.82 to just $9.36 at the close – reflecting a one-day decline of 20.81%, and a total drop of nearly 45% from the $17.00 per share IPO price.

## ARGUMENT

**I.     PART I OF THE COMPLAINT PLAUSIBLY ALLEGES VIOLATIONS OF THE SECURITIES ACT OF 1933**

Part I of the Complaint alleges strict liability claims under §§11 and 12(a)(2) of the Securities Act of 1933 against Oatly, CEO Petersson, CFO Hanke, and all other Oatly Directors who signed the Offering Documents for the IPO (collectively, "Defendants").  *See*, *e.g.*, ¶¶21-37.

### A.    Legal Standard

Sections 11 and 12(a)(2) of the Securities Act "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re Pareteum Sec. Litig.*, No. 19 CIV. 9767 (AKH), 2021 WL 3540779, at *18 (S.D.N.Y. Aug. 11, 2021) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. §§77k(a), 77l(a)(2))).  To plead a §11 claim, Plaintiffs must (as they do here) allege that (i) they "purchased a registered security, either directly from the issuer or in the aftermarket following the offering"; (ii) "the defendant participated in the offering in a manner sufficient to give rise to liability under section 11"; and, (iii) "the registration statement contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *Id.*  The elements of a §12(a)(2) claim are similarly broad and impose liability "'where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions,'" while also extending liability to also include "statutory sellers."  *Id.*

Claims under §§11 and 12(a)(2) need not plead or prove scienter, reliance, or loss causation.  *Id.* **18-19.  Instead, once "a plaintiff establishes one of the three bases for liability under these provisions – (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading – then, in a Section 11 case, 'the general rule [is] that an issuer's liability . . . is absolute.'"  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011); *see also In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *11 (S.D.N.Y. Sept. 9, 2019) (same rule for §12(a)(2) claims); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *18 ("The burdensome requirement of *scienter*,

16

required to state a claim under §10(b) and Rule 10b-5 of the Exchange Act, is not applicable to a claim under §§11 and 12 of the Securities Act.").

Moreover, claims under §§11 and 12(a)(2) are subject only to Rule 8(a)'s pleading standard, which simply requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Litwin*, 634 F.3d at 715; *In re WorldCom, Inc. Sec Litig.*, 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003). Defendants' contrary suggestions are plainly misplaced.

First, Defendants' argument (Def. Br. at 40-41) that incorporating the Securities Act allegations into Plaintiff's §10b claims somehow eliminates the distinctions between the initially pled §11 and §12(a)(2) claims and the latter pled §10(b) claims is exactly backwards. In the Complaint, the Part I Securities Act claims precede the Part II fraud-based §10b claims (which include additional allegations not pled in Part I, including post-IPO misrepresentations, (¶¶136-40), *scienter* allegations (¶¶155-58), and loss causation allegations (¶¶159-63)). The Complaint is thus readily distinguishable with *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 690-91 (S.D.N.Y. 2000), where "plaintiffs ma[d]e little, if any, effort to differentiate their asserted negligence claims from the fraud claims . . . ." Indeed, the animating concern in cases like *Ultrafem* – that "without specifying the allegations that would support a negligence cause of action" the reviewing court must "parse the[] allegations to find a negligence claim," *id.* at 690 – is inapplicable here because, as Defendants concede (Def. Br. at 40), the Complaint's separately pled "Part I" clearly specifies the relevant negligence claims. ¶¶15-117.

In short, where (as here) a complaint clearly separates negligence-based §11 and/or §12(a)(2) claims from §10(b) claims that allegedly "sound in fraud," Rule 9(b)'s heightened pleading requirements do not apply. *See*, *e.g.*, *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017) (notice pleading applies to Securities Act claims

17

where the complaint "is segregated into two parts," and "'disclaims any allegations of fraud, *scienter*, or recklessness [as to the] non-fraud claims . . . .'"); *see also In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 CIV. 7301, 2007 WL 2615928, at *9 (S.D.N.Y. Sept. 10, 2007) (plaintiff can "establish[] negligence claims under § 11 that avoided Rule 9(b) where '[the complaint] is carefully structured so as to draw a clear distinction between negligence and fraud claims'" as where "[t]he Securities Act claims are found in the [separate] first half of the complaint" making it "easy to distinguish" between the fraud and non-fraud based claims) (case cited by Defendants). A holding to the contrary would hinder plaintiffs from filing both Securities Act and Exchange Act claims in the same suit, and "[t]here is no suggestion that Congress intended such an incongruous approach." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 273 (3d Cir. 2006).

Second, Defendants argue that the "language Plaintiffs use in articulating" their Securities Act claims proves those "claims sound in fraud," thus triggering Rule 9(b). Def Br. at 41. However, the language at issue – that the Offering Documents contained "materially untrue, misleading, and incomplete" statements (*id.* at 41, citing ¶¶17, 37, 50, 53-54, 65, 67) – simply mirrors the language of §§11 and 12, which impose liability for "*untrue* statement[s]" and omissions of material facts needed to make the relevant statements "not *misleading*." 15 U.S.C. §77k(a); 15 U.S.C. §77l(a)(2). If using language from §§11 and 12 to allege claims under those statutes were enough to make a claim "sound in fraud," then Rule 9(b) would apply to all such claims. That is not the law. *See*, *e.g.*, *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 586 (S.D.N.Y. 2010) ("mere use of the statutory language is itself insufficient to render a complaint one that 'sounds in fraud'"); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (Lynch, J.) ("Second Circuit" did not "intend[] that all allegations directly reproducing the

18

language of §11 be subject to Rule 9(b)"); *In re WRT Energy*, No. 96 CIV. 3610 (JFK), 2005 WL 323729, at *6 (S.D.N.Y. Feb. 9, 2005) (terms "'materially incorrect' [and] 'untrue statements' . . . merely allude to language in Section 11 " and are not "allegations sounding in fraud").

Finally, even if Rule 9(b) did somehow apply to Plaintiffs' Securities Act claims (and it does not), it is easily satisfied here. Rule 9(b) requires only that "[a] securities fraud complaint based on misstatements must (1) specify the statements that plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *12. Here, the Complaint (i) identifies each challenged statement by quoting the Offering Documents; (ii) identifies Oatly as the issuer of the ADSs and the Defendant-signatories of the Offering Documents as the "speakers"; (iii) identifies "when and where" those statements were made (*i.e.*, in the May 2021 Offering Documents); and (iv) explains why each of those statements were materially untrue and/or omitted material facts necessary to make them not misleading. ¶¶50-67. No more is required to satisfy Rule 9(b).

### B.    The Offering Documents Contained Numerous Materially Untrue, Misleading, and Incomplete Statements

Defendants next aver that "Plaintiffs fail to allege material misstatements or omissions." Def Br. at 42. Defendants are again incorrect.

### 1.    Defendants Omitted Information Necessary to Make the Offering Documents "Complete and Accurate"

In evaluating Plaintiffs Securities Act claims, "the court must review the Offering Documents as a whole." *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representations, taken together and in context.' Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the

representation must be 'complete and accurate.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (2d Cir. 2010).  Moreover, statements are actionable under the securities laws where they "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005).  Viewed as a whole, the Offering Documents plainly failed to provide "complete and accurate" information but, instead, by omitting material facts, "created an impression of a state of affairs [at Oatly] that differed in a material way from the one that actually existed." *Id.*

The Offering Documents sold investors on the IPO by stating that "the greatest constraint on [Oatly's] growth has been production capacity," and that "global demand for Oatly products has outpaced our supply," and by further stating that the IPO proceeds would allow Oatly to "leverage the significant demand for Oatly products in new and existing markets" by expanding production to "Grow Distribution" by "continu[ing] to build on industry-leading food retail performance [via] growing velocity and *expanding on-shelf presence*."  ¶46.  In short, the Offering Documents presented Oatly as a company that was "expanding," including "on-shelf" in "food retail," and in "existing markets," but that was constrained by "production capacity."  *Id.* Similarly, the Offering Documents assured investors that Oatly had adequate sources of oats and rapeseed oil from suppliers around the world to produce "oat base" while the Company expanded, while warning only of "possible" risks to its existing favorable pricing terms of these key ingredients – thereby furthering the impression that Oatly had no *then-existing* reasons to believe it would likely be unable to acquire these ingredients on favorable terms going forward.  ¶¶63-67.

In reality, as of the IPO, Oatly was facing significant undisclosed material problems far beyond "production capacity."  Oatly's retail shelf space was declining in the U.S. before and after the IPO, as confirmed by CW1's account (¶54) and by the *WSJ's* March 14, 2022 exposé (¶86).

