# ATTACHMENT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

In re REFCO, INC. SECURITIES
LITIGATION

                  :   MASTER FILE NO.
                  :   05 Civ. 8626 (GEL)
                  :   JURY TRIAL DEMANDED

_____

## FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT


**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Max W. Berger (MB-5010)
John P. Coffey  (JC-3832)
John C. Browne (JB-0391)
Noam N. Mandel (NM-0203)
Jeremy P. Robinson
1285 Avenue of the Americas
New York, NY 10019
Telephone:   (212) 554-1400
Facsimile:    (212) 554-1444

**GRANT & EISENHOFER  P.A.**
Stuart M. Grant (SG-8157)
James J. Sabella (JS-5454)
45 Rockefeller Center, 15th Floor
New York, NY 10111
Telephone:   (646) 722-8500
Facsimile:   (646) 722-8501

    - and -

Megan D. McIntyre
Jeff A. Almeida
Christine M. Mackintosh
Jill Agro
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone:   (302) 622-7000
Facsimile:   (302) 622-7100


*Attorneys for Lead Plaintiffs RH Capital Associates LLC and Pacific*
*Investment Management Company LLC and Co-Lead Counsel for the Putative Class*

**TABLE OF CONTENTS**

Page

I.      NATURE OF THE ACTION .........................................................................1

II.     JURISDICTION AND VENUE .........................................................6

III.    PARTIES AND RELEVANT NON-PARTIES ....................................................8

        A.      Plaintiffs ....................................................................8

        B.      The Company ................................................................10

        C.      The Defendants ..............................................................12

                1.      The Bennett Shell-Entity Defendants .........................................12

                2.      The Refco-Affiliated Defendants...............................................13

                3.      The Officer Defendants................................................................13

                4.      Defendant Trosten.........................................................................17

                5.      Defendant Grant ..........................................................................18

                6.      The Audit Committee Defendants ...............................................18

                7.      The Defendants Affiliated with Thomas H. Lee Partners...........20

                8.      Grant Thornton.............................................................................23

                9.      The Underwriter Defendants........................................................23

                10.     Defendant BAWAG....................................................................31

IV.     CLASS ALLEGATIONS .............................................................................33

V.      FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF
        UNDER THE SECURITIES ACT ...................................................................36

        A.      Historical Background Regarding the Company ...................................36

        B.      The THL Partner Defendants' Investment and the 2004
                Recapitalization.................................................................................38

i

C.	The Bond Offering .................................................................................41

1.	The Offering Memorandum .......................................................43

(a)	The Financial Statements in the Offering
Memorandum  Contained Untrue Statements
of Material Facts .............................................................44

(b)	The Description of Customer Receivables and
Related-Party Transactions in the Offering
Memorandum Contained Untrue Statements and
Omissions of Material Fact.............................................52

(c)	The Offering Memorandum Misrepresented the
Reasons for the Company's Purported Success ..............54

(d)	The Offering Memorandum Misrepresented the
Company's Ability to Access the Cash It Needed
to Service Its Debt...........................................................55

(e)	The Offering Memorandum Misrepresented That
the Company Had Taken Adequate Steps to Protect
Itself From the Risk of Customer Defaults .....................57

(f)	The Offering Memorandum Misrepresented That
the Company Maintained Excess Regulatory Capital ....59

(g)	The Offering Memorandum Failed to Disclose
BAWAG's Full Ownership Interest in Refco Group ......60

2.	The Bond Road Show................................................................61

3.	The Bond Registration Statement .............................................62

D.	The August 2005 Initial Public Offering ..............................................68

1.	The IPO Registration Statement ...............................................69

(a)	The Financial Statements in the IPO Registration
Statement Contained Untrue Statements of Material
Facts ...............................................................................70

(b)	Description of Customer Receivables and Related-
Party Transactions in the IPO Registration Statement
Contained Untrue Statements and Omissions of
Material Fact...................................................................79

(c)     The IPO Registration Statement Misrepresented
That the Company Had Taken Adequate Steps to
Protect Itself From the Risk of Customer Defaults.........81

(d)     The IPO Registration Statement Misrepresented
That  The Company Maintained Excess Regulatory
Capital.............................................................................82

(e)     The IPO Registration Statement Failed to Disclose
BAWAG's Full Ownership Interest in Refco Group......84

E.     The Truth Begins to Emerge and the Company Collapses ....................84

VI.     THE COMPANY'S VIOLATIONS OF GAAP ................................................89

VII.     GRANT THORNTON'S VIOLATIONS OF AUDITING STANDARDS .......94

A.     Violations of General Standards ..............................................95

B.     Violations of Standards of Fieldwork ......................................96

C.     Violations of Reporting Standards .........................................101

D.     Violations of CFTC Rules and Regulations ..........................102

VIII.     DEFENDANTS' NEGLIGENCE....................................................103

A.     The Offering Memorandum and the Bond Registration Statement ......103

B.     The IPO Registration Statement ...........................................105

IX.     ALLEGATIONS PERTAINING TO CONTROL PERSON LIABILITY ......107

A.     The Officer Defendants...........................................................107

B.     Refco Holdings and the Bennett Trust...................................110

C.     Robert C. Trosten...................................................................112

D.     The THL Partner Defendants.................................................113

E.     The THL Individual Defendants.............................................115

F.     The Audit Committee Defendants ..........................................117

G.     BAWAG          ........................................................................119

X.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT...........................122

       COUNT ONE............................................................................................122

       COUNT TWO ...........................................................................................125

       COUNT THREE........................................................................................130

       COUNT FOUR ..........................................................................................133

       COUNT FIVE.............................................................................................137

       COUNT SIX ...............................................................................................139

       COUNT SEVEN .........................................................................................144

       COUNT EIGHT ..........................................................................................146

XI.    DEFENDANTS' FRAUDULENT SCHEME..................................................148

       A.     Origins of the Scheme...........................................................................149

       B.     Bennett Becomes CEO and, With the Aid of Maggio and Others,
              Transfers Uncollectible Receivables Off Refco's Books .....................153

       C.     Refco Engages In a Series of Fraudulent "Round About" Transactions
              to Conceal the Receivable At Each Financial Period End ....................154

              1.     The Financial Statements Closest in Time to The Bond
                     Offering and IPO Were Materially Misstated by Virtue of
                     Transactions with BAWAG and Customer X............................155

                     i.      The February 2002 Transaction....................................158

                     ii.     The February 2003 Transaction....................................161

                     iii.    The February 2004 Transaction....................................162

                     iv.     The May 2004 Transaction...........................................164

                     v.      The August 2004 Transaction......................................165

                     vi.     The November 2004 Transaction..................................167

                     vii.    The December 2004 Transaction...................................168

iv

|  |  | viii. | The February 2005 Transaction | 169 |
|  |  | ix. | The May 2005 Transaction | 170 |
|  |  | x. | The August 2005 Transaction | 171 |
|  | 2. | | The Fraudulent Transactions with BAWAG | 172 |
|  |  | i. | The February 2000 Transaction | 174 |
|  |  | ii. | The February 2001 Transaction | 175 |
|  |  | iii. | The February 2002 Transaction | 177 |
|  |  | iv. | The February 2003 Transaction | 179 |
|  |  | v. | The February 2004 Transaction | 180 |
|  |  | vi. | The February 2005 Transaction | 182 |
|  | 3. | | The Scheme Predated the BAWAG/Customer Transactions | 183 |
|  |  | a. | Ingram Micro, Inc. | 183 |
|  |  | b. | Delta Flyer | 185 |
| D. | | | Summary and Form of Transactions | 187 |
| E. | | | Impact on Financial Statements | 190 |
| XII. | | | FALSE AND MISLEADING STATEMENTS | 192 |
|  | 1. | | The May 2005 Press Release and May 2005 8-K | 193 |
|  | 2. | | The Year End 2005 Press Release and 2005 10-K | 194 |
|  | 3. | | The First Quarter 2006 Press Release, July 2005 8-K, and First Quarter 2006 10-Q | 198 |
|  | 4. | | ADDITIONAL ALLEGATIONS OF SCIENTER | 201 |
|  |  | a. | Circumstantial Evidence of Scienter | 201 |
|  |  | b. | Motive and Opportunity | 216 |

v

c.     Additional Allegations of Scienter As to the Audit Committee ........................................................................225

d.     Additional Allegations of Scienter Against BAWAG ...................................................................................230

5.     LOSS CAUSATION .................................................................237

6.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ....................................................................................239

7.     PRESUMPTION OF RELIANCE ............................................240

a.     Reliance Should Be Presumed With Respect to Defendants' Omissions ...............................................240

b.     Reliance Should Be Presumed Because Fraud Created the Market for the Company's Securities ........240

c.     Reliance Should Be Presumed Under the Fraud-on-the-Market Doctrine ......................................242

8.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................243

COUNT NINE .......................................................................................243

COUNT TEN ........................................................................................245

COUNT ELEVEN .................................................................................247

COUNT TWELVE ................................................................................252

COUNT THIRTEEN .............................................................................259

COUNT FOURTEEN ............................................................................264

COUNT FIFTEEN ................................................................................265

JURY DEMAND .............................................................................................269

PRAYER FOR RELIEF .................................................................................269

RH Capital Associates LLC, Pacific Investment Management Company LLC and PIMCO Funds: Pacific Investment Management Series – PIMCO High Yield Fund bring this federal securities law class action on behalf of themselves and all other persons and entities, other than Defendants and their affiliates as specified in ¶¶26-77 below, who purchased or acquired publicly traded shares, bonds or notes of Refco Inc., its predecessors and affiliates (including, but not limited to, Refco Group Ltd., LLC, Refco Finance Holdings LLC, and Refco Finance Inc.) (collectively, with Refco Inc., the "Company" or "Refco") between August 5, 2004 and October 17, 2005 (the "Class Period"), and based on conduct asserted herein, were injured thereby.[1]

## I.      NATURE OF THE ACTION

1.      This is a case about a company that suffered one of the most precipitous corporate meltdowns in U.S. history, and the well-compensated professional gatekeepers who utterly failed in their responsibilities to the investing public.  That company is Refco, and the gatekeepers who failed to do their jobs include one of this country's largest auditing firms, fifteen Wall Street investment banks, an audit committee, a board of directors and corporate officers more intent on lining their own pockets than with ensuring that the company they ran reported accurate information to investors.  As explained below, a little more than two months after completing a highly lucrative initial public offering, Refco admitted that its financial statements "should no longer be relied upon" because the Company had concealed hundreds of millions of dollars of uncollectible receivables owed to the Company by an off-balance sheet entity owned by its CEO. While this admission only partially revealed the true extent of the problems at the Company, it

---

[1]      For the convenience of the reader, Lead Plaintiffs attach hereto a glossary of definitions (Exhibit 1) and a table of Defendants and claims (Exhibit 2).

set into motion a chain of events and subsequent disclosures that – over the span of just a few days – led to Refco's abrupt collapse into bankruptcy, causing hundreds of millions of dollars of investor losses.

2.      Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency and futures markets. An integral component of Refco's business model was to extend credit to its customers so that they could trade on "margin" and leverage their capital into larger trades. These larger trades, in turn, generated larger commissions, revenues and profits for Refco. Unknown to investors, however, Refco regularly extended credit to its customers based on little or no assessment of the customer's credit-worthiness. These "no questions asked" loans exposed the Company to the very same trading risks undertaken by its customers, some of whom were willing to make large and speculative wagers with Refco's money. Thus, Refco had, unbeknownst to the public, adopted a business model that sought to increase the Company's fees by gambling its very survival on the ability of its customers to make successful trades in the volatile currency, commodities and derivatives markets around the world.

3.      As described in more detail below, the inherent dangers posed by this business model materialized – though were not revealed to the public – in the late 1990s, when a number of Refco's most significant customers suffered massive trading losses and were unable or unwilling to repay hundreds of millions of dollars of loans extended to them by Refco. Rather than properly account for these uncollectible receivables on Refco's books, the Company's CEO, Phillip Bennett ("Bennett"), and others hid them from public view by transferring them to a related entity, which was wholly-owned by Bennett.

4.      As was ultimately revealed, this scheme was simple to perpetrate and even easier

2

to detect, had the gatekeepers for the investing public not averted their eyes. As described in more detail below, the scheme involved the manipulation of huge sums of money – as much as 75% of Refco's annual revenue and 500% of its annual net income – yearly and sometimes quarterly for at least six years. Like clock-work, a few days before Refco closed its books for the pertinent period, from at least 1999 until the scheme was discovered in October 2005, the Company loaned huge sums of money – as much as $970 million on one occasion – from one of its subsidiaries to one of its members and to certain third parties, which simultaneously loaned the same amount to the Bennett-owned entity, Refco Group Holdings, Inc. ("Refco Holdings"). Refco Holdings, in turn, used the proceeds from the member and third-party loans to pay down temporarily the uncollectible receivable it owed to Refco, while neither the uncollectible receivable nor the related-party transactions were disclosed to the investors. Promptly after the close of each financial period, the circular transactions were "unwound," the loans were repaid, and the uncollectible receivable from Refco Holdings was returned to Refco's books, where it was apparent to anyone who had bothered or wanted to look.

5.     The scheme allowed Refco to project the appearance of growth and success, which inflated the price of Refco's securities and enabled the Company's insiders to enrich themselves by hundreds of millions of dollars at investors' expense. For instance, in June 2004, Refco engaged in a Leveraged Buyout ("LBO") with the THL Partner Defendants (defined below). As part of this LBO, Refco – with the direct assistance of some of Wall Street's most powerful investment banks – issued and sold $600 million worth of bonds to public investors. Although Refco's senior officers received tens of millions of dollars in cash payouts from the LBO and the bond offering, this was just the beginning of a feeding frenzy designed to further enrich the Company's insiders. Following the LBO, Refco issued tens of millions of dollars

3

worth of stock options to Refco's officers, audit committee members, and directors. Thus, Refco's insiders were perfectly positioned for the ultimate prize: taking their fraud-ridden company public through a lucrative initial public offering.

6. There was no shortage of professionals eager to help Refco sell itself to the public. On August 10, 2005, with the aid of fifteen Wall Street investment banks acting as underwriters, Refco conducted a $670 million initial public offering (the "August 2005 IPO" or the "IPO"). Defendant Bennett made over $118 million by selling a portion of his Refco holdings in the IPO; the THL Partner Defendants and their passive co-investors made nearly $170 million; and, through the exercise of a "green shoe" option built into the IPO, an additional $87 million "special dividend" was paid to Refco's shareholders of record before the IPO (including Defendant Bennett and the THL Partner Defendants).

7. Bolstered by Refco's false financial statements, the IPO was an unqualified success for Refco's insiders. Indeed, on September 9, 2005, Bennett – a newly minted billionaire – was invited to ring the opening bell on the New York Stock Exchange ("NYSE"). With the Company's supposed gatekeepers ignoring their responsibilities, the price of Refco's common stock, issued at $22 per share, quickly rose above $28 per share, further enriching the Company's insiders. Just a short time later, however, the scheme unraveled when the issue of the huge related-party receivable was brought to light – not by the professional gatekeepers who had been associated with the Company for years, but rather by an employee who had been working at Refco less than two months.

8. On October 10, 2005 – a mere forty-two trading days after Refco's transition to a public company – Refco publicly disclosed the existence of a multi-hundred million dollar uncollectible receivable that had previously been undisclosed, and admitted that its financial

4

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 12 of 301

statements for the years ended February 29, 2002 ("fiscal year 2002"), February 28, 2003 ("fiscal year 2003"), February 28, 2004 ("fiscal year 2004"), February 28, 2005 ("fiscal year 2005"), and the quarter ended May 31, 2005 – all of which were integral to the IPO offering documents blessed by the underwriters, auditors, officers and directors just weeks earlier – should no longer be relied upon. Over the next few days, the market learned that the problems at Refco were even more severe than those disclosed in that initial announcement, as Bennett was arrested and charged with securities fraud; Refco disclosed that its "liquidity . . . [was] no longer sufficient to continue operations;" the NYSE suspended trading in Refco shares; and Refco filed for bankruptcy in this District. These disclosures caused the prices of Refco's publicly traded securities to collapse. Refco's bonds declined at least 80% in a single week, from 108.625% of par on October 7, 2005 to approximately 16% of par on October 14, 2005. Refco's publicly-traded stock declined from a closing price of $28.56 on October 7, 2005 to 65 cents on October 18, 2005 – a stunning drop of nearly 98% in little more than a week.

9.      The reverberations from the financial improprieties at Refco continue to be felt. Numerous criminal, civil, and regulatory investigations are underway, and the full extent and details of the misconduct at Refco have yet to be revealed. Indeed, new facts regarding these matters are revealed on an almost daily basis, and this first amended complaint incorporates several significant facts that have recently come to light concerning a significant co-conspirator in the Refco debacle, Defendant BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG"). While Lead Plaintiffs' ongoing investigation has identified other parties not named as defendants herein who may be partly responsible to investors for their losses, Lead Plaintiffs have determined that it is prudent to continue the investigation into the responsibility (if any) of these parties and await the results of

5

the investigation before determining whether to seek to amend the complaint to assert additional claims and/or name additional parties, based on a more complete investigatory record (among other factors).

10.     In this complaint, Plaintiffs assert two different sets of claims.  The first set of claims (Counts One through Eight) asserts a series of strict liability and negligence claims based on the Securities Act of 1933 ("Securities Act"); these claims are asserted against the Defendants who are statutorily responsible for the untrue statements in the prospectuses and registration statements pursuant to which Refco issued securities to the public.  Plaintiffs specifically disclaim any allegations of fraud in these non-fraud claims.  In the second set of claims (Counts Nine through Fifteen), Plaintiffs assert a number of fraud-based claims under the Securities Exchange Act of 1934 ("Exchange Act") against those Defendants who directly participated in the fraudulent scheme and those who knew about or were reckless with respect to discovering the fraud.

## II.     JURISDICTION AND VENUE

11.     Certain non-fraud claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Certain other claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, Section 22 of the Securities Act, 15 U.S.C. §§ 77v, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

6

13.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15

U.S.C. §§ 78aa and Section 22 of the Securities Act, 15 U.S.C. §§ 77v.  Many of the acts and

transactions that constitute the violations of law complained of herein, including the

dissemination to the public of untrue statements of material facts, occurred in this District.

14.     Additional facts establishing this Court's jurisdiction over BAWAG include the

following:

(a)     BAWAG has availed itself of the courts in this District by, among other

things, filing an adversary proceeding in Refco's bankruptcy proceeding.  This adversary

proceeding relates to the $420 million loan BAWAG extended to Bennett and Refco

Holdings on or about October 10, 2005 (as described below).

(b)     BAWAG maintains significant assets in the United States.  For instance,

an Order Amending Order of Attachment and Temporary Restraining Order, dated May

3, 2006 (the "Order"), filed in the Bankruptcy Court for the Southern District of New

York in connection with the above referenced adversary proceeding, provides that

BAWAG must maintain approximately $1.156 billion dollars in assets in New York.

These assets consist of over $1 billion in three separate accounts located in New York.

However, the amounts listed in the Order do not represent all of BAWAG's assets in the

United States, as BAWAG consented to the Order so as to free up the remainder of its

assets.

(c)     BAWAG conducts a significant amount of business in New York.  For

instance, the Order states that BAWAG has at least $66 million in "various loans to

counterparties in the United States."  Moreover, throughout the Class Period, BAWAG

conducted business in New York directly relating to matters alleged herein by, among

7

other things, making numerous wire transfers into and out of bank accounts maintained by BAWAG at banks in New York. Finally, as admitted by BAWAG, BAWAG loaned Refco Holdings and Bennett approximately $420 million in October 2005.

15. In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## III. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiffs

16. RH Capital Associates LLC ("RH Capital") is a Delaware limited liability company with its principal office and place of business located at 139 W. Saddle River Road, Saddle River, New Jersey. Founded in 1983, RH Capital is an investment firm that manages in excess of $600 million in assets. RH Capital is the attorney-in-fact for its investment clients and is vested with the authority to initiate legal action on their behalf. In addition, during the Class Period, RH Capital had full investment discretion on behalf of its clients and was solely responsible for making all investment decisions with respect to transactions in Refco securities. As set forth in the certification attached hereto as Exhibit 3, during the Class Period, RH Capital purchased or acquired Refco securities in and/or traceable to the August 2005 IPO, and suffered millions of dollars in damages as a result of the violations of federal securities laws alleged herein. On February 3, 2006, the Honorable Gerard E. Lynch appointed RH Capital as Co-Lead Plaintiff for this consolidated litigation.

17. Pacific Investment Management Company LLC ("PIMCO") is an investment manager and advisor for numerous institutional and individual clients worldwide, with its headquarters in Newport Beach, California. Founded in 1971, PIMCO has grown to become one

8

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 16 of 301

of the world's leading fixed-income institutional money managers, currently managing over $600 billion in assets and overseeing numerous funds and accounts invested in such financial instruments as corporate bonds, emerging markets debt, municipal bonds, mortgage-backed securities, and other fixed income securities. During the Class Period, PIMCO had full investment discretion on behalf of its clients and was solely responsible for making all investment decisions with respect to transactions in the Company's securities. As set forth in the certification attached hereto as Exhibit 4, PIMCO purchased $87,245,000 par amount of the Company's 9% Senior Subordinated Notes due 2012 during the Class Period. These purchases included $49,300,000 par amount of 144A Bonds (defined below) in the initial offering, $22,165,000 par amount of 144A Bonds in the secondary market, and $15,780,000 par amount of Registered Bonds (defined below). As a result of these purchases of Refco securities and the violation of the federal securities laws alleged herein, PIMCO suffered millions of dollars in damages. On February 3, 2006, the Honorable Gerard E. Lynch appointed PIMCO as Co-Lead Plaintiff for this consolidated litigation.

18. Plaintiff PIMCO Funds: Pacific Investment Management Series - PIMCO High Yield Fund (the "PIMCO High Yield Fund") is an investment fund that invests in a diversified portfolio of high yield securities. The PIMCO High Yield Fund is one of the numerous investment funds and accounts managed by PIMCO, and for which PIMCO has sole discretion to make investment decisions. PIMCO purchased $28,720,000 par amount of Bonds on behalf of the PIMCO High Yield Fund during the Class Period, including $20,000,000 par amount of 144A Bonds in the initial offering, $4,320,000 par amount of 144A Bonds in the secondary market, and $4,400,000 million par amount of Registered Bonds. As a result of these purchases of Refco securities and the violation of the federal securities laws alleged herein, PIMCO High

9

Yield Fund suffered millions of dollars in damages. PIMCO High Yield Fund, which is not a Lead Plaintiff, has joined in this action as a Named Plaintiff and proposed Class Representative.

19. RH Capital, PIMCO, and the PIMCO High Yield Fund are collectively referred to herein as "Plaintiffs."

**B.     The Company**

20. Refco Inc. is a non-party that is not named in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005. Prior to its bankruptcy filing, Refco Inc. was a publicly traded holding company that, through its subsidiaries, was in the business of providing execution and clearing services for exchange-trade derivatives, and providing prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with the August 2005 IPO, and was the issuer of the stock sold pursuant to the August 2005 IPO. At all relevant times after the IPO, 44% of Refco Inc.'s stock was owned by the THL Partner Defendants and their passive co-investors, 36.4% was owned by Defendant Bennett, and 19.6% was owned by public investors. Refco Inc. was a Delaware corporation with its principal offices located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York.

21. Refco Group Ltd., LLC ("Refco Group") is a non-party that is not named in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005. Refco Group, which was formed in 1999, is a Delaware limited liability company with its principal offices at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. Prior to the formation of Refco Inc., the Company's business was conducted through Refco Group as the parent company. Refco Group was the co-issuer of the Company's Registered Bonds (defined below) and was a signatory to the Company's Bond

10

Registration Statement (defined below). Refco Group filed a Form 10-K Annual Report and a Form 10-K/A Annual Report with the SEC in July 2005.

22.     New Refco Group Ltd., LLC ("New Refco") is a non-party that is not named in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005. Upon completion of the Bond Offering (defined below), New Refco became the parent of, and owned all of the outstanding membership interests in, Refco Group. At that time, the THL Partner Defendants and Defendant Refco Holdings owned approximately 57% and 43%, respectively, of New Refco. Upon completion of the August 2005 IPO, Refco became the public company parent of New Refco.

23.     Refco Finance Holdings LLC ("Refco Finance Holdings") is a non-party that is not named in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005. Refco Finance Holdings was a co-issuer of the Company's 144A Bonds (defined below). On the date of the issuance of those bonds, August 5, 2004, Refco Finance Holdings merged with and into Refco Group.

24.     Refco Finance Inc. ("Refco Finance") is a non-party that is not named in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankrupcty Code on October 17, 2005. Refco Finance was a co-issuer of the 144A Bonds (defined below) and, at the time those bonds were issued, was a wholly-owned subsidiary of Refco Finance Holdings. Upon completion of the Bond Offering (defined below), Refco Finance became a wholly-owned subsidiary of Refco Group. Refco Finance was also a co-issuer of the Company's Registered Bonds and was a signatory to the Company's Bond Registration Statement. Refco Finance, together with Refco Group, filed a Form 10-K Annual Report and a Form 10-K/A Annual Report with the SEC in July 2005.

11

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 19 of 301

25.     Refco Capital Markets Ltd. ("Refco Capital") is a non-party that is not named in this lawsuit due to its filing for bankruptcy protection under Chapter 11 of the Bankrupcty Code on October 17, 2005.  Refco Capital is a Bermuda-based Refco subsidiary that traded over-the-counter derivatives contracts in a largely unregulated market.  In a criminal complaint against Bennett filed by the United States Attorney for this District on October 12, 2005, Refco Capital was named as one of the entities utilized by Bennett to help hide the Company's uncollectible receivables.

## C.     The Defendants

### 1.     The Bennett Shell-Entity Defendants

26.     Defendant Refco Group Holdings, Inc. ("Refco Holdings") is a Delaware corporation that at all relevant times was wholly owned and controlled by Refco's CEO, Bennett. Prior to the date of the Bond Offering (defined below), Refco Holdings was owned 50% by Bennett and 50% by Refco's former CEO, Defendant Tone Grant.  Bennett held his interests in Refco both directly and indirectly through Refco Holdings and The Phillip R. Bennett Three Year Annuity Trust (the "Bennett Trust").

27.     Defendant Bennett Trust is a U.S. domestic trust organized and existing under the laws of the State of Delaware.  At all relevant times, Defendant Bennett was both trustee and beneficiary of the Bennett Trust.

28.     Refco Holdings and the Bennett Trust were the primary shell entities that Bennett used to hold his substantial personal stockholdings in Refco.  Further, Refco Holdings was involved in the related-party transactions that concealed as much as $970 million worth of uncollectible debts owed to Refco, as alleged herein.

### 2.     The Refco-Affiliated Defendants

29.     Defendant Refco Managed Futures LLC ("Refco Futures"), a Delaware limited liability company, is a subsidiary of Refco Group with its principal offices located at the Company's headquarters in New York.  Refco Futures was a guarantor and co-registrant of the Registered Bonds.  At all relevant times, Bennett was a Manager of Refco Futures, Joseph J. Murphy was President and Principal Executive, Financial, and Accounting Officer of Refco Futures, and Philip Silverman was the company Secretary.

30.     Defendant Westminster-Refco Management LLC ("Westminster-Refco"), a Delaware limited liability company, is a subsidiary of Refco with its principal offices located at the Company's headquarters in New York.  Westminster-Refco was a guarantor and co-registrant of the Registered Bonds.  At all relevant times, Bennett was a Manager of Westminster-Refco, Joseph J. Murphy was its President and Principal Executive, Financial, and Accounting Officer, and Philip Silverman was the company Secretary.

31.     Lind-Waldock Securities LLC ("Lind-Waldock"), a Delaware limited liability company, is an online retail derivatives brokerage primarily serving individual traders.  At all relevant times, Lind-Waldock was a subsidiary of Refco Group, with its principal offices located at the Company's headquarters in New York.  Bennett was President, Manager, and Principal Executive, Financial, and Accounting Officer of Lind-Waldock, and Silverman was its corporate Secretary.  Lind-Waldock was a guarantor and co-registrant of the Registered Bonds.

### 3.     The Officer Defendants

32.     Defendant Phillip R. Bennett was the President, Chief Executive Officer ("CEO") and Chairman of Refco Group from September 1998 until he was forced to resign in October 2005.  He also served as President, CEO, and Chairman of Refco, and as President and CEO of New Refco, at all relevant times.  Prior to becoming CEO of Refco Group, Bennett held the

13

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 21 of 301

position of Chief Financial Officer ("CFO") since 1983. Bennett joined Refco Group in 1981 from Chase Manhattan Bank, where he had held various positions involving credit and commercial lending since 1970. Bennett prepared and approved the Offering Memorandum (defined below) for the 144A Bonds. Bennett also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments), the Company's August 2005 Registration Statement, and the Company's Form 10-K and Form 10-K/A for fiscal year 2005. In October 2005, Bennett was asked by the Board of Directors to take a leave of absence. He did so, then subsequently resigned from all posts at the Company on January 12, 2006. On October 12, 2005, a grand jury sitting in this District indicted Bennett, charging him with a massive securities fraud scheme as a result of acts alleged herein. He is currently under house arrest and confined to his penthouse apartment on Park Avenue in New York City and his suburban New Jersey horse farm after posting a $50 million bond, paying $5 million in cash, and surrendering the titles to his apartment and farm.

33. Defendant Gerald M. Sherer ("Sherer") joined Refco Group as its Executive Vice President and CFO in January 2005. From 1997 through 2004, Sherer held various positions at Deutsche Bank, including Deputy Global Head of Controlling, CFO of the Investment Bank, CFO of the Americas, and the Global Head of Internal Controls. From 1995 to 1997, Sherer was CFO of CIBC Woody Gundy's U.S. operations. Sherer also served as Senior Vice President of the Finance Division for Goldman Sachs from 1982 to 1995. Sherer prepared, approved and signed the Company's August 2005 IPO Registration Statement and the Company's fiscal year 2005 Form 10-K and Form 10-K/A. Refco recently requested permission of the Bankruptcy Court to terminate and reject its employment agreement with Sherer.

14

34.     Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer ("COO") of Refco Group beginning in August 2004 and was responsible for information technology, operations, accounting and finance, credit, margins, and risk control for Refco's futures businesses.  He joined Refco Group in April 1999 and served as Executive Vice President and COO of Refco, LLC, a Refco Group subsidiary, from July 2001 until August 2004.  After Bennett was forced to resign by the Board of Directors, Sexton served as CEO of Refco for a brief period of time before he resigned on November 15, 2005.  From 1991 to 1997, Sexton served in various capacities for Chase Manhattan Bank, including financial controller for the U.S. Foreign Currency Markets, institutional sales for marketing derivatives, and for exchange and treasury products.  Sexton prepared and approved the Company's Offering Memorandum for the Bonds, the Company's August 2005 IPO Registration Statement, and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.  Sexton also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments).

35.     Defendant Santo C. Maggio ("Maggio"), also known as "Sandy" Maggio, joined the Company in 1985, and was Executive Vice President of Refco Group and President and CEO of Refco Securities, LLC, the Company's NASD broker-dealer subsidiary, since 1991.  Maggio was also President of the Refco Capital subsidiary, since 2001.  Maggio prepared and approved the Offering Memorandum for the Bonds, the Company's August 2005 IPO Registration Statement and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.  Maggio also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments).  Like Bennett, Maggio was asked by Refco's Board of

15

Directors to take a leave of absence in October 2005. He did so, then subsequently resigned from the Board.

36. Defendant Joseph J. Murphy ("Murphy") was Executive Vice President of Refco Group and responsible for global marketing since 1999. Murphy was also President of various Refco subsidiaries, including Refco Futures and Westminster Refco during the same period. From 1994 to 1999, Murphy was Executive Managing Director of HSBC Futures Americas and Cash Securities based in Chicago. Prior to joining HSBC, Murphy was a Vice President and Producing Manager with Chase Manhattan Futures Corporation of New York and held management positions in the Treasury Department of the Chase Manhattan Bank. Murphy prepared and approved the Offering Memorandum for the Bonds, the Company's August 2005 IPO Registration Statement and the Company's fiscal year 2005 Form 10-K and Form 10-K/A. Murphy also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments).

37. Defendant Phillip Silverman ("Silverman") began serving as Secretary of the Company in at least 1999, and held numerous high-level executive positions within Refco and its subsidiaries, including Controller of Refco Group. Silverman was also Secretary of Refco Holdings and of numerous Refco subsidiaries. Silverman has been a certified public accountant ("CPA") since 1982, was a close confidant of Bennett, and, on information and belief, was Bennett's personal accountant. Silverman prepared and approved the Offering Memorandum for the Bonds, the Company's August 2005 IPO Registration Statement and the Company's fiscal year 2005 Form 10-K and Form 10-K/A. Silverman also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments).

Silverman was asked by the Board of Directors to resign, and did resign, at or about the same time as Bennett and Maggio.

38. Defendant Dennis A. Klejna ("Klejna") began serving as Executive Vice President and General Counsel of Refco Group in 1999. Prior to joining Refco Group, Klejna was in private law practice in the Washington, D.C. firm of Vinson & Elkins, L.L.P. from 1996 to 1998, where his practice focused on derivatives trading regulations. Klejna was Director of the Division of Enforcement of the Commodity Futures Trading Commission ("CFTC") from 1983 to 1995. Klejna prepared and approved the Offering Memorandum for the Bonds, and the Company's fiscal year 2005 Form 10-K and Form 10-K/A. Klejna also prepared, approved and signed the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments), and the Company's August 2005 IPO Registration Statement. As General Counsel of Refco Group, his duties included supervising the Company's outside legal counsel on all significant legal matters, and reviewing and approving bills received from outside counsel.

39. Defendants Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, and Klejna shall be collectively referred to herein as the "Officer Defendants."

### 4. Defendant Trosten

40. Defendant Robert C. Trosten ("Trosten") was Executive Vice President and CFO of Refco Group from 2001 until October 2004, when he abruptly resigned. Prior to becoming CFO, Trosten was a member of the Company's corporate finance team from 1997 until 2001. He is a CPA, and before joining the Company he served as Vice President of Corporate and Regulatory Accounting at Lehman Brothers Inc. As CFO of the Company, Trosten's responsibilities included global accounting and budgeting, regulatory reporting, establishment of accounting policies, and the development and execution of key strategic initiatives at the corporate level. In the years leading up to his departure, Trosten received salary and bonuses

17

totaling $2.2 million in fiscal year 2005, $3.1 million in fiscal year 2004, $2.8 million in fiscal year 2003, and $2.2 million in fiscal year 2002. According to his sworn testimony in an unrelated case, Trosten received a $45 million severance payment when he left the Company, after serving only three years as CFO. The Company did not publicly disclose to its investors this huge payment to Trosten, but instead simply announced that he had resigned in order to "pursue other financial interests." Trosten prepared and approved the Offering Memorandum for the Bonds and, along with Bennett and others, participated in the nationwide road show to market the Bonds to institutional investors.

### 5.   Defendant Grant

41.     Defendant Tone N. Grant ("Grant") was the CEO of Refco Group prior to Bennett's promotion to that position in September 1998. Upon information and belief, Grant continued to have direct involvement in the management of the Company even after stepping down as CEO. Indeed, prior to the LBO and Bond Offering (defined below), Grant owned 50% of Refco Holdings, which in turn owned approximately 43% of Refco Group. Grant was cashed out of his interest in Refco Holdings effective as of the date of the Bond Offering, leaving Bennett as the sole owner of Refco Holdings.

### 6.   The Audit Committee Defendants

42.     Defendant Ronald L. O'Kelley ("O'Kelley") was at all relevant times a director of the Company and a member of the Company's audit committee. O'Kelley has been Chairman and CEO of Atlantic Coast Venture Investments, Inc., a private investment company, since 2002. O'Kelley previously served as Executive Vice President, CFO and Treasurer of State Street Corporation from 1995 to 2002, as CFO of Douglas Aircraft Company from 1991 to 1995, and as CFO of Rolls Royce, Inc. from 1983 to 1991. Prior to his tenure at Rolls-Royce, O'Kelley held several senior financial positions at Citigroup from 1975 to 1983, and at Texas Instruments,

18

Inc. from 1969 to 1975. O'Kelley approved and signed the Company's August 2005 IPO Registration Statement. O'Kelley also approved the Company's financial statements for all relevant periods, the October 12, 2004 Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.

43. Defendant Leo R. Breitman ("Breitman") was at all relevant times a director of the Company and a member of its audit committee. Breitman was Chairman and CEO of Fleet Bank, Massachussetts, from 1991 through March 2004, and also served as Senior Lending Officer of FleetBoston Financial Corporation from 2002 through March 2004. From 1996 to 2002, Breitman was Managing Director of the Commercial Banking Division of FleetBoston Financial Corporation. Breitman approved and signed the Company's August 2005 IPO Registration Statement. Breitman also approved the Company's financial statements for all relevant periods, the October 12, 2004 Bond Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.

44. Defendant Nathan Gantcher ("Gantcher") was at all relevant times a director of the Company and a member of its audit committee. Gantcher was Co-Chairman, President and CEO of Alpha Investment Management L.L.C. from 2002 until August 2004. Prior to joining Alpha, Gantcher was a private investor from 1999 to 2001. Gantcher served as Vice Chairman of CIBC Oppenheimer Corp. from 1997 to 1999, and prior to that served as Co-CEO of Oppenheimer & Co., Inc. Gantcher approved and signed the Company's August 2005 IPO Registration Statement. Gantcher also approved the Company's financial statements for all relevant periods, the October 12, 2004 Bond Registration Statement (including subsequent amendments), and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.

19

45.     Defendants O'Kelley, Breitman and Gantcher are collectively referred to herein as the "Audit Committee Defendants."  Prior to the August 2005 IPO, the Audit Committee Defendants comprised the audit committee of New Refco, which performed the functions of an audit committee of Refco Group.  After the August 2005 IPO, the Audit Committee Defendants comprised the audit committee of Refco Inc.  At all times (and as described more fully below), the Audit Committee Defendants were responsible for overseeing, among other things:  the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the engagement, independence and qualifications of the outside auditor; and the performance of the outside auditor.

### 7.     The Defendants Affiliated with Thomas H. Lee Partners

46.     Defendant Thomas H. Lee Partners, L.P. ("Thomas H. Lee Partners") is a private equity investment fund headquartered in Boston, Massachusetts, with approximately $12 billion of capital under management, which focuses on the acquisition of substantial equity stakes in mid- to large-capitalization companies.  In June 2004, as part of the LBO, Thomas H. Lee Partners and its affiliates and other related parties purchased a 57% equity stake in the Company for approximately $507 million.  These affiliates and other related parties, whose interests in the Company were at all times beneficially owned by Thomas H. Lee Partners, include:

a.     THL Refco Acquisition Partners, THL Refco Acquisition Partners II, and THL Refco Acquisition Partners III, each of which was, until its dissolution at or about the time of the August 2005 IPO, a Delaware general partnership indirectly owned by Defendants Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P., which in turn are Delaware limited partnerships whose general partner is Defendant THL Equity Advisors V, LLC.  Thomas H. Lee Partners is the sole member

20

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 28 of 301

of THL Equity Advisors V, LLC, and thus controlled THL Refco Acquisition Partners, THL Refco Acquisition Partners II, and THL Refco Acquisition Partners III;

b.  Defendant Thomas H. Lee Investors Limited Partnership, a Massachusetts limited partnership controlled by Defendant Thomas H. Lee; and

c.  Defendant The 1997 Thomas H. Lee Nominee Trust, a trust over which Defendant Thomas H. Lee has voting and investment control.

47.  Defendants Thomas H. Lee Partners, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust, are collectively referred to herein as the "THL Partner Defendants."

48.  At all relevant times, the THL Partner Defendants managed and controlled the Company.  One year after the LBO, the THL Partner Defendants brought Refco public in the August 2005 IPO.  The THL Partner Defendants and their co-investors were paid $210 million in the deal, while still maintaining a controlling ownership stake of 38% of the Company's stock.

49.  Defendant Thomas H. Lee ("Lee") was at all relevant times a director of the Company.  Lee founded the Thomas H. Lee Company, the predecessor of Thomas H. Lee Partners in 1974 and served as its Chairman and CEO since its inception until reportedly leaving that entity after the events giving rise to this litigation.  Lee approved and signed the Company's August 2005 IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Lee also approved.  Lee also approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.

21

50.     Defendant David V. Harkins ("Harkins") was at all relevant times a director of the Company.  Harkins is Vice Chairman and Managing Director of Private Equity Funds of Thomas H. Lee Partners, and has also served as President of Thomas H. Lee Partners.  Harkins approved and signed the Company's August 2005 IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Harkins also approved.  Harkins also prepared and approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.

51.     Defendant Scott L. Jaeckel ("Jaeckel") was at all relevant times a director of the Company.  Jaeckel is a Managing Director of Thomas H. Lee Partners.  Jaeckel previously served as Vice President of Thomas H. Lee Partners from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001.  Prior to his affiliation with Thomas H. Lee Partners, Jaeckel worked at Morgan Stanley in the Corporate Finance Department from 1992 to 1994.  Jaeckel approved and signed Refco's August 2005 IPO Registration Statement, and was identified as a director/manager of the Company in the Offering Memorandum for the Bonds, which Jaeckel also approved.  Along with Bennett and others, Jaeckel participated in the nationwide road show to market the Company's bonds to institutional investors.  Jaeckel also approved the Company's October 12, 2004 Bond Registration Statement (including subsequent amendments) and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.

52.     Defendant Scott A. Schoen ("Schoen") was at all relevant times a director of the Company.  Schoen joined Thomas H. Lee Partners in 1986 and currently serves as its Co-President.  He previously served as a Managing Director of Thomas H. Lee Partners from 1992 to 2004 and Vice President from 1988 to 1992.  Prior to joining Thomas H. Lee Partners, Schoen

22

was in the Private Finance Department of Goldman Sachs.  Schoen approved and signed Refco's

August 2005 IPO Registration Statement, and was identified as a director/manager of the

Company in the Offering Memorandum for the Bonds, which Schoen also approved.  Schoen

also approved the Company's October 12, 2004 Bond Registration Statement (including

subsequent amendments) and the Company's fiscal year 2005 Form 10-K and Form 10-K/A.

53.     Defendants Lee, Harkins, Jaeckel and Schoen are collectively referred to herein as

the "THL Individual Defendants," and, together with the THL Partner Defendants, are

collectively referred to herein as the "THL Defendants."

### 8.     Grant Thornton

54.     Defendant Grant Thornton LLP ("Grant Thornton") is the Chicago-based U.S.

member firm of Grant Thornton International, one of six global accounting, tax and business

advisory organizations with member firms in 111 countries.  Grant Thornton is one of the largest

U.S. accounting concerns outside of the "Big Four."  Grant Thornton served as the Company's

purportedly independent auditor at all relevant times since 2002, when it replaced Arthur

Andersen LLP ("Andersen") in that role.  Grant Thornton provided auditing and accounting

services to the Company prior to and in connection with the Bond Offering and the August 2005

IPO, which included the issuance of clean and unqualified audit opinion letters on the

Company's financial statements for fiscal years 2003, 2004, and 2005.  Grant Thornton's

unqualified audit opinion letters were also included in the Company's fiscal year 2005 Annual

Report on Form 10-K and Form 10-K/A.

### 9.     The Underwriter Defendants

55.     Defendant Credit Suisse Securities (USA) LLC (known at the time of the IPO as

Credit Suisse First Boston LLC) ("Credit Suisse"), a subsidiary of Credit Suisse Group, is an

investment banking firm that provides securities underwriting, financial advisory, capital raising,

sales and trading, and financial products and services. Its headquarters are located at 11 Madison Avenue, New York, New York. Credit Suisse was a lead placement agent, underwriter, and initial purchaser for the Company's Bond Offering, and a joint bookrunning manager of Refco's August 2005 IPO of 26,500,000 shares of common stock. It sold and distributed Bonds to investors in the Bond Offering, and it sold and distributed Refco common stock to the investing public pursuant to the registration statement and prospectus filed with the SEC in connection with the August 2005 IPO (together, the "August 2005 IPO Offering Materials"). As part of its duties as an underwriter, Credit Suisse was required to conduct, prior to the offerings of the Company's securities, a reasonable investigation of the Company to ensure that the statements contained in the Offering Memorandum for the Bonds and the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Credit Suisse purchased and agreed to sell to the investing public at least $150,822,100 in common stock in connection with the August 2005 IPO.

56.     Defendant Banc of America Securities LLC ("BAS"), a subsidiary of Bank of America Corporation, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services. Its headquarters are located at 9 W. 57th Street, New York, New York. BAS was a lead placement agent, underwriter, and initial purchaser for the Company's Bond Offering, and a joint bookrunning manager of the August 2005 IPO. It sold and distributed Bonds to investors in the Bond Offering, and it sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, BAS was required to conduct, prior to the offerings, a reasonable investigation of the Company to ensure that the statements contained in the Offering Memorandum for the Bonds and in the August 2005

24

IPO Offering Materials contained no misstatement or omission of material fact. BAS purchased and agreed to sell to the investing public at least $118,640,500 in common stock in connection with the August 2005 IPO.

57. Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank"), a subsidiary of Deutsche Bank AG, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products and services. Its headquarters are located at 60 Wall Street, New York, New York. Deutsche Bank was a lead placement agent, underwriter, and initial purchaser for the Company's Bond Offering, and a co-manager of the August 2005 IPO. It sold and distributed Bonds to investors in the Bond Offering, and it sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Deutsche Bank was required to conduct, prior to the offerings, a reasonable investigation of the Company to ensure that the statements contained in the Offering Memorandum for the Bonds and in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Deutsche Bank purchased and agreed to sell to the investing public at least $37,778,400 in common stock in connection with the August 2005 IPO.

58. Defendant Goldman, Sachs & Co. ("Goldman Sachs"), a subsidiary of The Goldman Sachs Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its global headquarters are located at 85 Broad Street, New York, New York. Goldman Sachs was a joint bookrunning manager of the August 2005 IPO. It sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Goldman Sachs was required to conduct, prior to the offering, a reasonable

investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Goldman Sachs purchased and agreed to sell to the investing public at least $124,062,400 in common stock in connection with the August 2005 IPO.

59.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 4 World Financial Center, New York, New York. Merrill Lynch was a co-manager of the August 2005 IPO. It sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Merrill Lynch was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Merrill Lynch purchased and agreed to sell to the investing public at least $53,927,500 in common stock in connection with the August 2005 IPO.

60.     Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan"), a subsidiary of J.P. Morgan Chase & Co., is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 270 Park Avenue, New York, New York. J.P. Morgan was a co-manager of the August 2005 IPO. It sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, J.P. Morgan was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no

26

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 34 of 301

misstatement or omission of material fact. J.P. Morgan purchased and agreed to sell to the investing public at least $37,778,400 in common stock in connection with the August 2005 IPO.

61. Defendant Sandler O'Neill & Partners, L.P. ("Sandler O'Neill") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 919 Third Avenue, New York, New York. Sandler O'Neill was a co-manager of the August 2005 IPO. It sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Sandler O'Neill was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Sandler O'Neill purchased and agreed to sell to the investing public at least $16,207,400 in common stock in connection with the August 2005 IPO.

62. Defendant HSBC Securities (USA) Inc. ("HSBC"), a subsidiary of The HSBC Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 2700 Sanders Road, Prospect Heights, Illinois. HSBC was a co-manager of the August 2005 IPO. It sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, HSBC was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. HSBC purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the August 2005 IPO.

63.     Defendant William Blair & Company, L.L.C. ("William Blair") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 222 West Adams Street, Chicago, Illinois. William Blair sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, William Blair was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. William Blair purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the August 2005 IPO.

64.     Defendant Harris Nesbitt Corp. ("Harris Nesbitt"), a subsidiary of the Bank of Montreal, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 111 West Monroe St., Chicago, Illinois. Harris Nesbitt sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Harris Nesbitt was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Harris Nesbitt purchased and agreed to sell to the investing public at least $9,736,100 in common stock in connection with the August 2005 IPO.

65.     Defendant CMG Institutional Trading LLC ("CMG") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 123 North Wacker Drive, Chicago, Illinois. CMG sold and distributed Refco common stock to the investing public pursuant to the

28

August 2005 IPO Offering Materials. As part of its duties as an underwriter, CMG was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. CMG purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the August 2005 IPO.

66. Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez & Co.") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 61 Broadway, Suite 2924, New York, New York. Ramirez & Co. sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Ramirez & Co. was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Ramirez & Co. purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the August 2005 IPO.

67. Defendant Muriel Siebert & Co. Inc. ("Seibert & Co.") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 885 Third Avenue, New York, New York. Seibert & Co. sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Seibert & Co. was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no

29

misstatement or omission of material fact. Seibert & Co. purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the August 2005 IPO.

68.    Defendant The Williams Capital Group, L.P. ("Williams Capital") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 650 Fifth Avenue, 10th Floor, New York, New York. Williams Capital sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Williams Capital was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Williams Capital purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the August 2005 IPO.

69.    Defendant Utendahl Capital Partners, L.P. ("Utendahl") is an investment banking firm that provides securities underwriting, financial advisory, capital raising, sales and trading, and financial products. Its headquarters are located at 30 Broad Street, New York, New York. Utendahl sold and distributed Refco common stock to the investing public pursuant to the August 2005 IPO Offering Materials. As part of its duties as an underwriter, Utendahl was required to conduct, prior to the offering, a reasonable investigation of the Company to ensure that the statements contained in the August 2005 IPO Offering Materials contained no misstatement or omission of material fact. Utendahl purchased and agreed to sell to the investing public at least $2,915,000 in common stock in connection with the August 2005 IPO.

70.    References herein to the "Bond Underwriter Defendants" refer collectively to Defendants Credit Suisse, BAS, and Deutsche Bank.

30

71. References herein to the "Stock Underwriter Defendants," refer collectively to Defendants Credit Suisse, BAS, Deutsche Bank, Goldman Sachs, Merrill Lynch, J.P. Morgan, Sandler O'Neill, HSBC, William Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams Capital, and Utendahl.

### 10. Defendant BAWAG

72. BAWAG is a banking and financial services corporation organized and existing under the laws of Austria with its principal place of business at Seitzergasse 2-4, A-1010, Wien, Austria. Founded in 1922, BAWAG is the fourth largest bank in Austria and is wholly owned by the Austrian Trade Union Federation.

73. At all relevant times prior to August 5, 2004, BAWAG owned a 10% equity interest in Refco Group, which was held by BAWAG Overseas, Inc., ("BAWAG Overseas") a wholly-owned BAWAG affiliate. BAWAG Overseas was incorporated in Delaware and maintained a business address at 1209 Orange Street, Wilmington, Delaware. Upon information and belief, BAWAG also beneficially owned and controlled another 27% or more of Refco's membership interests which it acquired as collateral for a series of undisclosed loans from BAWAG to Refco. When Refco was recapitalized on August 5, 2004, BAWAG received cash payments from Refco Holdings totaling $1.342 billion to cash out its direct and indirect equity interests in Refco.

74. The relationship between BAWAG and Refco dates back to at least the early 1990s, when BAWAG's longtime Chairman and CEO, Walter Flottl, used approximately $2 billion in BAWAG funds to help his son, Wolfgang Flottl, establish a Bermuda-based hedge fund. That hedge fund, Ross Capital, used Refco as its primary broker and, upon information and belief, was one of the Refco customers that suffered trading losses that were not properly disclosed and accounted for by Refco. On March 24, 2006, BAWAG announced that it had

31

suffered losses of 1 billion euros (approximately $1.2 billion U.S.), stemming primarily from bad loans to companies controlled by Wolfgang Flottl, which upon information and belief included Ross Capital. BAWAG further disclosed that it had hidden the losses by shifting them to six Anguilla-based companies. In particular, the losses were shifted to brokerage accounts maintained by Refco for these offshore companies.

75.  In 1998, BAWAG and Refco expanded their relationship with a joint venture to provide clearing services for futures and options traded on European exchanges. Bennett's close relationship with BAWAG also resulted in the Company's hiring of Thomas Hackl, who was head of investment banking at BAWAG from 1991 to 2000, as Executive Vice President in charge of global asset management of Refco Group. Hackl is also believed to be a director of Bank Frick & Co. Atkengesellschaft ("Bank Frick"), in which BAWAG holds a 26% stake and Refco Global Finance Ltd. holds a 4% stake.

76.  On July 12, 2002, Refco Group entered into a Proceeds Participation Agreement with DF Capital, Inc. ("DF Capital"), a company that had been incorporated days earlier by Bennett. At that time, the shareholders of Refco Group were Refco Holdings, Refco Group Holdings LLC, DF Capital, and BAWAG Overseas. Upon information and belief, BAWAG made a loan of approximately $254 million to DF Capital in November 2003. According to the UCC-1 Financing Statement for this transaction, the collateral for that loan included DF Capital's rights under the Proceeds Participation Agreement. Upon further information and belief, those rights included equity-like rights in Refco Group.

77.  On October 10, 2005, just hours before news broke of Refco's previously undisclosed receivable from a Bennett-controlled entity (Refco Holdings), BAWAG provided an emergency loan to Refco Holdings of 350 million euro (approximately $420 million U.S.)

32

collateralized by Refco Holdings' 34% interest in Refco stock. The purpose of this loan was to allow Refco Holdings to repay its debts to Refco, which it did upon receipt of the loan proceeds. Given the suspicious timing of this loan, it has been subject to intensive regulatory scrutiny in Austria, and has drawn scrutiny in the U.S. as well. On November 16, 2005, BAWAG filed an adversary complaint in connection with Refco's bankruptcy proceedings, alleging that it was fraudulently induced to make the loan. On April 21, 2006, Refco's Official Committee of Unsecured Creditors filed counterclaims against BAWAG, seeking to recover amounts in excess of $1.325 billion, including amounts that BAWAG received in the Company's August 5, 2004 recapitalization.

## IV.    CLASS ALLEGATIONS

78.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons and entities who purchased or otherwise acquired Refco Finance Holdings 9% Senior Subordinated Notes due 2012 (the "Bonds") and/or Refco common stock during the Class Period, either in the respective initial offering, pursuant to a registration statement, or in the secondary market, and who, upon disclosure of certain facts alleged herein, were injured thereby. Excluded from the Class are: (a) Refco and its subsidiaries and affiliates; (b) the Defendants; (c) members of the families of the individual Defendants; (d) the subsidiaries and affiliates of the Defendants; (e) any person or entity who is a partner, officer, director, employee, or controlling person of Refco (including any of its subsidiaries or affiliates) or of any Defendant; (f) any entity in which any Defendant has a controlling interest; (g) the Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (h) the legal representatives, heirs, successors and assigns of any such excluded party.

33

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 41 of 301

79. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Company issued $600 million par amount of debt securities and consummated an initial public offering of over 30 million shares of common stock. While Plaintiffs do not know the exact number of purchasers of those securities, Plaintiffs believe that Class members number in the thousands.

80. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the other members of the Class acquired Bonds and/or Refco common stock in the initial offerings, pursuant to a registration statement, and/or in the secondary market, and sustained damages as a result of Defendants' wrongful conduct complained of herein.

81. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

82. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

83. Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      (a) Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

      (b) Whether the registration statements and prospectuses for the Company's securities contained material misstatements or omitted to state material information;

(c)  Whether the S.E.C. filings, press releases, reports, and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

(d)  Whether and to what extent the Company's financial statements failed to comply with generally accepted accounting principles ("GAAP") during the Class Period;

(e)  Whether Grant Thornton's audits of the Company's financial statements during the Class Period were conducted in accordance with generally accepted auditing standards ("GAAS");

(f)  Whether and to what extent the market prices of the Company's securities were artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

(g)  With respect to Plaintiffs' claims under the Section 10(b) of the Exchange Act, whether the Defendants named in those claims acted with scienter;

(h)  With respect to Plaintiffs' claims under the Securities Act, whether the Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

(i)  With respect to Plaintiffs' claims pursuant to Section 15 of the Securities Act and Section 20(a) of the Exchange Act, whether the Defendants named in those counts are controlling persons of the Company;

(j)  Whether reliance may be presumed pursuant to the fraud-on-the-market rule and/or the fraud-created-the-market rule; and

(k)  Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and if so, the proper measure thereof.

84.  In addition to the common questions of law and fact, there are certain undisputed material facts that are common to the claims of all Class members. These undisputed facts, which Refco has publicly admitted or which are directly derived from Refco's public admissions, include that:

(a)  Certain related-party receivables involving hundreds of millions of dollars had been omitted from the Company's financial statements prior to

35

October 10, 2005;

(b)     The Company's financial statements for the fiscal years 2002, 2003, 2004 and 2005, and for the quarter ended May 31, 2005, taken as a whole, should no longer be relied upon; and

(c)     With respect to Plaintiffs' claims under the Securities Act, the offering materials for the Bond Offering and August 2005 IPO contained material misstatements and omissions.

85.     The names and addresses of those persons and entities who purchased securities in the Bond Offering and the August 2005 IPO, and/or of the record owners of the Company's securities, are available from the Company's transfer agent(s) and/or from the Stock Underwriter Defendants.  Notice may be provided to such purchasers and/or record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## V.     FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### A.     Historical Background Regarding the Company

86.     Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency and futures markets.  Essentially, Refco provided financial services by executing trades on behalf of its customers and then recording and "clearing" those trades.  Refco offered these services to a wide variety of customers – ranging from individuals to corporations, hedge funds, financial institutions, retail clients and professional traders – on a broad spectrum of derivatives exchanges and over-the-counter, cash and securities markets.

87.     Refco's revenues were primarily comprised of (i) transaction fees earned from executing and clearing customer orders; and (ii) interest income earned on cash balances in its customers' trading accounts and from providing financing through repurchase transactions.  The latter element of Refco's business model took on greater significance towards the end of the

36

1990s because it allowed Refco's customers to trade on "margin" and leverage their capital into larger trades, which generated larger commissions, revenues and profits for Refco.

88.    By 2004, the Company had secured a dominant position in the burgeoning derivatives market.  In fact, in that year it processed 461 million derivatives contacts, a volume comparable to that processed by the Chicago Board of Trade and greater than that processed by both the Chicago Board Options Exchange and the New York Mercantile Exchange that year.

89.    However, the very practice that fueled Refco's success – extending margin loans to its trading customers – would prove to be disastrous when, on information and belief, a number of its customers defaulted in the wake of international financial crises that occurred in late 1997 and 1998.  The Asian financial crisis began on July 2, 1997, when the Thai government was forced to devalue the Thai baht following months of speculative attacks on the currency. The collapse of the baht sparked economic decline in several Asian nations and led to similar devaluations of the Philippine peso, the Malaysian ringgit, the Indonesian rupiah and the Singaporean dollar.  The Hong Kong stock market crashed in the wake of these currency devaluations, suffering a staggering 40% loss in October 1997.  The aftershocks of this collapse were felt far and wide, causing declines in markets in Brazil, Argentina and Mexico.

90.    The Asian financial crisis hit the United States on October 27, 1997.  The Dow Jones Industrial Average suffered the third largest point loss in its 109-year history that day, dropping by 7%.  This "mini-crash" was so severe that it halted trading on the New York Stock Exchange for the first time ever.

91.    A number of the Company's customers suffered extensive trading losses in the crisis and were unable to repay the credit the Company had extended to them.  According to recent media reports, these customers may have included Ross Capital; Devonshire Strategic

37

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 45 of 301

Holdings; RGF Ltd.; Kipler Investments; Hazelhurst Investments; Helford Resources; East Client Services Ltd.; Luhur; and/or several other entities. In particular, based on Lead Plaintiffs' investigation to date, and on information and belief, it appears that Ross Capital, the hedge fund run by Wolfgang Flottl, incurred considerable losses.

92. Faced with the unwelcome prospect of having to write off these extensive customer trading losses, Defendant Bennett and others formulated a way to hide these bad debts from consumers of Refco's financial statements. First, the receivables were consolidated and transferred from the Company to Refco Holdings, an entity controlled by Bennett. The Company's books then reflected a large receivable from Refco Holdings. Concluding that such a large receivable would be less likely to draw attention if its character as a debt from a related-party were obscured, Bennett and others orchestrated a series of transactions whereby the Refco Holdings receivable was temporarily paid off at the end of each of the Company's financial reporting periods and replaced on the books with receivables from unrelated entities, including BAWAG. These transactions – which were repeated yearly from 1999 and at the end of every quarter from at least 2004 until August 2005 – enabled the Company to hide from the investing public the existence of uncollectible debts.

**B. The THL Partner Defendants' Investment and the 2004 Recapitalization**

93. According to Refco Group's public disclosures, as of early June 2004 it was owned 90% by Refco Holdings and 10% by BAWAG Overseas. At that time, Bennett and the former CEO of Refco Group, Tone Grant ("Grant"), were co-equal owners of Refco Holdings. Upon information and belief, BAWAG also had beneficial ownership and control of an additional 27% or more of Refco Group as a result of various loans by BAWAG, including the loan to DF Capital, which were secured by interests in Refco Group.

38

94.     On June 8, 2004, the THL Partner Defendants and their passive co-investors entered into an equity purchase and merger agreement (the "Merger Agreement") with Refco Group and Refco Holdings.  Pursuant to the Merger Agreement, as amended on July 9, 2004, New Refco would become the parent company of Refco Group, and the THL Partner Defendants and their co-investors would acquire a 57% equity stake in New Refco.  The remaining 43% of New Refco was to be held by Refco Holdings, which would then be wholly-owned by Bennett.  Grant and BAWAG were to be cashed out of their respective ownership interests in Refco Group.  The Merger Agreement took effect on August 5, 2004.

95.     The THL Partner Defendants and their passive co-investors paid $507 million in cash for their share of New Refco while Bennett (through Refco Holdings) rolled over $382.5 million of his Refco Group stock to pay for his share.  To raise the remaining funds needed to cash-out the existing equity holders (approximately $1.4 billion) and repay existing debt (including debt owed to Refco Holdings), the Company took out $800 million in term loans pursuant to a senior credit facility, opened a $75 million revolving line of credit, and issued $600 million of 9% Senior Subordinated Notes due in 2012 (the "144A Bonds").

96.     On August 5, 2004, as part of the recapitalization of Refco, Refco Group and Refco Finance transferred more than $1.325 billion and an asset management business, Forstmann-Leff International Associates, LLC (valued at approximately $231 million), to Refco Holdings.  On the same date, Refco Holdings transferred $1.342 billion to BAWAG through a series of transactions, as follows:

        a.     $191 million in consideration for the merger of BAWAG Overseas, Inc, into a subsidiary of Refco Holdings, thereby eliminating BAWAG's disclosed ownership interest in Refco Group;

39

b. $676 million in the form of repayments of the loan from BAWAG to DF Capital, where the funds for the repayments came from Refco Holdings' August 5, 2004 acquisition of DF Capital from its sole stockholder, Desana Foundation;

c. $85 million in the form of repayment of a loan from BAWAG to Refco Holdings;

d. $390 million in the form of repayment of an overdraft facility previously drawn down upon by Refco Holdings.

97. Defendants BAS, Credit Suisse and Deutsche Bank acted as co-lead arrangers and joint book running managers for the senior credit facility, and as lead underwriters and placement agents, joint book-running managers, and initial purchasers for the offering of 144A Bonds (the "Bond Offering"). Defendants Credit Suisse and Deutsche Bank also acted as syndication agent and documentation agent for the senior credit facility, respectively, while Bank of America, N.A., an affiliate of Defendant BAS, acted as administrative agent, swingline lender and letter of credit issuer.

98. Refco Finance Holdings and Refco Finance were co-issuers of the 144A Bonds. Upon completion of the Bond Offering, Refco Finance Holdings merged into Refco Group. Refco Finance, which was a wholly-owned subsidiary of Refco Finance Holdings at the time of the Bond Offering, thus became a subsidiary of Refco Group.

99. The chart below (taken from the Bond Registration Statement and the August 2005 IPO Registration Statement) summarizes the structure of the Company upon completion of the Bond Offering:

40



C. **The Bond Offering**

100. The 144A Bonds were issued in the same manner as much high yield debt. The issuance involved two steps, constituting a single plan of financing. The general purpose of the plan was to obtain rapid access to the public capital markets in order to obtain funds at a cost of capital corresponding to registered, freely tradable securities. The first step, pursuant to which the issuers actually obtained the funds, was to issue the 144A Bonds through underwriters pursuant to an offering memorandum (the "Offering Memorandum"). The second step, mandated by the Offering Memorandum and the underwriting contracts, was to exchange the bonds issued in the first step for identical bonds issued pursuant to a registration statement (the "Registered Bonds") (together with the 144A Bonds, the "Bonds"). The second step was merely an exchange of bonds issued without prior registration for identical bonds issued pursuant to a

41

registration statement and for which the issuers had already received funds in the first step (the "Exchange Offer"). Accordingly, no new funds flowed to the issuer in the second step. The entire two-step process constituted a public offering of the Bonds.

101. This two-step procedure is known in the investment banking industry as a "Rule 144A/Exxon Capital Exchange Offer." The reference to "Rule 144A" relates to the first step of the transaction, by which the initial purchasers (the Bond Underwriter Defendants) purchase the securities from the issuers and resell them pursuant to an SEC regulation providing a safe harbor for resales of unregistered securities to "Qualified Institutional Buyers." The second step, the "Exxon Capital Exchange Offer," is the means by which the 144A bonds are converted into registered, freely tradable securities. In practice, the Rule 144A/Exxon Capital framework does not differ from registration. High yield issuers and their underwriters prepare the offering memoranda for Rule 144A offerings in contemplation of the Exxon Capital Exchange Offer and, accordingly, prepare such documents to conform in all material respects with the requirements for a prospectus included in a registration statement on SEC Form S-1.

102. The Bond Underwriter Defendants purchased the 144A Bonds from the issuers and resold them to investors with the understanding and expectation that the 144A Bonds would later be exchanged for freely tradeable Registered Bonds in the second step Exchange Offer. The Bond Underwriter Defendants were compensated for their underwriting services by a discount between the price at which they initially purchased the 144A Bonds from the issuers and the offering price. Further, the Bond Underwriter Defendants obtained from the issuers a purported obligation to indemnify them from certain liabilities, including liabilities under the Securities Act.

103.     As is the case with all high yield debt issued in such two-step offerings, the 144A Bonds were priced from the outset as registered, freely tradable securities. Because the co-issuers undertook to use their best efforts to offer the Registered Bonds in exchange for the 144A Bonds within 450 days after the Bond Offering, the market accepted such pricing and did not demand the substantially higher yield that would otherwise be expected in the purchase of unregistered securities. Indeed, the Exchange Offer was consummated in April 2005, only eight months after the 144A Bonds were issued.

104.     PIMCO, the PIMCO High Yield Fund, and other members of the Class would not have purchased the 144A Bonds without the understanding that they would be exchanged for Registered Bonds. Indeed, the funds and accounts for which PIMCO, and many other class members purchased the 144A Bonds were subject to restrictions on the amount of unregistered securities they could hold, since, among other reasons, they required flexibility and liquidity to respond to investors' redemption requests.

### 1.     The Offering Memorandum

105.     The Company initially marketed the Bonds to PIMCO, other Qualified Institutional Buyers and other members of the Class pursuant to the Offering Memorandum, which was first disseminated to PIMCO, the PIMCO High Yield Fund, other Qualified Institutional Buyers and other members of the Class on or about July 12, 2004. The Offering Memorandum described the terms of the Bonds, provided information concerning the Company's operations and finances, and contained all the information required to be set forth in a prospectus included in a registration statement filed with the SEC.

106.     The Offering Memorandum, which described and provided for the entire two-step process by which the Bonds were transmitted into the market, constituted a prospectus for the Bonds, and was used by the Bond Underwriter Defendants, Bennett, Trosten, Jaeckel, and the

43

THL Partner Defendants to solicit PIMCO, the PIMCO High Yield Fund, and other members of the Class not only to participate in the first step of the offering, but also to participate in the second step exchange by which the 144A Bonds achieved their status as registered, freely tradable securities. The two steps of the offering were inseparable, and each and every communication soliciting the participation of any person in the first step necessarily also solicited participation in the second step.

107. The Offering Memorandum was created by, among others, Defendants Credit Suisse, BAS, Deutsche Bank, Bennett, Trosten, Jaeckel and the THL Partner Defendants. Defendant Grant Thornton reviewed the Offering Memorandum prior to its issuance, and consented to the inclusion of its audit opinion therein.

108. As set forth below, The Offering Memorandum pursuant to which PIMCO, the PIMCO High Yield Fund, and other members of the Class were induced to purchase the Bonds contained a number of untrue statements of material facts and omitted to state material facts needed to make it not misleading.

(a) **The Financial Statements in the Offering Memorandum Contained Untrue Statements of Material Facts**

109. The Offering Memorandum contained financial statements and other statements regarding the Company's financial performance that purported to demonstrate the Company's soundness, but which in reality contained untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading. These statements were made in several contexts, including (1) in the audited financial statements included in the Offering Memorandum; (2) in the discussion of certain historical consolidated financial data derived from the Company's audited consolidated financial statements; (3) in the unaudited financial statements included in the Offering Memorandum; (4) in the discussion of

44

certain historical consolidated financial data derived from the Company's unaudited consolidated financial statements; and (5) in statements made in the Management Discussion & Analysis ("MD&A") and other textual portions of the Offering Memorandum.

110.    Refco Group's Consolidated Balance Sheets, as audited and certified by Grant Thornton and as included in the Offering Memorandum, stated that Refco Group and its subsidiaries had receivables from customers in the amounts of $1,827,190,000 and $1,795,445,000 for fiscal years 2004 and 2003, respectively; total assets of $33,332,172,000 and $19,215,429,000 for fiscal years 2004 and 2003, respectively; and members' equity of $616,084,000 and $566,361,000 for fiscal years 2004 and 2003, respectively.

111.    Further, Refco Group's Consolidated Statements of Income, as audited and certified by Grant Thornton and as included in the Offering Memorandum, stated that Refco Group and its subsidiaries incurred general, administrative and other expenses in the amounts of $200,902,000 and $167,464,000 for fiscal years 2004 and 2003, respectively; and earned net income of $187,156,000 and $140,119,000 for fiscal years 2004 and 2003, respectively.

112.    Grant Thornton gave its written consent to the inclusion of its audit opinion on the Company's fiscal years 2003 and 2004 financial statements in the Offering Memorandum.  In the audit opinion, Grant Thonton certified that those financial statements had been prepared in accordance with GAAP.  Grant Thornton's report stated:

**REPORT OF INDEPENDENT REGISTERED
PUBLIC ACCOUNTING FIRM**

To the Members of
**Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheets of Refco Group Ltd., LLC (the "Company") (a Delaware limited liability company) and subsidiaries (the "Group") as of February 29, 2004 and February 28, 2003, and the related consolidated statements of income,

45

changes in members' equity and cash flows for each of the two years then ended….

We conducted our audits in accordance with the auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the two years then ended in conformity with accounting principles generally accepted in the United States of America.

Grant Thornton LLP
New York, New York
April 27, 2004

113.    In addition to the financial statements audited by Grant Thornton, the Offering Memorandum presented certain historical consolidated financial data derived from the Company's consolidated financial statements. Based on the audited financial statements for fiscal years 2003 and 2004, respectively, the Offering Memorandum reflected EBITDA (that is, earnings before interest, income tax, depreciation and amortization) for those years of $211 million and $258 million, respectively. Based on the Company's unaudited consolidated financial statements, for fiscal years 2000, 2001 and 2002, the Offering Memorandum reported:

(a)    general, administrative and other expenses in the amounts of $104 million, $174 million and $172 million for the fiscal years ended February 29, 2000 ("fiscal year 2000"), February 28, 2001 ("fiscal year 2001"), and fiscal year 2002, respectively;

46

(b)     net income of $45 million, $72 million and $93 million for fiscal years 2000, 2001, and 2002, respectively;

(c)     EBITDA of $92 million, $140 million, and $179 million for fiscal years 2000, 2001, and 2002, respectively;

(d)     total assets of $17.7 billion, $18.2 billion and $22.6 billion for fiscal years 2000, 2001, and 2002, respectively; and

(e)     members' equity of $441 million, $500 million and $522 million for fiscal years 2000, 2001, and 2002, respectively.

114.    The Offering Memorandum also included unaudited financial results for the three month period ended May 31, 2004, which was the first quarter of the Company's fiscal year 2005. For that quarter, the Offering Memorandum reported general, administrative and other expenses in the amount of $57,502,000; net income of $59,270,000; EBITDA of $78 million; total assets of $55,229,109,000; receivables from customers of $2,290,621,000; and members' equity of $671,100,000.

115.    Further, the Offering Memorandum included Unaudited Pro Forma Consolidated Statements of Operations for fiscal year 2004; the twelve months ended May 31, 2004; and the three months ended May 31, 2004. The Unaudited Pro Forma Consolidated Statements of Operations treated the Bond Offering and related transactions as if they had occurred on March 1, 2003. For fiscal year 2004, the Offering Memorandum reflected, on a pro forma basis, general, administrative and other expenses of $188 million and net income of $108 million. For the twelve months ended May 31, 2004, the Offering Memorandum reflected, on a pro forma basis, general, administrative and other expenses of $199 million and net income of $116 million. For the three months ended May 31, 2004, the Offering Memorandum reflected, on a

47

pro forma basis, general, administrative and other expenses of $52 million and net income of $35 million.

116. In addition, the Offering Memorandum included an Unaudited Pro Forma Consolidated Balance Sheet as of May 31, 2004, which treated the Bond Offering and related transactions as if they had occurred on May 31, 2004. As of May 31, 2004, the Offering Memorandum reflected, on a pro forma basis, members' equity of $76 million; receivables from customers of $2.26 billion; and total assets of $55.6 billion.

117. The textual portions of the Offering Memorandum also included a significant amount of financial information. For example, the MD&A section contains the following statements:

(a) "General, administrative and other expenses on a consolidated basis for the three months ended May 31, 2004 increased $14.8 million, or 34.7%, to $57.5 million from $42.7 million for the three months ended May 31, 2003."

(b) "General, administrative and other expenses on a consolidated basis for the year ended February 29, 2004 increased $33.5 million, or 20.0%, to $200.9 million from $167.4 million for the year ended February 28, 2003."

(c) "Operating profit on a consolidated basis for the three months ended May 31, 2004 increased $21.2 million, or 44.9%, to $68.4 million from $47.2 million for the three months ended May 31, 2003."

(d) "Operating profit on a consolidated basis for the year ended February 29, 2004 increased $42.9 million, or 27.2%, to $200.6 million from $157.7 million for the year ended February 28, 2003."

(e) "We currently have no off balance sheet arrangements."

(f)     "We generated significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures.  For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to 2004, our average capital expenditures were $16.0 million for the same period."

(g)     "[O]ur management has demonstrated its ability to operated in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA.  From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x."

118.    The statements set forth above were materially untrue because Refco failed to disclose the existence of hundreds of millions of dollars of uncollectible receivables, related-party transactions, and guarantees.  Among other things, the reported results for receivables from customers, net assets, members' equity, net income and EBITDA discussed above were materially overstated, and the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated.  Further, the pro forma financial statements were based on the Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts.

119.    The Company and the THL Partner Defendants have publicly admitted that Refco's reported financial information for fiscal years 2002, 2003 and 2004, as contained in the Offering Memorandum, was untrue and should not be relied upon.  Specifically, on October 10, 2005, Refco announced that the Company's financial statements for fiscal years 2002, 2003, and 2004, among other periods – taken as a whole – could no longer be relied upon.  The THL

49

Partner Defendants have also conceded, in a complaint filed in this District on November 14, 2005, and styled Thomas H. Lee Equity Fund V., L.P., et al. v. Phillip R. Bennett, et al., No. 05 Civ. 9608 (S.D.N.Y.) (the "THL Complaint"), that the Company's financial statements for these periods (and others) contained untrue statements of material facts.

120.    In addition to the foregoing admissions of Refco and the THL Partner Defendants, Lead Plaintiffs have, in the course of their ongoing investigation, gathered substantial evidence concerning the scope of the untrue statements in the financial statements contained in the Offering Memorandum. Lead Plaintiffs have reviewed documents and conducted witness interviews pertaining to several sets of transactions between Refco and third party customers of Refco which show, among other things, that the financial statements and description of the Company's historical performance contained in the Offering Memorandum contained material statements and omissions of material fact because:

(a)    For a seven-day period bracketing February 28, 2000, the final day of Refco's fiscal year 2000, a receivable from Refco Holdings to Refco in the amount of $300,000,000 was temporarily replaced with a receivable in the amount of $300,000,000 from Defendant BAWAG;

(b)    For a twelve-day period bracketing February 28, 2001, the final day of Refco's fiscal year 2001, a receivable from Refco Holdings to Refco in the amount of $550,000,000 was temporarily replaced with (1) a receivable in the amount of $250,000,000 from a third party named Ingram Micro, Inc. ("Ingram"), and (2) a receivable in the amount of $300,000,000 from Defendant BAWAG;

(c)    For a twelve-day period bracketing February 28, 2002, the final day of Refco's fiscal year 2002, a receivable from Refco Holdings to Refco in the amount of

50

$625,000,000 was temporarily replaced with (1) a receivable in the amount of $325,000,000 from a third-party customer of Refco ("Customer X"), and (2) a receivable in the amount of $300,000,000 from Defendant BAWAG;

(d)     For a sixteen-day period bracketing February 28, 2003, the final day of Refco's fiscal year 2003, a receivable from Refco Holdings to Refco in the amount of $750,000,000 was temporarily replaced with (1) a receivable in the amount of $500,000,000 from Customer X, and (2) a receivable in the amount of $250,000,000 from Defendant BAWAG;

(e)     For a seventeen-day period bracketing February 29, 2004, the final day of Refco's fiscal year 2004, a receivable from Refco Holdings to Refco in the amount of $970,000,000 was temporarily replaced with (1) a receivable in the amount of $720,000,000 from Customer X, and (2) a receivable in the amount of $250,000,000 from Defendant BAWAG;

(f)     For a twelve-day period bracketing May 31, 2004, the final day of Refco's first quarter for fiscal year 2005, a receivable from Refco Holdings to Refco in the amount of $700,000,000 was temporarily replaced with a receivable in the amount of $700,000,000 from Customer X.

121.    Further, a criminal indictment filed against Bennett on November 10, 2005 by the United States Attorney for this District (the "Indictment") states that Refco "failed to disclose" hundreds of millions of dollars of indebtedness and related-party transactions between Refco, certain of its customers and a company wholly owned by Bennett. The Indictment states that the indebtedness occurred, but was not disclosed, in or about 1999. The Indictment also states that the undisclosed related-party transactions started in or about 1999, and it sets forth details for

some of the related-party transactions.  These include that, on or about February 20, 2004 (just prior to the close of Refco's fiscal year 2004), Refco carried out an undisclosed related-party transaction of approximately $720 million.  Upon information and belief, the February 2004 transaction referred to in the Indictment is the same transaction between Refco and Customer X referred to in ¶120(e) above.

122.    In addition to the foregoing, the Offering Memorandum contained materially untrue statements by the Company's outside auditor.  Defendant Grant Thornton's statements that it had "conducted [its] audits in accordance with the auditing standards generally accepted in the United States of America" and that "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and its subsidiaries as of February 29, 2004 and February 28, 2003, and the results of their operations and their cash flows for each of the two years then ended in conformity with accounting principles generally accepted in the United States of America" constituted untrue statements of material facts.  Grant Thornton, as set forth more fully below, had not conducted its audits in accordance with GAAS.  Further, the Company's financial statements as of February 29, 2004 and February 28, 2003 and the results of its operations and cash flows for each of the two years then ended did not present fairly, in all material respects, the Company's financial position in accordance with GAAP.

> **(b)    The Description of Customer Receivables and Related-Party Transactions in the Offering Memorandum Contained Untrue Statements and Omissions of Material Fact**

123.    To assure investors that the Bonds were a sound investment, the Offering Memorandum stressed that the Company had adequately accounted for doubtful accounts and

related-party transactions.  With respect to receivables from and payable to customers, the Notes

To Consolidated Financial Statements stated:

> **Receivables from and payable to customers**
>
> These balances primarily pertain to margin and open contractual commitments related to customer futures, foreign currencies and securities transactions. … For certain receivables that are not fully secured and where the Group deems appropriate, the Group pursues collection of these receivables through various means, including legal action, and provides reserves when, in the opinion of management, such reserves are appropriate.  Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively.

124.    Similarly, the MD&A section of the Offering Memorandum stated:

> **Receivables from customers-provisions for doubtful accounts**.  Our receivables are generally collateralized with marketable securities.  For certain customer receivables that are not fully secured, we establish reserves when, in the opinion of management, such reserves are appropriate.  Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively.

125.    Further, the Offering Memorandum stated the following regarding related-party

transactions:

> The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties.  Interest is generally charged at prevailing market rates.  The $105 million due from Refco Group Holdings, Inc., included in receivables from customers at February 28, 2003, was received by February 29, 2004.
>
> As of February 29, 2004 and February 28, 2003, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who is a member, of $210 million and $175 million, respectively.  These balances were included in "Receivables from customers" and liquidated shortly after each year-end.

126.    These statements contained untrue statements and omissions of material facts

because they failed to account for the existence of material related-party transactions and related-

party indebtedness between the Company, Refco Holdings and BAWAG, or that the reserves

provided against receivables from customers as of February 29, 2004 and February 28, 2003

were grossly insufficient, given the $970 million in uncollectible receivables that the Company

was carrying on its books.  Further, the Offering Memorandum failed to disclose that the

receivable from Refco Holdings was "paid" by February 29, 2004 only because the Company

had loaned Refco Holdings several hundred million dollars through BAWAG and/or third-parties

to facilitate that "payment."  The Offering Memorandum also mischaracterized and failed to

disclose the full extent of the related-party transactions between Refco and BAWAG, by stating

that the Company had "deposits" with BAWAG Overseas of $210 million and $175 million as of

February 29, 2004 and February 28, 2003, respectively, without disclosing any of the loan

transactions referenced above.

### (c)   The Offering Memorandum Misrepresented the Reasons for the Company's Purported Success

127.   The Offering Memorandum portrayed the Company as a rising star in the

derivatives market led by a team of dedicated and talented executives.  For example, the Offering

Memorandum stated:

> From fiscal year 2000 through fiscal year 2004, our net revenues and
> EBITDA . . . have increased at a compound annual growth rate of 20.6%
> and 29.4%, respectively, as a result of organic growth and acquisitions.
> For the twelve months ended May 31, 2004 ("LTM") on a pro forma basis
> after giving effect to the Transactions, we generated $1,008.0 million and
> $269.0 million of net revenues and EBITDA, respectively.

128.   The Company attributed these remarkable results to its "proven and committed

management team," stating:

> We are led by a senior management team that has an average of 22 years
> of industry experience.  Phillip Bennett, who has been with us for 23
> years, became our President and CEO in 1998 and formed a new senior
> management team comprised of well respected industry professionals.
> Under the leadership of our senior management team, net revenues and
> EBITDA have grown at a compound annual growth rate of 20.6% and
> 29.4%, respectively, from fiscal year 2000 through fiscal year 2004.

54

129. These statements contained untrue statements of material facts because the Company's financial statements for fiscal years 2002, 2003 and 2004 materially overstated the Company's EBITDA. Thus, the Company's purported financial results in fiscal years 2000 through 2004 were not due to the "leadership" of its "proven and committed management team," but rather were the result of the failure to disclose uncollectible receivables and related-party transactions, which rendered the Company's financial results for fiscal years 2000 through 2005 materially untrue.

**(d)     The Offering Memorandum Misrepresented the Company's Ability to Access the Cash It Needed to Service Its Debt**

130. As discussed above, the Company incurred significant debt in connection with the 2004 recapitalization. As a result, its operations were highly leveraged. The Offering Memorandum emphasized that ready access to cash was critical to the Company's ability to service this debt:

> **To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.**
>
> Our ability to make payments on and to refinance our indebtedness, including the notes and amounts borrowed under our senior credit facilities, and to fund our operations, will depend on our ability to generate cash in the future, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors beyond our control.

(Emphasis in original).

131. Because ready access to cash was essential to its business, the Company had an interest in maintaining its high credit rating. The Offering Memorandum disclosed that a reduction in the Company's credit rating could cause a host of unwelcome problems:

55

**Liquidity Risk**

Ready access to cash is essential to our business. … Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under certain bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements.

(Emphasis in original).

132. The Company's ability to access cash to service its debt was of crucial importance to potential Bond investors, because the Bonds were subordinated to the Company's senior indebtedness, including $800 million in term loans and up to $75 million in borrowings that could be incurred under the revolving credit facility.

133. Because PIMCO, the PIMCO High Yield Fund, and other members of the Class understood when they purchased the Bonds that the Company's ability to make required payments on the Bonds was subject to its ability to generate sufficient cash, any facts that could affect the Company's ability to access the cash it needed to service its senior debt were of special significance to PIMCO, the PIMCO High Yield Fund, and other members the Class.

134. Accordingly, the Company and those Defendants who prepared the Offering Memorandum took steps to assure PIMCO, the PIMCO High Yield Fund, and other members of the Class that the Company was generating sufficient cash to service its debt and, thus, would be in a position to make required payments on the Bonds. For example, the Offering Memorandum stated:

56

We generate significant free cash flow afforded by high margins and a business model that allows us to grow without significant capital expenditures. For our fiscal year 2004, we generated EBITDA of $258.0 million with capital expenditures of $11.2 million. While our EBITDA has increased from $92.0 million to $258.0 million from fiscal year 2000 to 2004, our average capital expenditures were $16.0 million for the same period. In addition, our management has demonstrated its ability to operate in a leveraged capital structure by improving our leverage ratio, which we define as the ratio of long-term debt and preferred securities issued by subsidiaries to EBITDA. From fiscal year 2000 to fiscal year 2004, our total leverage ratio decreased from 4.0x to 1.5x.

135.    The statements identified above contained untrue statements and omissions of material facts. The Company had severely jeopardized its credit rating and had overstated its ability to generate the cash that it needed to service its debt (and, accordingly, its ability to make the payments that would come due on the Bonds) by including untrue material statements of fact in its financial statements, and by failing to disclose the existence of hundreds of millions of dollars in uncollectible receivables and the Refco Group Guaranty given to Customer X. If the truth had been disclosed, it would have shown that Refco failed to comply with its minimum capital requirements and thus impaired its ability to conduct its business. In addition, the EBITDA results and leverage ratios discussed above were materially overstated because they were based on the untrue financial statements.

**(e)     The Offering Memorandum Misrepresented
That the Company Had Taken Adequate Steps to
Protect Itself From the Risk of Customer Defaults**

136.    The Company's exposure to customer defaults further compounded the risks associated with its high degree of leverage. As the Offering Memorandum explained:

We act on behalf of our customers for all trades consummated both on exchanges and in OTC markets. Accordingly, we are responsible for our customers' obligations with respect to these transactions, which exposes us to significant credit risk. Our customers may default on their obligations due to bankruptcy, lack of liquidity, operational failure or other reasons. A substantial part of our working capital is at risk if customers default on their obligations to us and their margin and security

57

deposits are insufficient to meet all of their obligations. We cannot assure you that we will not be materially and adversely affected in the event of a significant default by our customers.

137. To allay potential investors' fears that these credit risks would prevent the Company from making required payments on the Bonds, the Company touted the steps it had taken to minimize the risk of customer default. In fact, the Company named its "Attractive Risk Profile" as a "Competitive Strength," stating:

> We have built a comprehensive risk management system throughout our operations to limit and monitor our exposure to customer and counterparty risk. … In order to mitigate customer and counterparty risk, we implement margin technologies, mark-to-market risk management tools, internal review and executive approval procedures and rigorous risk monitoring. As a result of our risk management techniques, we have had limited credit losses resulting from our customer or counterparty defaults since fiscal year 2000, even through such recent volatile events as the terrorist attacks on September 11, 2001.

138. Further, the MD&A Section of the Offering Memorandum stated:

> As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. … Using various stress tests, we quantify potential adverse price movements in order to determine whether such movements would adversely affect the customer's ability to pay margin. We perform frequent stress tests to our customers' positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis, position liquidity analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments.

139. These statements contained untrue statements and omissions of material facts because, contrary to the Company's espoused commitment to safeguarding itself against customer defaults, the Company had experienced significant customer defaults that were not disclosed to the investing public, and which materially impaired the Company's working capital. Further, the Company's financial statements contained untrue material statements and material omissions concerning its hundreds of millions of dollars in uncollectible debt, which was

58

inaccurately reflected on the Company's books as a "customer receivable." This uncollectible

debt, if properly disclosed, would have jeopardized the Company's credit rating and its ability to

pay down the senior indebtedness described above, and been a material fact weighed in the

investment decisions of PIMCO, the PIMCO High Yield Fund, and other members of the Class.

**(f)    The Offering Memorandum Misrepresented That
the Company Maintained Excess Regulatory Capital**

140.    The Company operated in a heavily regulated environment that imposed unique

requirements on its business operations. Among other things, the Company was required to

carry a certain amount of regulatory capital on its books as a condition of its continued operation.

In fact, the Offering Memorandum acknowledged that the Company's failure to maintain

adequate capital levels could be fatal to its continued existence:

> The SEC, NASD, CFTC and various other regulatory agencies have
> stringent rules with respect to the maintenance of specific levels of net
> capital by securities broker-dealers and FCMs. Our failure to maintain the
> required net capital could result in suspension or revocation of our
> registration by the SEC and our suspension or expulsion by the NASD,
> and could ultimately lead to our liquidation.

141.    To assure potential Bond purchasers that the Company's operations were not at

risk of being shut down due to failure to comply with regulatory capital requirements, the

Offering Memorandum reported that the Company "maintain[ed] excess regulatory capital to

provide liquidity during periods of unusual market volatility." Specifically, the Offering

Memorandum stated that the Company's regulated subsidiaries, Refco LLC and Refco

Securities, LLC, exceeded their minimum regulatory capital requirements by $95.6 million and

$61.9 million, respectively.

142.    These statements contained untrue statements of material facts because the

Company's reported regulatory capital was overstated and the Company failed to disclose that

Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that

Refco Group would unconditionally repay Refco Holding's various loans from Customer X if Refco Holdings were to default for any reason. Upon information and belief, the Company would not have satisfied its regulatory capital requirements during the Class Period if the true facts were disclosed regarding its hundreds of millions of dollars of uncollectible receivables. To the extent the Company did maintain excess regulatory capital, the excess amounts were materially less than the figures reported in the Offering Memorandum and were not sufficient to "provide liquidity during periods of unusual market volatility," as represented in the Offering Memorandum.

### (g) The Offering Memorandum Failed to Disclose BAWAG's Full Ownership Interest in Refco Group

143. In describing the Company's ownership, the notes to the financial statements contained in the Offering Memorandum stated that the Company was 90% owned by Refco Holdings, and 10% owned by "BAWAG Overseas, Inc., a third party financial institution." This statement was materially incomplete and misleading, because the Offering Memorandum failed to disclose that BAWAG also held a security interest in another 27% of the Company's equity by virtue of its secret loans to DF Capital and other Bennett-controlled entities. As a result, investors were led to believe that BAWAG's interest in Refco was limited to 10%, when in fact it held interests in approximately 37% of the Company's equity and therefore BAWAG was in a position to exercise significant influence and control over the Company. In addition, the description of BAWAG Overseas as a "third-party financial institution" was materially misleading because it failed to disclose the true extent of the business dealings and interlocking relationships between BAWAG, Refco, Bennett, Refco Holdings and other Defendants throughout the Class Period.

60

### 2.     **The Bond Road Show**

144.    Defendants Bennett, Trosten and Jaeckel, together with representatives of the Bond Underwriter Defendants, led a nationwide road show in July 2004 in an effort to convince investors to purchase the Bonds (the "Bond Road Show").  The Bond Road Show was organized by the Bond Underwriter Defendants, who identified and contacted potential investors and invited them to attend.  The Bond Road Show made stops in various cities across the United States and visited numerous institutional investors, including a visit to PIMCO's Newport Beach, California office on July 16, 2004.

145.    During the Bond Road Show, Defendants Bennett, Trosten, Jaeckel and representatives of the Bond Underwriter Defendants  made numerous oral statements relating to the Offering Memorandum and to the Company's financial condition and results, including liberal use of the financial statements contained in the Offering Memorandum, which, as explained above, contained untrue statements of material facts.

146.    Among other things, Defendants Bennett and Trosten told investors during the Bond Road Show that the Company had experienced only about $1 million in customer credit losses in the preceding five years (1999-2003), and had suffered no such losses in 1998.  These statements were materially untrue and omitted to state material facts because they did not disclose the hundreds of millions of dollars in customer credit losses that the Company had suffered in 1997 and 1998, which had been hidden from the Company's books.

147.    Investors were also presented with slide and/or written presentations at the Bond Road Show which, upon information and belief, were prepared by Defendants Bennett, Trosten, Jaeckel, and the Bond Underwriter Defendants, and which incorrectly stated that the Company had achieved EBITDA of $208 million and $256 million for fiscal years 2003 and 2004, respectively, and $289 million for the twelve months ending May 31, 2004.  These figures were

materially untrue because of Defendants' failure to write off hundreds of millions of dollars in uncollectible receivables and failure to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay Refco Holding's various loans from Customer X if Refco Holdings were to default for any reason.

148. In reliance on the information received during the Bond Road Show, the information contained in the Offering Memorandum (including the untrue financial statements contained therein, which, as set forth above, contained untrue statements of material fact), and the Company's commitment to complete the Exchange Offer, PIMCO, the PIMCO High Yield Fund, and numerous other institutional investors purchased the 144A Bonds.

### 3. The Bond Registration Statement

149. Pursuant to the Registration Rights Agreement, the Company filed a Form S-4 Registration Statement with the SEC on October 12, 2004, which was subsequently amended through Form S-4/A filings dated December 10, 2004; January 12, 2005; February 23, 2005; March 11, 2005; April 5, 2005; and April 6, 2005 (collectively, the "Bond Registration Statement"). The filing of the Bond Registration Statement with the SEC allowed for the conversion of all of the 144A Bonds from restricted to freely tradable securities, as originally contemplated in the Offering Memorandum.

150. The Bond Registration Statement became effective, and Registered Bonds were issued pursuant thereto, on or about April 13, 2005.

151. The co-issuers of the Registered Bonds were Refco Group and its wholly-owned subsidiary, Refco Finance. Additionally, there were a number of co-registrants for the Registered Bonds, including, among others, Lind-Waldock, Refco Futures, and Westminster-Refco.

152. Defendant Bennett signed the Bond Registration Statement on behalf of Refco Group. In addition, Defendants Sherer, Murphy, Sexton, Maggio, Silverman and Klejna (through their attorney-in-fact Defendant Bennett) signed the Bond Registration Statement on behalf of Refco Group. Other signatories on the Registration Statement included Refco Finance (through Bennett and Silverman), Lind-Waldock (through Bennett and Silverman), Refco Futures (through Bennett, Silverman and Murphy), and Westminster-Refco (through Bennett, Silverman and Murphy).

153. The Offering Memorandum was used as the foundation for preparing the Bond Registration Statement, and, therefore, the two documents were substantially similar in content. This fact was understood and expected by the parties that prepared the Offering Memorandum, including the Bond Underwriter Defendants, and thus those parties knew when they were preparing the Offering Memorandum that they were also preparing statements which would be repeated in the Bond Registration Statement. Further, upon information and belief, the Bond Underwriter Defendants participated in the preparation of the Bond Registration Statement itself. The Bond Registration Statement contained statements substantially similar to those set forth above from the Offering Memorandum, which contained untrue statements of material facts for the same reasons that the statements in the Offering Memorandum contained untrue statements of material facts.

154. The Bond Registration Statement contained the Company's audited financial statements for fiscal years 2003 and 2004, as well as Grant Thornton's audit report thereon. In the original Form S-4 filed on October 12, 2004, these audited financial statements and audit opinion were identical to those in the Offering Memorandum, and contained untrue statements of material facts for the same reasons.

63

155. In the amendments to the Form S-4, although the figures for net income, total assets, and members' equity were the same as in the Offering Memorandum, different figures were reported for certain line items on the financial statements, including, but not limited to: cash and cash equivalents; receivables from customers; payables to customers; total revenues (as well as all component items of total revenues); and general, administrative and other expenses. In the December 2004 and subsequent amendments of the Bond Registration Statement, the Company reported customer receivables of $1,591,385,000 and $1,490,380,000 for fiscal years 2004 and 2003, respectively (net of $65.2 million and $42.7 million in reserves, respectively); and $170,415,000 and $142,585,000 in general, administrative and other expenses for those periods, respectively. In addition, the December 2004 and subsequent amendments of the Bond Registration Statement reflect $210 million and $280 million in receivables from equity members, where as the Offering Memorandum and the original Form S-4 disclosed none.

156. The audited financial statements in the amendments to the Bond Registration Statement, though different from those in the Offering Memorandum, contained untrue statements of material facts for the same reasons as those in the Offering Memorandum, including the failure of the Company to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay Refco Holding's various loans from Customer X if Refco Holdings were to default for any reason. Specifically, the reported results for members' equity and net income were materially overstated, while the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated.

157. The related-party disclosures in the amendments to the Bond Registration Statement were also different from those in the Offering Memorandum and October 12, 2004

Form S-4, although they still contained untrue statements of material facts. Whereas the

Offering Memorandum had stated that a $105 million receivable from Refco Holdings and a

$210 million receivable from BAWAG were included in "receivables from customers" at

February 28, 2003, and that another $175 million deposit with BAWAG was included in

"receivables from customers" at February 29, 2004, the amendments to the Bond Registration

Statement stated that these receivables were included in "receivables from equity members" for

these same periods. Specifically, the related-party disclosures in the amendments to the Bond

Registration Statement stated:

> The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates. The $105.3 million due from Refco Group Holdings, Inc., included in "Receivables from equity members" at February 28, 2003, was received by February 29, 2004.
>
> As of February 29, 2004 and February 28, 2003, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who is a member, of $210.2 million and $175.2 million, respectively. These balances were also included in "Receivables from equity members" and liquidated shortly after each year-end.

(Emphasis added).

158.     These related-party disclosures in the Bond Registration Statement contained

untrue statements and omissions of material facts because Defendants failed to disclose the

existence and full extent of the related-party transactions and the related-party indebtedness

between the Company, Refco Holdings and BAWAG described herein. Further, the Bond

Registration Statement failed to disclose the Refco Group guaranty to Customer X or the fact

that the receivable from Refco Holdings was "paid" by February 29, 2004 only because the

Company had loaned Refco Holdings several hundred million dollars through BAWAG and a

third-party to facilitate that "payment."

65

159. Despite the differences in the financial statements and disclosures contained in the October 12, 2004 Form S-4 filing and the subsequent amendments of the Bond Registration Statement, the same audit report from Grant Thornton, dated October 8, 2004, accompanied each. The audit report in the Bond Registration Statement, which was included with Grant Thornton's consent, contained untrue statements of material facts for the same reasons as set forth above with respect to the audit report in the Offering Memorandum, namely, it inaccurately represented that Grant Thornton conducted its audits in accordance with GAAS and that the Company's financial statements "present[ed] fairly, in all material respects, the financial position of [the Company] … in conformity with accounting principles generally accepted in the United States of America."

160. The Notes To Consolidated Financial Statements in the Bond Registration Statement contained the following disclosures concerning customer receivables and payables:

Receivables from customers at each year end are as follows:

|  | 2004 | 2003 |
|---|---|---|
|  | **(in thousands)** | |
| Futures transactions | $ 212,299 | $ 209,629 |
| Foreign currency and other OTC derivative transactions | 38,724 | 364,711 |
| Securities transactions | 1,340,362 | 916,040 |
|  | $ 1,591,385 | $ 1,490,380 |

***

These receivables are generally collateralized with marketable securities. The Group's allowance for doubtful accounts is based upon management's continuing review and evaluation of factors such as collateral value, aging and the financial condition of the customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. The Group pursues collection of these receivables through various means, including legal action and collection agencies, and

66

generally does not charge-off any of these receivables. Reserves of $65.2 million and $42.7 million have been provided against receivables from customers as of February 29, 2004 and February 28, 2003, respectively.

161. These disclosures omitted to state material facts, because they failed to disclose that the reserves provided against receivables from customers as of February 29, 2004 and February 28, 2003 were grossly insufficient, given the (at least) $970 million in uncollectible receivables – amounting to nearly half of the Company's reported receivables – that the Company was carrying on its books. They also failed to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay Refco Holding's various loans from Customer X if Refco Holdings were to default for any reason.

162. The Bond Registration Statement also contained unaudited financial information relating to periods post-dating the Offering Memorandum. Specifically, the Company reported that it had incurred general, administrative and other expenses in the amounts of $97 million and $76 million for the periods from March 1, 2004 through August 5, 2004 and from August 6, 2004 through November 30, 2004, respectively; that it had earned net income of $98 million and $43 million in those same periods, respectively; and that it had members' equity of $127 million as of November 30, 2004.

163. Further, the Company provided Unaudited Pro Forma Consolidated Statements of Income for fiscal year 2004, and for the nine months ended November 30, 2004. The Unaudited Pro Forma Consolidated Statements of Income treated the Bond Offering and related transactions as if they had occurred on March 1, 2003. For fiscal year 2004, the Bond Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $190,323,000 and net income of $114,769,000. For the nine months ended November 30, 2004, the Bond

67

Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $181,015,000 and net income of $105,478,000.

164. The pro forma financial data contained in the Bond Registration Statement was based on the Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts.

165. In addition to the admissions of Refco and the THL Partner Defendants and other evidence concerning the financial statements in the Offering Memorandum discussed above in ¶¶109-122, Lead Plaintiffs' investigation has revealed that the additional financial statements contained in the Bond Registration Statement contained materially untrue statements and omissions of material fact because:

(a) For a fourteen-day period bracketing August 30, 2004, the final day of Refco's second quarter for fiscal year 2005, a receivable from Refco Holdings to Refco in the amount of $485,000,000 was temporarily replaced with a receivable in the amount of $485,000,000 from Customer X; and

(b) For a nine-day period bracketing November 30, 2004, the final day of Refco's third quarter for fiscal year 2005, a receivable from Refco Holdings to Refco in the amount of $545,000,000 was temporarily replaced with a receivable in the amount of $545,000,000 from Customer X.

**D.      The August 2005 Initial Public Offering**

166. On or about August 10, 2005, Refco sold approximately 20% of its shares to RH Capital and other members of the Class in the IPO. Defendants Credit Suisse, Goldman Sachs, and BAS acted as Joint Book-Running Mangers of the IPO. Defendants Deutsche Bank, J.P. Morgan, Sandler O'Neill, and HSBC acted as Co-Managers of the IPO. Defendants William

Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams Capital, and Utendahl acted as underwriters of the IPO.

167.  In order to issue stock to the investing public, Refco formed a new holding company.  The chart below (taken from the IPO Prospectus) summarizes the structure of the Company upon completion of the August 2005 IPO:



### 1.      **The IPO Registration Statement**

168.  In the August 2005 IPO, Refco offered approximately $670 million worth of stock to the investing public as follows: (1) 26,500,000 shares as part of the initial IPO, and (2) an additional 3,975,000 shares issued pursuant to an option (known as the "green shoe option") granted to the Stock Underwriter Defendants  by Refco to cover over-subscriptions of shares. The August 2005 IPO was conducted pursuant to a Form S-1 registration statement dated April 8, 2005, a Form S-1/A registration statement dated May 27, 2005, a Form S-1/A registration statement dated July 1, 2005, a Form S-1/A registration statement dated July 20, 2005, a Form S-

1/A registration statement dated July 25, 2005, a Form S-1/A registration statement dated August 8, 2005, a Form S-1/A registration statement dated August 10, 2005, and a Form 424B1 prospectus dated August 10, 2005 (the "IPO Prospectus" or the "Prospectus") (collectively, the "IPO Registration Statement"), which were filed with the SEC.

169. The IPO Registration Statement was signed by Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen.

170. The IPO Registration Statement includes the Company's audited financial statements for fiscal years 2003, 2004, and 2005. These audited financial statements include the Company's audited consolidated statements of income, statement of changes in members' equity and consolidated statements of cash flows, as of February 28, 2005, February 29, 2004, and February 28, 2003, and the Company's audited consolidated balance sheet as of February 28, 2005 and February 29, 2004.

171. As set forth below, the IPO Registration Statement pursuant to which RH Capital and other members of the Class were induced to purchase Refco stock contained a number of untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading.

**(a)     The Financial Statements in the IPO Registration Statement Contained Untrue Statements of Material Facts**

172. The IPO Registration Statement contained financial statements and other statements regarding the Company's financial performance that purported to demonstrate the Company's soundness, but which in reality contained untrue statements of material facts and omitted to state material facts required therein or necessary to make the statements therein not misleading. These statements were made in several contexts, including (1) in the audited financial statements included in the IPO Registration Statement; (2) in the discussion of certain

70

historical consolidated financial data derived from Refco's audited consolidated financial statements; (3) in the unaudited financial statements included in the IPO Registration Statement; (4) in the discussion of certain historical consolidated financial data derived from Refco's unaudited consolidated financial statements; and (5) in statements made in the MD&A and other textual portions of IPO Registration Statement.

173.    Refco's Consolidated Balance Sheets, as audited and certified by Grant Thornton and as included in the IPO Registration Statement, stated that the Company had receivables from customers (net of $61,190,000 in reserves) of $2,081,968,000 and $1,591,385,000 (net of $65,200,000 in reserves) for fiscal years 2005 and 2004, respectively; total assets of $48,765,349,000 and $33,332,172,000 for fiscal years 2005 and 2004, respectively; and members' equity of $150,250,000 and $616,084,000 for fiscal years 2005 and 2004, respectively.

174.    Refco's Consolidated Statements of Income contained in the IPO Registration Statement, reported that the Company had net income of $176,287,000, $187,156,000 and $140,119,000 for fiscal years 2005, 2004, and 2003, respectively; and general, administrative and other expenses of $243,546,000. $170,415,000 and $142,585,000 for fiscal years 2005, 2004, and 2003, respectively.

175.    Grant Thornton gave its written consent to the incorporation of its audit opinion on the Company's fiscal years 2003, 2004, and 2005 financial statements into the IPO Registration Statement.  In the audit opinion, Grant Thornton certified that those financial statements had been prepared in accordance with GAAP.  Grant Thornton's report stated:

**REPORT OF INDEPENDENT REGISTERED**
**PUBLIC ACCOUNTING FIRM**

To the Members of
**New Refco Group Ltd., LLC**

71

We have audited the accompanying consolidated balance sheet of New Refco Group Ltd., LLC (the "Successor" or "Company") (a Delaware limited liability company) and subsidiaries as of February 28, 2005 and the related consolidated statements of income, changes in members' equity and cash flows for the period from August 6, 2004 through February 28, 2005….

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement…

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of New Refco Group Ltd., LLC and subsidiaries as of February 28, 2005, and the results of their operations and their cash flows for the period from August 6, 2004 through February 28, 2005 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note H(1)(i), the notes to the consolidated financial statements have been restated to include summarized financial information related to a significant equity method investment.

Grant Thornton LLP
New York, New York
May 24, 2005 (except for Note H(1)(i) as to which the date is July 19, 2005)

In a second audit opinion letter incorporated in the IPO Registration Statement, Grant Thornton gave the same opinion regarding the Company's financial statements for Refco's consolidated balance sheet as of February 29, 2004 and the related consolidated statements of income, changes in the members' equity and cash flows for the period from March 1, 2004 through August 5, 2004 and for fiscal years 2003 and 2004.

176.    In addition to the financial statements audited by Grant Thornton, the IPO Registration Statement presented certain historical consolidated financial data derived from the Company's audited consolidated financial statements for fiscal years 2002, 2003, 2004, and 2005, including the information set forth in the following chart (in millions):

72

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 80 of 301

|  | **FY 2002** | **FY 2003** | **FY 2004** | **FY 2005** |
|---|---|---|---|---|
| **Total Assets** | $22,611 | $19,215 | $33,332 | $48,765 |
| **Members Equity** | $515 | $566 | $616 | $150 |

177.    The IPO Registration Statement also included the Company's unaudited financial statements for the three month periods ending May 31, 2005 and May 31, 2004.  These unaudited financial statements included the Company's consolidated balance sheets for the three months ended May 31, 2005, and its consolidated statements of income, consolidated statements of changes in members' equity and consolidated statements of cash flows for the three months ended May 31, 2005 and May 31, 2004.  The unaudited financial statements included in the IPO Registration Statement stated that Refco had:

(a)    Total assets of $74,317,191,000 for the three months ended May 31, 2005;

(b)    Members' equity of $185,427,000 and $671,100,000 for the three months ended May 31, 2005 and May 31, 2004, respectively;

(c)    Receivables from customers of $1,807,446,000 (net of reserves of $62,107,000) and $2,081,968,000 (net of reserves of $61,190,000) for the three months ended May 31, 2005 and fiscal year 2005, respectively; and

(d)    Net income of $42,587,000 and $59,270,000 for the three months ended May 31, 2005 and May 31, 2004, respectively.

178.    The IPO Registration Statement also included Unaudited Pro Forma Consolidated Statements of Income for the year ended February 28, 2005 and the three months ended May 31, 2005.  The Unaudited Pro Forma Consolidated Statements of Income treated the Bond Offering and related transactions as if they had occurred on March 1, 2004.  For fiscal year 2005, the IPO

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 81 of 301

Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $247,239,000 and net income of $105,681,000. For the three months ended May 31, 2005, the IPO Registration Statement reflected, on a pro forma basis, general, administrative and other expenses of $61,456,000 and net income of $31,920,000.

179. Further, the IPO Registration Statement included an Unaudited Pro Forma Consolidated Balance Sheet as of May 31, 2005. The Unaudited Pro Forma Consolidated Balance Sheet treated the Bond Offering and related transactions as if they had occurred on May 31, 2005. As of May 31, 2005, the IPO Registration Statement reflected, on a pro forma basis, receivables from customers (net of reserves) of $1,807,446,000; total assets of $74,413,468,000; and members' equity of $491,704,000.

180. In addition, the IPO Registration Statement included financial information derived from the Company's unaudited consolidated financial statements for fiscal year 2001. For example, the IPO Registration Statement reported that the Company had net income of $72 million; total assets of $18,277 million; and members' equity of $500 million for that fiscal year.

181. The IPO Registration Statement also included a significant amount of financial information set forth in the textual portions of the IPO Prospectus, including the MD&A section. For instance, the IPO Prospectus stated: "[F]or the year ended February 28, 2005, we generated … $176.3 million of net income and for the three months ended May 31, 2005, we generated … $42.6 million of net income." The Prospectus also makes the following statements, among others, regarding the Company's financial results and business operations:

> (a) "operating profit has increased from $61.0 million in fiscal year 2000 to $150.6 million in fiscal year 2005, a compound annual growth rate of 19.8%";

74

(b)     "Derivatives Brokerage & Clearing Operating profit for the three months ended May 31, 2005 decreased $5.4 million, or 13.2%, to $35.5 million from $40.9 million for the three months ended May 31, 2004."

(c)     "Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2005 increased $18.5 million, or 58.5%, to $50.1 million from $31.6 million for the three months ended May 31, 2004."

182.    In addition, the IPO Registration Statement includes certain information regarding Refco's purported compliance with its credit covenants, including the statement that the Company's Consolidated EBITDA for the twelve months ended May 31, 2005 was $296,747,000 and that its Actual Leverage Ratio was 3.03x.

183.    These statements were materially untrue because Refco failed to disclose the existence of hundreds of millions of dollars worth of uncollectible receivables and related-party transactions, and failed to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay Refco Holding's various loans from Customer X if Refco Holdings were to default for any reason. Among other things, the reported results for receivables from customers, net assets, members' equity, net income and EBITDA discussed above were materially overstated, and the reported results for general, administrative and other expenses (which includes allowances for doubtful accounts) were materially understated. Further, the pro forma financial statements were based on the Company's misstated financial results and, therefore, contained untrue statements of material facts for the same reasons the Company's financial results contained untrue statements of material facts. As discussed in ¶119 above, on October 10, 2005, Refco admitted that, because of this uncollectible receivable and the undisclosed related-party transactions, the

75

Company's financial statements for fiscal years 2002, 2003, 2004, 2005 and the quarter ended

May 31, 2005, each of which was included in the IPO Registration Statement, could no longer be

relied upon. As also noted in ¶119 above, the THL Partner Defendants have likewise admitted in

the THL Complaint that the Company's financial statements for each of these periods contained

untrue statements of material facts.

184. In addition to the foregoing admissions of Refco and the THL Partner Defendants,

Lead Plaintiffs' investigation has gathered substantial evidence concerning the scope of the

untrue statements in the financial statements contained in the IPO Registration Statement. As

describe above, Lead Plaintiffs have reviewed documents and conducted witness interviews

relating to several sets of transactions between Refco and third-party customers of Refco and/or

BAWAG, which show, among other things, that the financial statements and description of the

Company's historical performance contained in the IPO Registration Statement contained

material statements and omissions of material fact because:

> (a)     For a seven-day period bracketing February 28, 2000, the final day of
> Refco's fiscal year 2000, a receivable from Refco Holdings to Refco in the amount of
> $300,000,000 was temporarily replaced with a receivable in the amount of $300,000,000
> from Defendant BAWAG;

> (b)     For a twelve-day period bracketing February 28, 2001, the final day of
> Refco's fiscal year 2001, a receivable from Refco Holdings to Refco in the amount of
> $550,000,000 was temporarily replaced with (1) a receivable in the amount of
> $250,000,000 from Ingram, and (2) a receivable in the amount of $300,000,000 from
> Defendant BAWAG;

(c)     For a twelve-day period bracketing February 28, 2002, the final day of Refco's fiscal year 2002, a receivable from Refco Holdings to Refco in the amount of $625,000,000 was temporarily replaced with (1) a receivable in the amount of $325,000,000 from Customer X, and (2) a receivable in the amount of $300,000,000 from Defendant BAWAG;

(d)     For a sixteen-day period bracketing February 28, 2003, the final day of Refco's fiscal year 2003, a receivable from Refco Holdings to Refco in the amount of $750,000,000 was temporarily replaced with (1) a receivable in the amount of $500,000,000 from Customer X, and (2) a receivable in the amount of $250,000,000 from Defendant BAWAG;

(e)     For a seventeen-day period bracketing February 29, 2004, the final day of Refco's fiscal year 2004, a receivable from Refco Holdings to Refco in the amount of $970,000,000 was temporarily replaced with (1) a receivable in the amount of $720,000,000 from Customer X; and (2) a receivable in the amount of $250,000,000 from Defendant BAWAG;

(f)     For a sixteen-day period bracketing February 29, 2005, the final day of Refco's fiscal year 2005, a receivable from Refco Holdings to Refco in the amount of $595,000,000 was temporarily replaced with (1) a receivable in the amount of $345,000,000 from Customer X, and (2) a receivable in the amount of $250,000,000 from Defendant BAWAG;

(g)     Between December 30, 2004 and January 4, 2005, a receivable from Refco Holdings to Refco in the amount of $550,000,000 was temporarily replaced with a receivable in the amount of $550,000,000 from Customer X;

Case 1:05-cv-08626-JSR   Document 86   Filed 05/05/06   Page 85 of 301

(h)     For a twelve-day period bracketing May 31, 2005, the final day of Refco's first quarter for fiscal year 2006, a receivable from Refco Holdings to Refco in the amount of $450,000,000 was temporarily replaced with a receivable in the amount of $450,000,000 from Customer X; and

(i)     For a twelve-day period bracketing August 30, 2005, the final day of Refco's second quarter for fiscal year 2006, a receivable from Refco Holdings to Refco in the amount of $420,000,000 was temporarily replaced with a receivable in the amount of $420,000,000 million from Customer X.

185.    As noted above, the Indictment charging Defendant Bennett describes the transaction between Refco and (upon information and belief) Customer X at the end of fiscal year 2004.  In addition, the Indictment alleges that (i) on or about February 23, 2005 (just prior to the close of Refco's fiscal year 2005), Refco carried out an undisclosed related-party transaction of approximately $345 million; and (ii) on or about May 25, 2005 (just prior to the close of Refco's fiscal quarter ended May 31, 2005), Refco carried out an undisclosed related-party transaction of approximately $450 million.  Upon information and belief, these allegations refer to Refco's transactions with Customer X described in subparagraphs (f) and (h) in the preceding paragraph.  The Indictment further states that, as a result of the undisclosed indebtedness and related-party transactions, the IPO Registration Statement contained "untrue statements of material facts and omit[ed] to state material facts required to be stated therein and necessary to make the statements therein not misleading."

186.    Defendant Grant Thornton's statements that it had "conducted [its] audits in accordance with the auditing standards generally accepted in the United States of America" and that "the  consolidated financial statements referred to above present fairly, in all material

respects, the financial position of Refco Group Ltd., LLC and its subsidiaries as of February 28, 2005, and the results of their operations and their cash flows for the period from August 6, 2004 through February 28, 2005 in conformity with accounting principles generally accepted in the United States of America" also constituted untrue statements of material facts. Grant Thornton's second audit opinion letter gave the same opinion regarding the Company's financial statements for Refco's consolidated balance sheet as of February 29, 2004 and the related consolidated statements of income, changes in the members' equity and cash flows for the period from March 1, 2004 through August 5, 2004 and for fiscal years 2003 and 2004. Grant Thornton, as set forth more fully below, had not conducted its audits in accordance with GAAS. Further, the Company's financial statements for the periods mentioned above and the results of its operations and cash flows for those same periods did not present fairly, in all material respects, the Company's financial position in accordance with GAAP.

> **(b) Description of Customer Receivables and Related-Party Transactions in the IPO Registration Statement Contained Untrue Statements and Omissions of Material Fact**

187. To assure investors that the Company was sound, the IPO Registration Statement stated that the Company had adequately accounted for doubtful accounts and related-party transactions. With respect to receivables from and payble to customers, the Notes to the Company's Consolidated Financial Statements state:

> **Receivables from and payable to customers**
>
> These balances primarily pertain to margin and open contractual commitments related to customers' futures, foreign currency forward and securities transactions. Receivables from and payable to customers in connection with futures and foreign currency forward transactions include gains and losses on open futures, options and forward contracts. Receivables from and payable to customers in connection with securities transactions include amounts due on cash and margin transactions.

* * *

> The Group's allowance for doubtful accounts is based upon management's continuing review and evaluation of factors such as collateral value, aging and the financial condition of the customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. The Group pursues collection of these receivables through various means, including legal action and collection agencies. Reserves of $61.2 million and $65.2 million have been provided against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. The Group generally nets receivables and payables related to its customers' futures, foreign currency forwards and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

(Emphasis in original).

188.    In addition, the MD&A section of the IPO Registration Statement provided:

> **Receivables from Customers -Provisions for Doubtful Accounts**. Our receivables are generally collateralized with marketable securities. For some customer receivables that are not fully secured, we establish reserves for doubtful accounts when, in the opinion of management, such reserves are appropriate. We have established reserves of $61.2 million and $65.2 million against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. Our allowance for doubtful accounts is based upon management's continuing review and evaluation of the factors such as collateral value, aging and the financial condition of our customers. The allowance is assessed to reflect best [sic] estimate of probably losses that have been incurred as of the balance sheet date.

(Emphasis in original).

189.    Further, the Prospectus included the following statement regarding related-party transactions:

> The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates.

> As of February 29, 2004, the Group had a deposit with BAWAG Overseas, Inc., a third-party financial institution who was a member, of $210.2 million. This balance was also included in "Receivables from Customers" and liquidated shortly after each year-end.

80

190.    These statements contained untrue statements and omissions of material fact because they failed to disclose the existence of the related-party transactions, the related-party indebtedness between the Company, Refco Holdings and BAWAG, and the fact that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay Refco Holdings' various loans from Customer X if Refco Holdings were to default for any reason or that the reserves provided against receivables from customers as of February 28, 2005 and February 29, 2004 were grossly insufficient given the $595 million and $970 million of uncollectible receivables that the Company was carrying on its books for those years, respectively.  The IPO Registration Statement also mischaracterized and failed to disclose the full extent of the related-party transactions between Refco and BAWAG, by stating that the Company had a "deposit" with BAWAG Overseas, Inc. of $210.2 million as of February 29, 2004, without disclosing any of the transactions referenced above.

**(c)    The IPO Registration Statement Misrepresented That the Company Had Taken Adequate Steps to Protect Itself From the Risk of Customer Defaults**

191.    The IPO Registration Statement explained Refco's exposure to customer and counter-party risks as follows:

> We are exposed to the risk that third parties that owe us money, securities or other assets will not perform their obligations.  These parties may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons.  As a clearing broker, we generally bear the risk of the defaults or misconduct of our customers.  In addition, we have experienced, due to competitive factors, pressure to extend credit and to price more aggressively the credit risks we take.  Although we regularly review credit exposures to specific customers and counterparties and to specific industries, countries and regions that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to detect or foresee.  In addition, concerns about, or a default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect us.

192.   To allay potential investors' concerns over these potential risks, the IPO Registration Statement touted the Company's supposed ability to "manage risk prudently," stating: "We plan to continue to monitor and improve our exposure to customer and counterparty risk throughout our operations using our comprehensive risk management system." In addition, the IPO Registration Statement stated:

> As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. Our Global Risk Management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets. Our current system provides the ability to project the impact of market volatility on price movement.

193.   These statements contained untrue statements and omissions of material facts because, contrary to the Company's espoused commitment to safeguarding itself against customer defaults, the Company had experienced significant customer defaults which were not disclosed to the investing public, and failed to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay Refco Holding's various loans from Customer X if Refco Holdings were to default for any reason, and which materially impaired the Company's working capital. Further, the Company's financial statements contained untrue material statements and material omissions concerning its hundreds of millions of dollars in uncollectible debt. This uncollectible debt, if properly disclosed, would have jeopardized the Company's credit rating and its ability to pay down the senior indebtedness described above, and been a material fact weighed in the investment decisions of RH Capital and other members of the Class.

### (d)   The IPO Registration Statement Misrepresented That The Company Maintained Excess Regulatory Capital

194.   The IPO Registration Statement disclosed:

82

> We are extensively regulated by the Commodity Futures Trading Commission; the SEC; the National Association of Securities Dealers, our designated self-regulatory organization with respect to our registration as a broker-dealer; the Chicago Mercantile Exchange, our designated self-regulatory organization with respect to our registration as a Futures Commission Merchant; the National Futures Association; other exchanges of which we are a member; state regulatory agencies; and other domestic and foreign clearing organizations. If we fail to comply with applicable laws, rules or regulations, we may be subject to criminal conviction, increased reporting requirements, censure, fines, cease-and-desist orders, suspension of our business, removal of personnel, civil litigation or other sanctions, including revocation of our operating licenses.

195.    To assure potential stock purchasers that the Company was complying with regulatory capital requirements, the IPO Registration Statement stated that "[a]s a matter of policy, we maintain excess regulatory capital to provide liquidity during periods of unusual market volatility, and this has been sufficient in the past to absorb volatile market events."

196.    The IPO Registration Statement also stated: "[A]s of May 31, 2005, Refco, LLC had net capital of $354.5 million, which was $167.7 million in excess of required net capital . . . As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million, which was 11.1% of aggregate debit balances and $49.6 million in excess of required net capital . . . ."

197.    These statements contained untrue statements of material fact because the Company's reported regulatory capital was overstated and the Company failed to to disclose that Refco had given Customer X a written guarantee, signed by Bennett, assuring Customer X that Refco Group would unconditionally repay Refco Holding's various loans from Customer X if Refco Holdings were to default for any reason. Upon information and belief, the Company would not have satisfied its regulatory capital requirements during the Class Period if the true facts were disclosed regarding its hundreds of millions of dollars in uncollectible receivables. To the extent that the Company did maintain excess regulatory capital, the excess amounts were materially less than the figures reported in the IPO Registration Statement and were not

83

sufficient "to absorb volatile market events," as represented in the IPO Registration Statement.

#### (e)    The IPO Registration Statement Failed to Disclose BAWAG's Full Ownership Interest in Refco Group

198.    In describing the Company's historical ownership structure, the notes to the financial statements as contained in the IPO Prospectus stated that the Company was 90% owned by Refco Holdings, and 10% owned by "BAWAG Overseas, Inc., a third party financial institution." This statement was materially incomplete and misleading, because the IPO Prospectus failed to disclose that BAWAG had also held a security interest in another 27% of the Company's equity, by virtue of its secret loans to DF Capital and other Bennett-controlled entities. As a result, investors were led to believe that BAWAG's prior interest in Refco was limited to 10%, when in fact it held interests in approximately 37% of the Company's equity and therefore was in a position to exercise significant influence and control over the Company. In addition, the description of BAWAG Overseas as a "third-party financial institution" was materially misleading because it failed to disclose the true extent of the business dealings and interlocking relationships between BAWAG, Refco, Bennett, Refco Holdings and other Defendants throughout the Class Period.

#### E.    The Truth Begins to Emerge and the Company Collapses

199.    The existence of the related-party loans between the Company, Refco Holdings, BAWAG and others, the massive uncollectible receivable that they concealed, and Refco Group's written guarantees to Customer X went undisclosed for years. Even now, after the Company belatedly disclosed the existence of these transactions, the full nature and extent of the transactions has yet to be revealed. As previously noted, Refco issued a press release on October 10, 2005 announcing that it had discovered an "undisclosed affiliate transaction." The press release stated, in relevant part, that Refco had:

84

discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities.

200. Although it gave only sparse detail about the receivable, the October 10, 2005 press release conceded that the transaction had not been disclosed in the Company's previously-filed financial statements and, therefore,

the Company determined, on October 9, 2005, that its financial statements, as of and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon.

(Emphasis added).

201. In addition, the October 10, 2005 press release disclosed that the Company's Board of Directors had essentially fired Defendants Bennett and Maggio, stating that "at the request of the Board of Directors Mr. Bennett has taken a leave of absence …. Also at the request of the Board, Santo C. Maggio … has taken a leave of absence."

202. The reaction to this startling announcement – just two months after Refco had sold over $670 million worth of stock to the investing public and just one month after Bennett rang the opening bell on the New York Stock Exchange – was swift. On October 10, 2005, the price of Refco's stock dropped from a closing price of $28.46 the previous trading day to close at $15.60 – a 45% drop in a single day – on unprecedented volume of over 24.2 million shares, which was over fifty times average daily volume.

85

203. However, the October 10, 2005 press release did not disclose the full extent of the problems facing Refco and the price of Refco securities remained artificially inflated despite the correction caused by this partial disclosure. For example, the press release downplayed the probable impact that the matters described in the press release would have on Refco's financial results and business operations. For instance, Refco stated that it "believes that all customer funds on deposit are unaffected by these activities." In a further effort to assuage investor concerns, the press release quoted Defendant Sexton as stating, "I am staying at Refco because I believe in our employees, customers and franchise. I am excited about the opportunities ahead and am eager to work with our management team to help the Company achieve even greater success." Similarly, Defendant Murphy was quoted as stating, "We continue to see strong momentum across our businesses with record derivative contract and foreign exchange volume in the quarter."

204. In addition, the October 10, 2005 press release stated that "Mr. Bennett today repaid the receivable in cash, including all accrued interest." This statement did not disclose that Bennett had in fact obtained the funds to repay the debt from BAWAG, which had loaned him the money in the hours before the October 10, 2005 press release was issued, taking Bennett's shares of Refco, as security. The press release also did not disclose that BAWAG, the source of this eleventh-hour loan, was also an entity whose trading losses the circular transactions were designed to conceal, and that BAWAG had repeatedly acted as a conduit for funds in the circular transactions. The October 10, 2005 press release thus omitted to state material facts necessary to make the statements included therein not misleading, and the market price of Refco securities remained artificially inflated as a consequence, such that the price of Refco's securities did not accurately reflect the value of the Company.

86

205.     On October 11, 2005, the SEC announced commencement of a formal investigation of Refco. On that same day, Refco issued another press release stating that the "Company confirms that it has adequate liquidity to run the business in the ordinary course," even though, as the investing public would learn only two days later, the Company had actually begun to experience liquidity problems grave enough to threaten its ability to operate. The October 11, 2005 press release also stated that the "receivable in the amount of $430 million was repaid yesterday in full," again failing to disclose the fact that Bennett had obtained the funds to repay the debt from BAWAG. The October 11, 2005 press release thus omitted to state material facts necessary to make the statements included therein not misleading. The partial disclosure prompted a further partial correction of the trading prices of Refco securities, causing Refco stock to slide to close at $13.85 on a trading volume of 17.35 million shares and the Bonds – which were trading at 108.625% of par on October 7, 2005 and had never traded below 103% of par in the preceding twelve months – fell to 91.50%.

206.     On October 12, 2005, the Company's securities prices dropped again following news that the United States Attorney for this District had arrested Bennett because Bennett was considered a "flight risk." This news partially disclosed the serious nature of the financial improprieties at the Company – including the previously undisclosed news that Bennett had signed a letter of guaranty to Customer X on behalf of Refco Group for hundreds of millions of dollars – and caused the price of Refco's securities to decline again, with its stock closing at $10.85 on October 12, 2005, on volume of 35 million shares, and its Bonds dropping to approximately 76% of par on the same date.

87

207. The truth continued to leak into the market on October 13, 2005, when Refco announced – in a statement that was directly contrary to statements in the October 10 and 11, 2005 press releases – that:

> in light of recent events, the liquidity within the Company's non regulated subsidiary Refco Capital Markets, Ltd., which represents a material portion of the business of the Company is no longer sufficient to continue operations. The Company has therefore imposed a 15 day moratorium on all activities of Refco Capital Market, Ltd. to protect the value of the enterprise.

208. On October 13, 2005, the NYSE halted all trading in Refco shares. Trading in Refco stock did not resume for four days. At the time trading was halted, Refco shares had fallen to $7.90. The market price of Refco shares remained frozen at that artificially inflated price until trading reopened on October 18, 2005, whereupon the market for Refco shares opened at 75 cents per share. The Bonds continued to trade throughout this period, with the price dropping as low as 16% of par by October 14, 2005 and thus losing at least 80% of their value in only four days.

209. On October 17, 2005, Refco publicly announced that it was filing for bankruptcy court protection in this District. With the trading restrictions lifted following Refco's bankruptcy filing, Refco's stock traded on a massive volume of 28.5 million shares on October 18, 2005, closing at 65 cents per share. Thus, the price of Refco's publicly-traded stock had plummeted from $28.56 to 65 cents in little more than a week – a stunning decline of nearly 98% that resulted in a loss of market capitalization of more than $854 million.

210. Refco and many of the Defendants named herein are currently under investigation by numerous criminal, civil and regulatory bodies, including the SEC, the NASD, and the CFTC, as well as at least one foreign law enforcement agency.

211.    The dramatic fall in the prices of the Company's securities from October 10, 2005 to October 18, 2005, and the damages suffered by Plaintiffs and members of the Class, were a direct result of the disclosure to investors and the market of the untrue statements and omissions of material facts described herein.

## VI.    THE COMPANY'S VIOLATIONS OF GAAP

212.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature.  The highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion"), and AICPA Accounting Research Bulletins ("ARB").  GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

213.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in accordance with GAAP will be presumed to be false or misleading, despite footnote or other disclosures.

214.    The financial statements issued by the Company for fiscal years 2002, 2003, 2004, and 2005, and the financial statements for the fiscal quarters therein, did not fairly and accurately represent the Company's financial position and the results of its operations because they violated key provisions of GAAP.

215.    By failing to disclose recurring, significant related-party transactions between the Company and Refco Holdings, the Company violated SFAS No. 57, Related Party Transactions,

which states in relevant part:

> Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements.  The disclosures shall include:
>
> a.       The nature of the relationship(s) involved;
>
> b.       A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;
>
> c.       The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; [and]
>
> d.       Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

216.    SFAS No. 57 requires the disclosure of relationships between companies under common ownership or management control, when "the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous."  Defendant Bennett, as the CEO, Chairman of the Board, and 43% owner of the Company prior to the August 2005 IPO, exercised control over the Company.  Bennett also controlled Refco Holdings, as its sole stockholder.  Because the Company and Refco Holdings were clearly under common control, GAAP required full disclosure of all the transactions that took place between these entities.

217.    The Company's related-party transactions with Refco Holdings were not disclosed.  At the end of each fiscal quarter, the Company engaged in off balance sheet transactions that removed receivables from Refco Holdings (representing uncollectible customer

90

receivables) from the Company's books.  To accomplish this feat, Defendants Bennett, Maggio

and others contacted a one or more customers of Refco, and suggested that the customers could

borrow money from the Company and then loan that money to Refco Holdings.  Refco Holdings

used those funds to pay off its loan from the Company, thereby allowing the Company to remove

a huge related-party receivable from its books.  To ensure that the customer did not suffer any

economic risk in the transaction, the Company guaranteed repayment of the customer's loan to

Refco Holdings.

218.    When the reporting period for each fiscal period was over, the Company would

re-loan the money to Refco Holdings, which would pay off the loan from the customer, which

would then repay its loan from the Company.  These transactions allowed the Company to re-

characterize bad debts as collectible receivables from unrelated parties, thereby materially

misleading creditors and investors.

219.    The Company did not fully disclose the nature and amounts of the round-tripping

transactions involving Refco Holdings and its customers, in violation of GAAP.  The Company's

obligation to disclose the related-party transactions was not alleviated when the outstanding

balance was paid; it was still a related-party transaction that should have been disclosed to

Refco's creditors and investors.  Further, Refco's receivables from Refco Holdings were

outstanding on Refco's books for all but the first and last few days of each financial reporting

period.

220.    The Company also violated SFAS No. 5, Accounting for Contingencies, by

failing to take a charge for the uncollectible customer receivables described herein.  SFAS No. 5

establishes standards for reporting loss contingencies and requires that an estimated loss from a

loss contingency be accrued as a charge to income if a liability has been incurred at the date of

91

the financial statement and the amount of loss can be reasonably estimated.  The receivables that were assumed by Refco Holdings were known to be uncollectible since at least 2001, if not earlier, and a charge should have been taken by 2001 at the latest.

221.   Refco also failed to disclose that it guaranteed the multi-hundreds of millions of loans made by Customer X to Refco Holdings in the round-tripping transactions.  This material omission violated FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others.  Even if the likelihood that Refco might have to make payment pursuant to the guarantee was remote, the Company was still required to disclose the details of such a material transaction, including the nature of the guarantee, the term of the guarantee, how the guarantee arose, and any circumstances that would require Refco to perform under the guarantee.  The Company failed to disclose even the existence of the transaction that led to the guarantee, making its financial disclosures non-compliant with GAAP.

222.   The Company also violated APB Opinion No. 22, Disclosure of Accounting Policies, which instructs companies to report changes in accounting policies.  Accounting policies adopted by a company significantly affect the presentation of the company's financial position and results of operations.  Accordingly, the usefulness of financial statements for purposes of making investment decisions depends significantly upon the investor's understanding of the accounting policies utilized by the company.

223.   The Company devoted several pages of its SEC filings to "Significant Accounting Policies" and "Critical Accounting Policies," yet failed to disclose that it did not comply with those policies.  Instead of following these policies, the Company repeatedly concealed uncollectible receivables through undisclosed related-party transactions.  These recurring

92

transactions, in effect, became Refco's accounting policy. However, the Company did not report this substantially varied accounting policy because it would have revealed the untruths in its financial statements.

224. Refco's financial statements also violated several general principles of GAAP, including:

- FASCON No. 1 ¶ 34: "Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions."

- FASCON No. 1 ¶ 40: "Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources."

- FASCON No. 1 ¶ 50: "Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it . . . . To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general."

- FASCON No. 2 ¶ 58-59: "That information should be reliable as well as relevant is a notion that is central to accounting . . . . The reliability of a measure rests on the faithfulness with which it represents what it purports to represent . . . ."

- FASCON No. 2 ¶ 79, 80: Financial statements should be complete and contain all material information necessary for investors and creditors to make informed economic decisions.

- FASCON No. 2 ¶ 95, 97: Conservatism in financial reporting should be used as a prudent reaction to uncertainty to ensure that risk is adequately considered. "The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent."

- FASCON No. 6 ¶ 145: "[R]ecognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities– including matching of costs and revenues, allocation, and amortization–is the essence of using accrual accounting to measure performance of entities."

93

225. The Company's financial statements were not prepared in accordance with these general principles of GAAP because, among other reasons, the Company had not recognized losses that should have been recognized; its financial statements mischaracterized related-party transactions and uncollectible receivables as legitimate customer receivables; and its financial statements did not disclose all material information necessary for creditors and investors to make informed investment decisions.

## VII. GRANT THORNTON'S VIOLATIONS OF AUDITING STANDARDS

206. Public companies rely on independent registered audit firms to audit financial statements and review other public disclosures, assess internal controls, and gain the trust of the creditors and investors who will rely on the auditors' reports when deciding whether to invest in a company. The Public Company Accounting Oversight Board ("PCAOB"), which was established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing standards that are required to be followed by all auditors for public companies. The PCAOB initially adopted as its Interim Professional Auditing Standards all the auditing standards that had previously been issued by the AICPA. The auditing standards issued or adopted by the PCAOB, together with the auditing standards issued by the AICPA, are herein encompassed by the term GAAS. The PCAOB and the AICPA have codified the professional auditing standards (represented herein as "AU") to ensure that audits are conducted in accordance with GAAS. See AU § 150.

226. There are ten GAAS provisions, which are divided into three types of standards: (1) general standards, which provide guidelines for auditor training and maintaining independence from the client; (2) standards of fieldwork, which provide guidelines for audit planning, collecting evidential verification for audit findings, and the proper evaluation of internal controls; and (3) standards of reporting, which are primarily concerned with ensuring

94

that financial statements are presented in accordance with GAAP. As explained in detail below,

Grant Thornton violated almost every one of these provisions during its tenure as the Company's

purportedly independent auditor.

### A.    Violations of General Standards

227.    GAAS General Standard No. 3 states: "Due professional care is to be exercised

in the performance of the audit and the preparation of the report." Grant Thornton audited the

Company's financial statements and provided audit reports thereon for the years ended February

28, 2003, February 29, 2004, and February 28, 2005. Grant Thornton failed to exercise due

professional care in the performance of its audits and in the preparation of its audit reports.

Among other things, Grant Thornton repeatedly failed to detect huge, nine-figure sham

transactions whereby the Company avoided disclosing related-party transactions and

uncollectible receivables in its financial statements.

228.    GAAS General Standard No. 2 states that "[i]n all matters relating to the

assignment, an independence in mental attitude is to be maintained by the auditor or auditors."

Prior to 2002, Arthur Andersen served as the Company's independent auditor under the

leadership of Mark Ramler ("Ramler"), Arthur Andersen's lead partner assigned to the Refco

account. When Arthur Andersen began to collapse under the pressure of the Enron debacle,

Ramler moved to Grant Thornton and took the Refco engagement with him. At Grant Thornton,

Ramler remained the lead partner assigned to the Refco account. Ramler's longstanding

relationship with the Company and its management prevented him from maintaining the

necessary independence in mental attitude.

95

## B.    Violations of Standards of Fieldwork

229.    GAAS Standard of Fieldwork No. 1 requires audits to be "adequately planned," and provides that particular attention should be paid to matters that, if inaccurately reported in a financial statement, could materially alter a company's financial situation.

230.    GAAS requires that auditors pay significant attention to related-party transactions due to the inherent conflict of interest of such transactions.  As noted above, SFAS No. 57, Related Party Disclosures, requires that all related-party transactions be disclosed in the company's financial reports, including the nature of the relationship, a description of the transaction, and the amount of the transaction.  SFAS No. 57 warns that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis," and therefore require auditor substantiation.  Similarly, AU § 334, Related Parties, prescribes that independent auditors should be particularly aware of transactions that can be designed or manipulated to obscure related-party transactions, such as those used here to hide the Company's uncollectible receivables from Refco Holdings.

231.    Grant Thornton violated the foregoing GAAS provisions by failing to implement procedures for identifying and ensuring disclosure of the Company's related-party transactions, such as:

- Procedures for obtaining the names of all related parties, such as requesting the names from management personnel, reviewing the Company's filings with the SEC and other regulatory agencies, and identifying guarantors for large receivables;

- Procedures for determining the trustworthiness of related-party transactions, such as assessing the extent and nature of the transactions, confirming the amounts and terms of the transactions, and evaluating the probability of repayment of uncollected balances; and/or

- Procedures for reviewing the Company's accounting process for the large and unusual transactions that were taking place at the end of each reporting period.

232. In fact, throughout the entire Class Period, Grant Thornton sent only one confirmation to the customer that was assuming the receivables owed by Refco Holdings in the recurring period-end transactions. That confirmation request and its attachment show that Grant Thornton was aware that the loan had been made only a few days before the end of the quarter, yet Grant Thornton took no steps to determine whether these transactions were legitimate arms'-length transactions.

233. Grant Thornton's failure to implement these procedures allowed the Company to implement a scheme to offload uncollectible receivables to Refco Holdings, a related party, and to hide the existence of these related-party transactions from Plaintiffs and the investing public.

234. AU § 319 and GAAS Standards of Fieldwork No. 2 instruct auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls. "Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated." AU § 312. 02, Audit Risk and Materiality in Conducting an Audit.

235. "Internal control" is defined as a process "designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations." AU § 319.06, Consideration of Internal Control in a Financial Statement Audit – Definition of Internal Control. For financial statement audits, internal controls serve as an integral way "to prevent or detect material misstatements in financial statement assertions."

236. Grant Thornton's audits of the Company's financial statements were devoid of an adequate assessment of the Company's internal controls. Specifically, although such problems existed at least as early as 2002, it was not until Grant Thornton's audit of the Company's financial statements for the year ended February 28, 2005 that it identified and reported "significant deficiencies" in the Company's financial reporting internal controls, including the need to increase financial department resources to ensure the Company's reports were in compliance with SEC regulations and a lack of formalized procedures for closing the Company's books. These deficiencies were not disclosed to the public until the Company filed its Form S-1/A on July 25, 2005.

237. GAAS also required Grant Thornton to identify "fraud risk factors," or circumstances that could lend themselves to fraudulent and/or illegal activities, as part of the audit planning process. AU § 316, Consideration of Fraud in a Financial Statement Audit, serves as a roadmap for uncovering accounting fraud by providing examples of "risk factors relating to misstatements arising from fraudulent financial reporting," and requires that independent auditors utilize professional skepticism. Grant Thornton either ignored or failed to identify numerous red flags at the Company that AU § 316 identifies as "fraud risk factors," including:

- "significant related-party transactions," including frequent loans of hundreds of millions of dollars to Refco Holdings at disproportionately high interest rates that, for a period of several years, appeared on the Company's books just after the beginning of each accounting period and then disappeared just before the end of each period, which should have been serious red flags that the Company was manipulating its books to avoid disclosing these loans on its financial statements;

- "journal entries used on a recurring basis . . . [that were] subject to the entity's internal controls," including the repeated journal entries made at every quarter-end and year-end over a period of several years to reflect loans being made to the customer and other entities to conceal the related-party loans to Refco Holdings, and which were then reversed as the loans to the customer were "paid off" just after the end of the quarter;

98

- "pressure to perpetrate fraud," including significant pressure to avoid write-offs of bad debts which would have wiped out the Company's profits and members' equity and rendered the Company unable to satisfy its minimum regulatory capital requirements;

- "unusual or unexpected analytical relationships," specifically that the Company's financial statements indicated significant increases in receivable balances without corresponding decreases in uncollectible receivables reserves;

- "domination of management by a single person or small group," being that Bennett was the President, CEO, Chairman of the Board and 43% shareholder, while the THL Partner Defendants and their passive co-investors owned 57% of the Company and the THL Partner Defendants nominated half of the Company's board of directors;

- "weaknesses in internal control," including an ineffective accounting and internal audit staff and the lack of formal procedures for closing the books;

- the Company's "history of violations of securities laws or other laws and regulations, or claims against the entity, its senior management, or board members alleging fraud or violations of laws and regulations," including that the Company had been under SEC investigation for stock short sales and aiding money managers in cheating municipalities, that the Company was fined approximately $7 million in a proceeding before the CFTC concerning inadequate record keeping, and that Maggio was under SEC investigation for stock manipulation;

- the resignation of Trosten as the Company's CFO shortly after the Bond Offering, and his receipt of a remarkably rich $45 million severance payment;

- the Company's high debt-to-equity ratio, with long-term debt being eight times greater than its reported members' equity; and

- "assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate," in that the Company's allowance for bad debts was dependent on significant and sensitive assumptions, such as its customers' financial condition, the likelihood of payment on receivables, and the value of the underlying securities, of which the slightest change would materially alter the Company's financial results.

238. GAAS Standard of Fieldwork No. 3 states that "[s]ufficent competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for forming an opinion regarding the financial statements under audit." AU § 326, Evidential Matter, explains that the evidential matter collected and evaluated by auditors is

central to a proper audit and serves as the foundation for the auditor's opinion report. Thus, Grant Thornton was required to investigate and obtain supporting evidential documentation for the assertions made by the Company in its financial statements, and could not merely take the word of the Company's management about the accuracy of their financial statements.

239. As described above, however, throughout the entire Class Period, Grant Thornton sent only one request for information to the customer that was assuming the receivables owed by Refco Holdings in the recurring period-end transactions. Notably, Grant Thornton did not follow up on that request, despite the fact that it showed that a multi-hundred million dollar loan had been made only a few days before the end of the period. Moreover, Grant Thornton did not ask for any supporting evidential matter to back up the transaction.

240. AU § 342, Auditing Accounting Estimates, explains that an "auditor's objective when evaluating accounting estimates is to obtain sufficient competent evidential matter to provide reasonable assurance that . . . [a]ll accounting estimates that could be material to the financial statements have been developed." See AU § 342.07. Grant Thornton did not obtain competent evidential matter to provide reasonable assurance of the reasonableness of the Company's estimate of its uncollectible receivables, which had a material effect on the Company's financial statements and was underestimated by more than $400 million.

241. Additionally, Grant Thornton did not obtain evidential support for the claims in the Company's public filings and statements concerning the Company's internal controls, risk management procedures, and accounting policies. Obtaining documentation to support these claims would have revealed that the Company had been re-characterizing uncollectible receivables as related-party receivables that were "collected" prior to each quarter-end, and that Refco had not implemented sufficient internal controls or accounting policies.

100

242.    Had Grant Thornton adequately planned and conducted its audit in accordance with GAAS, it would have discovered these defects, as well as the massive misstatement of the Company's financial statements over many years that ultimately caused the Company's demise.

### C.    Violations of Reporting Standards

243.    GAAS Standard of Reporting No. 1 states: "The [audit] report shall state whether the financial statements are presented in accordance with [GAAP]." Grant Thornton issued unqualified audit reports stating that the Company's financial statements were presented fairly and in accordance with GAAP. In reality, however, the Company's financial statements violated GAAP, as the Company was improperly inflating its assets and earnings by exchanging uncollectible customer receivables for receivables with a related party and laundering money by round-tripping funds with Bennett, BAWAG, and other intermediaries.

244.    GAAS Standard of Reporting No. 4 and AU § 508, Reports on Audited Financial Statements, provide that an auditor can only give an unqualified audit report if the company's "financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flows in conformity with [GAAP]," and the audit was conducted in accordance with GAAS. Section 508 further provides that if an auditor cannot give an unqualified audit report, the circumstances may require the auditor to give the company an adverse opinion or to include explanatory language in the audit opinion report to explain non-conformities.

245.    In violation of the foregoing provisions, Grant Thornton issued unqualified audit opinions for each of the years ended February 28, 2003, February 29, 2004, and February 28, 2005, indicating that the Company's financial statements complied with GAAP, when in fact they did not. Rather than issuing unqualified audit reports, Grant Thornton should have issued

101

either adverse audit reports noting the Company's non-compliance with GAAP, or issued qualified audit reports highlighting the fact that Refco's financial statements contained untrue statements of material fact and omitted facts necessary to make the statements contained therein not misleading. Grant Thornton did neither.

246. GAAS Standard of Reporting No. 3 states: "Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report." Thus, if the auditor does not qualify its audit report with details of non-compliance or inaccuracies in the financial statements' informative disclosures, investors and creditors will assume that those disclosures are accurate. As alleged herein, the disclosures in the Company's financial statements were not adequate, and were materially untrue, because, among other reasons, they failed to disclose the Company's uncollectible receivables, or the related-party transactions with Refco Holdings and BAWAG that were being used to conceal those receivables.

247. Despite the Company's internal control problems, untrue statements of financial results, and non-disclosure of related-party transactions and uncollectible receivables, Grant Thornton continued to issue unqualified audit reports, which wrongly signified to creditors and investors that Grant Thornton had confirmed that the Company's financial statements were prepared in accordance with GAAP, that Grant Thornton had confirmed via evidential matter the claims made in the Company's financial statements, and that the Company's financial statements did not contain any materially untrue statements.

### D.  Violations of CFTC Rules and Regulations

248. In addition to issuing auditors' reports included in filings with the SEC, Grant Thornton issued reports that were included in filings with the CFTC. CFTC rules and

regulations require that audits conducted pursuant to the CFTC regulations be conducted in accordance with GAAS. These rules and regulations also provide that the CFTC may deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the CFTC to have engaged in unethical or improper professional conduct either in the course of an adjudicatory, investigative, rulemaking or other proceeding before the CFTC or otherwise. Grant Thornton failed to comply with the CFTC regulations by failing to perform its audits in accordance with GAAS.

## VIII. DEFENDANTS' NEGLIGENCE

### A. The Offering Memorandum and the Bond Registration Statement

249. The Bond Underwriter Defendants did not conduct a reasonable investigation of the statements contained in the Offering Memorandum and the Bond Registration Statement, and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading. In particular, the Bond Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the textual descriptions in the Offering Memorandum and the Bond Registration Statement relating to, among other things, the Company's past performance, operations, business condition, and future prospects. Nor did the Bond Underwriter Defendants conduct a reasonable investigation into the accuracy of the financial information included in the Offering Memorandum and the Bond Registration Statement, including the financial information contained in the textual portions of those documents, as well as that contained in the attached audited and unaudited financial statements.

250. In addition, the Offering Memorandum and Bond Registration Statement contained risk factors relating to, among other things, the Company's substantial indebtedness; its compliance with regulatory requirements; its internal controls over financial reporting; and risks relating to employee misconduct. Having identified these factors as risks for potential

103

investors, the Bond Underwriter Defendants were obligated to, but did not, conduct an especially diligent investigation into these issues in order to obtain reasonable assurance that the statements contained in the Offering Memorandum and Bond Registration Statement were true and not misleading.

251. The Bond Underwriter Defendants' failure to conduct a reasonable investigation into the unaudited financial statements in the Bond Registration Statement was particularly negligent given the recent seminal opinion in this District, In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628 (DLC) (S.D.N.Y. 2004), which reiterated and confirmed that underwriters cannot simply rely on an auditors' work when investigating the accuracy of unaudited financial statements. Rather, because "the public relies on the underwriter to obtain and verify relevant information and then make sure that essential facts are disclosed" (id. at 685), underwriters must conduct their own, independent (and reasonable) investigation into the accuracy of unaudited financial statements.

252. Defendants Bennett, Trosten, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, the THL Defendants, O'Kelley, Gantcher, Breitman, Refco Futures, Westminster-Refco, and Lind-Waldock, each of whom prepared, approved, and/or signed the Offering Memorandum and/or the Bond Registration Statement, did not conduct a reasonable investigation of the statements contained in the Offering Memorandum and the Bond Registration Statement, and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading.

253. Grant Thornton, which consented to the inclusion in the Offering Memorandum and Bond Registration Statement of its audit opinions on the Company's fiscal year 2003 and fiscal year 2004 financial statements, performed its audits of the Company's financial statements

104

in a negligent manner, which did not comply with GAAS and did not constitute a reasonable

investigation of whether the Company's financial statements were accurate and in compliance

with GAAP. As set forth above, Grant Thornton acted negligently in that its audit of Refco's

financial statements violated, among others, the following basic principles of GAAS:

> (a)     General Standard No. 3, in that Grant Thornton failed to exercise due
professional care in the performance of its audit and the preparation of its reports;

> (b)     Standard of Field Work No. 1, in that Grant Thornton failed to adequately
plan and supervise its audit;

> (c)     Standard of Reporting No. 1, in that Grant Thornton's reports incorrectly
stated that Refco's financial statements were presented in conformity with GAAP; and

> (d)     Standard of Reporting No. 4, in that Grant Thornton had an insufficient
basis for expressing its unqualified opinions, for its audits had not been conducted in

accordance with GAAS.

**B.     The IPO Registration Statement**

254.     The Stock Underwriter Defendants did not conduct a reasonable investigation of

the statements contained in the IPO Registration Statement, and did not possess reasonable

grounds for believing that the statements in the IPO Registration Statement were true and not

misleading. In particular, the Stock Underwriter Defendants did not conduct a reasonable

investigation into the accuracy of the textual descriptions in the IPO Registration Statement

relating to, among other things, the Company's past performance, operations, business condition,

and future prospects. Nor did the Stock Underwriter Defendants conduct a reasonable

investigation into the accuracy of the financial information included in the IPO Registration

Statement, including the financial information contained in the textual portions of the IPO

Registration Statement, as well as that contained in the attached audited and unaudited financial statements.

255. The Stock Underwriter Defendants' failure to conduct a reasonable investigation into the unaudited financial statements in the IPO Registration Statement was particularly negligent given the recent seminal opinion in this District, In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628 (DLC) (S.D.N.Y. 2004), which reiterated and confirmed that underwriters cannot simply rely on an auditors' work when investigating the accuracy of unaudited financial statements. Rather, because "the public relies on the underwriter to obtain and verify relevant information and then make sure that essential facts are disclosed" (id. at 685), underwriters must conduct their own, independent (and reasonable) investigation into the accuracy of unaudited financial statements.

256. In addition, the IPO Registration Statement contained risk factors relating to, among other things, the Company's substantial indebtedness; its compliance with regulatory requirements; its internal controls over financial reporting; and risks relating to employee misconduct. Having identified these factors as risks for potential investors, the Stock Underwriter Defendants were obligated to, but did not, conduct an especially diligent investigation into these issues in order to obtain reasonable assurance that the statements contained in the IPO Registration Statement were true and not misleading.

257. Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Harkins, and Schoen, each of whom whom prepared, approved, and/or signed the IPO Registration Statement, did not conduct a reasonable investigation of the statements contained in the IPO Registration Statement, and did not possess reasonable grounds for believing that the statements in the IPO Registration Statement were true and not misleading.

106

258. Grant Thornton, which consented to the inclusion in the IPO Registration Statement of its audit opinions for the Company's fiscal year 2003, fiscal year 2004, and fiscal year 2005 financial statements, performed its audits of the Company's financial statements in a negligent manner, which did not comply with GAAS and did not constitute a reasonable investigation of whether the Company's financial statements were accurate and in compliance with GAAP. Among other things, Grant Thornton violated the GAAS provisions set forth above by failing to properly plan and conduct its audits of the Company's financial statements.

## IX. ALLEGATIONS PERTAINING TO CONTROL PERSON LIABILITY

259. Plaintiffs incorporate and reallege the allegations set forth above. In addition to the allegations set forth above, the following allegations demonstrate the control that certain Defendants exercised over Refco and related entities.

### A. The Officer Defendants

260. The Officer Defendants had control of Refco by virtue of their executive positions with the Company, the key roles each played in the Company's management, and their direct involvement in its day-to-day operations, including its financial reporting and accounting functions. Facts demonstrating the Officer Defendants' control of Refco include:

(a) The Officer Defendants held the top management positions within the Company and thereby controlled the Company individually and collectively. Specifically:

(i) Bennett was Refco's President, CEO and Chairman from September 1998 through at least October 10, 2005.

(ii) Maggio was Executive Vice President of Refco, President and CEO of Refco Securities, LLC and President of Refco Capital from 1991 until at least October 10, 2005.

(iii)    Sexton was Executive Vice President and COO of Refco from August 2004 through at least October 10, 2005, whereupon he assumed the position of CEO until at least the end of the Class Period.

(iv)    Murphy was Executive Vice President of Refco and President and CEO of Refco Global Futures, LLC from March of 1999 until at least the end of the Class Period.

(v)    Klejna was Executive Vice President and General Counsel of Refco from January 1999 through at least the end of the Class Period.

(vi)    Sherer was the Executive Vice President and CFO of Refco from January 2005 until at least the close of the Class Period;

(vii)    Silverman was Secretary of the Company from 1999 until at least October 10, 2005.  Silverman also held numerous other high-level executive positions within Refco, including Controller of Refco Group during 2004 and the first half of 2005.  As Controller, Silverman was directly responsible for the closing of the Company's books, implementation and maintenance of adequate internal financial controls, as well as the adoption and implementation of appropriate accounting policies for the Company.

(b)    The Offering Memorandum, Bond Registration Statement, and the IPO Registration Statement touted the key role played by the Officer Defendants in the Company's operations and purported success.  For example, the Bond Registration Statement discussed the potential departure of the Officer Defendants in a risk disclosure, emphasizing that:

> ***Our business operations could be significantly disrupted if we lost the members of our management team.***

108

> Our future success depends to a significant degree upon the continued contributions of our management team. Our future performance will be substantially dependant on our ability to retain and motivate them. […] The loss of the services of any member of our management team…could adversely affect our ability to manage our business effectively or to execute our business strategy.

(Bold and italics in original, as heading). The Offering Memorandum and IPO Registration Statement each contained substantially similar discussions of the Officer Defendants' importance to the Company's affairs. In connection with the risk disclosure, the Bond Registration Statement further assured investors that Officer Defendants Bennett, Murphy, Sherer, Sexton, Maggio and Klejna were all subject to non-compete agreements with the Company in the event of their departure.

(c)     The Executive Employment and Non-Competition Agreements pursuant to which Officer Defendants Bennett, Maggio, Sexton, Murphy, Klejna, and Sherer were employed gave each substantial authority over the day-to-day management and operation of the Company. Each of their agreements explicitly stated that they were employed "in a key capacity with the Company," and that they had access to "confidential information regarding the organization, business and finances of the Company." Each of their employment agreements also placed non-competition, non-solicitation and no-hire restrictions on these defendants. Defendant Bennett's employment agreement, in particular, sets forth in detail his duties and responsibilities, which included:

> (i) formulating and executing the Company's business strategy; (ii) providing senior level counsel as to the business and operations of the Company; (iii) directing the day-to-day management of the Company's affairs; (iv) representing Company in relationships and business dealings within the financial services industry; and (v) participating in and supporting the activities of the Board.

(d)     According to a former senior operating officer of a Europe-based Refco

109

affiliate (the "Former Refco Officer"), who met frequently with Defendants Bennett, Sexton, Murphy, Maggio, and Trosten, those five officers were known to Refco staffers in the Company's offices abroad as the "New York Five" – a reflection of their control and domination of the Company's day-to-day operations from its headquarters in New York.

(e)     Defendant Bennett also controlled Refco because he was one of the Company's largest shareholders. At the time of the Bond Offering, Bennett owned approximately 43% of the equity interests of Refco through Refco Holdings. Following the August 2005 IPO, Bennett owned 33.8% of Refco's outstanding common stock through Refco Holdings and the Bennett Trust.

(f)     Defendant Silverman also exercised control by virtue of his close relationship with Defendant Bennett. Silverman was a CPA and a close confidant of Bennett, to whom Bennett turned for advice and guidance on accounting matters. Upon information and belief, Silverman had significant influence over Bennett's decision-making on behalf of the Company with respect to accounting-related issues.

### B.     Refco Holdings and the Bennett Trust

261.    Facts demonstrating Defendant Refco Holdings' and the Bennett Trust's control of Refco include:

(a)     At all relevant times, Refco Holdings and the Bennett Trust were instrumentalities of Defendant Bennett, wholly dominated and controlled by Bennett, and with no ability to take any action independent of Bennett. The Offering Memorandum, for example, disclosed that Refco Holdings would be "wholly owned" by Bennett following the LBO. The IPO Registration Statement similarly disclosed that Refco

110

Holdings was "wholly-owned" by Bennett and that he was "both Trustee and Beneficiary" of the Bennett Trust. The Indictment similarly alleges that Refco Holdings was "controlled" by Bennett. Refco Holdings and the Bennett Trust had control of Refco by virtue of Defendant Bennett's pervasive control of the Company (discussed above), which was at all times exercised through Refco Holdings and/or the Bennett Trust.

(b)     Bennett used Refco Holdings and the Bennett Trust as instrumentalities to hold and exercise his controlling equity interest in Refco. At the time of the Bond Offering, Defendant Bennett used Refco Holdings as a vehicle to hold his approximately 43% equity interest in Refco. As a result of the August 2005 IPO, and as set forth in the IPO Registration Statement, "[o]wnership by Phillip R. Bennett, which constitutes 33.8% of our outstanding common stock following the offering, represents direct ownership and indirect ownership through each of Refco Group Holdings, Inc. and the Phillip R. Bennett Three Year Annuity Trust." Following the August 2005 IPO, Refco Holdings held approximately 60% of Bennett's equity interests in Refco and the Bennett Trust held approximately 40% of Bennett's equity interests in Refco.

(c)     As an instrumentality Bennett used to exercise control of Refco, Refco Holdings was party to numerous contracts pursuant to which the LBO and consequent securities offerings were achieved. Specifically, Refco Holdings was party to the Equity Purchase and Merger Agreement dated June 8, 2004 (and as amended on July 9, 2004), which provided for the series of transactions forming the LBO, and the Securityholders Agreement, dated August 5, 2004, which governed the rights of Refco's equityholders in advance of the August 2005 IPO. Refco Holdings became contractually bound to these agreements by virtue of Defendant Bennett's signature.

111

(d)     As an instrumentality Bennett used to exercise control of Refco, Refco

Holdings had the unrestricted right, pursuant to the Securityholders Agreement, to

appoint two members of the Board of Directors, one of which was required to be Bennett,

and the right to appoint a third jointly with the THL Partner Defendants.

(e)     In addition, Refco has itself admitted that it was a "controlled company"

within the meaning of NYSE rules by virtue of Bennett's and the THL Partner

Defendants' collective post-August 2005 IPO position in Refco stock, which consisted of

Bennett's 33.8% (held through Refco Holdings and the Bennett Trust) and the THL

Partner Defendants' approximate 42.7% interest in Refco's outstanding shares.  Refco

benefited substantially from its status as a "controlled company" because the boards of

directors of controlled companies are exempt from normal NYSE rules requiring that

boards of directors, corporate governance committees, and compensation committees be

independent.

### C.     Robert C. Trosten

262.    Facts demonstrating Defendant Trosten's control of Refco include:

(a)     Trosten was Executive Vice President and CFO of Refco from 2001 until

his sudden resignation in October 2004.  As CFO, Trosten was directly responsible for

the preparation of Refco's financial statements, the closing of its books, its adoption and

compliance with appropriate accounting policies, and its maintenance of adequate

internal financial controls.

(b)     The Offering Memorandum and the Bond Registration Statement

highlighted Trosten's importance to the Company's success as a central member of

Refco's management team.  The Bond Registration Statement stated that:

112

> ***Our business operations could be significantly disrupted if we lost
> members of our management team.***
>
> Our future success depends to a significant degree upon the continued
> contributions of our management team. Our future performance will be
> substantially dependant on our ability to retain and motivate them. […]
> The loss of any member of our management team…could adversely affect
> our ability to manage our business effectively or execute our business
> strategy.

(bold and italics in original, as heading). The Offering Memorandum contained a
substantially similar discussion of Trosten's importance to the Company.

(c)     As noted above, according to the Former Refco Officer, Defendant
Trosten was among the senior officers known to Refco staffers in the Company's offices
abroad as one of the "New York Five" – a moniker reflecting his predominance of the
Company's affairs from its headquarters in New York.

### D.     The THL Partner Defendants

263.     The following facts further evidence the THL Partner Defendants' control of
Refco:

(a)     From the time of the LBO until the August 2005 IPO, the THL Partner
Defendants and their affiliates and passive co-investors held a controlling 57% interest in
Refco shares. After the August 2005 IPO, the THL Partner Defendants and their co-
investors continued to hold a dominant 42.7% interest. Thomas H. Lee Partners was, at
all times, the beneficial owner of all interests held by the THL Partner Defendants and
their co-investors.

(b)     The THL Partner Defendants dominated Refco's Board of Directors.
Specifically, half of Refco's eight member Board of Directors (and prior to the IPO, fully
half of New Refco's Board of Managers) was filled by the THL Partner Defendants'
designees. These designees – the THL Individual Defendants – each held high-level

113

positions within Thomas H. Lee Partners' upper management team, as set forth above.

Indeed, the THL Partner Defendants had the unrestricted right, pursuant to a

Securityholders Agreement, dated August 5, 2004, entered into in connection with the

LBO, to appoint four of the eight members of the Company's Board, and the right to

appoint a fifth jointly with Refco Holdings.

(c)     The Offering Memorandum acknowledged that the THL Partner

Defendants would, upon consummation of the LBO, "have the ability to control all

aspects of [the Company's] business."

(d)     THL Managers V, LLC ("THL Managers"), of which Thomas H. Lee

Partners is the Managing Member, was party to a Management Agreement, dated August

5, 2004, with Refco, pursuant to which it provided management and consulting services

to Refco.  As set forth in the Management Agreement, THL Managers was specifically

retained because Refco required its "special skills and management advisory services in

connection with [Refco's] business operations and execution of its strategic planning,"

and because THL Managers was "specifically skilled in corporate finance, strategic

corporate planning, and other management skills and advisory services."  The

Management Agreement also states that THL Managers was retained to advise Refco "in

connection with the negotiation and consummation of agreements, contracts, documents

and instruments related to [Refco's] or any of its subsidiaries finances or relationships

with banks or other financial institutions," and "with respect to the development and

implementation of strategies for improving the operating, marketing and financial

performance of [Refco] and other senior management matters related to the business,

administration and policies of [Refco] and its subsidiaries."  Thus, at the same time that

114

the THL Partner Defendants held a dominant position on Refco's Board of Directors and maintained a controlling interest in Refco stock, an entity controlled by Thomas H. Lee Partners was obligated by the Management Agreement to become deeply involved in the day-to-day management of Refco.

(e)     In addition, Refco has characterized itself as a "controlled company" within the meaning of NYSE rules by virtue of the THL Partners Defendants' and Refco Holdings' collective post-August 2005 IPO position in Refco stock, which consisted of an approximate 42.7% interest of the THL Partner Defendants and their passive co-investors and Refco Holdings' 33.8% interest in Refco's outstanding shares. Refco benefited substantially from its status as a "controlled company" because the boards of directors of controlled companies are exempt from normal NYSE rules requiring that boards of directors, corporate governance committees, and compensation committees be independent.

### E.     The THL Individual Defendants

264.    Facts demonstrating Defendant Lee's control of Refco include:

(a)     From the time of the LBO through at least the Class Period, Lee was a member of Refco's Board of Directors.

(b)     Lee was the Chairman, CEO, and founder of Thomas H. Lee Partners, which itself controlled Refco.

(c)     Lee provided services to Refco pursuant to the Management Agreement described in ¶263(d) above, and was therefore deeply involved in the day-to-day management of Refco.

(d)     Lee was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

265. Facts demonstrating Defendant Harkins' control of Refco include:

(a) From the time of the LBO through at least the Class Period, Harkins was a member of Refco's Board of Directors.

(b) Harkins was the Vice Chairman and Managing Director of Thomas H. Lee Partners, which itself controlled Refco.

(c) Harkins provided services to Refco pursuant to the Management Agreement described in ¶253(d), and was therefore deeply involved in the day-to-day management of Refco.

(d) Harkins was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

266. Facts demonstrating Defendant Jaeckel's control of Refco include:

(a) From the time of the LBO through at least the Class Period, Jaeckel was a member of Refco's Board of Directors.

(b) Jaeckel was a Managing Director of Thomas H. Lee Partners, which itself controlled Refco.

(c) Jaeckel provided services to Refco pursuant to the Management Agreement described in ¶263(d) above, and was therefore deeply involved in the day-to-day management of Refco.

(d) Jaeckel was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

267. Facts demonstrating Defendant Schoen's control of Refco include:

(a) From the time of the LBO through at least the Class Period, Schoen was a member of Refco's Board of Directors.

116

(b)     Schoen was a Co-President of Thomas H. Lee Partners, which itself controlled Refco;

(c)     Schoen provided services to Refco pursuant to the Management Agreement described in ¶263(d) above, and was therefore deeply involved in the day-to-day management of Refco;

(d)     Schoen was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

### F.     The Audit Committee Defendants

268.    Facts demonstrating the Audit Committee Defendants' control of Refco include:

(a)     Each of the Audit Committee Defendants was a member of the Audit Committee of New Refco's Board of Managers and subsequently of Refco's Board of Directors;

(b)     As stated in the IPO Registration Statement, the Audit Committee Defendants were specifically responsible for overseeing:

(i)     the integrity of Refco's financial statements;

(ii)    Refco's compliance with legal and regulatory requirements;

(iii)   Refco's independent auditors' qualifications and independence; and

(iv)    the performance of Refco's independent auditors and Refco's internal audit function.

(c)     As stated in the IPO Registration Statement, the Audit Committee Defendants were also specifically responsible for preparing the report required to be prepared by the Audit Committee pursuant to SEC rules;

117

(d)     The Charter of the Audit Committee articulated the Audit Committee's responsibilities in even greater detail.  In addition to the duties disclosed in the IPO Registration Statement, the responsibilities discussed in the Charter demonstrate the Audit Committee's pervasive involvement in the Company's auditing and financial reporting processes.  These additional responsibilities include:

(i)     Reviewing and discussing with management, internal audit and the independent auditor the adequacy and effectiveness of Refco's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, through inquiry and discussions with the independent auditors, management and head of internal audit;

(ii)     Discussing guidelines and policies governing the process by which senior management of Refco and the relevant departments of the Company, including the internal auditing department, assess and manage the Company's exposure to risk, as well as Refco's major financial and other risk exposures and the steps management has taken to monitor and control such exposures;

(iii)     Reviewing and discussing with management the progress and results of internal audit projects, and, when deemed necessary or appropriate by the Audit Committee, assigning additional internal audit projects to the head of internal audit;

(iv)     Reviewing and discussing with management the Company's administrative, operational and accounting internal controls, including special

118

audit steps adopted in light of the discovery of any significant and material control deficiencies;

(v)     Meeting periodically with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Company; and

(vi)     Reviewing and discussing with management, the Company's independent auditors and the head of internal audit, material financial arrangements of the Company which do not appear on the financial statements of the Company.

### G.     BAWAG

269.     BAWAG had the power to influence and control, and did influence and control, directly and indirectly, Refco.  In particular, facts demonstrating BAWAG's substantial control and influence over Refco include:

(a)     BAWAG's significant equity interest in Refco, which was composed of (i) BAWAG's publicly disclosed 10% equity stake in Refco (that BAWAG held through its affiliates Alinea Holding GmBH and BAWAG Overseas, Inc); and (ii) BAWAG's undisclosed additional 27% or more equity stake in Refco.  The fact that BAWAG owned a larger equity interest in Refco than previously disclosed is evidenced by certain loan documents between BAWAG, Refco and their respective affiliates, which reveal that BAWAG had made substantial loans to Refco Holdings, and other Bennett-affiliated entities that were guaranteed by at least 27% of Refco's equity.  On April 28, 2006,

119

BAWAG's owner – the Austrian Trade Union Federation – admitted that BAWAG had made two loans each backed by 13.7% of Refco's equity, and that there may be yet another such loan. While the details surrounding this ownership interest are continuing to emerge, Lead Plaintiffs' investigation has discovered that these loans from BAWAG involved entities with close associations and ties to Refco, Refco Holdings and BAWAG. For instance:

(i)      It appears that DF Capital, a company that was incorporated by Bennett, who also served as its President and Secretary, was involved in transactions whereby BAWAG obtained a significant undisclosed equity interest in Refco. DF Capital was incorporated on July 10, 2002 as DF Overseas Inc., with its registered address listed as Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware. This was also the registered address of BAWAG Overseas – the entity through which BAWAG owned its disclosed 10% equity interest in Refco. On December 23, 2004, DF Capital merged into Refco Holdings. The Plan of Merger lists the same address as the principal place of business for both DF Capital and Refco Holdings – namely, 200 Liberty Street, World Financial Center, New York, New York 10281, which was also the principal place of business for Refco. Defendants Silverman and Bennett both signed the Plan of Merger on behalf of Refco Holdings and Defendant Bennett alone signed on behalf of DF Capital.

(ii)      Refco and BAWAG also had close ties to DF Capital's sole stockholder, the Desana Foundation ("Desana"). Desana is a Liechtenstein-based foundation controlled by the Austrian Trade Union Federation (i.e., BAWAG's

120

owner). In or about August 2004, in connection with the LBO involving the THL Defendants, Desana sold its entire interest in DF Capital to Refco Holdings. According to a Stock Purchase Agreement, which purports to be the instrument by which Desana's interest in DF Capital was transferred to Refco Holdings, Refco's outside legal counsel since 1994 (defined below as the "Law Firm") was directly involved in negotiating and structuring this transaction. Indeed, the closing of this transaction took place at the Law Firm's offices. Further, the Stock Purchase Agreement requires that a copy of all notices intended for Refco Holdings be delivered to the Law Firm and, in particular, to the Law Firm partner primarily in charge of the Refco account (defined below as "Attorney C").

(b)     The close and interdependent relationship between BAWAG and Bennett goes back at least as early as 1999, when Bennett was introduced to BAWAG officials through individuals such as Wolfgang Flöttl (the son of BAWAG's Chief Executive Officer at the time) and Thomas Hackl (who at various different times worked at both BAWAG and Refco).

(c)     In the course of the August 2004 recapitalization transaction, BAWAG was able to require Refco to pay BAWAG at least $1.342 billion in exchange for BAWAG giving up its interests in Refco.

(d)     Refco and Bennett were heavily dependent upon BAWAG, and BAWAG's participation in the circular transactions alleged herein, for Refco's ability to avoid disclosing its significant uncollectible receivables and related-party transactions. This dependence enabled BAWAG to exert influence over Bennett and Refco.

121

## X.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT ONE

**For Violations of Section 12(a)(2) of the Securities Act,
On Behalf of Those Who Purchased or Otherwise
Acquired 144A Bonds in the Bond Offering,
Against Bennett, Trosten, Jaeckel, the THL Partner Defendants,
and the Bond Underwriter Defendants**

270.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

271.    This Claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Bond Underwriter Defendants and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants, on behalf of PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased or otherwise acquired 144A Bonds in the Bond Offering and were damaged by acts alleged in detail herein (collectively, the "Section 12(a)(2) Bond Plaintiffs").

272.    The Offering Memorandum for the 144A Bonds contained all of the information required to be contained in a Section 10 prospectus, and constituted a prospectus for purposes of Section 12(a)(2) of the Securities Act.  Further, the Bond Offering was a public offering of exempt-from-registration securities.

273.    The Bond Underwriter Defendants were underwriters of the public offering of the Bonds.  Although the Bonds were exempt-from-registration pursuant to Rule 144A, the Bond Underwriter Defendants performed functions identical to those they would have performed if the Bonds were registered.

274.     The Bond Underwriter Defendants sold the 144A Bonds to the Section 12(a)(2) Bond Plaintiffs in the Bond Offering.

275.     Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants, as well as Refco Group, Refco Finance Holdings and the Bond Underwriter Defendants, solicited the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in the Bond Offering.  Their actions of solicitation included preparation and distribution of the Offering Memorandum, inviting the Section 12(a)(2) Bond Plaintiffs to attend the Bond Road Show, and setting up and attending the Bond Road Show, where they aggressively marketed the Bonds to the Section 12(a)(2) Bond Plaintiffs through written and oral presentations.

276.     In soliciting the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in the Bond Offering, Refco Group, Refco Finance Holdings, the Bond Underwriter Defendants, and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants were motivated by their own or the security owner's financial interests.

277.     The Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants sold and/or offered to sell the 144A Bonds to the Section 12(a)(2) Bond Plaintiffs by means of the Offering Memorandum and oral communications at the Bond Road Show, all of which contained untrue statements of material fact, including, but not limited to, the financial statements of Refco Group and its subsidiaries, and discussions thereof.  In addition, as alleged in detail herein, the Offering Memorandum and oral communications at the Bond Road Show omitted to state material facts necessary to make the statements, in the light of the circumstances in which they were made, not misleading, including the significant related-party transactions between the Company, BAWAG and Refco Holdings, and the uncollectibility of hundreds of millions of dollars of the Company's

123

receivables due to high levels of customer credit losses in prior years. The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Memorandum or hearing the oral representations.

278. The Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants each owed the Section 12(a)(2) Bond Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Offering Memorandum and of the oral and written statements made at the Bond Road Show, to ensure that they did not include untrue statements of material facts or omit to state material facts necessary to make the statements, in the light of the circumstances in which they were made, not misleading.

279. As alleged in detail herein, the Bond Underwriter Defendants, Refco Group, Refco Finance Holdings, and Defendants Bennett, Trosten, Jaeckel, and the THL Partner Defendants did not make a reasonable and diligent investigation and did not possess reasonable grounds for believing that the statements in the Offering Memorandum and the oral and written statements presented at the Bond Road Show did not include untrue statements of material facts or omit to state material facts necessary to make the statements, in the light of the circumstances in which they were made, not misleading.

280. At the time the Section 12(a)(2) Bond Plaintiffs purchased Bonds in the Bond Offering, they did not know, nor in the exercise of reasonable diligence could they have known, of any of the untruths or omissions alleged in detail herein.

281. The Section 12(a)(2) Bond Plaintiffs suffered injury as a result of Defendants' actions in violation of Section 12(a)(2) of the Securities Act.

282. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Bond Offering.

283. The Section 12(a)(2) Bond Plaintiffs hereby tender their Bonds to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT TWO

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of 144A Bonds in the Bond Offering,
Against the THL Partner Defendants, Lee, Bennett,
Refco Holdings, Grant, Murphy, Trosten, Sexton, Silverman, Maggio and BAWAG
(Based on Violations of Section 12(a)(2) of the Securities Act
by Refco Group, Refco Finance Holdings, and Refco Finance)**

284. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

285. This Claim is brought pursuant to Section 15 of the Securities Act against the THL Partner Defendants and Defendants Lee, Bennett, Grant, Refco Holdings, BAWAG, Murphy, Trosten, Sexton, Silverman, Maggio and BAWAG, on behalf of PIMCO, the PIMCO High Yield Fund, and the other Section 12(a)(2) Bond Plaintiffs.

286. As alleged in detail herein, Refco Group, Refco Finance Holdings, and Refco Finance violated Section 12(a)(2) of the Securities Act by soliciting the Section 12(a)(2) Bond Plaintiffs' purchases of the 144A Bonds in the Bond Offering by means of a prospectus (the Offering Memorandum) and oral statements that included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. In soliciting these purchases, Refco

125

Group, Refco Finance Holdings, and Refco Finance were motivated by their own financial interests.  Refco Group, Refco Finance Holdings, and Refco Finance failed to exercise reasonable care regarding the accuracy and completeness of the Offering Memorandum and oral statements.  The facts misstated and omitted would have been material to a reasonable person.  But for the fact that Refco Group, Refco Finance Holdings, and Refco Finance have filed for bankruptcy protection, they would be named as defendants on the Section 12(a)(2) claims alleged herein.

287.    As a direct and proximate result of the violations of Section 12(a)(2) of the Securities Act by Refco Group, Refco Finance Holdings, and Refco Finance, the Section 12(a)(2) Bond Plaintiffs suffered damages in connection with their purchases of 144A Bonds in the Bond Offering and were damaged by the acts alleged in detail herein.

288.    Defendants Bennett, Murphy, Trosten, Sexton, Silverman and Maggio were controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance due (among other reasons alleged in detail herein) to their executive positions with Refco Group and Refco Finance Holdings (of which Refco Finance was a wholly-owned subsidiary at the time of the Bond Offering); their direct involvement in the day-to-day business and operations of each entity, including the preparation of their financial statements; their participation in the Bond Road Show where the Bonds were marketed to investors and the contents of the Offering Memorandum were discussed; and/or their participation in the preparation and dissemination of the inaccurate Offering Memorandum for the Bonds.  By virtue of the foregoing, each of these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, Refco Finance Holdings, and Refco Finance,

126

including the content and dissemination of their financial statements and the Offering Memorandum.

289. Defendant Bennett was also a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to his substantial ownership interest (through his ownership interest in Refco Holdings) in New Refco, the sole member of Refco Group.

290. Defendant Refco Holdings was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to its approximate 43% ownership interest in New Refco, the sole member of Refco Group.

291. The THL Partner Defendants were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to their approximate 57% ownership interest in New Refco, the sole member of Refco Group.

292. Defendant Lee was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged in detail herein) to his position as Chairman and CEO of Thomas H. Lee Partners, and the fact that Thomas H. Lee Partners or Lee controlled each of the other THL Partner Defendants, which in turn controlled Refco Group.

293. Defendant BAWAG was a controlling person of Refco Group by virtue of its substantial ownership interest in Refco Group. As alleged herein, since in or about 1998 BAWAG admittedly owned a 10% interest in Refco Group until it sold that interest in the August 2004 recapitalization transaction. Further, as discussed herein, BAWAG in fact held at least a 37% stake in Refco Group. By virtue of such ownership interest, BAWAG had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group and Defendant Bennett, including the content and dissemination of its

financial statements and the Offering Memorandum.  BAWAG's control over Refco Group is evidenced by the fact that in the course of the August 2004 recapitalization transaction, BAWAG was able to require Refco Group to pay BAWAG $1.342 billion in exchange for BAWAG giving up its interest in Refco Group.

294.    In addition, BAWAG was a controlling person of Refco Group because BAWAG controlled Defendant Bennett, who, in turn, controlled Refco Group.  BAWAG controlled Bennett bcause Bennett was dependent upon BAWAG to ensure that certain material facts about Refco Group's true financial condition were not disclosed.  Specifically, as set forth above, when a number of Refco's customers – including BAWAG – suffered extensive trading losses in the worldwide financial crises of 1998-2000, they were unable to repay the credit extended to them by Refco.  In order to avoid disclosing these uncollectible debts, Bennett transferred the debts to Refco Holdings and then orchestrated a series of transactions whereby the receivable was temporarily paid off at the end of each of the Company's financial reporting periods.

295.    BAWAG actively assisted Bennett in concealing this uncollectible receivable in at least three ways.  First, in 1999, shortly after Refco first suffered these losses, BAWAG injected a huge amount of fresh capital into the Company by acquiring a 10% stake in Refco through BAWAG's wholly-owned affiliate, BAWAG Overseas.  Indeed, in a May 20, 1999 press release, Defendant Bennett expressly referenced "this significant infusion of capital" from BAWAG and stated that the transaction "create[d] future opportunities of benefit to both parties."  Second, as alleged above, it appears that BAWAG injected additional capital into the Company through a series of undisclosed loans between Refco Holdings, Refco, DF Capital, Desana and perhaps other entities affiliated with BAWAG and/or Refco, in return for an additional undisclosed 27% equity stake in the Company.  Third, BAWAG participated in at least six transactions at the end

128

of Refco's fiscal years 2000 through 2005 that allowed Refco Holdings to temporarily pay off the receivable it owed to the Company. This significant economic assistance that BAWAG gave to Bennett provided BAWAG with disproportionate influence and control over Bennett – a CEO who was clearly desperate to conceal the existence of Refco Holdings' uncollectible receivable. Thus, by reason of Bennett's economic dependence on BAWAG, BAWAG controlled Bennett and, through him, Refco. This dependence is further evidenced by the fact that, when the $430 million related-party receivable came to light in October 2005, and Bennett was anxious to avoid full disclosure of all of the facts, Bennett turned to BAWAG for a $420 million loan in order to pay off Refco Holdings' debt to Refco.

296. The THL Partner Defendants and Defendants Lee, Bennett, Refco Holdings, Murphy, Trosten, Sexton, Silverman, Maggio and BAWAG acted negligently and without reasonable care regarding the accuracy of the information contained in the prospectus for the Bonds, and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

297. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Bond Offering.

298. Pursuant to Section 15 of the Securities Act, the THL Partner Defendants and Defendants Lee, Bennett, Refco Holdings, BAWAG, Murphy, Trosten, Sexton, Silverman, Maggio and BAWAG are jointly and severally liable with, and to the same extent as, Refco Group, Refco Finance Holdings, and Refco Finance, for those entities' violations of Section 12(a)(2) of the Securities Act.

129

## COUNT THREE

### For Violations of Section 11 of the Securities Act,
### On Behalf of Purchasers of Registered Bonds,
### Against the Section 11 Bond Defendants

299.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

300.    This Claim is brought pursuant to Section 11 of the Securities Act against Defendants Bennett, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, Harkins, Jaeckel, Schoen, O'Kelley, Gantcher, Breitman, Refco Futures, Westminster-Refco, Lind-Waldock, Grant Thornton, and the Bond Underwriter Defendants  (collectively, the "Section 11 Bond Defendants"), on behalf of PIMCO, the PIMCO High Yield Fund, and all other members of the Class who purchased or otherwise acquired Registered Bonds during the Class Period and were damaged by acts alleged herein (collectively, the "Section 11 Bond Plaintiffs").

301.    The Registered Bonds were issued pursuant to the Bond Registration Statement. All purchases of Registered Bonds are traceable to the Bond Registration Statement.

302.    The Bond Registration Statement contained untrue statements of material facts, including, but not limited to, the financial statements of Refco Group and its subsidiaries and other statements regarding Refco Group's business operations and financial results.  In addition, the Bond Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements made not misleading, including the significant related-party transactions between the Company and Refco Holdings and the uncollectibility of hundreds of

130

millions of dollars of the Company's receivables. The facts misstated and omitted would have been material to a reasonable person reviewing the Bond Registration Statement.

303. Refco Group and Refco Finance were the co-issuers of the Bonds pursuant to the Bond Registration Statement, and would be strictly liable for the untrue statements of material fact and omissions to state material facts therein, but for their filing for bankruptcy court protection.

304. Defendants Bennett, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, Refco Futures, Westminster-Refco, and Lind-Waldock each signed the Bond Registration Statement.

305. At the time the Bond Registration Statement was filed, Defendants Bennett, Lee, Harkins, Jaeckel, Schoen, O'Kelley, Gantcher, and Breitman were managers of New Refco, which managed and was the sole member of Refco Group. As such, these Defendants performed similar functions to those of directors of Refco Group, a co-issuer of the Bonds.

306. Defendant Grant Thornton was the auditor for Refco Group and its subsidiaries, and consented to being named in the Bond Registration Statement as a party who certified the audited financial statements contained therein. Grant Thornton's audit report, which was contained in the Bond Registration Statement, incorrectly stated that Grant Thornton's audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

307. The Bond Underwriter Defendants were underwriters for the Bonds. They served as underwriters in connection with the Bond Offering with the understanding and expectation that the Rule 144A Bonds would later be exchanged for Registered Bonds, and that the Registered Bonds would be registered pursuant to a registration statement that was virtually identical to the Offering Memorandum prepared by the Bond Underwriter Defendants for the

131

Bond Offering. The Bond Registration Statement, which was prepared with the participation of the Bond Underwriter Defendants, included substantially the same untrue statements of material fact and material omissions as the Offering Memorandum, as alleged in detail herein.

308. The Section 11 Bond Defendants owed the Section 11 Bond Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Bond Registration Statement, to ensure that they did not contain untrue statements of material fact or omit to state material facts required to be stated therein or necessary to make the statements therein not misleading.

309. As alleged in detail herein, the Section 11 Bond Defendants did not make a reasonable investigation of the statements contained in the Bond Registration Statement, and did not possess reasonable grounds for believing that the Bond Registration Statement did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

310. The Section 11 Bond Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the Bond Registration Statement when they purchased or acquired those Bonds.

311. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Exchange Offer pursuant to the Bond Registration Statement..

312. By reason of the foregoing, the Section 11 Bond Defendants are liable to the Section 11 Bond Plaintiffs for violations of Section 11 of the Securities Act.

## COUNT FOUR

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of the Section 11 Bond Plaintiffs,
Against the THL Defendants, Bennett, Refco Holdings,
the Bennett Trust, Murphy, Sherer, Sexton,
Maggio, Klejna, O'Kelley, Gantcher, Breitman and BAWAG
(Based on Violation of Section 11 of the Securities Act by Refco Group)**

313.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

314.    This Claim is brought pursuant to Section 15 of the Securities Act against the THL Defendants and Defendants Bennett, Refco Holdings, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman, and BAWAG on behalf of the Section 11 Bond Plaintiffs.

315.    As alleged herein, Refco Group violated Section 11 of the Securities Act by signing and issuing the Bond Registration Statement, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person.  But for the fact that Refco Group has filed for bankruptcy protection, it would be named as a defendant on the Section 11 claims alleged in detail herein.

316.    As a direct and proximate result of Refco Group's violation of Section 11 of the Securities Act, the Section 11 Bond Plaintiffs suffered damages in connection with their purchase and/or acquisition of Registered Bonds during the Class Period and were damaged by the acts alleged in detail herein.

133

317.    The THL Partner Defendants were controlling persons of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to the approximate 57% ownership interest that those Defendants, together with their passive co-investors, had in New Refco, the sole member of Refco Group.

318.    The THL Individual Defendants were controlling persons of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to their positions as four of the Company's eight managers, and their executive positions with the THL Partner Defendants, which controlled Refco Group.

319.    Defendant Bennett was a controlling person of Refco Group when the Bond Registration Statement was filed and became effective, due (among other reasons alleged herein) to his approximate 43% ownership interest (through his sole ownership of Refco Holdings and control of the Bennett Trust) in New Refco, the sole member of Refco Group.

320.    Defendants Refco Holdings and the Bennett Trust were controlling persons of Refco Group when the Bond Registration statement was filed and became effective due (among other reasons alleged in detail herein) to the approximate 43% ownership interest that these Defendants had in New Refco, the sole member of Refco Group.

321.    Defendants Bennett, Murphy, Sherer, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco Group due (among other reasons alleged herein) to their executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Bond Registration Statement.

322.    Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco Group due (among other reasons alleged herein) to their service on the Audit Committee of New

134

Refco, which also performed the functions of an audit committee for Refco Group. As members of the Audit Committee, these Defendants were responsible for overseeing Refco Group's financial reporting, accounting, and internal controls; overseeing the activities of Refco Group's outside auditors and reviewing the scope and results of those audits with the auditors; and meeting with and making recommendations to the managers of Refco Group concerning the foregoing activities.

323.    BAWAG was a controlling person of Refco because BAWAG controlled Defendant Bennett who, in turn, controlled Refco Group. BAWAG controlled Bennett because Bennett was dependent upon BAWAG to ensure that certain material facts about Refco Group's true financial condition were not disclosed. Specifically, as set forth above, when a number of Refco's customers – including BAWAG – suffered extensive trading losses in the worldwide financial crises of 1998-2000, they were unable to repay the credit extended to them by Refco. In order to avoid disclosing these uncollectible debts, Bennett transferred the debts to Refco Holdings and then orchestrated a series of transactions whereby the receivable was temporarily paid off at the end of each of the Company's financial reporting periods.

324.    BAWAG actively assisted Bennett in concealing this uncollectible receivable in at least three ways. First, in 1999, shortly after Refco first suffered these losses, BAWAG injected a huge amount of fresh capital into the Company by acquiring a 10% stake in Refco through BAWAG's wholly-owned affiliate, BAWAG Overseas. Indeed, in a May 20, 1999 press release, Defendant Bennett expressly referenced "this significant infusion of capital" from BAWAG and stated that the transaction "create[d] future opportunities of benefit to both parties." Second, as alleged above, it appears that BAWAG injected additional capital into the Company through a series of undisclosed loans between Refco Holdings, Refco, DF Capital, Desana and perhaps

135

other entities affiliated with BAWAG and/or Refco, in return for an additional undisclosed 27% equity stake in the Company. Third, BAWAG participated in at least six transactions at the end of Refco's fiscal years 2000 through 2005 that allowed Refco Holdings to temporarily pay off the receivable it owed to the Company. This significant economic assistance that BAWAG gave to Bennett provided BAWAG with disproportionate influence and control over Bennett – a CEO who was clearly desperate to conceal the existence of Refco Holdings' uncollectible receivable. Thus, by reason of Bennett's economic dependence on BAWAG, BAWAG controlled Bennett and, through him, Refco. This dependence is further evidenced by the fact that, when the $430 million related-party receivable came to light in October 2005, and Bennett and BAWAG were anxious to avoid full disclosure of all of the facts, BAWAG readily provided, in remarkably short order, a $420 million loan to Bennett, which he used to pay off Refco Holdings' debt to Refco.

325. By virtue of the foregoing, the THL Defendants, Bennett, Refco Holdings, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman and BAWAG each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, including the content of its financial statements and of the Bond Registration Statement.

326. The THL Defendants, Bennett, Refco Holdings, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman and BAWAG acted negligently and without reasonable care regarding the accuracy of the information contained in the Bond Registration Statement, and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

136

327. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the Exchange Offer pursuant to the Bond Registration Statement.

328. Pursuant to Section 15 of the Securities Act, the THL Defendants, Bennett, Refco Holdings, the Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman, and BAWAG are jointly and severally liable with, and to the same extent as, Refco Group for its violation of Section 11 of the Securities Act.

## COUNT FIVE

### For Violations of Section 11 of the Securities Act, On Behalf of Purchasers of Refco Common Stock, Against the Section 11 Stock Defendants

329. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

330. This Claim is brought pursuant to Section 11 of the Securities Act against Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Grant Thornton, and the Stock Underwriter Defendants (collectively, the "Section 11 Stock Defendants"), on behalf of RH Capital and other members of the Class who, during the Class Period, purchased or otherwise acquired Refco common stock issued pursuant and/or traceable to the IPO Registration Statement and were damaged by acts alleged herein (collectively, the "Section 11 Stock Plaintiffs").

331. Refco issued common stock pursuant to the IPO Registration Statement. All purchases of Refco common stock are traceable to the IPO Registration Statement.

332.     The IPO Registration Statement contained untrue statements of material fact, including, but not limited to, the financial statements of Refco and its subsidiaries and other statements regarding Refco's business operation and financial results.  In addition, the IPO Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including the significant related-party transactions between the Company and Refco Holdings and the uncollectibility of hundreds of millions of dollars of the Company's receivables.  The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Registration Statement.

333.     Refco issued stock pursuant to the IPO Registration Statement, and would be strictly liable for the untrue statements of material fact and omissions to state material facts therein, but for its filing for bankruptcy court protection.

334.     Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen each signed the IPO Registration Statement.

335.     At the time the IPO Registration Statement was filed, Defendants Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, and Schoen were directors of Refco.

336.     Defendant Grant Thornton was the auditor for Refco and its subsidiaries, and consented to being named in the IPO Registration Statement as a party who certified the audited financial statements contained therein.  Grant Thornton's audit report, which was contained in the IPO Registration Statement, incorrectly stated that Grant Thornton's audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

138

337. The Stock Underwriter Defendants sold shares of Refco stock in the August 2005 IPO, participated in the preparation of the IPO Registration Statement and were responsible for the contents and dissemination of the IPO Registration Statement.

338. The Section 11 Stock Defendants owed to the Section 11 Stock Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the IPO Registration Statement, to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

339. As alleged in detail herein, the Section 11 Stock Defendants did not make a reasonable investigation of the statements contained in the IPO Registration Statement, and did not possess reasonable grounds for believing that the IPO Registration Statement did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

340. The Section 11 Stock Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the IPO Registration Statement when they purchased or acquired the stock.

341. By reason of the foregoing, the Section 11 Stock Defendants are liable to the Section 11 Stock Plaintiffs for violations of Section 11 of the Securities Act.

**COUNT SIX**

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of Refco Common Stock
Against The Section 15 Stock Defendants
(Based on Violations of Section 11 of the Securities Act
by Refco)**

342. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and

139

omissions intentionally or recklessly.  For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

343.    This Claim is brought pursuant to Section 15 of the Securities Act against the THL Defendants and Defendants Bennett, Refco Holdings, the Bennett Trust, Murphy, Sherer, Sexton, Maggio, Klejna, Breitman, Gantcher, O'Kelley and BAWAG (collectively, the "Section 15 Stock Defendants"), on behalf of RH Capital, and the other members of the Class who purchased who purchased or acquired the stock issued in or traceable to the August 2005 IPO, and were damaged by acts alleged herein (the "Section 15 Stock Plaintiffs").

344.    As alleged in detail herein, Refco violated Section 11 of the Securities Act with respect to the August 2005 IPO by an issuing the IPO Registration Statement, which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Registration Statement.  But for the fact that Refco has filed for bankruptcy protection, it would be named as a Defendant on the Section 11 claims alleged in detail herein.

345.    The Section 15 Stock Defendants had a duty to disseminate accurate and truthful information with respect to Refco's financial condition and results of operations.

346.    The THL Partner Defendants were controlling persons of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to the approximate 42.7% ownership interest that these Defendants, together with their passive co-investors, had in Refco.

140

347. The THL Individual Defendants were controlling persons of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to their positions as four of the Company's eight managers, and their executive positions with the THL Partner Defendants, which controlled Refco.

348. Defendant Bennett was a controlling person of Refco when the IPO Registration Statement was filed and became effective, due (among other reasons alleged herein) to his approximate 33.8% ownership interest (through his sole ownership of Refco Holdings and control of the Bennett Trust) in Refco.

349. Defendants Refco Holdings and the Bennett Trust were controlling persons of Refco when the IPO Registration statement was filed and became effective due (among other reasons alleged in detail herein) to the approximate 33.8% ownership interest that these Defendants had in Refco.

350. Defendants Bennett, Murphy, Sherer, Sexton, Maggio and Klejna, were controlling persons of Refco due (among other reasons alleged herein) to their executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the IPO Registration Statement.

351. Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco due (among other reasons alleged herein) to their service on the Audit Committee of Refco. As members of the Audit Committee, these Defendants were responsible for overseeing Refco's financial reporting, accounting, and internal controls; overseeing the activities of Refco's outside auditors and reviewing the scope and results of those audits with the auditors; and meeting with and making recommendations to the managers of Refco concerning the foregoing activities.

141

352. BAWAG was a controlling person of Refco because BAWAG controlled Defendant Bennett who, in turn, controlled Refco. BAWAG controlled Bennett because Bennett was dependent upon BAWAG to ensure that certain material facts about Refco were not disclosed. Specifically, as set forth above, when a number of Refco's customers – including BAWAG – suffered extensive trading losses in the worldwide financial crises of 1998-2000, they were unable to repay the credit extended to them by Refco. In order to avoid disclosing these uncollectible debts, Bennett transferred the debts to Refco Holdings and then orchestrated a series of transactions whereby the receivable was temporarily paid off at the end of each of the Company's financial reporting periods.

353. BAWAG actively assisted Bennett in concealing this uncollectible receivable in at least three ways. First, in 1999, shortly after Refco first suffered these losses, BAWAG injected a huge amount of fresh capital into the Company by acquiring a 10% stake in Refco through BAWAG's wholly-owned affiliate, BAWAG Overseas. Indeed, in a May 20, 1999 press release, Defendant Bennett expressly referenced "this significant infusion of capital" from BAWAG and stated that the transaction "create[d] future opportunities of benefit to both parties." Second, as alleged above, it appears that BAWAG injected additional capital into the Company through a series of undisclosed loans between Refco Holdings, Refco, DF Capital, Desana and perhaps other entities affiliated with BAWAG and/or Refco, in return for an additional undisclosed 27% equity stake in the Company. Third, BAWAG participated in at least six transactions at the end of Refco's fiscal years 2000 through 2005 that allowed Refco Holdings to temporarily pay off the receivable it owed to the Company. This significant economic assistance that BAWAG gave to Bennett provided BAWAG with disproportionate influence and control over Bennett – a CEO who was clearly desperate to conceal the existence of Refco Holdings' uncollectible receivable.

142

Thus, by reason of Bennett's economic dependence on BAWAG, BAWAG controlled Bennett and, through him, Refco. This dependence is further evidenced by the fact that when the $430 million related-party receivable came to light in October 2005, and Bennett and BAWAG were anxious to avoid full disclosure of all of the facts, BAWAG readily provided, in remarkably short order, a $420 million loan to Bennett, which he used to pay off Refco Holdings' debt to Refco.

354. By virtue of the foregoing, the THL Defendants and Defendants Bennett, Refco Holdings, the Bennett Trust, Murphy, Sherer, Sexton, Maggio, Klejna, O'Kelley, Gantcher, Breitman and BAWAG each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco, including the content of its financial statements and of the IPO Registration Statement.

355. Lead Plaintiff RH Capital and the Section 15 Stock Plaintiffs purchased Refco securities issued in, or traceable to, the August 2005 IPO and were damaged thereby. The August 2005 IPO was conducted pursuant to the IPO Registration Statement.

356. The Section 15 Stock Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in the IPO Registration Statement and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

357. The Section 15 Stock Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the IPO Registration Statement.

143

358. The Section 15 Stock Plaintiffs have sustained damages as a result of the inaccurate statements and omissions in the IPO Registration Statement, for which they are entitled to compensation.

359. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the August 2005 IPO pursuant to the IPO Registration Statement.

360. Pursuant to Section 15 of the Securities Act, the Section 15 Stock Defendants are jointly and severally liable with and to the same extent as Refco, for its violations of Section 11 of the Securities Act.

### COUNT SEVEN

**For Violations of Section 12(a)(2) of the Securities Act,
On Behalf of Those Who Purchased or Otherwise Acquired
Refco Common Stock in the August 2005 IPO,
Against the Stock Underwriter Defendants**

361. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

362. This claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Stock Underwriter Defendants on behalf of RH Capital and other members of the Class who purchased or otherwise acquired Refco common stock in the August 2005 IPO and were damaged by the acts alleged in detail herein.

363. The Stock Underwriter Defendants sold shares of Refco stock in the August 2005 IPO and were responsible for the contents and dissemination of the Prospectus. As alleged in

144

detail herein, the Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. The untrue statements of material fact in the Prospectus included, but were not limited to, the financial statements of Refco and other statements regarding Refco's business operation and financial results. In addition, the Prospectus omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, including the significant related-party transactions between the Company and Refco Holdings, and the uncollectibility of hundreds of millions of dollars of the Company's receivables due to high levels of customer credit losses in prior years. The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

364. The Stock Underwriter Defendants owed to the purchasers of Refco stock, including Plaintiff RH Capital, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that it was true and that there was no omission to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

365. As alleged in detail herein, the Stock Underwriter Defendants did not make a reasonable and diligent investigation and did not possess reasonable grounds for believing that the Prospectus did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

366. Plaintiff RH Capital and the members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained

145

in the Prospectus at the time they acquired Refco stock.

367. By reason of the foregoing, the Stock Underwriter Defendants are liable to Plaintiff RH Capital and other members of the Class who purchased or otherwise acquired stock issued in the August 2005 IPO pursuant to the Prospectus for violations of Section 12(a)(2) of the Securities Act, each of whom has been damaged by reason of such violations.

368. Plaintiff RH Capital and other members of the Class who purchased or otherwise acquired stock issued in the August 2005 IPO pursuant to the Prospectus hereby tender their shares of Refco stock to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.

## COUNT EIGHT

**Control Person Liability Pursuant to Section 15 of the Securities Act,
On Behalf of Purchasers of Refco Common Stock
Against the Section 15 Stock Defendants
(Based on Violations of Section 12(a)(2) of the Securities Act
by Refco)**

369. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this Claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

370. This Claim is brought pursuant to Section 15 of the Securities Act against the Section 15 Stock Defendants on behalf of the Section 15 Stock Plaintiffs.

371. As alleged in detail herein, Refco violated Section 12(a)(2) of the Securities Act by soliciting the Section 15 Stock Plaintiffs' purchases of Refco's common stock by means of the IPO Prospectus, which included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under

146

which they were made, not misleading.  In soliciting these purchases, Refco was motivated by its own financial interests.  Refco failed to exercise reasonable care regarding the accuracy and completeness of the IPO Prospectus.  The facts misstated and omitted would have been material to a reasonable person.  The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Prospectus.  But for the fact that Refco has filed for bankruptcy protection, it would be named as defendants on the Section 12(a)(2) claims alleged herein.

372.   The Section 15 Stock Defendants had a duty to disseminate accurate and truthful information with respect to Refco's financial condition and results of operations.

373.   As alleged above, the Section 15 Stock Defendants at all relevant times either (i) participated in the operation and management of the Company, and/or (ii) conducted and participated, directly and indirectly, in the conduct of Refco's business affairs, and/or (iii) exerted controlling influence over the Company through the nature of their relationships with Bennett and others.  Because of their positions of control and authority over Refco, the Section 15 Stock Defendants were able to, and did, control the contents of the IPO Prospectus.

374.   Lead Plaintiff RH Capital and the Section 15 Stock Plaintiffs purchased Refco securities issued in, or traceable to, the August 2005 IPO and were damaged thereby.  The August 2005 IPO was conducted pursuant to the IPO Prospectus.

375.   The Section 15 Stock Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in the IPO Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

147

376. The Section 15 Stock Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the IPO Prospectus.

377. The Section 15 Stock Plaintiffs have sustained damages as a result of the inaccurate statements and omissions in the IPO Prospectus, for which they are entitled to compensation.

378. This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years of the August 2005 IPO.

379. Pursuant to Section 15 of the Securities Act, the Section 15 Stock Defendants are jointly and severally liable with and to the same extent as Refco, for those entities' violations of Section 12(a)(2) of the Securities Act.

## XI. DEFENDANTS' FRAUDULENT SCHEME

380. The allegations that follow describe the acts, practices, and a course of conduct engaged in by various Defendants that operated as a fraud on the investing public. As described in more detail below, Defendants Bennett, BAWAG, Maggio and others devised and participated in a fraudulent scheme consisting of a series of sham related-party "loans" that were timed to occur at the end of Refco's financial periods from 1999 through 2005. This scheme was designed to (and did) enable Refco to temporarily transfer uncollectible debt off of the Company's books by shifting it between wholly-owned Company subsidiaries, related-party companies owned and controlled by Bennett, and several third party customers of Refco. The goal of this scheme was to disguise hundreds of millions of dollars of uncollectible receivables owed to the Company so that the Company could fraudulently avoid taking hundreds of millions of dollars in write-offs.

381. As these Defendants knew, such large write-offs would have been catastrophic to

148

the Company because, among other things, they would have (a) eliminated the Company's members' equity (and thus eliminated any chance for Refco's insiders to accumulate huge personal fortunes); (b) revealed that the Company's business plan and operations exposed the Company to the very same enormous trading and market risks undertaken by its customers; (c) created a host of regulatory capital problems for the Company; and (d) wiped out the Company's income and profits by revealing that the numbers the Company reported as positive were actually negative.

A.    **Origins of the Scheme**

382.    During the 1970s, Bennett was employed by several international commercial banks and developed significant experience in arranging financing for commodities investors. When Bennett was hired as the Company's CFO in 1983, he put his experience into practice by creating a customer finance unit at Refco. Formed in 1982, the customer finance unit extended loans from the Company to its trading clients. These loans allowed the Company's customers to operate on "margin" and leverage their operating capital into increasingly larger trades in the commodities, derivatives, and futures markets. These larger trades, in turn, generated larger commissions for the Company and led to dramatic increases in its revenues, income and profits.

383.    The Company soon became dependent upon the increased flow of commissions, revenues and profits that these loans generated. In order to continue increasing its revenues and profits, the Company started extending credit to its customers based on little or no assessment of the customer's credit-worthiness. As reported in Bloomberg Markets in February 2006, a Refco broker stated that "Refco was like a used-car dealer: no money down, no credit, no problem."

384.    While these "no questions asked" loans allowed the Company to increase its commissions, revenues and profits, they also exposed it to the severe trading risks undertaken by its clients – clients who often took huge positions in the volatile commodities, derivatives,

149

currency and futures markets. Thus, if the Company's clients suffered significant trading losses rendering them unable to repay their loans to the Company, the Company would be forced, according to applicable accounting rules and regulations, to "write off" the amounts of the loans from its books. In short, by extending easily-obtained financing to its customers, the Company had created a business model that depended in large part upon the success its own customers achieved making trades in various financial markets around the world. The inherent dangers posed by this business model materialized – though were not revealed to the public – in 1997 and 1998 when a number of the Company's most significant customers (and the Company itself) suffered massive trading losses.

385. First, in what became known as the "Asian Financial Crisis," two rounds of currency devaluations in Southeast Asia caused the Company and its customers to suffer severe losses. In July 1997, the Thai baht, Malaysian ringgit, Philippine peso, and Indonesian rupiah suffered sharp declines in value. In late 1997, the Taiwan dollar, South Korean won, Brazilian real, Singaporean dollar, and Hong Kong dollar suffered similar sharp declines. Several of the Company's customers had made large speculative trading "bets" that these currencies would be supported by their respective governments and kept at a fixed value against the United States dollar. When these gambles failed, the customers lost huge sums of money and were unable to repay hundreds of millions of dollars worth of loans they had received from the Company. For instance, as reported in <u>Bloomberg Markets</u> in February 2006, "a person familiar with an internal review that Refco conducted" in October 2005 noted that Refco was unable to collect more than $300 million in amounts owed from eight customers who suffered severe losses in connection with the Asian Financial Crisis.

386. Second, in early 1998, international prices for oil, copper, gold and aluminum

began to decline. The Russian economy was hit especially hard by these price declines because nearly two-thirds of Russia's hard currency earnings depended on exports of oil and non-ferrous metals. As the Russian economy weakened, its tax revenues declined and the Russian government was forced to increase the interest rates on its domestic bonds in order to attract foreign capital. By July 1998, the interest rates on Russian ruble-backed domestic bonds had climbed above 70% and, notwithstanding the increasing risk that the Russian government would default on its repayment obligations, foreign speculators, including many of the Company's largest customers, purchased hundreds of millions of dollars' worth of the bonds. To fund these purchases, many of the Company's customers drew down on the credit lines extended to them by the Company itself. In addition to taking huge positions in Russian bonds, many Refco customers also purchased hundreds of millions of dollars in "ruble futures" that were due to mature in the Fall of 1998.

387. In essence, these customers were speculating that the Russian government would honor its debt obligations and keep the ruble at a fixed value relative to the U.S. dollar. This speculation proved ill-founded. On August 17, 1998, the Russian government defaulted on its domestic debt <u>and</u> devalued the ruble. These actions caused huge financial reversals for many of the Company's customers. On information and belief, the trading losses suffered by these customers were primarily the result of the international financial crises in late 1997 and 1998, which rendered the customers unable to repay hundreds of millions of dollars in loans they had received from the Company.

388. The losses suffered by the Company's customers are also described in the Indictment:

> During the 1990's, Refco extended credit to customers, allowing customers to trade securities and commodities in accounts held at Refco.

151

> During this time, certain Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of market losses in their Refco accounts. When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.

Indictment ¶ 5.

389.     A significant portion of these customer losses occurred as a result of the secret trading activities of Defendant BAWAG. On March 24, 2006, BAWAG held a press conference and announced that it had experienced approximately US $1.2 billion in trading losses in accounts maintained at Refco. According to published reports, and confirmed by Lead Plaintiffs' independent investigation, these losses occurred primarily in the trading accounts of Ross Capital. In apparent violation of representations he had made to BAWAG. Wolfgang Flottl engaged in high-risk currency speculation, which resulted in huge losses when the Japanese yen declined for eight straight weeks in 2000. Upon information and belief, a material percentage of the capital employed by Flottl in this speculation was provided by BAWAG and further extended on margin loans by Refco, thus creating both a significant loss for BAWAG and a significant bad debt owed to Refco.

390.     Gunter Weninger, the chairman of BAWAG's supervisory board, has recently admitted that he was informed of the losses in 2000 and understood that they "could threaten the bank's balance sheet," but he deliberately concealed the losses because:

> A public debate would have impeded our efforts to minimize the damage . . . I saw a danger that customers would leave, that jobs might be lost and that the bank would be harmed.

BAWAG concealed these losses through securities transactions conducted through offshore accounts held at Refco by entities related to BAWAG. On March 24, 2006, Weninger announced that he was resigning from BAWAG.

391.     In order to help BAWAG hide its massive losses, BAWAG's principal

152

shareholder, the Osterreichischer Gewerksschaftsbund ("OGB"), backed BAWAG and provided an influx of capital. Notably, Weninger is also the finance chief for OGB.

392. While BAWAG was keeping its losses off its own books, Refco and its executives were similarly determined to keep the uncollectible receivables stemming from Refco's customers' losses (including Ross Capital's) off of Refco's books, as described below.

**B.     Bennett Becomes CEO and, With the Aid of Maggio and Others, Transfers Uncollectible Receivables Off Refco's Books**

393. In September 1998, on the heels of the two world-wide financial catastrophes described above, Bennett was promoted from CFO to the Chairman and CEO of the Company. As a former CFO with over seventeen years of experience at the Company and over twenty-eight years of experience in the fields of commodity and commercial lending, Bennett knew that revealing the uncollectible loans and the huge trading losses would be catastrophic to the Company he now led. Indeed, as Bennett knew, if these loans and trading losses were revealed and properly accounted for, the resulting write-offs would threaten the Company's very survival.

394. The "life threatening" nature of the financial problems facing Refco at this time is discussed in a lawsuit filed on August 5, 2004 in the Northern District of Illinois by Thomas H. Dittmer, a former CEO of Refco, against Edwin L. Cox, Jr., a commodities trader with extensive dealings with Refco, captioned Thomas H. Dittmer v. Edwin L. Cox, Jr., No. 5185 (N.D. Ill.). In that lawsuit, Dittmer alleges that "Cox undertook to evaluate Refco's financial status in connection with accounts at Refco co-owned by Cox and Dittmer." According to that complaint:

> Prior to August 1999, Cox advised Dittmer that Dittmer's continued ownership of equity interests in Refco would cause Dittmer to suffer significant financial loss and that it would be in Dittmer's best interest to sell his interests in Refco as quickly as possible.

(Emphasis added). In a facsimile attached to Dittmer's Complaint and dated August 4, 2004, Cox wrote to Dittmer and stated:

153

> I am shocked that at this point in time you suddenly take the position that I have no claim involving Refco. You have an awfully short memory! I took risk, put in capital, endured a lot of grief, spent the time, hired the people, negotiated resolutions to your CFTC problems, and generally attempted to protect you from liabilities, <u>which we both know were life threatening.</u>

(Emphasis added).

395.  As explained in the Indictment, beginning no later than 1999, Bennett and others embarked on a scheme to conceal the losses the Company had suffered and the uncollectible receivables owed to it by its customers:

> Rather than write off these losses on Refco's books, [] Bennett . . . caused these and other losses to be transferred to [Refco Holdings] [a company owned and controlled by Bennett], with the result that Refco's books showed a large receivable owed by [Refco Holdings].

Indictment ¶ 5.

396.  Thus, according to the Indictment, Bennett simply transferred the uncollectible receivables owed to the Company onto the books of Refco Holdings, which he owned and controlled. These uncollectible receivables were then recorded on the Company's books as a receivable owed to it by Refco Holdings, instead of as uncollectible receivables owed by the Company's customers.

397.  As discussed below, Lead Plaintiffs' investigation has revealed that Defendant Maggio was directly involved with developing and implementing this scheme to transfer the customer receivables to Refco Holdings. Further, based on Lead Plaintiffs' investigation, Bennett, Maggio, BAWAG and others used this scheme to disguise losses suffered by Refco's customers not just in 1999, but repeatedly throughout the next six years.

**C.      Refco Engages In a Series of Fraudulent "Round About" Transactions to Conceal the Receivable At Each Financial Period End**

398.  Defendants Bennett and Maggio and others knew that, under applicable

accounting rules and regulations, the existence of a multi-hundred million dollar receivable owed

to the Company by a related-party entity such as Refco Holdings would have to be disclosed as a

"related party transaction." This disclosure, in turn, would attract the attention of, among others,

investors and regulators, who view related-party transactions with suspicion because they are

often used to carry out financial statement manipulations. These Defendants knew that such a

huge related-party receivable could be recognized for what it was: uncollectible debt that had to

be written off, and compelling evidence that the Company's business model was much less

robust than previously perceived.

399.    In order to avoid this result, they devised a remarkably simple scheme that should

have been obvious to all Defendants (all of whom had unfettered access to the Company's books

and records at and before the time of their securities law violations). As described below,

Bennett, Maggio, BAWAG and others carried out a series of "loan" transactions at the end of

each fiscal year from 1999 through 2005, and several fiscal quarters as well, to temporarily pay

down the receivable owed to Refco from Refco Holdings and replace it on the Company's books

with a receivable purportedly owed from one or more non-related third-party customers. The

Indictment describes this straightforward scheme as follows:

> Beginning in or about 1999 . . . Bennett caused the [Refco Holdings]
> receivable to be temporarily transferred to one or more customer accounts
> not affiliated with Bennett at every fiscal year-end through the fiscal year-
> end [through] February 28, 2005.

Indictment ¶ 7.

### 1.    The Fraudulent Transactions With Customer X

400.    Lead Plaintiffs have obtained substantial evidence regarding the related-party loan

transactions that were used to conceal the uncollectible receivables. For instance, Lead Plaintiffs

have obtained and reviewed numerous loan agreements, guarantees, correspondence and other

155

documents relating to the transactions described herein.  Lead Plaintiffs have also interviewed

representatives of Customer X, which was involved in at least ten of these transactions with

Refco between February 2002 and August 2005.  These representatives include the founder and

principal of Customer X (referred to herein as "Principal A").  Principal A has direct knowledge

of the origin and structure of approximately ten transactions that took place between Refco and

Customer X between February 2002 and August 2005.

401.    Principal A has informed Lead Counsel that, beginning in or about 1999,

Customer X used Refco as its prime broker, and conducted hundreds of millions of dollars of

business with the Company in that capacity.

402.    According to Principal A, in or about early February 2002, he received a

telephone call from Peter McCarthy ("McCarthy"), an executive officer of Refco and Customer

X's primary contact at the Company.  McCarthy asked Principal A whether Customer X would

be interested in participating in a "trade."  McCarthy stated that a group of other people were

already involved with these trades, and Refco wanted to get Customer X involved as well.  As

for the details of the "trade," McCarthy told Principal A to "talk to Sandy Maggio."

403.    Shortly thereafter, Principal A spoke with Defendant Maggio, who explained

some, but not all, of the details of the proposed transaction.  Maggio stated that the transaction

involved a loan from Refco Capital to Customer X and a simultaneous loan from Customer X to

Refco Holdings, which would then be reversed several days later.  For its participation in this

transaction, Maggio explained, Customer X would be entitled to a "spread" – the difference

between the interest rate that would be paid by Customer X to Refco Capital, and the slightly

higher rate that would be paid by Refco Holdings to Customer X.  According to Principal A, he

was not advised what Refco Holdings would do with the proceeds of the loan, and did not learn

that Refco Holdings used the money to pay down a debt owing to Refco until Refco's October 2005 announcement. Maggio told Principal A to speak with Refco's attorneys at the law firm that had been Refco's primary outside legal counsel since 1994 (the "Law Firm").

404. Refco was an extremely lucrative client for the Law Firm, due in large part to the close relationship between executives at Refco and the partner at the Law Firm who oversaw the Refco account ("Attorney C"). Refco was Attorney C's largest client. Between 1994 and October 2005, the Law Firm attorneys, with Attorney C as the primary contact and billing partner, provided a broad range of legal services to Refco. Indeed, Attorney C has been described in press reports as the "go to guy at Refco," and the vast majority of important transactions and deals at Refco were cleared through Attorney C or the Law Firm attorneys who worked under the direct supervision of Attorney C.

405. Maggio put Principal A in touch with a senior associate who worked in the Law Firm's "Derivatives Practice Group" under the supervision of Attorney C. Principal A has informed Lead Counsel that this lawyer explained in detail the structure of the transactions suggested by Maggio, which involved a series of loans – from Refco Capital to Customer X and from Customer X to Refco Holdings – that would be "unwound." According to Principal A, he was never told what Refco Holdings would do with the funds. The Law Firm then provided to Principal A a set of transaction documents, including loan agreements and promissory notes. Principal A has told Lead Counsel that he was intent on obtaining some guarantees for Customer X's participation in the transaction, particularly given that Customer X would make a relatively small profit in a transaction in which it would have several hundred million dollars at risk. Among the documents the Law Firm drafted and provided to Principal A on or about February 25, 2002 was a side letter from Refco Group, where it "unconditionally and absolutely

guarantee[d]" to Customer X "the prompt and complete payment and performance when due, whether by acceleration or otherwise, of all obligations and liabilities" of Refco Holdings pursuant to the loan agreement and related note. The guarantee was signed by Defendant Bennett, as President and CEO of Refco Group.

406. As described below, between February 2002 and August 2005, Customer X participated in ten separate transactions that took place among Customer X, Refco, Refco Capital, and Refco Group. The documentation for each of these transactions was created by the Law Firm.

### i. The February 2002 Transaction

407. Shortly before the close of the Company's fiscal year 2002, Defendants Bennett, Maggio and others caused the Company to carry out a series of transactions that were designed to remove the Refco Holdings receivable from the Company's books and temporarily transfer it to Customer X.

408. These transactions are memorialized in the documents enclosed with a February 26, 2002 cover memorandum (the "February 26, 2002 Memorandum") from the Law Firm to Principal A at Customer X. Enclosed with the memorandum were documents prepared by the Law Firm. The deal documents pertain to three components of an integrated transaction between Refco and Customer X.

409. *First*, on or about February 25, 2002, Refco loaned Customer X the sum of $325,000,000. The loan was to be repaid within two weeks, that is, by March 4, 2002. This loan is reflected in a "Loan Agreement" and "Note," each dated February 25, 2002, between Refco Capital and Customer X (here, and for each succeeding transaction, the "Refco Capital/Customer X Loan Agreement"). The agreement provided that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 1.8375%, calculated on the basis of a

year consisting of 360 days and paid for actual days elapsed." David Weaver, the Chief Administrative Officer at Refco Capital, signed the Refco Capital/Customer X Loan Agreement.

410. Principal A has told Lead Counsel that neither Refco nor the Law Firm ever informed him that Refco Holdings was not a Refco corporate entity but, rather, a separate holding company 100% owned by Defendant Bennett with no corporate relationship with Refco. To the contrary, Principal A said, the Refco Capital/Customer X Loan Agreement drafted by the Law Firm and provided to Principal A in February 2002 (and in the papers for each succeeding set of loans), specifically defined the term "Refco Parties" to include Refco Holdings, even though the Law Firm frequently provided substantial legal services to Bennett and Refco Holdings and knew it was not a Refco entity.

411. The purpose and function of this loan to Customer X was plain from the face of the loan document. It contained an affirmative "use of proceeds" covenant that obligated Customer X to "[u]se the Loan proceeds only for funding a corresponding loan to Refco Group Holdings, Inc."

412. *Second*, on the same day that the parties signed the Refco Capital/Customer X Loan Agreement they signed a loan agreement between Customer X and Refco Holdings (here, and for each succeeding transaction, the "Customer X/Refco Holdings Loan Agreement"), for the same principal amount of $325,000,000. As with the Refco Capital/Customer X loan, the repayment date was set as March 4, 2002.

413. The Refco Capital/Customer X Loan Agreement provided that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 2.8375% calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." Thus, the interest rate on this loan was 100 basis points higher than the interest rate on the loan from

the Company to Customer X.

414. The Refco Capital/Customer X Loan Agreement also defined Refco Holdings as one of the "Refco Parties." Further, and consistent with what Principal A told Lead Counsel regarding his understanding that Refco Holdings was, in fact, a Refco affiliate, the agreement provided that legal notices to Refco Holdings under this Loan Agreement were to be sent to Refco Capital (care of Refco Capital's then-Chief Administrative Officer). Defendant Bennett signed the Refco Capital/Customer X Loan Agreement on behalf of Refco Holdings.

415. *Third*, the loan between Customer X and Refco Holdings was guaranteed by Refco Group pursuant to a guaranty dated February 25, 2002, and signed by Bennett. The guaranty assured Customer X that Refco would make it whole if Refco Holdings defaulted on the $325,000,000 loan.

416. Based upon the Indictment and Lead Plaintiffs' investigation – including the review of documents, interviews with knowledgeable individuals, and Lead Plaintiffs' understanding of the nature and purpose of these transactions – the $325,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company, and the loans were unwound on or about March 4, 2002, such that the $325,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

417. Among other evidence, Lead Counsel has reviewed an internal Refco document confirming that the Company credited $325,000,000 to the account of Customer X on February 25, 2002.

418. According to Principal A, Customer X never physically received the principal proceeds of this loan (or any of the loans described below). To the contrary, the proceeds never

160

left Refco.  Rather, on the date the loan agreements were signed, Refco caused the funds to be transferred into an account maintained in Customer X's name at Refco, and then the funds were immediately transferred from that account to Refco Holdings.  When the repayment date on this loan (and those that followed) arrived, this pattern was reversed so that the funds were transferred from Refco Holdings back into Customer X's account, and then immediately transferred from that account back to Refco Capital.  As confirmed by Principal A, Customer X received its fee – the 100 basis point "spread" on the first loan and, as described below, 75 basis points in connection with the later loans – separately.  Notably, in each instance, those payments of net interest to Customer X were made by Refco Capital, not Refco Holdings.

### ii.  The February 2003 Transaction

419.    This series of transactions was repeated at the close of the Company's fiscal year ended February 28, 2003.  Again, documents obtained by Lead Plaintiffs set forth three components of an integrated transaction between Refco and Customer X.

420.    *First*, on or about February 21, 2003, Refco loaned Customer X the sum of $500,000,000.  The loan was to be repaid within two weeks, that is, by March 4, 2003.  This loan is reflected in a "Loan Agreement" and "Note," each dated February 21, 2003, between Refco Capital and Customer X.  The Refco Capital/Customer X Loan Agreement provides that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 1.31%, calculated on the basis of a year consisting of 360 days and paid for actual days elapsed."

421.    The Refco Capital/Customer X Loan Agreement contained the same "use of proceeds" covenant and definition of "Refco Parties" as the Loan Agreement above.  Notices to Refco Capital under the Loan Agreement were to be addressed to Defendant Maggio, who signed the Loan Agreement on behalf of Refco Capital.

422.    *Second*, on the same day that the parties signed the Refco Capital/Customer X

161

Loan Agreement, they signed a loan agreement between Customer X and Refco Holdings, for the same principal amount of $500,000,000. The repayment date on this loan was also March 4, 2003.

423. The Customer X/Refco Holdings Loan Agreement provided that "interest shall accrue on the Loan Amount outstanding from time to time at a rate per annum equal to 2.06% calculated on the basis of a year consisting of 360 days and paid for actual days elapsed." Thus, the interest rate on this loan was 75 basis points higher than the interest rate on the loan from the Company to Customer X.

424. The Customer X/Refco Holdings Loan Agreement contained the same definition of "Refco Parties" as the Loan Agreements described above, and likewise provided that legal notice to Refco Holdings be sent to Refco Capital, "Attention: Santo C. Maggio." Defendant Bennett signed the Loan Agreement on behalf of Refco Holdings.

425. *Third*, the loan between Customer X and Refco Holdings was guaranteed by Refco Group pursuant to a guaranty dated February 21, 2003, and signed by Bennett.

426. Based upon the Indictment and Lead Plaintiffs' investigation, the $500,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company. The loans were unwound on or about March 4, 2003, such that the $500,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### iii. **The February 2004 Transaction**

427. This series of transactions was repeated at the close of the Company's fiscal year ended February 29, 2004. These transactions are also reflected in testimony and/or documents apparently presented to the grand jury that returned the Indictment. Again, documents obtained by Lead Plaintiffs set forth three components of an integrated transaction between Refco and

162

Customer X.

428.    *First*, on or about February 20, 2004, Refco loaned Customer X the sum of $720,000,000.  The loan was to be repaid within two weeks, that is, by March 4, 2004.  This loan is reflected in a "Loan Agreement" and "Note," each dated February 20, 2004, between Refco Capital and Customer X.  The Refco Capital/Customer X Loan Agreement provides for interest of 1.06% per annum for the days the loan was outstanding.

429.    The Refco Capital/Customer X Loan Agreement contained the same "use of proceeds" covenant and definition of "Refco Parties" as the Loan Agreements described above.  Notices to Refco Capital under the Loan Agreement were to be addressed to Defendant Maggio, who signed the Loan Agreement on behalf of Refco Capital.

430.    *Second*, on the same day that the parties signed the Refco Capital/Customer X Loan Agreement they signed a loan agreement between Customer X and Refco Holdings, for the same principal amount of $720,000,000.  The repayment date on this loan was also March 4, 2004.

431.    The Customer X/Refco Holdings Loan Agreement provided for interest at a annual rate of 1.81%, which was 75 basis points higher than the interest rate on the loan from the Company to Customer X.

432.    The Customer X/Refco Holdings Loan Agreement contained the same definition of "Refco Parties" as the Loan Agreements described above, and likewise provided that legal notice to Refco Holdings be sent to Refco Capital, "Attention: Santo C. Maggio."  Defendant Bennett signed the Customer X/Refco Holdings Loan Agreement on behalf of Refco Holdings.

433.    *Third*, the loan between Customer X and Refco Holdings was guaranteed by Refco Group pursuant to a guaranty dated February 20, 2004, also signed by Defendant Bennett.

163

434.    Based upon the Indictment and Lead Plaintiffs' investigation, the $720,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company.  The loans were unwound on or about March 4, 2004, such that the $720,000,000 once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### iv.  **The May 2004 Transaction**

435.    This series of transactions was repeated at the close of the Company's fiscal quarter ended May 31, 2004.  Upon information and belief, this was done with intent by Defendants Bennett, Maggio and others to generate false financial statements for use in connection with the Bond registration process.  Again, documents obtained by Lead Plaintiffs set forth three components of an integrated transaction between Refco and Customer X.

436.    *First*, on or about May 27, 2004, Refco loaned Customer X the sum of $700,000,000.  The loan was to be repaid within two weeks, that is, by June 7, 2004.  This loan is referenced in several documents obtained by Lead Plaintiffs, including an indemnity dated May 27, 2004 and signed by Bennett.  The existence of this loan was also confirmed by Principal A.  Principal A confirmed that the loan agreements for all of the transactions contained substantially similar provisions, including the "use of proceeds" covenant obligating Customer X to loan the $700,000,000 to Refco Holdings, the interest rate spread, the definition of "Refco Parties," and notice provisions as contained in the Loan Agreements described above.

437.    *Second*, as in the prior transactions, the parties signed a Loan Agreement, also dated May 27, 2004, whereby Customer X loaned Refco Holdings the same principal amount of $700,000,000, with the same repayment date of June 7, 2004.  The interest rate for this loan was 1.81% per annum, which was 75 basis points higher than the interest rate on the loan from the Company to Customer X.  The Customer X/Refco Holdings Loan Agreement contained the same

164

definition of "Refco Parties" as contained in the Loan Agreements described above, and likewise provided that legal notice to Refco Holdings be sent to Refco Capital, "Attention: Santo C. Maggio." Defendant Bennett signed the Customer X/Refco Holdings Loan Agreement on behalf of Refco Holdings.

438.    *Third*, the loan between Customer X and Refco Holdings was guaranteed by Refco Group pursuant to a guaranty dated May 27, 2004, and signed by Bennett.

439.    Based upon the Indictment and Lead Plaintiffs' investigation, the $700,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company. The loans were unwound on or about June 7, 2004, such that the $700,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### v.    **The August 2004 Transaction**

440.    This series of transactions was repeated at the close of the Company's fiscal quarter ended August 31, 2004. Upon information and belief, this was done by Defendants Bennett and Maggio and others with intent to generate false financial statements for use in connection with the Bond registration process. Again, documents obtained by Lead Plaintiffs set forth three components of an integrated transaction between Refco and Customer X.

441.    *First*, on or about August 25, 2004, Refco loaned Customer X the sum of $485,000,000. The loan was to be repaid within two weeks, that is, by September 7, 2004. The Refco Capital/Customer X Loan Agreement for this transaction has a typewritten amount of $475,000,000, but that amount was crossed out and replaced in handwriting with the amount of $485,000,000, and initialed by Principal A. The Loan Agreement provided for interest of 1.50% per annum, and contained the same "use of proceeds" covenant, definition of "Refco Parties" and notice provision as the Loan Agreements described above. Defendant Maggio signed the Loan

165

Agreement on behalf of Refco Capital.

442. *Second*, as in the prior transactions, the parties signed a Customer X/Refco Holdings Loan Agreement, also dated August 25, 2004, whereby Customer X loaned Refco Holdings the same principal amount of $485,000,000, with the same repayment date of September 7, 2004. The interest rate for this loan was 2.25% per annum, which was 75 basis points higher than the interest rate on the loan from the Company to Customer X. The Loan Agreement contained the same definition of "Refco Parties" and notice provisions as the Loan Agreements described above. Defendant Bennett signed the Customer X/Refco Holdings Loan Agreement on behalf of Refco Holdings.

443. The Customer X/Refco Holdings Loan Agreement and accompanying note have a typewritten date of August 26, 2004, but that date was crossed out and replaced in handwriting with the date of August 25, 2004. As with the Refco Capital/Customer X Loan Agreement, the Customer X/Refco Holdings Loan Agreement has a typewritten amount of $475,000,000, but that amount was crossed out and replaced in handwriting with the amount of $485,000,000. These changes were initialed both by Principal A and Defendant Bennett, as were a number of other handwritten changes to the document.

444. *Third*, the loan between Customer X and Refco Holdings was guaranteed by Refco Group pursuant to a guarantee dated August 25, 2004, and signed by Bennett. This guaranty has a typewritten date of August 26, 2004, which was crossed out and replaced with August 25, 2004. This change was initialed by both Principal A and Bennett.

445. Based upon the Indictment and Lead Plaintiffs' investigation, the $485,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company. The loans were unwound on or about

166

September 7, 2004, such that the $485,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### vi. The November 2004 Transaction

446. This series of transactions was repeated at the close of the Company's fiscal quarter ended November 30, 2004. Upon information and belief, this was done with intent to generate false financial statements for use in connection with the Bond registration process. Again, documents obtained by Lead Plaintiffs set forth three components of an integrated transaction between Refco and Customer X.

447. *First*, on or about November 26, 2004, Refco loaned Customer X the sum of $545,000,000. The loan was to be repaid within two weeks, that is, by December 3, 2004. The Refco Capital/Customer X Loan Agreement for this transaction provides for interest of 2.00% per annum, contained the same "use of proceeds" covenant, definition of "Refco Parties" and notice provision as contained in the Loan Agreements described above. Defendant Maggio signed the Loan Agreement on behalf of Refco Capital.

448. *Second*, also on November 26, 2004, the parties signed a Customer X/Refco Loan Agreement for the same principal amount of $545,000,000. The repayment date on this loan was also December 3, 2004. The interest rate for this loan was to be 2.75% per annum, which was 75 basis points higher than the interest rate on the loan from the Company to Customer X. The Loan Agreement contained the same definition of "Refco Parties" and notice provisions as the Loan Agreements described above. Defendant Bennett signed the Customer X/Refco Holdings Loan Agreement on behalf of Refco Holdings.

449. *Third*, the loan between Customer X and Refco Holdings was guaranteed by Refco Group pursuant to a guaranty dated November 26, 2004, and signed by Bennett.

450. Based upon the Indictment and Lead Plaintiffs' investigation, the $545,000,000 in

167

proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company. The loans were unwound on or about December 3, 2004, such that the $545,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### vii. The December 2004 Transaction

451.    This series of transactions was repeated in December 2004. Again, documents obtained by Lead Plaintiffs set forth three components of an integrated transaction between Refco and Customer X.

452.    *First*, on or about December 30, 2004, Refco loaned Customer X the sum of $550,000,000. The loan was to be repaid within one week, that is, by January 4, 2005. The Refco Capital/Customer X Loan Agreement for this transaction provided for interest of 2.25% per annum, and contained the same "use of proceeds" covenant, definition of "Refco Parties," and notice provisions as the Loan Agreements described above. Defendant Maggio signed the Loan Agreement on behalf of Refco Capital.

453.    *Second*, also on December 30, 2004, the parties signed a Customer X/Refco Holdings Loan Agreement for the same principal amount of $550,000,000. The repayment date on this loan was also January 4, 2005. The interest rate for this loan was to be 3.00% per annum, which was 75 basis points higher than the interest rate on the loan from the Company to Customer X. The Loan Agreement contained the same definition of "Refco Parties" as the Loan Agreements described above. The Customer X/Refco Holdings Loan Agreement was signed by Bennett on behalf of Refco Holdings.

454.    *Third*, the loan between Customer X and Refco Holdings was guaranteed by Refco Group pursuant to a guaranty dated December 30, 2004, and signed by Bennett.

455.    Based upon the Indictment and Lead Plaintiffs' investigation, the $550,000,000 in

168

proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company. The loans were unwound on or about January 4, 2004 such that the $550,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### viii.   The February 2005 Transaction

456.   This series of transactions was repeated at the close of the Company's fiscal year 2005. Again, documents obtained by Lead Plaintiffs set forth three components of an integrated transaction between Refco and Customer X. This integrated transaction is also reflected in testimony and/or documents apparently presented to the grand jury that returned the Indictment.

457.   *First*, on or about February 23, 2005, Refco loaned Customer X the sum of $345,000,000. The loan was to be repaid within two weeks, that is, by March 8, 2005. This loan is reflected in a "Loan Agreement," "Note," and "First Amendment to Loan Agreement," each dated February 23, 2005, between Refco Capital and Customer X. The Loan Agreement provided for an interest rate of 2.50% per annum. The original Loan Agreement stated that the amount of the loan was $335,000,000, but pursuant to the First Amendment To Loan Agreement, the amount was increased to $345,000,000. The Loan Agreement contained the same "use of proceeds" covenant, definition of "Refco Parties" and notice provisions as the Loan Agreements described above. Defendant Maggio signed the Loan Agreement and First Amendment To Loan Agreement on behalf of Refco Capital.

458.   *Second*, also on February 23, 2005, the parties signed a Customer X/Refco Holdings Loan Agreement for the same principal amount of $345,000,000. The repayment date on this loan was also March 8, 2005. The Loan Agreement provided for interest at a rate of 3.25% per annum, which was 75 basis points higher than the interest rate on the loan from the Company to Customer X. The original Loan Agreement stated that the amount of the loan was

169

$335,000,000, but, as with the Refco Capital/Customer X loan documents, the amount was increased to $345,000,000. The Loan Agreement contained the same definition of "Refco Parties" and notice provisions as the Loan Agreements described above. Defendant Bennett signed the Loan Agreement and First Amendment To Loan Agreement on behalf of Refco Holdings.

459. *Third*, the loan from Customer X to Refco Holdings was guaranteed by Refco Group pursuant to a guaranty dated February 23, 2005, and signed by Bennett.

460. According to testimony and/or documents apparently presented to the grand jury that returned the Indictment, the $345,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company. The loans were unwound on or about March 8, 2005, such that the $345,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### ix. The May 2005 Transaction

461. This series of transactions was repeated at the close of Refco's fiscal quarter ending May 31, 2005. Upon information and belief, this was done with intent to generate false financial statements for use in connection with the upcoming IPO. According to testimony and/or documents apparently presented to the grand jury that returned the Indictment and as confirmed to Lead Counsel in substance by Principal A:

(a) On or about May 25, 2005, Defendant Bennett caused the Company, through Refco Capital, to loan Customer X approximately $450 million. The loan was to be repaid within two weeks, that is, by June 6, 2005.

(b) On the same day that the parties signed the Loan Agreement between Refco Capital and Customer X, they signed a loan agreement between Customer X and

170

Refco Holdings, for the same principal amount of $450 million. The repayment date on this loan was also June 6, 2005.

(c)     The loan from Customer X to Refco Holdings was signed by Bennett on behalf of Refco Holdings. The interest rate on the loan was 75 basis points higher than the interest rate on the loan from the Company to Customer X.

(d)     The loan between Customer X and Refco Holdings was guaranteed by the Company pursuant to a guaranty signed by Bennett.

(e)     The loans were unwound on or about June 6, 2005.

462.     According to testimony and/or documents apparently presented to the grand jury that returned the Indictment, the $450,000,000 loan that originated with Refco Capital was used to pay down the receivable owed from Refco Holdings to the Company. After it was unwound, the $450,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### x.  The August 2005 Transaction

463.     This series of transactions was repeated at the close of Refco's quarter ending August 31, 2005, the first quarter close after the Company completed the August 2005 IPO. Again, documents obtained by Lead Plaintiffs set forth set forth three components of an integrated transaction between Refco and Customer X. These transactions are also reflected in testimony and/or documents apparently presented to the grand jury that returned the Indictment.

464.     *First*, on or about August 26, 2005, Refco loaned Customer X the sum of $420,000,000. The loan was to be repaid within two weeks, that is, by September 6, 2005. The Refco Capital/Customer X Loan Agreement for this transaction provided for an interest rate of 3.50% per annum and contained the same "use of proceeds" covenant, definition of "Refco Parties," and notice provisions as the Loan Agreements described above. Defendant Maggio

171

signed the Loan Agreement on behalf of Refco Capital.

465.    *Second*, also on August 26, 2005, the parties signed a Customer X/Refco Holdings Loan Agreement for the same principal amount of $420,000,000.  The repayment date on this loan was also September 6, 2005.  The interest rate for this loan was to be 4.25% per annum, which was 75 basis points higher than the interest rate on the loan from the Company to Customer X.  The Loan Agreement contained the same definition of "Refco Parties" and notice provisions as the Loan Agreements described above.  Defendant Bennett signed the Customer X/Refco Holdings Loan Agreement on behalf of Refco Holdings.

466.    *Third*, the loan between Customer X and Refco Holdings was guaranteed by Refco Group pursuant to a guaranty dated August 26, 2005, and signed by Bennett.

467.    According to testimony and/or documents apparently presented to the grand jury that returned the Indictment, the $420,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company.  The loans were unwound on or about September 6, 2005, such that the $420,000,000 debt once again appeared on the Company's books as a receivable owed by Refco Holdings to the Company.

### 2.    The Fraudulent Transactions With BAWAG

468.    It has recently come to light that Defendant BAWAG was directly involved in at least six additional sham "loan" transactions with Refco and Refco Holdings, which occurred at the end of each of Refco's fiscal years from February 2000 through February 2005.  According to the allegations in the Amended Answer, Affirmative Defenses, and Counterclaims (the "Counterclaim"), filed on April 25, 2006 by the Official Committee of Unsecured Creditors in Refco's bankruptcy proceeding, BAWAG was a knowing, direct and active participant in the fraudulent scheme described herein.  Indeed, as confirmed by Lead Plaintiffs' independent

investigation, the Counterclaim, and certain e-mails and financial records filed in connection with Refco's bankruptcy proceeding, BAWAG participated a series of sham transactions with Refco and Refco Holdings bracketing each of Refco's fiscal year ends from February 2000 through February 2005.

469.    These fraudulent transactions consisted of four components.  First, Refco would transfer hundreds of millions of dollars to BAWAG, which BAWAG then immediately "loaned" (apparently without any of the formal loan documentation utilized in the Customer X transactions) to Refco Holdings.  Second, BAWAG would extend an additional smaller "loan" – between $40 million and $90 million (again, apparently without any formal documentation) – directly to Refco Holdings at a nominal interest rate.  Third, Refco Holdings would use these funds to temporarily pay down a portion of the outstanding receivable it owed to the Company. Finally, after Refco closed its books for the relevant fiscal year, the "loans" would be unwound, with the funds from the first component of the "loan" being returned through BAWAG from Refco Holdings to Refco, and the funds from the second component of the "loan" being repaid to BAWAG, along with a nominal interest rate.  These sham "loan" transactions were in addition to the loans with Customer X (described above) and other customers.

470.    As described below, BAWAG knew that these multi-hundred million dollar "loans" were a total sham designed for the purpose of concealing Refco Holdings' mammoth obligations to the Company.  For instance, the transactions were not memorialized with formal loan agreements or promissory notes, but instead were documented on an informal "wink and nod" basis through various e-mails, letters and, on information and belief, telephone calls between executives at BAWAG and Defendants Bennett, Maggio, Trosten and others at Refco. BAWAG did not perform any investigation into the creditworthiness of Refco before agreeing to

173

extend hundreds of millions of dollar in "loans." Further, as described below, the majority of these so-called "loans" simply involved shuttling money, through BAWAG, from Refco to Refco Group Holdings, and therefore were extended on a net interest free basis.

471.    In short, these transactions were not legitimate business transactions. To the contrary, the informal structure of these sham transactions clearly reflected their real purpose: to conceal Refco's true financial condition and BAWAG's losses from the past trading failures of Flottl. Indeed, BAWAG had to participate in these transactions because, if the Refco Holdings receivable came to light, BAWAG's own trading losses would likely also be revealed. As described herein, BAWAG was a co-owner of Refco along with Refco Holdings, had an extremely close relationship with Bennett and Refco, and was committed to masking its embarrassing track record with Flottl's Ross Capital. Accordingly, BAWAG had a detailed understanding of the corporate structure of Refco and the relationship between Refco Holdings and Refco. Thus, there can be no question that BAWAG understood the purpose of these transactions and knowingly participated in this scheme to conceal the uncollectible receivable owed to the Company by Refco Holdings.

### i.    The February 2000 Transaction

472.    Shortly before the close of the Company's fiscal year 2000, Defendants Bennett, BAWAG, Refco Holdings and others participated in a series of transactions designed to remove at least part of the Refco Holdings receivable from the Company's books and temporarily convert a substantial part of it into a receivable from BAWAG.

473.    The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 24, 2000, Refco transferred approximately $225 million to BAWAG. On the same day, BAWAG made two separate transfers to Refco Holdings, one in the amount of $225 million and another in the amount of $75

174

million.  These transfers are reflected in wire transfer instructions filed in Refco's bankruptcy proceedings.  Refco Holdings used the $300 million in proceeds to temporarily reduce a portion of the outstanding receivable it owed to the Company.

474.    On information and belief, Bennett, Refco Holdings, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 2, 2000.  Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year ending February 28, 2000, where they served to conceal part of Refco Holdings' obligations to Refco.

475.    In addition, the parties agreed that the $225 million transfer from Refco to BAWAG and the subsequent $225 million transfer from BAWAG to Refco Holdings would bear the exact same interest rate, such that <u>BAWAG would not earn any net interest on its $225 million "loan" to Refco Holdings.</u>  On information and belief, the parties agreed that the second component of the transaction, the $75 million "loan," would bear a nominal interest rate.

476.    The "unwinding" of these transactions is reflected in a Refco Holdings "Monthly Account Statement" that shows (1) a wire transfer from Refco Holdings to "1ST UNION INTL BK/BAWAG," dated March 2, 2000, in the amount of $75 million, and (2) a wire transfer described as "WT TO RE-ALLOCATE FUNDS," also dated March 2, 2000, in the amount of $225 million.  The Monthly Account statement also reflects the interest payment to BAWAG on the $75 million dollar portion of the transaction.  Specifically, the Monthly Account statement shows a $93,333.73 million payment on March 8, 2000, which is described as "WT TO 1ST UNION/BAWAG INT. ON 75MM."

### ii.    The February 2001 Transaction

477.    This series of sham transactions was repeated at the close of the Company's fiscal year 2001.  Again, the Counterclaim and financial records filed in connection with the Refco

bankruptcy proceeding demonstrate that, on or about February 26, 2001, Refco transferred approximately $225 million to BAWAG. On the same day, BAWAG made two separate transfers to Refco Holdings, one in the amount of $225 million and another in the amount of $75 million. These transfers are reflected in wire transfer instructions filed in Refco's bankruptcy proceedings. Refco Holdings used the $300 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

478. On information and belief, Bennett, Refco Holdings, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 5, 2001. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 28, 2001, where they served to conceal part of Refco Holdings' obligations to Refco.

479. In addition, the parties agreed that the $225 million transfer from Refco to BAWAG and the subsequent $225 million transfer from BAWAG to Refco Holdings would bear the exact same interest rate, such that <u>BAWAG would not earn any net interest on its $225 million "loan" to Refco Holdings.</u> On information and belief, the parties agreed that the second component of the transaction, the $75 million "loan," would bear a nominal interest rate.

480. The "unwinding" of these transactions is reflected in a Refco Holdings "Customer Ledger Report" that shows (1) a wire transfer from Refco Holdings to "1ST UNION INTL BK/BAWAG," dated March 5, 2001 in the amount of $75 million, and (2) a $225 million wire transfer described as "XFER FOR CREDIT RGF," also dated March 5, 2001.

481. These transactions were cumulative to a similar $250 million transaction with another customer of Refco identified by Lead Plaintiffs (described below), such that Refco was able to conceal at least $550 million in uncollectible receivables owed to Refco by Refco

Holdings as of the Company's fiscal year ended February 28, 2001.

### iii. The February 2002 Transaction

482. This series of sham transactions was repeated at the close of the Company's fiscal year 2002. The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 25, 2002, Refco transferred approximately $210 million to BAWAG. On the same day, BAWAG made a single transfer to Refco Holdings in the total amount of $300 million, consisting of the $210 million "loan" received from Refco Holdings and an additional $90 million "loan" from BAWAG to Refco Holdings. These transfers are reflected in, among other things, e-mails filed in the Refco bankruptcy proceedings. For instance, at 11:04 a.m. on February 21, 2002, Defendant Maggio sent an e-mail to Thomas Hackl, who was then a Managing Director and head of Treasury at BAWAG (and who joined Refco three months later), stating:

Good Morning Thomas:

This e-mail is to confirm the wire instruction for the following:

  1.  BAWAG will wire 300 million (USD) for value 2/25/02:

* * *

  2.  REFCO will wire 210 million (USD) for value 2/25/02:

* * *

If you have any questions, please contact me at (212) 693-7077.

Regards,

Sandy

483. Refco Holdings used the $300 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

484. Bennett, Maggio, Refco Holdings, BAWAG and others agreed that these transfers

177

would be unwound approximately seven days later, on March 4, 2002. At 12:23 p.m. on March

1, 2002, Defendant Maggio sent an e-mail to executives at BAWAG, stating:

Good Morning:

This e-mail is to confirm the following wire instruction

1.    BAWAG will wire to Refco USD 210,075.133,33 value 04.03.2002

    * * *

2.    REFCO will wire to BAWAG USD 210,075.133,33 value 04.03.2002

    * * *

3.    REFCO will wire to BAWAG USD 90,040.950, value 04.03.2002

    * * *

If you have any questions, please contact me at (212) 693-7077.

Regards,

Sandy

485.    Thus, the transfers were in effect for approximately a one week period bracketing

the Company's fiscal year end of February 28, 2002, where they served to conceal part of Refco

Holdings' obligations to Refco.

486.    The "unwinding" of these transactions is reflected in a Refco Holdings "Customer

Ledger Report" that shows (1) a wire transfer from Refco Holdings to "1ST UNION-BAWAG,"

dated March 4, 2002 in the amount of approximately $90 million, and (2) an approximate $210

million wire transfer described as "WT TO 1ST UNION-BAWAG," also dated March 4, 2002.

487.    These transactions were cumulative to a similar $325 million transaction with

Customer X, as identified by Lead Plaintiffs (described above), such that Refco was able to

conceal at least $625 million in uncollectible receivables owed to Refco by Refco Holdings as of

the Company's fiscal year ended February 28, 2002.

### iv.    The February 2003 Transaction

488.    This series of sham transactions was repeated at the close of the Company's fiscal year 2003. The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 25, 2003, Refco transferred approximately $175 million to BAWAG. On the same day, BAWAG made two separate transfers to Refco Holdings, one in the amount of $175 million and another in the amount of $75 million. These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings. Refco Holdings used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

489.    Bennett, Trosten, Refco Holdings, BAWAG and others agreed that these transfers would be unwound approximately seven days later, on March 4, 2003. Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 28, 2003, where they served to conceal part of Refco Holdings' obligations to Refco.

490.    In addition, the parties agreed that the $175 million transfer from Refco to BAWAG and the subsequent $175 million transfer from BAWAG to Refco Holdings would bear the exact same interest rate, such that <u>BAWAG would not earn any net interest on its $175 million "loan" to Refco Holdings.</u> At 9:37 a.m. on March 3, 2003, executives at BAWAG sent an e-mail to Defendant Trosten (later forwarded to Defendant Maggio), stating "USD 175.00.00: <u>flat – no payments.</u>" (Emphasis added). These documents also reflect that the parties agreed that the second component of the "loan," the $75 million transfer, would bear a nominal interest rate.

491.    The "unwinding" of these transactions is reflected in a Refco Holdings "Customer Ledger Report" that shows (1) a $75 million wire transfer to BAWAG from Refco Holdings, dated March 4, 2003, and described as "WT TO BAWAG," and (2) a $175 million wire transfer

179

described simply as "TRANSFER," also dated March 4, 2003. On information and belief, this Monthly Account Statement also shows the interest payment on the $75 million component of the "loan," in the form of a $26,486.98 payment dated March 4, 2003 and described as "WT TO BAWAG."

492. These transactions were cumulative to a similar $500 million transaction with Customer X, as identified by Lead Plaintiffs (described above), such that Refco was able to conceal at least $750 million in uncollectible receivables owed to Refco by Refco Holdings as of the Company's fiscal year ended February 28, 2003.

### v. The February 2004 Transaction

493. This series of sham transactions was repeated at the close of the Company's fiscal year 2004. Again, the Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 25, 2004, Refco transferred approximately $210 million to BAWAG. On the same day, BAWAG made two separate transfers to Refco Holdings, one in the amount of $210 million and another in the amount of $40 million. These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings. Refco Holdings used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

494. Bennett, Trosten, Refco Holdings, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 4, 2004. Bennett, Maggio, Refco Holdings, BAWAG and others agreed in advance that these transfers would be unwound approximately seven days later, on March 4, 2002. At 6:06 a.m. on February 24, 2004, Monika Weinhengst, a BAWAG executive, sent an e-mail to Defendant Trosten, copying two other BAWAG executives, that stated:

good morning Rob,

180

I refer to the following trades dealt 23.02.2004

   1.   we take from Refco Capital Bermuda USD 210,000.000,

* * *

   2.   we place on deposit with Refco Group Holding USD 40,000.000

* * *

   3.   we place on deposit with Refco Group Holding USD 210,000.000,

* * *

for Repayment value 04.03.2004 . . . .

495.   Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 29, 2004, where they served to conceal part of Refco Holdings' obligations to Refco.

496.   This e-mail further demonstrates that the parties agreed that the $210 million transfer from Refco to BAWAG and the subsequent $210 million transfer from BAWAG to Refco Holdings would bear the exact same interest rate – 1.08% – such that BAWAG would not earn any net interest on its $210 million "loan" to Refco Holdings.  In addition, this e-mail reflects that the parties agreed that the second component of the "loan," the $40 million transfer, would bear a nominal interest rate of 1.58%.

497.   The "unwinding" of these transactions is reflected in a Refco Holdings "Customer Ledger Report" that shows (1) a $40,014,044.44 wire transfer to BAWAG from Refco Holdings, dated March 4, 2004, and described as "WT TO BAWAG," and (2) a $210 million wire transfer described simply as "TRANSFER," also dated March 4, 2004.  On information and belief, the additional $14,044.44 reflected in this document comprises the interest payment from Refco to BAWAG on the $40 million component of the transaction.

181

498.     These transactions were cumulative to a similar $720 million transaction with Customer X, as identified by Lead Plaintiffs (described above), such that Refco was able to conceal at least $970 million in uncollectible receivables owed to Refco by Refco Holdings as of the Company's fiscal year ended February 29, 2004.

### vi.     The February 2005 Transaction

499.     This series of sham transactions was repeated at the close of the Company's fiscal year 2005.  The Counterclaim and financial records filed in connection with the Refco bankruptcy proceeding demonstrate that, on or about February 23, 2005, Refco transferred approximately $175 million to BAWAG.  On the same day, BAWAG made two separate transfers to Refco Holdings, one in the amount of $175 million and another in the amount of $75 million.  These transfers are reflected in wire transfer instructions and other documents filed in Refco's bankruptcy proceedings.  Refco Holdings used the $250 million to temporarily reduce a portion of the outstanding receivable it owed to the Company.

500.     The nature and structure of these transactions is set forth in a February 14, 2005 letter sent from Defendant Bennett to Selcuk Sari of BAWAG.  Among other things, the letter stated:

> Dear Mr. Sari:
>
> I am pleased you had a nice holiday . . . I am glad to <u>have confirmed the arrangements for later this month.</u>  As we discussed, the proposed transaction will be executed for value Wednesday, February 23, with an expiration Tuesday, March 8.  Confirming the mechanical arrangements these will be as follows:
> 1. A sum of U.S. $250 million is to be placed on deposit with Refco Group Holdings, Inc. and wired for value Wednesday, February 23, 2005 . . .
>
> * * *
>
> 2. The sum of US$175 million is to be placed on deposit with BAWAG by Refco Capital Markets and wired for value February 23, 2005 . . .

182

\* \* \*

3. the sum of US$250 million will be repaid for value Tuesday, March 8, 2005 .
. . . We understand that the <u>rate to be paid to Refco Capital Markets will be the
same as the rate charged on the deposits placed with Refco Group Holdings,
Inc. with a separate rate to be paid by Refco Group Holdings Inc. on the
difference of $75 million.</u>

(Emphasis added).

501.    Thus, Bennett, Refco Holdings, BAWAG and others agreed in advance that these transfers would be unwound approximately two weeks later, on March 8, 2003, and that <u>BAWAG would not earn any net interest on its $175 million "loan" to Refco Holdings.</u>  Thus, the transfers were in effect for approximately a one week period bracketing the Company's fiscal year end of February 29, 2005, where they served to conceal part of Refco Holdings' obligations to Refco.  The "unwinding" of these transactions is reflected in documents filed in the Refco bankruptcy proceedings.

502.    These transactions were cumulative to a similar $345 million transaction with Customer X, as identified by Lead Plaintiffs (described above), such that Refco was able to conceal at least $595 million in uncollectible receivables owed to Refco by Refco Holdings as of the Company's fiscal year ended February 28, 2003.

### 3.    The Fraudulent Transactions With Other Customers

503.    In addition to the loans involving BAWAG and Customer X between February 2000 and August 2005, Lead Plaintiffs' investigation has uncovered substantial evidence that at least two other third-parties were involved in similar loan transactions involving hundreds of millions of dollars prior to 2002.

### a.    Ingram Micro, Inc.

504.    Based on Lead Plaintiffs' investigation to date, another customer that was involved in these types of loan transactions was Ingram Micro Inc. ("Ingram").  Ingram is an

information-technology distributor based in Santa Ana, California. Upon information and belief, Ingram was once a customer of and/or vendor for Refco.

505. Lead Counsel has spoken with an individual familiar with facts relating to the Ingram/Refco loans. This person confirmed that Ingram was involved in at least one $250 million loan transaction with Refco, which took place in February 2001, at the close of Refco's fiscal year. According to this person, the specifics of this transaction include the following:

(a) On or about February 23, 2001, Refco Capital loaned Ingram the sum of $250,000,000. The loan was to be repaid within two weeks, that is by March 6, 2001.

(b) On the same day that the parties signed the loan agreement between Refco Capital and Ingram, they signed a loan agreement between Ingram and Refco Holdings, for the same principal amount of $250,000,000. The repayment date on this loan was also March 6, 2001.

(c) The Law Firm prepared the documentation for these loans.

506. In addition to the foregoing, a filing made in connection with Bennett's criminal proceeding notes that the U.S. Attorney has provided Bennett's criminal defense team with copies of one or more documents called the "Ingram Micro Loan Agreement," and describes these documents as "Loan Documentation between Ingram & Refco." Further, according to a March 30, 2006 article in The Wall Street Journal by Carrick Mollencamp, *"Tracing Refco's Ruin Leads Probe to Bermuda*," Ingram has confirmed that it was involved in a transaction with Refco several years ago and has provided documents to the U.S. Attorney's office.

507. Upon information and belief, including the pattern of conduct described above, the $250,000,000 in proceeds that originated with Refco Capital was used to pay down at least a portion of the receivable owed from Refco Holdings to the Company, and the loans were

184

unwound on or about March 6, 2001, such that the $250 million debt was once again showed on the Company's books as being owed by Refco Holdings to the Company.

### b. Delta Flyer

508. Based on Lead Plaintiffs' investigation, including review of documents filed in the Refco bankruptcy proceeding and the criminal proceeding against Bennett, another third-party involved in these types of loan transactions was an entity associated with the term "Delta Flyer."

509. A filing made in connection with Bennett's criminal proceeding notes that the Government has provided to Bennett's criminal counsel copies of one or more documents called the "Delta loan agmt.pdf" and "Loan Documentation between Delta Flyer & Refco." Similarly, a filing in the Refco bankruptcy proceeding indicates that forensic accountants hired by Refco's estate are seeking reimbursement for time spent searching for loan documents relating to "Delta Flyer."

510. In addition to these court-filings, Lead Plaintiffs have reviewed the February 26, 2002 Memorandum that, as described in ¶408 above, accompanied the transaction documents provided to Customer X by the Law Firm in February 2002. In what was apparently "cut and paste" oversight by the firm, the list of enclosed documents mistakenly identifies one of the deal documents (specifically, one of the promissory notes) as having "Delta" as a signatory. On information and belief, the February 26, 2002 Memorandum was a version of a form letter that the Law Firm had previously used to forward documents to third parties involved in these same types of loan transactions with Refco and Refco Holdings, including one third-party referred to as "Delta" or "Delta Flyer."

511. Lead Plaintiffs' investigation has discovered that "Delta Flyer" was the name of an online exchange, trading and auction system used by a San Francisco-based financial services

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 193 of 301

holding company called Merriman Curhan Ford & Co (formerly known as RateXchange Corporation). As set forth in a Form S-1 filed with the SEC by RateXchange Corporation on or about January 5, 2001, "Delta Flyer" was an "ETS" platform that allowed for the execution of trades on a broker-to-broker system. A possible connection between Delta Flyer and Refco is explained in a Proxy Statement filed by RateXchange Corporation, pursuant to Section 14(a) of the Exchange Act, on May 1, 2001, which states that one of the directors of RateXchange Corporation was Michael Boren ("Boren"). As stated in the Proxy, "Boren was a co-owner and co-founder of Summit Management, which he sold to Refco," apparently in or about 2002. For an undetermined period of time, Boren was also employed at Refco, where he traded government securities and managed portions of Refco's trading and commodity brokerage operations.

512. Lead Plaintiffs' investigation has also uncovered another possible source for the "Delta" inference in the documents reviewed by Lead Plaintiffs. Specifically, a limited liability company named Delta Flyer Fund, LLC ("Delta Flyer Fund") was organized in Delaware on April 26, 2000. The Certificate of Formation for Delta Flyer Fund indicated that the name and address of its initial manager was Eric M. Flanagan, 30 Maple Street, Summit, New Jersey 07901.

513. On April 6, 2006, TheStreet.com reported as follows:

> Sources say Delta Flyer [Fund], a small partnership that invested in private equity deals, engaged in three loan deals with entities it believed were affiliated with Refco. The last transaction was in 2003.

The Delta Flyer Fund was dissolved on August 25, 2005 – two weeks after Refco's IPO and less than two months prior to Refco's free fall into bankruptcy in October 2005.

514. While many details surrounding Delta Flyer are unknown, based on the current facts, the evidence concerning Delta Flyer confirms that Refco was engaging in these types of

transactions with other entities beside Ingram and Customer X.

### D. Summary and Form of Transactions

515. The chart below sets forth a summary of the transactions described above:

| "Loan" Date | Financial Period End | Repayment Date | Total Amount of "Loans |
|---|---|---|---|
| February 24, 2000[B] | February 28, 2000 | March 2, 2000 | $300 Million |
| February 23, 2001[I] <br> February 26, 2001[B] | February 28, 2001 | March 6, 2001 <br> March 5, 2001 | $550 Million |
| February 25, 2002[X] <br> February 25, 2002[B] | February 28, 2002 | March 4, 2002 <br> March 4, 2002 | $625 Million |
| February 21, 2003[X] <br> February 25, 2003[B] | February 28, 2003 | March 4, 2003 <br> March 4, 2003 | $750 Million |
| February 20, 2004[X] <br> February 25, 2004[B] | February 29, 2004 | March 4, 2004 <br> March 4, 2004 | $970 Million |
| May 27, 2004[X] | May 31, 2004 | June 7, 2004 | $700 Million |
| August 25, 2004[X] | August 30, 2004 | September 7, 2004 | $485 Million |
| November 26, 2004[X] | November 30, 2004 | December 3, 2004 | $545 Million |
| December 30, 2004[X] | End of Calendar 2004 | January 4, 2005 | $550 Million |
| February 23, 2005[X] <br> February 23, 2005[B] | February 29, 2005 | March 8, 2005 <br> March 8, 2005 | $595 Million |
| May 25, 2005[X] | May 31, 2005 | June 6, 2005 | $450 Million |
| August 26, 2005[X] | August 30, 2005 | September 6, 2005 | $420 Million |

[X]  Denotes transaction involving Customer X
[I]   Denotes transaction involving Ingram
[B]  Denotes transaction involving BAWAG

516. The following chart sets forth the known interest rates on the loans between

Customer X and Refco described above:

187

| Loan Date | Loan Amount | Interest Rate (Loan from Refco Capital to Customer X) | Interest Rate (Loan from Customer X to Refco Holdings) |
|---|---|---|---|
| February 2002 | $325 Million | 1.8375% | 2.8375% |
| February 2003 | $500 Million | 1.31% | 2.06% |
| February 2004 | $720 Million | 1.06% | 1.81% |
| May 2004 | $700 Million | 1.06% | 1.81% |
| August 2004 | $485 Million | 1.50% | 2.25% |
| November 2004 | $545 Million | 2.00% | 2.75% |
| December 2004 | $550 Million | 2.25% | 3.00% |
| February 2005 | $345 Million | 2.50% | 3.25% |
| May 2005 | $450 Million | -- | -- |
| August 2005 | $420 Million | 3.50% | 4.25% |

517.    Each of the sham transactions described above followed a similar format, and each was designed so that the Company could fraudulently avoid taking hundreds of millions of dollars of write-offs for receivables that could not be collected.  The following chart represents the form of the transactions as structured by Refco:

188



518. As described herein, after the Company closed its books for the pertinent period, the fraudulent transaction would be "unwound" and the receivable from Refco Holdings would be reinstated on the Company's books, where it would remain until the close of the next financial period. The following chart represents the form that the "unwinding" of the transactions took after each financial period:



**"Unwinding" The Transactions**
(Days After Pertinent Financial Period End)

### E. Impact on Financial Statements

519. In addition to undermining the validity of the descriptions of the Company's business model, historical performance, and operational parameters, the financial manipulations above (including those that took place prior to February 2002) rendered the Company's financial results materially false and misleading. These manipulations involved huge related-party transactions between various Refco entities and Refco Holdings, which was owned and controlled by Bennett and held Bennett's equity stake in the Company, as well as enormous guarantees by Refco Group to Customer X and transfers to and from Defendant BAWAG. These related-party transactions and guarantees were required to be disclosed under GAAP and other applicable accounting rules and regulations of the SEC and other regulatory bodies. The result (indeed, the goal) of the fraudulent transactions was to materially overstate the Company's net

190

capital, members' equity and net income while materially understating its reserves for doubtful accounts.

520.    The following chart details the impact that the Company's financial manipulations had on the Company's pre-tax income, net income, and members' equity, for fiscal years 2002, 2003, 2004 and 2005 (in millions):

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| **Fiscal** | **Pre-Tax Income** | | **Net Income** | | **Members' Equity** | |
| **Year** | **Reported** | **Adjusted** | **Reported** | **Adjusted** | **Reported** | **Adjusted** |
| 2002 | $ 116.2 | $ (508.8) | $ 93.6 | $ (472.0) | $ 515.1 | $ (50.5) |
| 2003 | 157.6 | (592.4) | 140.1 | (538.7) | 566.4 | (112.4) |
| 2004 | 200.6 | (769.4) | 187.2 | (690.7) | 616.1 | (261.8) |
| 2005 | 150.6 | (444.4) | 176.3 | (362.2) | 152.8 | (385.7) |

521.    The following chart details the impact that the Company's financial manipulation had on the Company's pre-tax income, net income, and members' equity on a quarterly basis for fiscal year 2005 and the quarter ended May 31, 2005:

| | (In Millions) | | | | | |
|---|---|---|---|---|---|---|
| **Quarters** | **Pre-Tax Income** | | **Net Income** | | **Members' Equity** | |
| **2005** | **Reported** | **Adjusted** | **Reported** | **Adjusted** | **Reported** | **Adjusted** |
| Q1 | $ 68.4 | $(631.6) | $ 60.2 | $ (312.4) | $ 671.0 | $ 37.6 |
| Q2 | 49.0 | (436.0) | 44.2 | (464.4) | 81.5 | (357.4) |
| Q3 | 21.3 | (523.7) | 17.9 | (135.9) | 126.7 | (366.5) |
| **2006** | | | | | | |
| Q1 | 43.8 | (406.2) | 38.8 | (368.5) | 187.9 | (219.3) |

522.    The following chart details the impact that the Company's financial manipulations

191

had on the Company's reserves for net capital, maintained pursuant to CFTC and other

regulatory requirements for fiscal years 2004 and 2005 (in millions):

| Fiscal CFTC Net Capital | | |
|---|---|---|
| **Year** | **Reported** | **Adjusted** |
| 2004 | 223.6 | (654.3) |
| 2005 | 283.9 | (254.6) |

523.    The following chart details the impact that the Company's financial manipulations

had on the Company's reserves for net capital, maintained pursuant to CFTC and other

regulatory requirements on a quarterly basis for the first, second and third quarters of 2005 and

the first quarter of 2006 (in millions):

| CFTC Net Capital | | |
|---|---|---|
| **Quarter** | **Reported** | **Adjusted** |
| Q1 2005 | 242.7 | (390.8) |
| Q2 2005 | 282.0 | (156.9) |
| Q3 2005 | 301.7 | (191.5) |
| Q1 2006 | 354.5 | (52.8) |

524.    For each period reflected in the preceding charts, the adjusted Pre-tax and net

income figures are based on the assumption that the uncollectible receivables were first

discovered and corrected in that period.

## XII.    FALSE AND MISLEADING STATEMENTS

525.    Following the Bond Offering in August 2004, the Company's securities began to

trade publicly and the Company became subject to the filing requirements of the Exchange Act.

192

From that point forward, in regular press releases and in periodic filings with the SEC, the

Company and its representatives made numerous materially false and misleading statements,

including the untrue statements in the Bond Registration Statement and the IPO Registration

Statement as discussed above, as well as statements by the Company and its officers and

directors in press releases and in SEC filings on Form 8-K, Form 10-Q, and Form 10-K, as

discussed below.

### 1.   The May 2005 Press Release and May 2005 8-K

526.    On May 27, 2005, the Company announced the results of its operations for the

year and quarter ended February 28, 2005 and filed a Form 8-K (the "May 2005 8-K"), which

was signed by Bennett.  A press release dated May 27, 2005 (the "May 2005 Press Release"),

which included the Company's consolidated financial statements for the year and quarter ended

February 28, 2005, was attached as an exhibit to the May 2005 8-K.

527.    The May 2005 Press Release contained numerous false statements of material fact

about the Company's financial results and performance, including the following statement by

Bennett:

> Refco Group Ltd., LLC's fourth quarter performance concluded a
> transforming and successful year for Refco, which reported strong
> performance in its key operating businesses.  Refco's transaction volume
> growth in derivative brokerage, foreign exchange and fixed income
> equaled or exceeded the strong secular and cyclical growth trends enjoyed
> by these global markets and drove revenues to record levels.  This is
> indicative of the key attributes of the Company's business model, its
> financial performance and cash flows . . . . In summary, fiscal 2005's
> performance maintained excellent growth in net revenue, net income and
> cash flow of our business segments.

528.    The May 2005 Press Release stated that the Company's:

(a)     "net income for the fourth quarter decreased by 23.6% to $35.7 million

from $46.8 million for the same quarter a year ago"; and

193

(b) "net income for the year ended February 28, 2005 decreased by 5.8% to $176.3 million from $187.2 million compared with the year ended February 29, 2004."

529. The May 2005 Press Release also stated that (a) the Company had established $61.190 million and $65.2 million in reserves for doubtful accounts (for the periods ending February 28, 2005 and February 29, 2004, respectively); (b) the Company's "regulated subsidiaries reported excess regulatory capital of $170.4 million;" (c) the Company's total assets were $48.8 billion; and (d) the Company's "members' equity was $152.8 million."

530. These statements were materially false and misleading because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, and similarly failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that Refco Holdings used to "pay off" some or all of the receivable days before the close of the period. As discussed above, Refco and the THL Partner Defendants have admitted that this receivable should have been, but was not, disclosed as a related-party transaction on the Company's reported financial statements. Further, the fraudulent scheme set forth above was designed to, and did, manipulate Refco's financial information such that the Company overstated its (i) income; (ii) total assets; (iii) regulatory capital reserves; and (iv) shareholders equity; and materially understated Refco's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Bennett and Refco.

### 2. The Year End 2005 Press Release and 2005 10-K

531. On July 1, 2005, Refco Group filed its Annual Report for fiscal year 2005 on Form 10-K (as amended through a Form 10-K/A filing on July 20, 2005) (collectively, the "2005 10-K"). Bennett and Sherer signed the 2005 10-K.

194

532.     The 2005 10-K included the Company's audited consolidated financial statements for fiscal years 2003, 2004 and 2005.  The consolidated financial statements were accompanied by two letters signed by Grant Thornton on May 24, 2005, which were included in the 2005 10-K, stating that Grant Thornton had conducted audits in accordance with GAAS and opining that the consolidated financial statements included in the 2005 10-K presented fairly, in all material respects, the financial position of the Company for the relevant dates and time periods "in conformity with accounting principles generally accepted in the United States of America."

533.     The Company's audited financial statements included in the 2005 10-K reported, among other things:

     (a)     net income of $176,287,000, $187,156,000 and $140,119,000 for fiscal years 2005, 2004 and 2003, respectively;

     (b)     receivables from customers (net of reserves) of $2,081,968,000 and $1,591,385,000 as of February 28, 2005 and February 29, 2004, respectively;

     (c)     reserves against receivables from customers of $61.2 million and $65.2 million as of February 28, 2005 and February 29, 2004, respectively;

     (d)     total assets of $48,767,849,000 and $33,332,172,000 as of February 28, 2005 and February 29, 2004, respectively; and

     (e)     members' equity of $152,750,000 as of February 28, 2005.

534.     The notes to the audited financial statements included in the 2005 10-K included the following disclosure regarding related-party transactions:

> [The Company] may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties.  Interest is generally charged at prevailing market rates.

195

535. The 2005 10-K also included the following statements regarding the Company's

allowance for doubtful accounts in respect to receivables from customers:

### Receivables from Customers –Provisions for Doubtful Accounts

Our receivables are generally collateralized with marketable securities. For some customer receivables that are not fully secured, we establish reserves for doubtful accounts when, in the opinion of management, such reserves are appropriate. We have established reserves of $61.2 million and $65.2 million against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. Our allowance for doubtful accounts is based upon management's continuing review and evaluation of the factors such as collateral value, aging and the financial condition of our customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. We pursue collection of these receivables through various means, including legal action and collection agencies, and generally do not charge-off any of these receivables. Although these reserves have been adequate historically, the default of a large customer or prolonged period of weakness in global financial markets could adversely affect the ability of our customers to meet their obligations. We do not establish reserves for unidentified losses, which may be inherent in our customer base.

(Emphasis added).

536. The 2005 10-K contained the following statements, among others, about the

Company's compliance with regulatory capital requirements:

As of February 28, 2005, Refco Securities, LLC had net capital of $82.0 million, which was 24.7% of aggregate debit balance and $75.4 million in excess of required net capital. . . . [A]s of February 28, 2005, Refco, LLC had net capital of $283.9 million, which was $95.0 million in excess of required net capital.

537. The 2005 10-K also included representations from the Company's management,

including Defendants Bennett, Murphy, Sherer, Sexton and Maggio, that:

Our management evaluated, with the participation of our principal executive and principal financial officer, the effectiveness of our disclosure controls and procedures . . . as of December 31, 2004. Based on their evaluation, our principal executive and principal financial officer concluded that our disclosure controls and procedures were effective as of February 28, 2005.

196

538. Pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Exchange Act, Defendants Bennett and Sherer each certified that "the financial statements, and other financial information included in [the 2005 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report." They also certified that the 2005 10-K:

> does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

539. Defendants Bennett and Sherer further certified that they had disclosed to the Company's auditors and its audit committee "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting."

540. Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Defendants Bennett and Sherer further certified that (1) "the [2005 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended"; and (2) "the information contained in the [2005 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

541. As set forth above, these statements were materially false and misleading at the time they were made because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, and similarly failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that Refco Holdings used to "pay off" some or all of the receivable days before the close of the period. Specifically, these misstatements materially overstated the Company's (i) income; (ii) total assets; (iii) regulatory capital reserves;

197

and (iv) shareholders equity and materially understated the Company's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Defendant Bennett and the Company.

### 3. The First Quarter 2006 Press Release, July 2005 8-K, and First Quarter 2006 10-Q

542.    On July 15, 2005, the Company announced its results of operations for the quarter ended May 31, 2005 and filed a Form 8-K (the "July 2005 8-K"), which was signed by Defendant Bennett.  A press release dated July 15, 2005 (the "First Quarter 2006 Press Release") containing the Company's consolidated financial statements for the quarter ended May 31, 2005 was attached as an exhibit to the July 2005 8-K.

543.    The First Quarter 2006 Press Release contained numerous false statements of material facts about the Company's financial results and performance, including the following statement by Defendant Bennett:

> Refco continues to report solid growth on a sequential basis following its recapitalization in August 2004.  The Company's global footprint and core competence in transaction processing has enabled it to capitalize on the continuing growth trends in exchange traded derivatives as well as the significant growth in foreign exchange brokerage volumes . . .  In summary, it has been an encouraging start to the year.

544.    The First Quarter 2006 Press Release stated that:

(a)    "Net income for the first quarter decreased by 28.2% to $42.6 million from $59.3 million for the same quarter a year ago and increased by 19.3% from $35.7 million for the quarter ended February 28, 2005"; and

(b)    Refco held reserves against receivables from customers in the amount of $62,107,000 as of May 31, 2005;

(c)    the Company's "regulated subsidiaries reported excess regulatory capital of $170.4 million";

198

(d)     the Company's total assets were $48.8 billion; and

(e)     the Company's "members' equity was $152.8 million."

545.    On July 15, 2005, the Company filed its quarterly report with the SEC on Form 10-Q (the "First Quarter 2006 10-Q"), which was signed by Defendants Bennett and Sherer and contained the Company's unaudited consolidated financial statements for the quarter ended May 31, 2005.  The First Quarter 2006 10-Q reiterated the Company's financial results reported in the First Quarter 2006 Press Release including the statements regarding the Company's (i) income, (ii) total assets, (iii) regulatory capital reserves, (iv) shareholders equity, and (v) reserves for doubtful accounts.  The First Quarter 2006 10-Q reported that members' equity was $187,927,000.

546.    The First Quarter 2006 10-Q contained the following statements, among others, about the Company's compliance with regulatory capital requirements:

> As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million, which was 11.1% of aggregate debit balances and $49.6 million in excess of required net capital . . .  As of May 31, 2005, Refco, LLC had net capital of $354.5 million, which was $167.7 million in excess of required net capital.

547.    The First Quarter 2006 10-Q included the following representation:

> Our management evaluated, with the participation of our principal executive and principal financial officer, the effectiveness of our disclosure controls and procedures . . . as of May 31, 2005.  Based on their evaluation, our principal executive and principal financial officer concluded that our disclosure controls and procedures were effective as of May 31, 2005.

548.    Pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the Exchange Act, Defendants Bennett and Sherer each certified that "the financial statements, and other financial information included in [the First Quarter 2006 10-Q], fairly present in all material respects the financial

199

condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report." They also certified that the First Quarter 2006 10-Q:

> does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

549. Defendants Bennett and Sherer further certified that they had disclosed to the Company's auditors and its audit committee "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting."

550. Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Defendants Bennett and Sherer further certified that (1) "the [First Quarter 2006 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended"; and (2) "the information contained in the [First Quarter 2006 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

551. The statements set forth above were materially false and misleading because they failed to disclose the existence of a material multi-hundred million dollar receivable owed to the Company from an entity controlled by Bennett, failed to disclose the "round robin" transactions through which Refco funneled through BAWAG and third-parties the huge sums of money that Refco Holdings used to "pay off" some or all of the receivable days before the close of the period, and failed to disclose the multi-hundred million dollar guarantees of Refco Group. Specifically, these misstatements materially overstated the Company's (i) income; (ii) total assets; (iii) regulatory capital reserves; and (iv) shareholders equity and materially understated the Company's reserves for doubtful accounts while omitting to disclose the related-party transactions involving, among others, Defendant Bennett and the Company.

200

### 4. ADDITIONAL ALLEGATIONS OF SCIENTER

552. The Officer Defendants, Trosten, and the Audit Committee Defendants (collectively, the "Inside Defendants"), and Grant Thornton and BAWAG each acted with scienter with respect to the materially false and misleading statements discussed herein, in that they had actual knowledge that the statements were false or misleading, or acted with reckless disregard for the truth or falsity of these statements. These Defendants' intent to deceive and/or reckless disregard for the truth is demonstrated both by circumstantial evidence supporting a strong inference of scienter, as well as by the fact that these Defendants had motive and the opportunity to commit fraud.

### a. Circumstantial Evidence of Scienter

553. There is substantial circumstantial evidence supporting a strong inference that the Inside Defendants and Grant Thornton acted with scienter.

554. The Confirmation Request. In the course of preparing the Bond Registration Statement, Refco retained Grant Thornton in or about the Fall of 2004 to conduct a re-audit of Refco Group's February 2002 year end consolidated financial statements. As part of that re-audit, on September 10, 2004, Refco Capital sent a confirmation request to Customer X, asking Customer X to confirm certain information to Grant Thornton. In the course of their investigation, Lead Plaintiffs have obtained and reviewed a copy of the confirmation request, and discussed it with Principal A and Customer X's operations manager, each of whom has personal knowledge of the facts and circumstances surrounding the confirmation. The confirmation request stated that Refco Group was "in the process of registering public debt," and that this process required audited financial statements for the year ended February 28, 2002. It further explained that Refco Group's fiscal year 2002 financial statements "had been audited by an accounting firm that ceased operations," that is, Arthur Andersen, and "accordingly, a re-audit of

201

[Refco's] fiscal 2002 consolidated financial statements is necessary." The confirmation request asked Customer X to send its confirmation directly to Grant Thornton.

555. Attached to the confirmation request was a Statement of Account for Customer X's account at Refco Capital as of February 28, 2002. The Statement of Account indicated that Customer X had an account balance of $325,000,000 as of that date, which it described as a "Time Deposit."

556. In addition to showing the balance as of February 28, 2002, however, the Statement of Account for Customer X also showed recent transaction activity in that account. The Statement of Account showed that Refco had loaned the $325,000,000 to Customer X on February 25, 2002, three days prior to the end of Refco's fiscal year.

557. On October 5, 2004, after confirming within his office that Customer X did in fact owe $325,000,000 to Refco Capital as of February 28, 2002, Customer X's operations manager signed the confirmation and sent it, along with the Statement of Account, to Grant Thornton.

558. While the Statement of Account should have alerted Grant Thornton to the fact that Refco's $325,000,000 debt to Customer X was created a mere three days before the end of the fiscal year, Grant Thornton did not ask Customer X for any additional information or documents. Customer X's Principal A has told Lead Counsel that if Grant Thornton had requested any documents relating to the February 25, 2002 transaction, he would have first suggested that Grant Thornton ask the Law Firm for them but, if Grant Thornton asked Customer X to provide them, Principal A would have done so. Grant Thornton's failure to make further inquiries as to the nature of the $325,000,000 transaction that created the Customer X balance, and why Refco had made such an enormous loan so close to the end of the fiscal year, raises a strong inference of scienter.

559.   The Absence of Other Confirmation Requests.  The operations manager for Customer X has told Lead Counsel that Customer X did not receive any audit confirmation requests from Grant Thornton (or its predecessor, Andersen) relating to the other transactions between Refco Group and Customer X that are the subject of this Complaint for any audit period.  Specifically, no request for confirmation of Customer X's account balance was received for fiscal years 2003, 2004, or 2005.  After having requested confirmation of Customer X's account balance at February 28, 2002 (albeit not until September 2004) and after having learned that the huge debt was created only three days before the end of fiscal year 2002, Grant Thornton's failure to request that Customer X provide confirmation of, or information relating to, the account balance at any subsequent time raises a strong inference of scienter.

560.   The Size of the Sham Loans:  The sheer size of the related-party receivable hidden by the transactions described herein and in the following chart also raises a strong inference that the Inside Defendants, BAWAG and Grant Thornton knew or recklessly disregarded the truth about the transactions.

| "Loan" Date | "Loan" Amount | Reported Net Income (Relevant Financial Period) | Percentage of Net Income |
|---|---|---|---|
| February 2002 | $625 Million | $93.6 Million (Year ended February 28, 2002) | 668% |
| February 2003 | $750 Million | $140.119 Million (Year ended February 28, 2003) | 535% |
| February 2004 | $970 Million | $187.156 Million (Year ended February 29, 2004) | 518% |
| May 2004 | $700 Million | $59.270 Million (Quarter ended May 31, 2004) | 1,180% |

| "Loan" Date | "Loan" Amount | Reported Net Income (Relevant Financial Period) | Percentage of Net Income |
|---|---|---|---|
| August 2004 | $485 Million | $44.20 Million (Quarter ended August31, 2004) | 1,097% |
| November 2004 | $545 Million | $17.9 Million (Quarter ended November 30, 2004) | 3,045% |
| December 2004 | $550 Million | Not applicable | Not applicable |
| February 2005 | $595 Million | $176.3 Million (Year ended February 28, 2005) | 337% |
| May 2005 | $450 Million | $42.587 Million (Quarter ended May 31, 2005) | 1,056% |
| August 2005 | $420 Million | (Financial Statements delayed because of 10/10/05 Disclosure of Uncollectible Receivable) | Not applicable |

That the sums hidden by these sham transactions dwarfed the Company's net income raises a strong inference that the transactions should not have escaped notice. Indeed, Refco's net proceeds from the August 2005 IPO were only $254,000,000, yet in the circular transaction that took place only two weeks later, Refco "loaned" its third-party customer the far larger sum of $420,000,000 as part of Refco's fraudulent scheme. The sheer magnitude of the sums hidden by the sham transactions raises a strong inference of scienter.

561.    The Timing and Recurrent Nature of the Transactions. The timing of the circular transactions also raises a strong inference of scienter. As discussed above, at the end of certain financial periods, the Company would "loan" a substantial sum to an unrelated middleman and/or BAWAG, which simultaneously loaned that money to Refco Holdings. Refco Holdings,

in turn, would use the sum to temporarily extinguish its outstanding obligation to Refco. At the beginning of the subsequent period, and once the financial reporting benefit of this circular arrangement had been realized, the money would find its way back the way it had come, and Refco would receive "repayment" of its massive "loan" of several weeks prior. These transactions took place for at least six years and each involved substantial sums that were unlikely to go unnoticed. The regularity and suspicious timing of these transactions raises a strong inference that the Inside Defendants, BAWAG and Grant Thornton knew or recklessly disregarded the truth about these transactions.

562. The Unusual Nature of the Transactions. The transactions described above were highly unusual transactions for Refco and, on their face, raise a strong inference of scienter. The first step in each of Refco's circular quarter-end transactions involved Refco "lending" sums far in excess of its net earnings to an outside customer or to BAWAG. A "loan" transferring sums greater than Refco's net income away from the Company should have drawn substantial scrutiny from the Inside Defendants, BAWAG and Grant Thornton. Further, the transactions with Customer X were unusual in that Refco provided a guaranty for Refco Holdings' obligation to the customer. Thus, at the end of every financial quarter, Refco regularly guaranteed the precise amount of its simultaneous and unusual loan to the same customer, a fact that, but for their deliberate intent and/or recklessness, would have alerted the Inside Defendants and Grant Thornton to the fraudulent scheme. Accordingly, the unusual nature of the circular transactions also raises a strong inference of scienter.

563. Refco Capital Paid the Interest Owed by Refco Holdings. Lead Plaintiffs' investigation has confirmed that it was Refco Capital – not Refco Holdings – which paid the 75-100 basis point "net interest" that Refco Holdings owed to Customer X, which also raises a

strong inference of scienter. As discussed above, Principal A has confirmed to Lead Counsel that, in each of the ten transactions between February 2002 and August 2005, Customer X received its interest payment from Refco Capital. Thus, Defendants Bennett, Maggio and others were forcing Refco, through Refco Capital, to pay the interest on a loan extended to a purportedly separate entity owned by Bennett. The Inside Defendants, BAWAG and Grant Thornton recklessly failed to discover that Refco was paying interest on a loan extended to an entirely separate entity, Refco Holdings.

564.    Lack of Business Purpose. The circular transactions also raise a strong inference of scienter because, on their face, they serve no legitimate business purpose. At their core, these transactions involved nothing more than funneling money from Refco through a third-party or BAWAG and Refco Holdings to Refco (and back again), with intermediary steps intended to create the appearance that the funds had a different source. The obvious lack of a legitimate business purpose for Refco's circular transactions also raises a strong inference of scienter with respect to the Inside Defendants, BAWAG and Grant Thornton.

565.    Insider Status and Access to Inside Information. The Inside Defendants' and Grant Thornton's positions in or with respect to the Company, and their concomitant access to inside information, also raise a strong inference that the Inside Defendants and Grant Thornton knew or recklessly disregarded the truth about the transactions discussed above. The Officer Defendants were responsible for the Company's operations and played a critical role in its management. The IPO Registration Statement, for example, highlighted the critical role played by Refco's management in the Company's operations, stating that the Company's "success depends to a significant degree upon the continued contributions of our management team, particularly our President and Chief Executive Officer, Phillip Bennett." Similarly, the IPO

Registration Statement makes clear that the Audit Committee Defendants were responsible for "the integrity of [the Company's] financial statements." As Refco's auditor, Grant Thornton was also responsible for the accuracy of Refco's financial statements and had unfettered access to the Company's inside information. In light of the size, timing, unusual nature, and lack of any business purpose for these transactions discussed above, these Defendants' access to, and obligation to monitor, all the underlying facts and circumstances of these transactions raises a strong inference of scienter with respect to the Inside Defendants, BAWAG and Grant Thornton.

566.     The Refco/Refco Holdings Relationship. The close relationship between Refco and Refco Holdings – the related party in which Refco's uncollectible receivables were stashed – was well-known to the Inside Defendants, BAWAG and Grant Thornton, as was the fact that Refco Holdings was controlled by Bennett. The IPO Registration Statement and the Bond Registration Statement each plainly state that Refco Holdings is wholly owned by Bennett and disclose numerous ties between Refco Holdings and Refco, the Audit Committee Defendants, and the Officer Defendants. These ties include Refco Holdings' massive ownership of Refco stock (larger than the total number of shares issued in the IPO); Refco Holdings' power to appoint several members to Refco's board of directors; and Refco Holdings' direct payment of $29 million to Officer Defendants Murphy, Maggio, Sexton, and Klejna for their interest in a Company-endorsed profit-sharing agreement in connection with the LBO. The Inside Defendants and BAWAG were therefore familiar with Refco Holdings and had every reason to know that it was a related party controlled by Refco's President and CEO. The close relationship between Refco and Refco Holdings, and the Inside Defendants, BAWAG's and Grant Thornton's knowledge thereof, also raises a strong inference of scienter.

567.    Line-Item Records of the Round Trip Transactions: Internal statements of Refco Holdings' accounts at Refco contained line-items reflecting the flow of funds in the circular transactions used to conceal the outstanding receivable. In particular, the account statements clearly show massive inflows of cash to Refco Holdings in the days immediately before Refco's fiscal year end, and massive outflows of like (and often identical) sums of cash several days after the fiscal year end. The fund transfers recorded in these account statements were at all times for material amounts far in excess of Refco's net income for the given year and could, therefore, not have escaped notice. The highly suspicious size and timing of this documented flow of funds should have alerted Grant Thornton to the likelihood of financial manipulation and raises a strong inference of scienter. Specifically:

(a)    Account statements for February and March of 2002 reflect two wire transfers from "1ST Union – BAWAG" to Refco Holdings on February 25, 2002 in the amounts of $90,000,000 and $210,000,000. The same document contains entries for March 4, 2002 showing wire transfers from Refco Holdings back to "1ST Union – BAWAG" in the amounts of $90,040,950 and $210,075,133.33. Significantly, this roughly $300,000,000 round-trip was for an amount over three times the size of Refco's reported net income of $93,634,000 for the fiscal year ended February 28, 2002.

(b)    Account statements for February and March of 2003 reflect two wire transfers from "Wachovia NY INTL" to Refco Holdings on February 25, 2003 in the amounts of $75,000,000 and $175,000,000. Supporting documentation attached to these statements make clear that the funds from "Wachovia NY INTL" are funds from the accounts of "BANK FUER ARBEIT UND WIRTSCHAFT"—i.e., from BAWAG. The same account statements also contain entries for March 4, 2003 showing a wire transfer

208

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 216 of 301

from Refco Holdings back to "BAWAG" in the amount of $75,000,000. The very next line contains an entry for a transfer of $175,000,000 labeled only "TRANSFER." Upon information and belief, this $175,000,000 was transferred directly to Refco (its original source) rather than routing the funds back to Refco through BAWAG, which was unnecessary now that the financial reporting benefit of the circular loans had been achieved. Significantly, this $250,000,000 round trip was for an amount over $100 million greater than Refco's reported net income of $140 million for the fiscal year ended February 28, 2003.

(c) Account statements for February and March of 2004 reflect two wire transfers from "Wachovia NY INTL" to Refco Holdings on February 25, 2004 in the amounts of $40,000,000 and $210,000,000. Supporting documentation attached to these statements make clear that the funds from "Wachovia NY INTL" are funds from the accounts of "BANK FUER ARBEIT UND WIRTSCHAFT"—*i.e.*, from BAWAG. The same account statements also contain entries for March 4, 2004 showing a wire transfer from Refco Holdings back to "BAWAG" in the amount of $40,014,044.44. The same date contains an entry for a transfer of $210,000,000 labeled only "TRANSFER." Upon information and belief, this $210,000,000 was transferred directly to Refco (its original source) rather than routing the funds back to Refco through BAWAG, which was unnecessary now that the financial reporting benefit of the circular loans had been achieved. Significantly, this $250,000,000 round trip was for an amount over $60 million greater than Refco's reported net income of $187 million for the fiscal year ended February 28, 2004.

568. <u>Bennett's Criminal Indictment</u>. Facts later documented in the Indictment of Defendant Bennett for securities fraud also raise a strong inference of his scienter. The Indictment charges that Defendant Bennett and "others" hid "losses sustained by Refco through its own and its customers' trading in the financial markets" by "direct[ing] a repeated series of transactions designed to conceal those losses at year- and quarter-end." The Indictment further states that Bennett did so "together with others known and unknown" and that he acted "willfully and knowingly." Bennett was forced from his position at Refco as a consequence.

569. <u>Maggio's Control of Refco Capital</u>. Defendant Maggio's control of Refco Capital raises a strong inference of scienter. The funds used in the circular transactions originated with Refco Capital, of which Maggio was the President. Maggio signed several of the Refco Capital/Customer X Loan Agreements (specifically those dated February 21, 2003; February 20, 2004; August 25, 2004; November 26, 2004; December 30, 2004; February 23, 2005; and August 26, 2005), and was listed as the person to receive legal notices for both Refco Capital <u>and</u> Refco Holdings for all transactions with Customer X from February 2003 onward. Maggio was forced from his position at Refco as a result of the disclosure of the circular transactions.

570. <u>Defendants Bennett, Maggio and Trosten's Direct Involvement in the Blatantly Fraudulent BAWAG Transactions.</u> As set forth above, e-mails and letters by and between BAWAG, Bennett, Maggio and Trosten relating to the blatantly fraudulent BAWAG transactions unequivocally demonstrate that these Defendants had knowledge, and participated in, the scheme to conceal the receivable owed by Refco Holdings to the Company. These so-called "loan" transactions did not involve collateral, formal loan documentation or, in large part, interest payments. Thus, these "loan" transactions served no legitimate purpose and were on their face obvious shams designed to further the scheme to misstate Refco's financials.

210

571.  Silverman's Close Connections to Both Refco and Refco Holdings.  In addition to serving as Controller and Secretary of Refco, Defendant Silverman was Secretary of Refco Holdings, the Bennett-owned entity that was used to carry out the fraudulent "Round-Robin" transactions.  Silverman, a close confidant of Bennett, was placed on leave at or about the same time as Bennett and Maggio.  According to a November 16, 2005 article on www.thestreet.com, sources have indicated that Silverman's leave was due to his involvement in the bookkeeping that allowed Bennett to conceal Refco's customer trading losses.  Silverman's close ties to Bennett, his knowledge of accounting, his role as Controller of the Company (which included the recording of entries on the Company's books), and his being placed on leave amidst rumors of his involvement in the booking of the fraudulent transactions, are all facts that raise a strong inference of his scienter.

572.  The THL Complaint.  The THL Partner Defendants, each of whom had (and has) significantly more access to Refco materials than Lead Plaintiffs, claim in the THL Complaint that Defendants Bennett and Maggio acted with scienter, alleging, among other things, that:

(a)  "beginning sometime prior to 2004, defendants Bennett, Maggio, and others had embarked on a secretive and willful scheme designed to misrepresent Refco's true financial picture by falsifying its books and records";

(b)  "Bennett intentionally and deliberately engaged in accounting fraud";

(c)  "Bennett (upon information and belief, with the knowing participation of Maggio) and others, had been manipulating the books and records of the Company for years in order to hide losses and obligations …" (emphasis added); and

(d)  "In the course of their fraudulent scheme, these defendants [Bennett and Maggio] made numerous and repeated statements of material facts and/or omitted to state

211

material facts which they knew, or were reckless in failing to know, were false and misleading or were rendered misleading and inaccurate by the failure to disclose material information."

573. Based on these allegations, the THL Partner Defendants assert claims under Section 10(b) and Rule 10(b)-5 against Maggio and Bennett. Further, the THL Partner Defendants claim in the THL Complaint that Bennett and Maggio were not the only individuals who acted with scienter. The THL Complaint names as "John Doe" defendants "third parties who knowingly or recklessly participated in, or aided and abetted Defendants Bennett [and] Maggio . . . with respect to, the fraudulent scheme and manipulative and deceptive conduct described herein."

574. <u>Severance Payment to Trosten</u>. Within a few months of the LBO, Trosten received a severance payment of at least $45 million when he resigned as CFO in October 2004 at the age of 35, after serving in that position for only three years. This severance payment was not disclosed by the Company, and became public only after Trosten was forced to admit receiving it during testimony in an arbitration proceeding in the summer of 2005. Notably, Trosten's resignation and the severance payment occurred at the same time he knew that Grant Thornton was conducting its re-audit of the Company's fiscal year 2002 financial statements (as discussed in ¶554 above). The Former Refco Officer was one of many who viewed the size of the severance and the timing of Trosten's resignation – just as the IPO planning had begun – as very suspicious.

575. The approximately $45 million severance payment was exponentially greater than Trosten's annual compensation of $3,139,000 in salary and bonuses for fiscal year 2004 and was grossly disproportionate to his level of experience and expertise. It also far exceeded the

212

severance package disclosed on page 88 of the Offering Memorandum, which would have entitled him to eighteen months of his base salary and annual bonus as of the date of termination. Trosten's extraordinarily lucrative $45 million severance package, which was one of many that was concealed from the public and was paid while the scheme to conceal the Company's uncollectible debts was actively ongoing and at the same time Grant Thornton was conducting a re-audit of the Company's 2002 financial statements, raises a strong inference of scienter. In particular, it raises a strong inference that Trosten knew about the scheme to defraud the Company's investors, and that Bennett and the Company, including the Inside Defendants who approved his severance package, paid him off in an effort to buy his silence when he left the Company.

576. History of Legal Violations. Refco had a history of legal violations and improprieties that should also have alerted the Inside Defendants and Grant Thornton to the risk of financial manipulation. Indeed, from the time Bennett became the Company's chief financial officer in 1983, the CFTC penalized Refco at least 140 times for violations that included filing false trading reports, inadequate record-keeping, and inadequate supervision of its traders – the worst record in the industry. As reported in Bloomberg Markets in February 2006, a former CFTC official involved in regulating Refco explained that "Refco was a firm that said 'Show us where the edge is,' and then they played just over it." Refco's culture of rule-breaking and repeated legal troubles should have, and but for their recklessness would have, alerted Grant Thornton and the Inside Defendants (who, unlike outside investors, had unfettered access to Refco's managers, books, and records) to Refco's fraudulent financial reporting.

577. For example, Refco was implicated in a SEC investigation related to a manipulative scheme involving shares of Sedona Corp., an Arizona technology company whose

213

stock price had collapsed as a result of illegal short selling conducted through Refco. As late as May 2005, Refco had received a "Wells Notice" from the SEC, recommending civil enforcement proceedings against Refco for violations of the Securities Act and Exchange Act – including violations of the Rule 10b-5 anti-fraud provisions promulgated thereunder. The investigation also focused on Defendant Maggio, then the President and CEO of Refco Securities, the Refco subsidiary through which the illegal short sales of Sedona stock had been cleared. The investigation was still ongoing at the time of Refco's IPO and the bankruptcy filing that occurred shortly thereafter.

578. Refco was also implicated in CFTC and SEC enforcement actions where Refco was accused of improperly shifting client funds between related party accounts – the same type of transactions that Refco used to hide the fraud in this case. For instance, Refco was directly involved in an enforcement action arising out of the conduct of S. Jay Goldinger ("Goldinger"), a Beverly Hills-based money manager who was accused of defrauding his clients by hiding losses in client accounts with Refco's assistance. Functioning much like a Ponzi scheme, the fraud was achieved by shifting funds between client accounts with losses and gains – profits were placed in the accounts of clients who asked for their money back while losses were stashed in accounts that appeared dormant. Refco participated in that scheme by allocating funds among Goldinger's clients' accounts at the close of each trading day in accordance with Goldinger's instructions. As the Inside Defendants and Grant Thornton knew well before the Class Period, Refco paid $8 million in 1999 to settle charges brought by the CFTC and the Chicago Board of Trade and over $40 million in arbitration awards to defrauded investors.

579. In yet another forerunner of the circular transactions Refco used to hide its massive related-party receivable, Refco was fined $1.2 million by the CFTC in 1994 for using

214

funds in client accounts to pay off its own debts. As discussed in an October 13, 2005 article available from Bloomberg Newswires, according to the CFTC at the time, Refco improperly availed itself of as much as $123 million in client funds on an "almost daily basis" in order to pay off debts owed by Refco Capital. Refco settled the CFTC action without admitting or denying guilt, but with a promise to stop unlawfully commingling funds. Aspects of this matter sufficient to put the Inside Defendants and Grant Thornton on notice of potential improprieties at Refco were well known to these Defendants before the Class Period.

580. In another instance involving the improper manipulation of related accounts, Refco hid losses in a client's account from the CFTC and Chicago Board of Trade by depositing its own funds into the client's depleted account and obtaining a promissory note from the client on the side. During the late 1990s, the Eastern Trading Company, a bullion trading company based in Dubai, suffered massive speculative losses resulting in a debit balance of $28 million in their account. Such a debit would have triggered reporting requirements. In order to avoid these requirements, Refco "repaid" the debit balance with its own funds and took a promissory note from the Eastern Trading Company for the same amount. As Judge Richard Posner explained in an opinion issued in 2000 by the United States Court of Appeals for the Seventh Circuit, "it is true that for reasons having to do with reporting requirements imposed by the commodities exchanges, Refco did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate." Eastern Trading Co. v. Refco, Inc., 229 F.3ed 617, 626 (7th Cir. 2000). Although holding that Refco was entitled to performance on the promissory note, Judge Posner concluded that the arrangement existed "for the disreputable purpose of fooling the Board of Trade and the Commodities Futures Trading Commission." Id. Aspects of this matter

215

sufficient to put the Inside Defendants and Grant Thornton on notice of potential improprieties at Refco were well known to these Defendants before the Class Period.

581.   Accounting Department Was In "Shambles."  The Former Refco Officer described above stated that the accounting department at his unit of Refco was overworked and understaffed, with the result that "the Accounts Department was an absolute shambles."  This Former Refco Officer also stated that, in or about 2003-2004, it was apparent to him that Refco had "absolutely no financial controls or reporting systems;" that he had "never seen an operation run anywhere like I witnessed at Refco;" and that there was a "very, very laissez faire attitude toward risk management and compliance in general."  In addition, a former member of Refco's accounting group, who worked in the New York office and was responsible for management reporting within the futures business, stated that prior to the August 2005 IPO there was "no internal audit" or significant accounting infrastructure of any kind.

### b.     **Motive and Opportunity**

582.   The unique factors that motivated the Inside Defendants to conceal the Company's massive related-party receivable in order to complete the Bond Offering and the August 2005 IPO also raise a strong inference of scienter.  The LBO in June 2004 and the recapitalization of the Company leading up to Refco's much-anticipated IPO fostered an environment of greed and recklessness amongst Refco insiders eager to cash in on the massive amount of capital suddenly flowing into the thinly-capitalized, highly leveraged firm.  Despite the fact that $2.3 billion was raised in connection with the THL Partner Defendants' recapitalization, in the year leading up to the IPO and the subsequent collapse of Refco, the Inside Defendants stripped close to $1 billion from the Company.  As described below, they did so through sales of equity interests in the LBO; enormous outright grants of Refco common stock; the "green shoe" oversubscription option on the IPO, the proceeds of which were used to

216

personally enrich Refco Holdings and the Officer Defendants; further grants in the form of "Restricted Stock Units" ("RSU") to the Officer Defendants and the Audit Committee Defendants – awards of large blocks of stock that vest over time upon certain conditions; and several other bonus and compensation plans. Public disclosure of the related-party receivable, and the sham transactions used to conceal it, would have prevented the LBO (which was financed via the Bond Offering) and the IPO from occurring.

583. Cashing Out of Equity Interests in the LBO. The feeding frenzy began in June 2004, when the THL Partner Defendants and their passive co-investors purchased a 57% stake in Refco for approximately $507 million in cash. According to press reports, these funds were paid to Refco Holdings, which at the time was owned by Bennett and Grant. In connection with the transactions, Refco Group transferred $550 million in cash plus all of its equity interests in Forstmann-Leff International Associates, LLC (valued at approximately $231 million) to Refco Holdings. According to an October 20, 2005 article on Bloomberg newswires, through an additional agreement with the THL Partner Defendants, Bennett (along with Grant) was also entitled to another $120 million, which consisted of $12 million in cash and $108 million in the form of debt forgiveness. Additionally, Bennett (along with Grant) received $24.9 million in penalties for the early redemption of outstanding debt, plus $19.8 million due to certain change-of-control provisions. Bennett (through Refco Holdings) also rolled over a $383 million equity investment in the Company, representing a 43% stake.

584. Payments to the Officer Defendants in the LBO. Officer Defendants Murphy, Sexton, Maggio, and Klejna also realized significant financial windfalls in connection with the LBO. In connection with the THL Partner Defendants' investment, each of these executives had their interests in a Company-endorsed profit-sharing agreement liquidated by Refco Holdings,

217

allowing them to share in payments totaling $29 million, with Murphy receiving $13.7 million, Sexton receiving $9 million, Maggio receiving $8.4 million and Klejna receiving $6.5 million. This $29 million was in addition to the multi-million dollar salaries and bonuses received by these executives over the period of 2003 to 2005 and the generous stock option awards they received in advance of the IPO. These large payments strongly indicate these Defendants' motivation and intent to use the LBO and the IPO to extract large personal payments, raising a strong inference of scienter.

585. Direct Equity Interests. In the lead-up to the IPO, the Officer Defendants and the Audit Committee Defendants received unusually large grants of Refco common stock. The benefits of these grants could only be realized through an IPO, which created a public trading market for the stock and substantially increased its trading value, thereby greatly increasing these Defendants' personal wealth. The following chart sets forth the Officer Defendants' and Audit Committee Defendants' Refco stock holdings on the eve of the IPO, and the value thereof at the offering price, as set forth in the Prospectus:

| Defendant | Stock Held at IPO | Value at IPO Price |
|-----------|-------------------|--------------------|
| Bennett | 48,427,000 shares | $1,065,394,000 |
| Sherer | 464,000 shares | $10,208,000 |
| Sexton | 596,000 shares | $13,112,000 |
| Murphy | 534,000 shares | $11,748,000 |
| Maggio | 503,000 shares | $11,066,000 |
| Klejna | 261,000 shares | $5,742,000 |
| Breitman | 13,000 shares | $286,000 |
| Gantcher | 13,000 shares | $286,000 |

218

| Defendant | Stock Held at IPO | Value at IPO Price |
|-----------|-------------------|--------------------|
| O'Kelley | 13,000 shares | $286,000 |

586.     The substantial pecuniary benefits that these Defendants received, and could only have received, through an IPO raises a strong inference that they acted with scienter.  Indeed, Defendant Bennett, (through Refco Holdings) sold 5.375 million shares in the IPO, netting over $118 million in cash while retaining a 33.8% stake in the Company.  Significantly, a "lock-up" agreement with the Stock Underwriter Defendants was the only impediment preventing the other Officer Defendants from similarly cashing in all or a portion of their equity interests in the IPO.  That "lock-up" agreement prevented the other Officer Defendants and the Audit Committee Defendants from selling their shares for 180 days after the IPO – a date that was ultimately preceded by Refco's collapse.  The Officer Defendants' and Audit Committee Defendants' clear motivation to conduct an IPO raises a strong inference of scienter.

587.     The Green Shoe Option.  The Officer Defendants, the THL Partner Defendants, and Refco Holdings also stood to benefit substantially from the use of the "green shoe" option in case of oversubscription on the IPO.  Refco registered nearly four million additional shares for sale in the IPO in case the 26.5 million shares planned for sale in the IPO were over subscribed.  As set forth in the Prospectus, the proceeds from the exercise of this "green shoe" option were distributed directly to the shareholders of record before the IPO, including the Officer Defendants, the THL Partner Defendants, and Refco Holdings.  In other words, by creating sufficient demand for Refco stock at the time of the IPO, these Defendants received an extra cash payment from the sale of the shares dedicated to cover the over subscription.  The prospect of these cash payments further motivated these Defendants to conceal and misrepresent Refco's true financial condition.  Ultimately, there was such strong demand generated around the August

219

2005 IPO that it triggered the sale of an additional 3,975,000 shares by Refco to cover over-allotments, the extra proceeds of which went directly to Bennett (through Refco Holdings) and the Officer Defendants in the form of a "dividend" totaling over $87 million. Upon information and belief, the following chart sets forth the approximate cash payments realized by these Defendants as a consequence of the green shoe option (based on a pro-rata distribution of shares to existing shareholders):

| Defendant | Pre-IPO Interest | Pro Rata Cash Payment |
|---|---|---|
| Bennett (through Refco Holdings) | 42.1% | $36,800,000 |
| Sherer | 0.40% | $349,800 |
| Sexton | 0.52% | $454,740 |
| Murphy | 0.46% | $402,270 |
| Maggio | 0.44% | $384,780 |
| Klejna | 0.23% | $201,135 |

588.    Defendants Focused on IPO Riches.  By April 2005, the ground work had been laid for the Officer Defendants, the Audit Committee Defendants and the THL Defendants to sell a huge stake of the Company to the investing public through an IPO.  An IPO was extremely attractive to these Defendants because it would allow them to reap huge financial rewards from their ownership stake in the Company.  Not only would these Defendants collectively stand to make more than $1 billion from an IPO, but it would have other benefits as well.  For example, it would (i) create a public trading market that would allow these Defendants to sell their stock for huge profits or, at a minimum, use their Refco stock as collateral for personal loans; (ii) create a significant capital infusion for the Company that would increase the book value of all Refco

220

shares, including the millions of shares that these Defendants would retain after an IPO; and (iii) result in a huge one-time "special dividend" payment that would be used to line the pockets of these corporate insiders.

589.    A successful IPO would also provide additional benefits to the THL Defendants because they were in the process of marketing a new private equity fund, which required them to raise approximately $7.5 billion from institutional investors.  The THL Defendants could "leverage" the publicity provided by a high-profile IPO of Refco by touting the quick profits they and their co-investors had realized through their involvement with the Company, and thereby market their new fund and raise billions of dollars of additional capital from institutional investors.  By demonstrating a quick profit on the Refco IPO, the THL Defendants greatly increased their chances of raising the capital to form a new fund in the hyper-competitive leveraged buyout community.  The THL Defendants stood to make huge fees and profits from their new private equity fund.

590.    For example, the Former Refco Officer stated that Refco purchased the Company at which he previously worked because, in his view, Refco was acquiring brokerage companies solely to build volume in order to "get ready for the big payoff which was the IPO."  He stated that the New York Five did not care about the quality of revenue at operating units such as the one he ran, because their only objective was to build volume by opening new offices, without evaluating whether adding these offices was a sound business decision.  The Former Refco Officer communicated his concerns over these issues to the New York Five, but they did not respond.  While he was at first puzzled by senior management's lack of responsiveness, over time it became clear to him that "really they didn't care, because ultimately this was all a house

221

of cards anyway." According to this Former Refco Officer, "the five guys who were running the company were all hooked into the IPO."

591. RSU Grants to Officers. The Officer Defendants also received huge grants of RSUs in advance of the IPO, and were consequently motivated to conceal Refco's true financial condition. Under the terms of the Restricted Stock Unit agreements, 50% of a grant would vest ratably over four fiscal years, and the other 50% would vest upon the achievements of undisclosed EBIDTA targets. As set forth in the IPO Registration Statement, Bennett received 1,203,365 RSUs; Murphy, Sexton and Maggio each received 701,963 RSUs; and Klejna received 350,981 RSUs. These large grants of RSUs motivated the Officer Defendants to conceal Refco's true financial condition in order to conduct an IPO because the RSUs were worthless without a public market for the underlying shares. Further, the RSUs' emphasis on EBIDTA targets also motivated the Officer Defendants to conceal Refco's bad debts, because writing off those debts as required would have substantially reduced EBIDTA and prevented the relevant vesting conditions from being triggered.

592. RSU Grants to the Audit Committee. Each of the three Audit Committee Defendants also received 20,000 RSUs in advance of the IPO. This arrangement was extremely unusual not only because of its impact on the Audit Committee Defendants' purported independence, but also because the Audit Committee Defendants were the only members of the Board to receive these RSU grants. In other words, the three board members responsible for the "integrity of [Refco's] financial statements" were specially compensated by a massive grant of RSUs that would have been rendered worthless by revelation of Refco's true financial condition because such a revelation would have prevented the IPO from occurring. Accordingly, the

222

highly unusual grant of RSUs to the Audit Committee Defendants also raises a strong inference of scienter.

593. Bonus Compensation. The Officer Defendants were also motivated to conceal Refco's true financial condition as a result of the Senior Management Bonus Pool Plan ("Bonus Plan"). As discussed in the Prospectus, the Bonus Plan would only pay bonuses to senior management subject to performance criteria based on EBIDTA. Had they not been concealed, the uncollectible receivables would have been written off, thereby causing a substantial reduction in (if not an entire elimination of) Refco's EBIDTA. The Officer Defendants' desire to receive bonuses under the Bonus Plan also raises a strong inference of scienter.

594. Each of the Inside Defendants had the opportunity to commit fraud, because each of them prepared, reviewed and/or approved the financial statements and other documents containing the materially false and misleading statements and omissions as alleged herein, and thus had the ability to influence and control the content of those statements. Refco Holdings had the opportunity to commit fraud by virtue of its exercise of control over the Company, and its ability to influence and control the content of the Company's public statements, including those that were materially false and misleading as alleged herein.

595. Review and Payment of the Law Firm Legal Fees. As CFOs, Trosten and Sherer were responsible for receiving and authorizing the payment of legal bills from the Law Firm that, on information and belief, described the legal work performed by the Law Firm in connection with documenting the transactions described above. As General Counsel, Klejna was responsible for authorizing and supervising this outside legal work, and reviewing the subsequent bills. Accordingly, these Defendants were, or should have been, alerted to a bright red flag regarding the fraudulent activities described herein.

596.    Grant Thornton.  Defendant Grant Thornton was also significantly motivated to actively conceal or recklessly disregard Refco's massive related party receivable and the circular transactions that concealed it.  Refco was a prestigious client for Grant Thornton – a client that Grant Thornton did not want to antagonize with probing and thorough audit inquiries.  Indeed, Refco had not always taken its auditing business to Grant Thornton.  Andersen – the Big Five firm that collapsed in the wake of the notorious Enron scandal – had previously been Refco's auditor.  Afterward, former Andersen partner Mark Ramler, Andersen's engagement partner for Refco, moved to Grant Thornton and brought the Refco account with him.  This new business was a major triumph for Grant Thornton, which had picked up the crumbs of Andersen's collection of former clients as it watched the (now) Big Four accounting firms take the overwhelming majority.  According to a New York Times article on February 20, 2006, Grant Thornton picked up less than 5% of Andersen's former clients – and none in the S&P 500 – as the remaining firms competed over Andersen's former business.  Grant Thornton was thus motivated to restrain its approach to auditing Refco in order to minimize the risk that the Company – the crown jewel former Andersen client – would take its business elsewhere.  Willful blindness to Refco's false and misleading financial reporting was the result.  In fact, Defendant Grant Thornton performed auditing procedures so deficient, and engaged in such an egregious refusal to see the obvious or to investigate the doubtful, that each time it audited the Company, its audit amounted to no audit at all.

597.    Moreover, Refco was a company that actively anticipated conducting an IPO. The IPO market in 2004 and 2005 had slowed substantially from previous years.  At the same time, there was substantial investor interest in companies, like Refco, that dealt in derivatives.  In this sluggish market environment, the prospect of acting as Refco's auditor in connection with its

224

IPO, especially in a market eager for investment opportunities in the derivatives business, would have been seen as a major coup for Grant Thornton. Grant Thornton was thus substantially motivated to retain Refco as a client, and ensure that Refco experienced a successful IPO, in order to market itself to other clients in the derivatives industry. This powerful motive also raises a strong inference of Grant Thornton's scienter.

### c.   Additional Allegations of Scienter As to the Audit Committee

598.   The Audit Committee Defendants acted recklessly in the performance of their duties and, as a direct result, facilitated the fraudulent scheme described herein. The vital importance of an audit committees to the integrity of a company's financial reporting is emphasized by the SEC in the rules promulgated pursuant to the Sarbanes Oxley Act of 2002:

> The audit committee, composed of members of the board of directors, plays a critical role in providing oversight over and serving as a check and balance on a company's financial reporting system. The audit committee provides independent review and oversight of a company's financial reporting process, internal controls and independent auditors. It provides a forum separate from management in which auditors and other interested parties can candidly discuss concerns. By effectively carrying out its functions and responsibilities, the audit committee helps to ensure that management properly develops and adheres to a sound system of internal controls, that procedures are in place to objectively assess management's practices and internal controls, and that the outside auditors, through their own review, objectively assess the company's financial reporting practices.

599.   The Audit Committee Defendants were responsible for assisting the entire board in the oversight of Refco's financial statements. Indeed, it is fundamental that an audit committee has a detailed understanding of the Company, and particularly the adequacy of its financial systems and internal controls, as well as the soundness of the Company's business model (including the procedures for extending "margin" loans to the Company's customers, the existence of related-party transactions, and the collectibility of the Company's receivables).

600.   The IPO Registration Statement set forth the "primary purpose of the audit

225

committee" as:

- Assist the board's oversight of:

    - the integrity of our financial statements;

    - our compliance with legal and regulatory requirements;

    - our independent auditors' qualifications and independence; and

    - the performance of our independent auditors and our internal audit function; and

    - prepare the report required to be prepared by the committee pursuant to SEC rules.

601. The Charter of the Audit Committee also sets forth, in great detail, the duties and responsibilities of the Audit Committee Defendants. These duties included:

(a) Reviewing and discussing with management, internal audit and the independent auditor the adequacy and effectiveness of Refco's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, through inquiry and discussions with the independent auditors, management and head of internal audit;

(b) Discussing guidelines and policies governing the process by which senior management of Refco and the relevant departments of the Company, including the internal auditing department, assess and manage the Company's exposure to risk, as well as Refco's major financial and other risk exposures and the steps management has taken to monitor and control such exposures;

(c) Reviewing and discussing with management the progress and results of internal audit projects, and, when deemed necessary or appropriate by the Audit Committee, assigning additional internal audit projects to the head of internal audit;

(d)     Reviewing and discussing with management the Company's administrative, operational and accounting internal controls, including special audit steps adopted in light of the discovery of any significant and material control deficiencies;

(e)     Meeting periodically with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Company; and

(f)     Reviewing and discussing with management, the Company's independent auditors and the head of internal audit, material financial arrangements of the Company which do not appear on the financial statements of the Company.

These duties reflect the Audit Committee's comprehensive involvement in Refco's audit and financial reporting processes, and raise a strong inference that, but for the Audit Committee Defendants' reckless disregard for these duties, the falsehoods and misleading disclosures described above would not have occurred.

602.    The IPO Registration Statement also stated that Defendant O'Kelley "serves as chairman of the audit committee and qualifies as an independent "audit committee financial expert" as such term has been defined by the SEC in Item 401(h)(2) of Regulation S-K.  In order to satisfy Item 401(h)(2), Defendant O'Kelley was required to have extensive experience relating to reporting financial statements.  This Item provides:

(2) For purposes of this Item, an audit committee financial expert means a person who has the following attributes:

(i)  An understanding of generally accepted accounting principles and financial statements;

227

(ii) The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;

(iii) Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;

(iv) An understanding of internal control over financial reporting; and

(v) An understanding of audit committee functions.

603. Given these specific responsibilities and their supposed expertise, the Audit Committee Defendants were reckless in failing to detect, and in failing to put in measures to prevent, the fraudulent scheme described herein. Indeed, the Audit Committee's reckless failure to perform its duties is demonstrated by the fact that, as of February 28, 2005, Refco's auditors identified two significant deficiencies in the Company's internal controls. As stated in the IPO Registration Statement, a "significant deficiency" is defined as "a deficiency that results in more than a remote likelihood that a misstatement of the financial statements that is more than inconsequential will not be prevented or detected." The specific deficiencies noted were:

(a) "the need to increase [the Company's] existing finance department resources to be able to prepare financial statements that are fully compliant with all SEC reporting guidelines on a timely basis"; and

(b) "lack of formalized procedures for closing [the Company's] books."

604. These two deficiencies fall squarely into the Audit Committee Defendants' area of responsibility, as described above, and should have alerted them that there was a significant risk of fraudulent activity at the Company. Moreover, these deficiencies created an environment where it was easy for Bennett, Maggio and others to fraudulently manipulate Refco's financial statements. As set forth in AU § 316, "fraud risk factors" include "domination of management

228

by a single person or small group" and "weaknesses in internal control."

605. The internal control deficiencies noted by Grant Thornton had existed through the entirety of fiscal year 2005, and in prior years as well. However, the existence of these deficiencies was not discovered, disclosed, or corrected by the Audit Committee Defendants. If the Audit Committee Defendants had not been reckless in the performance of their responsibilities, they would have discovered these deficiencies – which go to the heart of their oversight responsibilities – long before the auditors noted them in connection with the February 28, 2005 year-end review.

606. To compound their failure to identify these issues, the Audit Committee Defendants took no steps whatsoever to remedy these issues in a timely fashion. For instance, the IPO Registration Statement states that the Company was "in the process" of hiring "additional internal audit and financial personnel" as of August 10, 2005. Thus, approximately six months after learning of these deficiencies – which they should have known about much earlier – the Audit Committee Defendants were still in the process of attempting to remedy them. While this delay would be reckless under any circumstance, it is particularly reckless here because in the intervening sixth months Refco had conducted two major transactions with respect to the issuance of public securities: the Exchange Offer for the Registered Bonds and the August 2005 IPO.

607. The reckless failure of the Audit Committee Defendants to remedy these identified deficiencies in a timely fashion can be explained, at least in part, by their motivation to effect these two transactions in the Company's securities. As explained above, each of the Audit Committee Defendants was granted 20,000 shares of RSUs that vested over a period of time. These RSUs were essentially worthless unless and until Refco conducted an IPO. Upon

consummation of the IPO, these units instantly became worth hundreds of thousands of dollars, with the potential of increasing in value in the future. In order to ensure that nothing impeded them from reaping the monetary rewards of the IPO, the Audit Committee Defendants recklessly ignored their responsibilities to immediately correct the identified "significant deficiencies" in Refco's financial controls.

608. As set forth above, the fraudulent scheme was eventually discovered by a Refco employee who had been with the Company for less than two months. If the Audit Committee Defendants had performed their duties and ensured that this employee or other new employees had been hired in a timely fashion prior to the Exchange Offer and the August 2005 IPO, it is likely that the fraud at Refco would have been revealed much earlier, saving investors hundreds of millions of dollars.

### d. Additional Allegations of Scienter Against BAWAG

609. As described above, BAWAG knowingly participated in at least six sham "loan" transactions between BAWAG, Refco and Refco Holdings at each of Refco's fiscal year ends between February 2000 and February 2005. These so-called loan transactions were fraudulent on their face. For instance:

(a) The ties between the co-conspirators at Refco and BAWAG were so extensive that the "loans" were never formally documented. Rather, they were conducted through a series of secret e-mails, letters and, on information and belief, telephone conversations with Refco executives, including Defendants Bennett, Maggio and Trosten;

(b) These "loans" primarily involved shuttling hundreds of millions of dollars through BAWAG from Refco to Refco Holdings and then back again, and BAWAG did not earn any net interest on these transactions;

(c) BAWAG did not conduct any investigation into Refco's creditworthiness

230

and/or ability to repay the "loans"; and

> (d)     The "loans" lacked any legitimate business purpose.

610.     In addition, the highly unusual nature and timing of the "loans" raise a strong inference of scienter.  First, the loans involved the transfer of huge sums – multiples greater than Refco's yearly net income – away from the Company and into a related-entity (Refco Holdings) that BAWAG knew was owned by Defendant Bennett.  Second, the timing of the "loans" – days on either side of the end of each financial period from fiscal year 2000 through 2005 – also raises a strong inference of scienter.

611.     BAWAG's scienter is also demonstrated by the fact that BAWAG was indisputably aware of the relationship between Refco Holdings and Refco by virtue of, among other things, (a) the fact that BAWAG was a co-owner of Refco along with Refco Holdings; (b) BAWAG's numerous business dealings with Defendant Bennett and Refco (as described herein); and (c) certain BAWAG executives directly involved in these transactions, such as Thomas Hackl, who was a former Managing Director and head of Treasury at BAWAG, who later joined Refco.  Other examples of the close business ties between BAWAG and Refco include:

> (a)     On or about May 14, 1999, BAWAG acquired a 10% equity interest in Refco, held through BAWAG's subsidiary BAWAG Overseas, Inc. (as described above). In a press release issued by Refco on May 20, 1999, Defendant Bennett stated:
>
> > [Refco's] objective is to provide BAWAG with insights into non-bank financial markets in which we have expertise and in doing so, create future opportunities of benefit to both parties and our respective clients.  […]  [T]his significant infusion of capital complements a number of important recent management changes at Refco and positions us well to achieve our strategic goals as we move into the 21st Century.

231

(b)  BAWAG secretly held an additional, undisclosed equity interest of approximately 27% in Refco (as described above).

(c)  In or about 1998, Refco established a joint venture with Helmut Elsner, then the CEO of BAWAG, involving a futures and options-clearing service in Europe.

(d)  BAWAG and Refco each own a portion of Bank Frick & Co. Atkiengesellschaft ("Bank Frick"), a Lichtenstein joint stock company. Specifically, Refco owns a 4% stake in Bank Frick and BAWAG owns a 26% stake. Moreover, Thomas Hackl is a director of Bank Frick.

(e)  BAWAG and Refco have close ties through their common relationship with Christopher Sugrue ("Sugrue"), a former senior vice president at Refco. It has been widely reported that Sugrue, through his hedge fund PlusFunds Ltd. ("Plus Funds"), has a close relationship with BAWAG. Among other things, BAWAG is listed as a creditor of PlusFunds in the PlusFunds' recent bankruptcy filings. Moreover, Refco had a close business relationship with Sugrue and PlusFunds throughout the Class Period because, among other things, between 2002 through October 12, 2005, Refco was the clearing broker for PlusFunds.

(f)  According to an article published by TheStreet.com on April 7, 2006, reports that Defendant Maggio secretly taped a conversation with Defendant Bennett in which the latter indicates that he would be traveling to Vienna to go on a wine-tasting trip with the then-CEO of BAWAG on or about October 12, 2005. This tape recorded conversation likely hastened Defendant Bennett's arrest on October 10, 2005.

612.  BAWAG had a powerful motive to participate in the fraudulent scheme and to conceal the uncollectible receivable owed by Refco Holdings to Refco. Specifically, as

232

described above, BAWAG received a massive (and secret) $1.3 billion payment from Refco

Holdings in connection with the LBO in August 2004. BAWAG was motivated to participate in

the fraudulent scheme described herein to ensure that it would receive this massive payment and,

later, to keep this payment hidden from public disclosure. Indeed, this payment was apparently a

"reward" extracted from Refco in return for BAWAG's direct participation in, and support of,

the illicit scheme described herein, and it was imperative to BAWAG that this payment remain

secret. On information and belief, this payment allowed BAWAG to "make whole" significant

trading losses that it suffered as a result of the unauthorized trading activities in or about 1999 or

2000. Indeed, BAWAG had a direct interest in ensuring that the "cover-up" continued because it

allowed BAWAG to conceal the fact that it suffered these trading losses – a fact that BAWAG

only admitted six years after the event.

613. BAWAG's scienter is further demonstrated by the circumstances surrounding its

"no questions asked" eleventh hour loan of $420 million to Defendants Bennett and Refco

Holdings. In a last-ditch effort to conceal the ongoing fraud at Refco, as well as its own

extensive related misconduct, on or about October 10, 2005, BAWAG secretly loaned Bennett

and Refco Holdings approximately $420 million dollars to "repay" the outstanding receivable.

The loan, which according to BAWAG's then-CEO Jonathan Zwettler was secured by Bennett's

34% stake in Refco stock, was extended during the hours immediately preceding Refco's press

release announcing the discovery of the receivable. Relying on the proceeds of this loan, and on

the fact that BAWAG's involvement in the loan had been concealed from the investing public,

Refco represented in its October 10, 2005 press release that "Mr. Bennett today repaid the

receivable in cash, including all accrued interest." This statement failed to present a full and

accurate picture of the circumstances under which Refco had been "repaid"; created the false

impression that Refco had no internal shortfall; and falsely reassured the market with respect to Refco's true financial condition at that time, thereby staving off Refco's ultimate collapse for several additional days.

614.    BAWAG's motive for extending the loan is clear:  as discussed above, BAWAG and Bennett had for years been actively involved in concealing each others' financial improprieties – BAWAG by participating in Refco's circular transactions, and Bennett by using Refco accounts to conceal BAWAG's massive trading losses – and only through this last minute effort to prop up Refco could BAWAG hope to maintain that unholy alliance and avoid the revelations of its own misconduct that would (and did) follow inevitably upon Refco's bankruptcy.

615.    BAWAG's eleventh-hour bid ultimately failed and Refco filed for bankruptcy on or about October 17, 2005.  As a result of the last-minute loan, Refco listed BAWAG as its single largest creditor, for $451 million.

616.    Finally, BAWAG's scienter is further demonstrated by the numerous false statements made by BAWAG to cover-up and conceal its involvement in this scheme and the exposure it faces from its extensive involvement with Refco.  For instance:

(a)    BAWAG's annual report for 2004 made the following statement regarding its ownership interest in BAWAG:

> In the course of a change in the majority ownership of the Refco Group, which is one of the biggest global groups of brokerage and clearing companies for derivatives, BAWAG sold its 10% share. The agreements to this effect were signed in June.  The successful cooperation with the Refco Group will be continued in the future without an equity stake, so that BAWAG P.S.K. Group will continue to benefit from this access route to international customers in the future.

Contrary to this statement, however, BAWAG in fact owned a far greater than 10% share

234

in Refco, as discussed above.

      (b)     On or about November 17, 2005, BAWAG filed a complaint in the U.S. Bankruptcy Court against Bennett and Refco seeking to recover the $420 million loan it extended to Defendant Bennett on or about October 10, 2005. On November 18, 2005, BAWAG commented on this lawsuit in a press release that stated:

> The Supervisory Board came to the conclusion that the provisions of the Banking Act, the bank's statues and the rules of procedure of governing bodies had been complied with. Nor was there any indication of any criminal responsibility on the bank's part. . . . the Supervisory Board accordingly found the Executive Board not to have been in breach of its prudential responsibilities. <u>Rather, the bank had clearly been fraudulently misled by Mr. Bennett and the Refco Group.</u>.

(Emphasis added). This statement by BAWAG was designed to mislead BAWAG's investors, customers and business partners into believing that BAWAG was not involved in Bennett's wrongdoing. However, as has subsequently become clear, rather than being "misled by Mr. Bennett," as BAWAG claimed, BAWAG was an active and direct participant in a fraudulent scheme designed to conceal the true state of Refco's finances (and covered BAWAG's own extensive trading losses).

      (c)     In a press release issued on November 30, 2005, BAWAG reported that it had sold its position in a syndicated loan to Refco and that, because of this sale, "<u>BAWAG's remaining maximum amount at risk from its Refco exposure is thereby reduced from EUR 425 million to EUR 392 million.</u>" (Emphasis added). This statement was apparently designed to mislead BAWAG's investors, customers and business partners into believing that BAWAG did not face any legal liability for its involvement with Refco. As has subsequently become clear, however, BAWAG faces far more than EUR 392 million in "Refco exposure."

235

(d)    BAWAG repeated these false statements in a press release of January 30, 2006, where BAWAG stated "The effects of the Refco Affair are fully reflected and accommodated in BAWAG P.S.K.'s financial statements for 2005 . . . the Refco write-down will have no lasting effect on BAWAG P.S.K.'s earning power." (Emphasis added.)  On March 17, 2006, BAWAG repeated this statement in a press release, stating "the outstanding maximum credit exposure of BAWAG in connection with Refco is EUR 392 million.  This amount has been fully provided for in the 2005 financial statements." As has subsequently become clear, the effects of the "Refco Affair" are still being felt at BAWAG and are *not* fully or fairly reflected in BAWAG's 2005 financial statements.

(e)    On March 15, 2006, BAWAG issued a press release that, once again, misstated the true nature and extent of BAWAG's historical ownership interest in Refco, stating: "It is well-known that BAWAG invested in a 10 per cent stake in Refco in 1999. This holding was terminated through a sale in 2004."

(f)    On March 17, 2006, BAWAG issued a press release stating "BAWAG P.S.K. would like to emphasize that none of the circumstances referred to in recent media reports results in any additional risk exposure for the BAWAG P.S.K. Group . . . as far as our business relationship with Refco is concerned, the outstanding credit exposure will be fully provided for in the 2005 financial statements, in the amount of EUR 392 million." (Emphasis added).

(g)    On March 24, 2006, BAWAG issued a press release again stating that "the outstanding exposure [to Refco] has been fully provided for in the 2005 financial statements."

(h)    On April 7, 2006, BAWAG issued a press release that quoted CEO Ewald

236

Nowotny as stating:

> Now that we have brought the transactions of the past to light and taken the necessary action, we can confidently tackle the challenges ahead of us. The bank is financially sound . . . .

(Emphasis added). As has subsequently become clear, far from "bringing the transactions of the past to light," BAWAG had taken every opportunity to mislead investors, customers and business partners regarding the true extent of its blatantly fraudulent dealings with Refco, Refco Holdings, Bennett, Maggio, Trosten and others.

617. Each of the statements set forth above was false and designed to obscure BAWAG's culpability relating to its involvement with Refco and thus is further evidence of BAWAG's culpable state of mind.

### 5. LOSS CAUSATION

618. Throughout the Class Period, the prices of the Company's securities were artificially inflated as a direct result of Defendants' misrepresentations and omissions regarding the Company, including the misrepresentations about its financial condition and results of operations.

619. The Company's financial condition and results, including the collectibility of its receivables and the nature and extent of its transactions with related parties, were material information to Plaintiffs and the other members of the Class. Had the truth been disclosed to the market at or before the time of the Bond Offering or the August 2005 IPO, Plaintiffs and the other Class members would have been unwilling to purchase the Company's securities, and the Company would have been unable to complete those offerings.

620. When the truth about the Company was revealed, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant losses to Plaintiffs and the other Class members. The

237

October 10, 2005 disclosure of a $420 million related-party loan to Refco Holdings, and that the Company's prior financial statements could not be relied upon, was a partial disclosure of the misrepresentation and omissions, and led to a flurry of trading in which Refco's stock price plunged 45%, from its $28.56 close on October 7, 2005 to its $15.60 close on October 10. The stock price continued its freefall in the ensuing days, dropping 11% to close at $13.85 on October 11, 2005 following the announcement that the SEC had launched an investigation of Refco, and falling another 22% to close at $10.85 on October 12, 2005 upon news of Bennett's arrest on securities fraud charges. As customers ran for the exits amidst the growing uncertainty caused by the revelation of Defendants' misrepresentations and omissions, Refco was forced to shut down its Refco Capital Markets unit on October 13, whereupon the stock dropped another 27% to $7.90 before trading was halted by the New York Stock Exchange. Similarly, the Bonds – which were trading at 108.625% of par on October 7, 2005 and had never traded below 103% of par in the preceding twelve months – fell to 91.50% on October 11; approximately 76% on October 12; and as low as 16% by October 14, 2005. By October 17, 2005, merely one week after the initial revelation of the previously-undisclosed $420 million loan to Bennett, Refco announced that it was filing for bankruptcy. Following that announcement, the truth was finally revealed to the market, and Refco's stock fell to a price of approximately 65 cents, nearly a 98% decline.

621.    The declines in the Company's securities prices following the revelations of October 11-17, 2005 and the resulting losses suffered by Plaintiffs and the other members of the Class are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of

238

the Company's securities prices to reflect the newly emerging truth about the Company's

financial condition.

622. Defendants' conduct, as alleged herein, proximately caused foreseeable losses to

Plaintiffs and the other members of the Class.

### 6. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

623. The statutory safe harbor applicable to forward-looking statements under certain

circumstances does not apply to any of the false or misleading statements pleaded in this

Complaint. First, the statutory safe harbor does not apply to false or misleading statements that

are made in connection with an initial public offering (such as the Bond Offering and the August

2005 IPO) and/or are contained in financial statements which purport to have been prepared in

accordance with GAAP. Second, the statements complained of were not forward-looking

statements nor were they identified as forward-looking statements when made. Rather, the false

or misleading statements complained of in this Complaint concerned historical and/or current

facts and conditions existing at the time the statements were made.

624. To the extent that any of the false or misleading statements alleged herein can be

construed as forward-looking statements, they were not accompanied by any meaningful

cautionary language identifying important facts that could cause actual results to differ materially

from those in the purportedly forward-looking statements. Alternatively, to the extent the

statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein,

Defendants are liable for those false or misleading forward-looking statements because at the

time each of those statements was made, the speaker(s) knew the statement was false or

misleading, or the statement was authorized and/or approved by an executive officer of Refco or

of a Defendant who knew that the statement was materially false or misleading when made.

239

### 7. PRESUMPTION OF RELIANCE

#### a. Reliance Should Be Presumed With Respect to Defendants' Omissions

625. Throughout the Class Period, Plaintiffs and the members of the Class justifiably expected the Defendants to disclose material information in connection with the offering and sale of the Company's securities, including in the Offering Memorandum for the Bonds, the Bond Registration Statement, the 2005 10-K, the First Quarter 2006 10-Q and the IPO Registration Statement. Plaintiffs and the members of the Class would not have purchased the Company's securities at artificially inflated prices if Defendants had disclosed all material information, including the nature and magnitude of its uncollectible receivables and the undisclosed related-party transactions. Thus, reliance by Plaintiffs and the Class members should be presumed with respect to Defendants' omissions of material information.

#### b. Reliance Should Be Presumed Because Fraud Created the Market for the Company's Securities

626. As alleged herein, in connection with the offer and sale of the Bonds and the Refco stock, certain Defendants entered into and participated in a scheme to employ devices, schemes, and artifices to defraud, and to engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon Plaintiffs and the other members of the Class. This scheme included the offering and sale of the Bonds and Refco stock based on materially misleading information, and without disclosing material facts.

627. The Offering Memorandum for the Bonds instructed: "You should rely only on the information contained in this document or to which we have referred you. We have not authorized anyone to provide you with information that is different." Thus, in connection with their decisions to purchase 144A Bonds in the Bond Offering, investors relied heavily on the Offering Memorandum and the financial and other information contained therein, and the

240

information and documentation provided at the Bond Road Show (which was consistent with the information in the Offering Memorandum).

628. The information contained in the Offering Memorandum and disseminated at the Bond Road Show was materially false, as alleged herein. Had truthful and complete information been provided to potential investors at the time of the Bond Offering, and had the fraudulent scheme alleged herein not occurred, investors would have known that the credit risk associated with the Bonds was substantially greater than they otherwise believed, and there would have been no market for the Bonds.

629. Similarly, had truthful and complete information been provided to potential investors at the time of the August 2005 IPO, and had the fraudulent scheme alleged herein not occurred, investors would have known that the Company's financial condition was materially weaker than was represented, and there would have been no market for the Company's stock.

630. The scheme described herein was intended to, and did, bring the Bonds and the Refco stock into the market fraudulently. Those securities could not have been marketed at any price absent the fraud. Thus, the fraud alleged herein created a market for the Bonds and the Refco stock which would not otherwise have existed. Absent the fraud, there would have been no Bond Offering and no August 2005 IPO.

631. When purchasing the Company's securities in the Bond Offering, in the August 2005 IPO, and in the secondary market, Plaintiffs and the Class members reasonably relied on the availability of those securities in the market as an indication of their genuineness. Plaintiffs and the Class members relied on the integrity of the market to furnish securities that were not the product of a fraudulent scheme. Thus, the reliance of Plaintiffs and the Class members on

241

Defendants' fraudulent scheme, including their misstatements and omissions, should be presumed.

        **c.**      **Reliance Should Be Presumed Under the Fraud-on-the-Market Doctrine**

632.     The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.

633.     After the Bond Offering, a secondary market developed for the 144A Bonds, which traded in the PORTAL market. The market for the 144A Bonds consisted exclusively of institutional investors and other sophisticated investors. These institutional investors employed professional securities analysts who read and analyzed all relevant and publicly available information regarding the Company and the Bonds, and promptly adjusted the prices at which they were willing to buy and sell the Bonds accordingly. The secondary market for the Bonds broadened with the issuance of the Registered Bonds in April 2005, which were freely tradeable in the public markets. At all relevant times, major brokerage houses such as Credit Suisse, Bank of America, Deutsche Bank, Bank of New York, Morgan Stanley Dean Witter, Citigroup Capital Markets, Inc., and J.P. Morgan Chase Bank served as market makers and/or dealers in the Bonds, and information regarding the prices at which the Bonds were trading was publicly available through pricing services including the Trade Reporting and Compliance Engine (TRACE).

634.     After the Bond Offering, the Company was consistently followed by securities analysts from Moody's and Standard & Poor's – who published credit ratings on the Bonds – as well as the business press. During this period, Refco and certain Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts, and institutional investors; assimilated into the ratings agencies' ratings for the Bonds

and into analysts' and investors' analysis of the creditworthiness and the probability of default on the Bonds; and reflected in the market price of the Bonds.

635. From the time of the August 2005 IPO until October 7, 2005:

(a) Refco's stock was actively traded on the New York Stock Exchange;

(b) The market price of Refco's stock reacted promptly to the dissemination of public information regarding the Company;

(c) There were at least five securities analysts who followed and published research reports regarding Refco that were publicly available to investors, including analysts from BAS; Goldman Sachs; Credit Suisse; Weeden & Co.; and Sandler O'Neill;

(d) The average weekly trading volume for Refco's stock from August 12, 2005 through October 7, 2005 was over 3.2 million shares, or 2.5% of total outstanding shares; and

(e) The Company's market capitalization was in excess of $3 billion.

636. Plaintiffs and the other Class members relied on the integrity of the market price for the Company's securities and are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions during the Class Period.

## 8. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT NINE

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5(b) Promulgated Thereunder,
On Behalf of Plaintiffs and All Members of the Class,
Against the Officer Defendants, the Audit Committee Defendants, Trosten, and Grant
Thornton**

637. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

638. This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class, against Defendants Bennett, Trosten, Murphy, Sherer, Maggio, Sexton, Klejna, Silverman, O'Kelley, Gantcher, Breitman, and Grant Thornton (collectively, the "Section 10b-5(b) Defendants").

639. As alleged herein, throughout the Class Period, the Company and the Section 10b-5(b) Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. The Company's and the Section 10b-5(b) Defendants' false and misleading statements and omissions were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiffs and the other members of the Class to purchase the Company's securities at inflated prices.

640. The Company and the Section 10b-5(b) Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

641. As described above, the Company and the Section 10b-5(b) Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless

244

manner as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Refco securities during the Class Period.

642. The Company's and the Section 10b-5(b) Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

643. In ignorance of the false and misleading nature of the Company's and the Section 10b-5(b) Defendants' statements and omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

644. The market price for Refco securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Section 10b-5(b) Defendants, as described above.

645. Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT TEN

### For Violations of Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) Promulgated Thereunder, On Behalf of Lead Plaintiffs and All Members of the Class, Against Refco Holdings

646. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

647. This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class against Refco Holdings.

245

648.     As alleged herein, throughout the Class Period, Bennett, the Company, Refco Holdings and others, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, carried out a plan, scheme and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for, and market prices of, Refco securities; and (iii) cause Plaintiffs and the other members of the Class to purchase Refco securities at artificially inflated prices. In furtherance of this unlawful plan, scheme and course of conduct, the Company and Refco Holdings took the actions described at length above.

649.     As described above, the Company and Defendant Bennett engaged in the fraudulent activity described herein knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Refco securities during the Class Period. The knowledge and scienter of Defendant Bennett, as the sole stockholder and CEO of Refco Holdings, are imputed to Refco Holdings. Moreover, as a party to the sham transactions alleged herein, with knowledge (through Bennett) that the purpose and effect of those transactions was to manipulate and materially misstate Refco's reported financial condition, Refco Holdings acted with scienter and is subject to liability under Section 10(b) and Rule 10b-5(a) and (c).

650.     The Company's and Refco Holdings' fraudulent activities occurred in connection with the purchase or sale of the Company's securities.

651.     In ignorance of the Company's and Refco Holdings' fraudulent conduct, and relying directly or indirectly on the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices

246

during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

652. The market prices for Refco securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by the Company and Refco Holdings, as described above.

653. Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## COUNT ELEVEN

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act,
On Behalf of Purchasers of 144A Bonds in the Bond Offering,
Against Bennett, Grant, Refco Holdings, the THL Partner Defendants, Lee, Murphy,
Trosten, Sexton, Silverman, Maggio and BAWAG
(Based on Violations of Section 10(b) and Rule 10b-5 by Refco Group,
Refco Finance Holdings, and Refco Finance)**

654. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

655. This Claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Bennett, Grant, Refco Holdings, the THL Partner Defendants, Lee, Murphy, Trosten, Sexton, Silverman, Maggio and BAWAG (collectively, the "Section 20(a) Bond Offering Defendants"), on behalf of PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased 144A Bonds in the Bond Offering.

656. As alleged herein, Refco Group, Refco Finance Holdings, and Refco Finance violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct, all in connection with the

247

Bond Offering. This fraudulent conduct was undertaken with scienter because Refco Group, Refco Finance Holdings, and Refco Finance are charged with the knowledge and scienter of Defendant Bennett and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme. But for the fact that Refco Group, Refco Finance Holdings, and Refco Finance have filed for bankruptcy protection, they would be named as defendants on the Section 10(b) claims alleged herein.

657. PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased 144A Bonds in the Bond Offering suffered damages in connection with their purchases of those securities, as a direct and proximate result of the violations of Section 10(b) and Rule 10b-5 by Refco Group, Refco Finance Holdings, and Refco Finance.

658. The THL Partner Defendants were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to their approximate 57% ownership interest in New Refco, the sole member of Refco Group.

659. Defendant Lee was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to his position as Chairman and CEO of Thomas H. Lee Partners, and the fact that Thomas H. Lee Partners or Lee controlled each of the other THL Partner Defendants, which in turn controlled Refco Group.

660. Defendants Bennett and Grant were controlling persons of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to their approximate 43% ownership interest (through their ownership of Refco Holdings) in New Refco, the sole member of Refco Group.

248

661. Defendant Refco Holdings was a controlling person of Refco Group at the time of the Bond Offering due (among other reasons alleged herein) to its approximate 43% ownership interest in New Refco, the sole member of Refco Group.

662. Defendants Bennett, Murphy, Trosten, Sexton, Silverman and Maggio were controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance at the time of the Bond Offering due (among other reasons alleged herein) to their executive positions with Refco Group and Refco Finance Holdings (of which Refco Finance was a wholly-owned subsidiary at the time of the Bond Offering); their direct involvement in the day-to-day business and operations of each entity, including the preparation of their financial statements; their participation in the Bond Road Show where the Bonds were marketed to investors and the contents of the prospectus were discussed; and/or their participation in the preparation and dissemination of the false and misleading prospectus for the Bonds.

663. Defendant BAWAG was a controlling person of Refco Group by virtue of its ownership interest in Refco Group. As alleged herein, since in or about 1998 BAWAG admittedly owned a 10% interest in Refco Group until it sold that interest in the August 2004 recapitalization transaction. Furthermore, through a complex maze of transactions with offshore affiliates, BAWAG held an additional 37% stake in Refco Group. By virtue of such ownership interest, BAWAG had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, including the content and dissemination of its financial statements and the Offering Memorandum. BAWAG's control over Refco Group is evidenced by the fact that, in the course of the August 2004 recapitalization transaction, BAWAG was able to require Refco Group to pay BAWAG some $1.42 billion in exchange for BAWAG giving up its interest in Refco Group.

664. In addition, BAWAG was a controlling person of Refco because BAWAG controlled Defendant Bennett. BAWAG controlled Bennett by virtue of Bennett's economic dependence on BAWAG to ensure that the fraudulent scheme described herein could be perpetrated and concealed. Specifically, as set forth above, when a number of Refco's customers – including BAWAG – suffered extensive trading losses in the worldwide financial crises of 1998-2000, they were unable to repay the credit extended to them by Refco. In order to avoid disclosing these uncollectible debts, Bennett transferred them to Refco Holdings and then orchestrated a series of transactions whereby the receivable was temporarily paid off at the end of each of the Company's financial reporting periods.

665. BAWAG actively assisted Bennett in the scheme to conceal this uncollectible receivable in at least two ways. First, in 1999, when Refco first suffered these losses, BAWAG injected a huge amount of fresh capital into Refco by acquiring a 10% stake in the Company through its wholly-owned affiliate BAWAG Overseas. Indeed, in a May 20, 1999 press release, Defendant Bennett expressly referenced "this significant infusion of capital" from BAWAG and stated that the transaction "create[d] future opportunities of benefit to both parties." Second, BAWAG participated in at least six transactions at the end of Refco's fiscal years 2000 through 2005 that allowed Refco Holdings to temporarily pay off the receivable it owed to the Company. The significant economic assistance that BAWAG gave to Bennett provided BAWAG with disproportionate influence and control over Bennett – a CEO who was clearly desperate to conceal the existence of Refco Holdings' uncollectible receivable. Thus, by reason of Bennett's economic dependence on BAWAG, BAWAG controlled Bennett and, through him, Refco. This dependence is evidence further by the fact that when the $430 million related-party receivable came to light in October 2005, and Bennett and BAWAG were anxious to avoid full disclosure

250

of all of the facts, BAWAG readily provided, in remarkably short order, a $420 million loan to Bennett, which he used to pay off Refco Holdings' debt to Refco. Indeed, just two days later, Bennett was arrested when Defendant Maggio secretly taped a conversation with Bennett where Bennett stated that he would be traveling to Vienna to go on a wine-tasting trip with the then-CEO of BAWAG.

666. By virtue of the foregoing, the Section 20(a) Bond Offering Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, Refco Finance Holdings, and Refco Finance, including the content and dissemination of their financial statements and Offering Memorandum.

667. The Section 20(a) Bond Offering Defendants did not act in good faith in connection with the conduct at issue in this Claim. Further, these defendants directly or indirectly induced the act or acts constituting the violations of Section 10(b) and Rule 10b-5 by Refco Group, Refco Finance Holdings, and Refco Finance by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, approving and assisting in the preparation of the Offering Memorandum, and/or participating in the Bond Road Show where false statements were made to investors.

668. The Section 20(a) Bond Offering Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless disregard for the truth. Facts giving rise to a strong inference of Defendant Grant's culpability include: (1) that, upon information and belief, he continued to play a significant role in the management of the Company, despite leaving the Company, through the date of the Bond Offering; and (2) that he received substantial proceeds from the LBO, which could not have

251

occurred absent the Bond Offering. Upon information and belief, Grant and Bennett shared equally in the THL Partner Defendants' $507 million cash payment to Refco Holdings; Refco Group's transfer of $550 million in cash plus equity interests valued at $231 million to Refco Holdings; plus an additional $12 million in cash and $108 million in debt forgiveness. The facts giving rise to a strong inference of the other Section 20(a) Bond Offering Defendants' culpability are alleged in detail above.

669. By virtue of their positions as controlling persons of Refco Group, Refco Finance Holdings, and Refco Finance and their culpable participation in those entities' violations of Section 10(b) in connection with the Bond Offering, the Section 20(a) Bond Offering Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Refco Group, Refco Finance Holdings, and Refco Finance.

**COUNT TWELVE**

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act,**
**On Behalf of Purchasers of Bonds After the Bond Offering and**
**Before the Date of the August 2005 IPO, Against the**
**THL Defendants and Defendants Bennett, Refco Holdings, the Bennett Trust,**
**Murphy, Trosten, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley,**
**Gantcher, Breitman and BAWAG**
**(Based on Violations of Section 10(b) and Rule 10b-5 By Refco Group)**

670. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

671. This Claim is brought pursuant to Section 20(a) of the Exchange Act against the THL Defendants and Defendants Bennett, Refco Holdings, the Bennett Trust, Murphy, Trosten, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman and BAWAG (collectively, the "Section 20(a) Pre-IPO Defendants"), on behalf of PIMCO, the PIMCO High

252

Yield Fund, and the other members of the Class who purchased Bonds after the Bond Offering but prior to the August 2005 IPO.

672. As alleged herein, Refco Group violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct, during the period between the Bond Offering and the August 2005 IPO. This conduct was undertaken with scienter, because Refco Group is charged with the knowledge and scienter of Defendant Bennett and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme. But for the fact that Refco has filed for bankruptcy protection, it would be named as a defendant on the Section 10(b) claims alleged herein.

673. PIMCO, the PIMCO High Yield Fund, and the other members of the Class who purchased Bonds after the Bond Offering but prior to the August 2005 IPO suffered damages in connection with their purchases of those securities, as a direct and proximate result of Refco Group's violations of Section 10(b) and Rule 10b-5.

674. The THL Defendants were controlling persons of Refco Group from the completion of the Bond Offering until the date of the August 2005 IPO, due (among other reasons alleged herein) to an approximate 57% ownership interest in New Refco, the sole member of Refco Group, and the THL Individual Defendants' service on New Refco's Board of Managers.

675. Defendant Bennett was a controlling person of Refco Group from the completion of the Bond Offering until the date of the August 2005 IPO, due (among other reasons alleged

herein) to his 43% ownership interest (through Refco Holdings and/or the Bennett Trust) in New Refco, the sole member of Refco Group.

676. Defendant Refco Holdings was a controlling person of Refco Group from the completion of the Bond Offering until the date of the August 2005 IPO, due (among other reasons alleged herein) to its ownership interest in New Refco, the sole member of Refco Group. From the completion of the Bond Offering until the fiscal quarter ended February 28, 2005, Refco Holdings owned approximately 43% of New Refco. During the fiscal quarter ended February 28, 2005, Refco Holdings transferred approximately 40% of its equity interests in New Refco to the Bennett Trust, and thereafter owned approximately 26% of New Refco.

677. Defendant Bennett Trust was a controlling person of Refco Group from the fiscal quarter ended February 28, 2005 through the date of the August 2005 IPO, due to its ownership of approximately 17% of New Refco, the sole member of Refco Group.

678. Defendants Bennett, Murphy, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco Group from the completion of the Bond Offering until the date of the August 2005 IPO, due (among other reasons alleged herein) to their executive positions with Refco Group; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Bond Registration Statement and other public statements by Refco Group.

679. Defendant Trosten was a controlling person of Refco Group from the completion of the Bond Offering until his resignation in October 2004, due (among other reasons alleged herein) to his executive positions with Refco Group; his direct involvement in its day-to-day operations, including his direct responsibility for its financial reporting and accounting functions;

254

and his participation in the preparation and/or dissemination of public statements by Refco Group.

680.    Defendant Sherer was a controlling person of Refco Group from the time he joined the Company in January 2005 until the date of the August 2005 IPO, due (among other reasons alleged herein) to his executive positions with Refco Group; his direct involvement in its day-to-day operations including his direct responsibility for its financial reporting and accounting functions; and his participation in the preparation and/or dissemination of the Bond Registration Statement and other public statements by Refco Group.

681.    Defendants O'Kelley, Gantcher and Breitman were controlling persons of Refco Group from the completion of the initial offering of the Bonds until the date of the August 2005 IPO, due (among other reasons alleged herein) to their service on the Audit Committee of New Refco, which also performed the functions of an audit committee for Refco Group.  As members of the Audit Committee, these defendants were responsible for: overseeing Refco Group's financial reporting, accounting, and internal controls; overseeing the activities of Refco Group's outside auditors and reviewing the scope and results of those audits with the auditors; meeting with and making recommendations to the managers of Refco Group concerning the foregoing activities; and approving the false and misleading financial statements and other public statements as referenced herein.

682.    BAWAG was a controlling person of Refco because BAWAG controlled Defendant Bennett, who, in turn, controlled Refco Group.  BAWAG controlled Bennett because Bennett was dependent upon BAWAG to ensure that the fraudulent scheme described herein could be perpetrated and concealed.  Specifically, as set forth above, when a number of Refco's customers – including BAWAG – suffered extensive trading losses in the worldwide financial

crises of 1998-2000, they were unable to repay the credit extended to them by Refco. In order to avoid disclosing these uncollectible debts, Bennett transferred the debts to Refco Holdings and then orchestrated a series of transactions whereby the receivable was temporarily paid off at the end of each of the Company's financial reporting periods.

683. BAWAG actively assisted Bennett in concealing this uncollectible receivable in at least three ways. First, in 1999, shortly after Refco first suffered these losses, BAWAG injected a huge amount of fresh capital into the Company by acquiring a 10% stake in Refco through BAWAG's wholly-owned affiliate, BAWAG Overseas. Indeed, in a May 20, 1999 press release, Defendant Bennett expressly referenced "this significant infusion of capital" from BAWAG and stated that the transaction "create[d] future opportunities of benefit to both parties." Second, as alleged above, it appears that BAWAG injected additional capital into the Company through a series of undisclosed loans between Refco Holdings, Refco, DF Capital, Desana and perhaps other entities affiliated with BAWAG and/or Refco, in return for an additional undisclosed 27% equity stake in the Company. Third, BAWAG participated in at least six transactions at the end of Refco's fiscal years 2000 through 2005 that allowed Refco Holdings to temporarily pay off the receivable it owed to the Company. This significant economic assistance that BAWAG gave to Bennett provided BAWAG with disproportionate influence and control over Bennett – a CEO who was clearly desperate to conceal the existence of Refco Holdings' uncollectible receivable. Thus, by reason of Bennett's economic dependence on BAWAG, BAWAG controlled Bennett and, through him, Refco. This dependence is further evidenced by the fact that, when the $430 million related-party receivable came to light in October 2005, and Bennett and BAWAG were anxious to avoid full disclosure of all of the facts, BAWAG readily provided, in remarkably short order, a $420 million loan to Bennett, which he used to pay off Refco Holdings' debt to

Refco. Indeed, just two days later, Bennett was arrested when Defendant Maggio secretly taped a conversation with Bennett where Bennett stated that he would be traveling to Vienna to go on a wine-tasting trip with the then-CEO of BAWAG.

684. By virtue of the foregoing, each of the Section 20(a) Pre-IPO Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco Group, including the content and dissemination of its financial statements and registration statements, from the date of the completion of the initial offering of the Bonds until the date of the August 2005 IPO.

685. The Section 20(a) Pre-IPO Defendants did not act in good faith in connection with the conduct at issue in this Claim. Further, each of these defendants directly or indirectly induced the act or acts constituting Refco Group's violations of the Exchange Act by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, and/or signing and/or approving the false and misleading statements that were issued by Refco Group.

686. The Section 20(a) Pre-IPO Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that Refco Group's public statements were materially false or misleading, or knowingly omitted material information, or they acted with reckless disregard for the truth.

687. Facts raising a strong inference of the THL Defendants' culpability include:

(a)     The unusual size and timing of the transactions described in herein;

(b)     The atypical nature of such transactions for Refco;

(c)     The lack of a business purpose for the transactions;

(d)     The THL Defendants' access to Refco's inside information by virtue of the THL Individual Defendants' positions on the Board of Directors;

(e)     The THL Defendants' necessary knowledge of the relationship between Bennett and Refco Holdings, an entity with which they had substantial dealings;

(f)     The lengthy list of "due diligence" items that the THL Partner Defendants claim, in the THL Complaint, to have performed;

(g)     The sudden departure of Trosten, and the unusually large severance payment he received thereupon, shortly after the LBO;

(h)     The THL Defendants' strong incentive to complete the IPO so they could cash out a significant portion of their investment, and the fact that the THL Defendants profited handsomely from the August 2005 IPO, selling Refco shares for proceeds of approximately $210 million while still retaining a 38% stake in the Company; and

(i)     The THL Defendants' strong incentive to maintain a high demand among public investors for Refco shares in order to trigger the "green shoe" option and benefit therefrom, and the fact that the THL Defendants took in nearly $43 million as a result of sales pursuant to the "green shoe" option.

688.    Facts giving rise to the other Section 20(a) Pre-IPO Defendants' culpability are alleged in detail above.

689.    By virtue of their positions as controlling persons of Refco Group and their culpable participation in Refco Group's violations of Section 10(b) and Rule 10b-5 in connection with the purchase or sale of securities after the completion of the initial offering of Bonds and before the August 2005 IPO, the Section 20(a) Pre-IPO Defendants are each jointly and severally

258

liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same

extent as Refco Group.

## COUNT THIRTEEN

**Control Person Liability Pursuant to Section 20(a) of the Exchange Act,
On Behalf of Purchasers of Bonds and/or Refco Common Stock
On and After the Date of the August 2005 IPO, Against the
THL Defendants and Defendants Bennett, Refco Holdings, the
Bennett Trust, Murphy, Sherer, Sexton, Silverman, Maggio, Klejna,
O'Kelley, Gantcher, Breitman and BAWAG
(Based on Violations of Section 10(b) and Rule 10b-5 By Refco)**

690.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set

forth herein.

691.     This Claim is brought pursuant to Section 20(a) of the Exchange Act against the

THL Defendants and Defendants Bennett, Refco Holdings, the Bennett Trust, Murphy, Sherer,

Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman and BAWAG (collectively,

the "Section 20(a) IPO Defendants"), on behalf of Plaintiffs and all members of the Class who

purchased Bonds and/or Refco stock during the Class Period.

692.     As alleged herein, Refco violated Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder by making false and misleading statements in connection with the

purchase or sale of securities and by participating in a fraudulent scheme and course of business

or conduct in connection with the August 2005 IPO and thereafter.  This fraudulent conduct was

undertaken with scienter, because Refco is charged with the knowledge and scienter of

Defendant Bennett and others who of or recklessly disregarded the falsity of the Company's

statements and of the fraudulent nature of its scheme.

693.     Plaintiffs and the other members of the Class who purchased Bonds or Refco

stock during the Class Period suffered damages in connection with their purchases of those

259

securities, as a direct and proximate result of Refco's primary violations of Section 10(b) and Rule 10b-5.

694. The THL Defendants were controlling persons of Refco from the date of the August 2005 IPO through and including October 17, 2005, due (among other reasons alleged herein) to their approximate 44% direct and indirect ownership interest in Refco, and due to the service of the THL Individual Defendants on Refco's eight-member Board of Directors.

695. Defendant Bennett was a controlling person of Refco from the date of the August 2005 IPO through and including October 18, 2005, due (among other reasons alleged herein) to his 34% ownership interest in Refco (through Refco Holdings and the Bennett Trust), as well as his positions as Chairman of the Board, President, and Chief Executive Officer of Refco.

696. Defendants Refco Holdings and the Bennett Trust were controlling persons of Refco on and after the date of the August 2005 IPO due (among other reasons alleged herein) to their approximate 20% and 14% respective ownership interests in Refco, and the fact that they were controlled by Bennett and used by him to hold his interest in the Company.

697. Defendants Bennett, Murphy, Sherer, Sexton, Silverman, Maggio, and Klejna were controlling persons of Refco on and after the date of the August 2005 IPO, due (among other reasons alleged herein) to their executive positions with Refco; their direct involvement in the day-to-day operations of Refco, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of Refco's false financial statements and other public statements.

698. Defendants O'Kelley, Gantcher, and Breitman were controlling persons of Refco on and after the date of the August 2005 IPO, due (among other reasons alleged herein) to their service on the Audit Committee of Refco. As members of the Audit Committee, these

defendants were responsible for: overseeing Refco's financial reporting, accounting, and internal controls; overseeing the activities of Refco's outside auditors and reviewing the scope and results of those audits with the auditors; meeting with and making recommendations to Refco's Board of Directors concerning the foregoing activities; and approving the false and misleading financial statements and other public statements as referenced herein.

699. BAWAG was a controlling person of Refco because BAWAG controlled Defendant Bennett who, in turn, controlled Refco Group. BAWAG controlled Bennett because Bennett was, dependent upon BAWAG to ensure that the fraudulent scheme described herein could be perpetrated and concealed. Specifically, as set forth above, when a number of Refco's customers – including BAWAG – suffered extensive trading losses in the worldwide financial crises of 1998-2000, they were unable to repay the credit extended to them by Refco. In order to avoid disclosing these uncollectible debts, Bennett transferred the debts to Refco Holdings and then orchestrated a series of transactions whereby the receivable was temporarily paid off at the end of each of the Company's financial reporting periods.

700. BAWAG actively assisted Bennett in concealing this uncollectible receivable in at least three ways. First, in 1999, shortly after Refco first suffered these losses, BAWAG injected a huge amount of fresh capital into the Company by acquiring a 10% stake in Refco through BAWAG's wholly-owned affiliate, BAWAG Overseas. Indeed, in a May 20, 1999 press release, Defendant Bennett expressly referenced "this significant infusion of capital" from BAWAG and stated that the transaction "create[d] future opportunities of benefit to both parties." Second, as alleged above, it appears that BAWAG injected additional capital into the Company through a series of undisclosed loans between Refco Holdings, Refco, DF Capital, Desana and perhaps other entities affiliated with BAWAG and/or Refco, in return for an additional undisclosed 27%

261

equity stake in the Company. Third, BAWAG participated in at least six transactions at the end of Refco's fiscal years 2000 through 2005 that allowed Refco Holdings to temporarily pay off the receivable it owed to the Company. This significant economic assistance that BAWAG gave to Bennett provided BAWAG with disproportionate influence and control over Bennett – a CEO who was clearly desperate to conceal the existence of Refco Holdings' uncollectible receivable. Thus, by reason of Bennett's economic dependence on BAWAG, BAWAG controlled Bennett and, through him, Refco. This dependence is further evidenced by the fact that, when the $430 million related-party receivable came to light in October 2005, and Bennett and BAWAG were anxious to avoid full disclosure of all of the facts, BAWAG readily provided, in remarkably short order, a $420 million loan to Bennett, which he used to pay off Refco Holdings' debt to Refco. Indeed, just two days later, Bennett was arrested when Defendant Maggio secretly taped a conversation with Bennett where Bennett stated that he would be traveling to Vienna to go on a wine-tasting trip with the then-CEO of BAWAG.

701. By virtue of the foregoing, each of the Section 20(a) IPO Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Refco, including the content and dissemination of the false or misleading statements complained of herein.

702. The Section 20(a) IPO Defendants did not act in good faith in connection with the conduct at issue in this Claim. Further, these defendants directly or indirectly induced the act or acts constituting Refco's violations of the Exchange Act by, among other things, orchestrating the sham transactions that caused the Company's financial statements to be materially misstated, and/or signing and/or approving the false and misleading statements that were issued by Refco.

703.    The Section 20(a) IPO Defendants are culpable for participation in the matters

alleged herein, because they acted with knowledge that the Company's public statements were

materially false or misleading, or omitted material information, or they acted with reckless

disregard for the truth.

704.    Facts raising a strong inference of the THL Defendants' culpability include:

(a)    The unusual size and timing of the transactions described herein;

(b)    The atypical nature of such transactions for Refco;

(c)    The lack of a business purpose for the transactions;

(d)    The THL Defendants' access to Refco's inside information by virtue of

the THL Individual Defendants' positions on the Board of Directors;

(e)    The THL Defendants' necessary knowledge of the relationship between

Bennett and Refco Holdings, an entity with which they had substantial dealings;

(f)    The lengthy list of "due diligence" items that the THL Partner Defendants

claim, in the THL Complaint, to have performed;

(g)    The sudden departure of Trosten, and the unusually large $46 million

payment he received thereupon, shortly after the LBO;

(h)    The THL Defendants' strong incentive to complete the IPO so they could

cash out a significant portion of its investment, and the fact that they profited handsomely

from the August 2005 IPO, selling Refco shares for proceeds of approximately $210

million while still retaining a 38% stake in the Company; and

(i)    The THL Defendants' strong incentive to maintain a high demand among

public investors for Refco shares in order to trigger the "green shoe" option, and the fact

that they took in nearly $43 million as a result of sales pursuant to the "green shoe" option.

705.    Facts giving rise to a strong inference of the other Section 20(a) IPO Defendants' culpability are alleged in detail above.

706.    By virtue of their positions as controlling persons of Refco and their culpable participation in the Company's violations of the Exchange Act, the Section 20(a) IPO Defendants are each jointly and severally liable pursuant to Section 20(a) of the Exchange Act, with and to the same extent as Refco, for Refco's primary violations of Section 10(b) and Rule 10b-5.

### COUNT FOURTEEN

**Pursuant to Section 20A of the Exchange Act,**
**On Behalf of Purchasers of Refco Stock,**
**Against Bennett, Thomas H. Lee Equity Fund V., L.P.,**
**Thomas H. Lee Parallel Fund V, L.P.,**
**Thomas H. Lee Equity (Cayman) Fund V, L.P.,**
**Thomas H. Lee Investors Limited Partnership**

707.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

708.    This Claim is brought pursuant to Section 20A of the Exchange Act against Defendants Bennett, Thomas H. Lee Equity Fund V., L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., and Thomas H. Lee Investors Limited Partnership (collectively, the "Section 20A Defendants") on behalf of all purchasers of Refco common stock pursuant to or traceable to the August 2005 IPO.

709.    The Section 20A Defendants, by virtue of their positions as insiders of Refco, had access to, and were in possession of, material non-public information about Refco at the time of the August 2005 IPO.  As alleged above, Bennett violated Sections 10(b) and 20(a) of the

264

Exchange Act, and Defendants Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel

Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., and Thomas H. Lee Investors

Limited Partnership violated Section 20(a) of the Exchange Act.

710.    Defendant Bennett sold at least 5.375 million shares of Refco common stock in

the August 2005 IPO.  Defendants Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel

Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited

Partnership, sold at least 7.719 million shares of Refco common stock in the August 2005 IPO.

711.    These sales were made contemporaneously with Class members' purchases of

Refco common stock in the August 2005 IPO.

712.    All members of the Class who purchased shares of Refco common stock

contemporaneously with sales of Refco common stock by the Section 20A Defendants (i) have

suffered damages because, in reliance on the integrity of the market, they paid artificially inflated

prices for Refco common stock as a result of the violations of Section 10(b) and 20(a) of the

Exchange Act as alleged herein; and (ii) would not have purchased Refco common stock at the

prices they paid, or at all, if they had been aware that the market prices had been artificially

inflated by the Section 20A Defendants' false and misleading statements and concealment.  At

the time of the purchases of Refco stock by members of the Class who purchased in the August

2005 IPO, the fair and true market value of Refco common stock was substantially less than the

price paid by these Class members.

## COUNT FIFTEEN

### Pursuant to Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Promulgated thereunder on behalf of all Class Members against BAWAG

713.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set

forth herein.

265

714. This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class against BAWAG.

715. As alleged herein, throughout the Class Period, Bennett, the Company, Refco Holdings, BAWAG and others, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, orchestrated and carried out a plan, scheme and course of conduct described at length above which was intended to and did: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for, and market prices of, Refco securities; and (iii) cause Plaintiffs and the other members of the Class to purchase Refco securities at artificially inflated prices. In furtherance of this unlawful plan, scheme and course of conduct, BAWAG took the actions described at length above, including participating in at least six blatantly fraudulent sham loan transactions designed to conceal more than a billion dollars of trading losses suffered by BAWAG and to manipulate Refco's reported financial results. As described above, these "loan" transactions were a total sham. They served no legitimate business purpose and, as BAWAG knew, they were designed and orchestrated by Bennett, BAWAG, Refco, Refco Holdings and others for the purpose of furthering the fraudulent scheme described herein.

716. As described above, BAWAG engaged in the manipulative and deceptive acts described herein in furtherance of the scheme to materially misstate Refco's financial statements. BAWAG directly participated in this scheme knowingly and intentionally or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Refco securities during the Class Period. As a party to the

sham transactions alleged herein, with knowledge that the purpose and effect of those transactions was to manipulate and materially misstate Refco's reported financial condition, BAWAG acted with scienter and is subject to liability under Section 10(b) and Rule 10b-5(a) and (c). Indeed, the scheme was orchestrated and designed with the assistance of BAWAG in order to ensure that BAWAG could continue to conceal huge trading losses it had suffered through speculative investments in international currency markets. As set forth more fully above, facts raising a strong inference of BAWAG's scienter include:

(a)     The year-end transactions described herein were not formally documented;

(b)     BAWAG did not earn any net interest on the majority of the transactions;

(c)     BAWAG did not conduct any investigation into Refco's creditworthiness and/or ability to repay amounts borrowed;

(d)     The unusual size and timing of the transactions described herein;

(e)     The atypical nature of these transactions;

(f)     The lack of a legitimate business purpose for the transactions;

(g)     The close business ties between BAWAG, Refco and Refco Holdings, including that:

(i)     Until at least August 2004, BAWAG was a co-owner of Refco along with Refco Holdings;

(ii)    BAWAG had numerous business dealings with Bennett and Refco;

(iii)   Certain executives at BAWAG, including Thomas Hackl, who were directly involved in these transactions later joined Refco;

(iv)    BAWAG secretly held an additional approximately 37% or larger equity interest in Refco, however, it only publicly discussed a 10% equity stake;

267

(v)     Refco formed a joint venture with Helmut Elsner, former CEO of BAWAG;

(vi)     BAWAG and Refco each own a portion of Bank Frick;

(vii)     Thomas Hackl is a director of Bank Frick;

(viii)     BAWAG and Refco have close ties through Sugrue and his Plus Funds hedge fund; and

(ix)     BAWAG agreed to extend a "no questions asked" $420 million loan to Defendant Bennett on or about October 10, 2005.

(h)     BAWAG had a powerful motive to participate in the fraudulent scheme in order to (a) ensure itself a $1.3 billion payment from Refco Holdings in August 2004, and (b) continue to conceal and, eventually, "make whole" the trading losses that BAWAG has admitted it suffered in 2000 but concealed until March 24, 2006;

(i)     BAWAG has continually attempted to cover-up and conceal the true extent of its involvement with Refco, making a series of statements that are apparently designed to mislead BAWAG's investors, customers and business partners regarding BAWAG's involvement with Refco.

717.     BAWAG's fraudulent activities occurred in connection with the purchase or sale of the Company's securities.

718.     In ignorance of BAWAG's fraudulent conduct, and relying directly or indirectly on the integrity of the market price for Refco securities, Plaintiffs and the other members of the Class purchased Refco securities at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased the securities at artificially inflated prices.

719. The market prices for Refco securities declined materially upon the public disclosure of the true facts regarding the fraud perpetrated by BAWAG and others, as described above.

720. Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Refco securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

## JURY DEMAND

721. Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C. Awarding rescission and/or rescissory damages in favor of Plaintiffs and the other members of the Class;

D. Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiffs and the other members of the Class;

E. Awarding Plaintiffs and the Class the fees and expenses incurred in this action, including attorneys' fees and expert fees; and

F. Granting such other and further relief as the Court may deem just and proper.

269

Dated: New York, New York
      May 5, 2006

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

By: _____

Max W. Berger (MB-5010)
John P. Coffey (JC-3832)
John C. Browne (JB-0391)
Noam N. Mandel (NM-0203)
Jeremy P. Robinson
1285 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 554-1400
Facsimile:    (212) 554-1444

**GRANT & EISENHOFER P.A.**

By: _____

Stuart M. Grant (SG-8157)
James J. Sabella (JS-5454)
45 Rockefeller Center, 15th Floor
New York, NY 10111
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501

    - and -

Megan D. McIntyre
Jeff A. Almeida
Christine M. Mackintosh
Jill Agro
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone:    (302) 622-7000
Facsimile:    (302) 622-7100

*Attorneys for Lead Plaintiffs RH Capital Associates LLC and Pacific Investment Management
Company LLC and Co-Lead Counsel for the Putative Class*

EXHIBIT 1

# GLOSSARY
## OF CERTAIN KEY TERMS[†]

**144A Bonds** - refers to the $600 million of 9% Senior Subordinated Notes due in 2012 issued by Refco pursuant to the Offering Memorandum in 2004.

**AICPA** - refers to the American Institute of Certified Public Accountants.

**APB Opinion** - refers to Accounting Principles Board Opinions.

**ARB** - refers to AICPA Accounting Research Bulletins.

**Attorney C** - refers to an attorney at the Law Firm who provided legal services to Refco and oversaw the Refco account.

**Audit Committee Defendants** - refers to Defendants O'Kelley, Breitman and Gantcher.

**August 2005 IPO** - refers to Refco's initial public offering, which took place on or about August 10, 2005.

**August 2005 IPO Offering Materials** - refers collectively to the IPO Registration Statement, all amendments thereto, and the IPO Prospectus filed with the SEC in connection with the August 2005 IPO.

**Austrian Trade Union Foundation** - refers to the organization that owns BAWAG and controls Desana.

**Bank Frick** - refers to Bank Frick & Co. Atkiengesellschaft. Hackl is a director of Bank Frick. Refco and BAWAG own 4% and 26% of Bank Frick, respectively.

**BAS** - refers to Defendant Banc of America Securities LLC.

---

[†] The Glossary of Certain Key Terms is provided for the benefit of the reader only and does not in any way affect the content, meaning or interpretation of the Complaint. To the extent that there is any conflict, inconsistency or difference between statements included in the Glossary of Certain Key Terms and those in the Complaint -- the statements included in the Complaint govern.

# GLOSSARY
# OF CERTAIN KEY TERMS[†]

**BAWAG**                         - refers to Defendant Bank fur arbeit und Wirschaft und Osterreichische Postsparkasse AG.

**BAWAG Overseas**                - refers to BAWAG Overseas, Inc., a Delaware company that was a wholly-owned subsidiary of BAWAG.  BAWAG Overseas was the instrumentality through which BAWAG held its disclosed 10% equity stake in Refco.

**Bennett**                       - refers to Defendant Phillip R. Bennett.

**Bennett**
**Employment Agreement**          – refers to Defendant Bennett's employment agreement dated June 8, 2004.

**Bennett Trust**                 - refers to Defendant The Phillip R. Bennett Three Year Annuity Trust.

**Bond Offering**                 - refers to Refco's original issuance of the 144A Bonds in August 2004 pursuant to the Offering Memorandum.

**Bond Road Show**                - refers to the nationwide road show carried out by Defendants Bennett, Trosten and Jaeckel, together with representatives of the Bond Underwriter Defendants, in July 2004 in an effort to convince investors to purchase the 144A Bonds.

**Bond**
**Registration Statement**        - refers to the Form S-4 Registration Statement that the Company filed with the SEC on October 12, 2004, together with the subsequent amendments through Form S-4/A filings dated December 10, 2004; January 12, 2005; February 23, 2005; March 11, 2005; April 5, 2005; and April 6, 2005.

## GLOSSARY
## OF CERTAIN KEY TERMS[†]

**Bond
Underwriter Defendants**    - refers collectively to Defendants Credit Suisse, BAS, and Deutsche Bank.

**Bonus Plan**    - refers to the Senior Management Bonus Pool Plan.

**Boren**    - refers to Michael Boren, a director of RateXchange Corporation.

**Breitman**    - refers to Defendant Leo R. Breitman.

**Class Period**    - refers to the period between August 5, 2004 to October 17, 2005.

**Company**    - refers to Refco.

**CMG**    - refers to Defendant CMG Institutional Trading LLC.

**Credit Suisse**    - refers to Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC).

**Customer X**    - refers to a third-party customer of Refco, which was involved in at least ten of the undisclosed related-party transactions with Refco between February 2002 and August 2005.

**Delta Flyer Fund**    - refers to Delta Flyer Fund, LLC, a limited liability company organized in Delaware on April 26, 2000.

**Desana**    - refers to the Desana Foundation, which is a Liechtenstein-based organization controlled by the Austrian Trade Union Foundation.

**Deutsche Bank**    - refers to Defendant Deutsche Bank Securities, Inc.

**DF Capital**    - refers to DF Capital Inc. DF Capital was incorporated on July 10, 2002 as DF Overseas Inc. DF Overseas Inc., with its registered address listed as

iii

## GLOSSARY
## OF CERTAIN KEY TERMS†

|  | Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware. Defendant Bennett was the President and Secretary of DF Capital. |
|---|---|
| **Exchange Act** | - refers to Securities Exchange Act of 1934, 15 U.S.C. § 78 et seq. |
| **Exchange Offer** | - refers to the Exchange Offer for the Registered Bonds. |
| **FASCON** | -refers to FASB Concept Statements. |
| **FASB** | -refers to Financial Accounting Standards Board. |
| **FIN** | - refers to Financial Accounting Standards Board Interpretations. |
| **Fiscal Year 2000** | - refers to Refco's fiscal year ending February 29, 2000. |
| **Fiscal Year 2001** | - refers to Refco's fiscal year ending February 28, 2001 |
| **Fiscal Year 2002** | - refers to Refco's fiscal year ending February 28, 2002. |
| **Fiscal Year 2003** | - refers to Refco's fiscal year ending February 28, 2003. |
| **Fiscal Year 2004** | - refers to Refco's fiscal year ending February 29, 2004. |
| **Fiscal Year 2005** | - refers to Refco's fiscal year ending February 28, 2005. |
| **Flöttl** | - refers to Wolfgang Flöttl. Flöttl ran a fund named Ross Capital. He is also the son of Walter Flöttl, who was the former CEO of BAWAG. |

iv

## GLOSSARY
## OF CERTAIN KEY TERMS[†]

| | |
|---|---|
| **Former Refco Officer** | - refers to a former senior operating officer of a Europe-based Refco affiliate. |
| **GAAP** | - refers to generally accepted accounting principles |
| **GAAS** | - refers to generally accepted auditing standards. |
| **Gantcher** | - refers to Defendant Nathan Gantcher. |
| **Goldinger** | - refers to S. Jay Goldinger, a Beverly Hills-based money manager. |
| **Goldman Sachs** | - refers to Defendant Goldman, Sachs & Co. |
| **Grant** | - refers to Tone Grant. |
| **Grant Thornton** | - refers to Defendant Grant Thornton LLP. |
| **Green Shoe Option** | - refers to the option granted to the Stock Underwriters to purchase additional shares to cover over allotments of shares in connection with the August 2005 IPO. |
| **Hackl** | - refers to Thomas Hackl. Hackl is a director of Bank Frick and was formerly Managing Director and head of Treasury at BAWAG. |
| **Harkins** | - refers to Defendant David V. Harkins. |
| **Harris Nesbitt** | - refers to Defendant Harris Nesbitt Corp. |
| **HSBC** | - refers to Defendant HSBC Securities (USA) Inc. |
| **Indictment** | - refers to a criminal indictment filed against Bennett on November 10, 2005 by the United States Attorney for the Southern District of New York. |
| **Ingram** | - refers to Ingram Micro, Inc. an information-technology distributor based in Santa Ana, California. |

v

# GLOSSARY
## OF CERTAIN KEY TERMS[†]

**Inside Defendants** — refers to the Officer Defendants, Trosten, and the Audit Committee Defendants, and Grant Thornton.

**IPO** — refers to the August 2005 IPO.

**IPO Prospectus** — refers to Refco's Form 424B1 prospectus filed in connection with the August 2005 IPO.

**IPO Registration Statement** — refers to Refco's Form S-1 registration statement dated April 8, 2005, Form S-1/A registration statement dated May 27, 2005, Form S-1/A registration statement dated July 1, 2005, Form S-1/A registration statement dated July 20, 2005, Form S-1/A registration statement dated July 25, 2005, Form S-1/A registration statement dated August 8, 2005, Form S-1/A registration statement dated August 10, 2005, and Form 424B1 prospectus dated August 10, 2005, which were filed with the SEC.

**Jaeckel** — refers to Defendant Scott L. Jaeckel.

**J.P. Morgan** — refers to Defendant J.P. Morgan Securities, Inc.

**Klejna** — refers to Defendant Dennis A. Klejna.

**Klejna Employment Agreement** — refers to Defendant Klejna's employment agreement dated July 30, 2004.

**Law Firm** — refers to Refco's primary outside legal counsel since 1994.

**LBO** — refers to the THL Partner Defendants' June 2004 Leveraged Buyout with Refco.

**Lee** — refers to Defendant Thomas H. Lee.

**Lind-Waldock** — refers to Defendant Lind-Waldock Securities LLC.

# GLOSSARY
## OF CERTAIN KEY TERMS[†]

**Maggio**       - refers to Defendant Santo C. Maggio, also known as "Sandy" Maggio.

**Maggio Employment Agreement**       - refers to Defendant Maggio's employment agreement dated July 30, 2004.

**McCarthy**       - refers Peter McCarthy, an executive officer of Refco.

**Merger Agreement**       - refers to the June 8, 2004 agreement between the THL Partner Defendants, and their passive co-investors, and Refco Group and Refco Holdings.

**Merrill Lynch**       - refers to Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated.

**Murphy**       - refers to Defendant Joseph J. Murphy.

**Murphy Employment Agreement**       - refers to Defendant Murphy's employment agreement dated June 21, 2004.

**New Refco**       - refers to Defendant New Refco Group Ltd., LLC.

**NYSE**       -refers to the New York Stock Exchange.

**Offering Memorandum**       - refers to the document used to market the 144A Bonds to PIMCO, other Qualified Institutional Buyers and other members of the Class in July 2004.

**Officer Defendants**       - refers to Defendants Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, and Klejna.

**O'Kelley**       - refers to Defendant Ronald L. O'Kelley.

**PCAOB**       - refers to the Public Company Accounting Oversight Board, which was established by the Sarbanes-Oxley Act of 2002.

vii

# GLOSSARY
# OF CERTAIN KEY TERMS[†]

**PIMCO**                         - refers to Lead Plaintiff Pacific Investment
                                  Management Company LLC.

**PIMCO High Yield Fund**          - refers to Plaintiff PIMCO Funds: Pacific Investment
                                  Management Series - PIMCO High Yield Fund.

**Principal A**                   - refers to the founder and principal of Customer X.

**Ramirez & Co.**                 - refers to Defendant Samuel A. Ramirez & Company,
                                  Inc.

**Ramler**                        - refers to Mark Ramler, Arthur Andersen's
                                  engagement partner for Refco prior to 2002, who took
                                  the Refco audit account with him to Grant Thornton in
                                  or about 2002.

**Refco**                         - refers to Refco Inc., and all of its predecessors and
                                  affiliates, including, but not limited to, Refco Group
                                  Ltd., LLC, Refco Finance Holdings LLC, and Refco
                                  Finance Inc.

**Refco Inc.**                    - refers to Refco Inc.

**Refco Capital**                 - refers to Refco Capital Markets Ltd.

**Refco Finance**                 - refers to Refco Finance Inc.

**Refco Finance Holdings**        - refers to Refco Finance Holdings LLC.

**Refco Futures**                 - refers to Defendant Refco Managed Futures LLC.

**Refco Group**                   - refers to Refco Group Ltd., LLC.

**Refco Holdings**                - refers to Defendant Refco Group Holdings, Inc.

**Registered Bonds**              - refers to the Bonds issued by Refco Group and Refco
                                  Finance pursuant to the Bond Registration Statement
                                  on or about April 13, 2005.

viii

**RH Capital** — refers to Lead Plaintiff RH Capital Associates LLC.

**RSU** — refers to Restricted Stock Units, which were granted to the Officer Defendants and the Audit Committee Defendants in connection with the August 2005 IPO.

**SFAS** — refers to Statements of Financial Accounting Statements.

**Sandler O'Neil** — refers to Defendant Sandler O'Neill & Partners, L.P.

**Schoen** — refers to Defendant Scott A. Schoen.

**Securities Act** — refers to the Securities Act of 1933, 15 U.S.C. § 77a et seq.

**Seibert & Co.** — refers to Defendant Muriel Siebert & Co. Inc.

**Sexton** — refers to Defendant William M. Sexton.

**Sexton Employment Agreement** — refers to Defendant Sexton's employment agreement dated July 30, 2004.

**Sherer** — refers to Defendant Gerald M. Sherer.

**Sherer Employment Agreement** — refers to Defendant Sherer's employment agreement dated December 6, 2004.

**Silverman** — refers to Defendant Phillip Silverman.

**Stock Underwriter Defendants** — refers collectively to Defendants Credit Suisse, BAS, Deutsche Bank, Goldman Sachs, Merrill Lynch, J.P. Morgan, Sandler O'Neill, HSBC, William Blair, Harris Nesbitt, CMG, Ramirez & Co., Seibert & Co., Williams Capital, and Utendahl.

**Sugrue** — refers to Christopher Sugrue. Sugrue controls a hedge fund named Plusfunds Ltd. and was formerly a senior Vice President at Refco.

ix

| | |
|---|---|
| **THL Complaint** | - refers to the Complaint filed by the THL Partner Defendants on November 14, 2005, and styled <u>Thomas H. Lee Equity Fund V., L.P., et al. v. Phillip R. Bennett, et al.</u>, No. 05 Civ. 9608 (S.D.N.Y.). |
| **THL Defendants** | - refers collectively to the THL Individual Defendants and the THL Partner Defendants. |
| **THL Individual Defendants** | - refers to Defendants Lee, Harkins, Jaeckel and Schoen. |
| **THL Partner Defendants** | - refers to Defendants Thomas H. Lee Partners, THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Acquisition Partners III, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust. |
| **THL Managers** | - refers to THL Managers V, LLC, of which Thomas H. Lee Partners is the Managing Member. |
| **Thomas H. Lee Partners** | - refers to Defendant Thomas H. Lee Partners, L.P. |
| **Trosten** | - refers to Defendant Robert C. Trosten. |
| **Utendahl** | - refers to Defendant Utendahl Capital Partners, L.P. |
| **Westminster-Refco** | - refers to Defendant Westminster-Refco Management LLC. |
| **William Blair** | - refers Defendant William Blair & Company, L.L.C. |
| **Williams Capital** | - refers to Defendant The Williams Capital Group, L.P. |

x

EXHIBIT 2

**Exhibit 2**
(Reference Chart for Claims)[1]

| Count | I | II | III | IV | V | VI | VII | VIII | IX | X | XI | XII | XIII | XIV | XV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Officer Defendants* | | | | | | | | | | | | | | | |
| Bennett | X | X | X | X | X | X | | X | X | | X | X | X | X | |
| Sherer | | | | X | X | X | | X | X | | | X | X | | |
| Sexton | | X | X | X | | X | | X | X | | X | X | X | | |
| Maggio | | X | X | X | | X | | X | X | | X | X | X | | |
| Murphy | | X | X | X | | X | | X | X | | X | X | X | | |
| Silverman | | X | X | | | | | | X | | X | X | X | | |
| Klejna | | | X | X | | X | | X | X | | | X | X | | |
| *Bennett Shell-Entity Defendants* | | | | | | | | | | | | | | | |
| Refco Holdings | | X | | X | | X | | X | X | X | X | X | X | | |
| Bennett Trust | | | | X | | X | | X | X | | | X | X | | |
| *Refco-Affiliated Defendants* | | | | | | | | | | | | | | | |
| Refco Futures | | | X | | | | | | | | | | | | |
| Westminster-Refco | | | X | | | | | | | | | | | | |
| Lind-Waldock | | | X | | | | | | | | | | | | |
| *Audit Committee* | | | | | | | | | | | | | | | |
| O'Kelley | | | X | X | X | X | | X | X | | | X | X | | |
| Breitman | | | X | X | X | X | | X | X | | | X | X | | |
| Gantcher | | | X | X | X | X | | X | X | | | X | X | | |
| *THL Defendants* | | | | | | | | | | | | | | | |
| Thomas H. Lee Partners | | | | X | | X | | X | | | | X | X | | |
| THL Partner Defendants | X | X | | X | | X | | X | | | X | X | X | X[2] | |
| THL Individual Defendants | | | | X | | X | | X | | | | X | X | | |
| Lee | | X | X | X | X | X | | X | | | X | X | X | | |
| Harkins | | | X | X | X | X | | X | | | | X | X | | |
| Jaeckel | X | | X | X | X | X | | X | | | | X | X | | |
| Schoen | | | X | X | X | X | | X | | | | X | X | | |
| *Other Defendants* | | | | | | | | | | | | | | | |
| Stock Underwriter Defendants | | | | | X | | X | | | | | | | | |
| Bond Underwriter Defendants | X | | X | | | | | | | | | | | | |
| Trosten | X | X | | | | | | | X | | X | X | | | |
| Grant Thorton | | | X | | X | | | | X | | | | | | |
| Grant | | X | | | | | | | | | | X | | | |
| BAWAG | | X | | X | | X | | | | | X | X | X | | X |

*Securities Act*

Count I    Section 12(a)(2) (144 A Bonds)
Count II    Section 15 (144 A Bonds)
Count III    Section 11 (Registered Bonds)
Count IV    Section 15 (Registered Bonds)
Count V    Section 11 (IPO)
Count VI    Section 15 (IPO)
Count VII    Section 12 (a)(2)(IPO)
Count VIII  Section 15 (IPO)

*Exchange Act*

Count IX    Section 10b-5(b)
Count X    Section 10b-5(a) and (c)
Count XI    Section 20(a) (144 A Bonds)
Count XII    Section 20(a) (Bonds between Bond Offering and IPO)
Count XIII  Section 20(a) (Bonds or Stock after IPO)
Count XIV  Section 20A (Stock)
Count XV    Section 10b-5(a) and (c)

---

[1] This chart is provided solely as a reference aid for the reader of the Consolidated Class Complaint (the "Complaint"), and is not intended to modify the Complaint. If there are any conflicts between this chart and the Complaint, the Complaint shall control.

[2] This Claim is brought only against the following THL Partner Defendants: Thomas H. Lee Equity Fund V., L.P., Thomas H. Lee Parallel Fund V. L.P.. Thomas H. Lee Equity (Cayman) Fund V. L.P.. and Thomas H. Lee Investors Limited Partnership.

Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 291 of 301

EXHIBIT 3

Case 1:21-cv-06360-AKH-SR Document 83-2 Filed 05/05/22 Page 293 of 302
Case 1:05-cv-08626-JSR Document 86 Filed 05/05/06 Page 292 of 301

04/03/06  12:31 FAX                                                    ☒002

# CERTIFICATION

RH Capital Associates LLC, on its own behalf and on behalf of its investment management clients for which it has sole discretion and authority to manage investments and bring litigation (collectively hereinafter "RH Capital Associates LLC"), declares, as to the claims asserted under the federal securities laws, that:

1.    RH Capital Associates LLC has reviewed a complaint filed in this matter.

2.    RH Capital Associates LLC did not purchase the securities that are the subject of this action at the direction of its counsel or in order to participate in this private action.

3.    RH Capital Associates LLC is willing to serve as a Lead Plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.    The transactions of RH Capital Associates LLC in Refco, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.    Other than in this action, during the three years prior to the date of this Certification, RH Capital Associates LLC has not sought to serve as a representative party for a class under the federal securities laws.

6.    RH Capital Associates LLC will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of April, 2006.

RH CAPITAL ASSOCIATES LLC

By: _____
     Robert Horwitz
     Sole Managing Member

**RH Capital Associates Transactions in Refco, Inc. (RFX)**
Relevant Period: 8/5/04-10/18/05

*COMMON STOCK*

| Transaction | Date | Shares | Price Per Share |
|---|---|---|---|
| Purchases | 8/11/2005 | 50,000 | $22.00 |
| Purchases | 8/11/2005 | 200,000 | $26.30 |
| Purchases | 8/11/2005 | 2,000 | $26.41 |
| Purchases | 8/11/2005 | 50,000 | $26.55 |
| Purchases | 8/11/2005 | 90,000 | $26.85 |
| Purchases | 8/11/2005 | 25,000 | $27.53 |
| Purchases | 8/11/2005 | 25,000 | $27.54 |
| Purchases | 8/12/2005 | 15,000 | $27.15 |
| Purchases | 9/12/2005 | 25,000 | $28.62 |
| Purchases | 9/14/2005 | 25,000 | $27.32 |
| Purchases | 9/16/2005 | 500 | $27.23 |
| Purchases | 9/19/2005 | 38,600 | $27.56 |
| Purchases | 9/30/2005 | 3,000 | $28.16 |
| Purchases | 9/30/2005 | 25,000 | $28.19 |
| Purchases | 10/10/2005 | 50,000 | $15.64 |
| Sales | 11/10/2005 | -300,000 | $0.82 |
| Sales | 11/14/2005 | -16,200 | $0.94 |
| Sales | 11/15/2005 | -50,000 | $0.84 |
| Sales | 11/15/2005 | -25,000 | $0.84 |
| Sales | 11/15/2005 | -5,000 | $0.84 |
| Sales | 11/16/2005 | -25,000 | $0.74 |
| Sales | 11/21/2005 | -1,500 | $0.64 |
| Sales | 11/28/2005 | -75,000 | $0.45 |
| Sales | 11/29/2005 | -100,000 | $0.44 |
| Sales | 11/29/2005 | -26,400 | $0.44 |

*9% SENIOR SUBORDINATED NOTES DUE 2012*

| Transaction | Date | Par Amount | Price* |
|---|---|---|---|
| Purchases | 7/22/2004 | $330,000 | 100.00 |
| Purchases | 7/22/2004 | $1,170,000 | 100.00 |
| Sales | 11/3/2004 | -$330,000 | 110.00 |
| Sales | 11/3/2004 | -$1,170,000 | 110.00 |

*Price is expressed as a percentage of the par value.

EXHIBIT 4

## CERTIFICATION OF MOHAN PHANSALKAR ON BEHALF OF PIMCO

Mohan Phansalkar, Esquire, for his Certification on behalf of Pacific Investment Management Company LLC ("PIMCO"), pursuant to 15 U.S.C. § 78u-4, states as follows:

1.      I am the Chief Legal Officer and a Managing Director of PIMCO, and I am authorized to make this Certification on behalf of PIMCO.

2.      I have reviewed PIMCO's records of its transactions in the securities of Refco, Inc. ("Refco") and its predecessors in interest and subsidiaries for the time period August 5, 2004 through October 18, 2005. All of those transactions are listed on Schedule A hereto.

3.      PIMCO and its legal counsel have fully reviewed the facts and allegations of the complaints filed in this action, and have authorized the filing of the motion for PIMCO's appointment as a lead plaintiff in this action.

4.      PIMCO did not purchase the securities that are or will be the subject of the various complaints at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

5.      PIMCO is willing to serve as a representative party on behalf of the class of all Refco securities purchasers, including providing testimony at depositions and trial.

6.      During the three-year period preceding the date of this Certification, PIMCO has neither served nor sought to serve as a representative party on behalf of a class in any action under the federal securities laws.

7.      PIMCO will not accept any payment for serving as representative party on behalf of the class beyond its pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Dated:  December 12, 2005

*Mohan Phansalkar*
Mohan Phansalkar, Esquire

2

## SCHEDULE A

### PIMCO: Transactions in Refco Inc. Securities
### (Time Period: 08/05/04 - 10/18/05)
### 75866HAA5 / 75866HAC1

| ----------Purchases---------- | | | ----------Sales---------- | | |
| Trade Date | Par | Price | Trade Date | Par | Price |
|---|---|---|---|---|---|
| 8/5/2004 | 3,000,000 | 100.00 | 8/5/2004 | 125,000 | 100.75 |
| 8/5/2004 | 20,000,000 | 100.00 | 8/25/2004 | 650,000 | 104.00 |
| 8/5/2004 | 375,000 | 100.00 | 8/25/2004 | 3,775,000 | 104.00 |
| 8/5/2004 | 1,600,000 | 100.00 | 8/25/2004 | 75,000 | 104.00 |
| 8/5/2004 | 250,000 | 100.00 | 8/25/2004 | 675,000 | 104.00 |
| 8/5/2004 | 3,600,000 | 100.00 | 8/25/2004 | 125,000 | 104.00 |
| 8/5/2004 | 200,000 | 100.00 | 8/25/2004 | 150,000 | 104.00 |
| 8/5/2004 | 625,000 | 100.00 | 8/25/2004 | 200,000 | 104.00 |
| 8/5/2004 | 425,000 | 100.38 | 8/25/2004 | 425,000 | 104.00 |
| 8/5/2004 | 425,000 | 100.25 | 8/25/2004 | 75,000 | 104.00 |
| 8/5/2004 | 750,000 | 100.00 | 8/25/2004 | 1,350,000 | 104.00 |
| 8/5/2004 | 500,000 | 100.00 | 8/25/2004 | 375,000 | 104.00 |
| 8/5/2004 | 1,050,000 | 100.00 | 8/25/2004 | 225,000 | 104.00 |
| 8/5/2004 | 225,000 | 100.00 | 8/25/2004 | 25,000 | 104.00 |
| 8/5/2004 | 500,000 | 100.00 | 8/25/2004 | 200,000 | 104.00 |
| 8/5/2004 | 650,000 | 100.38 | 8/25/2004 | 200,000 | 104.00 |
| 8/5/2004 | 175,000 | 100.25 | 9/27/2004 | 500,000 | 106.00 |
| 8/5/2004 | 475,000 | 100.25 | 9/28/2004 | 1,000,000 | 106.00 |
| 8/5/2004 | 300,000 | 100.00 | 9/28/2004 | 275,000 | 106.00 |
| 8/5/2004 | 6,300,000 | 100.00 | 9/28/2004 | 225,000 | 106.00 |
| 8/5/2004 | 2,000,000 | 100.00 | 9/28/2004 | 175,000 | 106.00 |
| 8/5/2004 | 1,050,000 | 100.00 | 9/28/2004 | 350,000 | 106.00 |
| 8/5/2004 | 100,000 | 100.00 | 9/28/2004 | 400,000 | 106.00 |
| 8/5/2004 | 875,000 | 100.00 | 1/6/2005 | 350,000 | 110.00 |
| 8/5/2004 | 525,000 | 100.38 | 1/31/2005 | 50,000 | 109.50 |
| 8/5/2004 | 525,000 | 100.25 | 6/30/2005 | 200,000 | 106.50 |
| 8/5/2004 | 275,000 | 100.25 | 9/13/2005 | 900,000 | 108.63 |
| 8/5/2004 | 150,000 | 100.25 | 9/13/2005 | 100,000 | 108.63 |
| 8/5/2004 | 50,000 | 100.25 | 9/15/2005 | 50,000 | 109.25 |
| 8/5/2004 | 100,000 | 100.25 | 9/16/2005 | 1,942,000 | 109.00 |
| 8/5/2004 | 1,000,000 | 100.25 | 9/16/2005 | 8,608,000 | 109.00 |
| 8/5/2004 | 50,000 | 100.25 | 9/16/2005 | 312,000 | 109.00 |
| 8/5/2004 | 850,000 | 100.25 | 9/16/2005 | 560,000 | 109.00 |
| 8/5/2004 | 150,000 | 100.25 | 9/16/2005 | 44,000 | 109.00 |
| 8/5/2004 | 25,000 | 100.25 | 9/16/2005 | 140,000 | 109.00 |

## PIMCO: Transactions in Refco Inc. Securities
### (Time Period: 08/05/04 - 10/18/05)
### 75866HAA5 / 75866HAC1

| Purchases Trade Date | Par | Price | Sales Trade Date | Par | Price |
|---|---|---|---|---|---|
| 8/5/2004 | 150,000 | 100.25 | 9/16/2005 | 1,196,000 | 109.00 |
| 10/29/2004 | 900,000 | 108.50 | 9/16/2005 | 70,000 | 109 00 |
| 11/30/2004 | 1,000,000 | 109.25 | 9/16/2005 | 420,000 | 109.00 |
| 12/3/2004 | 1,000,000 | 109.00 | 9/16/2005 | 312,000 | 109.00 |
| 12/3/2004 | 1,220,000 | 109 00 | 9/16/2005 | 68,000 | 109.00 |
| 12/3/2004 | 780,000 | 109.00 | 9/16/2005 | 176,000 | 109.00 |
| 12/8/2004 | 1,000,000 | 108 88 | 9/16/2005 | 348,000 | 109.00 |
| 1/6/2005 | 350,000 | 110 00 | 9/16/2005 | 79,000 | 109.00 |
| 1/26/2005 | 2,000,000 | 108.75 | 9/16/2005 | 175,000 | 109.00 |
| 1/26/2005 | 500,000 | 108.75 | 9/16/2005 | 570,000 | 109.00 |
| 1/26/2005 | 1,850,000 | 108.75 | 9/16/2005 | 97,000 | 109.00 |
| 1/26/2005 | 2,500,000 | 108.75 | 9/16/2005 | 3,728,000 | 109.00 |
| 1/26/2005 | 1,500,000 | 108.75 | 9/16/2005 | 1,094,000 | 109.00 |
| 1/31/2005 | 50,000 | 109.50 | 9/16/2005 | 2,623,000 | 109 00 |
| 2/15/2005 | 75,000 | 109 75 | 9/16/2005 | 80,000 | 109.00 |
| 2/15/2005 | 100,000 | 109.75 | 9/16/2005 | 1,699,000 | 109.00 |
| 2/15/2005 | 100,000 | 109 75 | 9/16/2005 | 840,000 | 109.00 |
| 2/15/2005 | 50,000 | 109.75 | 9/16/2005 | 14,000 | 109.00 |
| 2/17/2005 | 600,000 | 110.00 | 9/16/2005 | 65,000 | 109 00 |
| 2/28/2005 | 300,000 | 109.55 | 9/16/2005 | 70,000 | 109 00 |
| 3/1/2005 | 1,420,000 | 109.50 | 9/27/2005 | 6,214,000 | 108 25 |
| 3/1/2005 | 600,000 | 109.50 | 9/27/2005 | 229,000 | 108 25 |
| 3/1/2005 | 130,000 | 109.50 | 10/11/2005 | 2,000,000 | 91.50 |
| 3/1/2005 | 350,000 | 109.50 | 10/11/2005 | 275,000 | 91.50 |
| 4/5/2005 | 75,000 | 106.50 | 10/12/2005 | 150,000 | 79.00 |
| 4/5/2005 | 60,000 | 106.50 | 10/12/2005 | 4,850,000 | 79.00 |
| 4/12/2005 | 2,900,000 | 108 50 | 10/12/2005 | 1,650,000 | 78.13 |
| 4/12/2005 | 105,000 | 108.50 | 10/12/2005 | 260,000 | 78.13 |
| 4/12/2005 | 650,000 | 108.13 | 10/12/2005 | 130,000 | 78.13 |
| 5/6/2005 | 1,500,000 | 105.55 | 10/12/2005 | 146,000 | 78.13 |
| 5/6/2005 | 600,000 | 105.55 | 10/12/2005 | 202,000 | 78.13 |
| 5/19/2005 | 135,000 | 103.25 | 10/12/2005 | 70,000 | 78.13 |
| 5/24/2005 | 185,000 | 104.00 | 10/12/2005 | 2,256,000 | 78 13 |
| 5/24/2005 | 55,000 | 104.00 | 10/12/2005 | 36,000 | 78.13 |
| 6/13/2005 | 300,000 | 106.00 | 10/12/2005 | 220,000 | 78.13 |
| 6/22/2005 | 275,000 | 106.50 | 10/12/2005 | 30,000 | 78.13 |

2

**PIMCO: Transactions in Refco Inc. Securities**
**(Time Period: 08/05/04 - 10/18/05)**
**75866HAA5 / 75866HAC1**

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Trade Date | Par | Price | | Trade Date | Par | Price |
| 6/22/2005 | 1,700,000 | 106.50 | | 10/12/2005 | 5,000,000 | 77.75 |
| 6/22/2005 | 25,000 | 106.50 | | 10/13/2005 | 160,000 | 77.50 |
| 6/22/2005 | 3,000,000 | 106.38 | | 10/13/2005 | 373,000 | 77.50 |
| 6/23/2005 | 1,400,000 | 106.50 | | 10/13/2005 | 7,000 | 77.50 |
| 6/23/2005 | 600,000 | 106.50 | | 10/13/2005 | 50,000 | 77.50 |
| 6/28/2005 | 3,000,000 | 106.25 | | 10/13/2005 | 80,000 | 77.50 |
| 6/30/2005 | 200,000 | 106.50 | | 10/13/2005 | 10,000 | 77.50 |
| 8/1/2005 | 100,000 | 109.00 | | 10/13/2005 | 60,000 | 77.50 |
| 9/15/2005 | 60,000 | 109.25 | | 10/13/2005 | 40,000 | 77.50 |
| 9/26/2005 | 150,000 | 108.75 | | 10/13/2005 | 10,000 | 77.50 |
| 10/7/2005 | 100,000 | 108.63 | | 10/13/2005 | 30,000 | 77.50 |
| 10/7/2005 | 100,000 | 108.63 | | 10/13/2005 | 50,000 | 77.50 |
| 10/11/2005 | 2,275,000 | 91.55 | | 10/13/2005 | 30,000 | 77.50 |
| | | | | 10/13/2005 | 80,000 | 77.50 |
| | | | | 10/13/2005 | 740,000 | 77.50 |
| | | | | 10/13/2005 | 160,000 | 77.50 |
| | | | | 10/13/2005 | 120,000 | 77.50 |
| | | | | 10/13/2005 | 160,000 | 40.38 |
| | | | | 10/13/2005 | 360,000 | 40.38 |
| | | | | 10/13/2005 | 50,000 | 40.38 |
| | | | | 10/13/2005 | 80,000 | 40.38 |
| | | | | 10/13/2005 | 10,000 | 40.38 |
| | | | | 10/13/2005 | 60,000 | 40.38 |
| | | | | 10/13/2005 | 40,000 | 40.38 |
| | | | | 10/13/2005 | 10,000 | 40.38 |
| | | | | 10/13/2005 | 30,000 | 40.38 |
| | | | | 10/13/2005 | 50,000 | 40.38 |
| | | | | 10/13/2005 | 30,000 | 40.38 |
| | | | | 10/13/2005 | 80,000 | 40.38 |
| | | | | 10/13/2005 | 740,000 | 40.38 |
| | | | | 10/13/2005 | 160,000 | 40.38 |
| | | | | 10/13/2005 | 120,000 | 40.38 |
| | | | | 10/13/2005 | 390,000 | 40.25 |
| | | | | 10/13/2005 | 960,000 | 40.25 |
| | | | | 10/13/2005 | 110,000 | 40.25 |
| | | | | 10/13/2005 | 210,000 | 40.25 |

PIMCO: Transactions in Refco Inc. Securities
(Time Period:  08/05/04 - 10/18/05)
75866HAA5 / 75866HAC1

| ─────────── Purchases ─────────── | | | ──────────── Sales ──────────── | | |
|---|---|---|---|---|---|
| **Trade Date** | **Par** | **Price** | **Trade Date** | **Par** | **Price** |
| | | | 10/13/2005 | 10,000 | 40.25 |
| | | | 10/13/2005 | 160,000 | 40.25 |
| | | | 10/13/2005 | 100,000 | 40.25 |
| | | | 10/13/2005 | 30,000 | 40.25 |
| | | | 10/13/2005 | 60,000 | 40.25 |
| | | | 10/13/2005 | 130,000 | 40.25 |
| | | | 10/13/2005 | 60,000 | 40.25 |
| | | | 10/13/2005 | 210,000 | 40.25 |
| | | | 10/13/2005 | 1,850,000 | 40.25 |
| | | | 10/13/2005 | 410,000 | 40.25 |
| | | | 10/13/2005 | 310,000 | 40.25 |
| | | | 10/13/2005 | 240,000 | 40.13 |
| | | | 10/13/2005 | 168,000 | 40.13 |
| | | | 10/13/2005 | 402,000 | 40.13 |
| | | | 10/13/2005 | 13,000 | 40.13 |
| | | | 10/13/2005 | 57,000 | 40.13 |
| | | | 10/13/2005 | 130,000 | 40.13 |
| | | | 10/13/2005 | 10,000 | 40.13 |
| | | | 10/13/2005 | 90,000 | 40.13 |
| | | | 10/13/2005 | 60,000 | 40.13 |
| | | | 10/13/2005 | 20,000 | 40.13 |
| | | | 10/13/2005 | 40,000 | 40.13 |
| | | | 10/13/2005 | 60,000 | 40.13 |
| | | | 10/13/2005 | 40,000 | 40.13 |
| | | | 10/13/2005 | 130,000 | 40.13 |
| | | | 10/13/2005 | 1,090,000 | 40.13 |
| | | | 10/13/2005 | 240,000 | 40.13 |
| | | | 10/13/2005 | 190,000 | 40.13 |
| | | | 10/13/2005 | 170,000 | 40.00 |
| | | | 10/13/2005 | 430,000 | 40.00 |
| | | | 10/13/2005 | 435,000 | 40.00 |
| | | | 10/13/2005 | 1,050,000 | 40.00 |
| | | | 10/13/2005 | 40,000 | 40.00 |
| | | | 10/13/2005 | 88,000 | 40.00 |
| | | | 10/13/2005 | 42,000 | 40.00 |
| | | | 10/13/2005 | 95,000 | 40.00 |

4

## PIMCO: Transactions in Refco Inc. Securities
### (Time Period: 08/05/04 - 10/18/05)
### 75866HAA5 / 75866HAC1

| Purchases | | | | Sales | | |
|-----------|-----|-------|---|------------|-----------|-------|
| Trade Date | Par | Price | | Trade Date | Par | Price |
| | | | | 10/13/2005 | 230,000 | 40.00 |
| | | | | 10/13/2005 | 10,000 | 40.00 |
| | | | | 10/13/2005 | 85,000 | 40.00 |
| | | | | 10/13/2005 | 170,000 | 40.00 |
| | | | | 10/13/2005 | 50,000 | 40.00 |
| | | | | 10/13/2005 | 110,000 | 40.00 |
| | | | | 10/13/2005 | 25,000 | 40.00 |
| | | | | 10/13/2005 | 30,000 | 40.00 |
| | | | | 10/13/2005 | 20,000 | 40.00 |
| | | | | 10/13/2005 | 70,000 | 40.00 |
| | | | | 10/13/2005 | 50,000 | 40.00 |
| | | | | 10/13/2005 | 140,000 | 40.00 |
| | | | | 10/13/2005 | 70,000 | 40 00 |
| | | | | 10/13/2005 | 20,000 | 40.00 |
| | | | | 10/13/2005 | 95,000 | 40.00 |
| | | | | 10/13/2005 | 230,000 | 40.00 |
| | | | | 10/13/2005 | 840,000 | 40.00 |
| | | | | 10/13/2005 | 2,040,000 | 40.00 |
| | | | | 10/13/2005 | 180,000 | 40.00 |
| | | | | 10/13/2005 | 450,000 | 40.00 |
| | | | | 10/13/2005 | 145,000 | 40.00 |
| | | | | 10/13/2005 | 340,000 | 40.00 |
| | | | | 10/14/2005 | 100,000 | 24.50 |
| | | | | 10/14/2005 | 240,000 | 24.50 |
| | | | | 10/14/2005 | 30,000 | 24.50 |
| | | | | 10/14/2005 | 50,000 | 24.50 |
| | | | | 10/14/2005 | 10,000 | 24.50 |
| | | | | 10/14/2005 | 40,000 | 24 50 |
| | | | | 10/14/2005 | 30,000 | 24.50 |
| | | | | 10/14/2005 | 10,000 | 24.50 |
| | | | | 10/14/2005 | 20,000 | 24.50 |
| | | | | 10/14/2005 | 30,000 | 24.50 |
| | | | | 10/14/2005 | 20,000 | 24.50 |
| | | | | 10/14/2005 | 60,000 | 24.50 |
| | | | | 10/14/2005 | 451,000 | 24.50 |
| | | | | 10/14/2005 | 100,000 | 24.50 |

6