N5VDOATO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KAI JOCHIMS, ET AL.,

               Plaintiffs,

         v.                    21 CV 6360

OATLY GROUP AB, ET AL.,

               Defendants.

                                   Oral Argument
------------------------------x

                                   New York, N.Y.
                                   May 31, 2023
                                   2:30 p.m.

Before:

              HON. ALVIN K. HELLERSTEIN,

                                 District Judge

                        APPEARANCES

SCOTT & SCOTT
     Attorneys for Plaintiffs
BY:  JACOB LIEBERMAN
     WILLIAM C. FREDERICKS

LATHAM & WATKINS
     Attorneys for Defendants
BY:  BENJAMIN NAFTALIS
     ELIZABETH R. MARKS
     KALANA KARIYAWASAM
     WILLIAM OLIVER RECKLER

N5VDOATO

(Case called; appearances noted)

THE COURT:  Good afternoon.  I think I have everybody.

Mr. Neftalis, how is your father?

MR. NEFTALIS:  He's good, your Honor.

THE COURT:  Give him my regards.

MR. NEFTALIS:  I will, your Honor.

THE COURT:  I think we'll proceed this way.  This is a motion to dismiss the complaint, and the motion attacks principally, at least for the Exchange Act counts, but maybe more, the adequacy of and the plausibility of the representations that are said to be false.  Since it's the complaint that's being attacked, I think I'll start with asking the plaintiffs' counsel to show that the obligations upon the plaintiff have been satisfied.

So we'll start with paragraph 50 of the Second Consolidated Complaint.  What is said to be untrue are two paragraphs, part of which is -- three paragraphs, part of which have been bolded.

So I'll take the first one:  Demand for Oatly products has grown at an incredible rate.

Who's going to speak for the plaintiff?

MR. LIEBERMAN:  I am, your Honor.  Jacob Lieberman.

THE COURT:  Do you allege, Mr. Lieberman, that is a misrepresentation?

MR. LIEBERMAN:  So, your Honor, we're not alleging

N5VDOATO

that the growth for Oatly products itself was falsely represented.  What we're alleging is that the representations about the company's growth rate, in conjunction with the repeated claims and the offering documents, that the only thing holding back the company was its inability to produce oat milk, created a misleading impression.

THE COURT:  Mr. Lieberman, do you remember the question I asked?

MR. LIEBERMAN:  Yes, your Honor.

THE COURT:  Would you answer it?

MR. LIEBERMAN:  So we are not claiming that this statement --

THE COURT:  You're not claiming that's a false statement?

MR. LIEBERMAN:  Correct.

THE COURT:  Even though your complaint says it's a false statement?

MR. LIEBERMAN:  So I think, your Honor, this gets to the point that I was making about how --

THE COURT:  No.  Is what I said true?  You said this is a falsehood in your complaint.

MR. LIEBERMAN:  Well, I think if you look at paragraph 53, your Honor --

THE COURT:  I'm looking at the sentence, "demand for Oatly products has grown at an incredible rate," and you say

N5VDOATO

that it contains materially untrue, misleading, incomplete statements. And this is false?

MR. LIEBERMAN: The complaint says --

THE COURT: But I'm not going to take you off this. This sentence is not alleged to be false?

MR. LIEBERMAN: Correct. It is not alleged to be false. It is alleged to be misleading.

THE COURT: Second, "to date," which is explanatory, giving context, "to date, production capacity has been a major constraint on our growth."

Is that a false statement?

MR. LIEBERMAN: We are not alleging that that statement is false. We are alleging it's --

THE COURT: Now, wait a minute. What is in this paragraph 50 is an example of an untrue, misleading, and incomplete statement.

MR. LIEBERMAN: Fine. So I think both of those statements, your Honor, are misleading and incomplete, in that they gave investors the impression that the major constraint on the company was its lack of production capacity, and the offering documents read as a whole gave that impression, when in reality the company was facing significant other constraints on its future growth, particularly, as we've alleged, the declines in shelf space in the U.S. and Europe, declining market share in the U.S. and Europe, and principally rising

ingredient prices for the two key ingredients in all of Oatly's products, oats and rapeseed oil.

And so the claim that --

THE COURT:  Giving as an example that the production in the Singapore plant has been decreasing, are there any other examples that you wish to cite?

MR. LIEBERMAN:  For production decreasing, your Honor? We don't have any additional examples of production decreasing. We do think the complaint alleges losses of market share.

THE COURT:  The allegation is that you haven't been able to have the capacity to produce as much as you can, and you should, to meet market conditions.

Is that false?

MR. LIEBERMAN:  Again, your Honor, I don't think it's false.  I think it's misleading and incomplete for the reasons I've discussed in the --

THE COURT:  Well, it's necessary for the offering plan to skip every reason?

MR. LIEBERMAN:  I don't think it has to give --

THE COURT:  As long as it's an important reason, and it is also a matter of opinion --

MR. LIEBERMAN:  So I think -- let's address both of those points in turn. I think the first point you're making, your Honor, is that while companies don't have an obligation to disclose everything, they do have an obligation to disclose

material information that would make their representations misleading if it was omitted.  And I think that's what we're alleging here.  You have declines in shelf space, and, more importantly, declines in market share in the U.S. and Europe before and after the IPO, which were not disclosed.  And, at the same time, there's other evidence, as we allege in the complaint, that it may not have been a matter of production capacity.

