**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE OATLY GROUP AB SECURITIES LITIGATION | Consolidated Civil Action No. 1:21-cv-06360-AKH<br><br>CLASS ACTION<br><br>**THIRD CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

## <u>TABLE OF CONTENTS</u>

SUMMARY OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE .............................................................................. 9

THE PARTIES ........................................................................................................ 9

SUBSTANTIVE ALLEGATIONS ........................................................................ 13

I.     OATLY'S HISTORY AND BACKGROUND TO THE IPO ......................... 13

II.    THE MAY 17, 2021 IPO ........................................................................... 15

III.   THE DEFECTIVE MAY 2021 OFFERING DOCUMENTS ......................... 16

       A.     The Offering Documents' Materially Misleading and Incomplete Statements
              Regarding Retail Market Share and Retail Shelf Space ........................ 16

       B.     The Offering Documents' Materially Misleading "Risk Disclosures" Regarding
              Retail Shelf Space ............................................................................. 20

       C.     The Offering Documents' Misleading Statements and Omissions Regarding Its
              Production Facilities and Efforts to "Ramp Up" Its Production Capacity ........... 21

       D.     The Offering Documents' Misleading Statements Regarding Rising Costs of Key
              Ingredients and Their Almost Certain Adverse Impact on Oatly's Post-IPO
              Profitability and Margins ................................................................... 25

IV.    THE EXCHANGE ACT DEFENDANTS MADE ADDITIONAL MATERIALLY
       FALSE AND MISLEADING STATEMENTS AFTER THE IPO ................... 31

V.     THE TRUTH BEGINS TO EMERGE ........................................................ 33

VI.    DEFENDANTS' DUTY TO DISCLOSE UNDER ITEMS 303 AND 105 OF
       REGULATION S-K ................................................................................. 45

VII.   ADDITIONAL SCIENTER ALLEGATIONS (As to Claims Asserted Herein Under the
       Exchange Act that Require Proof of S*cienter*.) ................................................ 49

       A.     The Exchange Act Defendants' Knowledge of, or Access to, Information
              Indicating that Their Statements Were Materially False, Misleading of
              Incomplete ...................................................................................... 49

       B.     The Core Operations Doctrine ............................................................. 50

       C.     The Individual Exchange Act Defendants' Motive and Opportunity to Commit
              Fraud ............................................................................................. 51

VIII.   ADDITIONAL LOSS CAUSATION ALLEGATIONS (As to Claims Asserted Herein Under the Exchange Act that Require Proof of Loss Causation.) .................................... 52

IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE (As to Claims Asserted Herein Under the Exchange Act that Require Proof of Reliance.)................................................ 57

CLAIMS FOR RELIEF ......................................................................................................... 59

COUNT I ............................................................................................................................... 59

COUNT II .............................................................................................................................. 61

COUNT III............................................................................................................................. 62

COUNT IV............................................................................................................................. 64

CLASS ACTION ALLEGATIONS ...................................................................................... 65

PRAYER FOR RELIEF ........................................................................................................ 67

JURY DEMAND.................................................................................................................... 68

Lead Plaintiff Mario Bello and additional Plaintiffs Kai Jochims and Mark Hayden (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, for their complaint allege the following upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by Plaintiffs' attorneys, which included a review of Securities and Exchange Commission ("SEC") filings by Oatly Group AB ("Oatly" or the "Company"), Oatly's press releases and other public statements, and media and analyst reports about the Company and the industry it operates in.  Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.    This is a securities class action on behalf of a class (the "ADS Class") consisting of all persons or entities who purchased Oatly's American Depositary Shares ("ADSs") between May 20, 2021 and November 15, 2021 (the "Class Period"), including those who purchased such ADSs directly in Oatly's May 20, 2021 initial public offering of ADSs (the "IPO").  As further detailed below, the action asserts strict liability and negligence claims under the Securities Act of 1933 ("Securities Act") for materially untrue, false, misleading, and/or incomplete statements contained in (and related material omissions from) the Offering Documents (as defined below) for the IPO. These claims are asserted against the "Securities Act Defendants," consisting of Oatly, Toni Petersson (Oatly's former CEO and an Oatly director ("Petersson")), Christian Hanke (its CFO ("Hanke")), and each of the other Oatly directors who signed the Offering Documents.  The action also asserts fraud-based claims under the Securities Exchange Act of 1934 ("Exchange Act") against Oatly, Petersson and Hanke (the "Exchange Act Defendants") based on both (a) the

defective Offering Documents and (b) certain additional materially false, misleading, or incomplete statements made by them.

2.      In the IPO Registration Statement and Prospectus materials incorporated therein (the "Offering Documents"), and in later statements, Oatly touted the demand for its oat-based products and corresponding successful growth, including its purportedly growing share of the "plant-based milk retail market."  As detailed below, however, Defendants failed to disclose that its production problems were so severe that, as of the IPO, they had already caused Oatly to lose retail shelf space and hemorrhage market share across Europe and the United States, thereby materially impairing the Company's growth prospects.

3.      Moreover, the Offering Documents advised investors that declining shelf space was merely a hypothetical, as-yet unrealized risk that "might" adversely impact Oatly in the future. For example, the Offering Documents represented that Oatly "*may* be unable to retain the placement of our products in dairy cases to effectively compete with traditional dairy product" and stated that "[*i]f* . . . our retailers allocate shelf space to other brands, our . . . results of operations could be adversely affected[.]"[1]  But, instead of accurately advising investors of the risk of investing in Oatly, these statements were patently misleading because the warned-of risks had *already materialized* in both the United States and Europe as of the IPO, and Oatly's business in these "core" markets was already "adversely affected."

4.      Retail grocery shelf space is critical to a food manufacturer's ability to grow demand and fend off competitors' rival products.  This is because retailers have limited amounts of physical shelf space in stores, and so they will allocate this scarce asset based on their assessment of which products are most likely to generate strong and sustained sales.  Thus, a

---

[1]      Unless otherwise indicated, all citations and internal quotation marks are omitted and emphasis is added.

decline in shelf space for a particular product or brand generally reflects retailers' declining confidence in their ability to generate sales of such product or brand, including in relation to competing products that retailers could use to stock their limited shelves.[2]

5.      Fluctuations in shelf space are also a key indicator of whether a product or brand is currently gaining or losing (or will gain or lose) market share vis-à-vis its competitors – especially as a product that is losing shelf space has less visibility in the store, thereby making it less likely to be purchased by end-user consumers (and risking a downward spiral of further reduced sales, leading to further reduced shelf space, leading to further reduced sales vis-à-vis competitors). Thus, even if Oatly were able to continue to increase its overall sales of oatmilk or other oat-based products as the *overall* oatmilk market expanded, the decline in Oatly's retail shelf space clearly showed that Oatly's competitive position relative to other oatmilk producers was weakening.

6.      Importantly, losing shelf space is particularly damaging for innovators, like Oatly, whose business is based on marketing and selling relatively new and innovative products.  This is because loss of shelf space means that – even if the concept behind the innovator's new product (*e.g.* oatmilk) is popular – *both retailers and end-user consumers are increasingly turning to competing brands*, thereby causing the innovator to (a) lose critical opportunities to build on its "first mover" advantages, and (b) suffer correspondingly painful damage to its growth prospects.

7.      Throughout the Class Period, Defendants also concealed that Oatly's ongoing efforts to increase its production capacity were plagued by delays and plant closures.  These problems were so severe that, as of the IPO, Oatly had already fallen woefully behind its 2021 production goals, and would likely continue to fall even further behind over the coming quarters.

---

[2]      *See, e.g.*, Teresa Bianchi-Aguiar, *et al.*, "*Retail shelf space planning problems:  A comprehensive review and classification framework*," EUROPEAN J. OF OPERATIONAL RES. at 2, 3 (2020) ("Shelf space has in fact been referred to as the retailer's scarcest resource" thus "[t]he ultimate objective of shelf space planning is to maximise the retailers' profits that stem from realised customer demand.").

Instead, the Offering Documents touted, *inter alia*, Oatly's purportedly "proven track record" of "build[ing] our production capabilities across each of our regions" as the basis for its representations that Oatly would be able "to increase our production capacity to approximately 600 liters of finished goods equivalent by 2021." Such representations, however, materially overstated Oatly's ability to overcome undisclosed – but then-existing – problems, like plant closures and disruptions in Oatly's two main European facilities, and construction delays at Oatly's new facility in the U.S (*i.e.*, at the majority of Oatly's production facilities). And even after Oatly's pre-IPO production problems began to come to light in the summer of 2021, Defendant Petersson continued to mislead investors by falsely assuring them that such problems were now "behind us."

8.    Defendants also failed to adequately disclose that, as of the IPO, there were already-existing adverse trends of rising futures prices for Oatly's two key raw materials (oats and rapeseed oil) that negatively impacted Oatly's bottom line by sharply reducing Oatly's post-IPO profit margins. However, far from disclosing these known adverse trends, the Offering Documents misleadingly warned only that "[i]ngredient . . . costs are volatile and may rise significantly, which *may* negatively impact [our] profitability" (emphasis added) – when, in fact, prices for future delivery of oats and rapeseed oil had *already* long been trending higher, making it nearly certain that increased raw materials costs would reduce its profit margins as the Company's pre-IPO pricing arrangements began to expire (as Oatly would admit just months after the IPO).

9.    These undisclosed adverse facts began to come to light shortly after the IPO. For example, Spruce Point Capital ("Spruce Point") issued a report on July 14, 2021, that partially disclosed numerous problems at Oatly, including its deteriorating market share in the U.S. and Sweden, its ongoing difficulties that were plaguing its efforts to expand production at both old and new plants, and the sharp upward trend in oat and rapeseed prices for future delivery (and its likely

4

adverse impact on Oatly). In response, the price of Oatly ADSs promptly fell 8.8% – and would have fallen even further but for Oatly's issuance of false denials of all of Spruce Point's allegations.

10.    In August 2021 Oatly ADSs suffered further significant price declines in response to news anticipating (and then confirming) highly disappointing earnings for 2Q 2021 (the quarter in which the IPO took place). And once again, Oatly's share price would have fallen even further but for Oatly's mixing of partial disclosures of the truth (*e.g.*, its disclosure of some production problems) with false assurances (*e.g.*, its assurance that such problems were now "behind us").

11.    On November 15, 2021, Oatly reported more disappointing results for 3Q 2021. Moreover, on that date Defendants also effectively admitted, *inter alia*, that:

(a)    Oatly's retail shelf space had been *declining* in Europe since well before the May IPO;

(b)    oat and rapeseed prices had driven up Oatly's costs for these raw materials by as much as *25% to 35%*, and were materially reducing the Company's profit margins;

(c)    beginning no later than May 2021 the Company's production challenges had become so great that, *inter alia*, Oatly was already far behind meeting the Offering Documents' stated plans to produce "approximately 600 million liters of finished goods equivalent of oat base by 2021"; and

(d)    notwithstanding the Defendants' prior repeated touting of the purportedly "strong demand" for Oatly product and representations that "lack of supply" was effectively the only significant impediment to the Company's ability to sell more product, the truth was that the Company's inventory of *unsold* product had skyrocketed by 215% between March 31, 2021 and September 30, 2021 – confirming that both as

of and after the May 2021 IPO Oatly was having serious problems selling even the products that it was able to manufacture.

In response to Oatly's November 15, 2021 disclosures, the price of Oatly ADSs plummeted a further $2.46 per share on unusually heavy trading, reflecting a further one-day decline of *20.81%* per share.

12.    In March 2022, a *Wall Street Journal* ("*WSJ*") article confirmed that Oatly's declining market share and shelf space woes were not confined to Europe.  Specifically, the *WSJ* article confirmed that Oatly's disappointing 2021 results had also been exacerbated by a steady decline in Oatly's market share and loss of shelf space in the United States – adverse trends that had also begun well before (and continued after) the May 2021 IPO  The article also included the chart below, which shows how Oatly's retail market share in the United States had steadily *fallen* from roughly 32% in 2019, to 28% in 2020, and then to just 26% by 2021:



**Top brands' share of U.S. retail oat milk market**

Source: Annual NielsenIQ data via industry analyst

The *WSJ* article also described how shortages caused by Oatly's efforts to try to keep Starbucks and Oatly's most preferred grocers supplied had the unfortunate effect of causing other, less-preferred grocers to replace Oatly products on their shelves with those of its competitors.  Such reports are corroborated by Plaintiffs' well-placed confidential witness (a former Oatly Sales Director during the relevant period), who also confirmed that Oatly's shelf space was declining in the United States both before and after Oatly's May 2021 IPO – and that Oatly was also losing market share in the United States during that same period.

