O2LBOATC
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARIO BELLO, et al,

                  Plaintiffs,

          v.                          21 Civ. 6360 (AKH)

OATLY GROUP AB SECURITIES,

                  Defendants.
                                      Conference
------------------------------x
                                      New York, N.Y.
                                      February 21, 2024
                                      2:00 p.m.

Before:

                  HON. ALVIN K. HELLERSTEIN,

                                      District Judge


                         APPEARANCES

SCOTT + SCOTT ATTORNEYS AT LAW, LLP
     Attorneys for Plaintiffs
BY:  WILLIAM C. FREDERICKS
     JACOB B. LIEBERMAN


LATHAM & WATKINS, LLP
     Attorneys for Defendants
BY:  WILLIAM O. RECKLER
     KALANA KARIYAWASAM



Also Present:  Brian S. Weinstein, Attorney with Davis Polk
               Esther C. Townes, Attorney with Davis Polk

O2LBOATC
(Case called)

MR. LIEBERMAN:  Your Honor, this is Jacob Lieberman and Bill Fredericks from Scott + Scott for the plaintiffs, and we're joined by Michael Capeci from Robbins Geller.

Good afternoon, your Honor.

MR. RECKLER:  Good afternoon your Honor.  William Reckler and Kalana Kariyawasam from Latham & Watkins on behalf of the individual defendants.

THE COURT:  Davis Polk, appearing or you're just observing?

MR. WEINSTEIN:  We're just here to observe, your Honor.  We represent the underwriters in the state court action.  We're parties to the settlement agreement, but we're not parties to this action.

THE COURT:  You can sit at counsel bench if you'd like.

MR. WEINSTEIN:  No need, your Honor.  Thank you.

THE COURT:  This is a motion to provide preliminary approval to a settlement.

MR. LIEBERMAN:  That's correct, your Honor.

THE COURT:  So I have a number of questions that I'd like you to address.  Who's going to do it, Mr. Fredericks, Mr. Lieberman?

MR. LIEBERMAN:  It's going to be primarily, your Honor, Jacob Lieberman.

O2LBOATC

THE COURT:  Why don't you take the podium.  Is the state court action involve the same matters as the federal action?

MR. LIEBERMAN:  Yes, it does, your Honor, except to the extent that the federal action also has claims under the 34 Act, which are not being alleged, and cannot be alleged in the state court case.

THE COURT:  But there's no distinction in the settlements?

MR. LIEBERMAN:  That's correct, your Honor.  The classes -- the state court class overlaps entirely with the federal class.

THE COURT:  Does Justice Borrok have to give his order regarding the settlement as well?

MR. LIEBERMAN:  My understanding.

THE COURT:  That case is not dismissed.  It's only stayed.

MR. LIEBERMAN:  That's correct, your Honor.  Once this settlement receives final approval, the state court action will be dismissed with prejudice, which Judge Borrok would have to sign off on.  And under the CPLR, there is a notice requirement before a class action could be dismissed with prejudice.  But the notice plan here, which is double-captioned under this case and the state court case should satisfy the CPLR's requirements.

O2LBOATC

THE COURT:  Let's first look at the document that's exhibit A1, the notice of pendency and propose settlement of class actions.  I have a number of comments to express.

On page four there are various references to Judge Phillips.  I have a great respect for Judge Phillips, but Judge Phillips is not making a merits determination here.  And in my opinion to put his name as if he made a merits determination is misleading.  So I would suggest in the paragraph settlement negotiations, you delete the reference to Judge Phillips and the reference to a nationally recognized mediator.  And in the bottom paragraph in the third from last sentence, you delete the phrase "is fully consistent with the terms of Judge Phillips mediated proposal."  All I assume he did was to bridge a gap between one party and the other.  He's certainly not making an offer reflecting his determination of the merits.

MR. LIEBERMAN:  We can make those changes, your Honor.

THE COURT:  Okay.  On page six they got the phrase "made by an experienced and highly respected mediator of complex class actions" for the same reason.

