O7H3OATC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE OATLY GROUP AB
SECURITIES,

                                    New York, N.Y.

                                    21 CV 6360 (AKH)


------------------------------x        Settlement

                                    July 17, 2024
                                    2:45 p.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                                    District Judge


                        APPEARANCES


SCOTT & SCOTT, LLP
      Attorneys for Plaintiffs
BY:   JACOB B. LIEBERMAN
        WILLIAM C. FREDERICKS

ROBBINS GELLER RUDMAN & DOWD, LLP
      Attorneys for Plaintiffs
BY:   MICHAEL G. CAPECI


LATHAM & WATKINS, LLP
      Attorneys for Defendant
BY:   WILLIAM O. RECKLER
        MOLLY BABAD

O7H3OATC

THE DEPUTY CLERK:  In the matter of In re Oatly Group AB Securities, docket no. 21 CV 6360, counsel, please state your appearance for the record.

MR. LIEBERMAN:  Jacob Lieberman on behalf of plaintiffs.

MR. FREDERICKS:  William Fredericks also on behalf of plaintiffs, law firm of Scott & Scott.

MR. CAPECI:  Michael Capeci, Robbins Geller, also on behalf of plaintiffs.

MR. RECKLER:  William Reckler of Latham & Watkins on behalf of defendants.

MS. BABAD:  Molly Babad, Latham & Watkins, on behalf of defendants.

THE COURT:  Good afternoon, all.  One moment.

Who is speaking for the plaintiffs?

MR. LIEBERMAN:  I am, your Honor.  Jacob Lieberman.

THE COURT:  Go ahead, Mr. Lieberman.

MR. LIEBERMAN:  Good afternoon, your Honor.  We are pleased to present the settlement to you for final approval. As we explained this past February and March, during the preliminary approval process, a certain cash payment of $9.25 million is a very good result for the class under these circumstances and will resolve this action as well as the related state court Section 11 case.

As you may recall, the Court preliminarily approved

O7H3OATC

settlement on March 27, 2024, and appointed Gilardi as the claims administrator.  Now the only thing that has changed since we last were before the Court is that notice has now been provided to the class.  And as the Court may recall, from preliminary approval, those notices set out the terms of the settlement, counsel's belief that the settlement presented a good result for the class, and the amounts of fees, expenses and PSLRA awards that will be sought.  As required, the notice also informed potential class members of their rights to opt out of the settlement and to object and the deadlines for doing so.

I am happy to report, your Honor, that the reaction of the class has overwhelmingly positive.  There have been no objections and only four timely requests for exclusion and one untimely request.

The opt-outs are all individual investors, who collectively purchased fewer than 1,000 shares of Oatly ADS. The only thing I would add, which is not currently in our papers, is as of this past Monday, Gilardi has received nearly 5500 claims for the settlement.  Now, the deadline to submit a claim is not until July 25, so we expect that number to grow materially for at least two reasons.  First, because the claims that have been submitted so far are still being processed and a number of them are from institutions.  We expect that what appears to be one claim today may in fact be multiple claims.

O7H3OATC

And then second, as the Court may know, many institutions wait until the last few days to file their claims. So we expect those claims to come in in the coming weeks.

The outcome of the claims process will be reported to the Court pursuant to the schedule set out in the order appointing Gilardi as the claims administrator.

Now, I think, your Honor, in light of the class's overwhelming support, we respectfully request that the Court approve the settlement and plan of allocation and award the requested attorneys' fees expenses and PSLRA awards to the four plaintiffs.

THE COURT: Let's do the attorney fees in a second phase and concentrate only now on the settlement.

So, of the 5500 claims, do you have a proportion as between holders of ADS and option people?

MR. LIEBERMAN: So, we do not have a formal proportion. We expected your Honor would have a question like this. And of the claims that have been processed, sort of about 12 have been options and the rest have been ADS. But we can give that final breakdown to you when we report on the claim process.

THE COURT: Your expert thought that there would be very little value to the options. So I guess the fact that 12 claims for options and 5,488 for ADS holders bears that out.

MR. LIEBERMAN: Yes, your Honor, we think it's

O7H3OATC

consistent with what Dr. Hakala expected.

THE COURT:  What were the potential number of claimants you thought you might have?