20

Indeed, Oatly's "share of [the] U.S. retail oat milk market" had been declining in the two years prior to the IPO (¶¶84-86), and Defendants would later admit that similar trends had also been playing out in Europe, as Oatly had "started 2021 with less shelf space than prior years" and "for 2021 had to scale back distribution of our products for 12 countries in [Europe]." ¶¶54, 77. Indeed, CEO Toni Petersson confirmed that not later than Q1 and Q2 2021, Oatly had already come "under great pressure" and now had "strained relationship[s] with retail[er]s" and "lost market shares" as "consequences for *losing 12 markets in 2020*." ¶77. And, at the same time Oatly was losing shelf space and market share in the U.S. and Europe, the costs to obtain the key ingredients for "oat base" – the basis every Oatly product – for delivery in the post-IPO period had been increasing steadily for a year prior to the IPO in the case of oats (and at least nine months for rapeseed oil). ¶¶58-62. In short, contrary to the Offering Documents' rosy assertions that Oatly was only being held back by a lack of "production capacity," those materials nowhere disclosed that, in reality, Oatly's operations and future performance were already being seriously jeopardized by ongoing declines in shelf space and market share in its core markets, and by the near certainty that it would have vastly higher raw material costs within months of the IPO.

Instead of addressing the Offering Documents as a whole, Defendants try to nitpick the Complaint's alleged omissions. Def. Br. at §I.A.1.a(1)-(2). Each of their arguments fail.

### a.      Plaintiffs Adequately Allege Declining Shelf Space and Market Share

Defendants assert that Plaintiffs do not "plead a single fact regarding loss of market share anywhere outside of the U.S." Def. Br. at 12-14. However, on November 15, 2021, CEO Toni Petersson himself admitted that in "Q1, Q2 [2021], *we . . . lost market shares*" in Europe, and CFO Christian Hanke admitted that "for 2021 we had to scale back distribution of our products for 12 countries in EMEA [*i.e.*, Europe]." ¶77. As for Oatly's declining trend in U.S. retail market

as of the IPO, Defendants aver that the Complaint does "not substantiate such a loss of market share" – but they then concede in the very next paragraph that the *WSJ* reported a decline in "the 'U.S. retail oat milk category' based on data from NeilsenIQ." Def. Br. at 14. Faced with the *WSJ* article, Defendants then try to downplay the decline in Oatly's U.S. retail market share for oatmilk as a "narrow metric," because "the U.S. market accounts for less than 25% of Oatly's sales," the decline was limited to only oatmilk, and retail sales allegedly "account for less than 50% of Oatly's U.S. sales." *Id*. But, by Defendants' own math, the declines in U.S. retail market share confirmed by the *WSJ* still implicated at least 10% of Oatly's company-wide sales, given that oatmilk accounted for roughly 86% to 90% of Oatly's revenue. *See* ¶41. Thus, Plaintiffs plainly allege that Oatly was in the grips of an ongoing material market share decline in both the U.S. and Europe well before the IPO.

Similarly, Defendants assert that Plaintiffs allege declines in retail shelf space only "at a single point in time (the beginning of 2021)," and only "somewhere in EMEA and in certain [U.S.] stores." Def. Br at 13. Not so. CW1 stated that Oatly was "suffering from declining shelf space in the U.S. *before and after the May 2021 IPO*." ¶54. Defendants' fixation on CW1's references to "Target and Sprouts Farmers Market" as retailers that "reduced their shelf space for Oatly products" (Def. Br. at 13) misses both (i) that these two retailers are merely CW1's *examples* of the broader trend in declining shelf space, and (ii) that the *WSJ* confirmed that Oatly's retail U.S. shelf space had been declining (and cited an additional *example* of a retailer who "cut Oatly's presence in [its] chain's dairy cases"). ¶86. As for declining shelf space in Europe, in November 2021 CFO Hanke himself stated that Oatly "started 2021 with less shelf space than prior years," and attributed that decline to "scal[ing] back distribution . . . for 12 countries in EMEA" (¶77) – and CEO Petersson similarly stated that Oatly had "los[t] 12 markets in 2020" and during Q1 and

22

Q2 of 2021 (*i.e.*, starting before the IPO) Oatly had already been under "great pressure due to supply constraints leading to lower growth rates, lower fill rates, [and] strained relationship[s] with retail[er]s." *Id.* These admissions, from Oatly's CFO and CEO, adequately allege that shelf space was declining in Europe "in 2020" such that Oatly "started 2021 with less shelf space than prior years," and that as of the IPO (*i.e.*, in Q1 Q2 2021) Oatly was still under "great pressure" and experiencing "lower growth rates" and "strained relationship[s] with retail[er]s."[6]

Defendants also blithely gloss over the Complaint's allegations that Oatly's inventory of "finished goods" increased 215% at the same time retail shelf space and market share were declining in the U.S. and Europe. ¶¶78-79. Oatly's increasing inventory is strongly corroborative of Plaintiffs' allegations of declining retail shelf space and market share, as it confirms that Oatly was having a hard time selling its products. *Id.* In a footnote, Defendants blame "COVID-19 induced barriers to distribution" for the increased inventories (Def. Br at 26 n.14), but such argument is not just "outside the record," it is also irrelevant (because regardless of the reasons for Oatly's ability to distribute its products, the fact remains that the Offering Documents failed to disclose that its shelf space and market share were still declining).

**b.      Defendants Had a Duty to Disclose Oatly's Declining Retail Shelf Space and Market Share, and the Likely Impact of Increasing Oat and Rapeseed Prices**

Defendants next assert that they had no duty to disclose Oatly's declining retail shelf space and market share in the U.S. and Europe, or the likely adverse impact of the skyrocketing prices of oats and rapeseed oil. Def. Br. at 17-19, 23. However, Defendants concede that a duty to

---

[6]      Defendants make much of the fact that, on the November 2021 analyst call, CEO Petersson contradicted CFO Hanke's statement that Oatly "started 2021 with less shelf space than in prior years," which Hanke said earlier on the November 2021 call. Def. Br. at 13. This factual discrepancy cannot be resolved on a motion to dismiss. *See In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *11 ("the Court is obliged to accept as true all well-pleaded factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor").

disclose arises where disclosure is "necessary to ensure the completeness and accuracy of [a defendant's] public statements." *Id.* at 17. And it is equally indisputable that "once a company speaks on an issue or topic," (*i.e.*, puts a subject "in play,") doing so triggers "a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).[7]

The Offering Documents describe how the money Oatly raised in the IPO was intended to allow it to keep "expanding" the Company's "*on-shelf* presence" with retailers, who (allegedly) "had welcomed Oatly *on shelves*." ¶46. Likewise, the Offering Documents touted the "significant demand for Oatly products in new and *existing markets*." *Id*. The Offering Documents, in the context of warning investors of mere "risks" to Oatly's business that "might" transpire, also discussed how Oatly's financial condition and results *might* be adversely affected "[if] . . . our *retailers allocate shelf space* to other brands" – but without warning that this risk had already materialized. ¶52. Such statements and risk warnings put both the issue of Oatly's retail shelf space and its market share "in play," thereby triggering a duty to tell the "whole truth" about how the Company's retail shelf space and market share in the U.S. and Europe were actually *in decline* as of the IPO. *See Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) ("statements regarding the sources of [a company's] sales growth . . . . such as 'strong demand,' [and] 'a well-defined strategy'" triggered duty to "tell the whole truth" about both topics). Indeed, the Offering Documents' purported "warnings" about shelf space are sufficient on their own to put the issue of declining shelf space "in play." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250, n.3 (2d Cir. 2014) ("Because

---

[7]   As explained below, *see infra* §I.B.2., the Defendants also had an independent duty pursuant to Item 303 to disclose the trends of declining retail shelf space and market share in the U.S. and Europe and the impact of rising prices for oats and rapeseed oil.

the May prospectus *discussed the risks* of pollution inherent in JinkoSolar's business and the general practices JinkoSolar had implemented to cabin this risk, it put the issue 'in play' . . . ."). Defendants conveniently ignore these statements when arguing that the "challenged statements" are too "generalized" and "say nothing about shelf space or market share." *Cf.* Def. Br. at 18.