So it gets disclosed on November 15, 2021, I think the close of the class period, that Oatly's stockpile of produced but as yet unsold goods had sky rocketed 219 percent -- maybe 215 percent.  I apologize, your Honor.  It's in the complaint -- in the period between March of 2020 and September of 2020, which we think strongly suggests that it wasn't just a production problem, that the company was not selling what it had been -- what it had produced.  And that's consistent, we think, with a loss of both shelf space, sort of the amount of footage being allocated to sell Oatly's products in retailers in the U.S. and in Europe, and consistent with the loss of market share in a highly competitive market, where the company is producing something which doesn't have a patent protection, but it was the first mover, that others have entered the market, and we see this clearly in the Wall Street Journal article, which shows --

THE COURT:  A complaint is a technical document, and I

am looking for what is untrue, misleading, and incomplete about the statement that "production capacity has been one major constraint."

Is that on its face untrue, or is it that you say it does not say something more?

MR. LIEBERMAN: So our position, your Honor, is not that the statement is untrue. It's that there may have been production issues. The problem that the plaintiffs have with that statement is, and the offering documents as a whole is that they gave investors the misleading impression that those were the only issues that the company was facing, such that an infusion of cash to the IPO would unlock this pent up demand for Oatly products; but, at the same time, what they had is other problems: Again, decreasing shelf space, decreasing market share, and rising key ingredient costs, which were not disclosed. So it left --

THE COURT: All right. You made that point before.

The third statement is "we've made substantial investments to scale our production capacity and address supply shortages."

Is that untrue?

MR. LIEBERMAN: We're not alleging that that is untrue, your Honor.

THE COURT: On the next paragraph, part of it is bolded. What's the reason for the bolding?

N5VDOATO

MR. LIEBERMAN:  Yes, your Honor.  I think this gets to the idea that I was talking about before.

THE COURT:  But why do you put it in bold?

It's a complaint.  A bold is like a shout.  Do you want to emphasize this particular point as a misstatement?

MR. LIEBERMAN:  So the reason the emphasis is there, your Honor, is because, under the Second Circuit law, the offering documents have to be reviewed as a whole and in context to determine whether or not they were false or misleading.  And we think it's helpful to provide the surrounding context.  That's why you have --

THE COURT:  By bolding?

MR. LIEBERMAN:  Well, by bolding the parts that we want to focus on, and the context around them.

THE COURT:  No, I -- paragraph 50 is not a true statement.  It's an improper set of allegations, and you can -- you'd be able to amend paragraph 50 to make it clear what it is that you allege to be untrue, what it is you allege to be misleading, and what it is you allege to be incomplete.  And with regard to that which is necessary to disclose, what the statement is that is misleading, without the additional disclosure -- the style of these complaints is to make long quotations, within which the Judge is supposed to figure out what is untrue, what is alleged to be untrue, and the like; but that's not the way to go.  Nor is it proper to do bolding.

It's not clear what the bolding is supposed to do.

All right.  We're finished with paragraph 50. Paragraph 51.  This is very true of many other allegations, and I'm not going to go through each of them, but there are too many allegations that contemplate lots of different statements. Some of which are alleged to be untrue, some of which are alleged to be benign, and the complaint is deficient for not making it clear what is being alleged.

Paragraph 51 seems to be an opinion about the future, or a puffery of the past.

MR. LIEBERMAN:  So I think that there's two statements, the two bolded statements in that, that paragraph, are what we are focused on here, your Honor, and then again provided the surrounding context.  But I'm cognizant of what the Court just said.

We think that the idea that there's accelerating performance in Germany, the United Kingdom, and the United States is misleading.

THE COURT:  But you have to say why.  What is the statistics, are the actual statistics of sales in Germany, the United Kingdom, and the United States?  Declining?  Flat? Increasing?  What is meant by an accelerated rate?  Is it increasing geometrically?  Linearly?

These are all ambiguous, and a pleader trying to answer this doesn't really know what is being alleged.  And

these complaints, these pleadings serve no useful function, other than to be a type of brief.  You have boldened the food retail channel in particular has welcomed Oatly on shelves. You have allegations that speak to the declining shelf space. This would be the place to allege it.

Paragraph 53 is a repetition of 50 to 52.  We don't need repetitions.

MR. LIEBERMAN:  So I think, your Honor, paragraph 53 is trying to explain or answer the question you have about paragraphs 50 to 52; but, as I take what you're saying is we would need to include a more detailed version of this for each of the misstatements?

THE COURT:  I wouldn't say detailed.  I'd say particular.

MR. LIEBERMAN:  Okay.

THE COURT:  You can't get anywhere saying a driving force is or is not a misstatement.

As to the statement that the Oatly brand contributed the most sales growth to the plant-based milk category in 2020, in the company's core Swedish, UK, German and US markets, you failed to show that they had been declining.  I think the law requires more specificity.