13.    All told, during the Class Period, the price of Oatly ADSs fell a staggering 45% from its IPO price of $17.00 per share to close at $9.36 on November 15, 2021, with investors

suffering huge losses within just six months of the IPO. By contrast, Oatly reaped over $1.4 billion from the May 2021 IPO – while Defendant Petersson (Oatly's CEO) pocketed $21.5 million, and Defendant Hanke (Oatly's CFO) pocketed another $2 million, through their well-timed insider sales of Oatly shares in a private placement conducted in connection with the IPO.

14.     In sum, in the Offering Documents and thereafter, Defendants discussed the importance to Oatly of (1) shelf space and market share, (2) its efforts to increase production, and (3) raw material prices – and thereby put each of these subjects "in play." However, due to Defendants' materially false assurances, misleading "risk disclosures," and other actionably incomplete statements – and also due to their violations of their independent affirmative duties to disclose material adverse trends and events under SEC Regulation S-K – the truth about Oatly was not adequately disclosed to investors until the end of the Class Period.

15.     Accordingly, Plaintiffs now seek a recovery by bringing two separate sets of claims. First, in Counts I and II, Plaintiffs Bello and Jochims assert strict liability and negligence claims under §11 of the Securities Act based on the defective IPO Offering Documents, plus related control person claims under §15 (the "Securities Act Claims"). These claims are brought on behalf of the ADS Class, and Plaintiffs specifically disclaim any allegations of fraud or fraudulent intent in connection with these claims.

16.     Second, in Counts III and IV, Plaintiffs Bello, Jochims and Hayden assert securities fraud claims under §§10(b) of the Exchange Act, together with related control person claims under §15.  (the "Exchange Act Claims"). The Exchange Act Claims are brought on behalf of both the ADS Class and the Options Class (as defined below), and include all factual allegations from which it may be inferred that the Exchange Act Defendants made the materially false and misleading statements at issue with *scienter* (*i.e.*, intentionally or recklessly).

## JURISDICTION AND VENUE

17.     The Securities Act Claims arise under §§1, and 15 of the Securities Act (15 U.S.C. §§77k, 77l, 77o).  This Court has jurisdiction over these claims under §22 of the Securities Act (15 U.S.C. §77v).

18.     The Exchange Act Claims arise under §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.  This Court has jurisdiction over these claims under §27 of the Exchange Act.

19.     Venue is proper in this Judicial District under §22 of the Securities Act and §27 of the Exchange Act.  Many of the acts and transactions alleged herein, including the dissemination of materially untrue and misleading statements, occurred in substantial part in this District.  In addition, Oatly's U.S. headquarters are located in this District and, by virtue of the May 2021 IPO, Oatly ADSs were registered to trade on the NASDAQ, which is headquartered in this District.  Moreover, the depository of the ADSs, JPMorgan Chase Bank, N.A., is located in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

21.     This action was brought within one year of the discovery of the untrue statements and omissions in the Offering Documents (and within one year after discovery should have been made in the exercise of reasonable diligence) and within three years of the IPO.

## THE PARTIES

22.     Lead Plaintiff Mario Bello purchased Oatly ADSs traceable to the IPO during the Class Period as set forth in his lead plaintiff papers and was damaged thereby.  (ECF. Nos. 13-3, 13-4).

23.     Plaintiff Kai Jochims purchased Oatly ADSs traceable to the IPO during the Class Period as set forth in his July 23, 2021 Certification and was damaged thereby.  (ECF. No. 31-1).

24.     Plaintiff Mark D. Hayden purchased call options on Oatly ADSs during the Class Period and was damaged thereby.  (*See* ECF No. 20-3.)  Plaintiffs Bello, Jochims, and Hayden are collectively referred to herein as "Plaintiffs."

25.     Defendant Oatly describes itself as the world's original and largest oatmilk company.  It is organized under the laws of Sweden and its headquarters are in Sweden.  Its ADSs are listed and trade on the NASDAQ under the ticker "OTLY."  Oatly maintains its U.S. offices at 220 E. 42nd Street, Suite 409A, New York, New York 10017.

26.     Defendant Toni Petersson was at all relevant times the CEO and a member of the board of directors of Oatly, until he was replaced as Oatly's CEO in June 2023.  Petersson signed the Registration Statement, and also participated in roadshow events in the run up to the IPO and otherwise solicited purchases of Oatly ADSs in the IPO.

27.     Defendant Christian Hanke is, and at all relevant times was, the CFO of Oatly.  In July 2023, Oatly announced that Hanke would be replaced as CFO at the end of September 2023.  Hanke signed the Registration Statement, and also participated in roadshow events in the run up to the IPO and otherwise solicited the purchase of Oatly ADSs in the IPO.

28.     Defendant Björn Öste ("Öste") was at all relevant times a member of Oatly's Board of Directors and was a co-founder of Oatly.  Öste signed the Registration Statement.  Öste was also a "selling shareholder" in the IPO who sold shares he owned in connection with the IPO.

29.     Defendant Fredrik Berg ("Berg") was at all relevant times a member of Oatly's Board of Directors.  Berg signed the Registration Statement.

30.     Defendant Ann Chung ("Chung") was at all relevant times a member of Oatly's Board of Directors.  Chung signed the Registration Statement.

31.     Defendant Bernard Hours ("Hours") was at all relevant times a member of Oatly's Board of Directors.  Hours signed the Registration Statement.

32.     Defendant Hannah Jones ("Jones") was at all relevant times a member of Oatly's Board of Directors.  Jones signed the Registration Statement.

33.     Defendant Mattias Klintemar ("Klintemar") was at all relevant times a member of Oatly's Board of Directors.  Klintemar signed the Registration Statement.

34.     Defendant Po Sing (Tomakin) Lai ("Lai") was at all relevant times a member of Oatly's Board of Directors.  Lai signed the Registration Statement.

35.     Defendant Eric Melloul ("Melloul") was at all relevant times a member of Oatly's Board of Directors.  Melloul signed the Registration Statement.

36.     Defendant Yawn Wu ("Wu") was at all relevant times a member of Oatly's Board of Directors.  Wu signed the Registration Statement.

37.     Defendant Tim Zhang ("Zhang") was at all relevant times a member of Oatly's Board of Directors.  Zhang signed the Registration Statement.

38.     Defendants Petersson, Hanke, Öste, Berg, Chung, Hours, Jones, Klintemar, Lai, Melloul, Wu, and Zhang (collectively, the "Individual Securities Act Defendants"), because of their positions with the Company, possessed the power and authority to control, and did control, the contents of Oatly's filings with the SEC, including the Offering Documents.

39.     The Individual Securities Act Defendants, as signatories of the Registration Statement, were required to conduct an adequate and reasonable investigation into Oatly's business, operations, products, and plans (also known as a "due diligence" investigation) to ensure

that the Offering Documents were free of any materially inaccurate or misleading statements and free of any omissions of material fact or other matters that were required to be disclosed therein. In connection with the IPO, these Defendants all had continual access to confidential corporate information concerning the Oatly's business, financial condition, products, plans, and prospects.

40.    In addition to having access to internal corporate documents, the Individual Securities Act Defendants had access to all of Oatly's top executives, directors, and advisors to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Oatly's ADSs would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications, at a minimum these Defendants should have known of the undisclosed materially untrue and misleading statements and omissions contained in the Offering Documents, as detailed herein.

41.    As used herein, the term "Individual Exchange Act Defendants" refers to Defendants Petersson and Hanke.  The Individual Exchange Act Defendants by virtue of their positions with the Company, possessed the power and authority to control, and did control, the contents of Oatly's filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors(*i.e.*, the market).  The Individual Exchange Act Defendants were provided with copies of Oatly's reports and press releases alleged herein to be materially false, misleading, and incomplete, prior to, or shortly after, their issuance and they had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them, but not to the public, the Individual Exchange Act Defendants knew that the

adverse facts specified herein had not been disclosed to, but were being concealed from, the public, and that the statements at issue here were materially false, misleading, and incomplete when made.

## SUBSTANTIVE ALLEGATIONS

**I.    OATLY'S HISTORY AND BACKGROUND TO THE IPO**

42.    Oatly was founded by Defendant Björn Öste and his brother, Rickard Öste, who (according to Oatly's May 19, 2021 IPO Prospectus filed on Form 424B4 (the "Prospectus")) were "on a mission to make the best possible form of milk for human beings and the planet" using oats, which "resulted in core technical advancements that enabled [Oatly] to unlock the breadth of the dairy portfolio, including milks, ice cream, yogurt, cooking creams, spreads and on-the-go drinks." Oatly set up its first oatmilk factory in Ladskrona, Sweden, in 2006.

43.    Oatly first entered the U.S. market in 2017 by targeting coffee's tastemakers, professional baristas and independent coffee shops, and then expanded into selling products through traditional retail channels such as grocery stores, convenience stores, and big-box retailers, such as Target.

44.    Oatly's "home market" is Sweden.  Oatly's other key markets (according to the Prospectus) are the United Kingdom, Germany, the United States, and China.

45.    The core of Oatly's manufacturing process is "oat base."  As stated in the Prospectus, Oatly's "proprietary oat base production technology . . . leverages patented enzymatic processes to turn oats into nutritional, great tasting liquid product."  In this process, oats are cleaned, dehulled, and heated to groats, which then undergo an enzymatic processing to create oat base.  During this process, rapeseed oil is added to the processed oats.  Subsequently, oat base is combined with other ingredients to create the different products Oatly sells to its customers in a process it refers to as "filling and mixing."  In other words, oatmilk, oat ice cream, and so-called "oatgurt" all start with the same "oat base," much in the same way that traditional milk, ice cream,

13

and yogurt all start with animal milk.  Oats and rapeseed oil are crucial ingredients in all Oatly products.  For example, the Prospectus noted that "oatmilk accounted for approximately 90% and 86% of [Oatly's] revenue in the years ended December 31, 2020 and 2019, respectively."

46.    Oatly states that it owns and manages the majority of its oat base manufacturing facilities.  Oatly does not, however, own the majority of the facilities used for filling and mixing (*i.e.*, for turning oat base into finished consumer products, like oatmilk).  The Company utilizes three main supply models for filling and mixing: (i) co-packing (or "complete outsourcing"), (ii) hybrid manufacturing, and (iii) end-to-end self-manufacturing.  In co-packing, Oatly transports the oat base through tanker trucks to third parties for filling and mixing.  With respect to so-called "hybrid" manufacturing, Oatly transports oat base through pipelines from an Oatly-owned facility to a physically adjacent plant operated by a third-party, which conducts the filling and mixing.  And, in end-to-end self-manufacturing, Oatly conducts both oat base manufacturing and the filling and mixing process at a single, Oatly-owned facility.  As a reasonable investor would expect, given the different degrees of outsourcing involved, "co-packing" should cost Oatly more than hybrid manufacturing, and hybrid manufacturing should cost more than end-to-end self-manufacturing.

47.    For the year ended December 31, 2020, the Offering Documents noted that "approximately 52% of [Oatly's] products were produced through the co-packing and complete outsourcing model, 24% through hybrid model and 24% through . . . end-to-end manufacturing." In November 2021, Oatly would later report that during 3Q 2021 (the quarter ending September 30, 2021), 40% of its products were produced through co-packing, 38% were produced through hybrid manufacturing, and 22% were produced through end-to-end self-manufacturing

48.    The Company, as per the Offering Documents, built its "factories and manufacturing facilities to be in close proximity to [Oatly's] customers as well as [the Company's]

co-packers."  As of the IPO, Oatly operated hybrid manufacturing facilities in Millville, NJ, and

Vlissingen, Netherlands – and its only end-to-end manufacturing facility was located in

Ladskronna, Sweden.  During the Class Period, Oatly commenced manufacturing at an end-to-end

facility in Ogden, Utah, and at a hybrid facility in Singapore.  The map below shows Oatly's

existing and planned manufacturing facilities as of the May 2021 IPO:



## II.    THE MAY 17, 2021 IPO

49.    On May 17, 2021 Oatly filed with the SEC a draft Form F-1 Registration Statement

(as amended) together with its final Prospectus Supplement.  These documents (including all

materials incorporated by reference therein, and all "free-writing" prospectus materials, including

the roadshow presentation materials) are collectively referred to herein as the "Offering

Documents."  On May 19, 2021, the SEC issued a Notice of Effectiveness of the Registration

Statement.