On page seven in the bottom full paragraph the last sentence, Why should there be any award to the individual plaintiffs?  They didn't do anything.

MR. LIEBERMAN:  Well, your Honor, I think they did do at least two important things.  First is, they stepped up to represent the class and assert claims against Oatly.  And

O2LBOATC

without incentivizing investors to come forward and bring claims, we wouldn't have claims like this. I think that's an important policy point to make, but they also did oversee the litigation. We were in contact with our clients extensively, and the awards we are seeking will be for the time and expenses that the class representatives have put forward.

THE COURT: There's no reference to time. No one's kept time. It hasn't been submitted, and I hesitate to believe that they were overseeing the lawyers. It is true they put up their names, and they should be rewarded for that, but I think the $5,000 payment would be sufficient. And how many are these people?

MR. LIEBERMAN: There are four in total, so that the payment comes out to less than 5,000 per plaintiff.

THE COURT: I'll approve $3500 to each. You can change that --

MR. LIEBERMAN: Okay.

THE COURT: -- to each of four, identify the four.

On page nine there's no reference to opting out of the class. I think it should be made clear that if you don't opt out to the settlement class, you have to give a release. You're bound by the settlement even though you don't put in a claim. So would you do that?

MR. LIEBERMAN: We can add a reference. I believe it's discussed earlier in the notice, but we can add it here as

O2LBOATC
well.

THE COURT:  Is it discussed earlier?  Where is it discussed?

MR. FREDERICKS:  Your Honor, I believe it's on page eight under the heading, Can I exclude myself from the settlement, ECF page nine, page eight of the document.

MR. LIEBERMAN:  Then, your Honor, on the chart that begins on page two and runs over to the top of page three --

THE COURT:  I take your point.  I withdraw my comment. On page 13 the date for counsel's appearance should be the same date as the bar date for filing objections.  And what's the purpose of the injunction clause?

MR. LIEBERMAN:  So the injunction clause would be to prohibit potential follow-on actions being filed and sort of raising to the court.

THE COURT:  You can't do that.  That's not right. Cross out the injunction clause.  Those are my comments to the notice.  Next we'll take up the appendix A.  The proposed plan of allocation.

In the third paragraph why are there different dates for the ADS holders and the put and call holders.  You'll notice that the class period is May 20 through November 15. But if you are a holder or put a call, July 15 is the magic date.  Please explain.

MR. LIEBERMAN:  Your Honor, my understanding is the

O2LBOATC

distinction between dates has to do with how damages are calculated under the section 11 or section 11 claims versus 10(b) claims.  So you could have damages as a 10(b) plaintiff, prior to the time that you have damages as a section 11; plaintiff; whereas here if I'm remembering correctly, the price declines, but does not decline below the IPO price prior to the date when you could have damages as a section 11 plaintiff.

THE COURT:  You're saying that the section 11 claim goes to all ADS holders?

MR. LIEBERMAN:  Correct, your Honor.

THE COURT:  Was there any market before the IPO about which you complain?

MR. LIEBERMAN:  There was no market before the IPO.

THE COURT:  So all shares are traceable to the offering that you claim --

MR. LIEBERMAN:  Yes.

THE COURT:  Contains misrepresentations?

MR. LIEBERMAN:  That's correct, your Honor.

THE COURT:  And when were the puts and calls first issued?  Is July 15 the issue date?

MR. LIEBERMAN:  My understanding, your Honor, is that you could have -- I don't know the first date that the puts and calls were issued.  My understanding is that the market for puts in options on Oatly ADSs likely started at or around the same time of the issuance.  Those puts and calls would not have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O2LBOATC

been damaged because the stock price, the ADS price increased immediately after the IPO.

THE COURT:  The IPO caused an inflated price from the very beginning, and by your theory that affected the puts and calls market as well.  I don't quite understand how or how you would measure it, but that's the theory, isn't it?  So I don't know why there are different days.  If it's a function of damages, it'll show up in the damage calculation.