MR. LIEBERMAN:  We estimated that the class size was probably around 50,000.

THE COURT:  So this is a small portion of the claims, the claims are a small portion of the total.

MR. LIEBERMAN:  Well, I think --

MR. CAPECI:  If I may on that point.  Just to provide some additional context.

THE COURT:  Why is not Mr. Lieberman able to talk?

MR. CAPECI:  I apologize.  Mr. Lieberman and I didn't get a chance to discuss this.  I was the one speaking directly with the claims administrator about this.

There were 896 electronic claims of the 5500.  Looking at the Excel spreadsheets, they were able to ascertain that 12 contained options.  For the remaining claims, it was too early in the administration process to know definitively whether they include options or not.  They very well may.  They may not.  It's just too early to know.  I didn't want your Honor to have a misunderstood view of what's been submitted.

THE COURT:  Thank you.  If the 5500 claims submitted gets to a field of 50,000, you think there will be many more claims coming in?

MR. CAPECI:  Your Honor, I couldn't speculate on that.

O7H3OATC

I just want you to understand exactly ask what Gilardi received and where they stand on it.

THE COURT:  All right.  Continue.  What would be, do you think, the average payout?

MR. LIEBERMAN:  So, your Honor, at this time, we can't calculate the specific average payout.  But if we assume the maximum number of estimated damages shares submit claims which it's, again, very high number, the average payout would be I think it's around 5 cents per ADS.

Now, you never have 100 percent claims rate in a settlement like this, so I expect that what individual investors recover will be materially more than that.  I just don't know at this time.

THE COURT:  What do you think?

MR. LIEBERMAN:  I'm sorry?

THE COURT:  What do you think?

MR. LIEBERMAN:  What do I think?  I think it's -- difficult to know.  Because the settlement -- in past settlements I've seen it go up one or two times that amount per share.  And sometimes it's less.  It is very difficult to tell while the claims are still being processed.

THE COURT:  So they were selling at the offering for what, about 20?

MR. LIEBERMAN:  Yes, your Honor.

THE COURT:  So, someone bought 500 shares, $10,000

O7H3OATC

investment, that person would get how much in a settlement at the rate of 5 cents a share?

MR. LIEBERMAN: So if it was the minimum amount, right, which is assuming 100 percent of the shares submit claims, it would be 5 cents a share.

THE COURT: Let's say 35 percent do.

MR. LIEBERMAN: Then so that would be --

THE COURT: It would be 5 cents per share if you had 50,000 claims. That would be $75 if you had 500 shares. All right?

MR. LIEBERMAN: I think that's right, your Honor. I'm not very good at doing math in my head.

THE COURT: So if you multiply that by, what, three, you would be getting -- I don't know. My question is pointed to the fact is there a significant enough recovery for an individual shareholder.

MR. LIEBERMAN: So I think there is, your Honor. Because I don't think you can look at the individual recovery in isolation. You have to look at it in the context of the risks of this case, which are innumerous we think, and the likely outcome had the case been successful.

THE COURT: Let's leave that aside. I'm very well aware of the risks of the case. I've been involved in it twice in dealing with the adequacy of the pleadings. I'm just thinking about $9,250,000, when you think about it, what does

O7H3OATC

it mean to the average shareholder?  If you were an institution, and you had a million shares, or several hundred thousand shares, it might be significant.  But if you are an average shareholder, what does it mean?

MR. LIEBERMAN:  I think I come at this from two ways, your Honor.  First, because our phone number's in the notice, I've spoken to a number of potential class members who call us with questions.  And I would say that of the maybe 10 to 15 people that I've talked to in the context of this specific settlement, all of them were quite happy that we had brought this case and were going to get them some relief.  But I think so that's one data point.

Another data point, your Honor, is we have no objections here.  And as you correctly point out, there would be institutional shareholders which have large holdings of Oatly ADS.  If they believed that the settlement as a whole was insufficient, they could have objected and had the incentive to object, and did not.  And we think that the case law, including what's cited in our brief, suggests that the absence of institutional investor objections is a benefit to the settlement.

THE COURT:  All right.  Anything else you want to tell me, Mr. Lieberman?