Even more puzzling is Defendants' reliance on *Klamberg v. Roth*, 473 F. Supp. 544, 551 (S.D.N.Y. 1979), to claim that they did not need "to disclose losses in shelf space and market share because a reasonable investor would have inferred" such declines from "Oatly's statements regarding production constraints." Def. Br. at 19. But *Klamberg* simply held that once "material facts are disclosed or already known, it is not deceptive to fail to 'characterize' those facts with 'pejorative nouns and adjectives,' or to fail to verbalize all adverse inferences expressly." 473 F. Supp. at 551. For example, if a company hypothetically discloses that it has lost 10% of its market share, it is not required to also "characterize" that decline as "sharp" or "severe," as investors can draw their own conclusions from accurate reporting of the raw data. Here, however, Defendants cite *Klamberg* for an entirely different proposition: namely, that disclosing some facts on one subject (Oatly's "production constraints") "obviated any possible duty to disclose" other facts on another subject ("losses in shelf space and market share"), as long as the disclosed facts relating to Subject A *might* have caused undisclosed problems relating to Subject B. *See* Def. Br. at 19. That is not the law. *Litwin*, 634 F.3d at 719 (the "potential future impact [defendant company] was certainly not public information," even if "the downward trend in the real estate market" was known to investors). Moreover, this argument is no more than a rephrasing of the "truth-on-the-market" defense, which is no basis for dismissal here. *See*, *e.g.*, *Karimi v. Deutsche Bank Aktiengesellschaft*, No. 22-CV-2854 (JSR), 2022 WL 2114628, at *8 (S.D.N.Y. June 13, 2022) (truth-on-the-market defense requires that "information is already known" and "'conveyed to the

25

public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements"").

Defendants' statements also put "in play," as a "risk factor," the effect that rising prices for oats and rapeseed oil, if they materialized, could have on the Company. The Offering Documents detailed how the Company "source[d] oats" and "rapeseed oil" by, *inter alia*, by identifying Oatly's "five oat suppliers" and describing various terms of the "agreements in place with each of these suppliers" (including how Oatly was "required to provide forecasts of our anticipated needs" for oats "to assess the supply we will require for the upcoming term"). The Offering Documents detailed how the Company "source[d] oats" and "rapeseed oil" by, *inter alia*, identifying Oatly's "five oat suppliers" and describing various terms of the "agreements in place with each of these suppliers" (including how Oatly was "required to provide forecasts of our anticipated needs" for oats "to assess the supply we will require for the upcoming term"). ¶¶63-64. And beyond that, the Offering Documents also made clear that maintaining a ready supply of oats and rapeseed oil at reasonable prices was of major importance to Oatly's business because its "financial performance depends in large part on our ability to arrange for the purchase of raw materials in sufficient quantities at competitive prices." ¶65. These statements, which described both the details of how Oatly sourced oats and rapeseed oil and the importance of getting "sufficient quantities at competitive prices," triggered a duty to tell the "whole truth" about oats and rapeseed oil – namely, that prices for post-IPO deliveries of these ingredients had risen sharply for at least nine months before the IPO, *and* that this already existing trend was likely to have a material adverse "ticking time bomb" impact on Oatly. *See Meyer*, 761 F.3d at 250, n.3.

Tellingly, Defendants do not seriously dispute that the subject of oat and rapeseed oil prices was put "in play," but instead assert that they had no duty to disclose any information about adverse

pricing trends because it was "readily available public information" or, if not, the relevant facts "would be commercially sensitive and confidential." Def. Br. at 22-23.

The two-pronged nature of relevant claims here is that the Offering Documents failed to disclose either (a) that prices for delivery of oats and rapeseed oil in the post-IPO period had already increased dramatically, or (b) the material adverse impact that such significant increases would almost certainly have on Oatly's business and margins going forward. ¶67. As to the first claim, it is rarely appropriate to find as a matter of law that Offering Documents can omit material information simply because it may be found elsewhere. *See*, *e.g.*, *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) ("we have previously stated that '[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a . . . prospectus on the basis that the information is public knowledge and otherwise available to them'" (quoting *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir.1987))). As for the second prong, even if investors can be deemed to know that "prices for delivery of oats and rapeseed oil" had increased, Defendants ignore that they were still required to disclose the material nature and extent of the adverse ***impact*** of such increases. In other words, the nature and extent of the impact of a publicly observable trend (here, increasing commodity prices) on a given company is ***not*** public information, and will need to be disclosed if an adverse impact is both likely and material. *Stratte-McClure v. Morgan Stanley*, 776 F. 3d 94, 105 (2d Cir. 2015) (defendant bank had to disclose likely material adverse impacts of "the deterioration of the real estate, credit, and subprime mortgage markets" on its financial condition); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 83 (S.D.N.Y. 2017) ("the risks otherwise known to investors about tailings dams generally from public reports . . . cannot insulate defendants here").

27

Moreover, it is absurd to suggest that adequate disclosure would have required revealing "commercially sensitive and confidential information" (Def. Br. at 23).  For example, as the Second Circuit recognized in *Stratte-McClure*, 776 F. 3d at 105-06, the defendant (Morgan Stanley) was not required to disclose all the details of its adverse exposure to declining subprime mortgage markets and its "Long Position," but "only that it faced deteriorating real estate, credit and subprime mortgage markets, that it had significant exposure to those markets, and that if those markets continued to decline [it] faced trading losses that could materially affect its financial condition."  Here, by contrast, the Offering Documents were admittedly silent on the ***likelihood*** that increased oat and rapeseed prices (which had ***already*** occurred) would have a ***significant, material*** adverse impact on Oatly's financial performance (because, *e.g.*, it did not expect to be able to pass along such increased costs without losing further market share).

### c.        The Offering Documents' "Risk Warnings" Were Deficient

Defendants also argue that the "risk warnings" in the Offering Documents regarding "shelf space" and "raw materials" sufficiently disclosed the "risk" of then-declining retail shelf space and market share, and of increasing prices for oats and rapeseed oil.  Def. Br. at 19-21, 23-24. However, it is well-settled that "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized."  *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013) ("Cautionary language may protect an issuer from liability; however, '[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'") (quoting *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011)).  This is because "to warn that the untoward may occur when the event is contingent is prudent" but "to caution that it is only possible for the unfavorable events to happen

28

when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Secs. Litig.*, 405

F. Supp. 2d 388, 400 (S.D.N.Y. 2005).[8]

The warnings here all simply disclosed that the risks *might* occur in the future, but never

warned investors that they had *already* transpired.  ¶¶52, 65-66.  For example, they warned that:

- *If* . . . consumers who have previously purchased our products buy other brands *or our retailers allocate shelf space to other brands*, our business, financial condition and results of operations *could* be adversely affected.  ¶52.

- *If* supplies of oats and other raw materials that meet our quality standards are reduced or are in greater demand, we *may* not be able to obtain sufficient supply to meet our need on favorable terms.  ¶65.

- Ingredient . . . costs are volatile and *may* rise significantly, which *may* negatively impact the profitability of our business.  ¶66.

- Volatility in the prices of raw materials [that] . . . we purchase *could* increase our cost of sales and reduce our profitability.  ¶66.

In sum, these "disclosures" simply failed to alert investors that the warned-of risks had already

materialized as of the IPO and would almost certainly have a material adverse impact on Oatly's

business and reported financial results after the IPO.  ¶¶54, 67.  For this reason, the risk warnings

in the Offering Documents do not insulate the Defendants from liability under the Securities Act

(and in fact constitute independently actionable misstatements as explained in §I.B.3. below).

### 2.    The Offering Documents Failed to Disclose Material Adverse Trends in Violation of Item 303 of Regulation S-K

Item 303 mandates disclosure and description in a registration statement of "any known

trends or uncertainties that have had or that the registrant reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations."

---

[8]    Defendants rely on *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 CIV.9203 (RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010), to argue that "[c]ourts in this district have held that risk disclosures are not misleading just because the risk . . . ha[s] already materialized" (Def Br. at 20).  However, *Noah* is plainly not good law (if it ever was) following the Second Circuit's later endorsement of the contrary majority rule in *Set Capital LLC* and *Wilson*.

17 C.F.R. §229.303(a)(1); *Litwin*, 634 F.3d at 716.  "Disclosures required by Item 303 will most often relate to issues in the realm of micro and macroeconomics; for example, a 'reduction in the registrant's product prices [or] ***erosion in the registrant's market share*** . . . .'"  *Constr. Laborers Pension Tr. For S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 541 (S.D.N.Y. 2020) (quoting SEC Securities Act Release No. 6835, "Management's Discussion and Analysis of Financial Condition & Results of Operations, 54 FR 22427-01, 22429 (May 18, 1989)).  Moreover, generic disclosure will invariably fail to satisfy Item 303," *Stratte-McClure*, 776 F.3d at 105; *Billiton*, 276 F. Supp. 3d at 83; instead, "the issuer . . . has a duty to disclose '***whether, and to what extent***' [a] known trend, event or uncertainty . . . 'might reasonably be expected to materially impact . . . future revenues.'"  *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 510 (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012)).