For example, in paragraph 54, you are attacking the optimism about the Oatly remarks, and showing that, instead of an increase in shelf space, there was the decline in shelf

space.  See, that should follow immediately after the alleged misstatement.  It should be particular to the alleged misstatement, and it should be giving statistical information.

It's not the old form of notice pleading.  The law requires a much greater specificity in showing the particulars of the statements alleged to be misleading, and the reasons for them.  An industry pleading -- I don't mind if you have allegations that are puffery or opinion or the like, but you should clearly show that these are not the allegations that you're taking issue with.  You're giving these for context, perhaps.  Though I don't know what you'd offer by that.

It would be much better to have the context in the words of the offering documents themselves, or the misstatements themselves, or, I give my first example --

Let me call upon Ms. Marks to add whatever she wants to add.

MS. MARKS:  Good afternoon.

THE COURT:  Not to reargue what was just said, but other allegations that you take issue with.

MS. MARKS:  Good afternoon, your Honor.  Betsy Marks from Latham & Watkins on behalf of defendants.

It sounds like your Honor understands the issues, and has the same troubles with the complaint as we did, which, as drafted, is a puzzle pleading.  I believe, even if the plaintiffs are able to plead actionable statements, all of the

N5VDOATO

claims fail for independent reasons as well.

For example, under the Exchange Act, they fail to plead scienter and loss causation; and under the Securities Act, they also fail to plead statutory standing, statutory seller, and standing requirements.

THE COURT:  Let's take these points up one by one.

MS. MARKS:  Sure, your Honor.

Would you like me to address scienter first?

THE COURT:  Whatever you wish.

MS. MARKS:  Out of the 180 total paragraphs in the Second Amended Complaint, only five paragraphs address scienter at all.  Two of the paragraphs attempt to allege motive and opportunity based on stock sales of two of the individual defendants.

THE COURT:  Which are they?

MS. MARKS:  Excuse me, your Honor?

THE COURT:  Which are they?

MS. MARKS:  Which are the defendants?  These would be --

THE COURT:  No.  Which are the --

MS. MARKS:  The paragraphs?  These are paragraphs 128 and 155 to 158.

THE COURT:  Let's start with 128.

128 I think sufficiently alleges that defendants Petersson and Hanke had access to the company's information.

N5VDOATO

Not sufficient to show scienter.  It just shows access.

MS. MARKS:  That's correct, your Honor.

As we argue, the fact that they may have had access to certain information because of their roles in the company is not enough to establish scienter under the case law. Particularly, where they haven't alleged motive, they must meet an even higher pleading standard to show a strong inference of scienter, which they have not done.

THE COURT:  Which is the second paragraph that you mentioned?

MS. MARKS:  The other ones are 155 to 158.

Your Honor, I'm happy to walk you through these unless you --

THE COURT:  Well, let me read them first.

MS. MARKS:  Okay.

THE COURT:  Wouldn't you say, Mr. Lieberman, that these are too conclusory?

MR. LIEBERMAN:  So, your Honor, I think these paragraphs, which appear under the additional allegations of scienter, are sort of trying to summarize a number of the prior allegations in the complaint.

THE COURT:  See, that's the problem, one of the big problems of long pleadings.  You only have to make the allegations once if you make it correctly.  The more times you make it in different words, the more problems you have.

So what paragraph would you like me to look at?

MR. LIEBERMAN:  Yes, your Honor.  It is -- so this is a --

THE COURT:  So, in the repleading, avoid repetition.  You're not writing a brief.  What you have to do is give me the material allegations that make out a claim for relief, answering, as you go along, the requirements of PSLRA, section -- and other sections that apply, Rule 9(b), and the like.

MR. LIEBERMAN:  So, your Honor, I direct you to paragraph 139.  This is where defendant Petersson --

THE COURT:  Let me read it.  139.

There will be no underlining and no bolding.  But what shows scienter here?

MR. LIEBERMAN:  So, your Honor, I think what I heard Ms. Marks saying is that the allegations show merely access to the allegedly undisclosed information.  Whereas here what we have is defendant Petersson making a representation about recent pressures on market share, velocity, measured channel.

Now, there's some dispute about what that means, but it's clearly talking about the company's market share, and explaining what has happened to it, which shows that he neither knows about the company's market share, and, therefore, should know about the declines in U.S. market share, in European market share, or he's being reckless and just shooting off his mouth.  And we think that that gets to scienter under either of

N5VDOATO

the prongs, and that's before we start looking at his prior stock sales.

THE COURT:  Let's examine the statement.  Any recent pressures on our market share velocity.

What is market share velocity?

MS. MARKS:  Your Honor, if I may here?

THE COURT:  We'll let Mr. Lieberman answer the question.

MS. MARKS:  Okay.

THE COURT:  He made the allegation, and he underlined it.

MR. LIEBERMAN:  Your Honor, we take it at face value that it's the rate of market share, the speed at which market share is expanding, or the pressure on the expansion of market share.

THE COURT:  Or declining?  Velocity doesn't make a difference, whether it's up or down.