50.     The IPO was held on or around May 20, 2021.  In the IPO, Oatly sold 68,688,000 ADS – and certain selling shareholders (including Defendant Öste) sold a total of 19,688,000 additional ADSs – to members of the ADS Class at a price of $17.00 per share.  The IPO raised $1.4 billion for the Company.

51.     Each Oatly ADS represents one Oatly ordinary share.  An ADS holder is not a shareholder of the Company; rather, the rights of an ADS holder are provided in a deposit agreement between the Company, the depositary of the ADSs (JPMorgan Chase Bank, N.A.), and all holders and beneficial owners of the ADSs thereunder.  The depositary holds the ordinary shares that underlie the ADSs.  An ADS holder may surrender its ADSs to the depositary and withdraw the underlying ordinary shares pursuant to limitations set forth in the deposit agreement.

52.     The IPO was conducted subject to a 180-day "lockup agreement."  Pursuant to this agreement, Oatly, the Oatly insiders who sold shares as part of the IPO, and Oatly's "executive officers, board members and holders of substantially all of [Oatly's] outstanding shares" agreed "not to offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise dispose of, directly or indirectly, or enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the ADSs, ordinary shares or such other securities."

## III.     THE DEFECTIVE MAY 2021 OFFERING DOCUMENTS

53.     The Class Period starts on May 20, 2021, the date of the IPO.

### A.     The Offering Documents' Materially Misleading and Incomplete Statements Regarding Retail Market Share and Retail Shelf Space

54.     The Defendants' pitch in the Offering Documents was simple:  "demand for Oatly products has far outpaced our supply" and the "major constraint on our growth" was a lack of

"production capacity."  Accordingly, the Offering Documents emphasized that the proceeds from the IPO would be used to permit Oatly to expand its production capabilities, and thereby allow it to capture its "significant opportunity to satisfy unmet demand and leverage our brand success to expand our product portfolio."  Indeed, the Offering Documents represented that "retail sales data shows that Oatly is the driving force behind the increasing consumer demand for oat-based dairy products," so that Oatly was purportedly well positioned to take advantage of this "significant opportunity" and execute its plans to expand its retail sales in the U.S., Europe, and elsewhere.

55.    The Offering Documents also described how Oatly's "products are sold through a variety of channels, from independent coffee shops to continent-wide partnerships with established franchises like Starbucks [and] from food retailers like Target."  The Offering Documents also specifically cited Target as an example of how Oatly had "successfully expanded [its] distribution from niche foodservice concepts to mainstream retail partnerships" which, according to the Prospectus, allowed the Company "to reach more of the consumer base."

56.    The Offering Documents also repeatedly touted that Oatly was "the leading oatmilk brand by market share in every key market in which we operate."

57.    Similarly, as one of the "Key Factors Affecting Our Performance," the Offering Documents represented that the Company "expect[ed] the retail channel to be a significant source of revenue in the future.  By increasing our distribution points and capturing greater shelf space, continuing to drive velocity increase and increasing our stock keeping unit count, we believe there is meaningful upside for further growth with existing retail customers."

58.    However, unbeknownst to investors, as of the date of the IPO the Offering Documents were materially misleading and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading because the statements in ¶¶54-

57, particularly when read as a whole, created the materially false and misleading impression that Oatly was not then experiencing declines in retail market share and retail shelf space in its "core markets" in the United States and Europe, when in fact:

(a)     as Defendant Petersson would later admit on Oatly's November 15, 2021 conference call to discuss the Company's highly disappointing 3Q 2021 financial results, "during Q1, Q2 [of 2021] we were under great pressure due to supply constraints leading to lower growth rates, lower fill rates, strained relationships with retail[ers], lost market shares, [as] consequences for losing [distribution in] 12 markets in 2020" in Europe;

(b)     as Defendant Hanke would also similarly admit on the same November 15, 2021 call, Oatly had "started 2021 with less shelf space than prior years," and that the situation only worsened during 2021 because "for 2021 we had to scale back a distribution of our products for 12 countries in EMEA" (*i.e.*, Europe), and that the Company would therefore have to look to the future before it "expect[s] to have a better share of shelf";

(c)     as the chart published in the *WSJ* article in March 2022 would also later show (*see* ¶12), Oatly's market share in the U.S. had fallen to roughly 32% in 2019, had fallen again to 28% in 2020, and had continued to decline to only 26% during 2021, such that Oatly was no longer "the leading oatmilk brand by market share" in the U.S.;

(d)     with respect to shelf space, far from Target being a noteworthy example of how Oatly had "successfully expanded [its] distribution from niche foodservice concepts to mainstream retail partnership," as confirmed by Plaintiffs' confidential witness No. 1 ("CW1") – who served as an Oatly Sales Director in the U.S. from

2020 through the latter part of 2021 and whose responsibilities included overseeing U.S. retail sales and distribution – (i) Oatly was suffering from declining shelf space in the United States both before and after the May 2021 IPO, and (ii) Target in particular was actually just one example that CW1 could recall (another being Sprouts Farmers Market) of a large U.S. supermarket company that had reduced their shelf space for Oatly products during this period;

(e)    with respect to the Offering Documents' statements touting Oatly's new retail partnership with Starbucks – a deal inked in March 2021 to have Starbucks launch the use of oatmilk in its drinks using Oatly's oatmilk – as of the IPO Oatly had, as confirmed by the March 2022 *WSJ* article, already lost much of the benefit of this deal when just weeks later (in April 2021) Oatly was unable to supply Starbucks with sufficient product, causing Starbucks to retain another Oatly competitor (SunOpta) in May 2021 to start supplying its needs; and

(f)    as the March 2022 *WSJ* article further reported, shortages exacerbated by Oatly's efforts to try to keep Starbucks and Oatly's most preferred grocers adequately supplied caused other less-preferred grocers to substitute Oatly products on store shelves with those of its competitors – thereby further corroborating CW1's statements that Oatly's shelf space in the United States had already declined in the period leading up to (and after) Oatly's May 2021 IPO, and further confirming that Oatly was also continuing to lose market share in the U.S. during the same period (as it had been since at least 2020).

59.    Further confirming the entirely predictable (but undisclosed) adverse impact on Oatly's business that its declining shelf space and market share woes were already having as of

the IPO, during the six month period immediately before and after the May 2021 IPO (*i.e.* between March 31 and September 30, 2021) – despite the purportedly strong consumer demand for its products – unbeknownst to investors Oatly was actually experiencing increasing difficulties in selling the inventory it had on hand.  For example, as Oatly's 3Q 2021 financial statements revealed, the value of Oatly's unsold product inventory increased by a stunning 215% between March 31 and September 30, 2021.

**B.    The Offering Documents' Materially Misleading "Risk Disclosures" Regarding Retail Shelf Space**

60.    Notably, the Offering Documents also included the following materially misleading "risk disclosures" which described Oatly's potential inability to maintain its retail shelf space and the resulting consequences of such a contingency actually materializing.  Specifically, the Offering Documents represented that:

(i)    the Company "*may* be unable to retain the placement of our products in dairy cases to effectively compete with traditional dairy product"; and

(ii)    "*If* we fail to meet demand for our products and, as a result, consumers who have previously purchased our products buy other brands or our retailers allocate shelf space to other brands, our business, financial condition and results of operations could be adversely affected."

61.    However, these two purported risk warnings set forth in the preceding paragraph, were themselves materially misleading, and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, because they characterized the relevant "risks" – namely the "risk" of being "unable to retain the placement of our products in dairy cases" and the risk of "retailers allocat[ing] shelf space to other brands" – as being merely

contingent events that "might" or "could" occur, when in fact, as of the May 2021 IPO and as detailed above:

      (a)     Oatly had *already* lost retail shelf space to its competitors in the United States and Europe, which in turn,

      (b)     diminished the Company's value and growth prospects as its competitors stepped in to increase their market share at Oatly's expense.

Indeed, during his prepared remarks on a November 15, 2021 investor call, Defendant Hanke admitted that Oatly had "started 2021 with less shelf space than prior years," and that the situation only worsened during 2021 because "for 2021 we had to scale back a distribution of our products for 12 countries in EMEA" (*i.e.*, Europe), and that the Company would therefore have to look to the future before it "expect[s] to have a better share of shelf."

         **C.**     **The Offering Documents' Misleading Statements and Omissions Regarding Its Production Facilities and Efforts to "Ramp Up" Its Production Capacity**

      62.     The Offering Documents also represented that Oatly was poised to capture a "significant opportunity to satisfy unmet demand and leverage our brand success to expand our product portfolio," and conveyed that the Company had made excellent progress, as of the IPO, in expanding its production capacity to satisfy its "unmet demand."

      63.     Specifically, the Offering Documents represented: "As we scale, we believe we have significant opportunity to satisfy unmet demand and roll out our full product portfolio," and "[o]ur ability to grow and meet future demand will be affected by our ability to properly plan for and add global production capacity in our key customer and consumer markets."

      64.     Moreover, the Offering Documents not only represented that the Company "will continue to make significant strategic investments in our manufacturing and production

capabilities, but also discussed how Oatly had significantly ramped up its own production

capabilities before the IPO to meet growing demand.  In particular, the Offering Documents stated:

> We are currently in the process of significantly expanding our existing self and hybrid manufacturing operations at our Landskrona, Sweden and Vlissingen, Netherlands facilities, respectively, with additional capacity available in the first quarter of 2021. In addition, we recently began production at our facility in Ogden, Utah (self-manufacturing), and we expect to begin production at a new facility in Singapore (hybrid) in the first half of 2021 and at a facility in Maanshan in the Anhui province in eastern China (self-manufacturing) during the second half of 2021, achieving approximately one billion liters of finished goods equivalent of oat base capacity by December 2022.  We also recently announced our plans to construct a facility in Peterborough, the United Kingdom.  We are also investing in improvements to our existing facilities and manufacturing equipment.

65.    Similarly, the Offering Documents further put the subject of the Company's

production facilities "in play" by representing that Oatly's facilities had allowed the Company to

"scale our production capacity and address supply shortages" to meet growing demand growth.

Relatedly, the Offering Documents also discussed how (i) "In 2019, we opened one production

facility in the United States and one in the Netherlands"; (ii) "In March 2021, we opened our

second U.S. facility"; and (iii) that  "Three additional facilities in Singapore, Maanshan, China,

and Peterborough, United Kingdom[,] are currently under construction or in the planning stages,

and we continue to expand capacity of our existing facilities."   The Offering Documents also

further represented that:

> (a)    Oatly's global production strategy was based "upon our proven track record and
>
> [ability to] continue to build our production capabilities across each of our regions";
>
> (b)    Oatly's "proven end-to-end manufacturing operations in Sweden demonstrates that
>
> our investment in owned manufacturing capabilities will drive an improved margin
>
> profile due to more favorable economics";
>
> (c)    Oatly's recent investments had dramatically increased the Company's production
>
> capacity, so that, as compared to Oatly's "production capacity of 350 million liters

of finished goods equivalent of oat base" in 2020, Oatly now purportedly "expect[ed] to increase our production capacity to approximately 600 million liters of finished goods equivalent of oat base by 2021, one billion liters by 2022, and 1.4 billion liters by 2023, as measured by finished goods product liters";

(d)    "Our demonstrated end-to-end manufacturing footprint in Sweden proves that our transition to a self-manufacturing footprint will result in an improved margin profile;" and that

(e)    "we believe that as we continue to scale our production capacity, minimize the use of third-party co-packers, identify raw materials sourcing, labor and distribution costs efficiencies, as well as spread other production-related costs over greater manufacturing volumes over time, our manufacturing costs on a per unit basis will decrease and improve our gross margin profile."

In sum, the Offering Documents stressed Oatly's "proven" track record in successfully scaling its operations through expanding existing or opening new manufacturing facilities, which, in turn, would purportedly provide the means to drive volume growth and expand the Company's profit margins.