MR. LIEBERMAN:  I see your point, your Honor.  I think I would have to go back to our expert who created the plan of allocation to answer that question specifically.  We'd be happy to do that if that would be helpful to your Honor.

THE COURT:  Make a short submission about that to explain it.  Tell me how you calculate damages for puts and calls.  Let me just make a few observations.  With regard to a share price or an ADS price, you take a measure of the inflation by the corrective action taken when there is a truthful disclosure.  So you back that out, and you come out to an inflated price and that's your damage.  You may also have to make an adjustment for market movement, so experts do that. But the pricing of a put and call has so many variables to it that I don't know how you can fix the damage amount.

MR. LIEBERMAN:  I think, your Honor, that the pricing for an option, you're correct, has many variables; but one of those inputs is going to be the pricing of the underlying

O2LBOATC

asset -- in this case, the ADS.  And if you can measure the inflation on the underlying asset and back that out in the same way that you would calculate damages for an individual share --

THE COURT:  But it should equally apply to the purchase price and the call price or the strike price, if I used the word "strike" in the right way.  When I buy the right to obtain shares from you at a future date, all the pricing is when I pay for it.  And then when you make a profit or not depends pretty much on the market.  So what you're saying I guess -- and I'm trying to reason this out because I don't understand it.  I guess when it comes time to call the stock if the correction is made, the call price will be lower.  What effect this has on the price of the option, I don't know.  It may differ different times.  Has an expert made any submission to explain this?

MR. LIEBERMAN:  So there have been no expert reports, your Honor.  I think going to your example when you buy an option, right, you're paying a premium, and that is just a cost of the option in simple terms.  The premium that you pay is a function of the expected likelihood that the option will be in the money at the time of expirate.  That calculation takes into account a number of factors, many of which are unrelated to the underlying ADS, sort of an overall market voluntarily.

But one of the key inputs to the option is what is the price today so that we can figure out how far away it is from

O2LBOATC

being in the money or at the money of expirate. The price that it is the date that the option is struck we allege has some inflation in it.  And so when you're buying an option, for example, you were paying too much in premium than you should have, or if you were selling a put option, you were not getting enough in premium due to the inflation in the underlining.

THE COURT:  I don't know that the differential can be expressed the same way that it could in a stock price.  We're talking really about a disappointed profit expectation, not a loss.  If you buy something and it diminishes in value when you sell it, you have a loss.  But if you buy something betting on what the price will be later on, both are affected by the false inflation.  There's a disappointed expectation of profit, but that's equal by the cheaper price to the reciprocal part of the option.  Maybe if I called upon you to sell me stock at a certain time, you're in effect putting that stock to me. You're betting the opposite way.  It becomes cheaper for you to buy the stock after the disclosure.

I don't even know what I'm talking about, but it seem to me you're making an equation of two different things.  They can't be in the same class, and there has been no adversarial tension in what the two classes expect relatively to the settlement.

MR. FREDERICKS:  Your Honor, if I may just make one clarifying point.  The inflation per security calculations are

O2LBOATC
different for the ADS --

THE COURT:  I was going to ask to explain that, so might as well do that now.

MR. FREDERICKS:  I think that your Honor was touching upon it.  When you're actually buying the security itself, you're fully long the security, and so the only factor that impacts the value is the market price; whereas with options you have other variables other than price.  I'm quite confident I could not give you as good an explanation as our damages expert as to how these numbers were derived.  And your Honor did indicate you'd like further information, we can.  I just wanted to clarify to the extent there might be any doubt that the formulas are different to reflect the different types of security.

THE COURT:  I don't understand it, and presumably I should have better standing to understand this than the average reader or investor.  You have a table of inflation factors per ADS. I don't know what that means.  I don't know how it's derived.  It's not defined.

Let's look at page two, appendix A, paragraph one. Why if an ADS is sold before July 14 is the recognized loss zero?