MR. LIEBERMAN:  Not about the settlement, your Honor, unless you have other questions.

THE COURT:  No, I don't have any other questions. Mr. Fredericks, do you want to add anything?

MR. FREDERICKS:  No, your Honor.  I think my colleague Mr. Lieberman has handled everything.  I don't know whether Mr. Reckler on behalf of defendants has anything to say.

THE COURT:  Mr. Capeci, anything you want to add?

MR. CAPECI:  No, your Honor.  Thank you.

THE COURT:  Mr. Reckler?

MR. RECKLER:  Your Honor, all I'll add is that obviously Oatly believes that it had very strong defenses to the case.

THE COURT:  You can stand.

MR. RECKLER:  Sorry.

Your Honor, Oatly obviously believes it had very strong defenses to the case.  We were successful on the initial motion to dismiss.  We made the decision to settle this in recognition of the risks inherent in the litigation.  And we do believe it is a very generous settlement for the class.

THE COURT:  What motivated the settlement at this early stage?

MR. RECKLER:  Well, obviously, your Honor, there is risk inherent in litigation.  Oatly --

THE COURT:  It's unusual for a securities class action to settle before any discovery has taken place.

MR. RECKLER:  Your Honor, this was simply a cost

O7H3OATC

benefit analysis for Oatly and a desire to being able to get back to its core business and growing its business.

THE COURT:  These were Europeans who owned this, right?

MR. RECKLER:  Swedish.

THE COURT:  Swedish company.  I suspect there was a very strong desire not to get involved in American litigation.

MR. RECKLER:  Exactly.

MR. FREDERICKS:  Your Honor, if I may, I would just add one point in response to your question, perhaps to your prior question.  Oatly's financial condition declined for a number of reasons since the offering.  At the time we negotiated the settlement, I believe that its stock price was around 50 cents a share.  I think it's currently trading around a dollar.

THE COURT:  Is it not an insurance driven amount?

MR. FREDERICKS:  Well, I don't think so entirely because if one is looking at the value of bringing a case all the way through trial, and the ultimate ability to pay a very large judgment --

THE COURT:  You would have outstripped the insurance.

MR. FREDERICKS:  Exactly.

THE COURT:  At this stage it's probably insurance driven I would think.

MR. FREDERICKS:  I don't want to speak to the

O7H3OATC

company's motivations, but we had sustained an initial dismissal. The company was not in great shape.

THE COURT: You didn't explore that issue.

MR. FREDERICKS: I think that as in all cases we try to look at the case holistically.

THE COURT: But you didn't get discovery about insurance. You didn't pursue that.

MR. FREDERICKS: Well, we would have had to have gotten past the motion to dismiss.

THE COURT: Right. This was settled in the context of a motion to dismiss the third amended complaint.

MR. FREDERICKS: That is correct, your Honor. And counsel --

THE COURT: You received the defendant's briefs and settled before you filed your own briefs.

MR. LIEBERMAN: I would correct that. We had filed the third amended complaint, and then we engaged in mediation before the defendants had filed their motion to dismiss. Although we had extensive motion to dismiss briefing on the second amended complaint. And while we thought that the third amended complaint had addressed the arguments raised by defendant, I don't know if they had anything new. We also had extensive mediation briefing which would be sort of a motion to dismiss where both sides previewed their motions to dismiss arguments. So we think we understood their position on the

O7H3OATC

motion to dismiss that would have been filed had the case not settled.

THE COURT:  Right.  You're correct.  No motion was made.  The third amended complaint was filed on August 11, 2023.  And the briefing schedule was set and then you told me about mediation.

MR. LIEBERMAN:  Thank you, your Honor.

THE COURT:  Okay.  Anything else?

All right.  I approve the settlement as fair, reasonable, and adequate in the circumstances presented.  This case went through several iterations of pleadings.  There were two -- there were one or two orders of dismissal?

MR. LIEBERMAN:  There were technically two, your Honor.  When the case was first filed, the Court sua sponte dismissed one of the complaints, and then there was one motion to dismiss.

THE COURT:  That was argued and then I filed an order following the rulings in the transcript.