Defendants aver that none of the three adverse trends alleged in the Complaint triggered an Item 303 duty to disclose.  None of Defendants' arguments have merit.

With respect to the undisclosed adverse trend in declining retail shelf space in the U.S. and Europe, Defendants first assert that "only two decreases in shelf space, occurring during brief snapshots in time" are insufficient to plead a "trend."  Def Br. at 15-16.  But the Complaint plainly alleges a longer and sustained trend, citing a decline in retail shelf space that was already well underway as of the May 2021 IPO in the U.S. (as per CW1 and the *WSJ*) as well as in Europe (*see*, *e.g.*, Defendants' own admissions of how it had suffered the "loss" of "12 markets in 2020" in Europe, how Oatly had "started 2021 with less shelf space than prior years" in Europe, and how Oatly continued to experience "great pressure" and "strained relationship[s] with retail[er]s" "great pressure" and in Q1 and Q2 2021 (*i.e.*, immediately before and after the May 2021 IPO)).  ¶¶54, 77, 86.  As in *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, such allegations

are "distinguishable from Defendants' cited authorities, where plaintiffs' allegations concerned time periods as brief as two to five months or would have required near instantaneous disclosure." 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (citing *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 CIV. 10528, 2010 WL 148617, at \*10 (S.D.N.Y. Jan 14, 2010) and *Pearlstein v. Blackberry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015)). Moreover, "whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage." *Oklahoma Firefighters,* 367 F. Supp. at 35 (quoting *In re CPI Card Grp. Inc. Sec. Litig.*, No. 16-CV-4531 (LAK), WL 2017 4941597, at \*3 (S.D.N.Y. Oct. 30, 2017)). As for the declining market share trend allegations, Defendants (i) ignore the Complaint's allegations of declining retail market share in Europe, and (ii) do not contest that its decline in U.S. market share *was* a trend, but instead insist the U.S. decline was somehow "not material to investors." Def Br. at 16. However, having conceded the existence of a "trend," Defendants' efforts to obtain dismissal on materiality grounds is misplaced, given that (a) they themselves repeatedly described the U.S. as a "core market" (*e.g*., ¶40), and (b) a trend is "immaterial" as a matter of law only if it is "obviously unimportant to a reasonable investor." *See generally* §I.C. below; *Litwin*, 634 F. 3d at 717.

Defendants are also wrong when they argue that their failures to disclose "declines in shelf space and market share" do not support Item 303 claims here absent allegations that Oatly management "was aware of these trends at the time [of] the Offering." Def. Br. at 17. However, not only did both Oatly's CFO and CEO acknowledge the declining retail shelf space and market share trends in Europe on November 15, 2021, it is also simply not plausible that Oatly's management would have somehow (but conveniently) not become aware of these trends until months after the IPO – especially where these declines are alleged to have carried over *from 2020*

and continued through (as well as beyond) the May 2021 IPO.  ¶77.  As for declining retail U.S. shelf space allegations, the Complaint's cites CW1, an "Oatly Sales Director in the U.S. [from] 2020 through the latter part of 2021" as a source, which confirms that such information was available within Oatly.  And this common sense conclusion is further supported by the fact that the Offering Documents touted "accelerating performance in . . . the United States" – including in "[t]he [U.S.] food retail channel, in particular" where Oatly had allegedly increased its "total distribution points by 13%" (¶51) – which confirms that Oatly management was actively tracking its retail market share in the U.S. as of the IPO.  *Compare*, *e.g*., *Lexmark Int'l*, 367 F. Supp. 3d at 35 (management awareness of trends adequately pled where plaintiffs alleged that Defendants "used models to track the changes in EMEA inventory levels").[9]

Finally, Defendants largely concede that "rising prices for key ingredients constituted a 'trend,'" but argue that they "had no duty to disclose this information" because it was "public," and the Offering Documents contained "extensive disclosures regarding the risks associated with rising ingredient costs."  Def. Br. at 24.  But as already discussed in §B.1.b above, the Second Circuit has repeatedly rejected similar arguments.  *See*, *e.g*., *Stratte-McClure,* 776 F. 3d at 105-106 (rejecting Morgan Stanley's argument that existing negative trends in subprime mortgages were so widely known, and/or that its warnings regarding the risks of the subprime mortgage markets were sufficiently specific, to satisfy its Item 303 requirements, because "patchwork commentary" on relevant market trends was not an adequate substitute for specific disclosure of adverse trends and Morgan Stanley's ***knowledge*** of their "potential negatively to affect" its business).  As in *Stratte-McClure*, there is no dispute that Oatly knew of the "negative trend[s]"

---

[9]    Defendants also again argue that any declining shelf space or market share trends were immaterial, and thus not reasonably likely to have a "material" effect on Oatly's financial performance. Def. Br. at 17.  Their flawed materiality arguments are addressed at §1.C below.

32

of rising prices for oats and rapeseed oil or that those trends had the "potential negatively to affect" Oatly by increasing its costs for making "oat base" – nor should there be any serious dispute that Oatly's commentary concerning the potential risks associated with rising ingredient costs was at best a "patchwork" that failed to substitute for a required Item 303 disclosure of Oatly's **knowledge** of price risks that had already materialized and the likely **magnitude** of the resulting adverse impact. *See also Strate-McClure*, 776 F. 3d at 102 (purpose of Item 303 is to "give investors an opportunity to look at the registrant through the eyes of management"); *Litwin*, 634 F.3d at 719 (even if "downward trend in the real estate market" was arguably known to investors, the "potential future impact [of that trend on the defendant] was certainly not public"). In sum, Plaintiffs' Item 303 disclosure violations are also well pled.

### 3. Defendants Also Made Affirmatively Misleading Statements Concerning Key Aspects of Oatly's Business

The Complaint also alleges that multiple statements in the Offering Documents were simply "materially untrue or misleading" when made. ¶¶50-56, 67. Defendants ignore most of these statements – including the Offering Documents' misleading "risk warnings" about shelf space and ingredient prices, which warned of hypothetical risks that had already materialized. *Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010) (statement purporting to warn of "risks" that certain events "might" occur is actionably misleading where the adverse events had **already** occurred); *see supra* at §I.B.1.C.[10]

Defendants do, however, at least argue that Oatly's affirmative statements about "capturing greater shelf space" and Oatly's "entry and expansion in China in 2018," were not materially false

---

[10]    Having failed to address these "risk warning" statements in their opening brief, Defendants should be deemed to waive any arguments that such statements are not adequately alleged to be materially misleading. *See Mullins v. City of New York*, 653 F.3d 104, 118 n.2 (2d Cir. 2011) ("[C]ourts are not to consider arguments raised for the first time in a reply.").

or misleading.  Def. Br. at 25, 27.  But these arguments also fail as to Plaintiff's Securities Act claims.

First, although Oatly does argue that the shelf-space related statements that Defendants made during Oatly's 2Q2021 earnings call and in its 2Q2021 financial statements were not false, *see* Def Br. at 25-26, Oatly nowhere contends that any of the shelf-space related statements in the ***Offering Documents*** are inadequately pled.

As for Oatly's misstatements regarding its China markets, Plaintiffs adequately allege that (a) the Offering Documents touted how Oatly's "growth in China demonstrates the effectiveness of [its] expansion strategy" (¶55), and that this statement was materially untrue because "demand for Oatly products in China was already stagnating if not decreasing" by the time of the IPO.  ¶56. As evidence, Plaintiffs allege that by late 2021, Oatly had already started to reduce production hours at its Singapore production facility, even though it had only opened a few months earlier, and that Oatly would later idle production there entirely for multiple months because of declining order volume in Asia (citing CW2, a former manager at Oatly's Singapore facility during 2021). ¶56.  As Plaintiffs further allege, the Singapore facility was Oatly's only manufacturing plant in Asia as of the IPO, and its purpose was to supply oatmilk to China and other parts of Asia.  ¶¶44, 56.  That Oatly had to idle a brand-new production facility for supplying oatmilk to China because of declining order volume almost as soon as the plant had opened demonstrates just how weak the demand for Oatly product was in China – and how the Complaint alleges with plausible basis that Oatly's statements touting the "effectiveness" of its growth and expansion in China were materially false or misleading."

Defendants respond by arguing that "Singapore is a separate sovereign state" and that the Complaint does not allege that the Singapore facility "supplied product to China."  Def. Br. at 28.