MR. LIEBERMAN:  That's true, your Honor.

THE COURT:  It has to do with speed.  It's the opposite of stability.  The statement looks to be meaningless.

The second part is, expected and directly correlated with the capacity constraints, and less of inventory to fulfill demand across sales channels.

So what the author is saying is that we're not doing well, because we could -- or we could do better, but we don't

have the capacity to produce this demand.  We can't fill it. And then it goes on, and less of inventory to fulfill demand. The statement is rather meaningless.

MR. LIEBERMAN:  Well, your Honor, we'd appreciate the opportunity to explain to you in more particularity.

THE COURT:  Explain to me now.

MR. LIEBERMAN:  So we think that the idea that there is pressure on the company's market share could indicate a decline or could indicate a declining rate of increase.  We think it's ambiguous as to that.  And the idea that it's directly -- or, I'm sorry, is expected and directly correlated with the capacity constraints, and less of inventory to fulfill demand across sales channels, I think what he's saying is he's tying it back to the original sort of pitch that we think is actionable on the offering documents, namely, this notion that the only thing holding Oatly back was its lack of production capacity.

And we think that that is materially misleading, because there are other problems at the company, again, shelf space, market share, cost of ingredients.  And, more importantly, by this time of August of 2021, we are still seeing the inventories of Oatly's as produced but not yet sold goods increasing pretty dramatically, which is, again, inconsistent with the notion that it's just a production problem.

THE COURT:  Is Petersson, in making these remarks, answering any criticism?

MR. LIEBERMAN:  These remarks occur on an investor call.  Sitting here today, I don't remember if this is part of his prepared marks, or if it was part of a response to an investor question.

THE COURT:  The trouble here is that there's nothing specific.  Paragraph 139 alleges that Petersson touted robust customer demand for Oatly's leading brand.  Now, this suggests an increase in sales, or at least a level of sales that is at the high point, and that's not true.  And he's got no basis to make this statement.

You could say he was consciously making an untruth, and what he's talking about, capacity constraints, in terms of pressures on market share, or sales, you'll have to show in some specificity that there was no problem with capacity; and if there was, you don't have a misstatement or scienter.

I address this to Ms. Marks.  It's hard to think that the president and chief financial officer of a company, if speaking untruth, as to basic economic data, did not know they were speaking untruths.

MS. MARKS:  Your Honor, first and foremost, there are no untruths.  The plaintiffs have --

THE COURT:  I grant you that's your issue, and that if there are no untruths, there's not enough to go on from there.

But if there were untruths, scienter comes into play, only if there were untruths.

MS. MARKS:  Your Honor, assuming the plaintiffs could plead false or misleading statements, they still must plead scienter with particularity under PSLRA.  It has a heightened pleading standard.  They have not alleged motive based on the stock sales that they have alleged.

THE COURT:  What more can they allege in terms of someone who has access, very close access to all the data, and makes an untrue statement?

MS. MARKS:  Your Honor, they could allege, if they wanted to establish scienter, they could allege specific meetings where these topics were discussed.  They could allege conversations, reports, documents.  They could plead facts with particularity to show that these defendants had the mental state, embracing intent to deceive, manipulate, or defraud investors.

THE COURT:  I think you're setting too high a standard.

I think, Mr. Lieberman, if you can allege the misstatement, and you can allege the data that shows it's a misstatement, and the access that these defendants in particular had with respect to that, you would satisfy my understanding of scienter.

Did they have a motive to lie, apart from their desire

N5VDOATO

to have the success of the enterprise?

MR. LIEBERMAN:  I think that there is a motive to lie as part of the IPO offering, right?  Because you have both the two --

THE COURT:  The cases hold that wishing the enterprise to succeed is not sufficient motive.

MR. LIEBERMAN:  I agree with you that wishing the enterprise to succeed is not a sufficient motive under the Second Circuit's law, but increasing the IPO price in a situation where the CEO, defendant Petersson, and the CFO, defendant Hanke, are both able to sell as part of a private placement, which is priced off of that IPO, and earn tens of millions of dollars is consistent with a finding of motive and opportunity under the Second Circuit's law.

THE COURT:  What do you say about that, Ms. Marks?

MS. MARKS:  Your Honor, stock sales only in a public offering, without any further stock sales during the class period, actually undercut an inference of scienter.  That motive to make money in an IPO is a consistent motive that all directors and officers would have.  Here --

THE COURT:  This is the allegation that the IPO had as one purpose the ability of the two defendants to liquidate their holdings to some degree.

MS. MARKS:  Your Honor, they only liquidated 13.5 percent.  They kept over 86 percent of their holdings, so they

N5VDOATO

--

THE COURT:  Well, they couldn't dump their whole holding, but they could liquidate a good percentage of it.  I think that shows motive.

MS. MARKS:  Your Honor, under the case law, specifically the *City of Omaha* case we cited, that would not be enough.  And, in this instance, their stock sale and the IPO, which was in May, was over six months from the third quarter earnings release, which they allege was a corrective disclosure.