66.    Moreover, with respect to existing or recent production problems, the Offering Documents represented that Oatly had only experienced "one closure for a few days" in April 2021 at a single production facility – its Vlissengen facility – and some delays due to the COVID-19 pandemic, but that the Company had otherwise "not closed any of our production facilities in response to the pandemic" and remained on track to meet the Company's ambitious production goals. More specifically, the Offering Documents stated:

> To date, other than one closure for a few days at our Vlissengen facility in mid-April 2021, we have not closed any of our production facilities in response to the pandemic,

but we have experienced delays in the construction of our new facilities in Singapore and Ogden and the expansion of our facility in Vlissengen as a result of COVIS-19, and there can be no assurance that there will not be closures or additional delays in the future as a result of the COVID-19 pandemic.

67.     However, the Offering Documents representations at ¶¶62-66 above, touting the Company's "proven" track record of expanding its production capacity, as well as its other production-related statements (including its representations that Oatly had only experienced "one closure for a few days" at a single production facility and had not otherwise closed any of its production facilities in response to the COVID pandemic), were materially false, misleading and incomplete because, unbeknownst to investors, the Offering Documents failed to disclose the following material facts which existed as of the May 2021 IPO:

(a)     that Oatly's Vlissengen facility had closed and suffered severe disruptions for a sustained period of time from at least mid-April until May 2021, and had caused Oatly to suffer a multi-million-dollar sales hit to its second quarter 2021 financial results (*see also* ¶¶92-94 below);

(b)     that, in addition to construction delays, Oatly's new Ogden facility had suffered significant startup-related headwinds in the first and second quarters of 2021, and was in fact running materially behind schedule (*see also* ¶¶92-94 below);

(c)     that Oatly had planned, and ultimately did, shut down its Landskrona production facility in May 2021, meaning that three of Oatly's four major production facilities had significant adverse events that predated the IPO (*see also* ¶¶92-94 below);

(d)     that, as a result of (a)-(c) above, rather than growing, Oatly's finished goods production volumes had materially declined by the time of the IPO, and were on track to decline by 4.6 million liters of finished goods equivalent, or 13%, in May

2021, and so Oatly was materially behind in its plans to expand and ramp up its production capacity (*see also* ¶¶92-94 below);

(e)     that, as a result of (a)-(d) above, Oatly was suffering from a materially lower growth rate, lower fill rates, strained relationships with retailers and lost market share;

(f)     that, as a result of (a)-(e) above, Oatly was also suffering from higher production and logistical costs and a negative consumer mix shift, as a result of which, the Company's gross margins were on track to plummet over 300 basis points in the second quarter of 2021 and would decline even further in third quarter of 2021; and

(g)     that, as a result of (a)-(f) above, the Offering Documents' claims about Oatly's growth rate and profitability, in addition to its statements regarding its production capabilities and expansion efforts, were also materially misleading.

### D.     The Offering Documents' Misleading Statements Regarding Rising Costs of Key Ingredients and Their Almost Certain Adverse Impact on Oatly's Post-IPO Profitability and Margins

68.     As Oatly's name implies, oats are the most important ingredient in the Company's products.  Rapeseed oil is the Company's second most important ingredient, and both oats and rapeseed oil are essential to manufacturing oat base – the foundation of all Oatly products.  Thus, a ready supply of oats and rapeseed oil, at reasonable prices, is critically import to Oatly's business and operating margins.

69.     Unfortunately for Oatly investors, however, 2021 was a difficult year for maintaining profit margins for companies like Oatly that needed to purchase large quantities of oats and rapeseed oil, as prices for post-IPO delivery for both commodities had increased sharply in relation to historical averages during the pre-IPO period.  Indeed, as shown below, futures contract prices for oats (for delivery in the second half of 2021) had already started to increase in

the second half of 2020, and futures contract prices for post-IPO delivery of rapeseed oil had begun to climb in January 2021.

70.     A commodity futures contract is an agreement to buy a specified amount of a commodity at a set point in the future for an agreed-upon price.  Oat futures are actively bought and sold on the CME.  Each CME future represents a contract for 5,000 bushels of oats, which is deliverable on the second business day following the last trading day of the delivery month.  CME oat futures contracts are monthly contracts, with deliveries in March, May, July, September, and December of each year, with two deliveries in July and September.  Each CME oat future is listed on the exchange 10 months prior to its delivery date.  Consequently, the published prices for CME oat futures contracts are a reliable measure of the current expected cost of procuring oats for delivery on the future date specified in the contract.  The graph below shows the daily closing prices (beginning in May 2020 and ending on November 15, 2021) for the various CME oat futures for delivery in May, July, and December of 2021 (with the white line showing the price for May 2021 delivery, and the blue, orange, and purple lines showing the prices for oat futures for delivery in July, September, and December 2021, respectively):

**CLOSING CME OAT FUTURES PRICES FOR MAY, JULY, SEPTEMBER, AND DECEMBER 2021 DELIVERY**



71.    Rapeseed futures contracts are actively bought and sold on the Euronext exchange. Each Euronext rapeseed future represents a contract for delivery of 50 tons of rapeseed oil for delivery in February, May, August, or November of a given year at one of several ports throughout Europe.  Each Euronext rapeseed future is listed on the exchange 10 months prior to its delivery date.  Consequently, the published prices for Euronext rapeseed futures are a reliable measure for the current expected cost of acquiring rapeseed for delivery on the future date specified in the contract.  The graph below shows the daily closing price for a Euronext rapeseed futures contract for delivery on the next available (or "active") delivery date, as reported for the period from May 2020 through November 15, 2021:

27

**CLOSING EURONEXT RAPESEED OIL FUTURE PRICES
FOR 10 MONTH DELIVERY**



72.    In sum, as can be seen clearly from the graphs above, the cost of oats and rapeseed oil for delivery in the latter, post-IPO portion of 2021, had increased sharply in the period leading up to the May 2021 IPO (and continued to increase even after the IPO).

73.    However, the Offering Documents failed to disclose this then-existing materially adverse trend in the pricing of both of these raw ingredients (or the almost certain adverse impact that these adverse price trends would predictably have on Oatly's post-IPO operating margins compared to recent years) – but instead misleadingly advised investors only that the Company's business "could" be adversely affected if it was unable to continue to buy its raw materials on favorable terms.

74.     Tellingly, the Offering Documents went to considerable lengths to discuss the importance of Oatly's ability to obtain steady sources of these products at favorable prices.  For example, with respect to "sourcing," the Offering Documents stated:

> Sourcing oats.  We source oats from regional millers, and we secure regional supply and capacity while minimizing transportation distance and expenses.  Within our regions, we work with farmers to implement sustainable agricultural strategies for oat cultivation, as well as actively seek to aid meat and dairy farmers to increase the amount of crops they grow for human consumption. . . .
>
> *Rapeseed oil and other strategic ingredients.*  We source non-GMO rapeseed oil. For our products produced in EMEA, we source from Sweden, and for products produced in the United States, we source from Canada. . . .
>
> * * *
>
> We currently work closely with five oat suppliers to source our oats – we have one supplier in Belgium, one in Malaysia, two in Sweden and one in the United States. We have agreements in place with each of these suppliers and believe that the terms contained in these agreements are customary for such suppliers in our industry. Under each of these agreements, we are required to provide forecasts of our anticipated needs for certain periods of time to assess the supply we will require for the upcoming term, and the oats supplied under each of these agreements are subject to certain quality control and sustainability requirements.  [Emphasis in original.]

75.     The Offering Documents further described how Oatly's supply agreements with its Belgian, Malaysian and U.S. suppliers had "terms of three years, which began on January 1, 2019, January 1, 2021 and October 1, 2019, respectively, with an automatic renewal for an additional two years thereafter;" that its agreement with one of its Swedish suppliers was "a framework agreement . . . that remains in effect until further notice and may be terminated by either party [on] six months' notice," and that its agreement with its other Swedish supplier "remains in effect until either party provides at least 24 months' notice."

76.     With respect to the prices that Oatly had to pay for its key raw materials, the Offering Documents noted their obvious importance – but then said nothing about the then-existing and materially adverse pricing trends that were plainly facing the Company as of the IPO.  Instead,

after noting that Oatly's business might be adversely affected *if* it were to face "reduced or limited availability of oats or other raw materials that meet our quality standards," the Offering Documents simply stated (without elaboration) that Oatly's "financial performance depends in large part on . . . the purchase of raw materials" at "competitive prices" or "on favorable terms."

77.     With respect to prices of its raw materials, the Offering Documents also noted that such prices "could" be volatile, in which case "higher costs" would almost certainly "adversely affect our business."  Specifically, the Offering Documents stated that (i) "Ingredient . . . costs are volatile and may rise significantly, which may negatively impact the profitability of our business"; and (ii) "If we are not successful in managing our ingredient and packaging costs or the higher costs of sustainable materials, if we are unable to increase our prices to cover increased costs or if such price increases reduce our sales volumes, then such increases in costs will adversely affect our business, financial condition and results of operations."

78.     However, the Offering Documents statements at ¶¶74-77 above, were materially misleading and omitted to state material facts required to be stated therein, or necessary to make statements therein not misleading, because they conveyed the materially misleading impression that Oatly was positioned as of the IPO to continue to acquire its essential raw materials on favorable terms, or at least on terms that were not materially worse than what it was currently paying.

79.     Moreover, the "risk disclosure" statements in the Offering Documents referenced at ¶¶76-77 above, were materially misleading and omitted to state material facts required to be stated therein or necessary to make statements therein not misleading, because they merely warned investors that pricing volatility "might" cause prices for those materials to rise significantly – when,  in fact, nowhere did the Offering Documents disclose either that (i) the prices for future

delivery of oats and rapeseed oil in the post-IPO period had *already* increased dramatically as of the IPO, or (ii) that such increases would likely have a material adverse impact on Oatly's business and margins going forward.

## IV.    THE EXCHANGE ACT DEFENDANTS MADE ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AFTER THE IPO

80.    After the IPO, the Exchange Act Defendants made additional materially false and misleading statements.

81.    For example, in its August 16, 2021 press release announcing the Company's second quarter 2021 financial results (which was also filed with the SEC on a Form 6-K later that day (the "August 2021 Release") and separate Form 6-K which contained the Company's financial statements for the three and six months ended June 30, 2021 the "2Q 2021 Financials"), the Company represented that its success in "capturing greater shelf space" had helped "drive[] net revenue growth" and positioned it to "leverage [its] brand success across . . . sales channels" (including retail sales) to increase growth.

82.    However, the statements in ¶81 that Oatly was "capturing greater shelf space" and was positioned to "leverage [its] brand success across . . . sales channels" were both materially false and misleading because they failed to disclose that, in fact, Oatly's retail shelf space in Europe and the United States had been *declining* since at least late 2020 (and was continuing to decline), and that as a result, Oatly had been losing (and was continuing to lose) significant market share to its competitors, including in its critical U.S. market.

83.    In addition, during the Company's earnings call with analysts held later that day, Defendant Petersson stated that, "certain COVID-19 and start-up manufacturing headwinds [adversely] impacted our revenue by approximately $12 million to $14 million," equal to roughly 8% to 9.5% of the Company's $146 million in 2Q 2021 revenues.  Similarly, Defendant Hanke

referred to Oatly's 2Q revenues having been adversely impacted "by approximately $12 million to $14 million of COVID-19 and startup-related manufacturing headwinds to sales that we experienced in the quarter at our Vlissingen, Netherlands and Ogden, Utah facilities." However, Petersson also went out of his way to reassure investors that "[i]mportantly, these [headwinds] are behind us, and we are expanding global production capacity every month to support out long-term growth."

84.    Although Defendants' statements constituted a partial disclosure of the extent to which Oatly had already been adversely impacted by material production problems as of the IPO, Defendant Petersson's further representation that the Company's "start-up manufacturing headwinds . . . . [are now] behind us" was materially false and misleading, as the Company was still continuing to experience significant problems expanding and ramping up its production capacity as of August 16, 2021. Indeed, as Defendants would admit just a few months later, the Company continued to be significantly behind on building out its production capacity and the numerous production issues that Oatly had identified in its August 2021 disclosures had *not* yet been resolved or put "behind us," and had in fact been worsening. For example, as of mid-August 2021 (but as Defendants would not disclose until November 15):

(a)    Oatly's Ogden facility was *still* suffering from material mechanical and automation problems, as evidenced by the fact that these problems (together with certain other adverse matters) adversely impacted Oatly's third quarter 2021 revenue by millions of dollars;

(b)    Oatly's "scaling challenges" at its Ogden facility during the 3Q 2021 had been sufficiently severe enough that they were a major factor in driving down the Company's gross margins for the quarter; and

(c)     there was a "quality issue" at one of Oatly's production facilities that would "probably result in the destruction of inventory and corresponding lost sales in the EMEA region" – a quality issue that was later revealed to relate to loose metal items identified in processing equipment in Oatly's Landskrona production plant in Sweden (the same plant that the Company had purportedly closed "for maintenance" in May 2021).