MR. LIEBERMAN:  Your Honor, I believe it's because at that point it would still have been sold for a profit over the IPO price.

O2LBOATC

THE COURT:  Still inflated.  Okay.  So July 15 must have been the disclosure date?

MR. LIEBERMAN:  It's one of the -- correct, the disclosure date that we allege.

THE COURT:  You're positing a series of corrected disclosures, each one causing a further loss.  I don't think that's real.  It may effect the class period.

MR. LIEBERMAN:  Well, your Honor, I think for the ADSs --

THE COURT:  If I can't understand this, I can't give you preliminary approval.  If I don't understand this methodology and the relationships of ADS to calls and puts on ADS, I can't give you preliminary approval, so you're going to have to come back and enlighten me.

MR. LIEBERMAN:  We can do that, your Honor.

MR. FREDERICKS:  Your Honor, we can certainly provide that additional detail.  I will just say that the theory of the complaint alleged more than one different type of misrepresentation, so corrective disclosures came out on different issues at different times.  So in our experience having more than one corrective disclosure date is not particularly unusual.  But since we're going to be giving you additional information on options, we can line up very clearly what the disclosure dates relate to.

THE COURT:  I don't know what you're saying.

O2LBOATC

Mr. Fredericks.  I don't understand.  I just don't understand.  If a corrective disclosure is made, that's not just a technical thing.  That shows a question as to the integrity of the entire document.  Theoretically, the price should drop because people lose faith and confidence in the entire set of representations.  I don't know that there can be any formula that will relate the first disclosure to the second to the third to the fourth in terms of effect on price.

Now I do know that the defendants have taken issue with loss causation in this case and have very strong arguments to that effect.  I'm prepared to approve a $9 million settlement, but I'm stuck on the allocation.  I'd be much more at ease if the class were made up only of ADS holders and not include puts and calls people.  I don't think there's any formula that can take account of the variables that go into an option and how that price is effected.  And it seems to me if I'm correct in my analysis, rather it's an objection rather than an analysis, the diminution is that of a expected profit, not a loss.

MR. LIEBERMAN:  We will explain this more, your Honor.

THE COURT:  If I'm buying a call at a certain price, it's true that price might be inflated; but the call price would also be equally inflated, and the pricing is not so much the price of another purchase of the share, it's the betting on the differential.

O2LBOATC

MR. LIEBERMAN:  I agree with you that there is some aspect of this that could be viewed as a frustration of the expected profits.  I do think though that the options holders are paying a premium, and that premium is in part determine to a mathematical formula which takes into account the price of the underlying ADSs --

THE COURT:  Both are equally inflated at the time of the purchase of the call.

MR. LIEBERMAN:  I don't know enough about options pricing to say whether or not they're equally inflated, but I do think that the inflation in the underlying ADS, the price of that ADS does carry through to the premium that is paid; and so you're paying more upfront for the option.

THE COURT:  Can either of the defendants help me?

MR. RECKLER:  Your Honor, I apologize.  I am probably less able to speak to the plaintiff allocation than the plaintiffs are.

THE COURT:  How about the Davis Polk folks?

MR. WEINSTEIN:  Unfortunately we can't help on that either, your Honor.

THE COURT:  All right.  We're going to have to reschedule.  Let me go through this.  What is inflation?  What's the inflation factor?  I'm looking at the table on page three.  What does that mean?  Does that mean the change in price that's attributable to market activity and not just the

O2LBOATC
loss causation?

MR. LIEBERMAN:  I think the inflation factor if we look at table A on page two is how much more the ADS was trading for on the market than its actual value was.  So if the value of the ADS say was $10 --

THE COURT:  You mean at the time of the issuance of shares, you can place a value on that which is owed to the misrepresentation, you can take that out of the -- I don't know what you're doing.  It doesn't make sense.  I don't know what it means.  It's not defined in any way.  You have to come back to do a better job.  It's just not going to work with this.  Those are my comments on appendix A.

Next is a summary notice.  What's the relationship of the summary notice of pendency to the notice of pendency?