So this case was settled when the pleadings were not yet completed, and when there was a good chance that the pleadings would never be completed, and a motion to dismiss would have been granted.  The ability to adequately plead misrepresentations under the '33 Act was found to be extremely difficult, and there were other risks in the case.  And in the context of those risks, and the context of a settlement by an

O7H3OATC

outside mediator, on the basis of the mediator's proposal for settlement, I can't say that it was not fair, reasonable, and adequate in the circumstances.

The adequacy of the plaintiffs and plaintiffs' counsel was there. Unfortunately, the merits couldn't be changed, but these are experienced counsel, who knew what they were doing. I did not appreciate the length, the prolixity, and the rhetorical nature of the proceedings. I let you know that. And I think it could have been decided at the outset whether this case was worth exploring or not. But you did explore it, you did pursue it, and you got a settlement. That was clearly better than no settlement at all. No one else was suing. So the settlement was arm's length. Defendant strongly resisted with two very good motions. And a mediator was necessary to bring you together. So there was arm's length dealing.

The risks of establishing liability at trial, the risks of establishing damages at a trial, and the very substantial costs of litigation all support the reasons for settlement. The allocation method has been very intensively explored at the preliminary conference. It's been fixed up and I believe it's reasonable and adequate.

I'll deal with the issue of attorneys' fees later today. There is equitable treatment by the members of the class. There have been no objections, are there?

MR. LIEBERMAN:  There have been no objections.

O7H3OATC

THE COURT: No objections. The plaintiffs have had sufficient information to make an informed decision regarding the settlement. The notice was hammered out with my review. Notice was adequate. There was a very serious issue about defendant's ability to withstand the ability of a large judgment, also speaking to the reasonableness of the settlement. And taking everything, the plan of allocation is fair and adequate, taking everything into consideration, I approve the settlement.

Now, the only thing left is attorneys' fees. So let's talk about that now. I have two applications essentially, one from Mr. Fredericks' firm, and one from Mr. Capeci's firm.

First tell me how much do you want separately or together?

MR. LIEBERMAN: So, your Honor, it's one application for fees and expenses. So the fees sought would be a percentage of the recovery which is standard in this jurisdiction.

THE COURT: You want 30 percent.

MR. LIEBERMAN: We are requesting 30 percent.

THE COURT: Which would be a fee of $2,775,000.

MR. LIEBERMAN: Yes, your Honor.

THE COURT: Higher than the lodestar of $2,197,595. I have trouble with that kind of fee in relationship to a settlement based on a case did not advance beyond pleadings.

O7H3OATC

And although $9,250,000 is better than nothing, compared to what would have been achievable by trying this case or at least going through discovery, does not point to an excellent settlement. It points to a reasonable settlement. So the fees should be reasonable. And I think 30 percent in the context is much too high.

MR. LIEBERMAN: Well, your Honor, I think a couple of responses to that. We begin with the lists of risks that the Court just articulated in approving the settlement. And how this was a case that, what I would say had some warts.

THE COURT: You knew that at the outset. I mean, you knew that before you began, because you had to confront that when you did your pleadings.

MR. LIEBERMAN: I think to the extent that that is true, your Honor, we had to understand the case when we brought it. We thought it was not -- this is certainly not Enron 2.0. We thought it was a viable case and we pursued it diligently. And we got what we think is a very good result under the circumstances of this case.

And I think if you look at the lodestar multiplier here, your Honor, the fee that we're seeking, the 30 percent is roughly 1.26 the actual lodestar. So this is not a case where we're making a tremendous amount of money.

THE COURT: You're making a good deal of money. Your rates are not modest at all.

O7H3OATC

Let's explore the lodestar. So your firm had roughly 1,700 hours, according to your records. In time, $1,636,988. Of that number of hours, 1695, 1165 hours were partners' hours, 530 were associates, of a ratio of 69 percent to 31 percent partner to associate. That's much too high.

MR. LIEBERMAN: Your Honor, I think that this is a little bit self-aggrandizing for myself, but I was an associate when I was on this case and worked most of those hours. And I became a partner on January 1st. So under the Second Circuit law, we can bill me out at my current rate and my current title because I'm now a partner.

But, with the exception of the preliminary approval work that I did, the first part of this year when I was a partner, all of those other hours would have been associate hours. And I think that if we were to go back and recalculate it, that the number would switch.