34

However, the Complaint *does* allege that the Singapore facility was meant to "supply oatmilk to China" (¶56) – which makes sense as Singapore is much closer to China than Oatly's other production facilities (which were based in the U.S. and Europe). ¶44. Moreover, Oatly's "separate sovereign" argument is baffling, inasmuch as Oatly admittedly supplies its "core markets" in the U.K. and Germany (¶¶40, 51) from European production facilities located in the "separate sovereign states" of Sweden and The Netherlands. ¶44.

Defendants also assert that CW2 is not "reliable" because Plaintiffs do not specify "what type of manager CW2 was . . . their role and responsibility . . . or whether they would have been in a position to know what the production hours even were or why they might have been reduced." Def. Br. at 27-28. However, confidential witnesses must only be "'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Hawaii Structural Ironworkers Pension Tr. Fund. v. AMC Ent. Holdings, Inc.*, 422 F. Supp.3d 821 (S.D.N.Y. 2019). Plaintiffs identify CW2 as a "manager" in the Singapore plant during the relevant period, ¶56, and any manager at a new production plant is likely to know when a plant's production is sharply cut, and the explanation given for such actions. Thus, no more detail is required.

### C.    The Undisclosed Adverse Truths About Oatly's Business Were Material

Defendants' repeated claims that the truth about (i) declining retail shelf space in the U.S. and Europe, (ii) declining market share in the U.S. and Europe, and (iii) increasing prices to purchase oats and rapeseed oil were all immaterial, ring hollow. "A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *13. This is an inherently fact-specific inquiry, and thus "[t]he question of whether a reasonable investor would find a particular misrepresentation or omission 'material' to an investment decision is usually a

35

matter reserved for the trier of fact." *Id*. Consequently, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so ***obviously unimportant*** to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). In sum, "[w]here the principal issue is materiality, . . . the burden on plaintiffs to state a claim is even lower than the relatively minimal burden applicable to other elements of their claims under Rule 8." *In re Facebook, Inc. IPO*, 986 F. Supp. 2d at 519. The Complaint's allegations easily meet this standard.

First, that Defendants chose to disclose the pre-IPO and post-IPO declines in retail shelf space and market share in Europe on November 15 (¶¶54, 77) strongly indicates that Defendants themselves believed that such matters were material. *See In re Facebook, Inc. IPO*, 986 F. Supp. 2d at 520 (Defendants' actions to disclose certain information "undermine[s] their contention that the information was not material."). Moreover, given that the Second Circuit has held that whether a misstatement or omission is "material" generally depends on whether it relates to a ***segment*** of the registrants business that is "significant," *see Litwin*, 634 F.3d at 720 – and given that here the rising prices for oats and rapeseed oil would (and did) impact ***all*** of Oatly's product lines (because these commodities are key ingredients in the "oat base" used to make all of Oatly's products) – it is hard to imagine justifying dismissal of the "undisclosed rising price" claims at the pleadings stage on (im)materiality grounds. Likewise, Oatly's declining retail shelf-space and market share in the U.S. and Europe relate to adverse trends in Oatly's "core markets," and impacted at least oatmilk, the product which "accounted for approximately 90% . . . of [Oatly's] revenue in the

year[] ended December 31, 2020."[11]  ¶¶41, 51.  These allegations collectively and individually, are more sufficient to plead materiality.

Defendants' few arguments in opposition (Def. Br. at 21-22, 24) are without merit.  For example, they argue that disclosing the adverse trend of "rising ingredient costs" and its likely impact on Oatly "would not have altered the mix of information available to investors" (Def. Br. at 24), but never explain how this could possibly be true given that investors were not told what prices Oatly was paying for oats and rapeseed oil as of the IPO (or to what extent Oatly would likely be paying more after the IPO due to various factors that included not only increased prices but the terms of existing supply contracts and other possible price hedging transactions).  ¶65. Similarly, Defendants offer no argument as to why declining market share in Europe was purportedly immaterial.  Instead, Defendants address only Oatly's declining retail market share in the U.S. by falsely claiming that "Oatly experienced a 2% market share decline" (Def. Br. at 22), when in fact the Complaint actually alleges market share was "down 6 percentage points since 2019" (¶86).  Setting aside this discrepancy, Defendants' other attempts to minimize declining market share in the U.S. as limited to "a single region," a single product, "and even then only in retail" (Def. Br. at 22) are unpersuasive, as the Complaint squarely alleges that (i) the U.S. was a "core market" for Oatly; (ii) oatmilk was Oatly's primary product by far; and (iii) according to Defendants, around 50% of Oatly's U.S. revenue was derived from its sales in the retail market. These facts amply suffice to plead the materiality of Oatly's declining retail market share and shelf

---

[11]      The misstatements related to demand for Oatly's products in China are material for the same reason — they related to the overall "effectiveness of [Oatly's] expansion strategy."  ¶55.

space in the U.S.  *See Ganino*, 228 F. 3d 154 (reversing district court decision that fees totaling only 1.7% of revenue were immaterial as a matter of law).[12]

### D.   Contrary to Defendants' Claims, Defendants' Misrepresentation and Omissions Are Actionable

Defendants next argue that certain statements in the Offering Documents are "inactionable" because they involve (i) "puzzle pleading," (ii) puffery, or (iii) opinions.  Def. Br. at 29. Defendants are again wrong on all counts.

***Puzzle Pleading***.  Defendants take issue with the block quotes cited in the Complaint, which they claim do not "specify which parts of the quotes . . . are alleg[ed] to be false and which part . . . are just quot[ed] for completeness."  Def. Br. at 30.  This is nonsense.  The Complaint ***does*** specifically identify with quotations, emphasized text, and explanatory paragraphs what portions of each statement Plaintiffs are challenging, why those portions of each statement are being challenged, and the relevant facts and circumstances that made each such statement false or misleading.  *See*, *e.g.*, ¶¶50-67.  Nothing more is required.  *Constr. Laborers Pension Tr. For S. California*, 433 F. Supp. 3d 515, 530 (no puzzle pleading where complaint "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading" and "describes 'what portion of each quotation constitutes a false representation'"); *see also Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20 CIV. 4650 (ER), 2022 WL 912965, at *5 (S.D.N.Y. Mar. 29, 2022) (no puzzle pleading where "complaint is not confusing and is not drafted in a manner that [suggests] bad faith").  More to the

---

[12]      Defendants also assert that "shelf space alone is a metric of marginal use to average investors" because "a company can have less shelf space than a competitor" but sell more goods. Def. Br at 21.  But Defendants cite no authority for their view that shelf space should be deemed immaterial as a matter of law.  Moreover, Plaintiffs allege facts explaining why shelf space "is of key importance" (*see* ¶7), which Defendants do not dispute, and the Offering Documents touted "expanding on-shelf presence" and warned (inadequately) of the risks of "retailers allocat[ing] shelf space to other brands."  ¶¶46, 52.  These facts are more than enough to plead materiality.

point, Defendants' feigned puzzlement is belied by the 45-page motion to dismiss they filed, which evinces no confusion as to the Complaint's claims. *CBS Corp.*, 455 F. Supp. 3d at 530, n.3 (defendants' "own detailed and targeted motion to dismiss betrays [their argument]").

*Puffery*. Defendants, by taking snippets of the Complaint out of context, argue that "[o]f the statements challenged, 12 constitute inactionable puffery." Def. Br. at 30-31; Appendix A. "Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011). However, whether a statement is puffery "'depends on all relevant circumstances of the particular case,' and is generally not an appropriate basis [for] dismiss[al]." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003). Importantly, statements like those at issue here, that are "'clearly designed to distinguish the company' to the investing public in some meaningful way" are not puffery. *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (quoting *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016)). The two alleged "puffing" statements that Defendants quote in their brief illustrate why their arguments fail.

First, Oatly's statement that "[d]emand for Oatly products has grown at an incredible rate" (Def. Br. at 31 (quoting ¶131)), is immediately followed by the representation that "[t]o date, production capacity has been a major constraint on our growth." ¶131. As alleged (*see supra* §I.B.), the purpose of these statements (and others like them) was to "distinguish" Oatly as a company that could capture the "incredible" "[d]emand for [its] products," if it could raise the money necessary to alleviate the "major constraint" of its limited "production capacity." Second, the Offering Documents' representation that "[t]he food retail channel, in particular, has welcomed Oatly on shelves" (Def. Br. at 31 (quoting ¶132)), is similarly an example of a statement that

invited investors to believe that there was already "significant demand for Oatly products to grow in new and existing markets" that Oatly could "leverage" after the IPO.  ¶132.  Such statements are routinely held *not* to be puffery, especially where, as here, Defendants were aware of contradictory facts as of the IPO (such as declining retail shelf space and market share in the U.S. and Europe, and rapidly increasing raw material costs that would almost certainly further aggravate the Company's already existing growth problems after the IPO).  *See*, *e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory situation was "'in good shape" or "under control'" were not puffery because they were made when defendants "allegedly knew that the contrary was true"); *Cheng v. Canada Goose Holdings Inc.*, No. 19-CV-8204 (VSB), 2021 WL 3077469, at *6 (S.D.N.Y. July 19, 2021) (statements that company was "building customer demand ahead of supply" were "not merely generic corporate expressions of optimism," but instead "conveyed material information about Defendants' then-current inventory levels and demand and Defendants' reasons, at that time, for building inventory").