There are other cases holding that when stock sales occur so far in time from the corrective disclosure --

THE COURT:  In advance?

MS. MARKS:  In advance.

THE COURT:  In advance.

MS. MARKS:  Yes.  The stock sales that far in advance of the corrective disclosures also undercut an inference of scienter.  They didn't sell stock at any other time during the class period.

THE COURT:  So the stock sales occurred during the period when arguably the misstatements had their effect?

MS. MARKS:  The stock sales occurred on the first day of the class period, which was the IPO.  And there were no further stock sales after that.

THE COURT:  That brings us back before, when an

executive of a company sells stock at an inflated rate, that's not supposed to be motive.  That's not motive to make a misstatement in order to allow the stock sale at an inflated rate.

MS. MARKS:  I agree with that, your Honor.

THE COURT:  Is that right, Mr. Lieberman?

MR. LIEBERMAN:  So I think there's an important fact here, which Ms. Marks has overlooked, which is there was a lockup period as part of the IPO.  So the defendants were contractually obligated not to sell any of their shares for six months after the IPO.

THE COURT:  I'm confused as to chronology.

MR. LIEBERMAN:  Let me try to help.

THE COURT:  There was the IPO, and then the private sales.

MR. LIEBERMAN:  So the IPO and the private sales happen on the same day, and we allege at the same price.  So it was a way for the insiders to piggyback off of the IPO without having to sell in the IPO.

THE COURT:  You know, it would make things a lot clearer if you said that the defendants had scienter; here is why; A, B, C, D.

MR. LIEBERMAN:  We can certainly add that, your Honor.

THE COURT:  What other point do you want to raise, Ms. Marks?

N5VDOATO

MS. MARKS:  Your Honor, the plaintiffs have also failed to plead loss causation.  They allege two corrective disclosures, the first of which is the Spruce Point report, which is a self-interested report by the short seller.

THE COURT:  Let me interrupt.  You list another paragraph, 158.

MS. MARKS:  Oh, your Honor, yes.

THE COURT:  I didn't get to that.

MS. MARKS:  If you'd like to stay on scienter, it's 153 to 155.

THE COURT:  We did 155.

MS. MARKS:  Fair enough.

THE COURT:  We did 128, and 155.  We didn't do 158.

That shows you the private placements.  I think we've covered that all.

MS. MARKS:  Okay.

THE COURT:  So the next point is?

MS. MARKS:  Loss.

THE COURT:  Loss causation.

MS. MARKS:  Loss causation, your Honor.

Neither of the two corrective disclosures, either this Spruce Point report or Oatly's announcements regarding its results for the third quarter of 2021 --

THE COURT:  The Spruce report couldn't be a corrective disclosure.  It's a short sellers' brief.

N5VDOATO

MS. MARKS:  Exactly, your Honor.  That is our position as well.

THE COURT:  But it could give scienter.  If you sell after a short sale, or without taking into consideration -- if you make a misstatement, after you've seen a short seller's report, without examining the data that is cited in the report, it -- arguably, that's proof of scienter, but it doesn't prove misrepresentation.

MS. MARKS:  Your Honor, that could be true.  In this situation, the stock sales were in May.  The short seller report came out in July, so it was two months after the IPO.  And there were no stock sales alleged around or after that time.

THE COURT:  So if the IPO is false and misleading, as they allege, the short seller's brief is not corrective.  When does the corrective come in?

MS. MARKS:  Excuse me, your Honor?

THE COURT:  When does the corrective come in?

MS. MARKS:  So the second corrective relief plaintiffs tried to rely on are the third quarter earnings results from 2021.  And they allege there were several corrective disclosures made by defendants in those.  For example, the disclosure we looked at that Oatly started in 2021 with less shelf space than prior years, that they had experienced great pressure in Q1 and Q2 that led to lower growth rates, strained

relationships with retailers, and lost market shares, and an operating loss of over 44 million.

Several of these --

THE COURT:  So that is supposed to be the corrected disclosure?

MS. MARKS:  That's what they allege, your Honor.

THE COURT:  And when is that?

MS. MARKS:  The third quarter earnings results were made in November of 2021.

THE COURT:  The IPO?

MS. MARKS:  Was six months prior, in May.

THE COURT:  So any loss causation would follow November 2021, right?

MS. MARKS:  Your Honor, yes.  They allege that the stock dropped based on the third quarter earnings results. However, our argument is that the more logical inference is the reason the stock dropped following those earnings results is that the company reduced its revenue guidance.  That's clearly the logical --

THE COURT:  Reduced its --

MS. MARKS:  Revenue guidance going forward.

THE COURT:  What does that mean?

MS. MARKS:  So, your Honor, the company changed its projections, and they stated in the earnings results that they were reducing their projections going forward.

N5VDOATO

THE COURT:  That's like a corrective disclosure.

MS. MARKS:  Your Honor, correct -- that is not a corrective disclosure.  Our position is that is what caused the stock drop.

THE COURT:  It's a consequence of the corrective disclosure.  If you're saying we have bad shelf coverage, and it's getting worse, and matters like that, and you -- it's the law of a growing company, you have to reduce your revenue expectations.