85.    During the Company's August 16, 2021 investor call, Petersson also represented that "in terms of our core ingredients of oats, we have contracts and supply in place to grow revenue at the rate we expect for 2021 and beyond." Defendant Hanke went even further, stating, in response to an analyst's questions about the impacts of "raw material inflation" on Oatly's business going forward, that "in terms of oats . . . I think we have the supply secured for '21 and '22" and "we have secured the supply for the next few years."

86.    However, the statements referenced in the preceding paragraph were materially false, misleading and incomplete because they failed to disclose that Oatly did not in fact have oat "contracts and supplies in place" (including "for 2021" and "the next few years") at prices that would protect the Company from suffering significant price increases, compared to what is was currently paying. Indeed, as the Company would also be forced to announce just a few months later, on November 15, 2021, as of the IPO, Oatly's cost of goods sold were materially increasing due to the skyrocketing cost of purchasing oats, thereby predictably adversely impacting the Company's margins.

## V.    THE TRUTH BEGINS TO EMERGE

87.    The undisclosed adverse truths about Oatly's business, operational problems and deteriorating shelf space and market share began to emerge on July 14, 2021, when before the market opened, Spruce Point issued its report entitled, "Sour on an Oat-lier Investment." The 124-

page Report (which became available online that same day) detailed a wide array of misconduct and misstatements by Oatly.  The Spruce Point Report was based on Spruce Point's close review of Oatly's financial statements and other public statements, as well as on its interviews of former Oatly employees, site visits, and other investigative work.

88.     The Spruce Point Report noted concerns about "loss of market share in Sweden and the U.S." and, also discussed how Oatly had consistently failed to adequately disclose the risks posed by price increases in oats and rapeseed.  For example, as the Spruce Point Report stated:

> Oatly highlights and discloses risks to foreign exchange, interest rates, credit, and liquidity, but doesn't say a word about commodity risk.   Yet, in its 2019 Sustainability Report oats and rapeseed oil were 87% and 7% of purchase volumes. Furthermore, Canada has historically supplied 10% of Oatly's total oat needs and is critical to fueling its U.S. growth. . . .  This appears to be problematic as Canadian oat production was recently forecasted to decline by the USDA. . . .

> Oat prices and rapeseed oil, as measured by futures contracts, are up sharply in 2021. Curiously, Oatly fails to say anything about the effect of these commodity prices on its business prospects.

89.     The Spruce Point Report received significant media attention.  For example, on the same day that the Report was issued (July 14, 2021), CNBC published a story about how the "activist short Spruce Point" had made a variety of serious allegations challenging the truthfulness of Oatly's prior public disclosures, and on the morning of July 15, 2021 *Fortune* published an article entitled "Wild Oats? Inside Spruce Point's 124-Page Attack Alleging Mismanagement and False Claims At Oatly" (and which described the Report as "the result[] of an extensive investigation into Oatly").

90.     In response to the revelations contained in the Spruce Point Report and related media coverage, the price of Oatly ADSs – which had closed at $21.13 per ADS on July 13 – fell to $19.48 at the close on July 15, 2021, for a two-day decline of 8.8% on unusually high trading volume on both days.  Moreover, that decline would almost certainly have been even greater but

for the fact that Defendant Oatly issued a vigorous public denial of all of the charges levelled against it in the Report at roughly mid-day on June 14, 2021.

91.    On August 16, 2021, Oatly issued its August 2021 Release announcing the Company's financial results for the second quarter of 2021, and it also issued its 2Q 2021 Financials (filed on Form 6-K) containing Oatly's financial statements for the three and six months ended June 30, 2021.

92.    The Company's August 16 disclosures revealed extremely disappointing financial results for the 2Q 2021 (the same quarter as the IPO), disclosing that Oatly had achieved revenue of only $146.2 million.  The Company also disclosed that it had generated only $38.6 million of gross profit at a 26.4% gross profit margin.  The Company further disclosed that it had suffered severe manufacturing delays at its Ogden and Vlissingen facilities which, together with adverse impacts from the COVID-19 pandemic, negatively impacted sales by $12 to $14 million for the quarter.  Notably, the start-up headwinds for Oatly's Ogden facility appeared separate from the COVID-19-related "construction" delays noted in the Offering Documents, because that facility had begun production (and thus was apparently no longer under construction) in March 2021 – prior to the start of the 2Q 2021.  Oatly further disclosed that its gross margin had been negatively impacted by, *inter alia,* higher logistics expenses, a negative consumer mix shift, and a higher share of co-packing production (which was presumably a consequence of Oatly's own production problems).  All told, the Company reported a staggering $59.1 million net loss for the quarter, more than twelve times Oatly's $4.8 million net loss in the prior year period.

93.    That same day, Oatly hosted an earnings call to discuss the Company's 2Q 2021 financial results.  A slide presentation accompanying that presentation showed that, rather than growing as represented in the Offering Documents, the Company's finished goods production

volume had, in fact, *declined* by 4.6 million liters of finished goods equivalent, or 13%, in May 2021, as a result of plant closures and similarly adverse production impacts. When an analyst asked about the significant decline in Oatly's production during the month, Defendant Petersson confirmed that the "Vlissengen [plant] was a big hit for us during Q2."

94.    Moreover, later in the conference call, Defendant Hanke conceded that the production plant shutdowns had preceded the IPO, stating:

> [W]e did have a planned maintenance stop on Landskrona as we had for our plants every now and then, right? So that occurred in May, so that's part of the explanation that you see, It was – the plant was shut down.
>
> And then we also have the Vlissengen COVID impact that occurred in April that had sort of a lag into may as well. So these are the two touch points for the dip in May.

95.    In anticipation of the release of the announcement of highly negative 2Q 2021 financial results, financial markets had already priced in most of the adverse impact of the August 16 disclosures three trading days earlier (on August 11, 2021). As a Benzinga report published on August 11 and entitled "Why Oatly's Stock is Trading Lower Wednesday [i.e. on August 11] stated, Benzinga attributed the sharp 8.7% decline in Oatly shares that day (from $19.07 at the close on August 10 to $17.41 at the close on August 11) to further pressure from Spruce Point, which had issued the following earnings warning earlier that day:

> Things that make you go … Hmmm. [Oatly] will report earnings on August 16th, the absolute last day possible they must file with the SEC. Loads of academic research points to companies pushing off bad news, and pulling fwd good news.

In sum, (a) on August 11, 2021, the price of Oatly shares fell 8.7% in anticipation of Oatly's reporting of materially negative news on August 16, and (b) Oatly shares then fell a further combined 10% (from $16.87 at the close on Friday, August 13) between August 16 and August 18, in response to the actual news on August 16 being even worse than expected, and in response to subsequent negative analyst commentary and downward price target revisions on August 17 and

18 by Credit Suisse, Truist, and Morgan Stanley, resulting in (c) a total price decline of roughly 20% from a closing price of $19.07 per ADS on August 10, down to $15.16 per ADS by the end of trading on August 18.

96.     Indeed, but for Defendants having also made a number of materially false or misleading statements on August 16, the price of Oatly shares would have dropped still further. For example, on August 16, the Exchange Act Defendants also misleadingly reassured investors that, *inter alia*, the Company had been "capturing greater shelf space" and was positioned to "leverage [its] brand success across . . . sales channels," that "COVID-19 and start-up manufacturing headwinds" that had battered Oatly's performance earlier in the year were now behind it, and that the Company had adequate contracts for the supply of future raw materials – when in fact Oatly's retail shelf space in Europe and the United States had been *declining* since at least late 2020 (and was continuing to decline), that Oatly had been losing (and was continuing to lose) significant market share to its competitors, that the Company's production "headwinds" were in fact *not* behind it, and that the Company would almost certainly be facing skyrocketing raw materials prices going forward. Accordingly, the truth about Oatly remained concealed.

97.     On November 15, 2021, Oatly announced its third quarter financial results, which disclosed that it suffered a quarterly operating loss of over $44 million, and that its gross profit margins had fallen year-on-year to only 26.2% (compared to 32% in the third quarter of the prior year, 2020) – a staggering 15% decline.[3] While the November 2021 Release tried to put a positive spin on Oatly's deteriorating business and operations, it also disclosed that the Company needed

---

[3]     The results were announced in a November 15 press release (the "November 2021 Release"), which included Oatly's interim condensed consolidated financial statements for the three and nine months ended September 30, 2021 (the "3Q 2021 Financials"), which were both filed with the SEC on separate Form 6-K's.

to revise its fiscal year 2021 revenue projection downwards by over 7%, from $690 million to $635 million.

98.     Defendants' November 15 disclosures also confirmed that Oatly's shelf space had not only failed to grow during 2021 in Europe, but in fact had been *declining* for at least the two financial quarters prior to Oatly's IPO (and had continued to decline thereafter).  For example, as Defendant Hanke admitted during the earnings conference call held later that same day (but also before the market opened) (the "November 15 Call"), Oatly had "started 2021 with less shelf space than prior years", and indeed "for 2021 we had to scale back a distribution of our products for 12 countries in EMEA" (*i.e.*, Europe).  On the same call, Defendant Petersson also stated:

> [I]f I just – let me just walk you through what's happened here from Q1 to Q4 to better – to give you better colors on what's going on here.  So during Q1, Q2, we were under great pressure due to supply constraints leading to lower growth rates, lower fill rates, strained relationship with retail[er]s, lost market shares, consequences for losing 12 markets in 2020.

In short, far from being mere "risks," in November investors belatedly learned that, as of the IPO, Oatly's shelf space had already declined, causing the Company to "los[e] market share" and suffer "strained relationships" with its retailers in 12 important markets in its core European region.  Indeed, after being peppered with questions from stock analysts about Oatly's shelf space declines in Europe, Petersson was forced to concede near the end of the call that "the shelf space is a significant thing."

99.     Defendants' November 15 disclosures were similarly illuminating with respect to the undisclosed trends of the rising prices to purchase future deliveries of oats and rapeseed oil.  Defendant Hanke said on the November 15 Call, that the Company now expected "inflationary pressure to impact our cost of goods sold more broadly as with the oat prices and other commodity prices . . . increasing."  Hanke then confirmed that "oats account for 8% to 9% of our total cost of goods sold" and that "rapeseed oil, which accounts for approximately 3 to 4 percentage points of

our total cost of goods sold continued to be higher versus second quarter and the third quarter of last year." Hanke later reiterated these points stating, "that an impact on several of our key ingredients and cost components [was] driven by a major increase in the cost of oats in the range of 10 to 35% depending on the region and site" and "further increase for rapeseed oil of 25%." To offset these known trends, Oatly was now going to have to implement "price increases in EMEA and the U.S.," in an effort to try to improve the company flagging gross profit margin. This was a far cry from Hanke's assurances just three months earlier that Oatly had "secured the supply [of oats] for the next few years."

100.    Defendants' November 15 disclosures also belatedly confirmed that the rising prices for oats and rapeseed oil were negatively impacting the Company. Specifically, the November 2021 Release and the 3Q 2021 Financials included a new "Risk Factor" for the Company: "the impact of rising commodity prices . . . on our cost of goods sold."

101.    Defendants also admitted that production problems were continuing to drag down Oatly's revenues. For example, on the November 15 Call, Defendant Petersson admitted that "in the Americas region, we were approximately US$3 million below [our] plan for quarter three" and that "[t]his was primarily due to lower-than-expected production output at our Ogden, Utah self-manufacturing facility." Petersson further admitted that the Ogden plant "experienced mechanical and automation issue[s] in August during our production ramp up, which slowed our production progress versus our plan." Tellingly, August 2021 was the same month that Defendant Petersson assured investors that production issues at Ogden "are behind us." Indeed, as Defendants would admit just a few months later, on November 15, 2021, the Company had fallen significantly behind on building out its production capacity and numerous production issues which Oatly had identified in connection with its discussion of its 2Q 2021 financial results, had still not been resolved and,

in fact, had worsened. For example, not only was Oatly's Ogden facility still suffering from mechanical and automation problems (which, together with foodservice location closures in Asia and a truck driver shortage in the United Kingdom), but the Company admitted that its gross margin had been negatively impacted by, *inter alia,* higher logistics expenses and scaling challenges at its Ogden facility.