MR. LIEBERMAN:  So the notice, the A1 is what would be mailed to class members as part of the notice plan.  The summary notice is what gets published in the Wall Street Journal and sent out via national news wire.  And I believe both of those documents would be available or will be available on the settlement's website.

THE COURT:  We'll have to reexamine this document after you've come back with your explanation.  I guess when you do that you'll have to change in some fashion this summary as well.

Next, the proposed order as to preliminary approval,

O2LBOATC

on page one, paragraph 1D.  Please eliminate it.  I'm not making any finding on compensation at this time.

On the next page, subparagraph E.  I don't know what it means by fall within the range of possible approval.  Suffice it to say that it's sufficiently fair, reasonable and adequate.  Delete the phrase, "Fall within the range of possible approval."

On page four, paragraph eight, I want a separate order for the appointment of Gilardi & Company.  That order will cover the problem of reversions; that is to say, if people do not make claim.

MR. LIEBERMAN:  I think that the stipulation, your Honor, also makes clear this is not a non-reversion settlement.

THE COURT:  I understand that.  But this requires a second distribution, and we should provide that.  And I think you said that the expenses will be capped at $450,000.  Is that only for Gilardi?

MR. LIEBERMAN:  That is the Gilardi fees for notice and settlement administration.

THE COURT:  That should be in that order too.  Finally, there should be a reporting date.

MR. LIEBERMAN:  I'm sorry, your Honor.  I didn't hear what you said.

THE COURT:  Gilardi should report to the Court, file on ECF the results of the initial distribution, and the results

O2LBOATC

of the second distribution.  And if there's anything left over, that will probably be given to some kind of charity, and you'll make provision for that, or make a motion at that time.  The charity that I would approve would be some kind of research charity in nutrition.  You could put that in the order.  So that if after a second distribution there's not enough left to honor the third distribution, the balance should be paid to this indicated charity which I will approve when you resubmit. It will be in the field of nutrition.

Page seven the bar clause subparagraph 14B.  I think you have to say that those settlement class members who have not opted out

MR. LIEBERMAN:  We can add that, your Honor.

THE COURT:  Pardon.

MR. LIEBERMAN:  We can add that, your Honor.

THE COURT:  Give me just a moment just to recap my notes.  One last point.  Someone here breakdown the cost per share.  I don't know how you can do that.  But if you want to break it down cost per share, you're going to have to do the same in terms of the gross receipts.  I suggest you eliminate that sentence, break it down allocating how much each share would bear for the cost.  I don't know where that is.

Those are my comments, so let's schedule something when we come back.  As I said, I would be prepared to give preliminary approval at that time if these problems were

O2LBOATC
resolved.

MR. LIEBERMAN:  Your Honor, can I just confer with Mr. Fredericks on timing?

THE COURT:  Yeah.

MR. LIEBERMAN:  Thank you, your Honor.  We request a day three weeks from now.  I have a vacation next week.

THE COURT:  Don't tell me your problems, just tell me when.

MR. LIEBERMAN:  I'm so dependent on my cell phone for a calendar.

THE COURT:  Mr. Fredericks?

MR. FREDERICKS:  I have Mr. Lieberman's problem with the cell phone.

MR. CAPECI:  March 13th, your Honor.

THE COURT:  You'll cure by March 15.

MR. FREDERICKS:  March 13th, your Honor.

THE COURT:  I'm giving you to March 15th to make a modified submission.  You understand?

MR. LIEBERMAN:  Yes, your Honor.

THE COURT:  And I'm going to give you a date for the hearing, 2:30 on March 28.  Anything else at this time?

MR. LIEBERMAN:  Your Honor, could we do either the 27 or the 29th.  That's my son's 5th birthday and he will be very upset with me if I have to travel to New York on the day of his birthday.

O2LBOATC

THE COURT:  The 27th.

MR. LIEBERMAN:  Thank you, your Honor.

THE COURT:  Thank you all.

(Adjourned)