THE COURT: Well, it would be less. It would be substantially less. So the ratio would be better, but it still would be overloaded.

Mr. Fredericks put in almost 300 hours, 297 hours. He's billing at $1900 an hour. That's pretty high.

MR. LIEBERMAN: I would agree with you that $1900 an hour is a large amount to an average person. But if you were to look at fees charged in this district, by comparable counsel, they would be at that rate, if not higher.

O7H3OATC

I can give you a benchmark, your Honor. I think my current rate is $795. When I was a seventh year associate at Sullivan & Cromwell, my hourly rate was $1200.

THE COURT: You don't have the overhead of Sullivan & Cromwell. And these are rates that are given leading to amounts that are awarded by courts, and it's different than having rates determined with clients.

And it's not a comparable fee. Mr. Gusikoff of Robbins Geller has a rate of $1200 an hour. Mr. Rudman, who did only seven hours in the case, has a rate of $1400 an hour. I'm sure Mr. Fredericks is an excellent attorney and I know he is because he's been here. But $1900 is a bit much when you're looking for an award from the Court.

MR. LIEBERMAN: Well, your Honor, I would say that Ms. Gusikoff is based out of San Diego, so her rate may be the prevailing rate in San Diego. Mr. Rudman's office is outside of New York City. Whereas Mr. Fredericks works in New York City and is a lawyer in New York City. And the Second Circuit's opinion in the case that is now escaping me indicates that the Court should look at the prevailing rate for legal services in the market where the case is brought.

THE COURT: So that would justify a higher fee for Mr. Rudman and Ms. Gusikoff.

I'm not, look, there is no science in what I'm saying. I'm pointing out that I think the lodestar is too high as well.

O7H3OATC

And so, when you say that it's only a 1.26 multiplier, the base for the multiplier is too high.  It's too high because it was not a proper ratio of partner to client neither in your firm nor in the Robbins Geller firm.  And the rates that are charged by Robbins Geller are more in line with the rates that one should expect with someone looking to get fees from the Court than those opposed to here.  So I'm not prepared to give you the lodestar.

MR. LIEBERMAN:  Well, your Honor, I would note if you were to decrease the hourly rates, say by a third, or even more, you would still get a multiplier well within the range that is acceptable in courts in this jurisdiction which routinely award a three X or four X multiplier on lodestar.

THE COURT:  Robbins Geller was counsel in the *American Capital* case.

MR. CAPECI:  Yes, that's correct.

THE COURT:  You did an extraordinary job in that case.

MR. CAPECI:  I'm sorry?

THE COURT:  You did an extraordinary job on that case.

MR. CAPECI:  Thank you.  It wasn't me personally, but my colleagues appreciate that, your Honor, I do believe.

THE COURT:  I gave you a very good fee in that case, if I remember correctly.

MR. CAPECI:  Yes.  You had looked at Robbins Geller's rates at that time.  If I could, I want to talk very briefly

about your point about the partner versus associate time. We feel that we were trying to be as diligent as possible in terms of prosecuting this case, given the early posture in which we were set to go to mediation. We purposely did not include an associate. The associate time for Robbins Geller was for an individual who assisted with the state action prior to the stay that was imposed by Justice Borrok. We could have but we chose not to have an associate be engaged in the process.

Part of putting together the third amended complaint and settlement process instead you had me and Ms. Gusikoff who specializes in the settlement space.

Lodestar in this case was done with an eye toward how we know your Honor wants to see these cases be prosecuted. Mr. Rudman and some of the other folks you mentioned from my firm had very limited hours. These were in connection with the mediation. I'm happy to explain any of the other items should it help the Court with its decision.

THE COURT: You had a 64 ratio which is to be expected because of the mediation.

I don't think a good job was done in the complaint. I expressed my views with the complaint. So I think a lot of hours were put into it that were not useful and the result was not a useful result and I have to allow for it.

And I think I've stated my comments with regard to attorneys and hours.

With regard to the expenses of Scott & Scott, having a company that read SEC filings and help people prepare the complaint, why isn't that part of your capital structure?  It's your business to read SEC complaints and do that.  This is not an expense incurred in the litigation.  It is an expense incurred to prepare for this litigation just as you prepare for all other litigations.  That's my comment as I see it.