*Opinions*.  Of all the challenged statements in the Complaint, Defendants assert that two constitute "inactionable opinions."  Def Br. at 31.  As a threshold matter, as is clear from the Complaint, Plaintiffs are *not* challenging Oatly's belief "that the terms contained in [Oatly's supplier] agreements are customary for such suppliers in our industry."  *See id*.  Instead, Plaintiffs' allegation concerning Oatly's supplier agreements is that the Offering Documents descriptions of them (and related risk warnings) "conveyed the materially misleading impression that as of the IPO Oatly was in a position to continue to acquire its essential raw materials *on favorable terms*," when that was not true given the skyrocketing prices for post-IPO delivery of oat and rapeseed oil had been skyrocketing.  ¶67.  As to the other "opinion" – Oatly's belief "that global demand for

40

Oatly products has far outpaced supply" (Def. Br. at 31) – is the type of statement that is actionable under well-settled law.

"Statements of opinion can give rise to liability under the securities laws in *two* distinct ways[:]" (i) where "the speaker did not hold the belief she professed or the supporting facts she supplied were untrue"; or (ii) where "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *13. Defendants misconstrue this standard to argue that opinions are only actionable where the plaintiff alleges "the speaker did not truly believe the opinion given," (Def. Br. at 31), which simply ignores the entire second part of the relevant analysis. As explained above, the significance of Oatly's statement that "global demand for Oatly products has far outpaced supply" must be viewed in the context of Oatly's claim that "production capacity has been a major constraint on [Oatly's] growth." ¶50; *see also In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *13 (opinion statements must be read "fairly and in context" (quoting *Tongu v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016))). Taken together, these statements were plainly designed to give investors the impression that the money raised in the IPO would unlock the "constraint on [Oatly's] growth" by allowing it to increase "production capacity" and reap the rewards of purportedly already-existing "demand for Oatly products [which] has far outpaced supply." *See* §I.B above. The Complaint details the facts regarding Oatly's known declining retail shelf space and market share in the U.S. and Europe, and the likely adverse impact of the rapidly increasing costs of oats and rapeseed oil. *Id*. But none of these facts were disclosed to investors, even though they "omit[ted] information whose omission" made Oatly's purported "opinion" about "global demand [having] far outpaced supply" patently misleading to a reasonable investor, and thus actionable under the securities laws. *Pareteum*, 2021 WL 3540779, at *13; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*

41

*Pension Fund.*, 575 U.S. 175, 189 (2015) (investor "expect[] not just that [the speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time").

### E.    Plaintiffs Have Standing to Pursue Claims Under Section 12 of the 1933 Act

Defendants argue that Plaintiffs lack standing to pursue §12(a)(2) claims because they only purchased ADS "traceable to the IPO," and not purchases in the IPO.  Def. Br. at 44.  Although some courts have found allegations of purchases "traceable to" an offering insufficient to allege standing, more recent cases in this circuit have found similarly anodyne "alleg[ations] that [the plaintiff] 'purchased . . . common stock pursuant to the registration statement'" sufficient to meet the standing requirement for both §11 and §12 claims.  *In re Patriot Nat'l. Inc. Sec. Litig.*, No. 17 CIV.1866 (ER), 2021 WL 3418615, at *10 (S.D.N.Y. Aug. 5, 2021).  No more is required here. *See* ¶¶19-20.[13]

## II.    PART II OF THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

Part II of the Complaint alleges claims against Oatly, CEO Petersson, and CFO Hanke (collectively, the "Exchange Act Defendants") for under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  ¶¶118, 125-28.

---

[13]    There is also no real dispute that Defendants Oatly, Petersson, Hanke, and Öste are "statutory sellers" for the purposes of §12(a)(2), or that Petersson and Hanke also personally solicited investors to buy Oatly ADSs as part of their active participation in giving Oatly's "road presentation" for the IPO.  ¶36; *see also* Def. Br. at 43.  As to the remaining Individual Defendants, the Complaint alleges they "signed the registration statement" (¶¶22-33), assisted "the underwriting firms that Oatly retained to help plan and execute the IPO[,] met with potential investors and presented highly favorable, but materially incorrect and/or misleading[] information about Oatly . . . and/or omitted to disclose material information required to be disclosed."  ¶36.  Defendants are thus wrong when they assert that "Plaintiffs do not plead that the Directors . . . did anything other than sign the Registration Statement."  *Cf.* Def. Br. at 43.

### A.    Legal Standard

To state a §10(b) claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *12 (quoting *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010)). The Exchange Act Defendants challenge the sufficiency of the pleading only as to the first, second and sixth elements. Def. Br. at 9.

In contrast to Plaintiff's Securities Act claims, the Exchange Act claims are subject to the pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) mandates that "the circumstances constituting fraud . . . be stated with particularity," and that a "complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *12 (quoting Rule 9(b)). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" and "facts giving rise to a strong inference" of scienter. *Id*. However, in applying these standards, courts in §10(b) cases must still "accept as true all well-pleaded factual allegations in the complaint[] and draw reasonable inferences in the plaintiff's favor." *Id*. at *11.

The allegations in Part II of the Complaint meet these standards.

### B.    Plaintiffs Plausibly Allege Actionable Material Misrepresentations and Omissions in the Offering Documents

There is no dispute that "[t]he standard for determining wither a defendant made a material misstatement or omission is essentially the same under Section10(b), Section 11 and Section 12."

43

Def. Br. at 42 (quoting *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16-CV-3068 (AJN), 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017)).  Thus, all the materially untrue and misleading statements and omissions in the Offering Documents detailed in §I *supra*, are also actionable under §10(b).

### C.      Plaintiffs Also Plausibly Allege Actionable Misstatements After the IPO

In addition to the misstatements in the Offering Documents, Part II of the Complaint alleges the Exchange Act Defendants made material misrepresentations after the IPO on August 16, 2021. ¶¶136-40.  For example, in its August 16 press release accompanying its 2Q2021 financial results, Oatly touted its "growth in . . . retail channels" in Europe and "growth in . . . retail channels across oatdrink" in the U.S.  ¶137.  Similarly, Oatly's 2Q2021 financial statements (also released on August 16) identified "capturing greater shelf space" as one of the "factors and trends in our business [that] have driven net revenue growth."  ¶138.  These statements were echoed by CEO Petersson on the investor call later that day, when he said that Oatly had a "significant opportunity to satisfy unmet demand and leverage our brand success to expand across geographies, sales channels and product categories" and alluded to "recent pressure on our market share velocity." ¶139.  And, like the statements in the Offering Documents, the August 16 statements were all made against the backdrop of repeated assurances that "global demand for Oatly products continued to outpace our supply, with capacity constraining our growth in the second quarter."  ¶139.

These statements were materially false, misleading and incomplete because they falsely conveyed that robust demand for Oatly products was driving an increase in "retail channel[]" sales, that Oatly was "capturing greater shelf space," and that it was positioned to "leverage [its] brand success across . . . sales channels," when, in reality, the Oatly's retail shelf space and market share

44

were declining in both the U.S. and Europe.[14]  ¶140.  As for CEO Petersson's reference to "pressure on [Oatly's] market share velocity," this statement was also materially false and misleading because it represented that while the rate (*i.e.*, velocity) of Oatly's market share expansion was under "pressure", the Company's market share was still expanding, when that was not the case in at least Europe and the U.S. retail market for oatmilk.