MS. MARKS:  Your Honor, the more logical inference is the reason the company reduced its revenue projections is because of the continued production constrains, supply chain difficulties that were arising in the middle of the COVID pandemic, not because of discrete reductions in shelf spaces or market share --

THE COURT:  What paragraph should I look at?

MS. MARKS:  Excuse me?

THE COURT:  What paragraph should I look at?

MS. MARKS:  Loss causation is at 159, and it continues on after that.

THE COURT:  Mr. Lieberman, where do you allege the stock dropped?

MR. LIEBERMAN:  So we allege on paragraph 161 a stock drop of 8.8 percent on July 14th as a partial corrective disclosure.

N5VDOATO

THE COURT:  Between what amount and what amount?

MR. LIEBERMAN:  That is not at paragraph 161.  It is earlier in the complaint, your Honor.

THE COURT:  The same thing, once is enough.

MR. LIEBERMAN:  Yes.  So if you look at paragraph 5, it shows the actual amount of the drops.  This is on page 3.  And then the second subsequent -- the other corrective disclosure on November 15.

THE COURT:  Let me do one at a time, please.

MR. LIEBERMAN:  Uh-huh.

THE COURT:  What do you want me to look at?  Paragraph 6.

MR. LIEBERMAN:  Paragraphs 5 and 6 are the two loss causation dates that we're aware of.

THE COURT:  The top of page 3.  The price of American depository shares fell from $21.13 to $19.48.

These are supposedly bids and asks, aren't they?

Is that a market -- what's published in this market, actual prices, transactions, or --

MR. LIEBERMAN:  Yes, your Honor.

THE COURT:  -- offers and sales?

MR. LIEBERMAN:  It is pulling the closing transaction price from the trading day.

THE COURT:  The actual transaction?

MR. LIEBERMAN:  Yeah, I believe that's correct.  It's

N5VDOATO

the NASDAQ data.

THE COURT:  At first it looks like a normal fluctuation.  What happened before.  What happened after.  It's very hard to make a judgment, because a stock dropped from $21 to 19.50, that it's anything else than normal market fluctuation.

MR. LIEBERMAN:  Well, I think what's significant here for loss causation purposes is, one, the pleading burden at this stage is relatively minimal, and so while we could have extensive expert discovery on what caused or didn't cause --

THE COURT:  Let's think about plausibility.  The plausibility of this statement is that it's a market fluctuation.

What shows that it's not a normal fluctuation?

MR. LIEBERMAN:  Well, I think what you have, new information entering the market on July 14 in terms of the Spruce Point report, which identifies the risks of price increases in oats and rapeseed oil; it flags a loss of market share in Sweden and the U.S., among other things --

THE COURT:  You have to have more than that.  You have to get comparisons on the same stock.  You have to get comparisons with other stocks.  You have to deal with the market as a whole, and where it's going.

Where were these traded?

MR. LIEBERMAN:  They're trading on the NASDAQ in New

N5VDOATO

York, your Honor.

THE COURT:  So there would be a bid and an ask.  I don't know how you get a closing price.

Do you get a closing price?

MR. LIEBERMAN:  I believe I do, your Honor.  I don't know how, sitting here today, how that's calculated, but we can include that in the next version of the complaint if that would be helpful.

THE COURT:  Whatever it is, you have to show that this is something other than market fluctuation, and this is more likely than not attributable to the disclosure of incorrect information, the disclosure of previously made misstatements.

What's next, Ms. Marks?

MS. MARKS:  Your Honor, I believe the rest of our arguments, including why the Securities Act claims are adequately set out in our briefing, so I don't --

THE COURT:  No, they're not.  Tell me.

MS. MARKS:  Okay.  Happy to, your Honor.

THE COURT:  Don't give me that burden.

Whatever it is you rely on for the motion to dismiss, I want to know it now.

MS. MARKS:  Okay.  I'm happy to, your Honor.  I just didn't want to go on too long.

But we've already covered why the section 11 claims fail, for failure to plead falsity.

N5VDOATO

THE COURT:  Same issue?

MS. MARKS:  Yes, same issue.

To address the section 12(a)(2) claims under the Securities Act, they fail for two reasons.  First, the plaintiffs' fail to allege that the director defendants, other than one of them, were statutory sellers, either by virtue of selling shares in the IPO, or by successfully soliciting investors, which means --

THE COURT:  They couldn't sell the IPO, could they?

MS. MARKS:  Your Honor, they -- it is not alleged that any of the director defendants, except from Oste, sold shares.  Only one Securities Act defendant --

THE COURT:  They would have to be listed as selling shareholders.

MS. MARKS:  Correct.  And the plaintiffs have not pled that.  All they plead --

THE COURT:  It's an initial public offering.  That means it's newly issued stock by the company, right?

MS. MARKS:  Correct, your Honor.

THE COURT:  So your thesis then becomes how could there be a section 12 obligation if none of the individual defendants sold shares?

MS. MARKS:  Your Honor, the plaintiffs could have pled that if they pled that they had successfully solicited investors, but they did not.  There's a vague reference to a

N5VDOATO

road show, but there are no specific allegations that any of these defendants met with investors, spoke with investors, or actually solicited an investment in Oatly.