102.    The Company also admitted on November 15, that there was a "quality issue" at one of the Company's production facilities that "will probably result in the destruction of inventory and corresponding lost sales in the EMEA region" – a quality issue that was later revealed to relate to loose metal items identified in processing equipment in Oatly's Landskrona plant (the same plant that the Company had closed for maintenance in May 2021).

103.    As noted above, on the November 15 Call, Defendant Petersson also admitted that "during Q1, Q2, we were under great pressure due to supply constraints leading to lower growth rates, lower fill rates . . . ." During the call, Defendant Petersson likewise referred to the "lows" in connection with Oatly's fill rate that the Company had experienced "in *pre*-summer" – further confirming the extent to which, unbeknownst to investors, Oatly had been experiencing material adverse production problems that had begun *before* (and continued after) the IPO.

104.    The November 15 Call was accompanied by a slide deck that was distributed to Oatly's investors. Slide 22 of that presentation (reproduced below) showed a marked decline in Oatly's production capacity in May 2021, the month of the IPO, stuttering increases in from June 2021 to July 201, a dramatic decline in production of about 16% in August 2021 and then gradual increases in September and October, 2021. What is most significant, however, is the overall trajectory of the trend in Oatly's production of finished goods. According to this slide, by the end of October 2021, the Company had purportedly produced 379.9 liters of finished goods (*i.e.*, oat

base) in 2021. This was a pace that was well below what would have been needed to generate the "approximately 600 million liters of finished goods equivalent of oat base by 2021" touted in the Offering Documents,[4] and shows that the Company's production expansion and ramp-up was significantly behind schedule going back to at least May 2021, the month of the IPO. Indeed, as the Company would report with its full-year 2021 results, Oatly would end up producing only around 470 million liters of oat base in 2021.



105.    Additional information disclosed for the first time in Oatly's 3Q 2021 financials further confirmed how Oatly's business and growth opportunities were suffering predictable material adverse harm as a result of its declining shelf space, declining market share and related "strained relationships" with retailers. Indeed, the 3Q 2021 financial statements confirm that Oatly's business was so disrupted by such problems that the Company – despite purportedly strong

---

[4]    For example, even assuming that the last two months of 2021 (i.e., November and December 2021) hit 60 million liters – level that Oatly had never hit before – it would have resulted in less than 500 million liters for the full year (compared to the 600 million referenced in the Offering Documents).

demand at the consumer level – was having problems selling all of the product that it was actually able to manufacture.  Specifically, as the 3Q 2021 financials revealed, the Company's inventory of unsold goods actually increased nearly 215% between March 31, 2021 and September 30, 2021. The chart below shows the dollar value of Oatly's inventory of "finished goods" (*i.e.*, product that is fully manufactured and ready to sell, but remains unsold)  as reported as of March 31, June 30 and September 30, 2021:



106.    The massive increase in Oatly's unsold inventory between March 30 and September 30 of 2021 should never have happened if it was true that Oatly could "never be able to make enough oat milk" to satisfy its retailers and other customers.  That Oatly's unsold supply of finished products increased so sharply during this period is further confirmation that Oatly's previously undisclosed loss of shelf space and declining market share had a materially adverse on the Company business.

107.    In response to Defendants' corrective November 15 disclosures, the price of Oatly ADSs plummeted 20.81% in one day, falling from a closing price of $11.82 on Friday, November 12, to close at only $9.36 on November 15, on unusually heavy trading volume.  The November

15 closing price of $9.36 represented a nearly 45% decline in value from the $17.00 per ADS price of the May 2021 IPO.

108.    On March 14, 2022, the *WSJ* published an expose entitled, "Oatly's Growing Pains Trip Up Pioneer of Oat Milk."  The sub-title of that article was "Competitors – including diary giants – have stepped in to fill the gaps with oat products and Oatly struggles to produce more and build its own factories."  As reported by the *WSJ*, Oatly is "falling behind on the one thing it was supposed to do:  make oat milk."  The article further confirms many the key allegations in this action.

109.    In preparing the March 14 article, the *WSJ* stated that it had reviewed internal Company documents and interviewed "employees and former executives."  That investigation uncovered how a "troubled U.S. expansion left [Oatly] unable to fully capitalize on the demand it created, leaving an opening for competitors from more-established food companies to gain ground."  According to the article, "Oatly struggled to build and operate factories in the U.S."

110.    The *WSJ* further reported, based upon proprietary NielsenIQ data, that Oatly's share of the U.S. retail oatmilk market had steadily declined from 2018 through 2021 – while (as shown in the chart below) during this same period the market shares of Oatly's competitors increased:



Top brands' share of U.S. retail oat milk market

Source: Annual NielsenIQ data via industry analyst

111.    In short, as the *WSJ* confirmed, in the face of these competitors "Oatly lost market share in the U.S., capturing about 26% of retail sales in 2021, down 6 percentage points since 2019." The *WSJ* article also confirmed that Oatly's shelf space in the United States has declined and gives the example of Festival Foods, a "Wisconsin-based grocer" that ultimately "cut Oatly's presence in [its] chain's dairy cases and add[ed] other options such as Planet Oat and Silk, made by Danone."

## VI.    DEFENDANTS' DUTY TO DISCLOSE UNDER ITEMS 303 AND 105 OF REGULATION S-K

112.    Item 303 of Regulation S-K, 17 C.F.R. 229.303, requires companies, in their

registration statements to:

> Describe any known trends or uncertainties that have had or that the
> registrant reasonably expects will have a material favorable or
> unfavorable impact on net sales or revenues or income from
> continuing operations.  If the registrant knows of events that will
> cause a material change in the relationship between costs and
> revenues (such as known future increases in costs of labor or materials
> or price increases or inventory adjustments), the change in the
> relationship shall be disclosed.

113.    Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall

focus specifically on material events and uncertainties known to management that would cause

reported financial information not to be necessarily indicative of future operating results or of

future financial condition."   17 C.F.R. § 229.303(a) (Instruction 3).   The SEC's interpretive

releases regarding Item 303 further clarify that the Regulation imposes a disclosure duty "where a

trend, demand, commitment, event or uncertainty is both [1] presently known to management and

[2] reasonably likely to have material effects on the registrant's financial condition or results of

operations.  *See. e.g.*, MANAGEMENT'S DISCUSSION & ANALYSIS OF FIN. CONDITION & RESULTS OF

OPERATIONS, Securities Act Release No. 6835, Exchange Act Release No. 26,831, 1989 WL

1092885, at *3 (May 18, 1989).  Importantly, the SEC has also emphasized that Item 303 is

"intended to give the investor an opportunity to look at the company through the eyes of

management by providing both a short and long-term analysis of the business of the company . . .

with particular emphasis on the registrant's prospects for the future." *Id.*  Thus, "material forward-

looking information regarding known material trends and uncertainties is required to be disclosed

as part of the required discussion of those matters and the analysis of their effects." COMMISSION

GUIDANCE REGARDING MANAGEMENT'S DISCUSSION & ANALYSIS OF FIN. CONDITION & RESULTS OF OPERATION, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 21, 2003).

114.    While Oatly's Registration Statement was filed on Form F-1, it still was required to comply with Item 303 under all circumstances. Part I of Form F-1, entitled "Information Required in Prospectus," governs the nature and content of information included therein in connection with an offering, such as the IPO. Item 4 of Part I, entitled "Information with Respect to the Registrant and the Offering," requires, in subpart (a) thereof, disclosure of the "[i]nformation required by Part I of Form 20-F." In turn, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods.*" (Emphasis in original.) Specifically, Item 5(D), entitled "Trend information," provides:

> The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

115.    Consequently, the scope of the information whose disclosure is required under this paragraph is coextensive with that required under Item 303.

116.    As described above, there were at least four known "trends, uncertainties, demands, commitments or events" that existed as of the IPO that the Registration Statement was required to, but did not, disclose in violation of Item 303 of Regulation S-K and Item 5 of Part I of Form 20-F, namely:

(a)     Oatly's ongoing material decline in retail market share in the United States and Europe, as detailed at ¶¶58, 98, 110-111, above;

(b)     Oatly's on-going material decline in retail shelf space in the United States and Europe, as detailed at ¶¶58, 98, 111, above;

(c)     the adverse facts concerning Oatly production setbacks problematic conditions, as detailed at ¶¶67, 92-94, 101, 104, above; and

(d)     the ongoing material adverse trends in the cost to acquire oats and rapeseed oil for delivery in the months following the IPO, as detailed at ¶¶69-72, 88, 99-100, above.

117.    At the time the Registration Statement for the May 2021 IPO was filed, these adverse trends, events and related uncertainties were readily apparent and known to Defendants, and were reasonably likely to (and ultimately did), have a material adverse impact on the Company's financial condition and results of operations, and accordingly, appropriate disclosure of them was required in the Registration Statement.  As a result, Defendants caused Oatly to violate Item 303 of Regulation S-K, by failing to disclose these adverse trends, events and related uncertainties to the marketplace.

118.    Additionally, the Offering Documents failed to adequately disclose certain of Oatly's most material risks as of the IPO in violation of Item 105 of SEC Regulation S-K ("Item 105"), 17 C.F.R. §229.105.  Item 105 requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  Specifically, Item 105 requires a company to "[e]xplain how each risk affects the registrant or the securities being offered," and each risk factor should be set forth under a subcaption that adequately describes the risk."  Item 3 of Part I of Form F-1 also requires a foreign private issuer, such as Oatly, to "[f]urnish the information required" by Item 105.

119.    The Registration Statement violated Item 105, by failing to disclose the risks attendant to the adverse facts alleged above concerning,

(a)    Oatly's ongoing material decline in retail market share in the United States and Europe, as detailed at ¶¶58, 98, 110-111, above;

(b)    Oatly's on-going material decline in retail shelf space in the United States and Europe, as detailed at ¶¶58, 98, 111, above;

(c)    The adverse facts concerning Oatly production setbacks problematic conditions, as detailed at ¶¶67, 92-94, 101, 104, above; and

(d)    the ongoing material adverse trends in the cost to acquire oats and rapeseed oil for delivery in the months following the IPO, as detailed at ¶¶69-72, 88, 99-100, above.

These risks were not disclosed, even though they were some of the most material factors that made an investment in Oatly ADSs speculative or risky.

120.    Furthermore, the purported "risk disclosures" contained in the Offering Documents and referenced at ¶¶60, 76-77, above were themselves materially misleading, as they purported to discuss potential or contingent risks that might impact the Company in the future, while failing to disclose that these "risks" had already materialized as of the IPO.

121.    Accordingly, the Offering Documents' "risk disclosures" mischaracterized and omitted material facts necessary to accurately gauge each risk's nature, potential magnitude and likelihood of transpiring, as well as the fact that certain so-called "risks" had already materialized as of the IPO, and thus violated Item 105's affirmative obligations to "adequately describe" the material factors that made an investment in Oatly ADSs "speculative or risky."

48

VII.    **ADDITIONAL SCIENTER ALLEGATIONS**
        **(As to Claims Asserted Herein Under the Exchange Act that Require Proof of**
        **S*cienter*.)**

122.    With respect only to their claims asserted under the Exchange Act that require that Plaintiffs adequately allege that one or more of the Exchange Act Defendants made any of the material misrepresentations or omissions as alleged herein with *scienter,* Plaintiffs allege that the requisite strong inference of *scienter* is supported by the totality of the following facts and the reasonable inferences that can be drawn therefrom, construed collectively and in their entirety:

A.    **The Exchange Act Defendants' Knowledge of, or Access to, Information**
      **Indicating that Their Statements Were Materially False, Misleading of**
      **Incomplete**

123.    Oatly and the Individual Exchange Act Defendants knew that (i) Oatly's retail market share in the United States and Europe was declining both before and after the May 2021 IPO; (ii) Oatly's retail shelf-space was declining in the United States and Europe, both before and after the May 2021 IPO; (iii) Oatly's failing attempts to expand or "ramp up" its production capacity; and (iv) the costs to purchase future deliveries of oats and rapeseed oil were skyrocketing before the May 2021 IPO, and would (and did) materially increase the cost to manufacture all of Oatly's products.  The Individual Exchange Act Defendants' knowledge of these facts is demonstrated by, or least strongly inferable from, in particular, the following:

(a)    The Offering Documents state that they "reference information and statistics regarding the industries in which [Oatly] operat[s]", and that the Company "obtained this information and statistics from various independent third-party sources."  One of those "sources" was "NielsenIQ," which is the same source the *WSJ* used to determine that Oatly's market share was declining in the United States. The Offering Documents also identify other data sources from Nielsen and IRI Infoscan, which tracked retail sales in the United States, Germany, the United

49

Kingdon and Sweeden, which contained data concerning Oatly's market share and shelf-space. It is implausible that Oatly and the Individual Exchange Act Defendants would have this data, make representations to investors in the Offering Documents based upon this data, and not know about Oatly's declining retail market share and shelf space in both the United States and Europe;

(b)    Similarly, the Offering Documents and the Individual Defendants' post-IPO statements make clear that they were tracking Oatly's production capacity. For example, on August 16, 2021, Petersson told investors about production delays at the Ogden, Utah plant and then claimed that these problem "are behind us." Similarly, the number of liters of oat based produced each month was regularly shared with investors, which further demonstrates that the Company was actively tracking this metric; and

(c)    The Individual Exchange Act Defendants also made statements about Oatly's market share, shelf space and key ingredient costs, which showed that they were tracking these measures. For example, on August 16, 2021, both Petersson and Hanke assured investors that the Company had already secured a sufficient supply of oats and advantageous prices. Similarly, on November 15, 2021, Hanke stated unequivocally that the Company had "started 2021 with less shelf space than prior years" as part of his prepared remarks to investors. Petersson, on this same call, also confirmed that "during Q1 [and] Q2" of 2021 that Oatly "lost market shares, as consequences for losing 12 markets in 2020," in Europe.