MR. LIEBERMAN:  Well, your Honor, I think that in this case, we brought in the accountants to help analyze Oatly's financial records and sort of accounting practices to prepare the second amended complaint which had allegations related to both of those two issues.  And so we needed -- we wanted to make sure we were articulating them correctly and truthfully. So we hired experts to help us with that.

THE COURT:  I believe that that should be part of your capital, your capital invested in your business.  We have a $2,730 expense for transportation hotels and meals.  You are a New York attorney.  There was no discovery.  How could you expend that kind of money?

MR. LIEBERMAN:  Those expenses are for me, your Honor, because I'm located in our firm's Connecticut office.  So it's for me to travel here and attend these hearings.

THE COURT:  I don't believe that transportation for an attorney outside of this district is necessary.  If you choose to do that, it shouldn't be an expense that is subject to be

O7H3OATC

allowance by the Court.

I notice that Robbins Geller did not charge, only charged $123.

Then you have a $6,000 expense for online legal and financial research when there was no really important legal issue here you didn't really experience time and time and time again in your other work.

MR. LIEBERMAN:  Well, your Honor, we had significant briefing on the motion to dismiss which required legal research as well as mediation briefing that the parties exchanged required legal research.  And unfortunately, Westlaw is very expensive.

THE COURT:  I understand it's very expensive.  But I understand also what kinds of issues are involved in this case.  And it's not something you haven't done over and over and over again.

There is no science as I said before.  To cut to the chase, I think a fee inclusive of expenses of $1,750,000 would be adequate.

MR. FREDERICKS:  Your Honor, I appreciate the Court's discretion and have of course listened to your Honor's comments.

Let me speak as a more senior member of Scott & Scott in terms of just business dynamics.  It's unfair to have my junior partners speak to that.

O7H3OATC

But, I will just say that from the perspective of trying to run a plaintiffs' firm, which is capable of taking on some of the best lawyers in the world who are here in Manhattan, we're very fortunate to have Mr. Lieberman with my firm. We got him from Sullivan & Cromwell. We need more men and women like Mr. Lieberman at our firm and the plaintiffs' bar.

But, the rate structures that big law provide here in New York make it very difficult to compete to get that kind of talent. We operate on a contingent fee basis. The $1900 rate I will say is not a rate that I set myself. It's set by the firm. But the law firms that we go against, their lawyers are paid $1900 and up on a non-contingent basis. They get paid whether they win or lose.

I don't mean to wax too much on this. But we took the case. Every case requires effort. We take every case we bring seriously. It takes time. I had 300 hours in the case. We had the complaint, we had a further version of the complaint, we had a third version of the complaint, we had motions to dismiss, we had the mediation, we worked on the settlement. Mr. Reckler and his firm are formidable adversaries. And I would just say that I respectfully request, your Honor, that recognizing that we operate on a contingent fee basis, recognizing that 25 percent, actually 30 percent fee is the benchmark.

O7H3OATC

THE COURT:  It's not.

MR. FREDERICKS:  I understand.  But, I think not to at least be awarded at our lodestar.  I understand, your Honor, but I did just want to say that, you know, we have to compete with these folks, we have to operate on a contingent fee basis, we wish every case were a winner and brought in a large number.  But, again, with respect, I just wanted to make those comments.  I've had the pleasure of being in front of your Honor 20 years ago, it is a pleasure to be in front of your Honor today.  I just hope the fact that my --

THE COURT:  Let me ask you a question.  You heard my attitudes about this case today and previously.  Assuming I don't think you should get your lodestar, and assuming I want to include expenses into the one figure, to be inclusive of fees, expense and the like, what number should I give you?

MR. FREDERICKS:  Your Honor, I think that we put in the fee request that we thought was appropriate.  I think we all understand that that's not a fee that you are comfortable with.  You proposed 1.75.  I would respectfully suggest or request very respectfully that there is a number that's higher than 1.75 and lower than 2.775 that would be appropriate here.  But it's your Honor's call.  I can only make the suggestion as respectfully as I could.

THE COURT:  The fee inclusive of expense will be $2 million.  Fine?