Exchange Act Defendants' only argument (not already addressed) for finding that the August 16 statements were not actionably false or misleading is that there was a "transcription error" in Petersson's statement concerning "pressure on our market share velocity."[15]  Def. Br. at 25.  However, this argument is improper for a motion to dismiss where this Court must "accept as true all well-pleaded factual allegations in the complaint."  *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *11.  Indeed, Exchange Act Defendants cite no authority for their novel argument that a defendant can obtain dismissal simply by claiming there was a typo in a document.  Further, that "velocity" may have had a "specific definition in Oatly's public documents" (Def. Br. at 25) does not mean that Petersson was using that meaning when he referred to "market share velocity" on August 16.  And, the inference that Petersson was using "velocity" to mean "speed" or "rate" is just as reasonable as any inference that "market share" and "velocity . . . should have been separated by a comma."  *Id*.  Indeed, although Exchange Act Defendants would revise the

---

[14]    The Exchange Act Defendants argue that Plaintiffs "mischaracterize Oatly's statement" about "capturing greater shelf space."  *See* Def. Br. at 25.  But, as they concede, the purpose of this statement was to tout how "capturing greater shelf space" had allegedly "dr[iven] net revenue growth" in the past and "was expected to be a key driver of net revenue growth going forward" (*id*.), – which was materially misleading given Oatly's ongoing declines in retail shelf space.
[15]    The Exchange Act Defendants assert that various August 16 statements were not materially misleading for the same reasons that similar misstatements in the Offering Documents were allegedly not misleading, and reprise their arguments that they had "no duty to disclose" Oatly's declining shelf space or market share.  These arguments should be rejected for the same reasons that their analog arguments in the Securities Act context should be rejected.  *See supra* §§I.A.-D.

statement to read, "[a]ny recent pressures on our market share, velocity measured channel is expected . . . ," such a reading makes no sense.[16]  And, even if "market share" and "velocity" are two separate things, representing that "[a]ny . . . pressures on [Oatly's] market share" were "recent" was highly misleading (if not downright false) in light of the declining market share in Europe that started in 2020 and continued through at least Q1 and Q2 2021, and the multi-year declines in Oatly's share of the U.S. retail oatmilk market, which had started even earlier.[17]  *See supra* §§I.B-B.1, B.2.

In sum, Part II of the Complaint plausibly alleges additional false and misleading statements after the IPO.

### D.     Plaintiffs' Allegations Give Rise to a Strong Inference of Scienter

The Complaint's Part II allegations also adequately allege *scienter*.  At the motion to dismiss stage, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).  "In this Circuit, 'scienter can be established by alleging facts to show either (1) the defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.'"  *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at \*14 (quoting

---

[16]     For example, are "market share," velocity," and "measured channel" all things that were under "recent pressures"?  If so, there's another "transcription error;" a missing "and" between "velocity" and "measured channel."  Alternatively, perhaps "market share" and the "velocity measured channel" are two "separate concepts" but if that is true then, by Exchange Act Defendants' own logic, statements in the Offering Documents like "growing velocity" and "we can increase velocities and growth" are missing the "measured channel."

[17]     The Exchange Act Defendants claim that "[e]ven if Petersson had implied Oatly's market share was growing . . . his statement was not specifically about the United States" and thus could not have been misleading because it would "not make a statement about all regions false."  Def. Br. at 26.  This argument fails because the Complaint alleges declining market share in both the U.S. and Europe.  *See supra* §I.B.1.a.

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)).  Importantly, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences . . . ."  *Tellabs, Inc.*, 551 U.S. at 324.  Instead, "a tie on scienter goes to the plaintiff."  *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).  The inference of scienter here is strong for many reasons.

### 1.    The Exchange Act Defendants' Motive and Opportunity

Motive and opportunity are most often alleged "when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 646 ("Motive is adequately pleaded where the plaintiffs allege that the defendants sold their own shares while at the same time misrepresenting corporate performance in order to inflate stock prices.").  Here, Exchange Act Defendants concede that Petersson and Hanke "each sold 13.5% of their respective shares" in Oatly as part of a private placement held concurrently with the IPO.  Def.Br. at 33.  These insider sales generated at least $21.5 *million* in inflated proceeds for Petersson and more than $2 million for Hanke.  Exchange Act Defendants argue that "[s]ales of these sizes are not suspicious" (Def. Br. at 33), but courts routinely find that opportunistically timed sales of smaller amounts suffice to plead *scienter*.  *See*, *e.g.*, *Hutchins v. NBTY, Inc.*, No. CV 10-2159, 2012 WL 1078823, at *2 (E.D.N.Y. Mar. 30, 2012) (*scienter* inferred where defendant sold 500,000 shares, representing 9.4% of his holdings); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (insider sales as low as 11% were "not insignificant" and, viewed holistically with plaintiffs' other allegations, pled "a strong inference of *scienter*"); *see also Nursing Home Pens. Fund, Loc. 144 v. Oracle Corp*, 380 F.3d 1226, 1232 (9th Cir. 2004)

47

(selling 2.1% and 7% of holdings supported scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E.D. Va. 2000) (sales of 2.2% of holdings indicative of scienter).

Next, Exchange Act Defendants argue that the timing of Petersson and Hanke's sales was not "suspicious." But as their own authority makes clear, "[i]nsider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed information." Def. Br. at 32-33 (quoting *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009)). Here, Petersson and Hanke cashed in their shares in a transaction that was suspiciously timed to coincide with the IPO, and to benefit from the Offering Documents' false and misleading statements. ¶¶155, 157-58. That Exchange Act Defendants did not sell any additional stock immediately after the IPO is also irrelevant because Petersson and Hanke signed "lock-up" agreements not to dispose of any of ADSs or other securities "convertible into or exchangeable for ADSs" for 180 days after the date of the IPO. Ex. B at 57. Accordingly, Petersson and Hanke's failure to sell even more shares during the class period can be readily explained without in any way undermining their motive to "to cash in what they could" in connection with the Concurrent Private Placement.

### 2.    Circumstantial Evidence of Conscious Misbehavior or Recklessness

This Circuit recognizes at least "four circumstances" giving rise to a strong inference of conscious misbehavior or recklessness: where the "defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *15 (quoting *ECA*, 553 F.3d at 198). Here, the Exchange Act Defendants disregard the Complaint's allegations that CEO Petersson and CFO Hanke clearly had "access to information" that Oatly's retail shelf space and market share were declining in the U.S. and Europe

48

and that prices for post-IPO delivery of oats and rapeseed oil were continuing to trend sharply higher, as confirmed by the fact that they had such information readily at hand just three months later in November 2021. Likewise, the Complaint alleges that Petersson and Hanke were actively monitoring trends as to these subjects. *See* ¶128. The Exchange Act Defendants' own statements confirm this allegation. For example, the Offering Documents referenced "[r]etail sales data," data from the "food retail channel" showing that retailers "welcomed Oatly on shelves," and the "volatility" of prices for oats and rapeseed oil, all of which demonstrate that the Company's senior management was able to and did actively monitor its shelf space and raw materials prices. ¶¶131-33, 149-52. Likewise, the 2Q2021 financial results ascribe Oatly's revenue in the U.S. and Europe at least in part to "growth in . . . retail channels" (¶137), and note a "trend[]" of "capturing greater shelf space," which further confirm Defendants also tracked these metrics. ¶138. And, Petersson's August 16 statement that Oatly's "market share velocity" was under "pressure[]" also supports a strong inference that he regularly monitored Oatly's "market share." ¶139. Viewed holistically, these allegations adequately allege that the Exchange Act Defendants were at least reckless in ignoring the adverse trends of declining shelf space and market share, and of increasing prices for oats and rapeseed oil.

### 3.    Core Operations Doctrine Further Supports Inferring Scienter

The core operations doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 623-24 (S.D.N.Y. 2017). Exchange Act Defendants do not dispute that "retail shelf space is central to Oatly's business" but, instead, argue that Plaintiffs' core operations allegations are not "independently sufficient" to raise a strong inference of scienter." Def. Br. at 34. However, even if core operations allegations are not dispositive of scienter, "the majority of courts in this Circuit" have held that this doctrine may still "provide

support" for finding a strong inference of *scienter*. *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 n.4. Given their concession that "retail shelf space" was a "central" part of Oatly's core operations (¶156), the doctrine further supports the requisite *scienter* inference as to CEO Petersson and CFO Hanke.

### 4. Defendants' "Non-Culpable Inferences" Are Unavailing

Exchange Act Defendants next assert that their posited non-culpable inferences of scienter are "far more plausible" because "it would have been economically irrational for Oatly to invest heavily in expanding production . . . if demand for its products was actually low and declining." Def. Br. at 35. But investing in expanded production is not incompatible with misleading investors about "shelf space losses, retail market share losses, and rising key ingredient prices" (*id.*), where doing so allowed Exchange Act Defendants to sell huge amounts of Oatly ADSs at artificially inflated prices – and Plaintiffs' culpable inferences are no less strong than Defendants' non-culpable inferences.