THE COURT:  What paragraph shows this?

MS. MARKS:  Your Honor, I believe the 12(a) count starts at 102.  And paragraph 105 in particular states, the Securities Act defendants solicited the purchase of securities motivated at least in part by a desire to serve their own financial interests.

That's the last sentence.  There's nothing else.

THE COURT:  We don't need motive there.  It's presumptive liability under section 12, right?

MS. MARKS:  Your Honor, they have to actually --

THE COURT:  Mr. Lieberman.

MS. MARKS:  The plaintiffs must -- excuse me, your Honor?

THE COURT:  I'm talking to Mr. Lieberman.

MR. LIEBERMAN:  For section 12, we don't need motive, your Honor.

THE COURT:  So why are you alleging that?

MR. LIEBERMAN:  I think it goes --

THE COURT:  It goes to nothing.  It takes up a brief with a complaint.

MR. LIEBERMAN:  I would --

THE COURT:  105.

N5VDOATO

The issuance or causing to be issued a prospectus does not make them a seller, and the motive to serve their own financial interests does not make them a seller.

What makes them a seller, Mr. Lieberman?

MR. LIEBERMAN:  So I think it's different for different defendants.  So if we look at paragraph 36 --

THE COURT:  Thirty-six.

MR. LIEBERMAN:  Yeah.  So this is where we allege at the bottom -- this is on page 10, your Honor.

THE COURT:  Okay.

MR. LIEBERMAN:  We allege that there was a road show that preceded the IPO, and that defendants Petersson and Hanke were among the presenters of that presentation, which was entitled the Oatly Road Show Presentation.  And so we think that that's sort of a direct allegation of solicitation for investors in an IPO, which is sufficient for a conclusion of statutory selling.

THE COURT:  Let's look at the selling issue.

The desistance of the individual Securities Act defendants.  That's Petersson and Hanke, right?

MR. LIEBERMAN:  The individual Securities Act defendants are broader than Petersson and Hanke, your Honor. It includes the directors of the company.

THE COURT:  The section 12?

MR. LIEBERMAN:  It's for section 12 and section 11.

N5VDOATO

THE COURT:  Don't mix them up.  Right?

MR. LIEBERMAN:  Right.

THE COURT:  Section 12 defendants are Petersson and Hanke, right?  Or more?

MR. LIEBERMAN:  So in the complaint they are alleged to be more.

THE COURT:  Who is?

MR. LIEBERMAN:  They are alleged to be the directors who signed the prospectus.

THE COURT:  The law doesn't say that, does it?

MR. LIEBERMAN:  Your Honor, some courts have found that allegations of signing the prospectus, or being involved in the preparing of the documents are sufficient.  Others have not.  When we recognize that --

THE COURT:  I don't believe that there's section 12 liability.  Those are section 11 liabilities, not section 12 liabilities.

Section 12 deals with the sale, buyer, seller; and there's nothing in paragraph 35 that will make these people sellers.  I don't think you have a section 12 claim.  You don't need it anyhow.  If you're going to win, you're going to win on 11.  Section 12 claims are dismissed.  That means the allegations that go into that get dismissed, too.

What's next, Ms. Marks?

MS. MARKS:  Your Honor, even if the plaintiffs could

N5VDOATO

allege that some of these Securities Act defendants were statutory sellers --

THE COURT:  You just won that point, didn't you?

MS. MARKS:  Excuse me, your Honor?

THE COURT:  You just won that point.  Do you want me to change my mind?

MS. MARKS:  I was just going to add an additional --

THE COURT:  Never do that.  You might cause me to change my mind.

MS. MARKS:  Okay.  Thank you, your Honor.

Our final argument would be that the control person claims fail as well, because the plaintiffs cannot establish section 11 or section 10(b) claims; but, other than that, I have nothing specific on the causes of action.

THE COURT:  What do you get on the control person's claim?

MS. MARKS:  Excuse me, your Honor?

THE COURT:  I'm asking Mr. Lieberman.

What's added to the scope of liability, or the liability to recover on a control person's claim?

You've got -- you have the Exchange Act claims by the president and chief financial officer, and others, I guess. What -- how would you get a liability on a control person theory, which might not exist on an Exchange Act theory?

MR. LIEBERMAN:  So, I think you could get, under a

N5VDOATO

control person theory, you could expand the scope of liability.

THE COURT:  How --

MR. LIEBERMAN:  To directors -- now I'm thinking in the context of the Securities Act.

THE COURT:  How are you going to prove that the directors of the company, who were probably asleep, were able to control the chief executive and the chief financial officer?

MR. LIEBERMAN:  Well, I think we would prove just that, your Honor, that they were asleep at the switch.

THE COURT:  Control.  The controlling person's claims are dismissed.

MR. FREDERICKS:  Your Honor, let me take some of the blame as an older member of the plaintiffs' bar --

THE COURT:  What you should do is whisper your comments to Mr. Lieberman, and he'll make them.