**B.    The Core Operations Doctrine**

124.    Oatly's retail shelf space in its "core markets" in Europe and the United States, along with the Company's share of those markets, was central to Oatly's business. Indeed, the

Offering Documents touted that Oatly had "demonstrated global commercial success through expansion" and cited purported growth in the "core markets of Sweden, the United Kingdom, Germany and the United States" as evidence of this assertation. The Offering Documents likewise represented that "[t]he food retail channel . . . has welcomed Oatly on shelves" and again cited purported distribution growth figures from the "core markets" of the United Kingdom, Germany and the United States as evidence for this claim. As such, there can be no doubt that the Exchange Act Defendants knew of (or, at best, recklessly disregarded) the Company's declining retail shelf space in Europe and the United States and the resulting loss of market share in these "core markets" during the Class Period. Similarly, the cost to purchase further deliveries of two ingredients that go into oat base, along with the rate at which the Company was producing oat base were of central to Oatly's business. And, knowledge of the state of, and problems afflicting Oatly's production facilities and fill rates can also be readily inferred here given (a) the limited number of Oatly plants; and (b) the fact that the Offering Documents themselves stressed the paramount importance of increasing the Company's production, that it was the lack of adequate production capacity that was the factor purportedly limiting Oatly's ability to grow, meet customer demand, and maintain or expand the Company's market share and shelf space.

### C.   The Individual Exchange Act Defendants' Motive and Opportunity to Commit Fraud

125.    In combination with Plaintiffs' other scienter allegations, the Individual Exchange Act Defendants' motive and opportunity to commit fraud further supports a strong inference of their *scienter*, as both Defendant CEO Petersson and Defendant CFO Hanke took advantage of Oatly's artificially inflated ADS price to sell shares in connection with Oatly's IPO. These insider sales were highly suspicious in their timing and amount, and enabled Defendant Petersson to reap

at least $21.5 million in inflated insider selling proceeds, and enabled Defendant Hanke to reap at least $2.5 million in inflated insider selling proceeds.

126.    As stated in the Offering Documents, Defendants Petersson and Hanke exercised certain Oatly stock warrants in connection with the IPO, which gave them 9,948,987 and 969,975 ordinary Oatly shares, respectively.    Promptly thereafter, as part of a "Concurrent Private Placement" transaction, (a) Defendant Petersson then sold 1,343,960 of those shares based on the IPO's inflated $17 per ADS price, reaping at least $21,503,360 in inflated insider selling proceeds, and (b) Defendant Hanke sold 131,029 of his shares based on the IPO's inflated $17 per ADS price, reaping at least $2,096,464 in inflated insider selling proceeds.    These sales represented at least 13.5% of each of these defendants' interests in Oatly ADS – and 100% of the total amount that they were allowed to sell during the Class Period (given that both Petersson and Hanke had signed "lock-up agreements" not to dispose of any ADSs or other securities "convertible or exchangeable into ADSs" for 180 days after the date of the IPO).

127.    Here, moreover, in addition to cashing in all of the ADS that they were able to sell during the Class Period, Petersson and Hanke cashed in those ADS in transactions that were suspiciously timed to coincide with the IPO, and to thereby fully benefit from the Offering Documents' materially false and misleading statements (and resulting inflated IPO offering price).

## VIII.    ADDITIONAL LOSS CAUSATION ALLEGATIONS
### (As to Claims Asserted Herein Under the Exchange Act that Require Proof of Loss Causation.)

128.    Pursuant to Section 11(e) of the Securities Act, 11 U.S.C. §77k(5), no Securities Plaintiff or other members of the ADS Class asserting Securities Act claims under Counts I and II of this Complaint is required to establish loss causation (although Defendants may seek to disprove causation pursuant to a so-called affirmative "negative causation" defense).

129.    As to all Exchange Act claims brought under Counts III and IV of this Complaint, Plaintiffs and the members of the ADS and Options Classes make the following additional allegations regarding loss causation, as set forth below.

130.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the prices of Oatly ADSs, and operated as a fraud or deceit on purchasers of Oatly ADSs.  As detailed above, when the truth about Oatly's misconduct was revealed, the value of Oatly's ADSs declined precipitously as the prior artificial inflation no longer propped up the ADR price.  The decline in the price of Oatly ADSs was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price decline negates any inference that the losses suffered by Plaintiffs and other members of the Classes were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic losses (*i.e.*, damages) suffered by Plaintiffs and other members of the Classes, were a direct result of defendants' fraudulent scheme to artificially inflate the prices of Oatly ADSs and the subsequent significant decline in the value of Oatly ADSs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

131.    At all relevant times, the Exchange Act Defendants' materially false, misleading, and incomplete statements alleged herein, directly or proximately caused the damages suffered by Plaintiffs and other members of the Classes.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Oatly's business, operations, and financial results, as alleged herein.  Throughout the Class Period, the Exchange Act Defendants issued materially false and misleading statements and omitted material facts

necessary to make defendants' statements not false or misleading, causing the price of Oatly ADSs to be artificially inflated.  Plaintiffs and other members of the Classes purchased Oatly ADSs, and bought and sold options on Oatly ADSs, at those artificially inflated prices, causing them to suffer damages, as complained of herein.

132.    The causal connection between the Exchange Act Defendants' fraud and the losses suffered by Plaintiffs and the members of the Classes is supported by, *inter alia,* the reactions of the press and stock analysts to the July 14, 2021 Spruce Point Report, which constituted a partial disclosure of, *inter alia,* Oatly's exposure to increasing oat and rapeseed oil prices and stagnant decline in demand for Oatly products in China, which caused Oatly ADSs to decline by roughly 8.8%.  For example, CNN reported at roughly 2:34 pm on July 14, 2021, that Oatly shares had fallen more than 9% "after short-seller attacks company's practices."

133.    Indeed, the intra-day trading activity for Oatly ADSs on July 14, 2021, strongly supports a reasonable inference of loss causation.  The Spruce Point Report was published before the market opening on July 14, and thereafter the price of Oatly ADS promptly declined, dropping in just a few hours from its closing price of $21.13 per ADS on the prior trading day (July 13, 2021) to as low as $19.62 per ADS before the Company reacted by issuing a strong denial of Spruce Point's allegations at around noon EDT on July 14.  In response to Oatly's false denials – which stated that "Oatly rejects all these false claims by the short-seller [Spruce Point] and stands behind all activities and financial reporting – the price for Oatly ADSs recovered slightly to close down for the day by only 2.8%, but only after numerous Class members had suffered significant losses from the partial corrective disclosures of earlier that morning.

134.    In addition, the further Spruce Point revelations of August 11, 2021 (which anticipated the Company's disappointing news of August 16), as well as the fuller disclosures of

August 16 and subsequent negative analyst commentaries and price target reductions of August 17 and 18, constituted additional partial disclosures that caused Class members to suffer losses.

135.    As disclosed on August 16, 2021, Oatly generated extremely disappointing financial results for the 2Q 2021 (the same quarter as the IPO).  Among other things, Oatly disclosed that (a) it had achieved revenue of only $146.2 million; (b) it had generated only $38.6 million of gross profit with a gross profit margin of only 26.4%; (c) it had incurred a staggering $59.1 million net loss for the quarter (more than 12 times Oatly's $4.8 million net loss in the prior year period); (d) it had suffered severe manufacturing delays at its Ogden and Vlissingen facilities which, together with adverse impacts from the COVID-19 pandemic, negatively impacted sales by $12 to $14 million for the quarter; (e) its gross margin had been negatively impacted by, *inter alia,* higher logistics expenses, a negative consumer mix shift, and a higher share of co-packing production (which was presumably a consequence of Oatly's own production problems); and (f) its finished goods production volume had in fact *declined* by 4.6 million liters of finished goods equivalent, or 13%, in May 2021 as a result of plant closures and similar adverse production impacts.  When an analyst asked about the significant decline in Oatly's production during the month, Defendant Petersson confirmed that the "Vlissingen [plant] was a big hit for us during Q2."

136.    However, in anticipation of the release of the announcement of highly negative 2Q 2021 financial results, financial markets had already priced in most of the adverse impact of the August 16 disclosures three trading days earlier (on August 11, 2021).  As a Benzinga report published on August 11 and entitled "Why Oatly's Stock is Trading Lower Wednesday [i.e. on August 11] stated, Benzinga attributed the sharp 8.7% decline in Oatly shares that day (from

$19.07 at the close on August 10 to $17.41 at the close on August 11) to further pressure from Spruce Point, which had issued the following earnings warning earlier that day:

> Things that make you go … Hmmm.  [Oatly] will report earnings on August 16th, the absolute last day possible they must file with the SEC.  Loads of academic research points to companies pushing off bad news, and pulling fwd good news."

In sum, (a) on August 11, 2021, the price of Oatly shares fell 8.7%, in anticipation of Oatly's reporting of materially negative news on August 16, and (b) Oatly shares then fell a further combined 10% (from $16.87 at the close on Friday, August 13) between August 16 and August 18, in response to the actual news on August 16 being even worse than expected, and in response to subsequent negative analyst commentary and downward price target revisions on August 17 and 18, by Credit Suisse, Truist, and Morgan Stanley, resulting in (c) a total price decline of roughly 20% from a closing price of $19.07 per ADS on August 10, down to $15.16 per ADS by the end of trading on August 18.

137.    Indeed, as alleged at ¶96 above, but for Defendants having also made a number of materially false or misleading statements on August 16, the price of Oatly shares would have dropped still further.

138.    On November 15, 2021, markets again reacted to Oatly's announcement of highly disappointing third quarter financial results and related Company commentary, which disclosed that (a) Oatly had suffered a quarterly operating loss of over $44 million; (b) that its gross profit margins had fallen year-on-year to only 26.2% (compared to 32% in the third quarter of the prior year, 2020) – a staggering 15% decline; (c) that the Company was revising its fiscal year 2021 revenue projection downwards by over 7%, from $690 million to $635 million; (d) that Oatly's shelf space had not only failed to grow during 2021 in Europe, but had actually been *declining* for at least the two financial quarters prior to Oatly's IPO (and had continued to decline thereafter),

with CFO Hanke admitting that Oatly had "started 2021 with less shelf space than prior years," and that the Company, according to CEO Petersson had experienced "great pressure" in Q1 and Q2 that had led to "lower growth rates, . . . strained relationship with retail[er]s, and lost market shares;" and (e) that Oatly's business was so disrupted by such problems that the Company – despite purportedly strong demand at the consumer level – was having problems selling all of the product that it was actually able to manufacture, as shown by the dramatic 215% increase over just the last two quarters in the amount of Oatly's inventory of unsold goods. Indeed, in response to these further corrective disclosures, the price of Oatly ADSs plummeted 20.81% on November 15, 2021, on heavy trading.