O7H3OATC

MR. FREDERICKS:  Your Honor, I know when we have a negotiation, we had a negotiation with defendants.  I don't -- this is not a negotiation.  I appreciate your Honor's comments.

THE COURT:  Fee inclusive of expense will be $2 million.  I'm ready to sign the documents.

MR. LIEBERMAN:  I have copies.

THE COURT:  Does anything change in the order and final judgment?  Any blanks to fill in?

MR. LIEBERMAN:  I don't believe so, your Honor.  I think the order and final judgment you just need to sign.  And the same thing for the proposed order appointing or approving the plan of allocation.

THE COURT:  The order and final judgment has been signed and will be filed.

MR. LIEBERMAN:  The one thing we have not discussed yet today are the --

THE COURT:  The order approving the plan of allocation has been signed and will be filed.  Yes.

MR. LIEBERMAN:  Is the four plaintiffs' request for PSLRA awards.

THE COURT:  I approved $3500 each.

MR. LIEBERMAN:  Thank you, your Honor.

THE COURT:  I've signed the order awarding attorneys' fees, etc., with changes which now will be exhibited to counsel.

O7H3OATC

MR. FREDERICKS:  Your Honor, if I may just address one item which wasn't discussed in colloquy or argument.

I notice that your Honor wants no portion of the fees or expenses paid until the distribution to the class.  We understand that you are not unique amongst judges in having some holdback provision, but in our experience, usually it's a holdback of just --

THE COURT:  It is my strong policy, Mr. Fredericks, and I've done this in every settlement that I've approved.  I do it because lawyers should not be paid before the clients are paid as a matter of principle.  And secondly, because this gives you a very strong incentive to get the money out to the people who deserve it quickly.

MR. FREDERICKS:  Again, I understand your position. If it's something that the Court consistently does, again in our experience, we're used to having a holdback but not 100 percent holdback.  And the Court does have an order for us to comply with getting claims out which we plan to comply with. I would just respectfully submit to the Court that I think we're plenty incentivized to get the claims distributed to the class if the holdback were only, let's say, 50 percent.

THE COURT:  I've done this in every case.  Mr. Capeci, did I do it in *American Capital*?

MR. CAPECI:  Your Honor, I did not look at that aspect of *American Capital* in preparing for today.  What I will say is

O7H3OATC

that the most recent settlement I had just down the hall I think with Judge Rakoff was 50-50 on approval of the settlement and first distribution.

MR. FREDERICKS:  I guess I'd say we'll all look at *American Capital*, and if that's what the rule is, that's fine. If it was 50-50 in *American Capital*, would your Honor be willing to give us the same terms in that case, if the terms were different?  That's all I would ask.  But, we'll live obviously of course with your decision.

Your Honor, let me withdraw the request.

THE COURT:  The lawyers have to wait.  If they're getting money out of the settlement fund, they should not before the clients' benefit.

MR. FREDERICKS:  Thank you.

THE COURT:  Thank you.

Look, I will part with a different comment.  The securities laws depend on private law enforcement for the integrity of the system, so what you do is socially important, important to the bar, important to society, and I applaud those efforts.  At the same time it's my job to look for ways to economize and to award efficiency and to create a deterrent to what I think is inefficiency.

It is no easy task for a judge to work with pleadings as prolix and redundant and rhetorical as I've seen in this case and in so many others.  And if anything as a final message

O7H3OATC

I would like to give to you is to come in with less rhetoric and more pointed allegations.  And the security laws require a lot more disclosure than when I started practice.  And you have substantial difficulties even when spotting that something is wrong in creating a pleading.  But you do not help yourself with all the rhetoric.  We read past it and it is a burden to us and it doesn't help you.  We're looking for the adequacy of pleadings in light of the securities laws and the rhetoric doesn't help you.  It gets in the way.

I would urge you to come in with pleadings that are much more useful to judges.  You're no different than anybody else.  We're all the same.  And I don't know what you're trying to prove by the complaint.  The only people who read the complaint is the lawyers who wrote it and the lawyers who have to deal with it and the judges.  Okay, folks, thanks.

MR. FREDERICKS:  Thank you, your Honor.

MR. LIEBERMAN:  Thank you, your Honor.

MR. RECKLER:  Thank you, your Honor.

(Adjourned)