### E. Plaintiffs Plausibly Alleges Loss Causation

Pleading loss causation is "not meant to impose a great burden upon a plaintiff," and loss-causation allegations must only meet Rule 8(a)'s notice-pleading standard. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (assuming that Rule 8(a)'s standard applies to loss causation); *IBEW Local 90 Pension Fund v. Deutsche Bank AG,* No. 11 CIV. 4209 KBF, 2013 WL 1223844, at *12 (S.D.N.Y. Mar. 27, 2013) ("[p]leading loss causation is an essential element of a claim . . . is not meant to impose a great burden on plaintiffs"). In this Circuit, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). "Generally, plaintiffs sufficiently plead loss causation when they allege that their share's 'price fell significantly after

50

the truth became known' through an express, corrective disclosure or 'through events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (alteration in original).  Part II of the Complaint adequately pleads loss causation based upon the partial corrective disclosures of July 14, 2021, and November 15, 2021.  *See* ¶¶159-63.

*The July 14, 2021, Partial Disclosures*.  As the Complaint alleges, the market's reaction to the partial disclosures of the July 14, 2021, Spruce Point Report supports a causal connection between the concealed truth about Oatly and the resulting ADS price drop.  ¶161.  Specifically, the Report partially disclosed that Oatly was exposed to the already materialized risks of sharply increased oat and rapeseed oil prices and declining demand in China.  ¶161.  As the Exchange Act Defendants also concede, the Report also stated that investors "should be focused on [Oatly's] loss of market share in Sweden and the U.S." (Def. Br. at 39), which was a partial corrective disclosure of Oatly's market share woes that would not be fully confirmed and disclosed until Defendants' later admissions in November.  Plaintiffs further allege, that as the information in the 124-page Report was absorbed into the market on July 14 and July 15, 2021, it "caused Oatly ADSs to decline by roughly 8.8%" (¶161), an amount that is certainly large enough to support a plausible inference that the observed price decline was indeed in response to disclosure of "new news" that was materially adverse to Oatly.[18]  Indeed, courts routinely find that disclosures in a short seller report, like those in the Report, are sufficient to plead loss causation, even if it incorporates at least some "old news."  *See*, *e.g.*, *Behrendsen v. Yangtze River Port Auth. & Logistics Ltd.*, No. 19CV00024, 2021 WL 2646353, at *15 (E.D.N.Y. June 28, 2021) ("a short seller's report can

---

[18]     This price reaction also further belies Defendants' assertions that the facts in the Report were "mere 'negative characterization[s] of already-public information" (Def. Br. at 37), rather than presentations of "new news."  *See also* p. 14 at n.5, above.

constitute a corrective disclosure, if the report reveals . . . information . . . that exposes actual misstatements by the company") (collecting cases).

The Exchange Act Defendants respond that the partial revelations in the Report did not "produc[e] a meaningful drop in Oatly's stock price in light of the stock's overall decline in the months after the IPO." Def. Br. at 37. But the Exchange Act Defendants' own authority makes clear that such an analysis is only applicable when pleading "that materializations of risks other than public disclosures resulted in shareholders' losses." *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010) (plaintiffs' allegations "track[ed] the gradual decline in SCA's share price alongside its account of Defendants' alleged misrepresentations over the course of the Class Period"). In contrast, Plaintiffs allege that the Report "constituted a partial disclosure" of certain concealed facts, not the materialization of a concealed risk. ¶161. Moreover, unlike in *60223 TR. v. Goldman Sachs & Co.*, 540 F. Supp. 2d 449 (S.D.N.Y. 2007), this is not a situation where the ADSs had already lost most of their value by the time of the partial corrective disclosures on July 14. *Id.* at 461 (finding no loss causation where "by the time of the disclosures which allegedly caused the economic loss . . . the stock had already lost almost all its value – declining from 24.75 on January 25 to 5.01 on June 14"); *see also* Oatly Appendix B (noting closing prices for Oatly ADSs of $21.13 and $19.28 on July 13 and July 16, 2021, respectively). Regardless, whether unrelated factors caused the price drop in Oatly ADSs "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).

***The November 15, 2021, Disclosure***. On November 15, 2021, markets reacted quickly and negatively to Oatly's announcement of disappointing third quarter financial results and management's explanations for those results, which disclosed (i) a quarterly operating loss of over

$44 million; (ii) a staggering 15% decline in gross profit margins; (iii) a downward revision of Oatly's fiscal year 2021 revenue project; (iv) declining retail shelf space and market share in Europe; and (v) a dramatic 215% increase in Oatly's finished but unsold goods over the last two quarters.  ¶162.  In response to the revelations on November 15, the price of Oatly ADSs plummeted 20.81% on heavy trading.  ¶162.  As the *Wall Street Journal* observed that same day, this massive loss was attributable at least in large part to "[t]he company's reduced sales outlook," "concerns about Oatly's losses" and "[r]ising costs . . . for ingredients."  ¶163.  Nothing more is required to plead loss causation.  *Abramson*, 965 F.3d at 179.

Exchange Act Defendants argue that the disclosures on November 15, 2021, "had been disclosed previously" and, thus, are not corrective.[19]  Def. Br. at 38.  As evidence, Exchange Act Defendants point to the Report's statement that "investors 'should be focused on [Oatly's] loss of market share in Sweden and the U.S." and Petersson's acknowledgement in August 2021 of "recent pressures on our market share."  Def. Br. at 39.  But these statements are a far cry from the revelations on November 15 that, for example, Oatly had "started 2021 with less shelf space than prior years" in Europe, had "lost market shares" there and was experiencing "great pressure" with "retailers."  ¶162.  Where, as here, prior public information is at best a partial disclosure of the concealed truth, a subsequent corrective disclosure is sufficient to plead loss causation.  *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199 (JMF), 2016 WL 58118590, at *10 (S.D.N.Y. Oct. 5, 2016) (rejecting "Defendants' . . . argument on loss causation" where prior "press release did not come close to fully revealing the information contained" in a subsequent corrective disclosure); *see also Speakes v. Taro Pharm. Indus., Ltd.*, No. 16-CV-08318 (ALC), 2018 WL

---

[19]    Exchange Act Defendants also assert that disclosures on November 15 did no "reveal[] that any of Oatly's prior statements were false or misleading" (Def. Br. at 38) but, as explained above, the Complaint does plausibly allege false and misleading statements and omissions. *See supra* §§I.B., II.B.-C.

4572987, at *11 (S.D.N.Y. Sept. 24, 2018) (fact that "the market was aware of investigations in the pharmaceutical industry" did not mean investors were "[]aware of the extent of [defendant's] *specific* involvement in a price-fixing conspiracy") (emphasis in original).

Exchange Act Defendants' "more plausible inference" that Oatly's "warn[ing] that production challenges might keep it from growing as fast as previously projected" caused the stock to drop on November 15 is unavailing. To start, the Company revealed on November 15 that its inventories of finished, but as-yet-unsold goods, had increased dramatically in the prior two quarters, which indicate that the problem was not Oatly's ability to *produce* its products, but rather, the problem was with Oatly's ability to find buyers to *sell its* products to. *E.g.*, ¶162. Moreover, even if it was plausible that "production challenges" caused Oatly ADSs to drop on November 15, this inference is no more plausible than Plaintiffs' competing inference that the ADSs declined because the Company finally revealed it was losing shelf space and its market share was declining. At this stage, nothing more is required. *Lentell*, 396 F.3d at 174 ("The complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible link between that loss and the alleged misrepresentation."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) ("Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price.").

## III.  THE COMPLAINT PLAUSIBLY ALLEGES "CONTROL PERSON" CLAIMS

Defendants' only argument against Plaintiffs' "control" person claims, under §20(a) of the Exchange Act and §15 of the Securities Act, is that the Complaint fails to plead "a predicate violation of the Exchange Act" (Def. Br. at 40) or "an underlying violation" of the Securities Act (Def. Br. at 44). Consequently, Defendants' arguments against Plaintiffs' "control" person claims must be rejected because, as shown above (*see supra* §§I & II), the Complaint adequately pleads primary violations of both the Exchange Act and the Securities Act.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss should be denied.

Dated:  November 9, 2022                    Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 *s/ William C. Fredericks*
William C. Fredericks
Thomas L. Laughlin, IV
Rhiana L. Swartz
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
tlaughlin@scott-scott.com
rswartz@scott-scott.com

Jacob B. Lieberman
156 South Main Street
Colchester, CT 06415
Telephone: (860) 810-7770
jlieberman@scott-scott.com

*Lead Counsel for Lead Plaintiff Mario Bello and Additional Plaintiffs Kai Jochim and Mark D. Hayden*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*s/ William C. Fredericks*
William C. Fredericks