MR. LIEBERMAN:  So the argument, your Honor, is that the individuals to the primary 33 Act claims would have a due diligence defense, which would not be available to them under the section 15 claims if they were found to control the company but then had satisfied their due diligence defense to avoid section 11 liability.

THE COURT:  Ms. Marks?

MS. MARKS:  Your Honor, our position is set forth in our briefing, which is that if --

THE COURT:  Don't do that.

MS. MARKS:  Excuse me, your Honor.

If plaintiffs cannot adequately plead the substance of their claims under section 10(b) of section --

THE COURT:  They lose it.  They can't get a control person victory unless they win on a section 11, but -- in terms of their proofs, but they say, if they prove that these principal executives are out because they were doing diligent -- others, nevertheless, could be liable.  It's hard for me to conceive that, Mr. Lieberman, but I don't know if I could dismiss it.

I'm going to leave the control person claim in, but make it specific.

Anything else?

MS. MARKS:  Your Honor, the only last comment I would make is that this is the fourth complaint in this action.  And I understand that your Honor is inclined to give the plaintiffs a chance to replead.  However, they've had many bites at the apple already.  They drafted this second amended complaint with the benefit of our first motion to dismiss, and giving them another opportunity, respectfully, would be futile.

THE COURT:  I don't think it's futile.  It's wearying, and I don't think it's impressive either.  It's costly and weary.

I have this comment as well, Mr. Lieberman, and this is also to the elder of the two, Mr. Fredericks.  What do you

get out of this case?

You can't make, I think, any real recovery.  You're going to put a lot of fees into this case, and I'm not going to give them to you, because you really don't have a substantial enough case.  The stock didn't fall enough.  Other factors came to play.  Misstatements tend to be puffery.

You may win.  You may get a settlement.  But at what cost?  These are not things I would rely on in deciding whether or not there was a legal claim for relief that could be plausibly stated.  It's something that you might want to put to yourself in terms of the economics of your business.

So how much time do you need, Mr. Lieberman, to replead --

MR. LIEBERMAN:  I'm sorry, your Honor.  I had a question.  We've spoken a lot today about the scienter requirement, the loss causation requirement, and the section 12 claim; but we haven't talked about plaintiffs' section 11 claim.  And I think that goes sort of directly to the point you just raised, which is we don't have a burden of proving causation under section 11.  We think that the section 11 claim is arguably the strongest claim here, and the drop on November 15th is --

THE COURT:  I don't have section 11 in front of me, but isn't there a subsection in 11 that makes it as a defense to show that the loss was caused by other things?

MR. LIEBERMAN:  Yes, your Honor, there is an affirmative defense under section 11 of negative causation.  We think that will be difficult here, because if you look at the November 15 drop, for example, where the stock went down 20 -- close to 21 percent, or even the fact that the stock is now trading at $1.65, as of the close yesterday, when it was IPOed at $17, the --

THE COURT:  What was the time of the corrective disclosure?  It's November 2021 plus how much time?

MR. LIEBERMAN:  So we --

THE COURT:  Ten days?  So the continuous decline of the stock after that is not attributed to the corrective disclosure.

MR. LIEBERMAN:  But it doesn't have to be, your Honor, because the negative causation defense puts the burden on the defendants to show that every drop wasn't attributable --

THE COURT:  I agree, but you know what they're going to say.  You know what their expert will say.  Market fluctuation, there's a trend in the whole market, other companies like Oatly suffered the same.  It's very hard to get a clean understanding of what causes a loss where it's not so dramatic and precipitous.  This is not a precipitous loss.

Now, of course you have the burden, but I'm not so sure it's so hard to sustain.

How much time do you need?

N5VDOATO

MR. LIEBERMAN:  Could we have 45 days, your Honor?

THE COURT:  Yes.

You know clearly what you can do.

MR. LIEBERMAN:  Yes, your Honor.

THE COURT:  No repetition.  No narratives.  A sharply focused complaint alleging just what the misstatement was, and why, and when, scienter.  I'll just give you a few.  You'll know more when you start doing it.

All right.  Let me give you a date.

August 11?

Mr. Lieberman.

MR. LIEBERMAN:  That's perfect, your Honor.

THE COURT:  I'd like to say that September 1 will be the time for any motions, but am I interfering with vacation plans?

MS. MARKS:  Thank you, your Honor.  That works.  Oh, could you -- September 1 for our opposition?

THE COURT:  Yes.

MS. MARKS:  Your Honor, respectfully, we will not --

THE COURT:  Your motion --

MS. MARKS:  I understand.

THE COURT:  They're going to plead by August 11.  If you want to make another motion or answer --

MS. MARKS:  Your Honor, respectfully, I do believe people probably have vacation plans at the end of August, and

N5VDOATO

we would ask for the same amount of time, 45 days as well, if possible.

THE COURT:  September 15.

MS. MARKS:  Thank you, your Honor.

THE COURT:  Answer, one motion -- I'm not going to do any further dates on that.  Work it out between you in a stipulation.

Thanks very much.  Good-bye.

MR. LIEBERMAN:  Thank you, your Honor.

(Adjourned)