139.    Third-party reports also confirm that the sharp declines in the price of Oatly ADSs observed on November 15, 2021, were caused by relevant disclosures of Oatly's true condition, which had been masked by Defendants' prior false and misleading statements. For example, the *WSJ,* in a November 15, 2021 article entitled "Oatly Shares Fall as Oat-Milk Maker Details Production Issues," confirmed that Oatly's November 15 disclosures, including those relating to "[t]he company's reduced sales outlook," "concerns about Oatly's losses", and "[rising] costs . . . for ingredients" had all contributed to the 21% plunge in Oatly ADS.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE
**(As to Claims Asserted Herein Under the Exchange Act that Require Proof of Reliance.)**

140.    Pursuant to Section 11(a) of the Securities Act, 11 U.S.C. §77k(1), no Plaintiff or other members of the ADS Class asserting Securities Act claims under Counts I and II of this Complaint, are required to establish reliance.

141.    As to all Exchange Act claims brought under Counts III and IV of this Complaint, Plaintiffs and the members of the ADS and Options Classes asserting such claims are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and the fraud-on-

the-market doctrine, because the market for Oatly ADSs was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Oatly ADSs met the requirements for listing, and were listed and actively traded on NASDAQ, a highly-efficient market;

(b)    Oatly regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)    Oatly was followed by a number of securities analysts employed by major brokerage firms, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

142.    As a result of the foregoing, the market for Oatly ADSs promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the ADSs and in the prices of options on those ADSs.  Under these circumstances, all those who transacted in Oatly ADSs and options on those ADSs during the Class Period suffered similar injury through their transactions in Oatly ADSs and options on those ADSs at artificially-inflated prices and a presumption of reliance applies.

143.    Without knowledge of the misrepresented or omitted material facts, Plaintiffs and other ADS Class Members purchased or acquired Oatly ADSs (and options on Oatly ADS, in the case of Options Class Members) during the Class Period.  Accordingly, Plaintiffs and other members of the Classes relied, and are entitled to have relied, upon the integrity of the market

prices for Oatly ADSs (or options thereon), and are entitled to a presumption of reliance on the Exchange Act Defendants' materially false and misleading statements and omissions during the Class Period.

144.    Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Exchange Act Defendants are predicated upon omissions of material facts for which there was a duty to disclose.

## CLAIMS FOR RELIEF

## COUNT I

### For Violation of Section 11 of the Securities Act
### Against All Securities Act Defendants

145.    Plaintiffs hereby incorporate ¶¶1-121 above by reference.

146.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the ADS Class, against each Securities Act Defendant.

147.    This is a non-fraud Count.  For the purpose of this Count, Plaintiffs do not assert that any Securities Act Defendant committed intentional or reckless misconduct, or acted with scienter or fraudulent intent.

148.    The Offering Documents, including the Form F-1 Registration Statement (as amended) and all materials incorporated therein (including the final Prospectus and all freewriting prospectus materials), contained untrue statements of material facts, omitted facts necessary to make the statements made therein not materially misleading, and omitted to state material facts required to be stated therein.

149.    Defendant Oatly is the issuer of the ADS shares purchased by Plaintiffs (other than Hayden) and the other members of the ADS Class.  As such, Oatly is strictly liable for the

materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate. By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Oatly is liable under §11 of the Securities Act to Plaintiffs (other than Hayden) and the other members of the ADS Class.

150.    Each Individual Securities Act Defendant signed the Offering Documents. As such, each of them is also strictly liable for the materially inaccurate and misleading statements contained in the Offering Documents (and the failure of the Offering Documents to be complete and accurate) unless they can carry their burden of establishing an affirmative "due diligence" defense. Each Individual Securities Act Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that they were true and accurate, that there were no omissions of material facts that would make the Offering Documents misleading, and that the Offering Documents contained all facts required to be stated therein. In the exercise of reasonable care, each Individual Securities Act Defendant should have known of the material misstatements and omissions contained in the Offering Documents, and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, each Individual Securities Act Defendant is liable to Plaintiffs (other than Hayden) and the ADS Class.

151.    The Securities Act Defendants acted negligently in preparing the Offering Documents. None of the Securities Act Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for a belief that the statements contained in the Offering Documents were true and without omission of any material facts and were not misleading. In alleging the foregoing, Plaintiffs specifically disclaim any allegations of fraud.

152.    In addition, Oatly's IPO Offering Documents also failed to disclose information that the Securities Act Defendants were required to disclosed therein under Items 303 and 105 of SEC Regulation S-K ("Item 105"), 17 C.F.R. §229.303 and 17 C.F.R. §229.105, as set forth at ¶¶112-121 of Section VI above.

153.    By reason of the conduct alleged herein, each Securities Act Defendant named in this Count violated §11 of the Securities Act.

154.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement.   Rather, each such statement concerned existing facts.   Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

155.    Plaintiffs (other than Hayden) acquired Oatly ADSs pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein. These Plaintiffs sustained damages as the price of Oatly's ADSs declined substantially following the issuance of the defective Offering Documents.

156.    This Count is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the May 2021 IPO.

157.    By virtue of the foregoing, Plaintiffs (other than Hayden) and the other members of the ADS Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Securities Act Defendants and each of them, jointly and severally.

## <u>COUNT II</u>

### For Violations of §15 of the Securities Act
### Against the Individual Securities Act Defendants

158.    Plaintiffs incorporates ¶¶1-121 and ¶¶145-157 above by reference.

159.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the ADS Class, against each Individual Securities Act Defendant.

160.    The Individual Securities Act Defendants were controlling persons of Oatly within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at Oatly, these Defendants, individually and collectively, had the power to influence, and exercised that power over Oatly to cause it to engage in the conduct complained of herein.

161.    Similarly, each of the Individual Securities Act Defendants controlled Oatly, which is subject to liability as a primary violator of §§11 and 12(a)(2) of the Securities Act, as alleged in Counts I and II above, and they directly participated in controlling Oatly by having signed or authorized the signing of the Offering Documents and authorizing the issuance of the Oatly ADSs that were sold to Plaintiffs and the members of the ADS Class.

162.    As control persons of Oatly, each Individual Securities Act Defendant is jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as Oatly for its violations of §§11 and 12(a)(2) of the Securities Act.

## COUNT III

**For Violation of §10(b) of the 1934 Act and Rule 10b-5
Against All Exchange Act Defendants**

163.    Plaintiffs incorporate ¶¶1-162 above by reference.

164.    The Exchange Act Defendants are liable for making materially false, misleading, and incomplete statements pleaded herein at ¶¶54-86, and for failing to adequately disclose material adverse facts that they were obligated to disclose, and that were known to them, as alleged above.  These Defendants' fraudulent scheme and course of conduct operated as a fraud or deceit on purchasers of Oatly ADSs and call options (and sellers of Oatly put options) as it: (i) deceived

the investing public regarding Oatly's business, performance and prospects; (ii) artificially inflated the prices of Oatly ADSs; (iii) caused Plaintiffs Bello and Jochims and other members of the ADS Class to purchase Oatly ADSs at inflated prices; and (iv) caused Plaintiff Hayden and other members of the Options Class to buy call options and sell put options on Oatly ADSs at inflated prices. The Exchange Act Defendants disseminated or approved the false statements specified above, while knowing or recklessly disregarding that they were materially false or misleading, and also, acting with *scienter*, violated their affirmative disclosure obligations under Items 303 and 105 of SEC Regulation S-K ("Item 105"), 17 C.F.R. §229.303 and 17 C.F.R. §229.105, as set forth at ¶¶112-121 of Section VI above.

165.    As alleged herein, including for the additional reasons set forth at ¶¶123-28 at §VII above, Oatly and the Individual Exchange Act Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false, misleading, and incomplete when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Individual Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding Oatly, their control over, and/or receipt and/or modification of Oatly's allegedly materially false, misleading, and incomplete statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Oatly, participated in the fraudulent scheme alleged herein.

166.    The Exchange Act Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, acting with *scienter*:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Oatly ADSs (and in connection with their purchases of call options on Oatly ADSs, and their sales of put options on Oatly ADSs) during the Class Period.

167.    Plaintiffs and the members of the ADS and Options Classes have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Oatly ADSs and options on those ADSs.  Plaintiffs and the members of the ADS and Options Classes would not have purchased Oatly ADSs or call options (or sold put options) on those ADSs at the prices they paid, or at all, if they had been aware that their market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

## COUNT IV

### For Violation of §20(a) of the 1934 Act
### Against All Exchange Act Defendants

168.    Plaintiffs incorporate ¶¶1-167 above by reference.

169.    The Individual Exchange Act Defendants acted as controlling persons of Oatly within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Oatly to engage in the wrongful conduct complained of herein.  Oatly controlled the Individual Exchange Act Defendants and its employees.  By reason of such conduct, the Exchange Act Defendants are liable pursuant to §20(a) of the Exchange Act.

## CLASS ACTION ALLEGATIONS

170.    The class action allegations set forth below apply to all claims asserted in this Complaint under both the Securities Act (Counts I and II) and the Exchange Act (Counts III and IV), unless otherwise stated.

171.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of two putative classes:  (i) the ADS Class, consisting of all purchasers of Oatly ADSs during the Class Period, and (ii) the Options Class, consisting of all persons that bought or sold options on Oatly ADSs during the Class Period and were damaged thereby. Excluded from both Classes are Defendants and their families, the directors and officers of Oatly and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

172.    The members of each Class are so numerous that joinder of all members is impracticable.  For example, Oatly issued 87.376 billion ADSs in the May 2021 IPO, and those ADSs were actively traded on the NASDAQ Global Select Market throughout the Class Period. While the exact number of ADS Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed class.  Record owners and other members of the ADS Class may be readily identified from, *inter alia*, records maintained by Oatly and its transfer agent and/or the depositary for its ADS shares, and may be notified of the pendency of this action by mail using forms of notice customarily used in securities class actions.  Similarly, while the exact number of Options Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are hundreds (if not thousands) of members of the proposed Options Class.  Record owners and other members of the Options Class may be identified from records maintained by third parties that

transacted in options with Options Class members and exchanges where options on Oatly ADSs are regularly traded.

173.    Plaintiffs Bello's and Jochims's claims are typical of those of the ADS Class, and Plaintiff Hayden's claims are typical of those of the Options Class, as all members of each of the respective Classes were similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

174.    Plaintiffs will adequately protect the interests of the respective Classes and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Classes.

175.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of each of the respective Classes, which predominate over questions which may affect individual members of those Classes. Among the questions of law and fact common to each Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the Offering Documents for the May 2021 IPO were materially misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

(c)    whether (with respect to Counts III and IV only) the other statements alleged in this Complaint to be actionable were materially misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

(d)    whether Defendants acted with *scienter* (i.e., knowingly or recklessly) in issuing false and misleading statements (with respect to Counts III and IV only);

(e)    whether (with respect to Counts III and IV) the prices of Oatly ADSs were artificially inflated during the Class Period because of Defendants' conduct as complained of herein, or whether (with respect to Counts I and II) Defendants can sustain their affirmative "negative causation" defense by establishing that the untrue or misleading statements in the Offering Documents did not cause all (or at least some portion of) the Class members' damages; and

(f)    whether the members of each Class have sustained damages under the relevant provisions of the Securities Act and the Exchange Act, respectively, and if so the proper measure(s) of damages.

176.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual members of each Class may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23 and appointing Plaintiffs as representative parties of the Classes and approving their selection of lead counsel as class counsel;

B.    Awarding Plaintiffs and the members of both Classes damages, including pre- and post-judgment interest;

C.    Awarding Plaintiffs' reasonable costs and attorneys' fees; and

67

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  August 11, 2023

      *s/ William C. Fredericks*
WILLIAM C. FREDERICKS (WF-1576)
THOMAS L. LAUGHLIN, IV (TL-8888)
RHIANA L. SWARTZ (RS-2332)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile:  212-233-6334
wfredericks@scott-scott.com
tlaughlin@scott-scott.com
rswartz@scott-scott.com

JACOB B. LIEBERMAN (JL-2728)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
Colchester, CT 06415
Telephone: 860-810-7770
jlieberman@scott-scott.com

*Lead Counsel for Lead Plaintiff Mario Bello and Additional Plaintiffs Kai Jochims and Mark D. Hayden*

SAMUEL RUDMAN
MICHAEL CAPECI
**ROBBINS GELLER RUDMAN &DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Tel: 631 367-7100
Fax: 631 367-1173
srudman@rgrdlaw.com
mcapeci@rgrdlaw.com

*Additional Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

*s/ William C. Fredericks*
William C. Fredericks
